# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
|  | ) |
|  | ) |
| v. | ) Case No. 1:21-cr-00216-JDB |
|  | ) |
|  | ) **District Judge John D. Bates** |
| LEO BRENT BOZELL IV, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

## DEFENDANT BOZELL'S MOTION TO DISMISS
## COUNTS ONE, THREE AND FOUR OF THE INDICTMENT

John M. Pierce
**PIERCE BAINBRIDGE P.C.**
355 S. Grand Avenue, 44th Floor
Los Angeles, CA 90071
Tel: (213) 262-9333
jpierce@piercebainbridge.com

*Counsel for Defendant Leo* Brent *Bozell IV*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................... 1

STATUTORY HISTORY AND FACTUAL BACKGROUND ..................................... 3

A.     Section 1512(c)(2)'s structure and legislative history ............................. 3

B.     Section 1752 and the U.S. Secret Service ............................................. 7

*1.*     *The legislative history of § 1752* ......................................................... 7

*2.*     *The current version § 1752* ................................................................. 9

         C.     The Indictment ............................................................. 11

ARGUMENT ........................................................................................ 11

I.     Standard for a Rule 12(b) motion to dismiss an indictment ................................. 11

II.     The Section 1512(c)(2) count should be dismissed ........................................... 12

A.     The Indictment fails to state a § 1512(c)(2) offense. ........................................ 12

         *1.*     *Congress's power of "Certification of the Electoral College vote" pursuant to 3 U.S.C. § 15 violates the express terms of the Twelfth Amendment.* ..................................................................... 12

         *2.*     *The Electoral Vote count does not involve the "due administration of justice" and is not an "Official Proceeding" before the Congress* ....................................................................... 19

         *3.*     *The government's interpretation of § 1512(c)(2) conflicts with ejusdem generis* ..................................................... 25

B.     If the government's interpretation of § 1512(c)(2) is applied, it isunconstitutionally vague as to Bozell ............................................... 29

         *1.*     *§ 1512(c)(2) does not provide fair notice that "official proceedings"includes proceedings unrelated to the administration of justice* ................................................................... 29

         *2.*     *The government's interpretation of "corruptly" fails this Circuit's Poindexter test* .......................................................... 31

C.   The rule of lenity dictates that any ambiguities in § 1512(c)(2) be resolved in Bozell's favor ............................................................... 34

D.   The novel construction principle of the Due Process Clause requires rejection of the government's interpretation, which would operate as an *ex post facto* law........................................................................... 35

E.   The Indictment's application of § 1512(c)(2) is invalid under the First Amendment, as applied to Bozell........................................................ 37

III.   The Section 1752 counts should be dismissed .................................... 40

A.   The SI fails to state an offense because only the USSS restricts areas under § 1752................................................................................................. 40

B.   If the government's interpretation of § 1752 is applied, it is unconstitutionally vague as to Bozell .................................................... 43

C.   The rule of lenity dictates that ambiguities in § 1752 be resolved in Bozell's favor ..................................................................................... 44

D.   The novel construction principle dictates against the government's interpretation, which would operate as an ex post facto law ................. 45

CONCLUSION .................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arthur Andersen LLP v. United States,*
   544 U.S. 696 (2005)..............................................................................24

*Baker v. Carr,*
   369 U.S. 186, 82 S. Ct. 691 (1962).................................16, 17, 18, 19

*Begay v. United States,*
   553 U.S. 137 (2008).........................................................27, 28, 35, 45

*Bouie v. City of Columbia,*
   378 U.S. 347 (1964).........................................................35, 36, 37, 45

*Brown v. Louisiana,*
   383 U.S. 131 (1966)..............................................................................38

*Bush v. Gore,*
   531 U.S. 98 (2000)........................................................................16, 17

*Citizens for Responsibility & Ethics in Wash. v. United*
   States, 922 F.3d 480 (D.C. Cir. 2019) ...............................................43

*City of Houston v. Hill,*
   482 U.S. 451 (1987)..............................................................................39

*Edwards v. Dist. of Columbia,*
   755 F.3d 996 (D.C. Cir. 2014) ............................................................37

*Hamling v. United States,*
   418 U.S. 87 (1974)................................................................................12

*Hoffman Estates v. Flipside, Hoffman Estates,*
   455 U.S. 489 (1982)..................................................................29, 30, 44

*Johnson v. United States,*
   576 U.S. 591 (2015)..............................................................................29

*Luther v. Borden,*
   48 U.S. 1 (1849).....................................................................................16

*Massachusetts v. Mellon,*
   262 U.S. 447 (1923)..............................................................................14

*Sessions v. Dimaya*,
    138 S. Ct. 1204 (2018) ........................................................................................29, 30

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ...................................................................................................38

*Texas v. Johnson*,
    491 U.S. 397 (1989) .............................................................................................37, 38

*Tinker v. Des Moines Ind. Comm. School. Dist.*,
    393 U.S. 503 (1969) ...................................................................................................38

*United States v. Am. Trucking Ass'ns, Inc.*,
    310 U.S. 534, 60 S. Ct. 1059, 84 L. Ed. 1345 (1940) .............................................42

*United States v. Batten*,
    226 F. Supp. 492 (D.D.C. 1964) ...............................................................................21

*United States v. Brady Knowlton*,
    21-cr-46, ECF No. 41, (D.D.C. 2021) .......................................................................24

*United States v. Bronstein*,
    849 F.3d 1101 (D.C. Cir. 2017) ................................................................................29

*United States v. Bursey*,
    416 F.3d 301 (4th Cir. 2005) ..............................................................................41, 42

*United States v. Caputo*,
    201 F. Supp. 3d 65 (D.D.C. 2016) ............................................................................38

*United States v. Dorri*,
    15 F.3d 888 (9th Cir. 1994) .......................................................................................33

*United States v. Ermoian*,
    752 F.3d 1165 (9th Cir. 2013) ......................................................................20, 21, 22

*United States v. Glenn Wes Lee Croy*,
    21-cr-162 (D.D.C. 2021) ...........................................................................................31

*United States v. Grace*,
    461 U.S. 171 (1983) ...................................................................................................38

*United States v. Granderson*,
    511 U.S. 39 (1994) ...............................................................................................35, 45

*United States v. Kanchanalak*,
    37 F. Supp. 2d 1 (D.D.C. 1999) (Friedman, J.) .......................................................33

*United States v. Kelley*,
    36 F.3d 1118 (D.C. Cir. 1994) ....................................................................21, 22

*United States v. Kelly*,
    147 F.3d 172 (2d Cir. 1998).................................................................................33

*United States v. Kevin Cordon*,
    21-cr-277 (D.D.C. 2021) ......................................................................................30

*United States v. Lanier*,
    520 U.S. 259 (1997)..............................................................................................29

*United States v. Moore*,
    613 F.2d 1029, 198 U.S. App. D.C. 296 (D.C. Cir. 1979) ...................................40

*United States v. Morrison*,
    98 F.3d 619 (D.C. Cir. 1996) ...............................................................................33

*United States v. North*,
    910 F.2d 843, 285 U.S. App. D.C. 343 (D.C. Cir. 1990), *opinion withdrawn
    and superseded in other part on reh'g*, 920 F.2d 940, 287 U.S. App. D.C. 146
    (D.C. Cir. 1990) .............................................................................................33, 34

*United States v. O'Brien*,
    391 U.S. 367 (1968)........................................................................................38, 39

*United States v. O'Connell*,
    2017 U.S. Dist. LEXIS 172491 (E.D. Wis. Sept. 5, 2017)...................................23

*United States v. Perez*,
    575 F.3d 164 (2d Cir. 2009).................................................................................22

*United States v. Poindexter*,
    951 F.2d 369 (D.C. Cir. 1991) ................................................................... *passim*

*United States v. Popkin*,
    943 F.2d 1535 (11th Cir. 1991) ...........................................................................34

*United States v. Ramos*,
    537 F.3d 439 (5th Cir. 2008) ...............................................................................22

*United States v. Reeves*,
    752 F2d 995 (5th Cir. 1985) ................................................................................34

*United States v. Rostenkowski*,
    59 F.3d 1291 (D.C. Cir. 1995) .............................................................................17

*United States v. Sutherland*,
   921 F.3d 421 (4th Cir. 2019) ........................................................................23

*United States v. Sutton*,
   732 F.2d 1483 (10th Cir. 1984) ....................................................................21

*United States v. Vixie*,
   532 F.2d 1277 (9th Cir. 1976) ......................................................................21

*United States v. Walsh*,
   194 F.3d 37 (2d Cir. 1999)............................................................................11

*United States v. William Pepe*,
   21-cr-52, ECF No. 55....................................................................................23

*United States v. Winstar Corp.*,
   518 U.S. 839 (1996)................................................................................15, 17

*Yates v. United States*,
   574 U.S. 528 (2015)........................................................................26, 27, 28

**Statutes**

3 U.S.C. § 15 ............................................................................................. *passim*

3 U.S.C. §§ 15-18 ..............................................................................................19

3 U.S.C. § 16.......................................................................................................23

18 U.S.C. § 73 ........................................................................................... *passim*

18 U.S.C. § 924..................................................................................................27

18 U.S.C. § 1505 ....................................................................................... *passim*

18 U.S.C. § 1512 ....................................................................................... *passim*

18 U.S.C. § 1752 ....................................................................................... *passim*

18 U.S.C. § 3056 ....................................................................................... *passim*

40 U.S.C. § 5104................................................................................................28

**Federal Rules**

Fed. R. Civ. P. 12........................................................................................11, 12

Fed. R. Crim. P. 7 ..............................................................................................11

## Legislation

116 Cong. Rec. 35,651 (1970) (statement of Sen. McClellan) ........................................8

116 Cong. Rec. 35,653 (statement of Sen. Hruska) ........................................................8

148 Cong. Rec. S6542 (daily ed. July 10, 2002) .............................................................5

167 Cong. Rec. H77 (Jan. 6, 2021) .................................................................................25

R. Rep. No. 1143, 76th Cong., 1st Sess. 1 (1939) ...........................................................6

S. 2010, 107th Cong. (2002) ...........................................................................................5

S. Rep. No. 91-1252 (1970) ...............................................................................7, 42, 43

S. Rep. No. 107-146 (2002) .............................................................................................5

S. Rep. No. 1135, 76th Cong., 1st Sess. 1 (1939) ...........................................................6

U.S. Const. amend I .............................................................................................30, 37, 44

## Other Authorities

31 C.F.R. §§ 408.1-408.3 ................................................................................................8

*Authority of the Secretary of the Treasury to Order the Closing of Certain Streets Located Along the Perimeter of the White House*, 19 Op. Off. Legal Counsel 109 (1995) ................................................................................................................43

Black's Law Dictionary 1241 (8th ed. 2004) ...............................................................20

*Congress Sowed the Seeds of Jan. 6 in 1887: the Electoral Vote Count Act lets Congress think it can choose the President, but it's unconstitutional*, Judge J. Michael Luttig and David B. Rivkin, Jr., Wall Street Journal, Mar. 18, 2021 ..........18

DOJ Resource Manual, § 1730 .....................................................................................22

*Is the Electoral Count Act Unconstitutional?*, Vasan Kesavan, 80 N.C.L. Rev. 1653  (2002) .................................................................................................................15

Kesavan, 80 N.C.L. Rev. 1653, 1793 ...........................................................................17

Ltr. of Vice President Mike Pence, Jan. 6, 2021 ..........................................................19

National Special Security Events: Fact Sheet,  Congressional Research Service (Jan. 11, 2021) ......................................................................................................10

Omnibus Crime Control Act of 1970. Public Law 91-644, Title V, Sec. 18, 84
    Stat. 1891-92 (Jan. 2, 1971) ..................................................................................7

Sabanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 ...................................4

U.S. Const. Art. I, § 5, cl. 2.................................................................................2, 15, 19

United States Capitol Police: Our Mission, available at: https://www.uscp.gov..........................10

USSG §2J1.2................................................................................................................24

Defendant Leo Brent Bozell IV, through his counsel, files this second motion to dismiss Counts One, Three and Four of the Indictment, pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure.

