**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**AARON MOSTOFSKY,**<br><br>**Defendant.** | **Criminal Action No. 21-138 (JEB)** |

**<u>MEMORANDUM OPINION</u>**

On January 6, 2021, Defendant Aaron Mostofsky was among the horde that descended on the United States Capitol while Congress was engaged in the certification of the Electoral College vote count for the 2020 Presidential election.  In a Second Superseding Indictment, the Government charges Defendant with eight separate crimes, ranging from civil disorder and obstruction of an official proceeding to impeding officers and demonstrating in a Capitol building.  In promulgating criminal statutes, past Congresses had understandably not fathomed that people might attempt to invalidate a lawful election by force in the Capitol itself.  As a result, the Government has had to be somewhat more innovative in determining which charges to prosecute.  Too innovative, claims Mostofsky, who contends in a Motion to Dismiss that certain counts are facially invalid, unconstitutional as applied to him, or violative of other legal doctrines.  Although Defendant has offered many thoughtful and creative arguments in his lengthy and comprehensive Motion, the Court ultimately remains unpersuaded.  As such, it will deny the Motion and permit the Indictment to stand.

## I.      Background

The Court gleans its understanding of the case by assuming as true the facts set forth in the Indictment and associated filings.  United States v. Ballestas, 795 F.3d 138, 149 (D.C. Cir. 2015).  According to the Criminal Complaint, filed January 11, 2021, with a joint session of Congress underway at the Capitol on the afternoon of January 6, Mostofsky was among a crowd that entered the building after certain individuals broke windows and overcame the U.S. Capitol Police.  See ECF No. 1-1 (Statement of Facts) at 1.  In an interview, Defendant explained that he had traveled from Brooklyn to Washington and stormed the U.S. Capitol in protest of the "stolen" election.  Id. at 1–2.  He was photographed inside the Capitol wearing a U.S. Capitol Police vest and holding a USCP riot shield.  Id. at 2.  According to the Government, he also "push[ed], individually or with others, against law enforcement officers setting up or adjusting barriers in a restricted area near the U.S. Capitol; and . . . position[ed] himself in a way to prevent law enforcement from setting up or adjusting barriers between themselves and rioters outside the U.S. Capitol."  ECF No. 38 (Gov. Resp. Bill of Particulars) at 2.

The Government indicted Mostofsky on February 19, 2021, on eight counts, see ECF No. 6 (Indictment), and then superseded several months later, also charging eight counts but with some minor tweaking.  See ECF No. 25 (Super. Ind.).  He has remained on release since his initial appearance.  See Minute Entry of Jan. 25, 2021.  During the pendency of the case, the parties have engaged in a number of legal and discovery disputes relating to, for example, the value of police items Mostofsky is alleged to have stolen, some specific language in particular counts, and whether the Government should be required to provide further information on certain charges.  See, e.g., ECF Nos. 27 (First Motion for Bill of Particulars), 40 (Motion to Compel Federally Protected Function Evidence).

Being careful to shore up any technical defects in its charging documents, the Government recently filed a Second Superseding Indictment on November 10, 2021, see ECF No. 69, and trial is now set for March 23, 2022. This latest Indictment still charges eight counts, which are: I) Civil Disorder in violation of 18 U.S.C. § 231(a)(3); II) Obstruction of an Official Proceeding and Aiding and Abetting in violation of 18 U.S.C. §§ 1512(c)(2) and 2; III) Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1); IV) Theft of Government Property in violation of 18 U.S.C. § 641; V) Entering and Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1); VI) Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2); VII) Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D); and VIII) Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).

In his current Motion, Mostofsky seeks the dismissal of Counts I, II, V, and VI. The Government opposes.

## II. Legal Standard

Prior to trial, a defendant may move to dismiss an indictment (or specific counts) on the basis that there is a "defect in the indictment or information" including a "failure to state an offense." Fed. R. Crim P. 12(b)(3)(B)(v). "The operative question is whether the allegations, if proven, would be sufficient to permit a jury to" conclude that the defendant committed the criminal offense as charged. United States v. Sanford, Ltd., 859 F. Supp. 2d 102, 107 (D.D.C. 2012); United States v. Bowdoin, 770 F. Supp. 2d 142, 146 (D.D.C. 2011). "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or

conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974).

In reviewing the indictment, a court affords deference to the "fundamental role of the grand jury." Ballestas, 795 F.3d at 148 (quoting Whitehouse v. U.S. Dist. Court, 53 F.3d 1349, 1360 (1st Cir. 1995)). As a result, "[a]dherence to the language of the indictment is essential because the Fifth Amendment requires that criminal prosecutions be limited to the unique allegations of the indictments returned by the grand jury." United States v. Hitt, 249 F.3d 1010, 1016 (D.C. Cir. 2001). A court accordingly cabins its analysis to "the face of the indictment and, more specifically, the language used to charge the crimes." United States v. Sunia, 643 F. Supp. 2d 51, 60 (D.D.C. 2009) (emphases and internal quotation marks omitted).

## III.  Analysis

Mostofsky argues that four counts of the Second Superseding Indictment should be dismissed. These counts were brought under several different statutes — 18 U.S.C. § 231(a)(3), 18 U.S.C. § 1512(c)(2) and § 2, and 18 U.S.C. § 1752(a)(1) and (2). The Court will consider each in the order it was presented in the Indictment.

### A.  18 U.S.C. § 231(a)(3)

Defendant initially contends that Count One of the Second Superseding Indictment, which relies on 18 U.S.C. § 231(a)(3), should be dismissed. That count charges:

> On or about January 6, 2021, within the District of Columbia, AARON MOSTOFSKY, committed and attempted to commit an act to obstruct, impede, and interfere with a law enforcement officer lawfully engaged in the lawful performance of his/her official duties incident to and during the commission of a civil disorder which in any way or degree obstructed, delayed, and adversely affected commerce and the movement of any article and commodity in commerce and the conduct and performance of any federally protected function.

