UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

ETHAN NORDEAN et al.,

*Defendants*.

Criminal Action No. 21-175 (TJK)

**MEMORANDUM OPINION**

Defendants Ethan Nordean, Joseph R. Biggs, Zachary Rehl, and Charles Donohoe are alleged, among other things, to have conspired to stop, delay, or hinder Congress's certification of the Electoral College vote on January 6, 2021, and to obstruct and interfere with law enforcement officers engaged in their official duties that day. They move to dismiss the First Superseding Indictment, arguing that the various statutes at issue do not apply to their alleged conduct, and that even if they do, the laws are unconstitutional as applied to them. They also argue that the First Superseding Indictment otherwise fails to adequately allege certain offenses. For the reasons explained below, the Court will deny the motion.

I.       **Background**

In March 2021, a grand jury returned the First Superseding Indictment charging Defendants for their alleged roles in the events of January 6, 2021. According to the First Superseding Indictment, the month after the 2020 United States presidential election on November 3, 2020, the presidential electors of the United States Electoral College met in the state capital of each state and the District of Columbia. ECF No. 26 ¶ 3. Their task was to formalize the results of the election: that Joe Biden and Kamala Harris had won enough votes to be the next president and vice

president of the United States. *Id.* And on January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate convened in the United States Capitol to certify the Electoral College's vote. *Id.* ¶ 4. But, the First Superseding Indictment alleges, Congress was attacked by a crowd that breached barriers erected by the United States Capitol Police and entered the Capitol by breaking windows and ramming open doors, forcing the evacuation of members of Congress and the halting of the Joint Session until later that evening. *Id.* ¶ 20–22. By the time law enforcement regained control over the Capitol and its grounds, about 81 members of the Capitol Police and 58 members of the Metropolitan Police Department had been assaulted, and the Capitol building had suffered millions of dollars in damage. *Id.* ¶ 23.

The First Superseding Indictment alleges that Defendants helped plan and orchestrate the events of January 6. Count One charges them with conspiracy under 18 U.S.C. § 371. ECF No. 26 ¶ 27. Defendants allegedly conspired "to stop, delay, or hinder Congress's certification of the Electoral College vote," in violation of 18 U.S.C. § 1512(c)(2), and "to obstruct and interfere with law enforcement officers engaged in their official duties to protect the Capitol and its occupants from those who had unlawfully advanced onto Capitol grounds," in violation of 18 U.S.C. § 231(a)(3). *Id.* Defendants—who allegedly held leadership positions or planning roles with the "Proud Boys" organization—purportedly carried out this conspiracy by, among other things, encouraging other Proud Boys to attend the protest on January 6; "[u]sing websites, social media, and other electronic communications to raise funds to support travel and equipment purchases for the visit to Washington, D.C."; "[o]btaining paramilitary gear and supplies—including tactical vests, protective equipment, and radio equipment—for the January 6 attack"; "[s]cheming to evade detection by law enforcement by dressing 'incognito' rather than wearing Proud Boys colors";

traveling to Washington, D.C., "prior to the attack"; using "programmable handheld radios, encrypted messaging applications, and other communications equipment to communicate and coordinate the January 6 attack"; "[d]ismantling" police barricades, and "[s]torming past" those barricades and law enforcement officers "in efforts to disrupt the proceedings at the Capitol"; and obtaining "entry into the Capitol building as a result of damage to windows and doors that otherwise would have precluded entry." *Id.* ¶ 28. The First Superseding Indictment also alleges that Defendants engaged in a series of detailed overt acts in furtherance of the conspiracy, described below.

In November 2020, Nordean, Biggs, and Rehl allegedly described what would happen if the election were "stolen." ECF No. 26 ¶¶ 31–36. Two days after Election Day, Biggs posted on social media, "It's time for fucking War if they steal this shit." *Id.* ¶ 31. Nordean supposedly said, "What's more disturbing to me than the Dems trying to steal this election, is how many people . . . just accepted Biden won, despite the obvious corruption[.]" *Id.* ¶ 32 (ellipsis in original). And he allegedly later warned, "We tried playing nice and by the rules, now you will deal with the monster you created." *Id.* ¶ 34. Rehl posted: "Hopefully the firing squads are for the traitors that are trying to steal the election from the American people." *Id.* ¶ 35. And Rehl allegedly described January 6 as "the day where Congress gets to argue the legitimacy of the [E]lectoral [C]ollege votes, and yes, there will be a big rally on that day." *Id.* ¶ 36 (alterations in original).

By December, Nordean and Rehl started to raise funds for January 6. ECF No. 26 ¶¶ 37–38. Nordean allegedly created an online crowdfunding campaign, soliciting money not only for "communications" but also for "[p]rotective gear" for Proud Boys who would attend. *Id.* ¶ 37. And he supposedly "shared a link to this crowdsourcing campaign on his social media page and

encouraged others to share it" as well. *Id.* Rehl also allegedly shared a link to an online fundraiser with the name "Travel Expenses for upcoming Patriot Events." *Id.* ¶ 38.

In the days before January 6, Defendants allegedly communicated covertly to plan for the events of that day. ECF No. 26 ¶¶ 39–48. On January 5, Defendants all joined a specific encrypted messaging channel called "Boots on the Ground," which "was created for communications by Proud Boys members in Washington, D.C." *Id.* ¶ 42. The channel had been created after Donohoe expressed concern that a prior channel might be compromised by law enforcement. *Id.* ¶ 39. Not long afterward, a co-conspirator allegedly posted on the channel: "We had originally planned on breaking the guys into teams. Let's start divying them up and getting baofeng channels picked out." *Id.* ¶ 41. "Baofeng" is a "manufacturer of handheld radios and other communications equipment," according to the First Superseding Indictment. *Id.* ¶ 41 n.1. Biggs allegedly posted a message shortly after the channel was created, noting that he was with Nordean and that "[t]omorrow's the day." *Id.* ¶ 42. He then apparently asked for "numbers" so that he and others could "plan accordingly for tonight and go over tomorrow's plan." *Id.* ¶ 43. Biggs later posted in one of the encrypted messaging channels, "We have a plan." *Id.* ¶ 48. When Donohoe asked what the plan was so he could pass it on, Biggs allegedly responded that he had given a plan to the Proud Boys Chairman. *Id.*

On the morning of January 6, "a group of Proud Boys members gathered near the Washington Monument." ECF No. 26 ¶ 51. Early that morning, Donohoe communicated that he "had the keys until [Nordean] and [Rehl] show up." *Id.* at 50 (cleaned up). Nordean, Biggs, and Rehl allegedly "led the group, which included Donohoe, to the east side of the Capitol." *Id.* ¶ 52 (capitalization altered). The group with Defendants "were not wearing Proud Boys colors of black and yellow," *id.* ¶ 53, consistent with an earlier directive given by Defendants and others, *id.* ¶ 12. Just

before 1:00 p.m.—when "the Joint Session convened in the Capitol to certify the Electoral College vote," *id.* ¶ 17—the group, allegedly led again by Nordean, Biggs, and Rehl, and including Donohoe, moved to the Capitol entrance on First Street, "which was secured by a small number of Capitol Police who were standing behind waist height metal barriers," *id.* ¶ 54.

According to the First Superseding Indictment, shortly after Defendants got to the First Street entrance, the metal barriers were "violently disassembled and trampled by the crowd." ECF No. 26 ¶ 55. Defendants crossed over the same barriers, and "charged" toward the Capitol. *Id.* As Defendants moved toward the building, individuals who had arrived with them apparently continued to remove metal barriers. *Id.* ¶ 56. Eventually, Defendants came to the "west plaza of the Capitol where additional metal barricades and law enforcement were deployed to protect the Capitol and its occupants from the advancing crowd." *Id.* ¶ 57. Nordean and Biggs allegedly shook one of the barricades until they and others "were able to knock it down." *Id.* ¶ 58. Defendants and the rest of the crowd then advanced past it, toward the Capitol. *Id.*

Arriving at the west plaza, Nordean and Biggs allegedly "positioned themselves at or near the front of the crowd." ECF No. 26 ¶ 59. Biggs then recorded a video, announcing, "we've just taken the Capitol." *Id.* Donohoe helped the crowd "advance up a flight of stairs towards the Capitol," overwhelming law enforcement officers trying to contain it. *Id.* ¶ 61. Fellow Proud Boys member Dominic Pezzola used a riot shield to break a window, which "allowed rioters to enter the building and force open an adjacent door from the inside." *Id.* ¶ 62. Biggs allegedly entered the building through that adjacent door before leaving and, 30 minutes later, "forcibly" re-entered the building on the opposite side, "pushing past at least one law enforcement officer" and eventually making his way to the Senate chamber. *Id.* ¶¶ 62–65. A few minutes after Biggs first entered, a member of the "Boots on the Ground" channel posted "We just stormed the capitol."

*Id.* ¶ 62. Rehl entered the Capitol through the same door as Biggs. *Id.* ¶ 67. And Nordean "entered and remained in the Capitol, including in the Rotunda, before exiting the Capitol with another member of the Proud Boys." *Id.* ¶ 66. Later, close to 4:00 p.m., Donohoe announced on one of the encrypted messaging platforms that some were "regrouping with a second force." *Id.* ¶ 68.

As these events took place, "members of the House and Senate (including Vice President Pence) . . . were evacuated from their respective chambers. The Joint Session was halted while Capitol Police and other law-enforcement officers worked to restore order and clear the Capitol building and grounds of the unlawful occupants." *Id.* ¶ 21. It was not until 8:00 p.m. that night that the "Joint Session reconvened, presided over by Vice President Pence, who had remained within the Capitol building in a secure location throughout these events." *Id.* ¶ 22.

In the end, as asserted in the First Superseding Indictment, almost "81 members of the Capitol Police and 58 members of the Metropolitan Police Department were assaulted," as were members of the media. ECF No. 26 ¶ 23. And the Capitol building "suffered millions of dollars in damage—including broken windows and doors, graffiti, and residue from pepper spray, tear gas, and fire extinguishers deployed both by crowd members who stormed the Capitol and by Capitol Police officers trying to restore order." *Id.* Meanwhile, Defendants allegedly "celebrated the events" of that day "through communications on social media and in encrypted chat messages." *Id.* ¶ 24.