## INTRODUCTION

The Indictment charges that, on January 6, 2021, Bozell unlawfully entered a "restricted area" at the Capitol in violation of 18 U.S.C. § 1752(a)(1)(**Counts Three and Four**).   In connection therewith he "corruptly obstructed" an "official proceeding," i.e., "Congress's certification of the Electoral College Vote," in violation of 18 U.S.C. § 1512(c)(2)(**Count One**).

The legal theories on which those charges rest are the result of dubious craftsmanship whereby DOJ attorneys were tasked to find bases to transform traditional misdemeanor offenses for unlawful political protests into novel felonies under expansive readings of criminal statutes never before employed for that purpose.  This was done at the expense of statutory text, case law, and legislative history.

The gambit – that the public will care less about the legalities of the day given the subject matter of the protest than they do when protests concern, for example, environmental or regulatory causes.  Public pressure resting on cries of "insurrection" and "threat to democracy" could motivate courts to go along – at least at the start while public opinion is being shaped by political interests inside various governmental institutions.

But the courts should not go along and should dismiss these charges as misapplications of federal criminal law for ulterior political motives.

**Section 1512(c)(2).**  To the extent the government theory rests on the claim that Bozell intended to "corruptly obstruct" the proceedings taking place inside the Capitol on January 6 pursuant to 3 U.S.C. § 15, the "Electoral Vote Act", the theory rests upon infirm constitutional

1

grounds.  Section 15 violates the express provisions of the Twelfth Amendment to the United States Constitution, with Congress having granted to itself the power to alter the outcome of Presidential elections in a manner not consistent with the process expressly set forth in the Twelfth Amendment.  Neither "certify" nor "certification" by Congress appear anywhere in the text of the Twelfth Amendment.

The government's obstruction theory also distorts the plain meaning of Section 1512(c) in several ways.  First, every circuit to address the issue has construed the statute's phrase "official proceeding" to mean one with a truth-seeking function carrying the threat of a penalty, i.e., administering justice.  That is why the Department of Justice's handbook for prosecutors instructs that Section 1512's "official proceeding" is no different from the "proceeding" found in Section 1505, which limits obstruction-of-Congress offenses to congressional inquiries or investigations. It is why, before January 6, the DOJ stipulated in court the synonymity between "proceedings" under Sections 1512 and 1505.  Because the government concedes that the joint session of Congress on January 6 was not an inquiry or investigation, its Section 1512(c) charge must be dismissed.  It must also be dismissed as its argument requires the Court first to resolve a political question: what are the constitutionally proper procedures for certifying Electoral College votes, a question reserved for Congress under the Rulemaking Clause.  U.S. Const. Art. I, § 5, cl. 2.  Courts say what the law is but only Congress says what its parliamentary rules are.

Second, by taking the traditional parading-in-Congress misdemeanor offense and claiming it now constitutes felony "obstruction of justice" under the financial and audit reforms of the Sarbanes-Oxley Act of 2002, the government's interpretation of Section 1512(c)'s "residual clause" conflicts with the canon of *ejusdem generis*.  Unless Section 1512(c)(2) is to swallow the rest of Chapter 73 (and Title 40), it must be cabined to actions directed at undermining a

proceeding's truth-finding function by impairing the integrity and availability of evidence.  That standard is not satisfied by the allegation that Bozell merely entered the Capitol.

Third, the government's interpretation of Section 1512's adverbial "corruptly" element is flawed under any of the formulas it offers.  Its theory is that "corruptly" means nothing more than "wrongfully." Decades ago, the D.C. Circuit found that construction unconstitutionally vague.  It still is.

**Section 1752.**  Since 1970, Section 1752 has criminalized the unlawful entry into areas restricted for the protection of U.S. Secret Service (USSS) protectees.  Statutory text, legislative history, and common sense all point to the conclusion that the sole agency that restricts such areas is the one that guards them, i.e., the USSS.  An opinion by DOJ's Office of Legal Counsel agrees. But here, the government contends that any federal or state entity may criminalize a person's movements under federal law.  It alleges that Bozell violated § 1752 because the Capitol was visibly restricted by the USCP.  But the USCP do not guard the USSS protectees identified in § 1752; they protect members of Congress, who are neither guarded by the USSS nor covered by § 1752.

On all these grounds, the Court should dismiss Counts One, Three, and Four of the SI.

## STATUTORY HISTORY AND FACTUAL BACKGROUND

### A.    Section 1512(c)(2)'s structure and legislative history

Section 1512(c) provides: "Whoever corruptly—

    (1)    alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

    (2)    otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so . . . shall be fined . . . or imprisoned. . .

§ 1512(c).

Section 1515 defines the term "official proceeding" as used in Section 1512(c).  "[T]he term 'official proceeding' means—

(A)     a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;

(B)     a proceeding before the Congress;

(C)     a proceeding before a Federal Government agency which is authorized by law; or

(D)     a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce;

§ 1515(a)(1).

Section 1515 also defines the term "corruptly"—but only for obstruction offenses charged "in section 1505." § 1515(b).  Before this definition was added, the D.C. Circuit had determined that § 1505's adverb "corruptly" was unconstitutionally vague.  *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991).  Congress subsequently amended § 1515 to provide,

> *As used in section 1505*, the term "corruptly" means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information.

§ 1515(b) (emphasis added).

Section 1512(c)(2) was enacted as part of the Sarbanes-Oxley Act of 2002 (SOX).  SOX was "[a]n Act to protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to securities laws, and for other purposes." Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745.  As the previous U.S. attorney general described it, SOX "was prompted by Enron's massive accounting fraud and revelations that the company's outside auditor, Arthur Andersen, had systematically destroyed potentially incriminating documents." Mem. of

4

William P. Barr, dated June 8, 2018 ("Barr Mem."), p. 5, available at: https://bit.ly/2RYVZ47.

Upon a review of the statute's legislative history, the former attorney general concluded that the

plain purpose of § 1512(c)(2) was a "loophole closer meant to address the fact that the existing

section 1512(b) covers document destruction only where a defendant has induced another person

to do it and does not address document destruction carried out by a defendant directly." *Id.*

The legislative history supports the former attorney general's interpretation of §

1512(c)(2)'s purpose.   A Senate Judiciary Committee report described SOX's purpose as

"provid[ing] for criminal prosecution and enhanced penalties of persons who defraud investors in

publicly traded securities or alter or destroy evidence in certain Federal investigations." S. Rep.

No. 107-146, at 2 (2002).   The report states that the Corporate Fraud Accountability Act was

designed to "clarify and close loopholes in the existing criminal laws relating to the destruction or

fabrication of evidence and the preservation of financial and audit records." S. Rep. No. 107-146,

at 14-15.   Section 1512(c) did not exist as part of the original proposal.   S. 2010, 107th Cong.

(2002).   Rather, Senator Trent Lott introduced it as an amendment in July 2002.   148 Cong. Rec.

S6542 (daily ed. July 10, 2002).   The senator explained the purpose of adding § 1512(c):

> [This section] would enact stronger laws against *document shredding*.   Current law prohibits obstruction of justice by a defendant acting alone, but only if a proceeding is pending and a subpoena has been issued for the evidence that has been destroyed or altered . . . [T]his section would allow the government to charge obstruction against individuals who acted alone, even if the tampering took place prior to the issuance of a grand jury subpoena.

*Id.* at S6545 (emphasis added).

Senator Orin Hatch explained that § 1512(c) would "close [] [the] loophole" created by the

available obstruction statutes and hold criminally liable a person who, acting alone, destroys

documents. *Id.*   As the former attorney generally summarized this history, "The legislative history

thus confirms that § 1512(c) was not intended as a sweeping provision supplanting wide swathes of obstruction law, but rather as a targeted gap-filler designed to strengthen prohibitions on the impairment of evidence." Barr Mem., p. 6.

Unlike § 1512(c), Section 1505 concerns obstruction of congressional proceedings "by threats or force." It provides criminal penalties for:

> Whoever corruptly, or by threats or force . . . influences, obstructs, or impedes . . . the due and proper exercise of *the power of inquiry* under which *any inquiry or investigation* is being had by either House, or any committee of either House or any joint committee of the Congress—

§ 1505 (emphasis added).

The italicized portions of that section show that Congress limited the obstruction-of-Congress offense to a specific kind of congressional "proceeding": those pursuant to Congress's "power of inquiry," which are "inquir[ies] or investigation[s]." § 1505. The legislative history of § 1505 shows that it was designed to prevent obstruction of only those proceedings held pursuant to Congress's investigative power. *Poindexter*, 951 F.2d at 380-81. Section 241, the predecessor of § 1505, was passed in 1940 to bar witness tampering before Congress. As the D.C. Circuit summarized the legislative history: "The Senate and House Reports and the floor debates concerning [§ 1505's predecessor] . . . state that the 'proposed legislation simply extends the protection now provided by law for witnesses in Court proceedings to witnesses in proceedings before either House of Congress or committees of either House (or joint committees).'" 951 F.2d at 381 (quoting R. Rep. No. 1143, 76th Cong., 1st Sess. 1 (1939); S. Rep. No. 1135, 76th Cong., 1st Sess. 1 (1939)).

**B.**     **Section 1752 and the U.S. Secret Service**

*1.*     *The legislative history of § 1752*

Congress enacted 18 U.S.C. § 1752 as part of the Omnibus Crime Control Act of 1970.
Public Law 91-644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan. 2, 1971).  At the time, the USSS was
part of the Treasury Department.

Later Congresses would amend Section 1752, but like its current iteration, the 1970 statute
provided that it was "unlawful for any person . . . (1) willfully and knowingly to enter or remain
in . . . (ii) any posted, cordoned off, or otherwise restricted area of a building or grounds where the
President is or will be temporarily visiting. . ." 84 Stat. 1891-92. The statute made clear which
entity "prescribed regulations" governing the "posted, cordoned off, or otherwise restricted areas
where the President is or will be temporarily visiting": the Treasury Department, of which the
USSS was then part. § 1752(d)(2); 84 Stat. 1892.