Sec. Super. Ind. at 1–2.  The language in the Second Superseding Indictment was drawn almost directly from the statute, as § 231(a)(3) states:

> Whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function—Shall be fined under this title or imprisoned not more than five years, or both.

The term "commerce" is further defined as "commerce (A) between any State or the District of Columbia and any place outside thereof; (B) between points within any State or the District of Columbia, but through any place outside thereof; or (C) wholly within the District of Columbia." 18 U.S.C. § 232(2).  And "civil disorder" is defined as "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual."  18 U.S.C. § 232(1).

Mostofsky maintains that the count is infirm because the statute exceeds Congress's power under the Commerce Clause and, alternatively, because the Government has failed to show that the "civil disorder" on January 6, 2021, "obstruct[ed], delay[ed], or adversely affect[ed]" a "federally protected function."  ECF No. 47 (MTD) at 39–51.  Since the Court can resolve the Motion purely on Commerce Clause grounds, it need not decide at this point whether any "federally protected function" was affected that day.  Of course, should the Government seek to obtain a conviction at trial via the federally-protected-function prong, Defendant will have an opportunity to challenge that element down the road.  Mostofsky also argues that the statute is

overbroad under the First Amendment; either the statute must be limited or the charge dismissed.

Id. at 51–54.  The Court looks first at the Commerce Clause and then the First Amendment.

      1.  *Interstate Commerce Clause*

The Commerce Clause gives Congress the "[p]ower . . . [t]o regulate Commerce . . .

among the several States."  U.S. CONST. art. I, § 8, cl. 3.  This clause "must be read carefully to

avoid creating a general federal authority akin to the police power," Nat'l Fed'n of Indep. Bus. v.

Sebelius, 567 U.S. 519, 536 (2012), and the limits of this power have become more defined over

the last few decades.  In United States v. Lopez, 514 U.S. 549 (1995), for example, the Supreme

Court listed "three broad categories of activity that Congress may regulate" under its interstate-

commerce power:

> First, Congress may regulate the use of the channels of interstate
> commerce.  Second, Congress is empowered to regulate and protect
> the instrumentalities of interstate commerce, or persons or things in
> interstate commerce, even though the threat may come only from
> intrastate activities.  Finally, Congress' commerce authority
> includes the power to regulate those activities having a substantial
> relation to interstate commerce, *i.e.*, those activities that
> substantially affect interstate commerce.

Id. at 558–59 (citations omitted); see also Sebelius, 567 U.S. at 536.  Both parties agree that the

relevant inquiry as to 18 U.S.C. § 231(a)(3) is the last — *i.e.*, whether it "substantially affects"

interstate commerce.  See ECF No. 77 (Def. Sec. Super. Ind. Br.) at 7; ECF No. 76 (Gov. Sec.

Super. Ind. Br.) at 9–10.

"To determine whether an activity has a 'substantial effect' on interstate commerce, the

court considers the 'four Lopez factors': (1) whether the activity itself 'has anything to do with

commerce or any sort of economic enterprise, however broadly one might define those terms';

(2) 'whether the statute in question contains an express jurisdictional element'; (3) 'whether

there are express congressional findings or legislative history regarding the effects upon

interstate commerce of the regulated activity'; and (4) 'whether the relationship between the regulated activity and interstate commerce is too attenuated to be regarded as substantial.'" United States v. Reed, No. 15-188, 2017 WL 3208458, at *8 (D.D.C. July 27, 2017) (quoting Rancho Viejo, LLC v. Norton, 323 F.3d 1062, 1068–69 (D.C. Cir. 2003)).

The Court will devote most of its attention to the "jurisdictional element" in the second factor above since that is where the parties focus the bulk of their briefing and because, as explained below, satisfying this prong is typically enough to satisfy the Commerce Clause. In striking down the Gun-Free School Zones Act of 1990, Lopez noted that the Act "contain[ed] no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." 514 U.S. at 561. Such an element "might limit [the statute's] reach to a discrete set of [activities] that additionally have an explicit connection with or effect on interstate commerce." Id. at 562. It contrasted the language of the Gun-Free School Zones Act with the statute it upheld as constitutional in United States v. Bass, 404 U.S. 336 (1971), which similarly punished firearm possession (this time, by a felon) but added that the possession must be "in commerce or affecting commerce." 514 U.S. at 561–62 (quoting Bass, 404 U.S. at 337). That nexus made a difference. Compare United States v. Morrison, 529 U.S. 598, 613 (2000) (noting in striking down Violence Against Women Act that it "contain[ed] no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce").

The Court later interpreted the same felon-in-possession statute in Scarborough v. United States, 431 U.S. 563 (1977), this time to decide "what would constitute an adequate nexus with commerce." Id. at 568. The Court concluded that the statute required only a "minimal nexus" to interstate commerce: "that the firearm ha[s] been, at some time, in interstate commerce." Id. at

7

575.  In reliance on those Supreme Court cases, every circuit — including ours — has held after
Lopez that a jurisdictional element "substantially identical" to the one in Bass and Scarborough
satisfies the Commerce Clause.  See Fraternal Order of Police v. United States, 173 F.3d 898,
907–08 & n.2 (D.C. Cir. 1999) (collecting cases).