Besides conspiring to violate 18 U.S.C. §§ 1512(c)(2) and 231(a)(3), Counts Two and Three of the First Superseding Indictment also charge Defendants with violating those statutes, either as principals or under an aiding and abetting theory. ECF No. 26 ¶¶ 69–72. Defendants are alleged to have corruptly obstructed, influenced, and impeded an official proceeding, and aided and abetted others to do the same—that is, they allegedly "unlawfully entered the Capitol grounds

or the Capitol building to . . . stop, delay, and hinder Congress's certification of the Electoral College vote," and succeeded in doing so—in violation of 18 U.S.C. § 1512(c)(2). *Id.* ¶ 70. And as for the substantive 18 U.S.C. 231(a)(3) charge, Defendants purportedly "committed and attempted to commit an act to obstruct, impede, and interfere with law enforcement officers lawfully engaged in official duties incident to and during the commission of a civil disorder," and aided and abetted others to do the same. *Id.* ¶ 72. As alleged in the First Superseding Indictment, "the civil disorder obstructed, delayed, and adversely affected the conduct and performance of a federally protected function." *Id.*

Defendants are also charged with violating three other statutes. Count Five alleges that they unlawfully and knowingly entered and remained in a restricted building and grounds—*i.e.*, "any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President and Vice President-Elect were temporarily visiting"—without lawful authority to do so, in violation of 18 U.S.C. § 1752(a)(1). ECF No. 26 ¶ 76. Count Six charges them with "knowingly, and with intent to impede and disrupt the orderly conduct of Government business and official functions," engaging in "disorderly and disruptive conduct in and within such proximity to" the same restricted building and grounds, in violation of 18 U.S.C. § 1752(a)(2). *Id.* ¶ 78. Finally, in Count Four, they are charged with willfully injuring and committing depredation against property of the United States, and aiding and abetting others to do so, in violation of 18 U.S.C. § 1361. *Id.* ¶ 74. Defendants, "together and with others known and unknown, aided and abetted others known and unknown to forcibly enter the Capitol," thus causing more than $1,000 in damage to the building. *Id.*

Defendant Nordean moved to dismiss the First Superseding Indictment. ECF No. 94. Defendants Biggs, Donohoe, and Rehl later joined the motion. ECF Nos. 105, 128, 225. Defendants

argue that the Section 1512(c)(2), Section 231(a)(3), and Section 1752 charges should be dismissed because the statutes do not apply to Defendants' alleged conduct, and if the statutes do apply, they are unconstitutional.  Defendants also contend that the Section 231(a)(3) and Section 1361 charges are otherwise inadequately alleged.

## II.   Legal Standard

Before trial, a criminal defendant may move to dismiss a count of the indictment based on a "defect in the indictment."  Fed. R. Crim. P. 12(b)(3)(B).  Defects can include "lack of specificity" and "failure to state an offense."  *Id.*  A "failure to state an offense" argument includes constitutional challenges to the statute creating the charged offenses.  *See United States v. Stone*, 394 F. Supp. 3d 1, 7 (D.D.C. 2019); *United States v. Seuss*, 474 F.2d 385, 387 n.2 (1st Cir. 1973).  When considering a challenge to the indictment, "a district court is limited to reviewing the *face* of the indictment"; the Court must "presume the allegations [in the] indictment to be true."  *United States v. Sunia*, 643 F. Supp. 2d 51, 60 (D.D.C. 2009) (internal quotation marks omitted).  "The operative question is whether [those] allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed."  *United States v. Sanford, Ltd.*, 859 F. Supp. 2d 102, 107 (D.D.C. 2012).

## III.   Analysis

### A.   18 U.S.C. § 1512(c)(2)

Defendants first challenge the application of Section 1512(c)(2) to their alleged conduct both preceding January 6, 2021, and on that day.  In full, Section 1512(c) reads:

> Whoever corruptly—
>> (1) alters destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>> (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,
> shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c).  According to Defendants, Section 1512(c)(2) does not apply here because Congress's certification was not an "official proceeding," and the phrase "otherwise obstructs, influences, or impedes" is limited to conduct like the destruction or alteration of documents and other records.  In addition, if the statute is not read as they propose, Defendants argue that it is vague as applied; contravenes the rule of lenity; conflicts with the novel-construction principle; and violates the First Amendment.  None of these arguments succeeds.

### 1. Congress's Certification of the Electoral College Vote Was an "Official Proceeding" Under Section 1512(c)(2)

Defendants start by arguing that Congress's certification of the Electoral College vote was not an "official proceeding" because it did not involve "Congress's implied power of investigation in aid of legislation but instead formalized the result of the 2020 U.S. Presidential election."  ECF No. 94 at 19 (internal quotation marks omitted).  The Court is not persuaded.

Section 1515 of title 18 defines terms used in Section 1512.  It specifically provides that "the term 'official proceeding' means," among other things, "a proceeding before the Congress." 18 U.S.C. § 1515(a)(1)(B).  Although the statute does not go further to define "proceeding," the dictionary does.  The term refers to "[t]he carrying on of an action or series of actions; action; course of action; conduct, behaviour."  *Proceeding*, def. 2a, Oxford English Dictionary (3d ed. 2021), *available at* https://www.oed.com.  Under that straightforward definition, Congress's certification was a "proceeding."  According to the Electoral Count Act of 1887, a Joint Session of the Senate and House of Representatives must convene at "the hour of 1 o'clock in the afternoon"

on "the sixth day of January succeeding every meeting of the electors." 3 U.S.C. § 15; *see also* U.S. Const. art. II, § 1, cl. 3; U.S. Const. amend. XII. And the Joint Session must follow specific steps: the President of the Senate (the Vice President) must open the votes, hand them to two tellers from each House, ensure the votes are properly counted, and then call for written objections, which must be signed "by at least one Senator and one Member of the House of Representatives." 3 U.S.C. § 15. Once any objections are "received and read," they must be "submitted" to both the Senate and the House of Representatives for their decision. *Id.* "When the two Houses separate to decide upon an objection . . . each Senator and Representative may speak to such objection or question five minutes, and not more than once." *Id.* § 17. The presiding officer must end the debate after two hours. *Id.* The Senate and House "concurrently may reject the vote or votes when they agree that such vote or votes have not been so regularly given by electors whose appointment has been so certified." *Id.* § 15. In sum, that the certification of the Electoral College vote consists of these "series of actions" strongly suggests that is a "proceeding" under the statute.

That said, the Court agrees with the court in *United States v. Sandlin* that not everything that falls under this general definition of "proceeding" qualifies as a Section 1515(a)(1)(B) "proceeding" because the phrase "before the Congress" suggests that the "proceeding" must involve "some formal convocation" of the Legislative Branch.[1]  --- F. Supp. 3d ---- , 2021 WL 5865006,

---

[1] Defendants point out in a recent filing that the *Ramos* court stated that a proceeding "before" an agency implies not just "some formal convocation of the agency" but one "in which parties are directed to appear." ECF No. 248 at 3. They argue that this "defeats the [*Sandlin* court's] formality per se definition" because "'parties' are by definition those opposed in an adjudicatory proceeding." *Id.* But the Fifth Circuit's description of the relevant actors in an *agency* proceeding as "parties" means little in the context of defining a "proceeding before the Congress." Indeed, it is hard to imagine how there would be ever "parties" to a "proceeding before the Congress" in the sense Defendants describe—save for maybe an impeachment. And while they were not "parties" in the sense described by Defendants, the relevant actors here—Vice President Pence and the members of Congress—were "directed to appear" by both statute and the Constitution. 3 U.S.C. § 15; *see also* U.S. Const. art. II, § 1, cl. 3; U.S. Const. amend. XII.

at *3 (D.D.C. Dec. 10, 2021) (internal quotation marks omitted) (quoting *United States v. Ramos*, 537 F.3d 439, 462–63 (5th Cir. 2008)). But even so, Congress's certification makes the grade. Once again, the certification process mandated under the Constitution requires the Senate and House to "convene[]" in Joint Session. ECF No. 26 ¶ 4; U.S. Const. art. II, § 1, cl. 3; U.S. Const. amend. XII. And by statute, the Joint Session must happen on a specific day, at a precise time, in a particular location. 3 U.S.C. § 15. For all these reasons, the certification is therefore a "series of actions" that requires "some formal convocation," making it a "proceeding before the Congress," 18 U.S.C. § 1515(a)(1)(B), and thus an "official proceeding," *id.* § 1512(c)(2).

Defendants argue that "official proceeding" refers to something more specific than a "series of actions" before a formally convened Congress. In their view, an "official proceeding" must be in some sense adjudicative or judicial. ECF No. 94 at 21. But the text of the statute does not suggest such an interpretation. To repeat, the law defines "official proceeding" simply as a "proceeding before the Congress." 18 U.S.C. § 1515. And the cases Defendants cite are not very helpful for them in this context. They address whether *other* activities—like FBI investigations— constitute *other* types of proceedings—like "a proceeding before a Federal Government agency which is authorized by law." 18 U.S.C. § 1515(a)(1)(C); *see* ECF No. 94 at 21–22 (discussing *United States v. Ermoian*, 752 F.3d 1165 (9th Cir. 2013)); ECF No. 105 at 3.

Besides, if Congress wanted to define "official proceeding" in a way that required something more like an adjudicative setting—rather than simply "a proceeding before the Congress"— it could have imported the language it used in 18 U.S.C. § 1505. That section criminalizes obstruction of the "due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee

11

of the Congress." *Id.* But Congress did not do so, and courts presume that choice was intentional.[2] *See Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 391 (2015) ("Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another.").