In 1969, Senators Roman Lee Hruska and James Eastland designed S. 2896, which would
later be codified at § 1752.  The very purpose of the bill was to give the Secret Service the power
to restrict areas for temporary visits by the president, a power which no other federal agency then
possessed.  S. Rep. No. 91-1252 (1970).  The Senate Judiciary Committee report accompanying
S. 2896 made clear that in 1970, "[a]lthough the Secret Service [was] charged with protecting the
person of the President . . . there [was], at the present time, no Federal statute which specifically
authorize[d] *them to restrict entry to areas* where the President maintains temporary residences or
offices." S. Rep. No. 91-1252, at 7 (emphasis added).

Similarly, during floor debate on the bill, senators explained that the key purpose of the
legislation that would become § 1752 was to vest the Secret Service in particular with the authority
to set restricted areas, cutting through the patchwork of existing State laws and local ordinances

and freeing the Secret Service from reliance on other government agencies. Explaining the need

for S. 2896, Senator McClellan stated:

> Protecting the President . . . is a formidable task for the Secret Service, which is charged with safeguarding the personal life of the President.  As difficult as this task is, however, it is rendered even more difficult because the Secret Service's present powers are somewhat limited.  Title 18, section 3056 of the United States Code authorizes the Secret Service to protect the life of the President, but does little more.  *Consequently, the Service must rely upon a patchwork of State laws and local ordinances and local officers to clear areas for security perimeters, to provide for free ingress and egress when the President is visiting, and to protect the President's private homes from trespassers.*

116 Cong. Rec. 35,651 (1970) (statement of Sen. McClellan) (emphasis added).

Similarly, Senator Hruska explained that S. 2896 was needed to empower the Secret

Service to set restricted areas:

> It would be unconscionable not to recognize the obvious fact that the President's vulnerability is maximized when he is traveling or residing temporarily in another section of the country.  It would be unconscionable not to recognize the obvious fact that *the Secret Service does not presently possess adequate Federal authority during these most vulnerable occasions.*  This body cannot ignore the obvious responsibility and duty it has at this moment to *create the needed* protection and *authority.*

116 Cong. Rec. 35,653 (statement of Sen. Hruska) (emphasis added).

Following enactment, Treasury promulgated regulations governing restricted areas under

§ 1752 in Chapter IV, part 408 of title 31 of the Code of Federal Regulations.  31 C.F.R. §§ 408.1-

408.3.  Section 408.1 stated that "the regulations governing access to such restricted areas where

the President or any other person protected by the Secret Service is or will be temporarily visiting

are promulgated pursuant to the authority vested in the Secretary of the Treasury by 18 U.S.C. §

1752." 31 C.F.R. § 408.1.  Part 408 provided many examples of the USSS, and no other agency,

exercising its power under § 1752 to set and define restricted areas.  § 408.2(a)-(c).  As for gaining

8

lawful access to areas restricted under § 1752, Part 408 was clear that authorization must be obtained from the Secret Service. § 408.3. No other federal agency was mentioned in Part 408.

> ### 2.   *The current version § 1752*

In its current version, Section 1752 criminalizes "knowingly enter[ing] or remain[ing] in any restricted building or grounds without lawful authority to do so." 18 U.S.C. § 1752(a)(1). It also criminalizes,

> knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engag[ing] in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions. . .

§ 1752(a)(2).

> In turn, "restricted building or grounds" is statutorily defined. In Section 1752,

> (1) the term "restricted building or grounds" means any posted, cordoned off, or otherwise restricted area—

> (A) of the White House or its grounds, or the Vice President's official residence or its grounds;

> (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or

> (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance;

18 U.S.C. § 1752(c)(1).

The first two subparts of Section 1752(c) concern individuals protected by the USSS. In subpart (A) those individuals are the President (at the White House) and the Vice President (at his or her official residence). In subpart (B) the individual protected by the Secret Service is the President or "other person protected by the Secret Service." Members of Congress are not protected by the Secret Service. 18 U.S.C. § 3056(a) (setting forth persons USSS is "authorized to

protect").  Protection of Congressmen and Senators is the role of a separate federal agency, the United States Capitol Police.  The U.S. Capitol Police do not provide for the protection of Secret Service protectees.  *See* United States Capitol Police: Our Mission, available at: https://www.uscp.gov/; § 3056(a).

The final Section 1752(c) subpart concerns "a building or grounds so restricted in conjunction with an event designated as a special event of national significance." "Designation" in this subpart refers to a specific federal agency process.  Major federal government or public events that are nationally significant may be designated by the President—or his representative, the Secretary of the Department of Homeland Security (DHS)—as National Special Security Events (NSSE).  18 U.S.C. § 3056(e)(1).  Section 3056 designates the USSS as the lead federal agency responsible for coordinating, planning, exercising and implementing security for NSSEs. *Id.*[1]  Accordingly, all three subparts of 18 U.S.C. § 1752(c)(1) concern decision-making authority or action by the Secret Service.

Section 3056 sets forth the "Powers, authorities, and duties of United States Secret Service." 18 U.S.C. § 3056.  Subsection (d) criminalizes interfering with agents "engaged in the protective functions authorized by this section *or by section 1752 of this title*. . ." 18 U.S.C. § 3056(d) (emphasis added).  Subsection (g) stresses the independence of the Secret Service's mission.  "The United States Secret Service shall be maintained as a distinct entity within the Department of Homeland Security. . . No personnel and operational elements of the United States Secret Service shall report to an individual other than the Director of the United States Secret

---

[1] The joint session of Congress that met at the U.S. Capitol on January 6, 2021, to open, certify, and count the November 2020 presidential election votes was not designated an NSSE. National Special Security Events: Fact Sheet, Jan. 11, 2021, p. 1, Congressional Research Service, available at: https://fas.org/sgp/crs/homesec/R43522.pdf.

Service, who shall report directly to the Secretary of Homeland Security without being required to report through any other official of the Department." 18 U.S.C. § 3056(g).

### C.      The Indictment

The Indictment charges Bozell with the following offenses relevant to this Motion:

**Count One**:   corruptly obstructing, influencing, and impeding an "official proceeding," that is, a proceeding before Congress, specifically, "Congress's certification of the Electoral College vote" in violation of § 1512(c)(2).

**Counts Three and Four**: unlawfully and knowingly entering "a restricted building and grounds, that is, any posted, cordoned off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President and Vice President-elect were temporarily visiting," in violation of § 1752(a)(1), and engaging in disorderly and disruptive conduct that in fact disrupted the orderly conduct of government business while in that restricted area, in violation of § 1752(a)(2).

## ARGUMENT

### I.      Standard for a Rule 12(b) motion to dismiss an indictment

Rule 7 of the Federal Rules of Criminal Procedure provides that "the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . ." Fed. R. Crim. P. 7(c)(1).  This rule performs several constitutionally required functions, including protecting against prosecution for crimes based on evidence not presented to the grand jury, as required by the Fifth Amendment.  *See*, *e.g.*, *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999).  Rule 12 provides that a defendant may move to dismiss the pleadings on the basis of a "defect in the indictment or information," including a "lack of specificity" and a "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(iii),(v).  It also

permits such a motion on the basis of a "defect in instituting the prosecution," including "an error in the grand-jury proceeding." Fed. R. Crim. P. 12(b)(3)(A)(v). *Hamling v. United States*, 418 U.S. 87, 117-18 (1974) (an indictment must "fairly inform[] a defendant of the charge against which he must defend" and "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged").

## II.   The Section 1512(c)(2) count should be dismissed

### A.   The Indictment fails to state a § 1512(c)(2) offense.

*1.    Congress's power of "Certification of the Electoral College vote" pursuant to 3 U.S.C. § 15 violates the express terms of the Twelfth Amendment.*

The Twelfth Amendment to the United States Constitution provides the sole legitimate process for receiving and counting the votes of the Electoral College.  It does not require or suggest a "Joint Session" of Congress.  The Amendment provides, in pertinent part:

> . . . . The President of the Senate shall, <u>in the presence</u> of the Senate and House of Representatives, open all the certificates and the votes shall then be counted; the person having the greatest number of votes for President, shall be the President, if such number be a majority of the whole number of electors appointed;  [Emphasis added.]

The only reference to Congress is that the opening of "certificates" received from the individual states shall be done "in the presence of" Congress. The members of Congress are witnesses, not participants, of the procedure set forth in the Twelfth Amendment.  If a person receives a majority of the whole of all votes cast by Electors that person is President without any participation --- or "*certification*" – by the House and/or Senate to determine that fact.  The House and Senate are called into action by the Twelfth Amendment <u>only</u> if no person receives a majority of the electors' votes.

12

The process of "certifying" the Electoral College vote only appears in 3 U.S.C. Sec 15. This is part of the process Congress created for itself, granting members the authority to "object" to electoral vote "certificates" sent from each state, and then voting amongst themselves whether or not to allow some Electoral votes reflected on the certificates to be included in the final count.

This "solemn" and "formal" – and unconstitutional – process which the government relies upon to claim that Bozell "corruptly obstructed" an "official proceeding".   The language employed in the Count One of the Indictment makes this clear:

> ". . . Leo Brent Bozell IV… with others known and unknown, forcibly entered the United States Capitol to, and did, stop, delay, and hinder Congress's certification of the Electoral College vote."

The Twelfth Amendment was ratified by the required number of States in 1804.  The Twelfth Amendment itself has never been amended through the same process under Article V since 1804.

In 3 U.S.C. § 15 Congress created statutory processes and procedures for participating in the counting of Electoral College votes that are contrary to and in conflict with the Twelfth Amendment.   Congress created for itself a procedure which includes the authority to invalidate Electoral Votes received from the States and engage in a process for selecting the President and Vice-President not provided for in provisions of the Twelfth Amendment.

The express provisions of § 15 which conflict read as follows:

1.      "Upon such reading of any such certificate or paper, the President of the Senate shall call for objections, if any."

The Twelfth Amendment gives no power to the President of the Senate to call for "objections" to votes as received.  The President of the Senate is directed by the Constitution only to open the certificates received and count the votes.

13

2.     "Every objection shall be made in writing, and shall state clearly and concisely, and without argument, the ground thereof, and shall be signed by at least one Senator and one Member of the House of Representatives before the same shall be received."

The Twelfth Amendment gives no authority to Members of the House or Senate to object to Electoral Vote Certificates received.

3.     ***When all objections so made*** to any vote or paper from a State shall have been received and read, the Senate shall thereupon withdraw, and ***such objections shall be submitted to the Senate for its decision***; and ***the Speaker of the House of Representatives shall, in like manner, submit such objections to the House of Representatives for its decision***; and no electoral vote or votes from any State which shall have been regularly given by electors whose appointment has been lawfully certified to according to section 6 of this title from which but one return has been received shall be rejected, but ***the two Houses concurrently may reject the vote or votes when they agree that such vote or votes have not been so regularly given by electors whose appointment has been so certified***.  [Emphasis added.]

There is no provision of the Constitution, in the Twelfth Amendment or elsewhere, that confers upon Congress the authority to reject the casting or counting of any Electoral Votes cast by members of the Electoral College.

The procedures set forth in the § 15 continue in similar fashion for several more sentences, all equally unconstitutional as the passages highlighted above.  All are facially unconstitutional as they assign to Congress, via statute, authority on matters that are expressly governed by the Constitution.