So does § 231(a)(3) contain such a jurisdictional element?  The answer is yes because it
requires that the "civil disorder" during which the act "to obstruct, impede, or interfere with" a
law-enforcement officer performing his duties occurs must be one that "in any way or degree
obstructs, delays, or adversely affects commerce or the movement of any article or commodity in
commerce."  In this Circuit, there is just a lone district-court opinion — United States v.
Hoffman, 334 F. Supp. 504 (D.D.C. 1971) — interpreting the constitutionality of this statutory
provision under the Commerce Clause.  Hoffman found that § 231(a)(3) was not an
"unconstitutional exercise[] of the commerce power" nor a violation of the First Amendment, id.
at 509, although this Court recognizes that the case is 50 years old and preceded the seminal
decisions in Lopez and Morrison.  A number of district courts across the country, however, have
recently concurred that the jurisdictional element in § 231(a)(3) is sufficient to fend off
challenges under the Commerce Clause.  See United States v. Phomma, No. 20-465, 2021 WL
4199961, at *3 (D. Or. Sept. 15, 2021); United States v. Howard, No. 21-28, 2021 WL 3856290,
at *11 (E.D. Wis. Aug. 30, 2021); United States v. Wood, No. 20-56, 2021 WL 3048448, at *6
(D. Del. July 20, 2021); United States v. Pugh, No. 20-73, slip op. at 9 (S.D. Ala. May 13, 2021).

The Court acknowledges Mostofsky's critique that these cases arise out of our Circuit,
see Def. Sec. Super. Ind. Br. at 10, but also notes that he offers no in-Circuit precedent on
§ 231(a)(3) nor any case where a statute has been struck down despite having an express
jurisdictional element.  Rather his argument focuses on three areas: 1) the indirect connection

between a defendant's act and interstate commerce under § 231(a)(3); 2) the jurisdictional

element's lack of connection to a commercial good or activity; and 3) the Government's failure

to address other Lopez factors besides the jurisdictional element.  See Def. Sec. Super. Ind. Br. at

8–11.  The Court takes up each point separately.

a.   Indirect Connection to Commerce

Mostofsky concedes that "§ 231(a)(3) contains a commercial nexus element," but

suggests that that "element is faulty because it does not limit the reach of the statute to activities

that 'substantially affect' interstate commerce."  MTD at 47.  In particular, he notes that because

the jurisdictional element "unambiguously modifies the term 'civil disorder,' not 'any act[,]' . . .

a charge under § 231(a)(3) need not be supported by evidence that a defendant's act impacted

interstate commerce."  Id. at 48 (emphasis in original).  As a result, he argues that § 231(a)(3) —

unlike other statutes the Government cites as examples of jurisdictional hooks — does not

"require that a defendant's activity [] directly impact commerce."  Def. Sec. Super. Ind. Br. at 8–

9.

The district court in Howard addressed a similar issue in concluding that § 231(a)(3)

could withstand a Commerce Clause challenge even though the phrase "obstructs, delays, or

adversely affects commerce" modifies "civil disorder" rather than "any act."  See 2021 WL

3856290, at *10 ("It is not clear to this court that to be convicted of violating § 231(a)(3), the

defendant need not personally do anything that affects interstate commerce.  A defendant may be

convicted of violating the statute only if the civil disorder during which the law enforcement

officers are lawfully performing their lawful duties obstructs, delays or affects interstate

commerce.") (emphasis added).  There, the court analogized to the jurisdictional element in 18

U.S.C. § 924(c)(1)(A), which sets the sentence for an individual "who, during and in relation to

any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in

9

furtherance of any such crime, possesses a firearm." In that statute, the relevant commerce connection is that the underlying crime of violence affected interstate commerce, such as in a Hobbs Act robbery, not the use or carrying of the firearm itself. See Howard, 2021 WL 3856290, at *10. This places the firearm's use at a similar remove to an act that occurs in the context of a civil disorder affecting commerce. Although the D.C. Circuit has not weighed in on the constitutionality of the jurisdictional element in § 924(c), multiple other circuits have found that it does not exceed Congress's Commerce Clause power. See, e.g., United States v. Ferreira, 275 F.3d 1020, 1028 (11th Cir. 2001); United States v. Staples, 85 F.3d 461, 463 (9th Cir. 1996), as amended (June 28, 1996); United States v. Brown, 72 F.3d 96, 97 (8th Cir. 1995).

The Court finds the reasoning of Howard persuasive and concurs that, "[w]hen a person deliberately commits some act to obstruct, impede or interfere with those officers [who are "attempting to quell an interference with interstate commerce"], that person is impacting interstate commerce." Howard, 2021 WL 3856290, at *10; see also Phomma, 2021 WL 4199961, at *3–4 (rejecting indirect-connection challenge). The connection to interstate commerce in § 231(a)(3) is slightly less direct than those in the jurisdictional elements of the Hobbs Act or RICO, but that does not make the jurisdictional element deficient. Cf. Def. Sec. Super. Ind. Br. at 8–9; 18 U.S.C. §§ 1962(a), 1962(b), & 1962(c) (requiring that enterprise be "engaged in, or the activities of which affect, interstate or foreign commerce"); 18 U.S.C. § 1951(a) (regulating whoever "obstructs, delays or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion . . .").

Mostofsky also maintains that other language in § 231(a)(3) makes the jurisdictional element faulty by creating too attenuated a connection with interstate commerce. Recall that the statute refers to the committing of "any act to obstruct, impede, or interfere with any fireman or

law enforcement officer lawfully engaged in the lawful performance of his official duties
<u>incident to and during</u> the commission of a civil disorder."  18 U.S.C. § 231(a)(3) (emphasis
added).  He argues that the "'incident to and during' connector further diminishes any required
link to interstate commerce," since it puts the "element another step removed from the regulated
activity."  MTD at 48.  As Defendant notes, when used as an adjective, "incident" can imply that
something is "[d]ependent on, subordinate to, arising out of, or otherwise connected with
(something else, usu[ally] of greater importance)."  <u>Id.</u> (quoting <u>Incident</u>, BLACK'S LAW
DICTIONARY (11th ed. 2019)).  Here, "the incident to and during" language in § 231(a)(3) does
not suggest that the "act" or "lawful performance of [an officer's] official duties" is somehow
minimally related to the civil disorder.  Rather, the most natural reading of the phrase is to
indicate that those activities "arise[] out of" or occur during the civil disorder, not that they are
some tangential consequence far downstream from the disorder itself.