And finally, even if an "official proceeding" had to be quasi-adjudicative or quasi-judicial in some way—a requirement missing from the plain text of the statute—because Congress's certification of the Electoral College vote has *some* of those features, it would pass the test. As explained above, it is a formal process. *See Ermoian*, 752 F.3d at 1170 ("[T]he descriptor 'official' indicates a sense of formality normally associated with legal proceedings[.]"); *United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009) (concluding that an agency's "detailed process of review and decision-making" was "sufficiently formal" to qualify as an "'official proceeding'"). In addition, the Vice President, as President of the Senate, serves as "presiding officer" while the votes cast by Electors are counted. 3 U.S.C. § 15. As in a court of law, members of Congress may object, which in turn causes the Senate and House of Representative to separately consider and render their separate "decision[s]" on the objection." *Id.* Further, after the count is finished, the certification must end with a "result declared."[3] *Id.* § 16.

_____

[2] If, as Defendants argue, ECF No. 248 at 4–5, there needed to be some sort of "clear[]" proof that Congress meant a "proceeding before the Congress" to be different from a proceeding before a different type of governmental body—*i.e.*, not necessarily adjudicative or investigatory—this choice would do the trick. *See, e.g.*, *SAS Institute, Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018) ("Congress's choice to depart from the model of a closely related statute is a choice neither we nor the agency may disregard.").

[3] Whether the Electoral Count Act is "interpreted as a hortatory House internal rule" or a statutory requirement, there is no question that it sets forth a list of official procedures. ECF No. 135 at 6. And that Congress has long followed those procedures—including on January 6, 2021— illustrates the formality of the certification process and why it qualifies as a "proceeding before the Congress." This Court need not, as Defendants argue, "answer nonjusticiable political questions" to come to these conclusions. *Id.* at 7.

## 2. Section 1512(c)(2) Prohibits Conduct That Need Not Impair Evidence

Defendants next argue that Section 1512(c)(2) should be limited by the subsection that comes before it—*i.e.*, Section 1512(c)(1). That section covers "corruptly . . . alter[ing], destroy[ing], multilat[ing] or conceal[ing] a record, document, or other object, or attempt[ing] to do so, with the intent to impair the object's integrity or availability for use in an official proceeding." 18 U.S.C. § 1512(c)(1). Given Section 1512(c)(1)'s focus on the impairment of evidence, Defendants say, Section 1512(c)(2) should be construed to apply only to the same. But that interpretation cannot be squared with Section 1512's statutory text or structure.

Section 1512(c)(2) prohibits conduct that "corruptly . . . obstructs, influences, or impedes" congressional proceedings. Those verbs—"obstruct," "influence," and "impede"—cover a wide range of conduct. "[O]bstruct" and "impede" can "refer to anything that blocks, makes difficult, or hinders." *Marinello v. United States* 138 S. Ct. 1101, 1106 (2018) (cleaned up). And "influence" includes "affect[ing] the condition of" or "hav[ing] an effect on." *Influence*, def. 1b, Oxford English Dictionary (3d ed. 2021), *available at* http://www.oed.com. This language is plainly "expansive" in scope, *United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013), and does not suggest a limitation along the lines Defendants propose.

The structure of the statute confirms Section 1512(c)(2)'s broad reach. Section 1512(c)(1) focuses on the destruction of documents and other records. *See* 18 U.S.C. § 1512(c)(1). Section 1512(c)(2) follows, and applies to conduct that "*otherwise* obstructs, influences, or impedes." *Id.* § 1512(c)(2) (emphasis added). The use of the word "otherwise" suggests that Section 1512(c)(2) was intended to target something different than (c)(1)—that is, conduct "beyond simple document destruction." *Burge*, 711 F.3d at 809; *see also United States v. Petruk*, 781 F.3d 438, 446–47 (8th Cir. 2015) (citing Webster's New World College Dictionary 1021 (4th ed. 2007), which defines

"otherwise" as "in another manner; differently"). In this way, Section 1512(c)(2) "operates as a catch-all."[4] *Burge*, 711 F.3d at 809.

Consistent with this reading, at least one Court of Appeals has affirmed the application of Section 1512(c)(2) to obstructive conduct without requiring that conduct to have impaired evidence. In *United States v. Phillips*, the Tenth Circuit upheld the application of Section 1512(c)(2) to a defendant's "disclos[ure] [of] the true identity of an undercover officer to a subject of" several investigations. 583 F.3d 1261, 1262 (10th Cir. 2009). The court never mentioned the impairment of evidence or testimony. It simply explained that "a reasonable jury could conclude that the natural and probable effect of" such disclosure "was impeding a federal grand jury investigation." *Id.* at 1265. In fact, the court held, "a jury could find that [the defendant] had no purpose other than to thwart such an investigation." *Id.* Similarly, there is no reason to think that Section 1512(c)(2) does not apply to Defendants' conduct charged in the First Superseding Indictment, which was allegedly intended to "stop, delay, or hinder Congress's certification of the Electoral College vote," ECF No. 26 ¶ 27, even if it did not involve the impairment of evidence.

Defendants' argument that Section 1512(c)(2)'s scope is more limited leans primarily on the canon of statutory interpretation known as *ejusdem generis*, Latin for "of the same kind." *Ass'n of Am. R. R. v. United States*, 603 F.2d 953, 963 n.28 (D.C. Cir. 1979). That canon teaches that "'when a general term follows a specific one, the general term should be understood as a reference

---

[4] The Court need not turn to legislative history for guidance, given this unambiguous text. *See Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 599 (2011) ("Congress's authoritative statement is the statutory text, not the legislative history." (quotation marks omitted)). That said, the legislative history cited by Defendants does not conflict with the Court's interpretation of Section 1512(c)(2). The comments of various Senators to which Defendants point address additional conduct Section 1512(c) would punish—*i.e.*, what "loopholes" it would close—but these comments do not suggest that Subsection (c)(2) is *limited* to those examples. ECF No. 94 at 5–6.

to subjects akin to the one with specific enumeration.'" *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 223 (2008) (quoting *Norfolk & Western R. Co. v. Train Dispatchers*, 499 U.S. 117, 129 (1991)).  But that canon has no force here.

    *Yates v. United States*—a case in which a plurality of the Court applied *ejusdem generis*— illustrates why.  574 U.S. 528 (2015) (plurality opinion).  In that case, the Supreme Court considered the meaning of the term "tangible object" as it appeared in 18 U.S.C. § 1519, which punishes anyone who "knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter" before a federal department or agency. *Id.* at 531.  In concluding that "tangible object" does not cover "fish," a plurality of the Supreme Court applied the *ejusdem generis* canon and read "tangible object" in light of the terms preceding it.  *Id.* at 545–46.  The plurality reasoned that "[w]here general words follow specific words in a statutory enumeration, the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  *Id.* at 545 (quotation marks omitted).  And Section 1519 lists first two specific things—"records" and "documents"—followed by "tangible object[s]," a more general term that encompasses both records and documents.  "Had Congress intended 'tangible object' . . . to be interpreted so generically as to capture physical objects as dissimilar as documents and fish, Congress would have had no reason to refer specifically to 'record' or 'document.'"  *Id.* at 546.  Indeed, other courts applying the canon have explained that when Congress uses "a list of specific items separated by commas and followed by a general or collective term," it signals that Congress "remained focused on [a] common attribute" when promulgating the statute.  *Ali*, 552 U.S. at 225; *see also Begay v. United States*, 553 U.S. 137 (2008) (applying *ejusdem generis* to a statute with a similar structure).

Section 1512(c)(2) is different than Section 1519 because it has no "list of specific items separated by commas and followed by a general or collective term." *Ali*, 552 U.S. at 225 (noting that the "absence of a list . . . undercuts the inference embodied in *ejusdem generis*"). Section 1512(c) has two separate clauses: Section 1512(c)(1) and Section 1512(c)(2). Section 1512(c)(1) refers to the destruction or manipulation of documents or other records. Then, set apart by a semicolon, and set off in different subsection, is the catch-all for all other efforts to obstruct an official proceeding—Section 1512(c)(2). The two subsections "have separate numbers, line breaks before, between, and after them, and equivalent indentation . . . placing the clauses visually on an equal footing." *Sandlin*, 2021 WL 5865006, at *6 (quoting *Loughrin v. United States*, 573 U.S. 351, 359 (2014)). Such "circumstances" suggest "separate meanings." *Id.*; *see also NACS v. Bd. of Governors of Fed. Rsrv. Sys.*, 746 F.3d 474, 486 (D.C. Cir. 2014) ("Even if punctuation is sometimes a minor element in interpreting the meaning of language, punctuation is often crucial. . . . After all, Congress communicates through written language, and one component of written language is grammar, including punctuation.").

Defendants also invoke the *noscitur a sociis* canon of statutory interpretation. *Noscitur a sociis* is the principle that "a word is known by the company it keeps." *Yates*, 574 U.S. at 543. The canon is used to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Id.* (quoting *Gustagson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)). Defendants point to the *Yates* plurality's use of this canon, along with *ejusdem generis*, to limit the meaning of the term "tangible object" in 18 U.S.C. § 1519. But once again, the plurality's reasoning is inapplicable here. In *Yates*, the plurality concluded that it would be "unnatural" to apply some verbs Congress used in Section 1519— "alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry"—to objects that

16

were not something like the records or documents specifically listed in the statute. *Yates*, 574 U.S. at 544. But while Section 1512(c)(1) employs verbs much like Section 1519, those in *Section 1512(c)(2)*—"obstruct[]," "influence[]," and "impede[]"—suggest no such limitation.