The fact that § 15 has never before been challenged is of no import, and it is not a basis for this Court to avoid addressing such a challenge.  As Justice Sutherland wrote for a unanimous Supreme Court in *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923):

> "We have no power *per se* to review and annul acts of Congress on
> the ground that they are unconstitutional. That question may be
> considered only when the justification for some direct injury
> suffered or threatened, presenting a justiciable issue, is made to rest
> upon such an act. Then the power exercised is that of ascertaining
> and declaring the law applicable to the controversy. It amounts to
> little more than the negative power to disregard an unconstitutional
> enactment… .

This Court should not avoid this direct attack on the constitutionality of § 15 as it relates
to the express language of the Twelfth Amendment.   If § 15 is unconstitutional, then the
"certification" that Bozell is alleged to have "corruptly obstructed" was not a lawful and legitimate
"official proceeding" as contemplated by § 1512(c)(2).

The truth is that the § 15 is treated by most constitutional scholars as a so-called non-
binding internal House rule given statutory form.   That is for two reasons.   First, under the
constitutional principle of "legislative entrenchment," one legislature cannot bind a future
legislature, i.e., purport to pass legislation that a future Congress cannot amend.  *See*, *e.g.*, *United
States v. Winstar Corp.*, 518 U.S. 839, 872 (1996).   And, second, the ECA purported not only to
bind future Congresses with legislation but to do so on the subject of parliamentary procedure,
over each Congress's constitutional power to set its own rules.  U.S. Const. Art. I, § 5, cl. 2 ("each
House may determine the Rules of its Proceedings.") (the "Rulemaking Clause").   Consequently,
the ECA is generally interpreted as a hortatory House internal rule in statutory form, in order to
avoid the serious constitutional questions, it raises.  *Is the Electoral Count Act Unconstitutional?*,
Vasan Kesavan, 80 N.C.L. Rev. 1653, 1793 (2002).

The implications of the government's novel attempt to import the federal obstruction
statutes into Congress's self-governing election rules, and vice versa, are enormous.  Consider the
government's claim that one "corruptly" obstructs the Electoral College vote certification by

delaying it "wrongfully." According to the government, Democratic presidential candidate Al Gore, and everyone who facilitated his statewide recount of Florida votes during the 2000 presidential election (co-conspirators), was guilty of obstruction of an "official proceeding." They are all guilty, according to the government because (1) they attempted to delay the Electoral College vote certification by insisting on statewide recounts of ballots; and (2) they acted "wrongfully" (thus, "corruptly") because the recounts they engineered violated the Equal Protection Clause rights of voters by valuing their votes less than others.' *Bush v. Gore*, 531 U.S. 98, 104 (2000).   Or consider the members of Congress who objected on January 6 to vote certification for certain States.   They are guilty of obstruction of an "official proceeding," and they are all felons, because (1) they delayed the vote certification; and (2) they acted "wrongfully" because, after all, there was no recognized legal basis for objecting that the vote counts in those States were fraudulent to a degree overbalancing proper vote tallies.

The government's interpretation of "official proceeding" (and of "corruptly," addressed *infra*) requires the Court to first answer nonjusticiable political questions.   *See Baker v. Carr*, 369 U.S. 186, 82 S. Ct. 691 (1962); *see also Luther v. Borden*, 48 U.S. 1 (1849) (holding courts could not decide whether the defendant trespassed during an insurrection as that would first require deciding the political question whether the Royal Charter government of Rhode Island satisfied the Constitution's republican form of government guarantee).   The political question doctrine is a facet of the separation of powers.   Under *Baker*, "an issue is non-justiciable if 'prominent on the surface' of that issue one finds:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion . . .

*United States v. Rostenkowski*, 59 F.3d 1291, 1304 (D.C. Cir. 1995) (quoting *Baker*, 369 U.S. at 217).

The D.C. Circuit has paid close attention to the political question doctrine in cases where criminal prosecutions turn on interpretation of ambiguous House rules.  "[T]he Rulemaking Clause of Article I clearly reserve to each House of the Congress the authority to make its own rules and judicial interpretation of an ambiguous House Rule runs the risk of the court intruding into the sphere of influence reserved to the legislative branch under the Constitution." *Rostenkowski*, 49 F.3d at 1306.  Added the D.C. Circuit, where "a court cannot be confident that its interpretation is correct, there is too great a chance that it will interpret the Rule differently than would the Congress itself; in that circumstance, the court would effectively be making the Rules—a power that the Rulemaking Clause reserved to each House alone." *Id.*

As noted, the ECA is treated as a non-binding internal House rule given statutory form, to avoid constitutional conflict with the Rulemaking Clause and the legislative anti-entrenchment principle.  *Winstar Corp.*, 518 U.S. at 872; Kesavan, 80 N.C.L. Rev. 1653, 1793.  Moreover, as certain Justices and many legal observers have noted over the years, the ECA's legislative history is littered with indications that Congress did not intend for any role for federal courts in the interpretation of the ECA.  *See*, *e.g.*, *Gore*, 531 U.S. at 153-54 (noting that the ECA's legislative history "makes clear its intent to commit the power to resolve disputes [about the meaning of ECA] to Congress," citing House reports and congressional record) (Breyer, J., dissenting).

Yet, here, the government relies, almost exclusively, on this Court imposing a judicial gloss on the ECA's notoriously opaque House procedures, in order to establish an "official proceeding" under Section 1512.  SI, Count One.  It also relies on this Court to define Congress's constitutional powers and duties concerning the Electoral College vote count under the Twelfth Amendment— an amendment so vague that Congress felt prompted to enact the (no less vague) ECA after the

17

scandals of the Presidential election of 1876. *Congress Sowed the Seeds of Jan. 6 in 1887: the Electoral Vote Count Act lets Congress think it can choose the President, but it's unconstitutional*, Judge J. Michael Luttig and David B. Rivkin, Jr., Wall Street Journal, Mar. 18, 2021, available at: https://www.wsj.com/articles/congress-sowed-the-seeds-of-jan-6-in-1887-11616086776. Judge Luttig notes that, contrary to the government's claim here that the ECA demonstrates Congress's decision-making discretion during the Electoral College vote count (which is supposed to show that it was an adjudicative-type "official proceeding"), the ECA was enacted "largely to *limit* Congress's role in determining which electoral votes to accept" (emphasis added). ECA aside, the former Fourth Circuit judge adds, "The Constitution's Electors Clause gives state legislatures plenary authority over the manner of choosing electors and relegates Congress to determining on what day the Electoral College would cast its votes. The 12th Amendment, ratified in 1804, reformed the Electoral College by providing for separate votes for president and vice president. It also reiterates the Article I, Section 1 language that the certified state electoral results are to be transmitted to Washington, opened by the president of the Senate, and counted in the presence of both congressional houses. No constitutional provision empowers Congress to resolve disputes over the validity of a state's electoral slate—or for that matter addresses who is to resolve these disputes. Significantly, the 12th Amendment gives Congress no power to enact legislation to enforce its provisions. . . ." So: it is clear why the government relies on the ECA alone to establish its adjudicative-type "official proceeding" point.

Thus, the government's "official proceeding" argument implicates the first three political question factors under *Baker*: (1) there is "a textually demonstrable constitutional commitment of the [Electoral College vote count] issue to a coordinate political department." *Baker*, 369 U.S. at 217. The authority to determine the rules of Congress's proceedings is given exclusively to

Congress under the Rulemaking Clause, not the federal courts.  U.S. Const. Art. I, § 5, cl. 2.  In any case, as Judge Luttig observes, neither the Electors Clause nor the 12th Amendment empowers Congress to resolve disputes over the validity of a state's electoral slate.  As to the vice president's constitutional role in the Electoral College vote certification, Vice President Pence himself correctly pointed out that the duties of the President of the Senate were "largely ceremonial," i.e., not "adjudicative," as the government (and former president) would have it.  Ltr. of Vice President Mike Pence, Jan. 6, 2021, available at: https://bit.ly/2WVy9s0. (2) The notoriously ambiguous ECA offers "a lack of judicially discoverable and manageable standards for resolving" the "official proceeding" question.  *Baker*, 369 U.S. at 217.  That is shown by the mismatch between the archaic ECA procedures cited by the government and all the Section 1512 case law analyzed by the parties. It is also demonstrated by the imponderables created by the government's importation of House rules into obstruction-of-justice jurisprudence, and vice versa, such as whether every person who delays the vote count "wrongfully" (a hopelessly vague political question) is a felon; and (3) it is impossible to decide the "official proceeding" question in the government's favor "without an initial policy determination" left to a coordinate political branch, *Baker*, 369 U.S. at 217, i.e., what are the procedures permissible to Congress in counting and certifying Electoral College votes under the Constitution and ECA?

2.      *The Electoral Vote count does not involve the "due administration of justice" and is not an "Official Proceeding" before the Congress*

Count One charges that Bozell attempted to, and did, obstruct, influence and impede an "official proceeding," namely, "Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and §§ 15-18." The first reason this charge fails to state an offense is that the Electoral College vote in Congress is not an "official

proceeding," as it is not one with a truth-seeking function carrying the threat of a penalty, i.e., administering justice.

Every time the government has attempted to give any Chapter 73 "proceeding" a meaning other than the business of a legal tribunal, it has failed. In *United States v. Ermoian*, 752 F.3d 1165 (9th Cir. 2013), for example, the government argued that an FBI investigation qualified as an "official proceeding" under § 1512(c). The Court will notice that an FBI investigation arguably has a greater claim to being an "official proceeding" than the Electoral College vote count, as it is at least an investigation. Yet the Ninth Circuit rejected the government's argument for the following reasons:

- Section 1512's descriptor "official" indicates a sense of formality associated with "*legal proceedings*." 752 F.3d at 1169 (emphasis added).

- The word "proceeding" in § 1515(a)(1) is "surrounded with other words that contemplate a *legal usage* of the term, including 'judge or court,' 'federal grand jury,' '*Congress*,' and 'federal government agency.'" *Id.* (emphasis added).

- Legal dictionaries define "proceeding" as "'a word much used to express the *business done in courts*.'" *Id.* (quoting Black's Law Dictionary 1241 (8th ed. 2004)) (emphasis original).

- The "use of the preposition 'before' suggests an appearance in front of [a body] *sitting as a tribunal*." *Id.* at 1171 (emphasis added).

- "Section 1512 refers to 'prevent[ing] the attendance or testimony of any person in an official proceeding'; 'prevent[ing] the production of a record, document, or other object, in an official proceeding'; and 'be[ing] absent from an official proceeding to which that person has been summoned by legal process.' 18 U.S.C. § 1512(a)(1)(A)-(B), (a)(2)(B)(iv). The use of the terms 'attendance,' 'testimony,' 'production,' and 'summon[]'" when describing an official proceeding strongly implies that some formal hearing *before a tribunal* is contemplated." *Id.* at 1172 (emphasis added).

The Court will notice that all of these points apply with equal force to Section 1515(a)(1)'s "a proceeding *before* the Congress," and that § 1512(c) refers to the "impair[ment] [of an] object's

integrity or availability for use in an official proceeding," § 1512(c)(1), which also "strongly implies that some formal hearing *before a tribunal* is contemplated." *Ermoian*, 752 F.3d at 1172 (emphasis added).