Similarly, Mostofsky does not prevail on his argument that the jurisdictional element is
insufficient as it "does not require a <u>substantial</u> effect on interstate commerce, but instead
requires a civil disorder that affects commerce 'in any way or degree.'"  MTD at 48; <u>see also</u>
Def. Sec. Super. Ind. Br. at 10.  This misunderstands what is required in a jurisdictional element.
The "'substantiality' requirement does not apply in the context of determining what quantum of
evidence is required to satisfy statutory interstate commerce jurisdictional elements," <u>United
States v. Harrington</u>, 108 F.3d 1460, 1465 (D.C. Cir. 1997), and a statute may be upheld when it
contains an element that requires that "the conduct criminalized must affect or attempt to affect
commerce <u>in some way or degree</u>."  <u>Taylor v. United States</u>, 579 U.S. 301, 308 (2016) (emphasis
added).  Indeed, the Hobbs Act jurisdictional element, which Mostofsky cites with approval,
regulates "whoever <u>in any way or degree</u> obstructs, delays or affects commerce . . . ."  18 U.S.C.

11

§ 1951(a) (emphasis added).  At trial the Government will have to provide evidence of an effect

on interstate commerce, but the "in any way or degree" language provides no basis for

dismissing the charge now.  Harrington, 108 F.3d at 1465 (quoting Lopez, 514 U.S. at 562, 567).

b.   Regulation of Non-Commercial Activity

Mostofsky also argues that § 231(a)(3) regulates criminal conduct without a sufficiently

close connection with a commercial good or activity.  See Def. Sec. Super. Ind. Br. at 8–10;

MTD at 46–47.  Congress may not "regulate noneconomic, violent criminal conduct based solely

on that conduct's aggregate effect on interstate commerce."  Morrison, 529 U.S. at 617.

However, "Morrison did not bar regulation of noneconomic conduct that affects interstate

commerce in individual instances."  United States v. Pettaway, 297 F. Supp. 3d 137, 147–48

(D.D.C. 2018); see also United States v. Hill, 927 F.3d 188, 199 (4th Cir. 2019) ("Congress may

proscribe violent conduct when such conduct interferes with or otherwise affects commerce over

which Congress has jurisdiction.").  The jurisdictional element in § 231(a)(3) requires precisely a

showing that the regulated conduct "interferes with or otherwise affects commerce" — namely,

that the individual civil disorder at issue "obstructs, delays, or adversely affects commerce or the

movement of any article or commodity in commerce."

Elaborating on this argument, Mostofsky objects to the Government's reliance on Hill

because the relevant statute there "specifically required that the victim of an unarmed assault be

engaged in commercial activity at his place of work."  Def. Sec. Super. Ind. Br. at 12 n. 2; Gov.

Sec. Super. Ind. Br. at 11.  That statute's jurisdictional element set a minimum sentence for

anyone who "willfully causes bodily injury to any person . . . because of" protected traits, if such

conduct "interferes with commercial or other economic activity in which the victim is engaged at

the time of the conduct."  18 U.S.C. §§ 249(a)(2)(A)(i) & (B)(iv)(I).  This is in fact similar to

§ 231(a)(3) since in both statutes "the *actus reus* [either causing bodily injury or acting to obstruct a law-enforcement officer] proscribed by a federal criminal statute . . . [is not] 'inherently economic.'" Hill, 927 F. 3d at 205. Despite the *actus reus* being noneconomic, both statutes may be upheld because they "proscribe conduct interfering with or affecting interstate commerce" in the form of either hurting a victim at work or disrupting efforts to contain a civil disorder that affects interstate commerce. See id. at 206. Indeed, it is often the case that the circumstances around an act are what must affect interstate commerce even though the act itself is not commercial. See, e.g., Harrington, 108 F.3d at 1469–70 ("We do not rest our holding on the understanding that the defendant was 'engaged in interstate commerce' when he participated in the robbery of the restaurant[;] . . . rather, we rely on the undisputed fact that the restaurant was engaged in interstate commerce.").

c.   Remaining Lopez Factors

Finally, turning to the other factors considered in Lopez and Morrison, Defendant argues at the outset that the Government forfeited its arguments as to these by focusing entirely on the jurisdictional element. See Def. Sec. Super. Ind. Br. at 7; Al-Tamimi v. Adelson, 916 F.3d 1, 6 (D.C. Cir. 2019). This is correct, although the Government did indirectly address the first Lopez factor in discussing Congress's power to regulate "non-commercial criminal activity." Gov. Sec. Super. Ind. Br. at 11. In any event, looking beyond the jurisdictional element is not required, and the Court observes that all recent district-court opinions to have considered whether § 231(a)(3) is valid under the Commerce Clause have done so solely based on that factor. See, e.g., Howard, 2021 WL 3856290, at *9–11; Wood, 2021 WL 3048448, at *6; Phomma, 2021 WL 4199961, at *2–4; see also Terry v. Reno, 101 F.3d 1412, 1418 (D.C. Cir. 1996) ("Lopez's fundamental proposition is that Congress must ensure that its Commerce Clause power to regulate non-

commercial activities extends to only those activities that substantially affect interstate commerce. <u>Congress may do so either through its own legislative findings or by including a jurisdictional element in the statute; it need not do both</u>.") (emphasis added).

*       *       *

In sum, the Court concurs with the Government and the other district courts that § 231(a)(3) contains a jurisdictional element that ensures a sufficient connection to interstate commerce in each application. This decision's reasoning will not create criminal liability for every instance in which someone interferes with law enforcement. <u>Cf.</u> Def. Sec. Super. Ind. Br. at 10. Section 231(a)(3) expressly limits the statute's sweep to instances where there is a civil disorder that affects interstate commerce and a defendant obstructs law-enforcement officials lawfully conducting their duties incident to such disorder. That connection to interstate commerce will need to be established in each prosecution, including in the trial in this case. <u>See, e.g.</u>, <u>Pugh</u>, slip op. at *10 ("It does not encompass all instances where a person interferes with law enforcement."); <u>Wood</u>, 2021 WL 3048448, at *6.