As for the potential for superfluity, admittedly, that gives the Court some pause. But the "preference for avoiding surplusage constructions is not absolute." *Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004). In fact, "overlap . . . is not uncommon in criminal statutes." *Loughrin*, 573 U.S. at 358 n.4. This Court agrees with the court in *Sandlin* that reading Section 1512(c)(2) to extend beyond the impairment of evidence does not "create[] *intolerable* overlap."[5] 2021 WL 5865006, at \*7. As that court explained*,* "a broad interpretation of [Section] 1512(c)(2) does not entirely subsume numerous provisions with[in] the chapter. For instance, [Section] 1512(a)(1)(C), (a)(2)(C), (b)(3), and (d)(2)–(4) proscribe conduct unrelated to an 'official proceeding.'" *Id.* The same is true with Section 1505, which concerns congressional inquiries and investigations. 18 U.S.C. § 1505. Defendants counter that these "sub-sub-sections" in Section 1512 are not "unconnected to an official proceeding" because they prohibit conduct that *could* affect an official proceeding. ECF No. 248 at 10. But that is a far cry from prohibiting conduct that *must* affect such a proceeding.[6]

---

[5] Defendants argue that the Supreme Court "has rejected the 'mere overlap' counter-canon in the context of 'catchall' provisions in obstruction statutes." ECF No. 248 at 11–12. But the cases they cite do not hold that any overlap is forbidden. In fact, in one of the cases, the Court noted that "[s]ome overlap in criminal provisions is, of course, inevitable." *Marinello*, 138 S. Ct. at 1107.

[6] As part of this argument, Defendants contend that a congressional inquiry or investigation would necessarily qualify as a "proceeding before the Congress." ECF No. 248 at 11. But as defined above—*i.e.*, a series of actions before a formally convened Congress—that is not necessarily so.

Thus, even if there is *some* overlap in these provisions without Defendants' limiting construction, it is still the better reading. The "cardinal canon" to which "a court should always turn" to "first" is that "a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992); *see also Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 881 (2019) ("Redundancy is not a silver bullet. . . . Sometimes the better overall reading of the statute contains some redundancy."). Reading Section 1512(c)(2) to include conduct unrelated to the impairment of evidence is most consistent with the text and structure of the statute, so the "'rule[] of thumb'" of trying to avoid superfluity when construing statutes must "give way." *Sebelius v. Cloer*, 569 U.S. 369, 381 (2013) (quoting *Conn. Nat'l Bank*, 503 U.S. at 253–54).

### 3. Section 1512(c)(2) Is Not Unconstitutionally Vague

Defendants next argue that Section 1512(c)(2) is unconstitutionally vague in several ways. The "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). Courts "are not concerned with vagueness in the sense that the term 'requires a person to conform his conduct to an imprecise but comprehensible normative standard,' whose satisfaction may vary depending upon whom you ask." *United States v. Bronstein*, 849 F.3d 1101, 1108 (D.C. Cir. 2017) (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)). Indeed, the doctrine does "not doubt the constitutionality of laws that call for the application of a qualitative standard . . . to real-world conduct"; after all, "the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree." *Johnson*, 576 U.S. at 603–04 (quotation marks omitted). "[T]erms

18

void for vagueness lack statutory definitions, narrowing context, or settled legal meanings." *Bronstein*, 849 F.3d at 1106 (internal quotation marks omitted) (quoting *United States v. Williams*, 553 U.S. 285, 306 (2008)).  As the D.C. Circuit has put it, "a statute's vagueness is either susceptible to judicial construction or is void for vagueness based on the application of traditional rules for statutory interpretation." *Id.*

Defendants argue that Section 1512(c)(2) is impermissibly vague in three ways.  First, they argue, the term "official proceeding" is vague if it is applied to Congress's certification.  Second, they say that applying the phrase "otherwise obstructs, influences, or impedes" to conduct other than the "impairment of evidence" is vague.  Finally, they assert that, as applied to them, the word "corruptly" renders the entire section vague.  They are wrong on all counts.

### a.      "Official proceeding"

To start, the term "official proceeding" is not vague as applied to Congress's certification of the Electoral College vote.  As explained above, an "official proceeding" is defined in the statute as a "proceeding before the Congress," 18 U.S.C. § 1515(a)(1)(B), and Congress's certification of the Electoral College vote qualifies as such.  That the statute has not been applied to Congress's certification before does not mean that someone of "ordinary intelligence" would not be forewarned of this application of the statute's plain language.  *Hill v. Colorado*, 530 U.S. 703, 732 (2000).  Nor does it signal that the statute invites arbitrariness.  Applying a straightforward reading of a statute to a novel set of facts is not "discriminatory."  ECF No. 94 at 26; *cf. United States v. Hammond*, 354 F. Supp. 3d 28, 47 (D.D.C. 2018) ("[A] court does not create a new rule if it only applies a general standard to yet another factual situation.") (quotation marks omitted).  At bottom,

applying this statute to new—even unprecedented—facts "does not, standing alone, render a statutory application so novel as to be unconstitutional for vagueness." *United States v. Harmon*, No. 19-cr-395 (BAH), 2021 WL 1518344, at *8 (D.D.C. Apr. 16, 2021).

### b.    "Otherwise obstructs, influences, or impedes"

The phrase "otherwise obstructs, influences, or impedes" is not vague as applied to Defendants' conduct for similar reasons.  As explained above, that language is best read broadly, not as constrained by the subsection preceding it.  And so read, "otherwise obstructs, influences, or impedes" plainly encompasses the conduct alleged here, even if no court has had the occasion to apply Section 1512(c)(2) to similar facts.

### c.    "Corruptly"

Defendants' vagueness argument centered on the term "corruptly" also fails.  They argue that because the D.C. Circuit found the term unconstitutionally vague in 18 U.S.C. § 1505 as applied to the defendant in *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991), the Court must also find it infirm in Section 1512(c)(2) as applied to them.  The Court disagrees.

In *Poindexter*, the defendant was charged with violating Section 1505 by, among other things, lying to Congress.  Section 1505 bars "corruptly, or by threats or force, or by any threatening letter or communication influenc[ing], obstruct[ing], or impede[ing] or endeavor[ing] to influence, obstruct, or impede . . . the due and proper exercise of" Congress's "power of inquiry."  18 U.S.C. § 1505.  Poindexter argued that "the term 'corruptly' [was] too vague to provide constitutionally adequate notice that it prohibits lying to the Congress."  *Poindexter*, 951 F.2d at 379.  The Circuit agreed.  The court explained that the term's dictionary definitions like "depraved, evil, immoral, wicked, and improper," did not clarify the word's meaning.  *Id.* 378–79 (internal quotation marks omitted).  Nor did the statute's legislative history.  *Id.* at 380–84.  Even so, the Court

did not declare "corruptly" unconstitutionally vague in all legal or factual contexts. *Id.* at 377–78, 385. In fact, it "approved" of one interpretation of the word as used in Section 1505. *United States v. Morrison*, 98 F.3d 619, 630 (D.C. Cir. 1996) (discussing *Poindexter*). The *Poindexter* court explained that Section 1505 "favors the transitive reading" of "corruptly"—*i.e.*, the word refers to "corrupting another" rather than "acting oneself 'in a corrupt or depraved manner.'" *Poindexter*, 951 F.2d at 379. Thus, the court approved of interpreting "corruptly" in Section 1505 to mean "'corrupting' another person by influencing him to violate his legal duty." *Id.* (emphasis removed). But because that interpretation did not cover lying to Congress, the court held that the word was still impermissibly vague as applied to Poindexter's conduct.

In the 30 years it has been on the books, courts have not applied *Poindexter* widely to render impotent the many obstruction statutes that use the word "corruptly." Rather, as other judges in this district pointed out recently, courts have recognized "the narrow reasoning used in *Poindexter*" and "cabined that vagueness holding to its unusual circumstances." *United States v. Edwards*, 869 F.3d 490, 502 (7th Cir. 2017) (citing cases); *see Sandlin*, 2021 WL 5865006, at *11; *United States v. Caldwell*, --- F. Supp. 3d ---- , 2021 WL 6062718, at *9 (D.D.C. Dec. 20, 2021). That trend could only have been reinforced by the Supreme Court's later decision in *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005). *See, e.g.*, *Edwards*, 869 F.3d at 502. There, in addressing the meaning of "corruptly" in Section 1512(b), the Supreme Court held that "corrupt" and "corruptly" were associated with "wrongful, immoral, depraved, or evil" behavior. *Arthur Andersen*, 544 U.S. at 705 (citing dictionaries). In that context, the Court suggested that the word meant "wrongdoing," without suggesting that it was unconstitutionally vague. *Id*. at 705–06 ("consciousness of wrongdoing" joins the meanings of "knowingly" and "corruptly" together); *see Edwards*, 869 F.3d at 502.

In any event, a key reason *Poindexter* does not control the outcome here is because of an important textual difference between Section 1505 and Section 1512(c):  Section 1512(c) favors an *intransitive* reading of the word "corruptly."  That is so because, unlike Section 1505, "corruptly" in Section 1512(c) is not linked to a "disjunctive series" of terms—"by threats," "[by] force," and "by any threatening letter or communication"—which are transitive and "take as their object a natural person."  *Poindexter*, 951 F.2d at 379.  Instead, "corruptly" in Section 1512(c) modifies two sets of open-ended verbs: "alter, destroy, mutilate, or conceal" and "obstruct, influence, or impede."  18 U.S.C. § 1512(c) (verb tense altered).  Under this structure, the focus of "corruptly" is how a defendant acts, not how he causes another person to act.[7]  As a result, "the concern that animated *Poindexter*—that a transitive reading of corruptly under [S]ection 1505 did not reach the making of false statements to Congress—is simply not present in this prosecution under [S]ection 1512(c)(2)."  *Caldwell*, 2021 WL 6062718, at *10.

For these reasons, *Poindexter* does not mandate that the Court hold Section 1512(c) unconstitutionally vague in this case.  And for those that follow, the Court finds that applying "corruptly" in Section 1512(c)(2) to Defendants' alleged conduct does not render the statute infirm in that way.  For these Defendants are alleged to have acted (1) intentionally and (2) wrongfully, in this case by unlawful means.