Equally telling is *United States v. Kelley*, 36 F.3d 1118 (D.C. Cir. 1994).  *Kelley* is significant not only because it is binding D.C. Circuit law, but because it concerned charges under both §§ 1505 and 1512, affording an opportunity for the court of appeals to find determinative distinctions between them, if any.  The "proceeding" at issue was an investigation conducted by the Officer of the Inspector General at the Agency for International Development.  The first thing to notice in *Kelley* is that the government *stipulated and agreed that § 1505's "proceeding" should be construed the same as § 1512's "official proceeding." Kelley*, 36 F.3d at 1128.  That prompted the D.C. Circuit to premise part of its decision on that basis.  *Id.*  The second thing to notice: the D.C. Circuit determined that the investigation at issue constituted a "proceeding" because (1) other § 1505 cases cited by the D.C. Circuit involved agency investigations "with some *adjudicative* power" or with "the power to enhance their investigations *through the issuance of subpoenas or warrants*"; and (2) the IG in the AID investigation at issue was "empowered to issue subpoenas and to compel sworn testimony in connection with *an investigation. . ."Kelley*, 36 F.3d 1118 at 1127 (emphasis added).[2]   Thus, it is binding D.C. Circuit law that Section 1512/1505 "proceedings" at the very least entail a baseline investigation (though, as seen in *Ermoian*, the courts often require more than that).

---

[2] *Kelley* relied on these authorities: *United States v. Sutton*, 732 F.2d 1483, 1490 (10th Cir. 1984) (Department of Energy investigation including issuance of administrative subpoena was proceeding under § 1505); *United States v. Vixie*, 532 F.2d 1277, 1278 (9th Cir. 1976) (IRS investigation including issuance of subpoena was a proceeding under § 1505); *United States v. Batten*, 226 F. Supp. 492, 493 (D.D.C. 1964) (SEC investigation with authority to issue subpoenas and administer oaths was "proceeding" under § 1505).

The point is underscored by the D.C. Circuit's decision in *Poindexter*.  As noted above, *Poindexter* determined that the legislative history of § 1505 shows that it was designed to prevent obstruction of only those proceedings held pursuant to Congress's investigative power. *Poindexter*, 951 F.2d at 380-81.

Every other circuit decision construing a Chapter 73 "proceeding" is in accord with *Ermoian*, *Kelley*, and *Poindexter*.  *See United States v. Ramos*, 537 F.3d 439 (5th Cir. 2008) (holding that a federal agency's internal investigation was not a Section 1512 "official proceeding" because that phrase "is consistently used throughout § 1512 in a manner that contemplates a formal environment *in which people are called to appear or produce documents*") (emphasis added); *United States v. Perez*, 575 F.3d 164 (2d Cir. 2009) (holding that BOP panel investigation was a Section 1512 "official proceeding" because "the review panel must '*determine*' if there has been a violation of BOP policy, must make '*findings*,' and may '*decide*' to refer the matter to senior departmental authorities . . .") (emphasis added).

Before January 6, the government adopted Bozell's interpretation of Section 1512.  To this day, the DOJ's Resource Manual instructs prosecutors that there is no difference between a Section 1505 "proceeding" and an "official proceeding" in Section 1512.  DOJ Resource Manual, § 1730 ("This definition [of 'proceeding' in § 1512] is in large part a restatement of the judicial interpretation of the word 'proceeding' in § 1503 and 1505."), available at: https://www.justice.gov/archives/jm/criminal-resource-manual-1730-protection-government-processes-official-proceeding-requirement.[3]   Indeed, as recently as three years ago, the government argued in federal courts that the meaning of "official proceeding" in § 1512(c) is

---

[3] The DOJ Manual clarifies that the only difference between "proceeding" in § 1505 and "official proceeding" in § 1512 is that the latter "does away with the pending proceeding requirement," which has nothing to do with the government's argument.  DOJ Resource Manual, § 1730.

"limited to quasi-adjudicative investigations or inquiries that involve the making of findings of fact and the issuance of rulings or recommendations for government action." *United States v. O'Connell*, 2017 U.S. Dist. LEXIS 172491, *14 (E.D. Wis. Sept. 5, 2017) (summarizing DOJ's interpretation of § 1512(c)).

The government concedes the Electoral College vote count on January 6 was not an inquiry or investigation.  *See*, *e.g.*, *United States v. William Pepe*, 21-cr-52, ECF No. 55, p. 8 n.3 (D.D.C. 2021) ("[T]he certification of the Electoral College vote is not an 'inquiry or investigation.'"). Instead, it relies exclusively on the provisions of the Electoral Count Act of 1887 (ECA).  SI, Count One (citing 3 U.S.C. §§ 15-18).  Congress's role in certifying Electoral College votes is of "grave significance," it observes.  The ECA's provisions, it adds, create a procedure for members of Congress to object to the certification of Electoral College votes.  See, e.g., 3 U.S.C. § 16.  So, just as a judge and legal parties occupy specific locations in a courtroom, so too do members of Congress in the "Hall." *Id.*  The ECA, the government continues, specifies where desks should be placed in the "Hall." *Id.*  In sum, the Electoral College vote count is an "official proceeding" because of the solemnity—but also the furniture.

To be clear: before January 6, the government never charged "obstruction of a congressional proceeding," under any statute, where the "proceeding" was not an investigation or inquiry.  No court has found an "official proceeding" based on congressional solemnity and furniture alone.  The ECA procedures identified by the government do not concern the "back and forth between citizens and government" within which zone the obstruction statutes aim to prevent the former's impairment of information bearing on the latter's decision-making. *United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019) (Wilkinson, J.).  They do not perform a truth-seeking function carrying the threat of a penalty, i.e., they do not concern the administration of justice.

*Arthur Andersen LLP v. United States*, 544 U.S. 696, 703 (2005) ("Chapter 73 of Title 18 of the United States Code provides criminal sanctions for those who obstruct justice.").

So contorted are the legal arguments required to arrive at its predetermined outcome that the government finds itself lost in its own positions.  Because the Electoral College vote count plainly does not concern obstruction "of justice," it has fallen back on the claim that Section 1512 does not require impeding "justice," merely obstruction of an "official proceeding." See, e.g., *United States v. Brady Knowlton*, 21-cr-46, ECF No. 41, pp. 12-13 (D.D.C. 2021) (Moss, J.) (Government brief: "The 'proceeding before Congress' is not limited to proceedings solely related to the administration of justice").  Yet it did not realize, or care, that in that case, the Frankenstein offense it tries to create cannot be properly sentenced under the U.S. Sentencing Guidelines.  For the Guidelines indicate that a Section 1512 conviction is sentenced under USSG §2J1.2—entitled "Obstruction of Justice." And every single specific offense characteristic under §2J1.2 requires interference with "the administration of justice," §2J1.2—a context that the government has conceded is not present in the January 6 cases. *Knowlton*, 21-cr-46, ECF No. 41, pp. 12-13.[4]

---

[4] The government advised the Court that it was insisting that Bozell stipulate to an 8-level enhancement for obstructing "the administration of justice" by "causing or threatening to cause physical injury to a person . . . .," §2J1.2(b)(1)(B), and a 3-level enhancement for "substantial interference with the administration of justice." §2J1.2(b)(2).  Thus does the government insist that Bozell disagree with the government's own position that this particular "obstruction of official proceeding" does *not* involve "the administration of justice."

A comparison of the penalty provisions in § 1505 and § 1512(c) demonstrates that Congress could not have intended to give the latter the all-encompassing meaning pushed by the government here.  Section 1505 criminalizes the obstruction of a congressional "inquiry or investigation" by "threats or force." § 1505.  The statutory maximum sentence is five years' imprisonment. *Id.*  By contrast, the statutory maximum sentence under Section 1512(c) is 20 years' imprisonment.  § 1512(c).  According to the government, then, Congress views obstruction of its investigations by "threats and force" far less seriously than it does obstruction of ceremonial proceedings by means short of "threats and force."

There are additional problems with the government's claim that the Electoral College vote certification is an "official proceeding" under the obstruction statutes.

The equation of the joint session of Congress with a Chapter 73 "official proceeding" raises additional political questions.  The government centers its "official proceeding" argument on the procedures of the joint session convened to certify Electoral College votes.  Yet a full hour before the first protester intrusion into the Capitol, the joint session had been suspended.  167 Cong. Rec. H77 (Jan. 6, 2021).  That is because, shortly before 1:15 p.m. Eastern Time, members of Congress objected to the certificate from the State of Arizona.  *Id.*  As a result, the Vice President directed "the two Houses [to] *withdraw from the joint session*." *Id.* (emphasis added). What the January 6 protesters "obstructed" was not the joint session composed of both Houses, but instead separated House deliberations on Republican objections to the Arizona certificate.  As the ECA procedures relied on by the government itself show, there was no possibility of the separated Houses certifying, or not certifying, Electoral College votes before reconvening in the joint session.  3 U.S.C. § 15.  The joint session reconvened at approximately 11:35 p.m. that day, with the Vice President announcing the "resumption" of the joint session.

The government asks the Court not only to declare the joint session an "official proceeding" under the obstruction laws, but to find that, under the parliamentary rules of Congress (either chamber? Both?), a joint session that "retired" and was "suspended" before, and not as a result of, those intrusions, and that could not formally certify or decertify Electoral College certificates, was also an "official proceeding." For all of these reasons, Count One fails to allege an offense under Section 1512(c)(2).

3.       *The government's interpretation of § 1512(c)(2) conflicts with ejusdem generis*

Beyond the government's misunderstanding of § 1512's "official proceeding," there are other reasons Count One fails to state a Section 1512(c)(2) offense.  Again, the "residual clause"

in subpart (2) penalizes, "Whoever corruptly— (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so . . .or (2) *otherwise* obstructs, influences, or impedes any official proceeding. . .§ 1512(c) (emphasis added).

"*[E]jusdem generis* counsels: Where general words follow specific words in a statutory enumeration, the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the proceeding specific words." *Yates v. United States*, 574 U.S. 528, 545 (2015) (cleaned up).  In *Yates*, the Supreme Court showed that the SI misapplies § 1512(c), an evidence impairment statute, to criminalize political protest at Congress.  There, a fisherman caught an undersized red grouper in the Gulf of Mexico, contrary to federal law.  To prevent federal authorities from finding out, he ordered a crew member to toss the catch into the sea.  He was charged with an obstruction offense under § 1519, which penalizes "Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, *or tangible object* with the intent to impede, obstruct, or influence the investigation . . ." 574 U.S. at 532 (quoting § 1519) (emphasis added).  The Supreme Court reversed Yates' conviction as the term "tangible object" did not cover the grouper.  Like Section 1512(c), Section 1519 was enacted as part of the Sarbanes-Oxley Act of 2002.  574 U.S. at 532.  To apply Section 1519 to sea creatures, the Court held,

> would cut § 1519 loose from its financial-fraud mooring to hold that it encompasses any and all objects, whatever their size or significance, destroyed with an obstructive intent.  *Mindful that in Sarbanes-Oxley, Congress trained its attention on corporate and accounting deception and cover ups, we conclude that a matching construction of § 1519 is in order*: A tangible object captured by § 1519, we hold, *must be one used to record or preserve information.*

574 U.S. at 532 (emphasis added).

Nearly every aspect of *Yates'* limitation of the phrase "tangible object" in Section 1519 applies to the phrase "or otherwise obstructs, influences, or impedes" in Section 1512(c)(2). As in *Yates*, the government implies here that § 1512(c)(2) "extends beyond the principal evil motivating its passage." 574 U.S. at 536. But *Yates* held that Section 1519, a companion to § 1512(c)(2) in SOX, could not be properly read outside the context of SOX's financial and audit reforms. *Id.* at 541. The Court also held that "the words immediately surrounding 'tangible object' in § 1519—'falsifies, or makes a false entry in any record [or] document]'—also cabin the contextual meaning of that term." *Id.* at 542. The *noscitur a sociis* canon thus operated to limit "tangible object" to "the subset of tangible objects involving records or documents, i.e., objects used to record or preserve information." *Id.* at 544. And under the related *ejusdem generis* canon— "[W]here general words follow specific words in a statutory enumeration, the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the proceeding specific words"—"tangible object" could not be read "to capture physical objects as dissimilar as documents and fish." *Id.* at 546.