## 2. *Alternate Basis*

The Court may conceivably have an independent ground to uphold the statute. Because all of the conduct at issue here occurred in the District of Columbia, the Government argues that Congress was empowered to enact § 231(a)(3) in regard to the District under Article 1, Section 8, Clause 17 of the U.S. Constitution. <u>See</u> Gov. Sec. Super. Ind. Br. at 3–9. This Clause gives Congress plenary power over the District. <u>See</u> U.S. CONST., art. 1, § 8, cl. 17 (Congress may "exercise exclusive Legislation in all Cases whatsoever, over such District . . . as may. . . become the Seat of Government of the United States."); <u>see also</u> <u>Palmore v. United States</u>, 411 U.S. 389, 397 (1973) ("Congress may also exercise all the police and regulatory powers which a state

14

legislature or municipal government would have in legislating for state or local purposes [over the District.]").  Given this power, the Circuit has repeatedly held that "[w]ithin the District, Congress did not need to rely on its Commerce Clause authority," and so "it is impossible to see how a statute regulating conduct within the District of Columbia could exceed congressional authority under the Commerce Clause."  United States v. Carson, 455 F.3d 336, 368 (D.C. Cir. 2006); see also United States v. Mahdi, 598 F.3d 883, 896 (D.C. Cir. 2010) ("[T]he Commerce Clause is simply irrelevant to the [Violent Crimes in Aid of Racketeering] statute as applied in the District.").  The Government thus contends that because Mostofsky's "§ 231(a)(3) charge [is] for conduct he committed wholly inside the District of Columbia," there is no need to reach the Commerce Clause.  See Gov. Sec. Super. Ind. Br. at 2–3.

Defendant disagrees, arguing that more recent precedent suggests that the Court cannot decide a facial Commerce Clause challenge based on the fact that the statute happens to have a legitimate application in one location.  See Gordon v. Holder, 721 F.3d 638, 654 (D.C. Cir. 2013) (noting that "when a statute erases the boundaries that define a sovereign's jurisdiction[,] . . . any legitimate application is pure happenstance[,]" which may have "led the Supreme Court to sustain facial challenges to laws that omit constitutionally-required jurisdictional elements, even though all such laws necessarily have a 'plainly legitimate sweep'"); Def. Sec. Super. Ind. Br. at 3–5.  Neither Gordon, which dealt with a due-process challenge, nor any subsequent Circuit case has addressed the specific question of how courts should now consider facial Commerce Clause challenges when the relevant activity occurs within the District.  This leaves the Court with scant guidance on how to treat Mostofsky's situation.  But see Pettaway, 297 F. Supp. 3d at 149 n.9 (explaining, post-Gordon, that although not raised by the parties, "the government would likely have authority [under Article 1, Section 8, Clause 17] to indict the defendant under [18 U.S.C.]

§ 844(e), [e]ven if there were some doubt about § [844(e)]'s constitutionality outside the District of Columbia") (internal quotation marks and citation omitted).  The Court also notes that the two Circuit precedents that upheld applications of a statute in the District against facial Commerce Clause challenges, <u>Carson</u> and <u>Mahdi</u>, were decided after <u>Lopez</u> and <u>Morrison</u> and thus may have taken the jurisdictional element into consideration.  While the Court need not ultimately resolve this question because it has already found that 18 U.S.C. § 231(a)(3) satisfies the Interstate Commerce Clause, Article 1, Section 8, Clause 3, it may provide the Government another leg to stand its § 231(a)(3) count on.

### 3.   *Overbreadth*

Mostofsky also argues that § 231(a)(3) is overbroad under the First Amendment, meaning that the Court must either dismiss the charge or at least limit the statute "to prohibiting acts of violence."  MTD at 51.  "The First Amendment doctrine of overbreadth is an exception to [the] normal rule regarding the standards for facial challenges," as an individual can sue to "invalidate <u>all</u> enforcement of" a law if that "law punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep,'" and no limiting construction is available.  <u>Virginia v. Hicks</u>, 539 U.S. 113, 118–19 (2003) (quoting <u>Broadrick v. Oklahoma</u>, 413 U.S. 601, 615 (1973)); <u>see also</u> <u>City of Houston v. Hill</u>, 482 U.S. 451, 459 (1987) (criminal statutes "that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application").  Mostofsky contends that § 231(a)(3) "extends to a substantial amount of constitutionally protected speech and expressive conduct in excess of the law's legitimate sweep."  MTD at 51.  As a criminal statute, § 231(a)(3) "must be scrutinized with particular care" for overbreadth.  <u>City of Houston</u>, 482 U.S. at 459. The Court nonetheless concludes that the "strong medicine of overbreadth invalidation" is not

necessary here because the statute's potentially unconstitutional applications are few compared to its legitimate ones. Hicks, 539 U.S. at 120 (internal citation and quotation marks omitted).

To begin, while Defendant asserts that § 231(a)(3) covers "a substantial amount of constitutionally protected speech," MTD at 51, the statute's text refers to "any act to obstruct, impede, or interfere with any fireman or law enforcement officer" (emphasis added), which most courts have read not to include speech. See United States v. Mechanic, 454 F.2d 849, 853 (8th Cir. 1971) ("[T]he statute does not purport to reach speech of any kind."); Wood, 2021 WL 3048448, at *7; Pugh, No. 20-73, at *12. It is nonetheless true that there could be limited instances in which speaking constitutes the "act" of interfering with a law-enforcement officer. See, e.g., MTD at 52 (offering example of "a bystander who yells at police to desist from an arrest"). The statute's plain text, however, indicates that it is "targeted primarily if not exclusively at conduct . . . rather than speech." Phomma, 2021 WL 4199961, at *5. As a result, Defendant faces an uphill battle, since "[r]arely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech." Hicks, 539 U.S. at 124.