To begin with, the Court notes that the parties do not contest that Section 1512(c)—either through the term "corruptly" or otherwise—requires a defendant to specifically intend to obstruct, influence, or impede an official proceeding.  *See United States v. Delgado*, 984 F.3d 435, 452 (5th

---

[7] *Cf.* Kyle R. Taylor, Note, *The Obstruction of Justice Nexus Requirement After Arthur Andersen and Sarbanes-Oxley*, 93 Cornell L. Rev. 401, 423 (2008) ("[Section] 1512(c)(2) is intransitive—it applies to obstructive activity that the defendant directly performs, rather than obstructive activity that the defendant somehow encourages.").

Cir. 2021); *United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011) (to act "corruptly" is to

act "with an improper purpose" and "with the specific intent to subvert, impede or obstruct") (quot-

ing *United States v. Mintmire*, 507 F.3d 1273, 1289 (11th Cir. 2007)); *United States v. Gordon*,

710 F.3d 1124, 1151 (10th Cir. 2013) (same).  Some courts have held that the "nexus" requirement

in obstruction statutes—the requirement that "the obstructive conduct be connected to a specific

official proceeding"—is best understood as an articulation of this intent requirement.  *United*

*States v. Young*, 916 F.3d 368, 385 & n.12 (4th Cir. 2019) (citing cases); *see also United States v.*

*Hawkins*, 185 F. Supp. 3d 114, 127 (D.D.C. 2016).  But either way, the parties do not contest that

the statute requires a specific intent to obstruct.

    Against that backdrop, the Court turns to the word "corruptly."  As Judge Silberman has

observed, that word must mean something more than an intent to obstruct when a statute like this

one criminalizes merely "influenc[ing]" a proceeding before the Congress.[8]  *See United States v.*

*North*, 910 F.2d 843, 942 (D.C. Cir. 1990) (Silberman, J., concurring in part and dissenting in

part), *withdrawn and superseded in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990).  The Supreme

---

[8] Unlike many other obstruction statutes, Section 1512(c)(2) covers not just judicial proceedings, but "proceeding[s] before the Congress."  18 U.S.C. § 1515(a)(1)(C).  And while there are "'very few non-corrupt ways to or reasons for intentionally obstructing a judicial proceeding,'" "[o]ne can imagine any number of non-corrupt ways in which an individual can intend to impede the work of an agency or congressional committee."  *United States v. Russo*, 104 F.3d 431, 436 (D.C. Cir. 1997) (quoting *United States v. North*, 910 F.2d 843, 882 (D.C. Cir. 1990), *withdrawn and superseded in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990)).  On top of that, Section 1512(c) criminalizes merely "influenc[ing]" such a proceeding.  Whatever it means to be charged with "corruptly influencing" a proceeding before the Congress, "it must require more than merely acting with the purpose of influencing the congressional committee."  *North*, 910 F.2d at 942 (Silberman, J., concurring in part and dissenting in part) (discussing the meaning of "corruptly" in Section 1505).  As Judge Silberman put it, "If attempting to influence a congressional committee by itself is a crime, we might as well convert all of Washington's office buildings into prisons.  Some might not think that such a bad idea, but I doubt that Congress so intended."  *Id.*

Court in *Arthur Andersen* provided a starting point when it explained that "corrupt" and "corruptly" were associated with "wrongful, immoral, depraved, or evil" behavior. *Arthur Andersen*, 544 U.S. at 705 (citing dictionaries). True, the Circuit in *Poindexter* cautioned that words like "evil" and "immoral" offer no more specificity than "corrupt." 951 F.2d at 379. But this Court agrees with the court in *Sandlin* that reading "corruptly" to mean "wrongfully" in this context does not present the same concerns. 2021 WL 5865006, at *12–13. That is so because wrongfully provides another well-settled meaning applicable here: "contrary to law, statute, or established rule." *Id.* at *13 (citing *Wrongful*, def. 3(a), Oxford English Dictionary (2d ed. 1989)).

Many courts have, in one way or another, applied this definition in the context of alleged obstructive conduct. As some have noted, a defendant can act "wrongfully"—*i.e.*, "corruptly"—through either his means or his purpose. *See Sandlin*, 2021 WL 5865006, at *11; *see also North*, 910 F.2d at 942–43 (Silberman, J., concurring in part and dissenting in part) ("[T]o say that someone corruptly endeavors to obstruct an inquiry might mean (1) that he does so with a corrupt purpose, or (2) that he does so by independently corrupt means, or (3) both."). Here, the Court need not wade into Section 1512(c)'s application to corrupt purposes because "*independently criminal*" means qualify as corrupt. *North*, 910 F.2d at 943. Indeed, "[u]nlawful activities clearly fall within the meaning of 'corrupt' acts under any plain construction of the term." *United States v. Bailey*,

72 F.3d 138 (Table), 1995 WL 716276, at *3 (10th Cir. Nov. 22, 1995).[9]  Even courts that have

not described "corruptly" specifically in terms of unlawful means have used similar definitions.[10]

     With this definition of "corruptly" in hand, the Court has little problem finding that the use

of the word "corruptly" does not render Section 1512(c)(2) unconstitutionally vague as applied to

Defendants, whose alleged conduct involved helping to plan and orchestrate the attack on the Cap-

itol.  The First Superseding Indictment charges Defendants with obstructing Congress's certifica-

tion of the Electoral College vote through means that involved: (1) willfully injuring and commit-

ting depredation against property of the United States, and aiding and abetting others to do so, in

violation of 18 U.S.C. § 1361; (2) unlawfully and knowingly entering and remaining in the Capitol

and its grounds without lawful authority to do so, in violation of 18 U.S.C. § 1752(a)(1); (3) know-

ingly, and with intent to impede and disrupt the orderly conduct of Government business and of-

ficial functions, engaging in disorderly and disruptive conduct in the Capitol and on its grounds,

in violation of 18 U.S.C. § 1752(a)(2); and (4) steps intending to obstruct law enforcement during

a civil disorder, in violation of 18 U.S.C. § 231(a)(3).  Defendants had fair notice that this conduct

---

[9] *Accord United States v. Erickson*, 561 F.3d 1150, 1160 (10th Cir. 2009) (noting the definition of "corruptly" as "[s]omething against law") (quoting *United States v. Ogle*, 613 F.2d 233, 238 (10th Cir. 1979)); *United States v. Liebo*, 923 F.2d 1308, 1312 (8th Cir. 1991) ("[A]n act . . . 'corruptly' done" is an act "done voluntarily and intentionally, and with a bad purpose of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means.") (cleaned up).

[10] For example, as noted above, in *Poindexter*, the D.C. Circuit "expressly approved of" reading "corruptly" in the transitive sense to mean "corrupting another person by influencing him *to violate his legal duty*."  *Morrison*, 98 F.3d at 630 (internal quotation marks omitted) (quoting *Poindexter*, 951 F.2d at 379); *see also Edwards*, 869 F.3d at 502 ("'transitive' corruption" includes trying "to persuade another person to lie when the other person has a legal duty to tell the truth") (cleaned up).  Thus, it follows that when used in the intransitive sense, "corruptly" can mean to violate one's *own* legal duty.  *See Hawkins*, 185 F. Supp. 3d at 126 (observing that the defendant could "be said to have acted 'corruptly'" under Section 1512(c)(2) because he "made false statements to FBI agents and the U.S. Attorney's Office in an attempt to influence the grand jury investigation").

was proscribed by Section 1512(c)(2).  And applying Section 1512(c)(2) to the facts alleged does not make it so standardless that it calls for discriminatory or arbitrary enforcement, either.  The statute requires (1) intent to obstruct, influence, or impede an official proceeding and (2) wrong-fulness, in this case, the use of unlawful means to do so.  These requirements provide the "minimal guidelines" necessary "to govern law enforcement."  *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)).

Arguing that the statute invites discriminatory enforcement, Defendants repeatedly point to charging decisions and plea deals related to other January 6 defendants, *see* ECF No. 226 at 12–13, and the uncharged protestors on the Capitol steps during Justice Kavanaugh's confirmation hearings, *see* ECF No. 113 at 13–16.  But neither provides evidence of vagueness.  Both merely show "the Executive's exercise of discretion over charging determinations."  *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016).  And "Supreme Court precedent teaches that the presence of enforcement discretion alone does not render a statutory scheme unconstitutionally vague."  *Kincaid v. Gov't of D.C.*, 854 F.3d 721, 729 (D.C. Cir. 2017); *see also United States v. Griffin*,  --- F. Supp. 3d ---- , 2021 WL 2778557, at *7 (D.D.C. July 2, 2021) (rejecting argument that defendant's prosecution was discriminatory given large numbers of similarly situated, un-charged individuals from January 6 and uncharged protestors at Justice Kavanaugh's confirmation hearings).  "As always, enforcement requires the exercise of some degree of police judgment, but, as confined, that degree of judgment here is permissible."  *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972).

### 4.     Applying Section 1512(c)(2) To Defendants Does Not Violate the Rule of Lenity

Defendants next claim that even if Section 1512(c)(2) is not unconstitutionally vague as applied, "any ambiguities in the statute should be resolved in [their] favor under the rule of lenity."

ECF No. 94 at 30.  The rule of lenity stands "for the principle that if a criminal statute is subject to multiple meanings, the court should resolve any ambiguity in favor of the defendant." *United States v. Sun-Diamond Growers of Cal.*, 941 F. Supp. 1262, 1268 n.8 (D.D.C. 1996).  But the rule "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (cleaned up).  As explained above, Section 1512(c)(2) is not ambiguous after application the ordinary canons of statutory construction.  Thus, the rule of lenity does not apply.

### 5. Applying Section 1512(c)(2) To Defendants Is Not a Novel Construction

Defendants also insist that applying Section 1512(c)(2) to the facts alleged here amounts to a novel construction of the statute in violation of due process, because no court has applied it to a proceeding like Congress's certification.  ECF No. 94 at 31–32.  Not so.  "[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997).  That is because when a court "unexpectedly broadens a statute which on its face had been definite and precise," that "judicial enlargement . . . , applied retroactively, operates precisely like an ex post facto law." *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964).  True, no court has interpreted Section 1512(c)(2) to include the precise allegations made here.  But that does not mean that this reading "unexpectedly broadens" it. *Id.*; *see also United States v. E-Gold, Ltd.*, 550 F. Supp. 2d 82, 101 (D.D.C. 2008) (rejecting argument "that because no court has ever construed Section 1960 to deem a business that does not transact in cash to be a money transmitting business, such a construction would be novel" and thus unconstitutional).  As discussed above, Section 1512(c)(2)'s application to the allegations in the First Superseding Indictment is

27

"fairly disclosed" by the text.  *Lanier*, 520 U.S. at 266.  Thus, the Due Process Clause does not require dismissal.