In reaching that interpretation of § 1519, *Yates* relied on *Begay v. United States*, 553 U.S. 137, 142-43 (2008). *Yates*, 574 U.S. at 545. In *Begay*, the Court used *ejusdem generis* to determine what crimes were covered by the statutory phrase "any crime . . . that . . . is burglary, arson, or extortion, involves use of explosives, or *otherwise involves* conduct that presents a serious potential risk of physical injury to another." 553 U.S. at 142 (quoting 18 U.S.C. § 924(e)(2)(B)(ii)) (emphasis added). *Begay* held that the "otherwise involves" provision covered "only similar crimes, rather than every crime that 'presents a serious potential risk of physical injury to another.'" *Id.* Had Congress intended the latter "all encompassing meaning," "it is hard to see why it would have needed to include the [preceding statutory] examples at all." *Id.*

27

*Yates* and *Begay* mean that § 1512(c)(2)'s reference to acts that "*otherwise* obstruct[], influence[], or impede[] any official proceeding," covers "only similar crimes" to those enumerated in § 1512(c)(1), i.e., "alter[ing], destroy[ing], mutilate[ing], or conceal[ing] a record, document, or other object . . . with the intent to impair the object's integrity or availability for use in an official proceeding." Had Congress intended the "or otherwise obstructs. . ." language to create an unlimited obstruction catch-call crime, "it is hard to see why it would have needed to include the examples [in § 1512(c)(1)] at all." *Yates*, 553 U.S. at 142.  Indeed, or why it would have any need for the rest of the obstruction crimes in Chapter 73.  Here, the SI's obstruction theory has nothing to do with the impairment of evidence.  Rather, it contends Bozell violated § 1512(c)(2) by virtue of his physical presence per se inside a building.  That underscores the government's attempt to transform the parading-in-Congress misdemeanor offense into felony obstruction.  40 U.S.C. § 5104(e)(2)(G).  Section 5104(e)(2)(G) makes it a misdemeanor to "parade, demonstrate, or picket in any of the Capitol Buildings." *Id.*  If Section 1512(c)(2) reaches "obstructive" conduct that has nothing to do with evidence impairment, such as appearing in the Capitol without permission, there is no conceptual distinction between the Title 40 misdemeanor offense carrying a 6-month sentencing maximum and a felony Section 1512 offense carrying a 20-year statutory maximum.  For if one "parades" or "demonstrates" inside the Capitol, one is by definition "obstructing," "impeding," or "influencing" Congress or attempting to do so.

Recently, Judge Moss stated in a January 6 case that he was concerned by the lack of any limiting principle in applying Section 1512(c)(2) in a way that would swallow the rest of Chapter 73. *Montgomery*, 21-cr-46, 8/3/21 Hr'g (D.D.C. 2021) (Moss, J.).  Judge Moss is right: the Section 1512(c)(2) charge here does not state an offense because it does not concern the impairment or availability of evidence.

**B.     If the government's interpretation of § 1512(c)(2) is applied, it is unconstitutionally vague as to Bozell**

A criminal statute is unconstitutionally vague if it "'fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement.'" *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)).  "[T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 67 (1997).  In addition, if the law at issue "interferes with the right of free speech or of association, a more stringent vagueness test [] appl[ies]." *Hoffman Estates v. Flipside*, *Hoffman Estates*, 455 U.S. 489, 500 (1982).  If the government's novel interpretation of § 1512(c)(2) is applied here, it is unconstitutionally vague for the following reasons.

*1.     § 1512(c)(2) does not provide fair notice that "official proceedings" includes proceedings unrelated to the administration of justice*

As indicated above, § 1512(c)(2) has never been used to prosecute a defendant for the obstruction of an "official proceeding" unrelated to the administration of justice, i.e., a proceeding not charged with hearing evidence and making factual findings.  Moreover, there is no notice, much less fair notice, in § 1512(c)(2) or in any statute in Chapter 73 that a person may be held federally liable for obstructing a proceeding in a way that does not interfere with the availability or integrity of evidence.  Accordingly, the government's interpretation of § 1512(c)(2) here is void-for-vagueness as applied to Bozell.

In this case, the void-for-vagueness doctrine's function of guarding against arbitrary or discriminatory law enforcement is worth elaborating.  As Justice Gorsuch memorably put it in a *Dimaya* concurrence,

> Vague laws invite arbitrary power.  Before the Revolution, the crime of treason in English law was so capaciously construed that the mere expression of disfavored opinions could invite transportation or death.  The founders cited the crown's abuse of 'pretended' crimes . . .as one of their reasons for revolution. . . Today's vague laws may not be as invidious, but they can invite the exercise of arbitrary power all the same—by leaving the people in the dark about what the law demands and allowing prosecutors and courts to make it up.

*Sessions v. Dimaya*, 138 S. Ct. 1204, 1223-24 (2018).

The concern about vagueness-enabled arbitrary enforcement is manifested here.  It takes two forms, which might be called specific and general arbitrariness.  At a general level, the government's enforcement of § 1512(c)(2) against Bozell is arbitrary because, prior to January 6, the government had never charged "obstruction of a congressional proceeding," under any statute, where the "proceeding" was not an investigation or inquiry.  Accordingly, the government's election to put a new interpretation on the statute for a select group of related cases raises questions about discriminatory law enforcement.  Those questions are only underlined by the patently political nature of the circumstances of the offense, as well as the criminalization of Bozell's First Amendment rights to political speech, assembly, and to petition the government for a redress of grievances.  U.S. Const. amend I; *Hoffman Estates*, 455 U.S. at 500.

Perhaps more serious is the specific arbitrariness enabled by the government's vague interpretation.  Hundreds of January 6 defendants entered the Capitol Building, many of whom made statements about their intent to demonstrate against Congress inside the building.  Yet some are charged with traditional misdemeanor "parading" offenses under Title 40 carrying six-month maximum sentences, while others are charged with felony obstruction carrying a 20-year maximum.  Consider *United States v. Kevin Cordon*, 21-cr-277 (D.D.C. 2021).  Cordon was charged with obstruction of an official proceeding under Section 1512(c)(2).  His criminal complaint shows that he entered the Capitol Building and, after January 6, made a statement to the

press giving direct insight into his intent.  Among other things, he stated, in writing, that he entered the Capitol to "take back our democratic republic. . .We're not going to take this lying down. . . We're taking our country back.  This is just the beginning." 21-cr-277, ECF No. 1-1.  Although this "obstructive" intent is far more clearly demonstrated than anything Bozell said, the government dropped its obstruction charge against Cordon.

Similarly, in another recent case, the Chief Judge raised questions about the supposed conceptual difference between a misdemeanor "parading in the Capitol" offense and felony "obstruction" of Congress.  *United States v. Glenn Wes Lee Croy*, 21-cr-162 (D.D.C. 2021).  The government's plea agreement with Croy, who entered the Capitol Building, concerned a misdemeanor parading offense.  But if Croy did not intend to impede or influence Congress, Chief Judge Howell observed, what was the purpose of the "parading, demonstrating, or picketing" inside the Capitol Building? The Chief Judge was right.  Only, the implication is not that the traditional misdemeanor offense should yield to the newly created felony, but that the latter is merely a misdemeanor masquerading as a felony.   Insofar as it alleges that Bozell obstructed a type of "official proceeding" nowhere identified in §§ 1512(c)(2) and 1515 and alleges a crime conceptually indistinguishable from a misdemeanor parading offense, Count One must be dismissed under the Due Process Clause of the Fifth Amendment.

> 2.    *The government's interpretation of "corruptly" fails this Circuit's Poindexter test*

In *United States v. Poindexter*, a former U.S. national security advisor was charged under § 1505 for obstructing a congressional investigation into the Iran/Contra affair.  951 F.2d 369, 371 (D.C. Cir. 1991).  The defendant's obstruction consisted of lying to or misleading Members of the House and Senate Intelligence Committees about U.S. shipments of missiles to Iran.  *Id.* at 372. The relevant passage of § 1505 provided, "Whoever corruptly . . . .  influences, obstructs, or

impedes or endeavors to influence, obstruct or impede . . .the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House . . .shall be [punished]. . ." The court held that Poindexter's lying to Congress, while a violation of § 1001, was not an obstruction offense under § 1505.

The D.C. Circuit arrived at that conclusion in the following way.  First, it determined that the adverb "corruptly" was vague.  951 F.2d at 379 ("Words like 'depraved,' 'evil,' 'immoral,' 'wicked,' and 'improper' are no more specific—indeed they may be less specific—than 'corrupt.'").  Searching for a way out of the mess, the court observed that the verb "corrupt" "may be used transitively ('A corrupts B,' i.e., 'A causes B to act corruptly') or intransitively ('A corrupts,' i.e., 'A becomes corrupt, depraved, impure, etc.')." 951 F.2d at 379.  It similarly determined that § 1505's adverb "corruptly" could take on either a transitive or intransitive meaning.  Accordingly, to avoid the unconstitutional vagueness in a value-laden interpretation (e.g., "immoral"), the court decided that § 1505 "favor[ed] the transitive reading." *Id.* Thus, the *Poindexter* court construed § 1505 "to include only 'corrupting' another person by influencing him to violate his legal duty." *Id.*  The court further found that even that definition of "corruptly" may suffer from unconstitutional vagueness where the defendant's purpose is not "to obtain an improper advantage for himself or someone else. . ." *Id.* at 385.  The court gave this example of congressional activity the adverb "corruptly" may not cover without vagueness problems:

> [S]omeone who influences another to violate his legal duty [but] to cause the enactment of legislation that would afford no particular benefit to him or anyone connected to him.  Or, as the Chief Judge instanced at the oral argument of this case, there "would be some purposes that would be corrupt and some that wouldn't be . . . Suppose the [defendant acted] to protect the historical reputation of some historical figure that has been dead for 20 years and he decides that he doesn't want to mar that person's reputation."

*Poindexter*, 951 F.2d at 386.