The statute would also not "make unlawful a substantial amount of constitutionally protected conduct," City of Houston, 482 U.S. at 459, even though some expressive conduct may fall within its remit. Mostofsky argues that the language of § 231(a)(3) sweeps in too much protected conduct since it "penaliz[es] 'any act'" that "interfere[s]" with a law-enforcement officer and fails to "draw[] any distinction that could exclude acts undertaken merely to convey a message or symbolic content." MTD at 50–52. He offers several hypotheticals that could result in unlawful applications of § 231(a)(3), including those of a bystander "who flips off officers to

distract or to encourage resistance, or one who records police activity with a cell phone." Id. at 52.

For starters, it is not clear that these examples would in fact rise to the level of "obstruct[ing], imped[ing], or interfer[ing]" with a law-enforcement officer. But even acknowledging the potential for unlawful applications, "[t]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." Members of City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 800 (1984); see also Hoffman, 334 F. Supp. at 509 (rejecting First Amendment challenge to § 231(a)(3) where defendant set forth "hypothetical situations which defendant contends would result in unconstitutional applications of" statute). Many more potential applications would fall within the "statute's plainly legitimate sweep." These would include violent conduct since "where demonstrations turn violent, they lose their protected quality as expression under the First Amendment." Grayned v. City of Rockford, 408 U.S. 104, 116 (1972); see also Wood, 2021 WL 3048448 at *7. Non-violent conduct could also be covered, since not all such conduct would be expressive. Courts refuse to "accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." United States v. O'Brien, 391 U.S. 367, 376 (1968). Indeed, conduct previously penalized under the statute includes clearly unprotected activity such as throwing items at officers, attacking officers, spraying officers, and creating a barricade to prevent officers' movement. See Phomma, 2021 WL 4199961, at *5 (listing examples of acts prosecuted); Hoffman, 334 F. Supp. at 509.

In his Reply, Mostofsky focuses on one category of protected expressive conduct — picketing — that he believes his actions were akin to and that § 231(a)(3) risks criminalizing.

See ECF No. 61 (Def. Reply) at 33–34.  Picketing is a "method of protesting where individuals stand outside of a workplace or organization to publicize an issue." Id. at 33 (quoting Picketing, WEX DICTIONARY, Legal Information Institute, https://bit.ly/3yCOP68).  A picketer could only potentially be charged under § 231(a)(3), however, if a slew of other factors were present such that the picketer was obstructing or interfering with a law-enforcement officer, that officer was "engaged in the lawful performance of his official duties," the protest involved violent acts and affected commerce or a federally protected function, and an individual or property was put in immediate danger or actually damaged.  The Supreme Court has upheld against overbreadth challenges prohibitions against picketing in similar circumstances.  See Cameron v. Johnson, 390 U.S. 611, 617 (1968) (upholding statute that prohibited picketing "engaged in in a manner which obstructs or unreasonably interferes with ingress or egress to or from the courthouse").  The potential applications of § 231(a)(3) to picketing are thus quite limited compared to all potential legitimate applications of the statute.

Finally, the Court need not adopt a limiting construction such that § 231(a)(3) reaches only violent conduct because it has not found the statute overbroad.  Broadrick, 413 U.S. at 613 (1973) (availability of limiting construction can defeat facial overbreadth challenge).  Mostofsky urges that, at minimum, the Court should adopt the Eighth Circuit's reading in Mechanic that the statute "applies only to violent physical acts."  454 F.2d at 852; MTD at 53–54.  This Court, however, agrees with the district courts outside the Eighth Circuit that such a reading is not required.  See Pugh, No. 20-73, at *12-13; Wood, 2021 WL 3048448, at *7; Phomma, 2021 WL 4199961, at *5 (all noting that violent acts may be more likely to be charged, but not limiting statute); see also ECF No. 57 (Gov. Opp. MTD) at 45–46.  The statute covers "any act to obstruct, impede, or interfere with," which on its face does not suggest an intent to limit

application only to violent acts. It may well be — and indeed appears to be thus far in the

January 6 cases — that many of the prosecutions under the statute will involve violent conduct,

especially given that the civil disorder itself must "involv[e] acts of violence." See ECF No. 47-

1 (list of criminal conduct for January 6 defendants with § 231(a)(3) charges). Nonviolent

conduct, however, could also be constitutionally punished under the statute as described above.

Indeed, the only in-Circuit case to address an overbreadth challenge to § 231(a)(3) dealt with an

individual who "erected a barricade in a public thoroughfare for the purpose of organizing,

promoting, encouraging, participating in and carrying on a riot," which is likely a nonviolent

activity. Hoffman, 334 F. Supp. at 509. The Court thus finds that the statute is not overbroad

and will not limit its scope to violent conduct.

It will not address a vagueness challenge to § 231(a)(3) as Mostofsky did not raise this

theory in his opening brief and cannot rely on a notice of supplemental authority to do so.

Plaquemines Port, Harbor & Terminal Dist. v. Fed. Maritime Comm'n, 838 F.2d 536, 550 (D.C.

Cir. 1988) (warning that supplemental brief was "an undisguised attempt to introduce new legal

theories into the case . . . not stated in [the] original brief").

    B.  18 U.S.C. § 1512(c)(2)

Mostofsky next contends that Count II should be dismissed. That count cites 18 U.S.C.

§ 1512(c)(2) in charging that Defendant "attempted to, and did, corruptly obstruct, influence, and

impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's

certification of the Electoral College vote as set out in the Twelfth Amendment to the

Constitution of the United States and 3 U.S.C. §§ 15–18." Sec. Super. Ind. at 2. The invoked

section criminalizes anyone who "corruptly . . . obstructs, influences, or impedes any official

proceeding, or attempts to do so." 18 U.S.C. § 1512(c)(2).  The term "official proceeding" is

defined in 18 U.S.C. § 1515(a)(1) as:

> (A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;
> (B) a proceeding before the Congress;
> (C) a proceeding before a Federal Government agency which is authorized by law; or
> (D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce.