In advancing this argument, Defendants rely heavily on *Bouie*, but the statute addressed in that case is quite different than Section 1512(c)(2).  In *Bouie*, the Supreme Court considered a challenge to a South Carolina law that "was admirably narrow and precise."  378 U.S. at 351.  Thus, the Court found, it "lull[ed] . . . potential defendant[s] into a false sense of security, giving [them] no reason even to suspect that" certain conduct could be "brought within it by an act of judicial construction."  *Id.* at 352.  In contrast, as described above, Section 1512(c)(2) is not "narrow" at all.  It sweeps broadly—punishing a host of "corrupt" conduct.  Thus, it hardly lulled Defendants into a false sense of security, giving them no reason to suspect that the conduct charged in the First Superseding Indictment was prohibited under Section 1512(c)(2).  *Id.*; *see also McDonald v. Champion*, 962 F.2d 1455, 1458–59 (10th Cir. 1992).

### 6.    Applying Section 1512(c)(2) To Defendants Does Not Violate the First Amendment

Finally, Defendants argue that, as applied to them, Section 1512(c)(2) violates the First Amendment.  According to Defendants, the statute's "incidental restriction on alleged First Amendment freedoms is . . . greater than is essential to the furtherance of" the Government's interest.  ECF No. 94 at 32 (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968)).  But "to prevail on an as-applied First Amendment challenge," Defendants "must demonstrate that the statute is unconstitutional as applied to [their] particular expressive activity."  *United States v. Caputo*, 201 F. Supp. 3d 65, 71 (D.D.C. 2016).  The Court easily concludes that it is not.

The Court first turns to the threshold question of whether the conduct with which Defendants are charged is protected by the First Amendment at all.  *See Caputo*, 201 F. Supp. 3d at 71

28

(explaining that "[t]he Court must first assess whether [the defendant's] conduct is, in fact, expressive"); *see also Texas v. Johnson*, 491 U.S. 397, 403 (1989) ("We must first determine whether Johnson's burning of the flag constituted expressive conduct, permitting him to invoke the First Amendment in challenging his conviction.").  It is not.  Defendants are alleged to have "corruptly" obstructed, influenced, and impeded an official proceeding, and aided and abetted others to do the same—that is, they allegedly "unlawfully entered the Capitol grounds or the Capitol building to . . . stop, delay, and hinder Congress's certification of the Electoral College vote," and succeeded in doing so.  ECF No. 26 ¶ 70.  And more specifically, they are charged with conduct involving acts of trespass, depredation of property, and interference with law enforcement, all intended to obstruct Congress's performance of its constitutional duties.  No matter Defendants political motivations or any political message they wished to express, this alleged conduct is simply not protected by the First Amendment.  Defendants are not, as they argue, charged with anything like burning flags, wearing black armbands, or participating in mere sit-ins or protests.  ECF No. 94 at 33.  Moreover, even if the charged conduct had some expressive aspect, it lost whatever First Amendment protection it may have had.  *See Grayned*, 408 U.S. at 116 ("[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment."); *Cameron v. Johnson*, 390 U.S. 611, 617 (1968) (government may punish physical obstruction); *Cox v. Louisiana*, 379 U.S. 536, 555 (1965) (The First Amendment does not allow a "group of demonstrators" to "insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations."); *United States v. Gregg*, 226 F.3d 253, 267-68 (3d Cir. 2000) ("Activities that injure, threaten, or obstruct are not protected by the First Amendment, whether or not such conduct communicates a message.").

Even assuming some aspect of Defendants' charged conduct warranted First Amendment protection, applying Section 1512(c)(2) to them still passes muster.  The Supreme Court has "held that when speech and nonspeech elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms."  *O'Brien*, 391 U.S. at 376 (cleaned up).  The Government has a weighty interest in protecting Congress's ability to function without "corrupt" interference, and that interest is unrelated to the suppression of free expression.  18 U.S.C. § 1512(c)(2). And here, given that Congress was convened in Joint Session to undertake one of its most solemn and important constitutional duties, that interest could hardly have been more important.  In addition, applying the statute to Defendants imposes no more than an incidental limitation on First Amendment freedoms, if even that.  In fact, by focusing on "corrupt" actions, the statute does not even reach free speech.  *See United States v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996) ("By targeting only such persuasion as is corrupt, Section 1512(b) does not proscribe lawful or constitutionally protected speech[.]") (cleaned up); *United States v. Jeter*, 775 F.2d 670, 679 (6th Cir. 1985) (statute limited to those who "corruptly endeavor to interfere with the due administration of justice . . . is clearly limited to . . . constitutionally unprotected and purportedly illicit activity"). Finally, the statute "leave[s] open ample alternative channels for communication of the information."  *Am. Libr. Ass'n v. Reno*, 33 F.3d 78, 88 (D.C. Cir. 1994) (*quoting Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).  Quite obviously, there were many avenues for Defendants to express their opinions about the 2020 presidential election, or their views about how Congress should perform its constitutional duties on January 6, without resorting to the conduct with which they have been charged.

30

**B.     18 U.S.C. § 231(a)(3)**

Defendants next challenge the applicability and constitutionality of 18 U.S.C. § 231(a)(3). Section 231(a)(3) prohibits "commit[ting] or attempt[ing] to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder."  18 U.S.C. § 231(a)(3).  But for the statute to apply, the "civil disorder" at issue has to in some way "obstruct[], delay[], or adversely affect[] commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function."  *Id*.  The First Superseding Indictment alleges that the civil disorder at issue "obstructed, delayed, and adversely affected the conduct and performance of a federally protected function."  ECF No. 26 ¶ 72.  Defendants say these charges must be dismissed because the First Superseding Indictment does not identify any adversely affected "federally protected function."  On top of that, Defendants claim that the statute is both unconstitutionally vague and facially overbroad.  The Court disagrees.

> **1.     The First Superseding Indictment Identifies a Federally Protected Function That Was Obstructed, Delayed or Adversely Affected by a Civil Disorder**

According to Defendants, Congress's certification of the 2020 election is not a "federally protected function," and because it is not, the First Superseding Indictment fails to identify one affected by the events of January 6, 2021.  They are right on the former, but wrong on the latter.

To begin with, the Court agrees with Defendants that Congress's certification of the 2020 election was not a "federally protected function," for purposes of Section 231(a)(3).  A "federally protected function" is defined in the statute as a "function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof; and such term shall specifically include, but not be limited to, the collection and distribution of the United States mails."  18 U.S.C. § 232(3).  The issue, then,

is whether the Congress is a "department, agency or instrumentality" for purposes of the statute. The Government argues it is a "department," ECF No. 133-1 at 13, but the Court disagrees. That term is not defined in 18 U.S.C. § 232, but it is elsewhere in Title 18 as "one of the executive departments enumerated in section 1 of Title 5, unless the context shows that such term was intended to describe the executive, legislative, or judicial branches of government." 18 U.S.C. § 6. Of course, Congress is not an "executive department." *Id.* And the Court is unconvinced that the context here shows that the word "department" includes the legislative branch. The Supreme Court has said that "fairly powerful" contextual evidence is needed to rebut the presumption that the term "department" has the ordinary meaning set forth in 18 U.S.C. § 6. *Hubbard v. United States*, 514 U.S. 695, 700 (1995). Like the statute in *Hubbard*, "there is nothing in the text of [Section 231(a)(3)], or in any related legislation, that even suggests—let alone 'shows'—that the normal definition . . . was not intended." *Id.* at 701. The only specific "federally protected function" the statute references is "the collection and distribution of the United States mails," which is carried out by the executive branch. 18 U.S.C. § 232(3).

The question of whether the First Superseding Indictment identifies a federally protected function under Section 231(a)(3) does not end there, though. In the alternative, the Government argues that the United States Secret Service's protection of the Vice President and Vice President-elect on January 6 is also a federally protected function. ECF No. 133-1 at 15. And here, the Government is on firmer ground. Unlike Congress, the Secret Service is plainly an executive department. It is part of the Department of Homeland Security, which is one of the "executive departments enumerated in section 1 of Title 5." 18 U.S.C. § 6; *see* 5 U.S.C. § 101; 18 U.S.C. § 3056. Further, the Court has no trouble concluding that the Secret Service's statutorily prescribed responsibility to protect the Vice President and Vice President-elect, 18 U.S.C. § 3056(a)(1), both

of whom the First Superseding Indictment describes as present at the Joint Session on January 6, *see* ECF No. 26 ¶ 17, counts as a function carried out "under the laws of the United States," 18 U.S.C. § 232(3).