As indicated above, following *Poindexter* Congress amended § 1515 to clarify that "As used *in Section 1505*, the term 'corruptly' means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering or destroying a document or other information." § 1515(b) (emphasis added). However, Congress did not amend § 1515 to define "corruptly" as used in § 1512.  In addition, the phrase "improper purpose" was held unconstitutionally vague in *Poindexter*.  951 F.2d at 379 ("Words like 'depraved,' 'evil,' 'immoral,' 'wicked,' and 'improper' are no more specific—indeed they may be less specific—than 'corrupt.'").

*Poindexter* is still good law in this circuit.  *United States v. Morrison*, 98 F.3d 619, 630 (D.C. Cir. 1996) (affirming § 1512 conviction because the defendant had committed "transitive" corruption in the *Poindexter* sense by persuading a witness to violate their legal duty to testify truthfully in court); see also *United States v. Kanchanalak*, 37 F. Supp. 2d 1, 4 (D.D.C. 1999) (Friedman, J.) (finding that even after Congress amended § 1515 in the wake of *Poindexter* to define "corruptly" for purposes of § 1505, § 1515's definition of "corruptly" to mean acting with an "improper purpose" is still unconstitutionally vague under *Poindexter*).

More broadly, the most widely accepted definition of "corrupt" intent, as understood in the obstruction statutes, is acting with the intent to obtain an improper advantage for oneself or an associate.  *United States v. North*, 910 F.2d 843, 882, 285 U.S. App. D.C. 343 (D.C. Cir. 1990), *opinion withdrawn and superseded in other part on reh'g*, 920 F.2d 940, 287 U.S. App. D.C. 146 (D.C. Cir. 1990) (holding that a "corrupt" intent means "the intent to obtain an improper advantage for oneself or someone else. . ."); *United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998) ("[A] well-accepted definition of corruptly" is "to act with the intent to secure an unlawful advantage or benefit either for one's self or for another"); *United States v. Dorri*, 15 F.3d 888, 895

(9th Cir. 1994) (holding that "corruptly" element was satisfied by evidence that defendant acted "with a hope or expectation of [a] benefit to one's self"); *United States v. Popkin*, 943 F.2d 1535, 1540 (11th Cir. 1991) ("Corruptly" means "done with the intent to secure an unlawful benefit either for oneself or another"); *United States v. Reeves*, 752 F2d 995, 1001 (5th Cir. 1985) ("To interpret 'corruptly' [in obstruction statute] as meaning 'with an improper motive or bad or evil purpose' would raise the potential of overbreadth' in this statute because of the chilling effect on protected activities. . . Where 'corruptly' is taken to require an intent to secure an unlawful advantage or benefit, the statute does not infringe on first amendment guarantees and is not 'overbroad.'").

In the January 6 cases, the government has made clear that by "corruptly" it means nothing more than "wrongfully"—a term it declines to define with any precision. As Judge Moss recently observed, that is likely unconstitutionally vague in this circuit under *Poindexter* and *North*. And as Bozell noted above, a definition as vacuous as "wrongfully" would, among other things, render Al Gore a felon for organizing vote recounts in the 2000 presidential election. The government's interpretation also contributes to the collapse of any distinction between a misdemeanor parading-in-Congress offense and felony obstruction of an official proceeding, as its understanding of "corruptly" means nothing more than the intent to impede or influence. Because the SI does not allege that Bozell "obstructed" the joint session by 'corrupting' another person by influencing him to violate his legal duty," *Poindexter*, 951 F.2d at 385, or that Bozell somehow acted to gain a material advantage for himself or an associate, it either fails to state a Section 1512(c) offense or alleges an unconstitutionally vague one.

## C.    The rule of lenity dictates that any ambiguities in § 1512(c)(2) be resolved in Bozell's favor

Even if § 1512(c)(2) is not unconstitutionally vague as applied to Bozell, any ambiguities in the statute should be resolved in his favor under the rule of lenity. Under that principle, "where text, structure, and history fail to establish that the government's position is unambiguously correct," courts must "apply the rule of lenity and resolve the ambiguity in [the defendant's] favor." *United States v. Granderson*, 511 U.S. 39, 54 (1994).

Here, even if the Court decides that the government's interpretation of § 1512(c)(2) is correct—i.e., that "official proceedings" of Congress include those which are not held pursuant to its investigatory power, that § 1512(c)(2) applies outside the context of the impairment of evidence, and that "corruptly" includes a disinterested but mistaken purpose—it is plainly not unambiguously so. That is shown by the lack of any case law supporting the government's interpretations, by the legislative history which tells against those interpretations, and by the text and structure not just of § 1512(c) but of all sections of Chapter 73.

Because the government's interpretations are not unambiguously correct, the Court is required to resolve any ambiguities in Bozell's favor by dismissing Count One. *Granderson*, 511 U.S. at 54; *Santos*, 553 U.S. at 515.

**D.    The novel construction principle of the Due Process Clause requires rejection of the government's interpretation, which would operate as an *ex post facto* law**

Because no court has construed § 1512(c)(2) as the government does in this case, to retroactively apply that construction against Bozell in this matter would violate the novel construction principle of the Due Process Clause of the Fifth Amendment. *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964). "[A]n unforeseen judicial enlargement of a criminal statute, applied retroactively, operates precisely as an *ex post facto* law, such as Art. I, § 10, of the Constitution forbids." *Id.* If a "legislature is barred by the *Ex Post Facto* Clause from passing such

35

a law, it must follow that a [court] is barred by the Due Process Clause from achieving precisely the same result by judicial construction." *Id.*

*Bouie* also concerned a trespass prosecution that gave indications of being politically motivated.  The 1964 case involved a combination drugstore and restaurant in South Carolina.  The establishment would not serve black Americans.  Two black college students took seats in the restaurant.  After they entered, an employee hung up a "no trespass" sign.  The store manager called the police, who asked the students to leave.  When they refused, they were arrested and charged with trespass.  The students were tried and convicted, with the State Supreme Court upholding the trespass convictions.  The Supreme Court vacated the convictions based on the novel construction principle of the Due Process Clause.  It reasoned that the South Carolina Supreme Court's construction of the trespass statute was effectively an *ex post facto* law.  By its terms, the state statute merely prohibited "*entry* upon the lands of another . . .*after* notice from the owner . . prohibiting such entry. . ." 378 U.S. at 355 (emphasis added).  However, there "was nothing in the statute to indicate that it also prohibited the different act of *remaining* on the premises *after* being asked to leave.  Petitioners did not violate the statute as it was written; they received no notice before entering either the drugstore or the restaurant department."  *Id.* (emphasis added).  Finally, "the interpretation given the statute by the South Carolina Supreme Court  . . . ha[d] not the slightest support in prior South Carolina decisions."  *Id*. at 356.

So too here.  Bozell did not "violate the statute as it was written." *Bouie*, 378 U.S. at 355.  Section 1512 prohibits obstruction of "official proceedings" which all courts have construed to mean proceedings before a tribunal that mimic a court of law.  There is "nothing in the statute to indicate that it also prohibited the different act," *Bouie*, 378 U.S. at 355, of interfering with

proceedings that do not hear evidence or find facts.  "The interpretation given the statute by the [government] . . . has not the slightest support in prior [§ 1512] decisions." *Id.*

Accordingly, the novel construction principle requires rejection of the government's interpretation, which would operate as an *ex post facto* law in violation of the Due Process Clause of the Fifth Amendment.

### E. The Indictment's application of § 1512(c)(2) is invalid under the First Amendment, as applied to Bozell

As the government acknowledges, Bozell's activities on January 6 included political expression, assembly and petitioning of the government for a redress of grievances.  U.S. Const. amend. I.  Insofar as the § 1512(c)(2) charge characterizes protest per se as obstruction of congressional proceedings, it is an unconstitutional application of the statute as applied to Bozell.

To prevail on an as-applied challenge under the First Amendment, Bozell must merely show that § 1512(c)(2) is being unconstitutionally applied as to the specific protected activity for which he is charged.  *Edwards v. Dist. of Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014).  The first question is whether Bozell's alleged conduct was "expressive." *Texas v. Johnson*, 491 U.S. 397, 404 (1989).  "[T]o bring the First Amendment into play," Bozell must merely show "[a]n intent to convey a particularized message was present" and "the likelihood . . . that the message would be understood by those who viewed it." *Id.*  Next, the court assesses whether the challenged statute is related in any way to the suppression of free expression.  If so, and if the law is content-neutral, the court must subject the statute to intermediate scrutiny.  *Edwards*, 755 F.3d at 1002.  Under that standard, the statute is constitutionally applied only if (1) "it is within the constitutional power of the government"; (2) "it furthers an important or substantial governmental interest"; (3) "the governmental interest is unrelated to the suppression of free expression"; and (4) "the

incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968).

Here, there is no argument that the conduct charged under § 1512(c)(2) was not protected expression.  The entire thrust of the § 1512(c)(2) offense is that Bozell and others protested at the Capitol concerning the results of the 2020 presidental election.  That is the very core of the First Amendment.  A fur pelt sends a message.  *See*, *e.g.*, *Johnson*, 491 U.S. at 404 (flag burning expressive); *Tinker v. Des Moines Ind. Comm. School. Dist.*, 393 U.S. 503, 505 (1969) (students wearing black armbands to protest war is expressive); *Brown v. Louisiana*, 383 U.S. 131, 141-142 (1966) (sit-in to protest segregation expressive); *United States v. Grace*, 461 U.S. 171 (1983) (picketing is expressive); *Snyder v. Phelps*, 562 U.S. 443, 444 (2011) ("A statement's arguably inappropriate or controversial character . . . is irrelevant to the question [of] whether it deals with a matter of public concern.").

Similarly, there is no argument that § 1512(c)(2)'s application here is unrelated to the suppression of expression, assembly and the petitioning of the government for a redress of grievances.  Again, the thrust of the obstruction claim is that Bozell and the other defendants intended to affect the actions of Congress: otherwise known as political demonstration and protest. Critically, the government's obstruction claim is not *limited* to any alleged intent to enter the Capitol and to affect congressional action *by force or threats*.  SI, Count One.  After all, the government could have attempted to charge such an offense under § 1505, prohibiting obstruction of Congress's investigatory powers by force or threats.  The SI does not charge that offense and its obstruction theory encompasses the very act of protesting to affect congressional action itself. Accordingly, § 1512(c)(2) is here "related to the suppression of free expression." *See*, *e.g.*, *United States v. Caputo*, 201 F. Supp. 3d 65, 71 (D.D.C. 2016) (restricted area statute "related to the

suppression of free expression" where charged defendant jumped White House fence to protest executive action).