As relatively simple as the language in § 1512(c)(2) appears, a proper analysis is quite involved.

Fortunately for the Court, its colleagues have engaged fully with the knotty questions and

recently issued comprehensive opinions that the Court finds persuasive.  See United States v.

Caldwell, No. 21-28, slip op. (D.D.C. Dec. 20, 2021); United States v. Sandlin, No. 21-88, 2021

WL 5865006 (D.D.C. Dec. 10, 2021).

   To begin, Mostofsky believes that the Electoral College vote is not an official proceeding

within the meaning of the statute.  See MTD at 14.  More specifically, "[e]very time the

government has attempted to give any Chapter 73 'proceeding' [the chapter of Title 18 in which

§ 1512 and § 1515 are housed] a meaning other than the business of a legal tribunal, it has

failed."  Id.  The certification of the Electoral College, he thus posits, was not a formal inquiry or

investigation that could be characterized as a "proceeding" within the meaning of the statute.  Id.

at 17–18.  Yet, § 1515 defines "official proceeding" in part as "a proceeding before the

Congress."  18 U.S.C. § 1515(a)(1)(B).  As Judge Dabney Friedrich explained with examples in

her recent opinion rejecting a defendant's similar motion to dismiss this count, "Congress's Joint

Session to certify the electoral results is . . . a formal hearing" such that it qualifies as an "official proceeding."  <u>Sandlin</u>, 2021 WL 5865006, at *4; <u>see also</u> <u>Caldwell</u>, slip op. at 8–9.  As Judge Friedrich explained, the certification has many trappings familiar from other types of proceedings including "a presiding officer, a process by which objections can be heard, debated, and ruled upon, and a decision — the certification of the results — that must be reached before the session can be adjourned."  <u>Sandlin</u>, 2021 WL 5865006, at *4.  This decision does not conflict with Circuit precedent in <u>United States v. Kelley</u>, 36 F.3d 1118 (D.C. Cir. 1994), where the Court of Appeals explicitly said that it "need not decide whether 'proceeding' has the same meaning in . . . § 1512" as in a separate statute governing obstructing, influencing, or impeding proceedings before a department, agency, or congressional inquiry or investigation because "the parties agree that a parallel should be drawn between the two sections."  <u>Id.</u> at 1128.  No such stipulation has been made in this case.  Nor does determining that Congress's certification is an "official proceeding" require the Court to wade into a political question, <u>cf.</u> MTD at 20–25, as this determination does not turn on whether the Electoral Count Act is constitutional or Congress's ability to set rules for the vote certification.

Mostofsky also maintains that the doctrine of *ejusdem generis* requires that the language in § 1512(c)(2) cover only crimes similar to those enumerated in (c)(1).  <u>See</u> MTD at 27.  That canon of construction, interpreted as "of the same kind or class," means that "when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed."  Ejusdem Generis, Black's Law Dictionary (11th ed. 2019).  To explain, (c)(1) criminalizes an act that corruptly "alters, destroys, mutilates, or conceals a record, document, or other object . . . with the intent to impair the object's integrity or availability for use in an official proceeding."  Then, (c)(2) penalizes one

who corruptly "<u>otherwise</u> . . . obstructs, influences, or impedes any official proceeding, or attempts to do so."  (Emphasis added.)  Defendant's position, consequently, is that the Government must charge that his actions were similar to those listed in (c)(1), yet he is not alleged to have destroyed or altered any record.  <u>See</u> MTD at 27.  Such a position, however, would have the Court ignore the plain meaning of the words contained in (c)(2) — to wit, "obstructs, influences, or impedes" — which cannot be read so narrowly.  <u>See</u> <u>Sandlin</u>, 2021 WL 5865006, at *5.  The use of "otherwise" is better understood as "clarif[ying] that the latter prohibits obstruction by means <u>other than</u> document destruction."  <u>Id.</u>; <u>see also</u> <u>Caldwell</u>, slip op. at 29–32.

Defendant alternatively contends that, as applied to him, § 1512(c)(2) is unconstitutionally vague both because it does not provide fair notice that the term "official proceedings" includes proceedings such as the Electoral College certification and in its use of the term "corruptly."  <u>See</u> MTD at 28–34.  As to the first question, it is difficult to fathom that a reasonable person would not believe the Electoral College certification was an official proceeding, especially since the definition of that term includes "a proceeding before Congress"; indeed, this is precisely the reason why the January 6 rioters wished to stop it.  <u>See</u> <u>Caldwell</u>, slip op. at 17 (rejecting such a challenge and explaining that "[t]he fact that this case may be a first-of-its-kind prosecution does not render the term 'official proceeding' vague as applied.  If that were the case, countless initial prosecutions under new criminal statutes would be constitutionally deficient.").

The Court also concurs with how the court defined "corruptly" in <u>Sandlin</u> — *i.e.*, requiring that defendants acted "unlawfully, and with the intent to obstruct[,]" impede, or influence an official proceeding.  <u>See</u> 2021 WL 5865006 at *14.  As Judge Friedrich noted,

United States v. Poindexter, 951 F.2d 369 (D.C. Cir. 1991), on which Mostofsky relies heavily, see MTD at 30–34, has since had its holding "cabined . . . to its facts[,]" and that case alone cannot "show[] that § 1512(c) is unconstitutionally vague." Sandlin, 2021 WL 5865006, at *11; see also Caldwell, slip op. at 20–23 (explaining why interpretation of § 1512(c) "is not controlled by Poindexter"). As a result, to the extent that Mostofsky argues that § 1512(c)(2) is vague on its face, such an argument cannot succeed "because the statute specifies 'core' behavior to which it constitutionally applies, though there may be scenarios at the edges that present vagueness problems." Sandlin, 2021 WL 5865006, at *10. The Court will also not dismiss the § 1512 charge as vague as applied to Mostofsky, given that mapping the statutory language on to his conduct, as described in the statement of facts and response to the Bill of Particulars, see Gov. Resp. Bill of Particulars at 2, is sufficient to state an offense. See Caldwell, slip op. at 24 ("Defendants cannot complain that section 1512(c)(2) does not supply fair notice if it is construed to require proof that Defendants acted with a specific intent to do what the statute prohibits: obstruct an official proceeding.").