Defendants counter that interpreting "federally protected function" to include the actions of federal law enforcement officers like the Secret Service would write the term "federally protected function" out of the statute. ECF No. 135 at 26. They argue that, under that reading, "the 'law enforcement officers' referenced in the statute would constitute both the entities *protecting* the 'function' adversely affected by the civil disorder but also the 'federally *protected* function at the same time.'" ECF No. 113 at 30; *see also* ECF No. 135 at 26. But that is not necessarily so. For instance, here, the federally protected function with which the civil disorder interfered was the Secret Service's statutorily required protection of the Vice President and Vice President-elect. But the statute prohibits a defendant from obstructing any "law enforcement officer" performing official duties "incident to and during" the civil disorder, which in this case would also include the members of the Capitol Police and Metropolitan Police Department who responded to the Capitol and its grounds that day.[11] ECF No. 26 ¶ 23. And even if Defendants are right in some cases, that

---

[11] Defendants also rely on *United States v. Rupert*, No. 20-cr-104 (NEB/TNL), 2021 WL 1341632 (D. Minn. Jan. 6, 2021) (Report & Recommendation), *adopted*, 2021 WL 942101 (D. Minn. Mar. 12, 2021), for the proposition that a "federally protected function" cannot include the efforts of federal law enforcement officers. Defendants claim that, in *Rupert*, the court "reject[ed] [the] government's argument that it could simply point to law enforcement officers interfered with during a civil disorder to satisfy the 'federally protected function' element." ECF No. 135 at 24–25. But there, the Government did not argue that federal law enforcement officers were engaging in any action that constituted a federally protected function beyond responding to the civil disorder— like the Secret Service was here. *Rupert*, 2021 WL 1341632, at *17. And in any event, the court did not have to address the merits of this issue in *Rupert*. In response to the defendant's motion to dismiss in that case, the Government essentially abandoned its "federally protected function" theory and instead argued that the civil disorders interfered with commerce. *Id.* ("[T]he Government did not address Defendant's federally-protected-function argument at all."). Thus, the Court found the Government's federally-protected-function argument moot. *Id.*

does not make the term "federally protected function" a nullity. "Language in a statute is not rendered superfluous merely because in *some* contexts that language may not be pertinent." *United States v. Turkette*, 452 U.S. 576, 583 n.5 (1981) (emphasis added).

Besides, "no canon of construction justifies construing the actual statutory language beyond what the terms can reasonably bear." *Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810, 816 (D.C. Cir. 2008) (cleaned up). Defendants effectively ask the Court "to do just that, by adding words that are not in the statute that the legislature enacted," *id.* at 816–17—*i.e.*, that "[t]he term 'federally protected function' means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States [*except law enforcement agencies*]." That construction makes no sense, especially given that "department" includes the Department of Defense, the Department of Justice, and the Department of Homeland Security—all of which include component law enforcement agencies. *See* 5 U.S.C. § 101; 18 U.S.C. § 6 (defining "department" as any executive department in 5 U.S.C. § 101).

Finally, the Court's construction of "federally protected function" is nothing new, even if cases interpreting the phrase are scarce. For example, in *United States v. Dodge*, the Eighth Circuit described law enforcement officers responding to a civil disorder on a federal enclave as "engag[ing] in a federally-protected function." 538 F.2d 770, 780 (8th Cir. 1976). And a district court in Nevada upheld a conviction under Section 231(a)(3) for interfering with agents from the Federal Bureau of Investigation when they responded to the occupation of a reservation; according to that court, both the "investigating of reported crimes and the operation of the post office were federally protected functions." *United States v. Jaramillo*, 380 F. Supp. 1375, 1377–78 (D. Neb. 1974). Defendants try to distinguish these cases by pointing out that they occurred on American Indian reservations. ECF No. 135 at 27–28. But regardless of the location, these courts still concluded

that the efforts of federal law enforcement agencies qualified as federally protected functions under the statute.[12]

### 2. Section 231(a)(3) Is Not Unconstitutionally Vague or Overbroad

Defendants also attack to the constitutionality of Section 231(a)(3), arguing that it is both vague and facially overbroad.[13] Neither argument succeeds. As explained above, a statute is impermissibly vague if it either (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732 (citing *City of Chicago v. Morales*, 527 U.S. 41, 56-57 (1999)).

Section 231(a)(3) does not carry the potential for misunderstanding or arbitrary enforcement like the statutes in the cases Defendants cite. It prohibits any "act" done "to obstruct, impede, or interfere" with law enforcement responding to a "civil disorder." 18 U.S.C. 231(a)(3). These terms are not "dependent on the subjective reaction of others," ECF No. 94 at 43—as with others like "annoying," *Coates*, 402 U.S. at 611, "unjust or unreasonable," *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 86 (1921), or "indecent," *Williams*, 553 U.S. at 306. Indeed, there are

---

[12] Defendants also argue that adopting this interpretation creates a "Fifth Amendment[] presentment" issue because "it is almost surely the case" that the Secret Service's actions were not "presented to the Grand Jury." ECF No. 135 at 27. But "if the facts alleged in the indictment warrant an inference that the jury found probable cause to support all the necessary elements of the charge, the indictment is not fatally deficient on Fifth Amendment grounds." *Sunia*, 643 F. Supp. 2d at 78 (quoting *United States v. Fern*, 155 F.3d 1318, 1325 (11th Cir. 1998)). While the Secret Service's protection of the Vice President and Vice President-elect at the Capitol on January 6 is "perhaps not explicitly alleged in the indictment," it is "necessarily implied by" the allegations that the Vice President and Vice President-elect were present at the Joint Session. *Id.*; ECF No. 26 ¶¶ 17, 21; *see also United States v. Palumbo Bros., Inc.*, 145 F.3d 850, 860 (7th Cir. 1998) ("The indictment must be 'read to include facts which are necessarily implied' and 'construed according to common sense.'") (quoting *United States v. Blinder*, 10 F.3d 1468, 1471 (9th Cir. 1993)).

[13] Throughout briefing, Defendants seem to conflate "vagueness" and "overbreadth." The two doctrines, however, are "distinct." *United States v. Hite*, 896 F. Supp. 2d 17, 21 (D.D.C. 2012). Thus, the Court addresses each argument separately.

specific fact-based ways to determine whether a "defendant's conduct interferes with or impedes others," or if a law enforcement officer is performing his official duties "incident to and during" a civil disorder. ECF No. 94 at 44. Plus, this Court must consider vagueness "as applied to the particular facts at issue, for a [defendant] who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applies to the conduct of others." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18–19 (2010) (cleaned up). The First Superseding Indictment alleges that Defendants schemed to "evade detection by law enforcement on January 6," and they themselves charged over metal barriers and past law enforcement officers toward the Capitol that day. ECF No. 26 ¶¶ 28, 55–61. "This alleged conduct would fit within the type of conduct prohibited by [Section] 231(a)(3). The statute sufficiently gives th[ese] defendant[s] notice of the conduct it prohibits." *United States v. Phomma*, No. 20-cr-465 (JO), 2021 WL 4199961, at *6 (D. Or. Sept. 15, 2021).

Defendants' overbreadth argument fares no better. "[I]n a facial challenge to the overbreadth . . . of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 458 (1987) (quoting *Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982)). "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). A defendant must show "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Id.* at 801. "Rarely, if ever, will an overbreadth challenge

succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." *Virginia v. Hicks*, 539 U.S. 113, 124 (2003).

Section 231(a)(3) "applies to persons who commit or attempt to commit 'any act to obstruct, impede, or interfere' with law enforcement or firefighters. The words 'any act' imply that the statute is directed towards conduct, not speech." *Phomma*, 2021 WL 4199961, at *5. In fact, Section 231(a)(3) does not even mention speech, and it simply does not prohibit peaceful expression or association. For these reasons, several courts have rejected arguments that Section 231(a)(3) is overbroad on its face.[14] *See id.*; *United States v. Howard*, No. 21-cr-28 (PP), 2021 WL 3856290, at *11–12 (E.D. Wis. Aug. 30, 2021); *United States v. Wood*, No. 20-cv-56 (MN), 2021 WL 3048448, at *8 (D. Del. July 20, 2021); *United States v. Mechanic*, 454 F.2d 849, 852 (8th Cir. 1971); *see also United States v. Hoffman,* 334 F. Supp. 504, 509 (D.D.C. 1971) (rejecting First Amendment challenge to Section 231(a)(3)). For the same reasons, this Court joins them.[15]

---

[14] Defendants also argue that the Section 231(a)(3) charges against them must be dismissed because they are not alleged to have committed violent acts, and the statute only reaches such acts. In doing so, they rely on *United States v. Mechanic*, in which they say the Eighth Circuit found that Section 231(a)(3) "applies only to violent physical acts." 454 F.2d 849, 852 (8th Cir. 1971). But at least one court has found that to be a misreading of *Mechanic*. In *United States v. Howard*, the court explained that "[i]t appears that the Eighth Circuit was considering the specific 'acts' committed by the defendants in that case . . . when it referenced 'violent acts.'" No. 21-cr-28 (PP), 2021 WL 3856290, at *11 (E.D. Wis. Aug. 30, 2021). In any event, there is no basis in the text of the statute for such a limitation. The Court "conclude[s] that the statute is targeted primarily if not exclusively at conduct, *whether violent or not.*" *Phomma*, 2021 WL 4199961, at *5 (emphasis added); *Howard*, 2021 WL 3856290, at *11 ("Section 231(a)(3) criminalizes *acts*—violent or otherwise—not speech."); *United States v. Wood*, No. 20-cv-56 (MN), 2021 WL 3048448, at *7 (D. Del. July 20, 2021) ("Although it may be likely that violent conduct will be at issue with a defendant charged under the statute, it is possible for nonviolent acts to also fall within the statute's prohibition.").

[15] In a recent filing, Defendants bring to the Court's attention the Northern District of Florida's decision in *Dream Defenders v. DeSantis*, --- F. Supp. 3d ----, 2021 WL 4099437 (N.D. Fla. 2021).