Under an intermediate scrutiny test, the Court applies the *O'Brien* factors to determine the constitutionality of § 1512(c)(2)'s application here. The following two factors show that the statute's application here is unconstitutional: (1) the government's interest *is* related to the suppression of free expression; and (2) the incidental restriction on First Amendment freedoms *is* greater than is essential to the furtherance of that interest. *O'Brien*, 391 U.S. at 377. As explained, that the § 1512(c)(2) theory in this case is not limited to an attempt to influence Congress by threats or force can only mean that it covers acts that influence Congress through protest and demonstration. Moreover, nothing in the SI cabins Bozell's "obstruction" to the act of entry into the Capitol Building. (In the January 6 cases, the government has charged many protesters with felony "obstruction of Congress" who did not enter the Capitol.) If his "obstruction" encompasses protest outside the Capitol Building, the government is criminalizing not just his expression, but the expression of every group that politically demonstrates outside that building with a view to affecting, or "obstructing," legislation. Second, that restriction is far greater than is "essential" to the furtherance of the government's legitimate interest in preventing obstruction of official proceedings of Congress. For the government could adequately protect that interest merely by preventing obstruction of Congress "by threats or force"—*i.e.*, using the proper statute for the crime it is failing to allege, 18 U.S.C. § 1505—or at the very least by preventing obstruction of Congress through unlawful entry into the building. *City of Houston v. Hill*, 482 U.S. 451, 459 (1987) ("[W]e have repeatedly invalidated laws that provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them."). Accordingly, the SI's

overbroad charge against Bozell under § 1512(c)(2) unconstitutionally infringes on his First Amendment rights and should be dismissed.

## III.   The Section 1752 counts should be dismissed

### A.   The SI fails to state an offense because only the USSS restricts areas under § 1752

Counts Three and Four contend that Bozell violated § 1752 by entering the Capitol Building, which the SI characterizes as a "restricted building and grounds," as that phrase is defined in § 1752.  However, it does not allege that the U.S. Secret Service (USSS) restricted that area under the statute.  The government's position that any government entity may set a restricted area under § 1752 finds no support in the statutory text, the case law, or the legislative history.

Penal statutes are strictly construed.  *United States v. Moore*, 613 F.2d 1029, 198 U.S. App. D.C. 296 (D.C. Cir. 1979).  The plain meaning of § 1752 unequivocally indicates that the USSS alone sets restricted areas.  As shown above, all three definitions of "restricted building or grounds" in § 1752(c)(1) concern the authority and actions of the USSS and not any other federal agency. Section 3056, concerning the "powers, authorities, and duties of United States Secret Service," confirms that § 1752 is a statute directed to the USSS and not any other federal agency.  18 U.S.C. § 3056(d).

Section 1752 defines "restricted building or grounds" to mean "any posted, cordoned off, or otherwise restricted area" in any of three scenarios set forth in the statute. § 1752(c)(1). If an area is to be "restricted," § 1752(c)(1), some person or government entity must do the restricting. Areas do not restrict themselves.  That statutory phrase's neighboring provisions, and common sense, reveal exactly which entity does the restricting.  First, the restricting entity must be a government agency.  If a § 1752 restricted area could be set by any person, it would be illegal to enter an area "cordoned off" around the White House by a homeless person using tinfoil traffic

40

cones.  § 1752(c)(1)(A).  Second, that government agency is the USSS because each of the three types of "restricted area" are patrolled and managed by that specific agency and no other.  § 1752(c)(1)(A)-(C).

That is why what little § 1752 precedent there is supports Bozell, while none supports the government's interpretation.  To be clear: before January 6, the government never prosecuted a § 1752 case where the "restricted area" was set by any entity other than the USSS.  Instructive is *United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005).  There, Bursey entered an area restricted by the USSS in advance of a political rally in South Carolina held by the president.  *Id.*, at 304.  Reviewing the trial record, the Fourth Circuit observed that "the Secret Service designated an area near [the rally] as a restricted area."  *Id.*  It also noted that the "authorized persons" admitted into the area all "wore lapel pins issued by the Secret Service," meaning that the USSS was the entity that granted "lawful access" to the area.  *Id.*  Intending to protest the Iraq war, Bursey approached the restricted area with a megaphone.  A Secret Service Agent advised him he could not remain in that area.  He was repeatedly advised thereafter of the same by multiple law enforcement agents over a twenty to twenty-five minute period.  *Id.*  Bursey was charged and convicted under § 1752(a)(1).

One sufficiency argument Bursey raised on appeal was that, as a matter of *mens rea*, "he was never advised that the area was a federally restricted zone, *so designated by the Secret Service.*" 416 F.3d at 308 (emphasis added).  The Fourth Circuit rejected this argument.  But not on the ground that § 1752 restricted areas need not be so restricted by the USSS.  Instead, trial evidence showed that Bursey "understood the restriction to have been created by the Secret Service (as opposed to state or local law enforcement)." *Id.*  Added the Fourth Circuit, "[T]here was ample

evidence that Bursey understood the area to have been restricted by the Secret Service, *and thus a federally restricted zone*." *Bursey*, 416 F.3d at 309 (emphasis added).

The import of the Fourth Circuit's logic is clear.  Had the Fourth Circuit even contemplated the idea that entities other than the USSS could restrict areas under § 1752, the above reasoning would lack sense.

The government's anyone-may-restrict interpretation yields absurd results.  *See United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 543, 60 S. Ct. 1059, 84 L. Ed. 1345 (1940) ("When [one possible statutory] meaning has led to absurd or futile results . . . this Court has looked beyond the words to the purpose of the act.").  Consider a Secret Service protectee who is "temporarily visiting" a place.  § 1752(c)(1)(B).  The Secret Service sets a "restricted area" of one block around the protectee's presence.  Under the government's construction, any local police unit could decide to extend the "restricted area" to 20 blocks, without authorization from the Secret Service: the agency charged with protecting the person for whose sake the area is restricted in the first place.  If any person were to enter the expanded area without "lawful authority" (from the local police? The Secret Service?) the same government that deemed the area limited to one block could also prosecute a person for entering block 20.  The statute has simply never worked that way, as the Secret Service would readily attest.

At the very least, the *government's* interpretation is not unambiguously correct on the face of the statute.  In that case, the Court would look to legislative history.  As shown above, that history could hardly be clearer: the entire purpose of Section 1752 was to vest a specific federal agency with area-restricting authority which no agency then possessed: the USSS.  A Senate Judicial Committee report explicitly states that the purpose of § 1752 was to vest the Secret Service specifically with the power to set federal restricted areas.  S. Rep. No. 91-1252 (1970), at 7

("[a]lthough the Secret Service [was] charged with protecting the person of the President . . . there [was], at the present time, no Federal statute which specifically authorize[d] *them to restrict entry to areas* where the President maintains temporary residences or offices.") (emphasis added).

This is not just Bozell's view.  It is also the view of the Office of Legal Counsel of the Department of Justice.  *See Citizens for Responsibility & Ethics in Wash. v. United* States, 922 F.3d 480, 483 (D.C. Cir. 2019) ("The authority of the OLC is nearly as old as the Republic itself."). In May 1995, the Secretary of the Treasury requested a legal opinion from the OLC on whether the Secretary had authority to restrict traffic on a segment of Pennsylvania Avenue in order to protect the President*.   Authority of the Secretary of the Treasury to Order the Closing of Certain Streets Located Along the Perimeter of the White House*, 19 Op. Off. Legal Counsel 109 (1995). In crafting this opinion, OLC painstakingly examined the text of § 1752 and its legislative history. *Id.* at 109-122.  OLC determined that § 1752 did, in fact, specify which government entity restricts areas under that statute.  It is the Secret Service *via* the Treasury Department: "Section 1752 plainly grants *the [Treasury] Secretary* authority to limit ingress and egress to an area where the President will be visiting *to create a security perimeter*."  Op. Off. Legal Counsel, p. 113 (emphasis added). If any government entity could set § 1752 restricted areas, there was no reason for OLC to conduct the analysis in the first place.   Accordingly, Counts Three and Four should be dismissed because the government does not allege the "restricted area" Bozell entered was set by the USSS (the government concedes it was not).

### B.      If the government's interpretation of § 1752 is applied, it is  unconstitutionally vague as to Bozell

If the Court concludes that the SI properly charges Bozell with violating § 1752 by crossing a boundary set by an agency other than the USSS, the statute is unconstitutionally vague as applied to him.  Assuming the truth of the government's allegations, Bozell saw police lined up outside

the U.S. Capitol.  But if the text, legislative history and common sense inform an "ordinary person" that he violates § 1752 by entering an area the Secret Service has restricted, there is no notice in the statute that being on the wrong side of a police barricade is, independent of the Secret Service, in violation of that statute.  The concern about vagueness-enabled arbitrary enforcement is evident. Generally, the government's enforcement of § 1752 against Bozell is arbitrary because, prior to January 6, it had never prosecuted a violation of that statute with the allegation that the accused entered an area restricted by some government agency other than the USSS.  Accordingly, the government's election to put a new interpretation on the statute for a select group of related cases raises questions about discriminatory law enforcement, heightened in the context of Bozell's rights to political speech, assembly, and to petition the government for a redress of grievances.  U.S. Const. amend I; *Hoffman Estates*, 455 U.S. at 500.  Perhaps more serious is the specific arbitrariness.  Hundreds or perhaps thousands of other protesters "entered" the same "restricted area" as Bozell on January 6.  Yet it is undisputed that many of those people have not been charged under § 1752 like him.  Bozell was singled out for reasons that do not concern the animating purpose of the Secret Service statute.  Insofar as they both allege that Bozell entered and remained in a "restricted area" set by an agency nowhere identified in the statute, Counts Three and Four are unconstitutionally vague.

**The rule of lenity dictates that ambiguities in § 1752 be resolved in Bozell's favor**

    **C.**    **The rule of lenity dictates that ambiguities in § 1752 be resolved in Bozell's favor**

Even if the Court decides that the government's interpretation of § 1752 is somehow formally correct—i.e., that any entity may set restricted areas under § 1752(c)—it is plainly not unambiguous*ly* so.  That is shown by the lack of any references in § 1752 to agencies other than the USSS; the statute's legislative history, which similarly focuses exclusively on the USSS; the

clear role that the USSS plays in all three definitions of "restricted buildings or grounds" in § 1752(c); the indication in Section 3056 that the USSS enforces restricted areas in § 1752; the lack of any case law supporting the government's position; and the common sense notion that if the USSS patrols and guards the restricted areas in § 1752, it also sets them.  Because the government's interpretations are not unambiguously correct, the Court is required to resolve any ambiguities in Bozell's favor by dismissing Counts Three and Four.  *Granderson*, 511 U.S. at 54; *Santos*, 553 U.S. at 515.

### D.    The novel construction principle dictates against the government's interpretation, which would operate as an ex post facto law

Because no court before January 6 ever construed Section 1752 to mean that agencies other than the USSS may set restricted areas under the statute, such a construction would be retroactively applied to Bozell and would constitute an *ex post facto* law in violation of the Due Process Clause of the Fifth Amendment.  *Bouie*, 378 U.S. at 353.

### CONCLUSION

For all the foregoing reasons, Bozell respectfully requests that the Court dismiss Counts One, Three, and Four of the SI.

Dated: December 16, 2021       Respectfully yours,


/s/ John M. Pierce
John M. Pierce
**PIERCE BAINBRIDGE P.C.**
355 S. Grand Avenue, 44th Floor
Los Angeles, CA 90071
Tel: (213) 262-9333
jpierce@piercebainbridge.com

*Counsel for Defendant Leo Brent* Bozell *IV*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 16 day of December 2021, I filed the foregoing motion with the

Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to

the following CM/ECF user(s):

And I hereby certify that I have mailed the document by United States mail, first class

postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

 

_____

John M. Pierce

3