Mostofsky adds three final arguments to the mix, but none carries the day. First, he asserts that the rule of lenity should require the resolution of ambiguities in the statute in his favor. See MTD at 34. That "last resort," Guedes v. ATF, 920 F.3d 1, 27 (D.C. Cir. 2019), has no application where the statute is reasonably clear on its face and contains no "grievous ambiguity or uncertainty." Barber v. Thomas, 560 U.S. 474, 488 (2010); see also Sandlin, 2021 WL 5865006, at *10. Next, he posits that the Government's interpretation would operate as an ex post facto law given its novelty. See MTD at 34–36. The Court has already rejected the notion that this is such a novel interpretation, and it cannot say that applying it to his conduct is

so "unexpected and indefensible by reference to the law which had been expressed prior to the conduct at issue." Bouie v. City of Columbia, 378 U.S. 347, 354 (1964).

Last, he contends that the statute is invalid under the First Amendment as applied to him. See MTD at 36–39. As Judge Amit Mehta explained in a recent decision addressing whether prosecution of certain January 6 defendants under § 1512(c)(2) violates the First Amendment, "Section 1512(c)(2) targets only 'corrupt' acts of obstructing, influencing, or impeding an official proceeding. Therefore, it does not 'proscribe lawful or constitutionally protected speech.'" Caldwell, slip op. at 48 (quoting United States v. Thompson, 76 F.3d 442, 452 (2d Cir. 1996)). Indeed, Mostofsky is not being charged for his views or his expression of them; rather, it is his actions in entering a restricted area in an alleged effort to impede the Electoral College certification that has landed him under indictment — actions that wearing a fur vest had nothing to do with. Cf. MTD at 37.

Count II may thus also proceed to trial.

C. 18 U.S.C. § 1752(a)(1) and (2)

Mostofsky next contends that Counts V and VI, which rely on 18 U.S.C. § 1752, should be dismissed. The former charges a violation of § 1752(a)(1) in that Defendant "did knowingly enter and remain in a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was temporarily visiting, without lawful authority to do so." Sec. Super. Ind. at 3. The latter is somewhat more involved and alleges a violation of § 1752(a)(2):

> Aaron Mostofsky did knowingly, and with intent to impede and disrupt the orderly conduct of Government business and official functions, engage in disorderly and disruptive conduct in and within such proximity to, a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was

25

temporarily visiting, when and so that such conduct did in fact impede and disrupt the orderly conduct of Government business and official functions.

Id.

In seeking dismissal, Mostofsky maintains that these charges are infirm because they can be brought only where the U.S. Secret Service has restricted a particular area.  Here, conversely, the evidence shows that the U.S. Capitol Police was the only law-enforcement entity to set up a barrier and cordon off the Capitol building.  Defendant also contends that the Government's application of the section to him is unconstitutionally vague, that the rule of lenity dictates a resolution of the section's ambiguities in his favor, and that the Government's interpretation "would operate as an *ex post facto* law."  See MTD at 54–60.

In considering these challenges, the Court starts with the text of the statute, bearing in mind that Mostofsky is charged with one count under § 1752(a)(1) and one under (a)(2).  Section 1752 penalizes:

(a) Whoever—
    (1) knowingly enters or remains in any restricted building or grounds without lawful authority to do so;
    (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions;

(c) In this section—
    (1) the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—
        (A) of the White House or its grounds, or the Vice President's official residence or its grounds;
        (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or

26

> (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance.
>
> (2) the term "other person protected by the Secret Service" means any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection.

The text plainly does not require that the Secret Service be the entity to restrict or cordon off a particular area. While Mostofsky talks about the original 1970 statute being geared toward the Secret Service, see MTD at 8–10, 55–58, its current language now has no such reference. In a thorough opinion rejecting all of the same arguments Mostofsky raises here (in a case in which the defendant was represented by the same counsel retained in this case), Judge Trevor McFadden of this district noted: "[T]he only reference in the statute to the Secret Service is to its protectees. Section 1752 says nothing about who must do the restricting." United States v. Griffin, No. 21-92, 2021 WL 2778557, at *4 (D.D.C. July 2, 2021); see also Caldwell, No. 21-28, ECF No. 415 (Order) at 4 (adopting reasoning in Griffin). Not only does Mostofsky nowhere mention this decision, but he also drops any argument about § 1752 in his Reply, thereby implying no great faith in his position.

Defendant's other cursory contentions — namely, unconstitutional vagueness as applied, violation of rule of lenity, and ex post facto law, see MTD at 58–60 — similarly gain no traction because they also all focus on the purported role of the Secret Service. In other words, Defendant believes that there was insufficient notice that this statute could be applied to someone who was not warned by the Secret Service to stay out. Once again, the statute says nothing about any requirement that the Secret Service be involved in restricting an area, so there is no likelihood of potential violators being misled. See Griffin, 2021 WL 2778557, at *6 ("This law is no trap awaiting the unwary."); id. ("Section 1752 is capacious, not ambiguous.").

The Court, accordingly, will deny Mostofsky's Motion as to § 1752.

## IV. Conclusion

For these reasons, the Court will deny Defendant's Motion to Dismiss. A separate Order so stating will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: December 21, 2021