## C.     18 U.S.C. § 1752

Defendants argue that they could not have violated Section 1752 without entering an area restricted by the Secret Service, and the First Superseding Indictment does not allege that the Secret Service restricted either the Capitol or its grounds on January 6.  ECF No. 94 at 46.  They are right that the First Superseding Indictment alleges that the United States Capitol Police Board "closed" the area.  ECF No. 26 ¶ 15.  And the Government does not argue that any law enforcement agency other than the Capitol Police restricted the area.  *See* ECF No. 106 at 32–36.  But Defendants are wrong that the Secret Service must have restricted the Capitol building and its grounds for

---

That case does not change the Court's conclusion that Section 231(a)(3) is neither vague nor overbroad.  In *Dream Defenders*, the court found that the plaintiffs were likely to succeed in showing that a new Florida law was unconstitutionally vague and overbroad.  *Id.* at *28–29.  That law defines rioting in part as "willfully participat[ing] in a violent public disturbance involving an assembly of three or more persons, acting with a common intent to assist each other in violent and disorderly conduct."  § 870.01(2), Fla. Stat. (2021).  As Defendants point out, "civil disorder" in Section 231(a)(3) is defined using some of the same words: "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual."  18 U.S.C. § 232(1).  But there the similarities end.  Most obviously, relevant to a vagueness analysis, the language from the Florida law defines the behavior the statute prohibits, unlike the definition of "civil disorder" in Section 231(a)(3), which is only a part of the broader statute.  And Section 231(a)(3)'s definition of civil disorder does not use the same "violent public disturbance" phrase found in the Florida law, which the court in *Dream Defenders* thought left unclear how and when violence needed to be involved.  *See* 2021 WL 4099437, at *21 ("Is a violent public disturbance a peaceful protest that later turns violent?  Is it a protest that creates an imminent risk of violence?").  "Civil disorder" in Section 231(a)(3) is defined explicitly as "involving" affirmative "acts of violence."  18 U.S.C. § 232(1).  As for overbreadth, Section 231(a)(3) does not criminalize "participat[ing]" in a civil disorder, which could "consume[] vast swaths of core First Amendment speech."  2021 WL 4099437, at *29.  It prohibits "act[s]" that "obstruct, impede, or interfere," which do not.  18 U.S.C. § 231(a)(3); *see also Dream Defenders*, 2021 WL 4099437, at *29 (distinguishing Florida riot law from those that criminalize "disobeying a lawful order, . . . obstructing justice, [and] . . . actively joining in violent or destructive conduct").

Section 1752 to apply.  As several other courts in this district have already found, the statute imposes no such requirement.  *See, e.g.*, *Griffin*, 2021 WL 2778557, at *2; *United States v. Caldwell*, No. 21-cr-28 (APM), ECF No. 415 (D.D.C. Sept. 14, 2021).

Section 1752 prohibits "knowingly enter[ing] or remain[ing] in any restricted building or grounds without lawful authority to do so," as well as "knowingly" and intentionally "engag[ing] in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions."  18 U.S.C. § 1752(a)(1)–(2).  The statute defines "restricted building or grounds" to include "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting."  *Id*. § 1752(c)(1)(B).  Thus, "someone can violate the statute by knowingly 'entering without lawful authority to do so in any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting.'"  *Griffin*, 2021 WL 2778557, at *3 (quoting *Wilson v. DNC Servs. Corp*., 417 F. Supp. 3d 86, 98 (D.D.C. 2019), *aff'd*, 831 F. App'x 513 (D.C. Cir. 2020)).

At bottom, nothing in the statute's text dictates that the Secret Service must restrict the area at issue.  The statute's focus is on *where* a defendant enters, not *who* does the restricting.  Indeed, "Section 1752 says nothing about who must do the restricting."  *Griffin*, 2021 WL 2778557, at *4.  And "the only reference in the statute to the Secret Service is to its protectees."  *Id*.  Thus, the statute is not ambiguous as to who may restrict an area under it.  ECF No. 113 at 35–36; *see also Griffin*, 2021 WL 2778557, at *4 ("Just because Congress left this part of the statute open-ended does not mean any word or phrase is ambiguous or that the statute is inoperable unless the Court fills in the blank.").  And given the "straightforward" text of the statute, "there is no reason to

resort to legislative history" to discern its meaning on this point. *United States v. Gonzales*, 520 U.S. 1, 6 (1997).

None of Defendants' other arguments that the statute requires the Secret Service to do the restricting are persuasive, either. First, the "absurdities" of which Defendants warn amount to nothing. The Court in *Griffin* already rejected the notion that this interpretation would allow the Postal Service to "resolve[], unilaterally, that the 'restricted area' of the White House should extend from the State Department to the west, and to the E. Barrett Prettyman U.S. Courthouse, to the east." ECF No. 94 at 47. "The USPS could not extend the 'restricted area' to indefinite bounds because then it would no longer be an area 'of the White House or its grounds.'" *Griffin*, 2021 WL 2778557, at *5. For a similar reason, if a "Secret Service protectee . . . is 'temporarily visiting' a place[,] . . . any local police unit could" not "decide to extend the 'restricted area' to 20 blocks" around the protectee. ECF No. 113 at 35 (internal citation omitted). "[U]nder [Section] 1752(c)(1)(B), the restricted area could never encompass an area wider than the building or grounds where the Secret Service protectee was present." *Griffin*, 2021 WL 2778557, at *5.

Second, the statute is not unconstitutionally vague such that Defendant's preferred construction is necessary.[16] The text is clear and gives fair notice of the conduct it punishes, and it is not standardless enough to invite arbitrary enforcement. Put simply, "[t]his law is no trap awaiting the unwary." *Griffin*, 2021 WL 2778557, at *6. On top of that, the First Superseding Indictment

---

[16] Defendants' vagueness arguments are no more persuasive when focused on Section 1752(a)(2) specifically. That subsection concerns "disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds." 18 U.S.C. § 1752(a)(2). Defendants claim that "within such proximity to" is unconstitutionally vague. ECF No. 94 at 51. But the First Superseding Indictment alleges that Defendants were *in* the restricted area. ECF No. 26 ¶¶ 59–68, 78. So whatever "fuzzy boundary standard[]" that phrase may introduce is irrelevant here. ECF No. 94 at 52.

alleges that the Capitol grounds were restricted in a highly visible way, by being cordoned off by metal barricades and a row of Capitol Police officers.  ECF No. 26 ¶¶ 54–56, 58.

Third, neither the rule of lenity nor the "novel construction principle" require the Secret Service to have restricted the area in question.  For both doctrines "the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal."  *Lanier*, 520 U.S. at 267.  As explained above, lenity only comes into play "when a court has exhausted all canons of statutory construction" but ambiguity remains.  *Griffin*, 2021 WL 2778557, at *6.  And the novel construction principle "applies only where the judicial 'construction unexpectedly broadens a statute which on its face had been definite and precise.'"  *E-Gold, Ltd*., 550 F. Supp. 2d at 101 (quoting *Bouie*, 378 U.S. at 353).  Here, the statute is not ambiguous, nor does applying it to Defendants' alleged conduct unexpectedly broaden it.

### D.  The First Superseding Indictment Otherwise Adequately Alleges Violations of 18 U.S.C. §§ 231(a)(3) and 1361

Finally, Defendants argue that the First Superseding Indictment does not state offenses under Section 231(a)(3) and Section 1361 because it includes no relevant "specific acts or circumstances."  ECF No. 94 at 55.  Once again, the Court disagrees.  Under Federal Rule of Criminal Procedure 7(c)(1), an indictment need be only "a plain, concise, and definite written statement of the essential facts constituting the offense charged."  And the constitutional requirements are twofold:  first, the indictment must "contain the elements of the offense charged and fairly inform a defendant of the charge against which he must defend," and, second, it must allow the defendant "to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *United*

*States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007) (cleaned up).  The First Superseding Indictment satisfies these requirements for both the civil disorder charges and the destruction of government property charges.

The Court explained why the Section 231(a)(3) charges hold up when it denied Nordean's motion for a bill of particulars.  *See* ECF No. 138.  As explained there, "[t]he First Superseding Indictment specifies in great detail how [Defendants] are alleged to have" "'commit[ted] or attempt[ed] to commit any act to obstruct, impede, or interfere with'" a "'law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects . . . the conduct or performance of any federally protected function,'" either as a principal or under an aiding and abetting theory.  *Id.* at 4–5 (ellipses in original) (quoting 18 U.S.C. § 231(a)(3)); *see also id.* at 5 (detailing allegations related to civil disorder charges).  These allegations meet the standards above, which the Court notes do not require the Government to disclose all its evidence or *how* it will prove its case.

The Section 1361 charge also passes muster.  The First Superseding Indictment alleges that "[o]n January 6, 2021," Defendants "attempted to, and did, willfully injure and commit depredation against property of the United States, and did aid and abet other known and unknown to do so."  ECF No. 26 ¶ 74.  It also charges that Defendants "together and with others known and unknown, aided and abetted others known and unknown to forcibly enter the Capitol and thereby caused damage to the building in an amount more than $1,000."  *Id.*  And the Section 1361 count incorporates earlier paragraphs in the document, which include allegations that a Capitol building "door was opened after a Proud Boys member, Dominic Pezzola, charged elsewhere, used a riot shield at 2:13 p.m. to break a window that allowed rioters to enter the building and force open an

adjacent door from the inside." *Id.* ¶ 62.  These allegations, taken together and with the rest of the First Superseding Indictment, are enough to withstand a motion to dismiss.

None of this is to say that the First Superseding Indictment is a model of clarity on Section 1361.  It does not specifically allege, as the Government has since represented in response to Nordean's motion for a bill of particulars, that the depredation at issue "was Pezzola's breaking of the Capitol window."  ECF No. 138 at 7.  As the Court noted in denying the motion, that is information it would have required the Government to provide in a bill of particulars had it not already done so.  *Id.*  But the First Superseding Indictment is not deficient just because it lacks this information.  *See United States v. Brantley*, 461 F. App'x 849, 852 (11th Cir. 2012) ("The sufficiency of the indictment was also not undermined by the filing of a more detailed bill of particulars.").  Dismissal is required only when an omitted fact "is a material element of the offense."  *United States v. Thomas*, 444 F.2d 919, 922 (D.C. Cir. 1971).  And the identification of the exact property depredated is not that.  Nor does guilt "depend so crucially upon" that clarification.  *Resendiz-Ponce*, 549 U.S. at 110 (cleaned up).  The First Superseding Indictment alleges the required facts here.  *See United States v. Conlon*, 628 F.2d 150, 156 n.33 (D.C. Cir. 1980) ("There is a difference . . . between failing to state an element of the offense and being less specific than one could be in spelling out the acts that constitute the offense.").

## IV.    Conclusion

For all the above reasons, the Court will deny Defendants' motion to dismiss.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: December 28, 2021