**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
UNITED STATES OF AMERICA,      .
                               .
          Plaintiff,           .  CR No. 21-0216 (JDB)
                               .
     v.                        .
                               .  Washington, D.C.
LEO BRENT BOZELL IV,           .  Wednesday, September 6, 2023
                               .  9:46 a.m.
          Defendant.           .
. . . . . . . . . . . . . . . . .  Pages 1 through 167
```

**DAY 1**
**TRANSCRIPT OF BENCH TRIAL**
**BEFORE THE HONORABLE JOHN D. BATES**
**UNITED STATES DISTRICT JUDGE**

<u>**APPEARANCES**</u>:

```
For the Government:            ASHLEY AKERS, ESQ.
                               BRENDAN BALLOU, ESQ.
                               U.S. Attorney's Office
                               601 D Street NW
                               Washington, DC 20530


For Defendant:                 WILLIAM L. SHIPLEY, ESQ.
                               Law Offices of William L. Shipley
                               PO Box 745
                               Kailua, HI 96734


Court Reporter:                BRYAN A. WAYNE, RPR, CRR, CCP
                               U.S. Courthouse, Room 4704-A
                               333 Constitution Avenue NW
                               Washington, DC 20001
```

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

# C O N T E N T S

Government Opening Statement ........................... 11
Defense Opening Statement ............................. 18


TESTIMONY

ADAM DESCAMP:      Direct Examination..................... 23
                  Cross-Examination...................... 47
                  Redirect Examination................... 54

BRADLEY MURRAY:    Direct Examination..................... 56
                  Cross-Examination...................... 78

VICTOR NICHOLS:    Direct Examination..................... 84

KEITH ROBISHAW:    Direct Examination..................... 101
                  Cross-Examination...................... 144
                  Redirect Examination................... 158


EXHIBITS RECEIVED

Government Exhibit No. 400 ............................ 28
Government Exhibit No. 455 ............................ 30
Government Exhibit No. 405 ............................ 32
Government Exhibit No. 403 ............................ 33
Government Exhibit No. 423 ............................ 38
Government Exhibit No. 404 ............................ 41
Government Exhibit No. 1003 ........................... 45
Government Exhibit No. 1004 ........................... 63
Government Exhibit No. 1000 ........................... 69
Government Exhibit No. 1005 ........................... 74
Government Exhibit No. 1002 ........................... 75
Government Exhibit No. 1006 ........................... 87
Government Exhibit No. 1007 ........................... 90
Government Exhibit No. 407 ............................ 92
Government Exhibit No. 1008 ........................... 96
Government Exhibit No. 100 ............................ 98
Government Exhibit No. 1011 ........................... 108
Government Exhibit Nos. 101-140 ....................... 114
Government Exhibit No. 1013 ........................... 116
Government Exhibit No. 435 ............................ 125
Government Exhibit Nos. 301-305 ....................... 131
Government Exhibit No. 438 ............................ 134
Government Exhibit No. 1009  .......................... 136

1                        P R O C E E D I N G S

2              THE DEPUTY CLERK:  Good morning, Your Honor.  We're on

3       the record in criminal case 21-216, United States of America

4       versus Leo Brent Bozell.  Starting with government counsel,

5       may you please approach the podium and state your appearance

6       for the record.

7              MS. AKERS:  Good morning, Your Honor.  Ashley Akers

8       for the United States.  With me at counsel table is Brendan

9       Ballou, co-counsel, Special Agent Daniel Wright, and our

10      paralegal specialist, Aschya Boone.

11             THE COURT:  Good morning to all of you.

12             MR. SHIPLEY:  Good morning, Your Honor.  William

13      Shipley on behalf of defendant Leo Bozell, who is present

14      with me at counsel table.

15             THE COURT:  Good morning to each of you.  All right.

16      We're ready for a bench trial in this matter.  Let's do a

17      couple of preliminary things to begin with.  Are there any

18      changes in the anticipated witness list, particularly for

19      the government I think it would be that I'm looking to know

20      whether we're still dealing with as many as 13 or whether

21      we're on a more reasonable footing.

22             MS. AKERS:  Your Honor, we have reached stipulations,

23      and so we've culled that way back, so I believe we will have

24      four government witnesses.

25             THE COURT:  That will give us a chance to get this

 1      done.  Who will the four be?

 2              MS. AKERS:  We will have United States Capitol Police

 3      Sergeant Adam DesCamp, which is No. 2 on the list.  We'll then

 4      have No. 6 on the list, United States Capitol Police Officer

 5      Bradley Murray.  No. 7, Sergeant Victor Nichols.  And No. 10,

 6      Officer Keith Robishaw.  And then I guess we'll actually have

 7      the additional fifth, which is our testifying case agent,

 8      Daniel Wright, which is not on the list --

 9              THE COURT:  I was going to say -- not listed here.

10              MS. AKERS:  -- but he will be testifying.

11              THE COURT:  Okay.

12              MS. AKERS:  Thank you, Your Honor.

13              THE COURT:  All right.  In addition to that -- I'm not

14      going to try to go over the exhibits and any changes to the

15      exhibits by virtue of the stipulations.  That will just happen

16      in terms of introducing and admitting exhibits as we go along.

17      But what else do we need to talk about before we begin with

18      any opening statements that each side wants to make?

19              MS. AKERS:  Sure, Your Honor.  If we could just very

20      briefly, could I discuss the stipulations?  I think it will

21      help Your Honor understand what we're doing here.  The parties

22      have agreed to a document that's 13 pages in length that we

23      will move to admit into the record here.  It's stipulations

24      that cover many facts.  I want to point Your Honor

25      specifically to --

1          THE COURT:  It would be easier to point me if you have

2     a copy for me.

3          MS. AKERS:  Sure thing.

4        (Document tendered to the Court.)

5          THE COURT:  Thank you.  Now please go ahead, Ms. Akers.

6          MS. AKERS:  As Your Honor can see, this is a 13-page

7     document.  The first page is the general Capitol building and

8     grounds, background information.  The second page is a

9     stipulation that relates to the certification of the Electoral

10    College vote.  The third page relates to the civil disorder.

11    The parties have agreed that what was happening at the U.S.

12    Capitol building constitutes a civil disorder.

13        The fourth page, Your Honor, you'll see a stipulation to

14    interstate commerce, which is relevant to the civil disorder

15    charge, as well as the federally protected function that the

16    parties have stipulated to.  That's also relevant to the 18

17    U.S.C. 231 charge.

18        On page 5 you'll see a stipulation that the officers from

19    Capitol Police and the Metropolitan Police Department were

20    engaged in official duties, which is relevant to several of

21    the counts.  And then on page 5 you'll also see a stipulation

22    to the authenticity and admissibility of the CCTV, which will

23    be an entire government exhibit series.

24        We have on page 6 a stipulation to the Senate and House

25    recording studios.  These are the videos that were in the

1     Senate floor.  We call them the C-SPAN videos.  So we've

2     agreed to the admissibility of those.  We also have an

3     agreement to the admissibility of our open-source footage.

4     That's Exhibit 400.  That will be a bulk of the video evidence

5     that Your Honor sees during this trial.

6          On the bottom of page 6 we have a stipulation to the

7     admissibility and authenticity of photographs that we'll be

8     using.  Those are series 200.  And then on page 7 we have a

9     stipulation to montage videos.  We're not going to show those

10    to Your Honor.  I understand Your Honor has already seen those

11    in prior trials, but we will introduce those into evidence

12    when we move these stipulations here.

13         And then importantly in this case, on page 7 to page 8,

14    the parties have agreed to stipulated testimony for four

15    witnesses, a couple of whom I believe Your Honor has already

16    heard from.

17         The first is Captain Mendoza from the United States Capitol

18    Police.  This is what we typically call our overview witness

19    for January 6 cases.  She describes in the transcripts that

20    we'll move into evidence and the accompanying exhibits the

21    restricted perimeter, the events of January 6, the overview

22    that Your Honor's already very familiar with.

23         We then have agreed to stipulate to the testimony of

24    Lanelle Hawa from the United States Secret Service.  This

25    testimony in sum and the subparts, which are her exhibits,

1    are that the vice president was in the building on January 6

2    protected by the Secret Service, therefore there was the

3    restricted perimeter set up.

4        Next the parties have agreed to Daniel Schwager, the former

5    general counsel for the U.S. Senate.  His testimony, he talks

6    about the official proceeding that was going on, that there

7    was an evacuation of the president and the House and the

8    Senate, and sort of the events that had to take a recess

9    because there were people unauthorized in building.

10       And then finally the parties have agreed to the stipulated

11   testimony of Edgar Tippett.  He's our Safeway witness that

12   goes to the civil disorder count that Your Honor's also

13   familiar with.

14       And then -- we're wrapping up here.  On page 8 the parties

15   have agreed to the standard protocols for device extraction

16   for Mr. Bozell's cell phone.  This will obviate the need to

17   call the CART agent.  He agreed we performed the extraction

18   correctly.

19       Page 9, the parties have stipulated to the repair cost for

20   the door and the window.  Your Honor will see that.  Those are

21   Counts 1 and 2 relating to the 18 U.S.C. 1361 charges.  We've

22   stipulated that the costs for the repair on both of those

23   charges exceeded $1,000.

24           THE COURT:  You said Counts 1 and 2, I think.  Did you

25   mean Counts 2 and 3?

1        MS. AKERS:  That's correct, Your Honor.  Sorry about

2   that.  Thank you.

3        THE COURT:  That's all right.

4        MS. AKERS:  And then finally, on pages 9, 10, 11, 12,

5   you'll see that the defendant has stipulated to his

6   identification, that he is the person charged in the

7   superseding indictment, and that the photos that we've

8   provided in the stipulations are in fact him.  He stipulated

9   to the attire that he was wearing.  You'll see that on page 9.

10  And that will be relevant as you review videos during this

11  trial.

12      And then on the final page that we'll submit to Your Honor,

13  there will be signatures on that page.

14      So the government moves to admit the stipulation of the

15  parties as well as all of the stipulated testimonies, which is

16  the 900 series and all of their subparts into the record.

17       THE COURT:  All right.  So first question, Mr. Shipley,

18  do you agree to the stipulation and the admission of it as --

19       MR. SHIPLEY:  Yes, Your Honor.  I believe Ms. Akers has

20  a version of that that's signed by both my client and I.  So

21  we are in agreement with that.  We talked about these, both my

22  client and I as well as Ms. Akers and I have talked about

23  these at some length.  And consistent with my trial brief,

24  we're not here to deny the obvious, as I've said.

25       THE COURT:  I think you did say that.

1          MR. SHIPLEY:  I think probably the only issue that I

2    would raise is when I received the government's exhibits for

3    trial, I think they numbered over 500 individual items.  Not

4    suggesting that she intends to introduce --

5          THE COURT:  My guess is they're not going to actually

6    introduce --

7          MR. SHIPLEY:  But it kind of put me in a little bit of

8    a conundrum.  It's like, well, I'm not sure what's going to

9    come in here until she says I want to put this in.  So I guess

10   probably the only thing I want to say at this point is I need

11   to reserve the opportunity to maybe object to something

12   because the numbered exhibits that she's actually put forward

13   is far in excess of what I anticipated.

14      Now, what I think she's done -- I could be wrong -- is

15   she's simply marked for identification source material, and

16   then she's extracting exhibits from the source material, which

17   that's fine.

18          THE COURT:  We'll see where we go.  I don't think the

19   stipulation is going to be taken as limiting your ability,

20   with respect to exhibits that aren't specifically identified

21   in the stipulation, to make objections.  And I agree with you

22   that there are a lot of exhibits on the government's exhibit

23   list, and it's unlikely that all of those will be offered and

24   admitted into evidence.

25          MR. SHIPLEY:  And that's fine.  I guess -- I had

1       another thought, and now it is... time marches on for all of

2       us.  My thought just escaped me.

3              THE COURT:  It may come back.  It may come back.

4              MR. SHIPLEY:  I'll let you know when it occurs to me

5       again.  But at this point, we're generally in agreement.

6       We're ready to go forward.

7              THE COURT:  I thank the government and Mr. Shipley and

8       Mr. Bozell, obviously, for their conscientious efforts and the

9       stipulations which should make this trial more manageable for

10      everyone.

11             MR. SHIPLEY:  Thank you, Your Honor.

12             THE COURT:  All right.  With that, the only thing that

13      I would also note is that on the transcripts of witness

14      testimony, you're going to have to provide those to me at a

15      time when I can then read them.  You're not going to read them

16      into the record.

17             MS. AKERS:  That would be my hope, Your Honor.  We will

18      provide those today to you.

19             THE COURT:  So I can read them before I need to render

20      a decision in the case.

21             MS. AKERS:  Of course.

22             THE COURT:  All right.

23             MS. AKERS:  And with that, Your Honor, the government

24      does have a very brief opening statement that we would like to

25      provide.

1          THE COURT:  And Mr. Shipley, you indicated that yours
2     would be very brief.
3          MR. SHIPLEY:  I may have to revisit that now depending
4     on what I hear.
5          THE COURT:  All right.
6          MR. SHIPLEY:  I expect it will be brief.
7          THE COURT:  All right.  Well, let's begin with the
8     opening statements, and then we will go into the first
9     witness.  Will the order of witnesses be as they are listed on
10    your witness list, starting with Sergeant DesCamp?
11         MS. AKERS:  Yes, Your Honor.  This will be the order
12    that they will be presented.
13         THE COURT:  Okay.  Mr. Ballou.
14         MR. BALLOU:  Good morning, Your Honor.
15         THE COURT:  Good morning.
16         MR. BALLOU:  Can you see the presentation?
17         THE COURT:  I can.
18         MR. BALLOU:  And if you'd prefer a printed copy, we can
19    also give that to you.
20         THE COURT:  I don't need a printed copy.
21                   GOVERNMENT OPENING STATEMENT
22         MR. BALLOU:  Your Honor, as Ms. Akers mentioned, we
23    will endeavor to make this brief, but we want to help direct
24    you to understand what we're using each witness for.
25       Your Honor, we're here today to discuss the actions of

1    Leo Brent Bozell on January 6.  I obviously don't need to

2    recite the actions that day.  You're well familiar with them.

3    Suffice to say that Mr. Bozell's actions were not just an

4    attack on law enforcement and potentially elected officials,

5    but on our democratic institutions and what makes your time

6    here so very important.

7        This is Leo Brent Bozell standing in the well of the

8    Senate.  This was just one of the dozen or so places where he

9    went in and around the Capitol that day.  In fact, he was one

10   of the most active rioters in the Capitol building on January

11   6, helping to break windows, test doors, disable cameras, and

12   generally help his fellow rioters overtake the Capitol.

13       A review of Bozell's text messages before January 6 reveal

14   several things:  He believed that the election results were

15   fraudulent and that Donald Trump should have won.  He was well

16   familiar with the congressional proceedings taking place and

17   the process for the election certification.  He encouraged

18   others to go to the Capitol on the 6th, and he even helped to

19   organize entertainment for that weekend.

20       Most importantly, he prepared for violence, writing "I

21   almost hope it goes south on the 6th.  Let's just take the

22   Capitol and hang these pedo-satanist traitors."  He said,

23   "No, I'm bringing lighters, fire starters."  And "Biden will

24   never be sworn in.  We'll have World War IV before that

25   happens."

 1      Now, on January 6, Bozell first trespassed over the --

 2  and made -- on January 6, Bozell first trespassed over the

 3  restricted perimeter that prohibited the public from entering

 4  the Capitol grounds, and made his way to the base of the

 5  building's western steps.  There he climbed a bike rack that

 6  had been turned into a makeshift ladder and got under the

 7  scaffolding that had been erected for the inauguration in a

 8  few weeks' time.

 9      Once under the scaffolding, he climbed up the Capitol steps

10  where, confronted by police, he tried to rip the tarp that was

11  blocking rioters from advancing further towards the building.

12  Bozell was part of the very first group to make it up that far

13  on the steps.  Bozell tore his way through the tarp and made

14  his way to the mezzanine of the Capitol steps, where he and

15  other rioters were confronted by a line of officers.  Closed

16  circuit television shows Bozell yelling at officers and waving

17  over more agitators.

18      Then at 2:09 p.m., protesters yelled:  "Are you ready to

19  push?  Let's go."  Bozell leaned forward and pushed the line

20  of officers as rioters overwhelmed the police.  Up the stairs,

21  Bozell looked back at what the rioters had already

22  accomplished as he joined the very first group to reach the

23  Upper West Terrace.

24      Bozell then made his way to the Senate side of the

25  building, where third-party footage shows him pointing rioters

to the Senate Wing doors, the same doors through which so many rioters ultimately entered the building.

There, Bozell appeared to pick up something heavy from the ground.  He then rushed to the Senate Wing Door, where he used what appeared to be a rock to smash the door's inset window pane.  He then moved a few feet over to smash the Senate Wing Door itself.  These actions form the basis for Bozell's destruction of property charges.

As rioters began to stream into the Capitol, Bozell climbed in through the windows he helped to break, traveling over toppled furniture and shattered glass.  He did so at 2:13 p.m., making him one of the very first rioters to enter the building.  As he entered, Bozell wore some distinctive clothing that you saw on the second slide there, sunglasses, a hat, a blue hoodie that you'll see says Hershey Christian Academy on it.

Now, for nearly an hour Bozell traveled through the Capitol building, helping fellow rioters where he could.  Now, to save you time we are not going to go through every motion in that hour, but I want to point out a few highlights.

Here he was, for instance, at 2:17 p.m. at the Ohio Clock Corridor, feet away from the Senate Chamber where senators and the vice president still were.  There, police formed a fragile line to prevent rioters from advancing.  Here he was, trying to enter the office of the Senate Majority Whip.  Now, that

1    door was locked, but he was ultimately able to enter another

2    closed door before being escorted out by police.

3        Here he is on the ground floor, joining other rioters

4    near the carriage entrance, where crucially, as police tried

5    to escort rioters out of the building, Bozell chose to stay.

6    Here he is, back on the second floor, entering the Great

7    Rotunda.

8        Around 2:38 p.m., nearly an hour after -- half an hour

9    after he entered the building, Bozell made his way to the

10   Rotunda door, into the Capitol's east side.  There, rioters

11   inside the building fought police who were trying to prevent

12   other rioters from getting inside.  Bozell joined the mass of

13   people that were pushing against the police, almost crushing

14   them, until they succeeded in opening the doors and letting

15   the mass of rioters in.

16       Bozell then traveled to the third floor -- and recall,

17   Bozell had been on the second floor, then the first floor,

18   then the second floor, now he's on the third floor again --

19   and joined the group of rioters who overtook officers to

20   breach the Senate Gallery.  Rioters succeeded in getting in

21   the gallery that overlooked the well of the Senate.  And here

22   Bozell did something very important.

23       C-SPAN cameras flanked the well to record what happened

24   below.  Bozell moved the camera to face down so that it

25   couldn't record what was happening in the Senate itself.

1    Bozell then went back down to the second floor, into the
2    Senate Chamber, and went up to the well.  Bozell's actions in
3    the gallery, on the floor of the Senate, along with others,
4    show his intent to obstruct an official proceeding.

5        And this brings us back to the first photo, a photo of
6    Bozell looking out at the captured chamber, surveying what he
7    and others had accomplished.  Bozell eventually left the
8    Capitol at 3:07 p.m., nearly an hour after he first entered
9    through the broken window.

10       But after January 6, Bozell did not express remorse.
11   Rather, he was proud of his actions.  In subsequent text
12   messages he wrote:  "Capitol siege is morally justified."
13   "Someone needs to show these pictures to Dad.  Then Dad needs
14   to reconsider condemning all violence."  And, "If power is
15   stolen by child rapists and murderers, then any attempt to
16   stop them is morally justified."

17       For his actions, Bozell was charged with 10 crimes:
18   Count 1 charges him with obstruction of an official proceeding
19   for, among other things, disabling the C-SPAN camera and
20   entering the Senate Chamber.  Counts 2 and 3 charge him with
21   destruction of property for damaging the Senate Wing Door and
22   window.  Counts 4, 5, and 9 charge him with civil disorder,
23   assault, and physical assault, for shoving the officers on a
24   Capitol steps mezzanine.  Counts 6, 7, 8, and 10 charge him
25   with misdemeanors for trespass and disorderly conduct in a

1    Capitol building or grounds.

2        Let me very briefly summarize how we plan to proceed here.

3    The following Capitol Police officers will testify:

4        Officer Adam DesCamp, who we will call first, will explain

5    how the Capitol stairs were overrun.

6        Officer Bradley Murray will describe Bozell's attack on

7    officers along the stairs mezzanine.

8        Sergeant Victor Nichols will describe how Bozell and others

9    broke in through the Senate Wing Door.

10        And Officer Keith Robishaw will describe how Bozell

11    overtook the Senate floor.

12        Finally, Special Agent Dan Wright of the FBI will testify

13    about the investigation into Bozell himself, including how he

14    was identified, and the contents of his cell phone

15    communications.

16        Your Honor, I'll close simply by noting I know that you've

17    seen many of these cases, but your care and attention here

18    will help to ensure that the sorts of attacks on our law

19    enforcement and our institutions, attacks that Mr. Bozell

20    committed, never happen again.  With that, we're ready to

21    proceed.

22            THE COURT:  All right.  Mr. Shipley.

23            MR. SHIPLEY:  Good morning.

24            THE COURT:  Good morning.

25

1                    DEFENSE OPENING STATEMENT

2           MR. SHIPLEY:  I think something the Court will be

3    struck by as we work through the evidence in the case, and

4    particularly the videos, is how still images sometimes don't

5    reflect the actual video.  You're going to see many videos

6    probably in defense case of Mr. Bozell simply walking around,

7    by himself, engaging in casual conversation with various law

8    enforcement officers inside the Capitol, but not doing much of

9    anything.

10          In fact, the one that strikes me is where he's the --

11   government says he's attempting to open the Senate Minority

12   Whip's door.  He's walking down the hallway.  He passes by the

13   door.  He reaches out, grabs the handle, doesn't open, and he

14   keeps going.  No real effort to find his way into places where

15   he shouldn't go, and in fact, when he gets into the Senate

16   Chamber, he's escorted into the Senate Chamber.

17          Without question, law enforcement inside the building in

18   this time frame was far outnumbered.  And I think as one --

19   Officer Robishaw said -- I won't use his exact language, but

20   he said, we were just trying to manage a terrible situation.

21   Fair enough.  They weren't in a position where they could

22   arrest everybody inside, couldn't be done, so the best you

23   could do is just manage your way through a bad situation until

24   you can address it appropriately.

25          Mr. Bozell's not a problem for them.  You'll see many

1    videos.  Mr. Bozell is just walking around and nothing else.

2    So let's talk about just for a moment how he got into the

3    building.  I think one thing you will see demonstrated in the

4    video of him breaking two windows -- first he breaks the glass

5    doors on the Senate Wing doors, the doors that actually open,

6    two panels of glass on each door.

7        He strikes it nine or 10 times with the object in his hand,

8    which he had picked up in the grass.  You saw that still image

9    of him reaching down into the grass.  I think what he would

10   describe it as is a metal or iron drain cover for -- you know,

11   water drain.  But he only strikes the glass until it

12   fractures, and he stops.

13       And then he does essentially the same thing to the window

14   glass.  He breaks it until it fractures, and then he stops --

15   unlike video you will see of Mr. Pezzola, who's famous for

16   using a police shield to knock out the windows on the other

17   side, keeps beating on them until they're gone and two

18   openings are created and people start crawling in.

19       The distinction I think is meaningful.  Both acts are

20   destruction of government property as charged under 1361.

21   But one act is simply an act of vandalism.  The other act is

22   somebody who is making every effort they can to gain access to

23   the building.

24       I think a clarification that the Court will see and a

25   conclusion that the Court will draw when watching the videos is

1    that Mr. Bozell was engaging in vandalism.  He was not actually

2    trying to break into the building.  He took the opportunity to

3    go inside once the windows were broken out by others and many

4    people had gone in front of him.  Foolish.  Unlawful.

5    Wandering around inside the building, not allowed.  The

6    building was not just closed on January 6, it was closed for

7    Covid for many months up to January 6.  There were plenty of

8    objective indicators that should have led Mr. Bozell, as well as

9    the hundreds of other people who went inside, to conclude this

10   is not a normal day to enter into the Capitol and wander around

11   as a tourist.  Wasn't objectively reasonable to do that.

12   That's why I'm making this argument.  I may sound like a

13   prosecutor, but what I'm telling you is we didn't come here

14   to deny the obvious.  He made a lot of mistakes in judgment that

15   day.  But he was not there to attack the Congress, to interfere

16   with the Congress, to interfere with the transfer

17   of power.

18   He was by himself.  He had been with his brother earlier

19   in the day.  He was walking back to his car, which was on the

20   other side of the Capitol where he had parked that morning, the

21   same place he had parked the day before, so he knew parking was

22   available, and he was simply drawn to the growing crowd at the

23   Capitol grounds, and from that point, curiosity took over.

24   You will not see any video of him actively, aggressively

25   engaged with the police.  In fact, you know, the government put

1       a caption on one of those still images of him pushing on the

2       bike rack.  The video doesn't show him pushing on the bike rack.

3       It's his hand on the bike rack, but he's not pushing on the bike

4       rack.  At no time, at no place does he attack the police.

5           And I'm going to reserve until you actually see the video my

6       comments about pushing through the police line at the top of the

7       stairs, which forms the basis for the added charge which pushed

8       us back from our May trial date to today: the 111(a) count

9       charged with the group at the top of the stairs who overcomes a

10      line of six officers standing in their way, and then from that

11      much it's pretty much the crowd is on its way to the Senate side

12      of the building.  Sort of half of the crowd goes straight;

13      Mr. Bozell and the other half of the crowd turn to the right and

14      head for the Senate Wing doors.  Several hundred people at that

15      point.

16          But what exactly happens at that point where he pushes through

17      the officers, or, more accurately, where he's with a group of

18      other people who pushed through the officers, we're going to

19      reserve.  Because I want you to form your own opinion when you

20      see the video; it just does not support the point -- the

21      argument that the government's making.

22          At the end of the day, I expect the Court will hear from

23      Mr. Bozell, because one thing the government cannot offer to the

24      Court, and I'm troubled by the way they have gone about it in

25      other cases, is they simply assume and characterize events in

1    the worst possible light.  But Mr. Bozell can offer you exactly
2    what his thinking was.  He can tell you exactly what his
3    feelings were about the election that led him to the protest and
4    there that day.
5        And I will simply point this out for Mr. Bozell, and I'll
6    leave it at this, and we'll get into some more later:
7    Mr. Bozell is a resident of Pennsylvania.  Lives in Hershey, or
8    near Hershey.
9        In the aftermath of the election, good or ill, rightly or
10   wrongly, the State of Texas sued the State of Pennsylvania under
11   the original jurisdiction of the Supreme Court for election
12   irregularities in changes that the Pennsylvania Supreme Court
13   made to its own election laws in advance of the election.
14       Yes, Mr. Bozell was suspicious about the outcome, but so were
15   the legislators in Texas.  I don't know that it is fair to say
16   that the views of several million Americans in December and
17   early January of 2020 were so crazy and off base, based upon the
18   lens at which we view them through today.  We know so much more
19   today than any of those people knew in that time frame.
20       So as I'm sure this is no revelation to the Court, you need to
21   wait, listen to Mr. Bozell, then you'll have a complete picture
22   of what brought him there that day and what motivated his
23   conduct and what did not.
24            THE COURT:  All right.  I thank both counsel, and we're
25   ready to proceed with the first witness.

1          MR. BALLOU:  Your Honor, we'll call Sergeant Adam

2     DesCamp, who is entering.

3          ADAM DESCAMP, WITNESS FOR THE GOVERNMENT, SWORN

4                        DIRECT EXAMINATION

5     BY MR. BALLOU:

6     Q.   Can you please state your name.

7     A.   Adam DesCamp.

8     Q.   Where do you work?

9     A.   United States Capitol Police.

10    Q.   How long have you worked there?

11    A.   Going on 18 years now.

12    Q.   And what's your current position?

13    A.   I'm the lead firearms instructor for the Capitol Police.

14    Q.   And before you were at the Capitol Police, what did you

15    do?

16    A.   I was in the military for eight years.

17    Q.   And what was your title in the military, what rank?

18    A.   I was a staff sergeant in the Army, active duty military

19    police.

20    Q.   Were you deployed anywhere?

21    A.   I was.

22    Q.   Where?

23    A.   Multiple deployments to both Korea, Afghanistan, Israel,

24    and that's pretty much it for the deployments, just

25    location-wise in those different countries.

1    Q.   What was your title or rank on January 6, 2021?

2    A.   I was a sergeant on the less lethal team.

3    Q.   And can you describe briefly what the less lethal team

4    is?

5    A.   Less lethal team is a branch of the Civil Disturbance

6    Unit.  Most of us are all instructors for civil disturbance.

7    The less lethal team is the people that are trained in all the

8    different techniques and tactics for -- or weapons systems

9    that are less lethal in nature.

10   Q.   And for those of us who aren't particularly familiar with

11   the range of weapons here, can you give us an example?

12   A.   Sure.  PR-24 baton, ASP baton, pepper spray, Sabre Red,

13   all different types of deployment -- methods of deployment,

14   whether it be handheld grenades or Mark 9, Mark 60, different

15   pepper spray aerosol dispenser systems.  And then you have the

16   FN 303, which is essentially a higher-powered paintball gun

17   and then -- or paintball launcher, I'm sorry.  And then

18   there's the pepper-ball system, which is another launcher that

19   we have.

20   Q.   As part of your work either on the less lethal team or

21   somewhere else, were you ever given training on de-escalation

22   tactics?

23   A.   Yes.  Yes, we were.  I think all officers get the --

24   especially Capitol Police get the Verbal Judo de-escalation

25   training.  That all comes in the academy.

1    Q.   And when you say "Verbal Judo," is that a known term?

2    A.   Verbal Judo is what -- it's an actual known term, at

3    least for Capitol Police for what I went through.  We all used

4    the term "Verbal Judo."  It's an actual class we attend, yes.

5    Q.   And we don't need to belabor this, but just very briefly,

6    what does that Verbal Judo entail?

7    A.   It's just de-escalation techniques using, you know,

8    words.

9    Q.   Where did you begin your day on January 6, 2021?

10   A.   I was on the east front of the Capitol; that was where I

11   was posted.

12   Q.   And what were you assigned to do?

13   A.   I was assigned to the less lethal team.

14   Q.   And tell us how your day began.  We don't need to belabor

15   this, but we just want to understand generally what your

16   journey was that morning.

17   A.   It was about six o'clock.  We went in and we got all of

18   our weapons systems loaded up on the truck.  We went and we

19   assumed our positions, whether it be east front, west front,

20   whatever barricade it was, and then we just posted up for the

21   event that was about to unfold.

22   Q.   And you alluded to the event that was about to unfold.

23   What happened?

24   A.   Well, actually, we heard -- myself and my partner, her

25   name is Officer Kerkhoff, we heard over the radio that the

1    inspector, Inspector Lloyd, he was on the west front at the

2    time, he was requesting less lethal to launch their weapons

3    systems.  To us, that set off alarm bells because the less

4    lethal weapons systems that we had had never been deployed up

5    until that point in time.  We've never actually launched on

6    individuals until that day.

7         So it set off an alarm.  Officer Kerkhoff and I decided

8    to respond over to try to help and to assist.  So we ran into

9    the Capitol, the Capitol went into lockdown, so the doors

10   locked so we couldn't get out, so we had to respond back

11   through the way that we came in and run around the Upper West

12   Terrace all the way to get to the west front where the

13   situation was taking place.

14   Q.   When you got to the west side, what did you see?

15   A.   I got to the west side, and I was on the stage area, the

16   inaugural stage area, but I could see that there was a -- an

17   extensive amount of people pressed up against the -- there's a

18   police line established on the Lower West Terrace and they

19   were all tussling back and forth and, you know, going at it.

20   It was definitely a, you know, an incident where the less

21   lethal team was necessary there.

22   Q.   And you'd been working for the Capitol Police for a long

23   period at that point, you'd been in the military.  What was

24   your first reaction when you saw it?

25   A.   My first reaction was surprise.  I didn't expect to see

1    anything like that, I didn't expect to see people fighting

2    with officers.  It just -- I was kind of stunned by the whole

3    thing.

4    Q.   We'll get to the video in just a moment, but after you

5    made it to the west side, then what did you do?

6    A.   Eventually I was flagged down by Inspector Hyman, who was

7    over on the Senate side of the scaffolding steps, the Senate

8    side steps area of the Capitol, leading up to the Upper West

9    Terrace.  And she was waving at us to get our attention, so

10   myself and Officer Kerkhoff responded over to assist and see

11   what she had going on over there by the side of the

12   scaffolding.

13       And it was demonstrators that were actually on the

14   railing and in a small narrow walkway of steps leading up to

15   the Upper West Terrace that they -- they were trying to push

16   their way up there.

17   Q.   I'm pulling up what's been marked as Government Exhibit

18   400.  Start from the beginning.  I'm pulling up what's been

19   marked as Government Exhibit 400.  We'll play this for about

20   10 seconds.

21       (Video played.)

22       Try that again.  Play Exhibit 400 for just a few more

23   seconds.

24       (Video played.)

25       Sergeant, where was this video taken?

1    A.   This is on the Senate side steps location at the bottom

2    of the scaffolding.

3    Q.   And very approximately, when would this video have been

4    taken?

5    A.   Probably around twelve o'clock that day.

6    Q.   At that time where would you have been relative to this

7    video?

8    A.   I was up at the top of the scaffolding, either at the

9    center inaugural stage area or at the corner of the

10   scaffolding here.

11        MR. BALLOU:  Your Honor, given the defense has

12   stipulated to the authenticity of the 400 series, we'd move to

13   admit Government's Exhibit 400.

14        THE COURT:  Without objection, 400 is admitted.

15                              (Government Exhibit No. 400

16                                received into evidence.)

17        MR. BALLOU:  I'm going to play until 19 seconds.

18     (Video played.)

19   BY MR. BALLOU:

20   Q.   Sergeant, can you describe the man on the left?

21   A.   Sure.  He's like wearing a blue hoodie, looks like orange

22   lens sunglasses, and a hat.

23   Q.   Just so we can situate ourselves, do you see in the

24   middle sort of the man in the Revolutionary War outfit?

25   A.   I do.

1    Q.   And Sergeant, I notice you're looking at that computer.

2    Is that computer for you not working?

3    A.   It's not on, no.

4         (Deputy clerk assists.)

5    Q.   Can you see it?

6    A.   Yeah.

7    Q.   Great.  I'm going to pull up next what's been marked as

8    Government's Exhibit 455, and again I'm just going to play for

9    a few seconds here.

10        (Video played.)

11        Sergeant, where is this video taken?

12   A.   It's the same spot.  It's in the Senate side steps area

13   of the scaffolding.

14   Q.   And do you see the man in sort of the Revolutionary War

15   garb here, as we situate ourselves?

16   A.   I do, yes.

17   Q.   I don't know if you can see my cursor, but do you see the

18   man in the blue hoodie below?

19   A.   I do.

20   Q.   Okay.  I'm just going to play for a few seconds here.

21        (Video played.)

22        Okay.  At this point, what are the rioters trying to do?

23            THE COURT:  Are we going to admit this into evidence?

24            MR. BALLOU:  Your Honor, of course.  The government

25   moves to admit Exhibit 455.

1          MR. SHIPLEY:  No objection.

2          THE COURT:  Without objection, 455 is admitted.

3                              (Government Exhibit No. 455

4                               received into evidence.)

5     BY MR. BALLOU:

6     Q.   Sergeant, let's set some preliminaries here.  Where would

7     you have been at this point?

8     A.   I'm right here on the corner of the scaffolding.

9     Q.   Okay.  Were you able to see yourself in this video at

10    all?

11    A.   I wasn't in that, the last couple seconds of that video,

12    no, but I'm definitely right around in that area, as I saw my

13    partner was there.

14    Q.   Okay.  And what are the protesters trying to do at this

15    moment?

16    A.   They're trying to breach up the top of the steps there on

17    that landing, on the edge of the scaffolding.

18    Q.   And what are the police trying to do?

19    A.   We're trying to keep them down the steps.

20    Q.   Are you succeeding?

21    A.   For the moment, yes.

22    Q.   Okay.  What happens then?

23    A.   They started tearing into the scaffolding itself,

24    removing the tarp and cutting the tarp away, climbing inside

25    the scaffolding.  Once you get in there, there's a center

1    walkway area where it would be much easier access for them to

2    get up.

3    Q.   And we'll look at some more videos with the tarp but

4    could you just explain why was cutting the tarp important for

5    the protesters?

6    A.   Well, it gave them a different avenue of approach that --

7    another place where we didn't have enough officers to stop

8    them from coming up.

9    Q.   I'm going to pull up Government Exhibit 405.  I'm going

10   to mute this because it has -- the person who uploaded it had

11   a soundtrack that I think is unnecessary.  And I'm going to

12   advance to 2:10, play for about 20 seconds.

13        (Video played.)

14        Sergeant, where was this video taken?

15   A.   That's at the center area of the scaffolding where the

16   walkway was.

17   Q.   Okay.  In terms of time, where does this match with the

18   previous videos that we've been looking at?

19   A.   Not too long after.

20   Q.   Just a few minutes or --

21   A.   Yeah.  I'd say a few minutes after.

22   Q.   Okay.

23        MR. BALLOU:  Government moves to admit Exhibit 405.

24        MR. SHIPLEY:  No objection.

25        THE COURT:  Without objection, 405 is admitted.

1                          (Government Exhibit No. 405

2                              received into evidence.)

3           MR. BALLOU:  I'm going back to 2:15 in the video.

4       (Video played.)

5    BY MR. BALLOU:

6    Q.   Do you see the man in blue?

7    A.   I do.

8    Q.   Can you describe him?

9    A.   Sure.  He's wearing the blue hoodie with the orange

10   glasses, looks like a hat.  And the hoodie has like a white

11   football shape on it.

12   Q.   And what do the rioters here appear to be doing?

13   A.   They're all breaking into the scaffolding area, getting

14   into that center walkway where it's easy for them to come up.

15   Q.   Okay.  I'm going to pull up Government Exhibit 403.

16   Turn the sound back on.  Just play for a few seconds.

17          (Video played.)

18          Where was this video taken?

19   A.   That's the center of the scaffolding.

20   Q.   And can you situate it next to -- in relation to the

21   previous video we saw?

22   A.   Yes.  I was up at the top here.

23   Q.   Okay.  And the previous video, was that roughly the same

24   place or --

25   A.   Yes.

1    Q.   -- a different location?

2    A.   It's the same.

3    Q.   Okay.  And where were you when this video was taken?

4    A.   I am up at the very top at the center.  You can't see it

5    in this picture, really, but I'm directly at the far end of

6    this video.

7              MR. BALLOU:  Government moves to admit Exhibit 403.

8              MR. SHIPLEY:  No objection.

9              THE COURT:  Without objection, 403 is admitted.

10                            (Government Exhibit No. 403

11                              received into evidence.)

12   BY MR. BALLOU:

13   Q.   Okay.  And I'm pausing at 4 seconds into the video, and

14   I don't know if you can see my cursor but can you see the man

15   I'm circling here?

16   A.   I do.

17   Q.   Can you describe him?

18   A.   Sure.  It's a white male with the orange lens glasses,

19   looks like a blue hoodie, and a hat.

20   Q.   Is that the same man as the previous video?

21   A.   It appears to be, yes.

22   Q.   And can you just describe because, you know, the court

23   record won't show the actual video, where is he now in

24   relation to the previous video?

25   A.   He's inside the center scaffolding area all the way up

1    at the top on the left.

2    Q.   I'm going to play until 27 seconds.  And to the extent

3    you can, Sergeant, if you can listen to what the rioters are

4    saying at this point, that would be helpful.

5         (Video played.)

6         Did you hear what the person said just there?

7    A.   "Pass this up" is what it sounded like.

8    Q.   And based on your experience in the scene of this moment,

9    what do you think he meant by "pass this up"?

10        MR. SHIPLEY:  Objection.  Calls for speculation.

11        THE COURT:  I'll allow -- overruled.  I'll have him

12   testify based on his experience.

13   BY MR. BALLOU:

14   Q.   Do you recall them passing anything up at that point?

15   A.   The bike rack.  There was a bunch of stuff, they were

16   passing up shields that they had taken from officers, bike

17   racks.  I don't even -- could have been a plethora of other

18   things.

19   Q.   Well, let's focus on the bike racks specifically.  When

20   they were pushing the bike racks up, what were they doing with

21   those bike racks?

22   A.   They were positioning the bike racks to use against us,

23   whether it be to move us out of the way with the bike rack or

24   even attempt to throw it at us.

25        MR. SHIPLEY:  Objection.  Move to strike.  It's all

1    speculation.

2           THE COURT:  I do think that that last testimony was

3    speculative.  I'll go ahead and strike it.

4           MR. BALLOU:  I'll rephrase the question if I may,

5    Your Honor.

6           THE COURT:  Go ahead.

7    BY MR. BALLOU:

8    Q.   Did you see any rioters push the bike racks up the crowd?

9    A.   Yes.

10   Q.   What did you see them use the bike racks for?

11   A.   For using it against us, to push the officers out of the

12   way.

13   Q.   Did you personally see that?

14   A.   Yes.

15   Q.   Can you describe an instance where that happened?

16   A.   Actually, we were holding a bike rack at a point in time,

17   which was taken away from us, and then they used it -- they

18   were like jousting us with this massive bike rack, or then

19   they also used it to kind of gate us away, like push us away

20   with it.

21   Q.   I see.  I'm going to play until 57 seconds.  While you're

22   watching this, if you can pay attention to what's happening

23   with the tarp on the side and above the steps, that would be

24   helpful.

25           (Video played.)

1     Stopping at 56.  What's happening to the tarps here?

2     A.   They're cutting away at the tarp to remove it.

3     Q.   And just so we're clear, by "they" you mean the

4     protesters?

5     A.   I'm sorry?

6     Q.   By "they" you mean the protesters are cutting the tarp?

7     A.   Correct.

8     Q.   Again, why was it important for them to cut the tarp?

9     A.   The more tarp that they removed, the --

10         MR. SHIPLEY:  Calls for speculation and irrelevant.

11         THE COURT:  Use your microphone, Mr. Shipley.

12         MR. SHIPLEY:  Objection.  We're talking about --

13    speculation and irrelevant.  We're not talking about

14    Mr. Bozell.  We're talking about protesters.

15         MR. BALLOU:  Your Honor, we'll very quickly -- sorry,

16    go ahead.

17         THE COURT:  The last part of the objection is

18    overruled.

19       I think you need to rephrase to make it so that the officer

20    is not just speculating.

21         MR. BALLOU:  Understood, Your Honor.

22    BY MR. BALLOU:

23    Q.   Sergeant, did you see the rioters cut the tarp?

24    A.   I did.

25    Q.   Once they cut the tarp, what were they able to do?

1    A.    They had access to up to the landing area where all the

2    officers were at.

3    Q.    I'm going to play until 1:33.

4          (Video played.)

5          Sergeant, did you see the officers at the base of the

6    steps?

7    A.    Did I see any officers there?

8    Q.    In this video right here, did you see any officers?

9    A.    I must have missed it.  I wasn't paying attention to

10   that.  I'm sorry.

11   Q.    No, of course.  There's a lot going on here.  Let me go

12   back a few seconds.  If you can focus on where the -- I'll

13   use layman's terms, where the smoke bombs are going off, if

14   you take a look here.

15         (Video played.)

16         Do you see the officers now?

17   A.    I did.

18   Q.    What are they trying to accomplish here?

19   A.    They're trying to get people away.

20         MR. SHIPLEY:  Objection, Your Honor.  We're talking

21   about other officers, no foundation that this witness knows

22   what the other officers are doing.

23         THE COURT:  You can ask him what they appear to be

24   doing.

25         MR. BALLOU:  Of course, Your Honor.

1    BY MR. BALLOU:

2    Q.   Sergeant, based on your experience and your communication

3    with officers that day, what do they appear to be doing?

4    A.   They were trying to push the people back, get them away

5    from the scaffolding area.

6    Q.   And these smoke bombs, do you know what they are?

7    A.   I would have to speculate.  That's Metropolitan PD,

8    whatever they were throwing, with handheld grenades.

9    Q.   I'm going to try to avoid further speculation here.

10   A.   Right.

11   Q.   So we'll move on to the next video.  I'm pulling up

12   what's been marked as Government's Exhibit 423.  Play a few

13   seconds of that.

14        (Video played.)

15        Sergeant, where is this video taken?

16   A.   It's at the center walkway of the scaffolding.

17   Q.   And where would you have been at this time?

18   A.   I'm at the very top of the center walkway.

19        MR. BALLOU:  The government moves to admit Exhibit 423.

20        MR. SHIPLEY:  No objection.

21        THE COURT:  423 is admitted without objection.

22                           (Government Exhibit No. 423

23                            received into evidence.)

24   BY MR. BALLOU:

25   Q.   I'm playing until 25 seconds.

1            (Video played.)

2            What are the rioters trying to do with the bike rack

3       here?

4       A.   They're trying to take the bike rack away from us.

5       Q.   And to avoid speculation, you were at the top of the

6       steps right here at this time?

7       A.   Correct.

8       Q.   Did you personally see any rioters taking bike racks like

9       at this moment?

10      A.   I did.  I believe I'm in the next frame of this video.

11      Q.   Let's look at this a little further.  Let's play for a

12      few more seconds.

13           (Video played.)

14           Do you see yourself at this point?

15      A.   I do.  I'm there with the gas mask, kind of blurry face

16      in the back.  There.

17      Q.   I see.  So you're to the -- looking at the video, you're

18      to the right of the person in the neon jacket?

19           THE COURT:  He can circle himself on the screen.

20        (Witness complies.)

21           THE WITNESS:  There we go.  That's me.

22           MR. BALLOU:  Thank you.

23      BY MR. BALLOU:

24      Q.   Okay.  So you personally witnessed this moment?

25      A.   Correct.

1    Q.   And what are the protesters doing with the bike racks

2    here?

3    A.   They're pulling them away from us.  One, so that we can't

4    use them to block them from getting up, and then they're also,

5    once they get them, to try to use against us.

6    Q.   And do you see the man in blue on the left?

7    A.   I do.

8    Q.   Can you describe him?  I know the video's a little grainy

9    here.

10   A.   Blue hoodie, got the hood up and it looks like orange

11   lens glasses on.

12   Q.   We can advance frame by frame here.  We're stopping at

13   35 seconds.  What is he doing?

14   A.   He's trying to tear the tarp away from the poles.

15   Q.   Is this the same man who we saw in the previous videos?

16   A.   It appears to be, yes.

17   Q.   I'm pulling up what's been marked --

18        THE COURT:  You can remove the --

19        MS. AKERS:  Your Honor, our screen is not working, and

20   so I don't know that we'll be able to be removing the...

21        MR. BALLOU:  Yes.  Unfortunately, the screen at the

22   podium doesn't work either.  So I'm just working off of my

23   laptop.

24        THE COURT:  Can you show him how to do it?

25        (Deputy clerk assists.)

1              MR. BALLOU:  Thank you.

2     BY MR. BALLOU:

3     Q.   I'm pulling up what's been marked as Government's Exhibit

4     404.  I'm going to play beginning at 31:50.  31:53.  We'll

5     just play for a few seconds.

6          (Video played.)

7          Where was this video taken?

8     A.   Center of the scaffolding.  Center area of the

9     scaffolding.

10    Q.   Where were you at this time?

11    A.   Right here, directly in the middle.

12    Q.   Can you circle yourself?

13    A.   Sure.  This guy.

14             MR. BALLOU:  Government moves to admit Exhibit 404.

15             MR. SHIPLEY:  No objection.

16             THE COURT:  Without objection, 404 is admitted.

17                                (Government Exhibit No. 404

18                                 received into evidence.)

19    BY MR. BALLOU:

20    Q.   I'm going to play until 32:35.

21         (Video played.)

22         I'm going to stop just very briefly at 32:18 and I'll

23    circle here if I can do it.  Do you see this man I just

24    circled?

25    A.   I do.

1    Q.   I know it's a little grainy, but can you just generally

2    describe what you're seeing?

3    A.   White male, looks like orange sunglasses and something

4    over his head.

5    Q.   Okay.  Keep your eye on him.  We'll keep moving forward.

6         (Video played.)

7         Okay.  I'm circling him again.  Do you see him again?

8    A.   I do.

9    Q.   Okay, great.  I'm going to play until 32:50.  And as

10   we're watching, please follow the bike rack if you can see it

11   here.

12        (Video played.)

13        Stopping at 32:51.  What are the protesters doing with

14   the bike rack?

15   A.   Bringing it to the front, with us.

16   Q.   Sorry, I didn't mean to interrupt you.  Do you remember

17   what they used that bike rack for?

18   A.   Not off the top of my head.

19   Q.   Okay.  Do you remember -- you described a couple of

20   instances here.  What are some of the other instances when

21   they used bike racks at this point?

22   A.   They were either like jousting at us with it to try to

23   push us out of the way or using it like a gate to force us in

24   another direction.

25   Q.   I'm going to advance to 33:12, and we'll play until

1      33:31.

2            (Video played.)

3            Okay.  Can you see the person I've circled?

4      A.    I can.

5      Q.    Can you just describe him very briefly?

6      A.    There's a couple faces in there.

7      Q.    Let me try to advance a few frames.  Right here.

8      A.    Okay.  I see the blue hoodie.

9      Q.    What does he appear to be doing as I advance frame by

10     frame?

11     A.    They're tearing that tarp away.

12     Q.    I'm going to advance to 34:03.

13           (Video played.)

14           Let's pause for a moment at 33:54.  Can you see yourself

15     here?

16     A.    I can.

17     Q.    Can you circle yourself?

18     A.    Yeah.

19           (Witness complies.)

20     Q.    Great.  Thank you.  I'll clear this.

21           (Video played.)

22           Okay.  And can you see the man I've circled there?

23     A.    In the blue hoodie, yeah.

24     Q.    What does he appear to be doing?

25     A.    They're still tearing away at the tarp there.

1    Q.   Advance to 34:14.

2         (Video played.)

3         We'll advance frame by frame.  Do you see the man in

4    blue?

5    A.   I saw him, yes.

6    Q.   What was he doing?

7    A.   He continued to cut the tarp all the way to the corner.

8    Q.   I'm pulling up what's been marked as Government Exhibit

9    1003.  This is a slightly different angle.  Where was this

10   video taken?

11   A.   It's the Senate side steps of the Capitol on the west

12   front.

13   Q.   Can you just situate us, where does this sit in relation

14   to the previous videos we've been looking at?

15   A.   The center scaffolding videos we were watching is

16   slightly to the left of the American flag in the top corner

17   there, and the corner of the scaffolding would be to the right

18   of the center step -- the center walkway video that we were

19   watching.

20   Q.   So many of the previous videos that we've been looking

21   at would be inside the scaffolding that we're looking at now?

22   A.   Correct.

23        MR. BALLOU:  Government moves to admit 1003.

24        MR. SHIPLEY:  No objection.

25        THE COURT:  1003 is admitted.

1          (Government Exhibit No. 1003

2               received into evidence.)

3    BY MR. BALLOU:

4    Q.   I'm going to play until 8 seconds here, and I'm going to

5    ask you to focus on this circled area.

6         (Video played.)

7         What is the man circled in yellow doing?

8    A.   He's coming out of the tarp.

9    Q.   I'm advancing to 22 seconds.

10        Okay.  I can zoom in if you want, but can you describe

11   what he looks like from here?

12   A.   Sure.  Blue hoodie, white male, orange glasses, with a

13   hat on.

14        MR. SHIPLEY:  Your Honor, we're willing to concede that

15   all these identifications of the person in the blue hoodie

16   with the sunglasses is Mr. Bozell.  We don't need to go

17   through that every time.

18        THE COURT:  All right.  That might make things easier

19   for the government.  Go ahead.

20        MR. BALLOU:  Thank you, Mr. Shipley.  And you'll be

21   pleased to know this is actually the last video for this

22   witness.

23   BY MR. BALLOU:

24   Q.   Advancing to 50 seconds.  And if it's helpful, I may just

25   zoom in here.

1          (Video played.)

2          What is the man in blue doing here?

3     A.   I see him there on the side of the flower pot.  Right now

4     it looks like he's just looking around.

5     Q.   I'm going to advance a few seconds to 1:40.

6          Stopping now.  What is he doing now?

7     A.   Looks like he's waving people up or waving at someone.

8     Q.   I'm going to advance until 2:20.

9          Stopping at 2:30, what is he doing here?

10    A.   He was talking to the officers and now looks like he's

11    talking to somebody next to him.

12    Q.   Okay.  I'm stopping at 2:45 and I'm going to ask you to

13    pay close attention to what happens next.

14         (Video played.)

15         Stopping at 2:50.  What just happened here?

16    A.   They ended up breaching the landing area.

17    Q.   And what are the people behind him doing?

18    A.   They're all just following along to go up to the Upper

19    West Terrace.

20    Q.   Where do these steps lead?

21    A.   The Upper West Terrace of the Capitol.

22              MR. BALLOU:  One moment, Your Honor.

23    BY MR. BALLOU:

24    Q.   Lastly, how did your day end on January 6?

25    A.   How did the day end?

1    Q.   When did it end, I should ask?

2    A.   I didn't get home until about four o'clock in the

3    morning, but I would say around eight o'clock-ish we had

4    people cleared out of the building.

5    Q.   At this time when you were at the mezzanine, did you at

6    all fear for your safety?

7    A.   At that time, no.  There was just a stunned recovery time

8    at the mezzanine after it was over.

9    Q.   And then what happened?

10   A.   After that, everyone was gone.  So that was when we were

11   getting debriefed and things of that nature.  We have to

12   gather all of our equipment and pack it up for the day.

13   Q.   Great.

14        MR. BALLOU:  No further questions, Your Honor.

15        THE COURT:  Mr. Shipley.

16                     CROSS-EXAMINATION

17   BY MR. SHIPLEY:

18   Q.   Sergeant, correct?

19   A.   Yes, sir.

20   Q.   Good morning, Sergeant.  Thank you for coming.

21   A.   Good morning.

22   Q.   You began your testimony by describing yourself as a

23   member of the less lethal team.

24   A.   Correct.

25   Q.   That's a reference to the type of munitions that your

1    unit uses?

2    A.   Correct.

3    Q.   And you're actually specialized in that respect.  Right?

4    A.   Correct.

5    Q.   In fact, you're a firearms instructor now so you train

6    not only in use of firearms but also less lethal munitions.

7    A.   Yes, sir.

8    Q.   During this sequence of events that you've testified

9    about where we've seen these videos, you were employing

10   repeatedly a less lethal type of device, right?

11   A.   I had all different types of less lethal devices on me

12   at the time, yes.

13   Q.   But consistently you were using the 303, right?

14   A.   The FN 303, yeah.

15   Q.   Describe that.

16   A.   That is basically a high-powered -- well, pepper ball is

17   a paintball.  So it's the lowest level of less lethal.  There

18   is no real levels, but it is the least pain compliance version

19   of less lethal.  The FN 303 has a little more horsepower to it

20   so it tends to cause a little more pain compliance.

21   Q.   Okay.  Pain compliance.

22   A.   Correct.

23   Q.   And you were employing it for dual purposes, to deliver

24   the pepper spray munition, right?

25   A.   Correct.

1    Q.   Upon impact it breaks like a paintball.  But also at a

2    high end of velocity that you don't want to get hit with it

3    because it hurts.

4    A.   Correct.

5    Q.   But sometimes it depends on what the person might be

6    wearing.  Right?

7    A.   Correct.

8    Q.   And you testified in the trial involving a defendant

9    named Guy Reffitt that you employed that on him there on the

10   stairs a few times, didn't seem to have much effect, and you

11   thought he was wearing some kind of padding.

12   A.   Yes, sir.

13   Q.   I think you also testified that you were pretty sure

14   that you hit pretty much everything you shot at that day.

15   A.   Yes, sir.

16   Q.   You went through five magazines.

17   A.   About, yes.

18   Q.   How many rounds in a magazine?

19   A.   There's like 10 rounds per magazine.

20   Q.   Possible that you missed?

21   A.   Sure.  Anything's possible.

22   Q.   And you weren't the only one employing that particular

23   device, right?

24   A.   Correct.

25   Q.   And so it's likely that people who weren't -- I think you

1      said in earlier testimony that you were using that on anybody

2      that you saw actively engaged with an officer.

3      A.   Correct.

4      Q.   You weren't just using it indiscriminately, right?

5      A.   Correct.

6      Q.   But if you missed, you could conceivably impact somebody

7      who wasn't doing anything.

8      A.   It is possible, yes.

9      Q.   Now, you said when you moved from the east side to the

10     west side, that you were stunned by what you saw?

11     A.   Correct.

12     Q.   Would it be fair to say you were stunned in two respects?

13          It would be fair to say you were stunned by a couple of

14     things.  This was not the first protest you'd seen, right?

15     A.   Correct.

16     Q.   But it was the first protest where you saw hand-to-hand

17     combat, for lack of a better description.

18     A.   Fisticuffs.  Correct.

19     Q.   But also just the sheer size of the crowd when you moved

20     from east to west shocked you, didn't it?

21     A.   Yes.

22     Q.   On the east side there were a couple thousand people

23     maybe?

24     A.   Yeah, at the time, yeah.  It was still the beginning,

25     yeah.

1    Q.   But when you got to the west side you had an elevated

2    position.  Right?

3    A.   Yes, sir.

4    Q.   So you could see out over the crowd.

5    A.   Yes.

6    Q.   And there were tens of thousands of people on the west --

7    A.   Oh, yes.

8    Q.   Now, you testified to what you saw rioters doing, and you

9    identified Mr. Bozell at various times --

10   A.   Mm-hmm.

11   Q.   -- in pictures.  And that was sort of the purpose of the

12   exercise.  Who's that person?  He's in a blue hoodie, wearing

13   a -- it's Mr. Bozell.  So I'm just going to refer to that

14   individual that you identified as Mr. Bozell.

15   A.   Okay.

16   Q.   You did see and you identified in a video Mr. Bozell

17   pulling on the tarp at one place?

18   A.   Yes, sir.

19   Q.   You didn't see Mr. Bozell cutting a tarp, right?  You

20   didn't see him using a knife --

21   A.   I couldn't see him cutting it, no.

22   Q.   You didn't hear, at least you can't testify here today

23   that you heard anything in particular that Mr. Bozell was

24   saying, right?

25   A.   No.

1    Q.   You just heard the crowd?

2    A.   Just what the crowd was saying.

3    Q.   We spent an hour with you or thereabouts on direct.  You

4    didn't say that Mr. Bozell ever employed the bike rack in any

5    particular fashion aggressively towards the police.  Right?

6    A.   No, sir.

7    Q.   And you didn't say that Mr. Bozell was pulling the bike

8    rack away from the officers, as many others were doing.

9    Correct?

10   A.   Correct.

11   Q.   And then even at the top of the stairs there, when

12   there's -- I think the first time we watched the video it said

13   2:07 and 30 seconds.  And he's sort of just milling around

14   there talking to the officers in front of him, right?

15   A.   Mm-hmm.

16   Q.   Then for some period of time he turns, he's got his back

17   to the officers and he's looking out at the crowd?

18   A.   Yeah.

19   Q.   And it's not until 2:09:45, so we're two minutes and 15

20   seconds later, that there's -- the crowd rushed past the

21   officers.  Right?

22   A.   Yes.

23   Q.   And you identified Mr. Bozell right there, you know,

24   near the front of the group that pushed through the line.

25   A.   Correct.

1    Q.    And I think -- we could look at the video again, but

2    you've probably seen that many times.   There's like five or

3    six officers in the way.   Right?

4    A.    Yes.

5    Q.    Two or three of them just -- they knew that was a tide

6    that they couldn't hold back and they just turned and went the

7    other way.   Right?

8    A.    Mm-hmm.

9    Q.    And a couple stepped to the sides.

10   A.    Okay.

11   Q.    So the crowd pretty much had free run up those steps once

12   the officers exercised --

13        MR. BALLOU:   Your Honor, objection.   This is bordering

14   on speculation now.

15        MR. SHIPLEY:   He testified to the --

16        THE COURT:   Just a second.   Overruled.   You may

17   proceed.

18   BY MR. SHIPLEY:

19   Q.    So once the crowd sort of had the stairway, the officers

20   exercised discretion and stood aside?

21   A.    Once the initial push made it through the officers, they

22   turned around and tried to regroup at the top of the steps,

23   yes.

24   Q.    There's no officers over -- getting knocked down and run

25   over there, right?

1    A.   I didn't see it in the video, but -- I don't know.

2    Q.   But you were there.  Right?

3    A.   I wasn't at that particular location, no.

4    Q.   Okay.  You didn't see the aftermath where any officers

5    were being treated for having gotten knocked down or run over

6    there, right?

7    A.   No.

8    Q.   I'm talking about that specific -- the crowd pauses there

9    for a long period of time, then all the sudden everybody comes

10   forward.

11   A.   Yes.

12   Q.   And it's not just -- we can watch it again real quick

13   if you want to see it.  I'm not going to deprive you of it.

14   We can have them brought up.  But it's not just the two people

15   in the front of the crowd that suddenly push through and

16   nobody follows, is it?  It's everybody on the stairwell kind

17   of pushes forward at the same time, and that's what causes the

18   officers to have to fall back?

19   A.   Okay.  I feel that -- yes, that potentially could have

20   happened.

21   Q.   Okay.

22        MR. SHIPLEY:  Thank you, Your Honor.

23        THE COURT:  Redirect.

24        MR. BALLOU:  Just to clarify one thing, Your Honor.

25    I'm taking a gamble by trying to present once again.

1     Your Honor, can you see the video?

2              THE COURT:  It appears to be up there, yeah.

3                       REDIRECT EXAMINATION

4     BY MR. BALLOU:

5     Q.   Sergeant, I just want to play you just one moment just

6     to clarify something.  This is Exhibit 1003, starting at 2:38.

7          (Video played.)

8          Okay.  You see Bozell moving forward at that moment.

9     Right?

10    A.   I do.

11    Q.   And we can go back.  Has any police officer moved out of

12    the way of Bozell's path?

13    A.   Not that -- they eventually turn to start running up the

14    steps, yes, but they are getting -- they're pushed backwards.

15    Q.   So they did not move to the side to make way for

16    Mr. Bozell and the other protesters.  Right?

17    A.   Correct.  They stayed right in the same spot.

18             MR. BALLOU:  No further questions, Your Honor.

19             THE COURT:  All right.  Why don't we just, for ease --

20    you may step down.  Thank you very much, Sergeant.

21         (Witness steps down.)

22         For ease of scheduling, why don't we take our morning break

23    and we'll resume at 11:15 with your next witness.  Thank you.

24         (Recess from 11:00 a.m. to 11:27 a.m.)

25             THE COURT:  All right.

1        MS. AKERS:  The government calls Officer Bradley

2    Murray.

3        BRADLEY MURRAY, WITNESS FOR THE GOVERNMENT, SWORN

4                     DIRECT EXAMINATION

5    BY MS. AKERS:

6    Q.   Thank you for being here.  Can you please state and spell

7    your name for the court reporter?

8    A.   Bradley, B-R-A-D-L-E-Y.  Murray, M-U-R-R-A-Y.

9    Q.   Officer Murray, are you employed?

10   A.   Yes.

11   Q.   Where do you work?

12   A.   The United States Capitol Police.

13   Q.   What is your position at the United States Capitol

14   Police?

15   A.   Officer.

16   Q.   How long have you worked for the Capitol Police?

17   A.   Just over 20 years.  I began my career in April 2003.

18   Q.   And were you working for the United States Capitol Police

19   on January 6, 2021?

20   A.   I was.

21   Q.   What was your position then?

22   A.   On that day I was assigned to the north barricade of

23   the United States Capitol.

24   Q.   And what uniform were you wearing on January 6?

25   A.   It was a department-issued pants, department-issued

1    cruiser jacket, department-issued ball cap and a personal

2    winter fleece gaiter.

3    Q.   Like around your neck area?

4    A.   And face, correct.

5    Q.   And early on in the day you said you were stationed at

6    the north barricade.  Is that correct?

7    A.   That's correct.

8    Q.   Can you tell us just briefly your experience early on in

9    the day?

10   A.   Yes.  Early on in the day at the north barricade, it

11   is located at 11 Constitution Avenue Northeast and it's in

12   the area of just south of Delaware and Constitution Avenue

13   in the Northeast.  That's where the barricade is located.

14   We're trying to run our normal day-to-day operations of

15   allowing staff and members to access those areas.

16       And I remember one of the first issues we were having

17   was with the crowds and trying to keep the crowds off of our

18   deployable barriers.  So those barriers are deployed to

19   prevent unauthorized vehicles from entering the perimeter.

20       And I recall just trying to keep the crowds from walking

21   on those barriers so we could deploy them to prevent any type

22   of accidents.  At one point I remember placing caution tape up

23   to prevent crowds from walking on there.  And at one point the

24   caution tape was removed.  I don't know if it was cut, torn

25   down, anything like that.

1        But when I was trying to close that area to prevent

2    individuals from walking into our area and our deployable

3    barriers, I remember a confrontation I had with some

4    individuals, and they questioned the authority of which I

5    was able to close that sidewalk.  And they asked where in the

6    Constitution did I have the authority to close that sidewalk.

7    And then they questioned who my oath was to and they

8    questioned my oath.

9        And I explained to them that in regards to the Capitol

10   grounds regulations, that authority is given to us from

11   Congress and the Capitol Police Board.  So that's how we

12   received that authority to close down those areas, to close

13   down sidewalks, for the protection of the people and to keep

14   the flow of traffic.

15   Q.   So, Officer Murray, after those interactions on the north

16   barricade, did there come a point on January 6 where you

17   actually made it to the west side of the building?

18   A.   That's correct.  Once additional units were called, the

19   officer I was holding the line down with, he advised me to go

20   ahead and respond to the west front and he would hold down the

21   offense line on the northwest drive.

22   Q.   To your knowledge why were you called to respond to the

23   west front?

24   A.   It's from my understanding there was a breach on the west

25   front of the Capitol for the perimeter line.

1    Q.   When you went from the north side of the Capitol and

2    walked to the west front, where did you go?

3    A.   So I was stationed in the area of the top northwest

4    drive.  I responded south to the area of the north door of the

5    Capitol, and then I responded west across the North Terrace

6    and then south across the West Terrace.

7    Q.   And so is it fair to say when you ended up on the west

8    side you were on the Upper West Terrace of the Capitol

9    building?

10    A.   That's correct.

11    Q.   And more on the north side than the south side?

12    A.   That's correct.

13    Q.   All right.  Were you at -- were there any staircases

14    around where you were standing?

15    A.   The staircase would have been, if I was facing west,

16    the staircase would have been in front of me.

17    Q.   All right.  And when you got to the west side and you

18    were at the top of the staircase there, what did you see in

19    front of you, looking west?

20    A.   When I went out onto the stage area, I could see the

21    crowd had entered into the west front perimeter area.

22    Q.   And had the crowd entered the Upper West Terrace by the

23    time you got there?

24    A.   Not the Upper West Terrace.

25    Q.   When you arrived at the top of those stairs -- I'm going

1    to refer to them as the northwest stairs.  Is that what you

2    would call them?

3    A.   That's fine, yes.

4    Q.   When you got to the top of the northwest stairs, what was

5    your duty or job at that point?

6    A.   When I arrived at the top of the staircase, I came into

7    contact with Lieutenant Pollack, who was my lieutenant at the

8    time.  He told me to hold down that area at the top of the

9    staircase to prevent people from further getting closer to the

10   building.

11   Q.   And how did you do that duty?  What did you do to hold

12   down the area?

13   A.   One of the things I did, the area was an active

14   construction site.  There was a lot of debris in the area,

15   including like hammers, tool belts.  Also, there was a line of

16   bike racks at the top of the staircase and I made the decision

17   to interlock all of those bike racks.  That way it could be

18   better defended.

19   Q.   You mentioned there was a lot of construction debris.

20   Did you do anything with that construction debris?

21   A.   Yes.  We made an attempt to hide that debris, so it could

22   not be used against us.

23   Q.   And then you deployed the bike racks at the top of the

24   stairs.  Correct?

25   A.   They were interlocked at that time, yes.

1    Q.   Did you remain at the top of the stairs behind the bike

2    rack?

3    A.   Yes.

4    Q.   Did there come a time when you actually descended down

5    the stairs to sort of the middle of the northwest stairs?

6    A.   That's correct.

7    Q.   And why did you do that?

8    A.   The first time was a call was made for water to help

9    decon officers who were affected by chemical irritants.  I

10   remember at one point taking a case of that water down to the

11   area of what was considered the stage.  And then I eventually

12   responded down to the middle of the Lower West Terrace at one

13   point.

14   Q.   I'm plugging in my computer and pulling up some exhibits.

15   Can you let me know if you can see on your screen a 3D model

16   of the Capitol building?

17   A.   That's correct.

18   Q.   And can you identify for the Court -- you can draw a

19   circle -- approximately what area you set up that bike rack?

20        (Witness complies.)

21        Okay.  So you drew a circle at the top of the northwest

22   stairs right above the number 3.  Correct?

23   A.   That's correct.

24   Q.   All right.  And at some point you said you'd sort of

25   descended down.  Can you indicate on the screen where

1      approximately you descended down to?

2      A.   For the first time for the water?

3      Q.   Sure.

4      A.   It would have been in this area here.

5      Q.   So you went over to the middle of the Capitol building?

6      A.   Of the stage area.

7      Q.   Did you later descend down the northwest stairs?

8      A.   Yes, I did.

9      Q.   And where approximately did you go?

10     A.   It would have been in the area of No. 3.

11     Q.   I'm going to pull up Government Exhibit 1004.

12          Officer, is this CCTV footage from January 6 at

13     approximately 2:09 p.m.?

14     A.   Yes.

15     Q.   And --

16          THE COURT:  Both?

17          MS. AKERS:  Correct.

18     BY MS. AKERS:

19     Q.   And are these different angles of the same general area

20     from January 6, 2021?

21     A.   That is correct.

22     Q.   Can you identify yourself in, first, how about the

23     left-hand video?

24          (Witness complies.)

25          And then can you identify yourself in the right-hand

1    video?

2         (Witness complies.)

3         You drew two circles around a person in a sort of black

4    bomber jacket with a black gaiter on and a baseball cap.  Is

5    that correct?

6    A.   That's correct.

7         MS. AKERS:  Your Honor, the government moves to admit

8    Exhibit 1004.

9         MR. SHIPLEY:  No objection.

10        THE COURT:  1004 is admitted.

11                        (Government Exhibit No. 1004

12                          received into evidence.)

13   BY MS. AKERS:

14   Q.   At this point, Officer, is it fair to say the crowd was

15   in front of you?

16   A.   That is correct.

17   Q.   And where in the northwest stairs are you at this point?

18   A.   I would say in the middle.  That was a landing between

19   two staircases.

20   Q.   I'm going to play from 2 seconds to 15 seconds.

21        (Video played.)

22        All right.  Stopping at 15 seconds, at this point are you

23   in an officer line?

24   A.   In the rear, yes.

25   Q.   What was you and your fellow officers' objective at this

1    time and place?

2    A.   To try to hold the crowd back at that location.

3    Q.   Why was that important to the officers?

4    A.   To prevent them from entering the -- gaining access to

5    the actual Capitol building itself.

6    Q.   And based on your understanding from working on that day,

7    was there a proceeding going on inside the Capitol building?

8    A.   That's correct.

9    Q.   Did you perceive this crowd that was advancing up the

10   stairs to pose a threat to you and your fellow officers?

11   A.   That's correct.

12   Q.   Can you explain why?

13   A.   If you look at my photo, to my right down below in the

14   area where you see like the trees, we were taking debris from

15   individuals in that location.  I remember being struck at

16   least two times by different pieces of debris, one being a

17   large bolt.  And then I recall other officers saying that they

18   were struck with items such as batteries.  And at one point

19   somebody did throw a traffic cone into that location.

20   Q.   And when you were on this landing around 2:09 p.m., what

21   was the demeanor of the crowd like that was facing towards

22   you?

23   A.   It seems like they wanted to progress up the stairs.

24   Q.   Would you characterize the crowd in any manner as being

25   peaceful?

1    A.   No.

2    Q.   Were they being compliant with you and your fellow

3    officers' orders?

4    A.   It did not seem so.

5    Q.   I'm going to skip ahead to 20 seconds and play until

6    24 seconds.  I'm going to have you just pay attention to the

7    white area -- I'm drawing a circle on the left-hand side of

8    the screen -- the white area above the officers' heads.

9    All right?  (Video played.)

10    And did you see anything happen on that white area that

11    I circled?

12    A.   Yes.  An object came from a location, and it looked

13    like it struck the wall.

14    Q.   I'm going to circle what appears -- I'm on the wrong

15    screen.  I'm going to circle an object in the top right-hand

16    corner of the left-hand side of the screen.  Is that the

17    object you're referring to?

18    A.   That is correct.

19    Q.   And previously you testified that you were hit with

20    several objects.  Where approximately were the objects being

21    deployed from?

22    A.   It appeared that they were coming from down below to my

23    right, in the area where you see the trees.

24    Q.   And you testified that you were actually hit with several

25    objects.  Correct?

1    A.    That's correct.

2    Q.    When you had objects coming from the side at your right,

3    were you able to defend yourself from those objects given the

4    crowd that was in front of you?

5    A.    No.

6    Q.    Why not?

7    A.    Because I realized we -- you could use the term we were

8    outflanked at that time.  We had objects coming in from the

9    right and then the crowd to our front.  And also, one of my

10   fears was the staircase behind us.  If I could reflect back on

11   another civil disturbance type environment in which we were

12   holding an intersection and there was an officer in front of

13   the curb line, and he went to step back and tripped back on

14   that curb, and I remember telling him, you know, take the

15   higher ground, step up on that sidewalk, don't let that curb

16   be an obstacle, a danger to yourself, like we need to take a

17   higher ground.

18        And that was my fear there too, with the staircase to our

19   rear.  If we were pushed back, that would have been a tripping

20   hazard and we could have been overrun.

21   Q.    And you mean pushed back by whom?

22   A.    The crowd.

23   Q.    Were you -- did the crowd in front of you impede your

24   ability to defend yourself from the objects coming from the

25   right?

1    A.    Because our attention was focused on them.

2    Q.    So is that a yes?

3    A.    Yes.

4    Q.    I'm going to play now until 34 seconds.

5          (Video played.)

6          Can you identify yourself -- let's just do on the

7    left-hand side of the screen because it's a little clearer.

8    A.    That's correct.

9    Q.    You drew a circle around yourself, and it looks like

10   you're holding something.  Are you?

11   A.    I did.  One of my fears at that point was the amount of

12   debris that we were being struck with could be used again.  I

13   was trying to utilize, if you see right here is a flower pot,

14   I remember throwing debris in there just to try to get it away

15   from the crowd, say, if we could remove this from the

16   environment, then it can't be used against us again.  I did

17   pick up that cylinder.  I'm not able to identify what that

18   cylinder was, but my purpose in picking that cylinder up was

19   to prevent it from being used as a weapon against us.

20   Q.    And at this time -- we're about 34 seconds into the

21   clip -- is the demeanor of the crowd in front of you the same

22   as you previously described while you're getting stuff thrown

23   at you?

24   A.    That's correct.

25   Q.    How would you characterize them?

1    A.   As if they wanted to ascend up the staircase.

2    Q.   I'm going to play now from 34 seconds to 45 seconds.

3         (Video played.)

4         Officer, I stopped at 46 seconds on accident.  What just

5    happened there?

6    A.   A traffic cone was thrown from a location in the

7    direction of where we were posted.

8    Q.   And now I'm going to play again, starting at 46 seconds.

9         (Video played.)

10        I stopped at 52 seconds.  Officer, what just happened?

11   A.   The crowd broke through our line and progressed up the

12   steps.

13   Q.   When the crowd, as you characterize it, broke through the

14   line, did you and your fellow officers maintain your ground

15   and hold your police line?

16   A.   We did not.

17   Q.   Why not?

18   A.   We were outnumbered.

19   Q.   And did you -- why did being outnumbered lead you to turn

20   in the direction of upward the stairs rather than staying,

21   facing the rioters?

22   A.   Out of fear that we would have been trampled on the

23   staircase.

24   Q.   I'm now going to pull up Government Exhibit 1000.

25        Officer, is Government Exhibit 1000 on the left-hand side

1    of the screen CCTV footage we reviewed in preparation for your

2    testimony?

3    A.   Yes.

4    Q.   And on the right-hand side of the screen, is this footage

5    filmed by one of the rioters occurring at about the same time

6    as the CCTV footage on the left?

7    A.   Yes.

8    Q.   And are you able to identify yourself in the CCTV footage

9    on the left?

10   A.   Yes.

11        MS. AKERS:  The government moves to admit Exhibit 1000.

12        MR. SHIPLEY:  No objection.  Could we ask the witness

13   to actually identify himself?

14        MS. AKERS:  Sure.

15   BY MS. AKERS:

16   Q.   Can you please circle yourself, Officer?

17   A.   Yes.

18        (Witness complies.)

19        MR. SHIPLEY:  No objection.  I appreciate the officer

20   clarifying.

21        THE COURT:  Without objection, 1000 is admitted.

22                         (Government Exhibit No. 1000

23                          received into evidence.)

24        MS. AKERS:  Thank you, Your Honor.

25

1    BY MS. AKERS:

2    Q.   And did you circle yourself holding that canister that

3    you previously testified to?

4    A.   I did.

5    Q.   And can you please state the time as indicated on the

6    CCTV footage?

7    A.   2:09:34 p.m.

8    Q.   I'm going to play this exhibit.

9         (Video played.)

10        All right.  I'm stopping at 48 seconds.  Officer, can you

11   explain to the Court what just happened in this video footage?

12   A.   The crowd broke through our line and we ascended up the

13   staircase.

14   Q.   In your experience, when you say the crowd broke through

15   the line, did they move or act with force?

16   A.   Yes.

17   Q.   Why do you say that?

18   A.   Because of the manner at which they were moving.  We did

19   have officers there in front of my location trying to hold

20   that line.

21   Q.   And when you weren't able to hold the line, what did you

22   then do?

23   A.   I ascended up the staircase.  I thought that would be a

24   better location for us to hold the line because I had

25   interlocked those barricades and removed debris from the area

1    prior to descending down the steps.

2    Q.   When you turned and ascended the steps, what manner were

3    you moving in?

4    A.   I was running.

5    Q.   And why were you running?

6    A.   Out of fear of getting trampled.

7    Q.   I'm going to pull this back to 7 seconds.  And on the

8    right-hand side of the screen do you see an arrow pointing

9    to an object?

10   A.   I do.

11   Q.   Or a person, I suppose.  And do you see, like, sort of a

12   navy blue in color item that the red arrow's pointing to?

13   A.   I do.

14        (Video played.)

15   Q.   At 18 seconds do you see the red arrow on the left-hand

16   side of the screen?

17   A.   I do.

18   Q.   I'm going to put a circle around a person who's wearing

19   maybe a royal blue jacket.  Do you know who that person is?

20   A.   That is one of my coworkers.

21   Q.   What is his name?

22   A.   Officer Tom McMahon.

23   Q.   We just watched this video with some audio in it.  What

24   did you hear here the crowd saying as they barrelled through

25   the police line?

1          MR. SHIPLEY:  I'm going to object.  The audio speaks

2     for itself.  If the witness has an independent recollection,

3     he can testify to that, but I don't think he can just repeat

4     what's on the audio.

5          THE COURT:  In these cases without a jury, we typically

6     are allowing the witness to repeat, because sometimes I don't

7     hear as clearly as others do.  So whether you remember it from

8     the moment or from hearing the video that you're watching that

9     you were a participant in, you can go ahead and testify to

10    what you hear.

11         THE WITNESS:  From the video it sounded as if the

12    individual is saying "let's go."

13    BY MS. AKERS:

14    Q.   Let me pull this back to approximately two seconds and

15    play one more time here.

16         (Video played.)

17         Did you hear in the audio -- I know it's sort of faint in

18    the courtroom -- any references to pushing?

19    A.   Not of my -- I just remember my coworker saying we need

20    to move.  Officer McMahon.  We need to move.

21    Q.   Would you agree with the characterization that the line

22    was pushing the officer line as they barrelled forward?

23         MR. SHIPLEY:  Objection.  Leading.

24         THE COURT:  Sustained.  Try to do it without leading.

25         MS. AKERS:  Sure.  I'll reask you the question.

1        BY MS. AKERS:

2        Q.   How would you characterize the crowd's movement as they

3        progressed towards the officer line?

4        A.   As if they wanted to make it to the top of the staircase.

5        Q.   And did the crowd at this point as they wanted to make it

6        to the top of the staircase, did they interfere and impede

7        with your ability to do your job?

8        A.   Yes.

9        Q.   I'm going to pull up Government Exhibit 1005.  Is

10       Government Exhibit 1005 on the right-hand side at this point a

11       CCTV footage?

12       A.   On my screen I'm only seeing a right side.  Okay.  Yes.

13       Q.   Yes.  And then later in the video, which -- did you watch

14       this video in preparation for your testimony?

15       A.   Yes.

16       Q.   And later in the video does third-party footage appear on

17       the left-hand side of the screen?

18       A.   Yes.

19       Q.   And based on your review of the video and your experience

20       at this time -- excuse me -- on January 6, were these videos

21       taken at approximately the same time period?

22       A.   Yes.

23             MS. AKERS:  The government moves to admit Exhibit 1005.

24             MR. SHIPLEY:  No objection.

25             THE COURT:  Without objection, 1005 is admitted.

1                              (Government Exhibit No. 1005

2                                 received into evidence.)

3          MS. AKERS:  I'm going to play Government Exhibit 1005.

4      (Video played.)

5    BY MS. AKERS:

6    Q.   Stopping at 43 seconds.

7         Officer, were you in this crowd that was ascending up the

8    stairs?

9    A.   That is correct.

10   Q.   And can you tell me what that was like as you were

11   running up the stairs?

12   A.   I was fearful of being trampled.

13   Q.   And why were you fearful of being trampled?

14   A.   Because the crowd was ascending behind us.

15   Q.   I'm going to pull up Government Exhibit 1002, the last

16   one here.  And is Government Exhibit 1002 video footage that

17   was taken around the same time that you reviewed in

18   preparation for your testimony?

19   A.   Yes.

20   Q.   Does it accurately depict what your experience was like

21   on January 6?

22   A.   Yes.

23          MS. AKERS:  The government moves to admit Exhibit 1002.

24          THE COURT:  Just a second.  Did you say government

25   footage?

1          MS. AKERS:  No.  I said -- I don't know what I said,

2     but I didn't mean government footage.  I think I said video

3     footage, or intended to.

4          THE COURT:  Any objection, 1002?

5          MR. SHIPLEY:  No objection.

6          THE COURT:  1002 is admitted.

7                              (Government Exhibit No. 1002

8                               received into evidence.)

9     BY MS. AKERS:

10    Q.   I'm going to play from zero seconds to 43 seconds.

11         (Video played.)

12         I stopped at 43 seconds.  Officer Murray, when the crowd

13    reached the top of the stairs, did they slow down their run?

14    A.   They did not.

15    Q.   Well, at some point --

16    A.   Yes.

17    Q.   Did you say yes?  I'm sorry.

18    A.   Yes.  When they reached the bike racks.

19    Q.   And so was that the same bike rack where you had

20    previously set up?

21    A.   That is correct.

22    Q.   When you reached the top of the stairs, what did you do?

23    A.   As I was ascending up the staircase, I went to my left,

24    or the north, to try to secure that side of the bike rack to

25    prevent people -- it was my intention to try to use the

1    geography of the Capitol, for us to use that as a defensive

2    posture to help hold the crowd back.

3    Q.   And were you and your fellow officers successful at

4    the top of the stairs bike rack in keeping the crowd on the

5    stairs?

6    A.   We were not.

7    Q.   Can you explain what happened?

8    A.   From my experience, if you see where the yellow circle

9    is, I would have been to the left of that location on the end.

10   I remember trying to hold that bike rack down as hard as I

11   could, but an individual who I was not able to identify

12   sprayed me in the eyes with some type of chemical irritant

13   and I lost control of the bike racks.

14   Q.   And when you lost control of the bike racks did your

15   fellow officers on the line also lose control of the bike

16   racks?

17   A.   That's correct.

18   Q.   Did the -- how was the demeanor of the crowd in front of

19   you at the time depicted in this video?

20   A.   Aggressive.

21   Q.   And when the bike racks you said were removed, who were

22   they actually removed by?

23   A.   They were pushed eastward by the crowd.

24   Q.   Would you characterize the pushing as forceful?

25   A.   Yes.

1   Q.   At this point, were you still in fear for your safety

2   at the top of the stairs?

3   A.   Yes.  After being sprayed with the chemical irritant.

4   Q.   And did the spray and having to defend behind the bike

5   racks impede your ability to do your job of protecting the

6   Capitol building?

7   A.   That's correct.

8   Q.   How so?

9   A.   We were not able to hold that line.

10   Q.   After you were sprayed and the line broke there, then

11   what did you do?

12   A.   I started to proceed north and then east across the

13   terrace because it was my fear, like, of getting, you could

14   say swarmed by the crowd.  Like, I wanted to try to keep the

15   crowd somewhat in front of me, didn't want to have people

16   behind me as well.  So I was trying to react to the spray.

17   Q.   And after the crowd broke through that line, what did a

18   lot of the crowd do then?

19   A.   It was my understanding they proceeded to a window of

20   the Capitol that was broken out.

21        MS. AKERS:  No further questions, Your Honor.  Thank

22   you, Officer.

23        THE COURT:  All right.  Mr. Shipley.

24        MR. SHIPLEY:  Thank you, Your Honor.

25

1                         CROSS-EXAMINATION

2     BY MR. SHIPLEY:

3     Q.    Good morning, Officer.

4           You went up the stairs, fairly, out of fear of being

5     trampled by the crowd that was behind you.

6     A.    In front of me.

7     Q.    But you also testified that you had recognized that was

8     sort of a tactically disadvantaged location where you were at.

9     Right?

10    A.    That is correct.

11    Q.    You had a large crowd in front of you, probably there

12    wasn't a good place to take up a tactical position.  But where

13    you were at, you had the crowd down below throwing things and

14    the group in front of you that was occupying your attention?

15    A.    Uh-huh.

16    Q.    And stairs behind you is not something you want if you're

17    trying to back up.

18    A.    That's correct.

19    Q.    Now, would it be fair to say that as the officers turned

20    to go up the stairs to escape -- not pejoratively, but just to

21    escape the threat of the crowd behind them, that that same

22    threat probably existed for any member of the crowd that tried

23    to stop?  Right?

24    A.    I don't understand your question.

25    Q.    Well, if you're trying to get away for fear of being

1    trampled by an advancing crowd, if somebody in the crowd

2    stopped, they're going to get trampled.

3    A.   Possibly, yes.

4    Q.   And I don't think you would -- I don't take it from your

5    testimony that you had the thought that the crowd was trying

6    to attack the officers.  They were just trying to get past the

7    line that you had formed.  Right?

8    A.   I don't know, because we were being hit with the debris

9    from down below.

10   Q.   Fair enough.  That's kind of indirect.  The people down

11   below can't really see what they're throwing at.  They're just

12   throwing stuff out there, right?

13   A.   That I don't know.  I can't --

14   Q.   But the crowd on the stairs can see the officers in front

15   of them, right?

16   A.   The crowd could see the officers.  That's correct.

17   Q.   You and the four or five others that were exposed right

18   there in front of them, they could see you, and they began to

19   advance forward, they can see you there, and you and three or

20   four others -- I think one kind of stood to the side and let

21   the crowd pass, put his back to the tarp.

22   A.   That I don't recall.

23   Q.   We can watch it again.  And then, I think I counted three

24   of you actually just up the stairs ahead of the crowd.  But

25   the -- none of you were tackled on the way, right?  Nobody

1    held you down and pummelled you?

2    A.   I can only speak for myself, and I was not.

3    Q.   And you didn't see any other officer go down and get set

4    upon by some protesters and get beaten, right?

5    A.   At that location, I don't recall.

6    Q.   When you got to the top of the stairs the crowd began

7    to -- after they bypassed the bike racks, they began to

8    disperse, they went lots of different directions, right?

9    A.   I believe a majority of the crowd went to the area of the

10   windows.  But like I said, I was injured at that time.

11   Q.   And when they get to the top of the stairs and the bike

12   rack stops them, but then they bypass the bike rack, if they

13   run straight, they are just going to sort of run parallel to

14   the building until they get to the north end.  Right?

15   A.   That's not correct.  If they proceeded east up the

16   staircase, the way the Capitol is designed, they would go

17   towards the Senate Wing.  So you would have to make a left or

18   to the north and turn and then right or east to exit the --

19   Q.   My error.  That stairway runs east and west.  It's not

20   running north and south.  I sort of had it in my head it was

21   running north and south.

22   A.   That's correct.

23   Q.   But it runs east and west to the top, and then if they

24   go left they're going to run parallel to the building?

25   A.   If they went left, that's correct.

```
 1    Q.   Towards the north?

 2    A.   Towards the north.

 3    Q.   And then go straight, you're just going to run into the

 4    building?

 5    A.   No.  If they made a left and went straight after making

 6    that left they would run to the end of the terrace.

 7    Q.   Okay.  Now, but at some point while you were trying to

 8    man the bike racks, for some short period of time while the

 9    bike racks held, you were sprayed in the face?

10    A.   That's correct.

11    Q.   You don't think it was pepper spray, right?  It was

12    something else?

13    A.   I do not know what it was.

14    Q.   Well, you've been sprayed with pepper spray, right?

15    A.   That's correct.

16    Q.   So you know sort of what the sensation is.  You have

17    a recollection that that was it or it was something else?

18    Not that it really matters.

19    A.   I don't recall.

20    Q.   But you were incapacitated, by whatever it was?

21    A.   That's correct.

22    Q.   And you had to retreat from the bike rack?

23    A.   Yes.

24    Q.   Seek treatment?

25    A.   Later that evening, I did, from a medical professional,
```

1   but we were using bottles of water to self-decontaminate.

2   Q.   Okay.  At least in the moments after it happened, you

3   sought some kind of treatment from fellow officers to wash

4   it off.  So you didn't see what happened at least immediately

5   after the crowd bypassed the bike racks?

6   A.   I was advised by an officer who was at that location that

7   individuals were breaking through the windows.

8   Q.   You testified that you could hear on the audio the words

9   "let's go."  Right?

10  A.   I did read that from this hearing, yes.

11  Q.   Even watching the audio, you can't attribute those words

12  to any particular person, right?  You can't see who the

13  speaker is?

14  A.   I would have to watch the video again.

15  Q.   Well, let's say -- you didn't testify on direct

16  examination to who the speaker was, right?  Just that you

17  could hear the words.

18  A.   That's correct.

19  Q.   Now, at least as to that five or six officers there at

20  the top, sort of all congregated together, there was a period

21  of time before the crowd -- I think it was at -- I wrote it

22  down -- 2:08:43 or 45 is about when the crowd pushed through

23  there.  Five or six officers.  You with a helmet, another

24  officer with a helmet.

25  A.   That is not correct.  I did not have a helmet.  I was

1   wearing a department-issued ball cap and fleece gaiter.

2   Q.   Okay.  I thought you circled yourself -- fair enough.

3   Was there anybody among that group of five that was sort of

4   in operational command or were you all just kind of talking

5   to each other trying to figure out how to manage yourselves?

6   A.   I don't recall anybody being in like any type of

7   operational command.  We were just trying to hold it

8   ourselves.

9   Q.   Okay.

10       MR. SHIPLEY:  Can I have just a moment, Your Honor?

11       THE COURT:  Certainly.

12    (Defense conferring.)

13       MR. SHIPLEY:  Nothing further, Your Honor.  Thank you.

14       THE COURT:  Redirect, Ms. Akers?

15       MS. AKERS:  No, Your Honor.

16       THE COURT:  All right.  Thank you very much, Officer.

17   You may step down.

18       THE WITNESS:  Thank you, Your Honor.

19    (Witness steps down.)

20       THE COURT:  And let's call our next witness.

21       MR. BALLOU:  Your Honor, we call Officer Victor

22   Nichols.

23       THE COURT:  All right.

24    Good afternoon, Officer Nichols.  Please stand there to be

25   sworn before you take the stand.

```
 1              VICTOR NICHOLS, WITNESS FOR THE GOVERNMENT, SWORN
 2                          DIRECT EXAMINATION
 3      BY MR. BALLOU:
 4      Q.   Good afternoon, Officer.
 5      A.   Good afternoon.
 6      Q.   Can you please state and spell your name?
 7      A.   It's Victor Alexander Nichols, Jr.  V-I-C-T-O-R,
 8      Alexander, A-L-E-X-A-N-D-E-R, Nichols, N-I-C-H-O-L-S, Junior,
 9      J-R.
10      Q.   Where do you work?
11      A.   United States Capitol Police.
12      Q.   And what's your title?
13      A.   Sergeant.
14      Q.   And how long have you worked there?
15      A.   I just started year 10 in July.
16      Q.   What are your current responsibilities?
17      A.   I'm a sergeant.  I supervise the line officers on the
18      House Division.
19      Q.   And on January 6 what was your role?
20           THE COURT:  January 6, 2021.
21           MR. BALLOU:  Thank you for the correction, Your Honor.
22      BY MR. BALLOU:
23      Q.   January 6, 2021, what was your role?
24      A.   I was a sergeant that day as well.  I supervised officers
25      who were assigned to the east front of the Capitol.
```

1    Q.   Can you describe how your morning began?

2    A.   My morning began -- I started around 7 a.m.  I was a

3    admin sergeant, so I came in, prepared roll call.  We have

4    roll call around the Rayburn building to get our guys ready

5    for their assignment on the east front.

6    Q.   And what happened then?

7    A.   On the east front we set a police line on the east front

8    restricting the plaza, which is the improved area by the House

9    Egg, which is the grassy area.  We went on -- we made sure the

10   bike rack was in place, and we went, you know, hour on, hour

11   off in the beginning because it was relatively calm.

12   Q.   Tell us how your morning progressed.

13   A.   So after -- we got a call for everybody to come back to

14   post, then we heard a 1033 on the west front, in front of the

15   west front of the Capitol.  After that, I had an officer next

16   to me, he asked me, Sarge, can we go, can we go to help?  And

17   I told him, yes, let's go.  So I grabbed -- it was myself and

18   I believe four other officers.  We went and we responded to

19   the west front.

20   Q.   And for those of us who are uninitiated, what's a 1033?

21   A.   It's an officer in distress who needs -- someone needs

22   help.

23   Q.   So you went to the west side of the Capitol.  And what

24   happened then?

25   A.   So when we got to the west side of the Capitol, we saw a

crowd over there.  They had made it to the Lower West Terrace.
We looked and we went to go respond down to assist, and pepper
spray had been deployed already, and we realized us going
down, we would become casualties and we would become a
liability.  So what we did is we created a bike rack, we put
bike rack at the top of the steps to make sure no one can come
up.  And any people who were coming from the line, we helped
decon them as they were coming up.

Q.   And what does "decon" mean?

A.   So anybody that was pepper-sprayed, we would use bottled
water or whatever to get the pepper spray out of their eyes.

Q.   And where do you go after that?

A.   So after that I dealt with an arrest on the west front.
There was a man who climbed scaffolding on the west front and
I helped to subdue him and he was taken away.  I climbed up
the scaffolding where he was.  What I did was, we -- I looked
at the crowd to see if there was anything suspicious going on
in the crowd.  We did recognize someone starting to put gas
masks on in the crowd and I put that on the radio.

Q.   Did you go into the building at a certain point?

A.   Yes, I did.  So there was a call for us to lock down the
building.  When the call was made, everybody who was up on the
Upper West Terrace, we went into the, I guess you'd say the
Lower West Terrace door, the tunnel that, you know, that's
been said.  The building was locked down.  That door was

1    locked.  And I ended up going up towards the Crypt.

2    Q.   I'm pulling up what's been marked as Government Exhibit

3    1006.  We'll play for about eight seconds.

4         (Video played.)

5         Sergeant, where was this video taken?

6    A.   That would be on the Upper West Terrace on the Senate

7    side.

8    Q.   And very approximately, when would this video have been

9    taken?

10   A.   So this video would have been taken approximately -- it

11   would have been after I was in the building.  I don't have a

12   time.

13   Q.   That's helpful enough, because it's useful for placing

14   where we're going to go with a couple of these videos.

15            MR. BALLOU:  Government moves to admit Exhibit 1006.

16            MR. SHIPLEY:  No objection.

17            THE COURT:  1006 is admitted.

18                              (Government Exhibit No. 1006

19                               received into evidence.)

20   BY MR. BALLOU:

21   Q.   I'm going to play until 15 seconds.

22        (Video played.)

23        Can you describe the highlighted man?

24   A.   The highlighted man looks to have a hoodie on and -- is

25   it a blue hoodie?  Looks like a blue hoodie and black pants?

1    Q.   I'm going to play until about 19 seconds.  Can you just

2    follow --

3         MR. SHIPLEY:  Your Honor, we'll stipulate that that is

4    Mr. Bozell that was highlighted there.

5         THE COURT:  All right.  Thank you, Mr. Shipley.

6         MR. BALLOU:  Thank you.

7    BY MR. BALLOU:

8    Q.   I'm just going to play from 15 to about 19 seconds,

9    16 seconds.

10        (Video played.)

11        Can you describe what Mr. Bozell was doing right there?

12   A.   It looked like he was reaching down to the ground.

13   I don't know if he was picking up an object.

14   Q.   I'm going to play until 34 seconds.

15        (Video played.)

16        Do you see Mr. Bozell highlighted again?

17   A.   Yes.

18   Q.   Where is he headed?

19   A.   Toward the Senate Wing Door.

20   Q.   Play to the end.

21        (Video played.)

22        Okay.  I'm going to pull up what's been marked as

23   Government Exhibit 1007.  Play it for about 6 seconds.

24        (Video played.)

25        Where was this video taken?

1  A.   Next to the Senate Wing Door, there's windows that are

2  adjacent to it.

3  Q.   And I'm going to play until about 18 seconds.  It's going

4  to highlight a section.

5       (Video played.)

6       I don't know if the defense will stipulate to that being

7  Mr. Bozell in this video, so I'll just say for now, the man in

8  blue, what was he doing there?

9  A.   He was hitting the window to the Senate Wing Door with an

10  object, it looks like.

11  Q.   And we can play it again to count if you want, but how

12  many times did he strike the door?

13  A.   I don't recall.

14  Q.   Let's play it again just really quickly.

15       (Video played.)

16       Did you get a sense of how many times he struck the door?

17  A.   Approximately 10 times.

18  Q.   What's happened to the door here?

19  A.   It is damaged.

20  Q.   Can you describe specifically what's happened?

21  A.   It looks like the window began to shatter.

22  Q.   Playing until 25 seconds.

23       (Video played.)

24       I know you can't read this but can you just generally

25  describe what's on the man's hoodie here?

1    A.   Looks like a symbol, looks like it has a cross on it,

2    I believe.

3    Q.   Pulling up what's been marked as -- well, we admitted

4    Government Exhibit 1007, didn't we?

5              THE COURT:  No.  It hasn't been admitted yet.

6              MR. BALLOU:  My apologies then.  Government moves

7    to admit 1007.

8              MR. SHIPLEY:  No objection.  And we stipulate that

9    is Mr. Bozell's sweatshirt.

10             THE COURT:  1007 is admitted without objection.  And

11   thank you, Mr. Shipley, for your stipulation.

12                            (Government Exhibit No. 1007

13                              received into evidence.)

14   BY MR. BALLOU:

15   Q.   Moving along to Exhibit 407.  I'm going to start at 11:14

16   and just play for a few seconds.

17        (Video played.)

18        Once again, where is this video taken?

19   A.   It appears to be at the Senate Wing Door.

20   Q.   Is this approximately the same time as the previous

21   videos?

22   A.   I believe so.

23             MR. BALLOU:  Government moves to admit Exhibit 407.

24             MR. SHIPLEY:  Does it run continuously to 22:38?

25             MR. BALLOU:  No.  It changes scenes.

1          MR. SHIPLEY:  Your Honor, I've looked at this and it

2    changes scene somewhere else.  This witness has already

3    testified that he was inside at this point, but I've let it

4    go on.  He recognized the area.  If we need to see the rest

5    of it to see if he recognizes that.  But...

6          MR. BALLOU:  Your Honor, I don't think we want to bore

7    you with some extraneous parts of this video.  There's a

8    short, about 45-second clip that's relevant here within the

9    larger video.

10         MR. SHIPLEY:  Then I'd ask the government to clip that

11   and make that the exhibit.  And I won't object to 407 if we

12   clip that down to just what's relevant rather than have a

13   22-minute video.

14         THE COURT:  Well, it isn't 22 minutes -- well, I guess

15   it is.  This is running at 11:20.

16         MR. SHIPLEY:  Yeah.  But at the end it runs to 22:38.

17         THE COURT:  So it is a 22-minute video, most of which

18   the government is not trying to admit?

19         MR. BALLOU:  Most of which the government does not

20   need, I should say.  We are trying to admit the entire

21   exhibit.

22         THE COURT:  Are you able to clip it down so you only

23   have the relevant portion?

24         MR. BALLOU:  Yes, we can.  I'm wondering how to do this

25   most efficiently for the Court's and Sergeant Nichols' time.

1    Perhaps we could conditionally admit this exhibit on the

2    understanding that we will clip it to just this moment?

3         MR. SHIPLEY:  I'll take the government at their word.

4    If they'll clip it down to what's relevant, I don't have an

5    objection to that.

6         MR. BALLOU:  On the understanding then that we will

7    clip this video to just the portion outside --

8         THE COURT:  And what is it approximately in terms of

9    the running time?

10        MR. BALLOU:  I think this video we plan to play about

11   two or three minutes total.

12        THE COURT:  But from when to when?  From roughly 11

13   minutes to roughly 14 minutes?

14        MR. BALLOU:  Yes.  Sorry.  I should say a little over

15   two minutes, from a little over 11 to a little over 13.

16        THE COURT:  With that understanding, no objection?

17        MR. SHIPLEY:  No objection with that understanding.

18   Thank you, Your Honor.

19        THE COURT:  And with the understanding that the

20   government will clip it to the approximately three-minute

21   portion.

22        MR. BALLOU:  Thank you, Your Honor.

23                        (Government Exhibit No. 407

24                          received into evidence.)

25

1      BY MR. BALLOU:

2      Q.   Sergeant, just to confirm, this is outside the same

3      Senate Wing area?

4      A.   Yes.

5      Q.   I'm going to play until 11:26.

6           (Video played.)

7           Do you see the door right here?

8      A.   Yes, I do.

9      Q.   Is it cracked at that point?

10     A.   No.

11     Q.   Moving ahead to 11:41.

12          (Video played.)

13          Is the window in the door now cracked?

14     A.   Yes.

15     Q.   And can you describe the man who is cracking it?

16     A.   It is the same gentleman that I described earlier.

17     Q.   Wearing the blue hoodie?

18     A.   Yes.

19     Q.   I'm advancing to 12:13.

20          (Video played.)

21          Stop at 12:09, actually.  Who is this officer in the

22     window?

23     A.   That is me.

24     Q.   How did you get to there?

25     A.   So once we called for the lockdown of the building, I

1    entered through the Lower West Terrace up to the Crypt, and

2    I met with my Lieutenant Jeffers, and she asked for us to make

3    sure there were no breaches of the building in the wings, and

4    I ended up going down the Senate Wing.

5    Q.   Do you remember this moment?

6    A.   Yes.

7    Q.   What was your initial reaction when you saw this?

8    A.   So being on the Upper West Terrace before, I honestly was

9    in shock.  I didn't believe that they would come into the

10   building, and I feared for my life.

11   Q.   Let's watch for just a minute.

12        (Video played.)

13        I'm stopping at 12:12.  I can see that you're sort of

14   moving with both arms.  What are you doing there?

15   A.   I'm determining which level of force that I planned on

16   using at that time.  I decided on using less than lethal force

17   by using my pepper spray.  I realized that with the amount of

18   people that were there, using lethal force would probably end

19   up with more casualties on law enforcement side and on the

20   rioters' side.  So I wanted to use less force.

21   Q.   So what did you do with the pepper spray?

22   A.   I sprayed the individuals that tried to enter that

23   window.

24   Q.   Then what happened?

25   A.   So after I used all the pepper spray in the can that

1    we're issued, I retreated back to the Crypt.  There was a

2    media near there, so I told them to run back to the Crypt.

3    I ran to the Crypt and I told everyone who was there that the

4    building's been breached and that they need to get out of the

5    area.

6        Prior to that, I did go on my radio.  I tried to get on

7    the radio, the radio was busy, so I had to use the emergency

8    channel to say the building's been breached, we need to secure

9    the chambers.

10   Q.   I'm playing until 12:52.

11       (Video played.)

12       Can you describe the man in blue here?

13   A.   That appears to be the same gentleman that I described

14   earlier.

15   Q.   And what is he doing?

16   A.   He's entering the building.

17   Q.   And at the risk of stating the obvious --

18   A.   Sorry.  He's entering the building through a window that

19   was broken.

20   Q.   I'm going to play just for a few more seconds.

21       (Video played.)

22       Now, if we stop at 13 minutes, I can see some protesters

23   are walking in the direction that it appears you went.  Where

24   does that go?

25   A.   That goes to the Crypt of the Capitol.

NICHOLS - DIRECT

1    Q.   And other protesters, including the man in blue -- I

2    don't know if the defense will stipulate to that being

3    Mr. Bozell --

4         MR. SHIPLEY:  Yes.

5    BY MR. BALLOU:

6    Q.   If Mr. Bozell was walking in the other direction, where

7    does that go?

8    A.   That leads towards the Senate Chamber.

9    Q.   Pulling up what's been marked as Government Exhibit 1008.

10   Playing for about five seconds.

11        (Video played.)

12        Where is this?

13   A.   That is inside the Senate Wing Door.

14        MR. BALLOU:  Okay.  Government moves to admit Exhibit

15   1008.

16        MR. SHIPLEY:  No objection.

17        THE COURT:  Without objection, 1008 is admitted.

18                          (Government Exhibit No. 1008

19                           received into evidence.)

20   BY MR. BALLOU:

21   Q.   I'm playing until 8 seconds.

22        (Video played.)

23        Do you see the highlighted man?

24   A.   Yes.  That appears to be the same gentleman that I

25   described earlier.

1    Q.    I'm playing until 19 seconds.

2          (Video played.)

3          What is the man in blue doing?

4    A.    He is hitting the window and breaking it.

5    Q.    And, again, we can play the whole video if you'd like,

6    but how many times does he appear to strike the window?

7    A.    From the previous video -- no, that was a different area.

8    But this one looks like five times.

9    Q.    I'm pulling up finally Exhibit 100.  So we're pulling up

10   Exhibit 100.  Oh, excuse me.  Let me just pull up 1008 one

11   more time.  See if we got to the end of the video.

12         I apologize.  I stopped the video prematurely.  So we'll

13   start at the beginning here.

14             THE COURT:  1008, not 100?

15             MR. BALLOU:  Yes, sorry, I'm going back to Exhibit

16   1008.  If we can track how many times he strikes this.  I

17   stopped this prematurely.

18         (Video played.)

19   BY MR. BALLOU:

20   Q.    How many times did he strike the window?

21   A.    Approximately eight -- I mean 11 times.

22   Q.    We'll just play to the end of the video for completeness.

23         (Video played.)

24         Stopping at 37 seconds.  Is that you rushing in over

25   there?

1    A.    Yes.  I'm the officer.

2    Q.    We're going to watch a slightly longer clip of the same

3    moment.  Pulling up Exhibit 100 this time.

4          (Video played.)

5          And you've seen a version of this video already, but

6    where is this?

7    A.    The Senate Wing Door.

8              MR. BALLOU:  The government moves to admit Exhibit 100.

9              MR. SHIPLEY:  No objection.

10             THE COURT:  Government 100 is admitted without

11   objection.

12                                   (Government Exhibit No. 100

13                                      received into evidence.)

14   BY MR. BALLOU:

15   Q.    Playing until 30 seconds.

16         (Video played.)

17         Okay.  What are you doing here?

18   A.    I am deploying my pepper spray.

19   Q.    Who are the other people in the hallway here?

20   A.    That is media.

21   Q.    What are they doing?

22   A.    So the media -- well, you can see they're taking pictures

23   of me deploying the pepper spray.  So the media, they're

24   always stationed, they're stationed in the Capitol building.

25   So they're there doing their job.

1    Q.   I'm going to play until 36 seconds.

2         (Video played.)

3         Okay.  What did you just do there?

4    A.   So in that moment I deployed my pepper spray on the

5    individual who came through.  As I was deploying my pepper

6    spray I turned to the media and told them to run.  And then I

7    used the rest of my pepper spray on anybody else that was in

8    that window, and then I retreated towards the Crypt of the

9    Capitol.

10   Q.   Was the pepper spray effective in deterring the rioters?

11   A.   No.

12   Q.   And you mentioned earlier that you retreated backwards.

13   Where did you go when you retreated?

14   A.   So I went to the Crypt of the Capitol to warn everyone

15   else that was there that the building had been breached.

16   Q.   And you testified earlier that you feared for your life

17   when you responded to this moment.  Right?

18   A.   Yes.

19   Q.   Why did you fear for your life?

20   A.   Because I was outnumbered by a mob of people who were --

21   had gone past multiple police lines and disobeyed all orders.

22   Q.   I'm going to go to 1:13.  I'd like you to focus on the

23   window that's been smashed open.

24        (Video played.)

25        You see the man that I just circled?

1    A.    Yes.

2    Q.    What is he doing?

3    A.    He's entering the building through a broken window.

4    Q.    And what's that sort of piece of furniture on the ground?

5    A.    That is a -- that is like a museum piece.  You know, the

6    Capitol is a living, working museum, I believe.  So it's a

7    museum piece that has different information for people who

8    come on tours.

9    Q.    And the man in blue just stepped over that?

10   A.    Correct.

11        MR. BALLOU:  I can't recall.  Did we move to admit

12   Government Exhibit 100?

13        THE COURT:  100 is in evidence.

14        MR. BALLOU:  Okay, great.

15     No further questions, Your Honor.

16        THE COURT:  All right.  Mr. Shipley.

17        MR. SHIPLEY:  We can break or --

18        THE COURT:  I was just going to ask you, how long do

19   you think your cross-examination --

20        MR. SHIPLEY:  15 minutes.

21        THE COURT:  15 minutes?  I guess we'll take our midday

22   break now and we'll resume at 1:45.  All right?  Thank you.

23        (Lunch recess from 12:28 p.m. to 1:54 p.m.)

24        THE COURT:  All right.  We're ready to go again.  And

25   that will be with the cross-examination by Mr. Shipley.

 1          Sergeant Nichols, I remind you you're still under oath.

 2     Mr. Shipley.

 3          MR. SHIPLEY:  Having the lunch hour to go through the

 4     notes, I could have done 15 minutes but I actually don't have

 5     any questions, Your Honor.

 6          THE COURT:  Then you're done for the day, Sergeant

 7     Nichols.

 8          MR. SHIPLEY:  My apologies for bringing you back.

 9          THE WITNESS:  Thank you.

10          THE COURT:  All right.  Thank you very much.  You're

11     excused.  And we'll go to the next witness.

12        (Witness steps down.)

13          MS. AKERS:  The government calls Officer Keith

14     Robishaw.

15          KEITH ROBISHAW, WITNESS FOR THE GOVERNMENT, SWORN

16                          DIRECT EXAMINATION

17     BY MS. AKERS:

18     Q.   Good afternoon.  Could you please state and spell your

19     name for us?

20     A.   Yeah.  My name is Keith Robishaw.  My last name is

21     spelled R-O-B-I-S-H-A-W.

22     Q.   And Officer Robishaw, where do you work?

23     A.   United States Capitol Police.

24     Q.   What is your position?

25     A.   Technician now.  I'm with the K9 unit.

```
1    Q.   Did you get promoted recently?

2    A.   I did.

3    Q.   Congratulations.

4    A.   Thank you.

5    Q.   How long have you worked for the Capitol Police?

6    A.   Going on eight years.

7    Q.   And have you worked in different posts during that time?

8    A.   Yes, I have.

9    Q.   Can you give us a brief rundown?

10   A.   So when I came on the United States Capitol Police, I was

11   assigned to the House Division.  From there I went to the

12   Capitol Division for a spell and then back over to the House.

13   But I have worked various posts.

14   Q.   Throughout the Capitol building?

15   A.   Throughout the Capitol.  Correct.

16   Q.   Are you familiar with the layout of the Capitol building?

17   A.   Yes, ma'am.

18   Q.   Were you working for the United States Capitol Police on

19   January 6, 2021?

20   A.   Yes, I was.

21   Q.   What was your position that day?

22   A.   I was assigned as an additional ER, Emergency Response

23   Unit.  It's like our building patrol.  And I was assigned to

24   the Cannon House Office Building.

25   Q.   Where is the Cannon House Office Building in relation to
```

1    the Capitol building?

2    A.   It's directly across the street on Independence.

3    Q.   What uniform were you wearing that day?

4    A.   Uniform of the day, similar to this, but it was Class Bs.

5    Q.   Anything unusual happen in the morning when you got to

6    work?

7    A.   Yeah.  You know, we had the crowd started amassing

8    outside the Capitol.  We were getting ready for our day.

9    They were giving out assignments.  And then the really unusual

10   part was the bomb threat that was called out earlier in the

11   morning.

12   Q.   And did you respond to that?

13   A.   I did.  We were told to meet out on New Jersey Street

14   right outside the Cannon.

15   Q.   Did there come a time when you then responded to the

16   Capitol building?

17   A.   Correct.  After we took care of evacuating the Cannon

18   House Office Building, I was told to, with some of the other

19   officers, muster back outside the Longworth main door.

20   Q.   To the Capitol building?

21   A.   Yeah.  Well, we went out the Longworth main, and then we

22   all started talking and we heard all the calls for service and

23   so we took it upon ourselves -- it was a handful of officers,

24   like five officers and like a couple sergeants -- then we made

25   our way over there using the tunnels to the Capitol.

1    Q.   When you say you heard the call for service, how did you

2    hear that?

3    A.   So the calls that I remember coming across were from the

4    west front, and everyone moving up, and they kept saying they

5    needed more support, and they needed additional officers and

6    some of the hard squad guys to respond because they were

7    losing ground and getting pushed up the stairs.

8    Q.   Were you hearing that on the radio or a different form?

9    A.   Correct.   Through the radio.

10   Q.   So you testified that you came under -- through the

11   tunnels --

12   A.   Correct.

13   Q.   -- to the Capitol building.   Where did you go next?

14   A.   So having worked the Capitol Division before on

15   midnights, I kind of took the lead with the officers that

16   I was with and kind of led them through the Cannon, through

17   their basement, to the -- what was it? -- the west front

18   terrace doors right there.

19   Q.   And did you stay outside when you arrived at the Capitol

20   building?

21   A.   So when I arrived inside the Capitol to those set of

22   doors, there were several officers in hard gear coming inside

23   who had been sprayed with some sort of chemical irritant, and

24   you know, their eyes, they couldn't see.   Various staff,

25   including the Architect of the Capitol, they were bringing

1   people in to get them deconned, to rinse their eyes out, to

2   try and get them back in the fight.

3        I was kind of thinking if I go out there, I don't have

4   the hard gear they had and they're getting overran, I'll just

5   become another casualty, that I'd have to come back in because

6   I don't have the gear they had.  But at that time we were

7   moving the screening machinery out of the way to get more

8   officers in just because more and more kept coming.  We

9   actually started a queue.  They were all just sitting on the

10  ground, waiting to be deconned by the Architect of the

11  Capitol.  That was when the next series of calls came out that

12  they had made their way inside the building.

13  Q.   When you say "they," who are you referring to?

14  A.   The rioters.

15  Q.   When you heard that next call, once people made it into

16  the building, what did you do next?

17  A.   I felt that that would be, not a better use of my time

18  but something I could assist with, not having the riot gear,

19  fighting outside, I could more better assist inside the

20  building with the gear that I had.

21  Q.   And so you were in the Lower West Terrace doors.  That's

22  sort of the middle of the Capitol building.  Right?

23  A.   Correct.

24  Q.   Where did you go next?

25  A.   We turned around and I ran up the staircase that's right

1    there that leads straight up into the Rotunda.

2    Q.   Once you were in the Rotunda, were there unauthorized

3    people in the building at that point?

4    A.   The calls were coming out that they were in there but

5    I hadn't seen them yet.  We were trying to make our way and

6    figure out where they were coming in at and do our best to

7    get to where they would be so we could meet them.

8    Q.   So you were in the Rotunda.  And where did you go next?

9    A.   So I made my way from the Rotunda to the Rotunda door

10   that leads outside, and there were some officers that were

11   standing there and they were contemplating how to assist the

12   four officers in hard gear that have now been pushed up

13   against those doors by the crowd that had made their way all

14   the way up the stairs and shoving them against those doors.

15   From there I made my way over to the Senate side.

16   Q.   And where specifically in the Senate side did you respond

17   to?

18   A.   I found myself, after listening to the calls and trying

19   to figure out where everyone was going, I found myself on the

20   second floor, the Ohio Clock Corridor, outside the chambers.

21   Q.   And when you refer to chambers, during your time that

22   we're talking about here today, what chambers are you

23   referring to?

24   A.   The Senate Chambers.

25   Q.   Were you aware of whether Congress was in session in the

1    Senate Chamber at that time?

2    A.   Yes.

3    Q.   I'm going to pull up what's been marked as Government

4    Exhibit 1011.  In preparation for your testimony, Officer

5    Robishaw, did we watch this video together?

6    A.   Yes.

7    Q.   And is this four, at times, videos sort of side by side

8    showing the same occurrence from different angles?

9    A.   That is correct.

10   Q.   And you see a time stamp in the upper right-hand corner?

11   A.   I do.

12   Q.   And is that consistent with the CCTV time stamp?  You can

13   look in the upper right-hand corner video.

14   A.   Correct.

15   Q.   To orient ourselves, if we're looking in the upper

16   right-hand corner, what area of the Capitol building is that?

17   A.   We're looking at the right one, that would be the Ohio

18   Clock Corridor looking back down toward the House way.

19   Q.   So that's the upper right-hand corner I'm circling here?

20   Ohio Clock Corridor.

21   A.   Correct.  Looking straight down the Capitol.

22   Q.   And that's near where you responded to.  Correct?

23   A.   Correct.

24   Q.   And if we look at the bottom left-hand corner that I'm

25   circling, what area is that?

1    A.   That's down there on the first floor of the Senate Wing.

2    Q.   Okay.  And then to the right of the Senate Wing Door

3    entry there that you just identified on the bottom right-hand

4    corner, can you tell where that is?

5    A.   Yeah.  Looks like it's in the same kind of vicinity,

6    going up to the Grand Staircase.

7    Q.   All right.

8         MS. AKERS:  Your Honor, I move to admit Exhibit 1011.

9         MR. SHIPLEY:  No objection.

10        THE COURT:  Without objection, 1011 is admitted.

11                        (Government Exhibit No. 1011

12                           received into evidence.)

13   BY MS. AKERS:

14   Q.   I'm going to play first just a few seconds here.

15        (Video played.)

16        I played from 2:22 to 2:28, and I'm circling a person in

17   blue at 2:13:43 p.m. on the bottom left-hand corner.  Do you

18   see that person?

19   A.   I do.

20   Q.   What does he appear to be doing?

21   A.   Can you go back?

22   Q.   Sure.

23   A.   I'll look at it again.

24        (Video played.)

25        Oh, yeah.  Climbing through the window.

1    Q.   All right.  I'm going to continue playing at this time.

2    With sound.

3         (Video played.)

4         All right.  I stopped at 3:05.  On the right-hand side

5    of the screen do you see someone who appears to be wearing a

6    uniform?

7    A.   I do.

8    Q.   Are you familiar with who that is?

9    A.   Yes.

10   Q.   Can you tell the Court, please.

11   A.   Officer Goodman.

12   Q.   Where approximately in the Capitol building is Officer

13   Goodman?

14   A.   He is by the Senate door, by the Grand Staircase of the

15   Senate.

16   Q.   So Senate Wing side by the Senate door?

17   A.   Correct.

18   Q.   And is this still the first floor?

19   A.   Yes.

20   Q.   All right.  I'm going to continue playing.

21        (Video played.)

22        I stopped the video at 4:09.  In the upper right-hand

23   corner, can you identify what location of the Capitol building

24   that is?

25   A.   Still in the Senate Wing but they're going up to the

1    second floor.

2    Q.   And I'm going to circle a person in the middle of the

3    screen who appears to have a red and white item on his head.

4    Do you see that person?

5    A.   I do.

6    Q.   The left-hand side of the screen, where this group has

7    entered now, where is that in relation to that right-hand side

8    of the screen person I just circled?

9    A.   It's just down the hallway.  It's like two lefts -- or a

10   right and -- it would be a couple rights.

11   Q.   So, in other words, the people on the upper right-hand

12   corner are coming up the stairs and they're going to enter the

13   room on the left-hand side of the screen.

14   A.   Yeah.  Correct.  There we go.

15   Q.   Very close in space.

16   A.   Yeah.

17   Q.   And --

18   A.   10 feet.

19   Q.   -- what is the area on the left-hand side of the screen

20   called?

21   A.   That's the Ohio Clock Corridor.  It's right outside the

22   Senate Chambers.

23   Q.   What did you see in this approximately minute of video

24   footage that we watched?  What happened from that entry point

25   at the Senate Wing Door up until this point?

1    A.   A lot of shouting, chanting, moving up, intimidating the

2    officer, pushing him back up the stairs.

3    Q.   We're going to continue playing.

4         (Video played.)

5         I stopped the video at 5:05.  Do you recognize anyone in

6    this video?

7    A.   Yeah.  That's myself.

8    Q.   I'm circling a person in the middle of the screen with a

9    blue Covid mask on.  Is that you?

10   A.   That is me.

11   Q.   And you're in the Ohio Clock Corridor?

12   A.   Correct.

13   Q.   What's happening right now?

14   A.   The crowd has kind of met with our police line that we

15   have established right there outside the chambers.

16   Q.   And what are you trying to do at this point?

17   A.   Just talk with the crowd, keep them, I don't know --

18   there was so much going through my mind at the time, but I

19   told myself that I didn't want anyone passing us and that this

20   was going to be their final -- you know, they weren't going to

21   get past us.

22   Q.   Why was it important, from your perspective standing in

23   the Ohio Clock Corridor, that this group didn't get past your

24   line?

25   A.   Because the senators and congressmen were in session at

1    the time and we had no idea if they were still in the building

2    or had left the building.

3    Q.   Where is the congresspeople in the Senate Chamber in

4    relation to where you are right now?

5    A.   Where the senators are or the congresspeople?

6    Q.   Excuse me.

7    A.   Sorry.

8    Q.   That's a good clarification.

9    A.   My bad.

10   Q.   The, I guess, senators because you're on the Senate Wing

11   side, where is the Senate Chamber in relation to where you're

12   standing right now?

13   A.   If you're looking at me, it's directly to my left.

14   They're right outside the chamber.

15   Q.   Can you describe to the Court the tone and demeanor of

16   the crowd as they approached the officer line including

17   yourself around this time?

18   A.   Oh.  Very hostile.  Irate.  Angry.  We had known that

19   they had used violence to gain entry into the building since

20   we had heard the radio calls that they were breaking out

21   windows to gain entry.

22   Q.   And did you use any techniques to try to deescalate the

23   situation at this time?

24   A.   Yes, ma'am.  So in the academy they go over a technique

25   called Verbal Judo.  It's a trademarked training that we go

1    through, and it's how to, you know, talk with individuals and

2    build rapport with, you know, people we are in contact with

3    on a daily basis and try to, you know, ease tension.  And it's

4    pretty much an officer's first line that we go to to try and,

5    you know, quell any type of violence or situation that arises.

6    Q.   Given the proximity of this crowd to the Senate Chamber,

7    why did you and your fellow officers not use force at this

8    point?

9    A.   For the simple fact that we were outnumbered.  You know,

10   there wasn't as many officers that we had on the line as they

11   had.  People kept coming in, flooding out, spilling through

12   the building.  So we were just simply outnumbered.

13   Q.   And is it fair to say that there were some people who

14   were closer to the police line and others who were sort of

15   further back in the Ohio Clock Corridor?

16   A.   That is correct.

17   Q.   Did the number of people in the Ohio Clock Corridor,

18   whether they were the front of the line or further back in

19   the room, impact your ability to do your job?

20   A.   I mean, no.  I still did what I was supposed to do and

21   what I thought was best.  But it still was a really bad day.

22   You know, it could have been better if it never happened, but

23   it did and I think as an agency we did the best we could.

24   Q.   All right.  I'm going to now pull up another exhibit,

25   Exhibit 109.

1          MS. AKERS:  Your Honor, the parties have agreed to the

2     admission of the 100 series, which is CCTV footage, so I'd

3     move the admission of that series right now so we don't have

4     to go through every time as we're watching those.

5          THE COURT:  The entire series?

6          MS. AKERS:  Correct.

7          THE COURT:  Okay.  Go ahead.  109.

8          MR. SHIPLEY:  That's correct, Your Honor.  No objection.

9          THE COURT:  So 109 is admitted.

10         MS. AKERS:  And we would move all of the 100s as well.

11         THE COURT:  And they can all be admitted, Mr. Shipley,

12    without objection?  The entire 100 series can be admitted

13    without objection?

14         MR. SHIPLEY:  Yes.  Correct, Your Honor.

15         THE COURT:  All right.  We'll do that.  And that would

16    be -- 100 is already admitted.  So it would be 101 through

17    140.

18         MS. AKERS:  That's correct, Your Honor.

19                         (Government Exhibit Nos. 101-140

20                          received into evidence.)

21         THE COURT:  All right.

22    BY MS. AKERS:

23    Q.   We're pulling up now what's been marked as Government

24    Exhibit 109.  Do you recognize the area that this exhibit is

25    depicting, Officer Robishaw?

```
1    A.   Yes, ma'am.

2    Q.   Where is it?

3    A.   We're still in the Ohio Clock Corridor.

4    Q.   I'm going to play five seconds.

5         (Video played.)

6         And I'm going to circle a person in a red, white, and

7    blue hat, blue sweatshirt in the lower right-hand corner.

8    Do you see that person?

9    A.   Yes, I do.

10   Q.   I'm going to continue playing here.

11        (Video played.)

12        All right.  I just stopped the video.  And do you still

13   see that person?  I'm going to circle him on the right-hand

14   side of the screen.

15   A.   Yes.

16   Q.   Do you also see yourself depicted in this video?

17   A.   I do.  I just came up at the top left screen.

18   Q.   Can you circle yourself?

19   A.   I can.  Yes.

20        (Witness complies.)

21   Q.   Okay.  You circled a person with a blue mask in the top

22   left-hand corner of the screen.  Correct?

23   A.   Correct.

24   Q.   And when you were approaching this line of officers who

25   was facing this line of people who entered the building, what
```

1    was the tone and the demeanor of this crowd at this point?

2    A.   Still really angry, hostile, yelling all sorts of things.

3    Q.   And can you indicate, now that we have more of an aerial

4    view, where the Senate Chamber is in location to the officer

5    line?

6    A.   I'm going to touch the screen.

7    Q.   Sure.  You drew an arrow in the upper left-hand corner of

8    the screen behind your head.  Is that an entry point to the

9    Senate Chamber?

10   A.   Correct.  Those are like the main doors, if you will.

11   Q.   Now I'm going to pull up Government Exhibit 1013.  And

12   have we watched this video in preparation for your testimony,

13   Officer?

14   A.   Correct.

15   Q.   Does it show various video footage of January 6 with an

16   overlap of United States Secret Service radio?

17   A.   Yes.

18        MS. AKERS:  The government moves to admit Exhibit 1013.

19        MR. SHIPLEY:  No objection.

20        THE COURT:  Without objection, 1013 is admitted.

21                      (Government Exhibit No. 1013

22                        received into evidence.)

23        MS. AKERS:  All right.  I'm going to play this exhibit.

24        (Video played.)

25

1    BY MS. AKERS:

2    Q.   Officer Robishaw, what was going on in this video here?

3    A.   Throughout the video, it's footage that has the Secret

4    Service radio traffic over top of it, kind of giving you what

5    they were saying and what they were doing and giving a really

6    good perspective that they were still in the chambers

7    throughout a good majority of the time that we had encountered

8    the rioters outside the chamber.

9    Q.   And does it appear that there was an evacuation going on

10   at this time?

11   A.   Correct.   At the end of the video they did decide to

12   evacuate.

13   Q.   And are you familiar with who was evacuated?

14   A.   Correct.   Yes.   It was the vice president.

15   Q.   At the end of the video prior to this evacuation route

16   that we see here now, there seemed to be smoke in the air.

17   Were you in the Ohio Clock Corridor when that happened?

18   A.   Correct.   I was.

19   Q.   Can you explain to the Court what happened at that time?

20   A.   Yes.   So we were -- well, I was -- I'll speak to what I

21   was doing.   I was sitting there talking to the crowd still.

22   And as I was trying to build rapport with some of the crowd to

23   keep them at bay, I still don't know what it was.   They said

24   it was a fire extinguisher.   I still don't know.   I just

25   assumed, I went with what they said, but something had

1    exploded.  It was a very loud noise.  It took everybody by

2    surprise.  And then a mysterious substance of a white smoke

3    filled the hallway.  I kind of just reacted and I yelled at

4    everyone to back away.

5         So our police line moves back from that smoke, and so did

6    the rioters.  They moved back as well, except for like one or

7    two individuals that were extremely aggressive at that moment,

8    yelling, and they were threatening manners and body language.

9    Q.   Did you perceive the crowd in the Ohio Clock Corridor to

10   be a threat at this time?

11   A.   Pretty much throughout the entire day.  I just assumed

12   that everybody was a threat using the violence they utilized

13   to make entry into the building by breaking windows.  At one

14   point in that hallway, in the Ohio Clock Corridor, I actually

15   asked if any of the individuals that were there in front of

16   me had weapons, and they actually decided to show me various

17   things.  People pulled out knives, bear spray, all different

18   things like that.  So I just assumed from that point on that

19   I was just going to assume everybody was armed with something.

20   Q.   Typically, when visitors enter the Capitol building, do

21   they typically have to go through some sort of security

22   screening?

23   A.   That is correct.  Yeah.  Your bags get x-rayed just like

24   you would at the airport.  All your metals and everything

25   comes out of your pockets, belts, and you walk through a metal

1    detector.  And if anything goes off, then additional screening

2    will follow with a hand wand.

3    Q.   So whether someone is walking a hallway by themselves

4    or with a group of people in a given location, if they haven't

5    gone through that security, what is the risk that you as a

6    Capitol police officer face?

7    A.   Well, any given day, if it was a normal day, anybody in

8    the Capitol or any of the House office buildings would have

9    been screened.  There's no way to get into the building

10   without being screened.  So on that day we knew that everybody

11   in that building hadn't been screened as normally would have

12   been.  So you just assume.

13   Q.   I'm going to pull up another CCTV footage.  This is

14   Government Exhibit 112.  Do you recognize this area?

15   A.   Yeah.  This is -- I don't know its technical term but

16   it's a hallway right off of the Ohio Clock Corridor.  You can

17   kind of see it -- well, you don't see it from, but when we

18   were look looking at the last video footage, it's directly

19   underneath that camera.

20   Q.   And so if I circle the doorway in the middle of the

21   screen, what does that doorway lead to?

22   A.   That leads to the Ohio Clock Corridor, right where

23   everybody was, all the rioters were outside of.

24   Q.   I'm going to play this video.

25        (Video played.)

1       While I'm paused here at 11 seconds, do you see an

2    individual walking by himself in this corridor?

3    A.    I do.

4    Q.    I'm going to continue playing.

5          (Video played.)

6          All right.  I stopped at 55 seconds.  What just happened

7    here?

8    A.    You see the individual walk down the hallway, and right

9    when he gets to the edge of the camera, he stops and turns

10   around and proceeds to go the other way as if something had

11   changed his mind to continue forward.  And as you can see,

12   officers come up, so he probably heard the officers coming

13   down the hallway.

14         MR. SHIPLEY:  I object and move to strike that.

15   That's all speculation.

16         THE COURT:  Overruled.

17   BY MS. AKERS:

18   Q.    And then after he turned around and started walking back

19   down the hallway, what did you witness happening?

20   A.    He continued to go down the hallway and then walked into

21   the open door.

22   Q.    Do you know what that room is?

23   A.    It's got like tables and chairs.  It's kind of like a

24   place where senators go and have lunch.

25   Q.    Do you know the name of the room?

1    A.    I do not remember.

2    Q.    No problem.  And then does it appear after the officers

3    take him out, they are headed back towards the Ohio Clock

4    Corridor?

5    A.    That is correct.

6    Q.    I'm now going to pull up Government Exhibit 110.

7    I'm going to play 4 seconds.

8       (Video played.)

9    I stopped at 4 seconds here.  Do you see the man in the lower

10   right-hand corner of the screen with the red and white hat who

11   appears to have just re-entered the Ohio Clock Corridor?

12   A.    Yes, ma'am.

13       (Video played.)

14   Q.    I played until 8 seconds.  And then what did this person

15   just do?

16   A.    Can you go back?

17   Q.    Sure.

18   A.    Yeah.  He just turned and walked out, going back towards

19   the Grand Staircase.

20   Q.    I'm showing you now Government Exhibit 126.  You said he

21   walked toward the Grand Staircase.  Are you able to identify

22   that in this CCTV footage?

23   A.    Correct.  I'm going to touch the monitor again.  This is

24   the Grand Staircase on the Senate Wing, on that side of the

25   building.

1    Q.   You made a green circle on the left-hand side of the

2    screen where the staircase is.   Correct?

3    A.   Correct.

4    Q.   What else do you see in this visual here?

5    A.   The Majority Whip's office is right here.

6    Q.   And are you familiar, is that an office on the Senate

7    side of the building?

8    A.   Correct.

9    Q.   I'm going to play the video, Exhibit 126.

10        (Video played.)

11        I stopped it here at 4 seconds.   Do you see that same

12   individual with the red, white, and blue hat and the blue

13   sweatshirt?

14   A.   Yes, ma'am.

15   Q.   What does he appear to be doing?

16   A.   Checking to see if the doors open.

17   Q.   Based on your experience working in the Capitol building,

18   are office doors typically locked during the day?

19   A.   Correct.

20   Q.   I'm going to continue playing until 12 seconds.

21        (Video played.)

22        And does it appear that individual wasn't able to get

23   into that room?

24   A.   Yes.

25   Q.   I'm now going to skip ahead in time a little bit and

1    go to Government Exhibit 113.  Are you familiar with this

2    location in the Capitol building?

3    A.    Correct.

4    Q.    Where is this location?

5    A.    The third floor.  It leads up into the galleries.

6    Q.    Is this still the Senate side of the building?

7    A.    That is correct.

8    Q.    And earlier we were at like 2:17 p.m.  What time are we

9    at now?

10   A.    Up in the top it says 2:40:40.

11   Q.    I'm going to play 23 seconds.

12         (Video played.)

13         I'm going to circle a person who appears to have

14   sunglasses on, a hat, in the middle of the screen.

15   Do you see that person?

16   A.    Yes, ma'am.

17   Q.    Do you also see a person sort of right behind him in an

18   orange, bright orange sweatshirt?

19   A.    I do.

20   Q.    And do you see another person I'm circling who seems to

21   be sort of bending over towards the wall?

22   A.    Yes.

23   Q.    Are you familiar with what is right there where that

24   person seems to be bending over?

25   A.    There's a water fountain right there.

1    Q.   And this hallway -- did you say this was on the third

2    floor?

3    A.   Correct.

4    Q.   In relation to the Senate Chamber, where is this hallway?

5    A.   So the chamber itself is one floor down, but the

6    galleries is right where they're headed for.  So right behind

7    the camera's the Senate Gallery.

8    Q.   And when we say the Senate Gallery, is that the same

9    broad room as the Senate floor?

10   A.   That is correct.  It's just separated by the level of

11   the floor.

12   Q.   Can you get to the Senate floor if you're just in the

13   Senate Gallery?

14   A.   If you wanted to jump, yes.

15   Q.   Normally, how would one get, if they were on the Senate

16   Gallery, down to the Senate floor?

17   A.   Normally, if you were authorized to be in there, you

18   would, you know, go through the proper means, and then you

19   would just go through the door at the second floor.  You would

20   use the door.

21   Q.   Would you have to exit the Senate Gallery, go outside the

22   Senate Gallery, down the stairs or elevator, and then into --

23   A.   That is correct.  Or use the stairs.

24   Q.   Okay.  I'm now going to pull up Government Exhibit 435.

25   And is this a video, Officer Robishaw, that we watched

1    together in preparation for your testimony that shows a route

2    like the one we just saw in the CCTV footage?

3    A.    Yes.

4         MS. AKERS:  The government moves to admit Exhibit 435.

5         MR. SHIPLEY:  No objection.

6         THE COURT:  Without objection, 435 is admitted.

7                        (Government Exhibit No. 435

8                         received into evidence.)

9    BY MS. AKERS:

10   Q.    I'm going to play starting at 3:04.

11        (Video played.)

12        All right.  I'm stopping at 3:21.  And first what I'm

13   going to do is circle a person in the middle of the screen who

14   appears to be wearing a blue hoodie.  Do you see that person?

15   A.    Yes, I do.

16   Q.    It appears that the crowd at this point is walking

17   upstairs.  Do you know where they're walking from, what area

18   that is?

19   A.    It's the Rotunda doors I was talking about.  So there's

20   the stairs and an elevator.  They're going up the stairs that

21   lead you to the third deck that will lead to the gallery.

22   Q.    I'm going to continue playing.

23        (Video played.)

24        I'm stopping at 4:24.  As this person who just took a

25   drink from the water fountain next to the man in the orange is

1   walking down the hallway, what do you hear the crowd chanting?

2   A.   Quite a few different things:  Treason.  Freedom.

3   America.  Our house.

4   Q.   Okay.  I'm going to continue playing.

5       (Video played.)

6       I just stopped at 4:43.  I'm not going to get it exactly,

7   but at 4:42, do you see a man in a blue sweatshirt standing

8   next to the person videoing?

9   A.   Correct.

10   Q.   All right.  I'm going to continue.

11       (Video played.)

12       I stopped at 5:26.  What area of the Capitol building are

13   we in now?

14   A.   The area?  We're still in the Senate side.  This is right

15   outside the Senate Gallery.

16   Q.   And you see the person in the middle right of the screen

17   that I'm circling with the red, white and blue hat and blue

18   sweatshirt?

19   A.   I do.

20   Q.   What appears to be happening at this point?

21   A.   At this point it seems the crowd has started to force

22   their way into the galleries through those doors by assaulting

23   two gentlemen in, like, suit attire.

24   Q.   Like plain clothes?

25   A.   Plain clothes, yeah.

1    Q.   I'm going to continue playing.

2         (Video played.)

3         I stopped at 6:45.  What's going on here, Officer?

4    A.   It sounds like, you know, they're still all chanting

5    certain things, yelling, and it also sounds like they're

6    trying to come up with a plan to how to get down to the

7    chambers itself.

8    Q.   So at this point, have the rioters breached the Senate

9    Chamber?

10   A.   It would appear no, that they have not yet.

11   Q.   Sorry.  I keep using the wrong terminology.  Senate

12   Gallery.

13   A.   Yeah.  Okay, yes.  They are in the gallery.  They have

14   made it to the gallery, but they're not in the chamber itself

15   yet.

16   Q.   Not yet.  And I'm circling on the middle right-hand side

17   of the screen the man with the blue sweatshirt.  Do you see

18   him?

19   A.   I do.

20   Q.   What does he appear to be doing to you?

21   A.   It would appear he's going through one of the bags that

22   are under the seats in the galleries that contain like escape

23   hoods.  It's like a mask you can put on in case of a fire.

24   And they're random -- no, not randomly placed, but they're

25   strategically placed throughout the rows at different spots.

1    Q.   I'm going to continue playing.

2         (Video played.)

3         I'm actually going to stop.  Did you just hear what that

4    man said?

5    A.   No.  Go back?

6    Q.   Sure.

7         (Video played.)

8    A.   "Sacred ground."

9    Q.   Would you agree with that characterization that the

10   Senate Chamber is in fact a sacred area of the Capitol

11   building?

12   A.   I would.  And I also stated such in another video.

13   Q.   In your time as -- working for the United States Capitol

14   Police for eight years, prior to January 6, 2021, had you ever

15   even been on the Senate floor?

16   A.   No, ma'am.

17   Q.   Why not?

18   A.   We were never allowed to.  We had access to the House

19   Chambers for midnights because we would let the cleaning crew

20   in to do their maintenance or if they had to fix things or

21   what have you before Congress would come in.  But we never had

22   access to the Senate Chambers.

23   Q.   Is it fair to say that people in Congress generally agree

24   with the characterization that this is a sacred room?

25   A.   I would say so, yes.

1    Q.   I'm going to continue to play.

2         (Video played.)

3         I stopped at 7:43.  I'm circling a man who's immediately

4    to the left of this guy's chin in the red hat and blue

5    sweatshirt.  Do you see him?

6    A.   I do.

7    Q.   I'm going to play one more second.  Stopping at 7:44.

8    What does this man appear to be doing at this time?

9    A.   He's climbing over the railing.

10   Q.   And normally I guess is it typical to climb over the

11   railing?  How do senators normally get from place to place

12   in the gallery?

13   A.   Well, the gallery is more so for people who are visiting.

14   So normally when they would come, they get put strategically

15   throughout the different doors that are open, and they funnel

16   into their section.  And normally you wouldn't cross that

17   specific railing to get to that side.  You would go out and

18   around, or up and down the railing.

19   Q.   I'm going to continue playing.

20        (Video played.)

21        I'm stopping at 9:17.  On the very far right-hand side

22   of the screen do you see the person I circled in the blue

23   sweatshirt?

24   A.   Yes, ma'am, I do.

25   Q.   Where does he appear to be in the Senate Gallery in

1    relation to where the rioters actually forced their way in?

2    A.    It would appear in the video that they entered -- I'm

3    going to touch the screen --

4    Q.    Sure.

5    A.    -- that they entered on this side, on the left side of

6    the screen, and that he had walked around the gallery, going

7    over those railings, to make it to this side.

8    Q.    So fair to say he made it to the opposite side --

9    A.    Correct.  He's on the opposite side of what they entered.

10   Q.    I'm going to finish playing.

11        (Video played.)

12        All right.  I stopped at 10:17.  What happened in this

13   latter half of the video?

14   A.    This latter half, an individual went from the galleries

15   and jumped off the balcony into the chamber.

16   Q.    When you were listening to that video, did you hear the

17   crowd saying anything?

18   A.    That, you know, they were talking about the individual

19   who had jumped from the gallery, and that, you know, they

20   should sit in Pelosi's seat, even though that's not her seat.

21   That would be the seat where the vice president would sit when

22   senators are in session.

23   Q.    All right.  Just one moment, please.

24        MS. AKERS:  Your Honor, I'm about to pull up Exhibit

25   304.  The 300 series is footage from the Senate floor to which

1    the parties entered a stipulation as to the authenticity of

2    and so I would move the admission of the 300 series that we're

3    going to review.

4           THE COURT:  That would be 301 through 305.

5       Any objection, Mr. Shipley?

6           MR. SHIPLEY:  No objection.

7           THE COURT:  All right.  Those are admitted.

8                          (Government Exhibit Nos. 301-305

9                           received into evidence.)

10          MS. AKERS:  Just one moment, Your Honor.  I'm having

11   a computer glitch, but it's loading.

12          THE COURT:  Take your time.

13          MS. AKERS:  Thank you.

14   BY MS. AKERS:

15   Q.   All right, Officer Robishaw.  I pulled up Government

16   Exhibit 304.  Do you recognize this area of the Capitol

17   building?

18   A.   Yes, ma'am.  That's the Senate Chambers.

19   Q.   I'm going to play starting at 13 minutes.  And can you

20   tell us what time this is in the middle of the screen?

21   A.   It says "14:46:18:21."

22   Q.   I'm going to start to play here.

23          (Video played.)

24          MS. AKERS:  I'm going to pause, and give me just one

25   moment, please.

1          Your Honor, if I could have just two minutes, I'm going to

2     reload this on the desktop so it doesn't keep glitching out.

3               THE COURT:  So it's going to take a couple minutes?

4               MS. AKERS:  Yeah.

5               THE COURT:  Then we're going to take our afternoon

6     break.

7               MS. AKERS:  Thank you so much.  I apologize.

8               THE COURT:  All right.  We'll take a break and resume

9     at three o'clock.  And we'll be going until about 20 after

10    4:00 today.

11         (Recess from 2:48 p.m. to 3:13 p.m.)

12               THE COURT:  Ms. Akers.

13               MS. AKERS:  Thank you, Your Honor.

14    BY MS. AKERS:

15    Q.   We're going to pull up Government Exhibit 304.  And we're

16    starting at 13 minutes and we're going to play from here.

17         (Video played.)

18         We stopped at 13:33.  Officer Robishaw, what happens

19    here?

20    A.   You can see the two individuals.  One is covering the

21    camera with his jacket, and the other has moved the camera

22    facing up towards the ceiling.

23    Q.   And we're still in the Senate Gallery here.  Correct?

24    A.   Correct.  They're in the Senate Gallery.

25    Q.   Are you familiar with what these cameras are typically

1    used for in the Senate Chambers?

2    A.   Yeah.   There are various cameras throughout the gallery

3    that record when they're in session.   It's like C-SPAN.

4    You can watch it live.

5    Q.   Does it record the happenings on the Senate floor below?

6    A.   Correct.

7    Q.   Can we please play.

8         (Video played.)

9         Can we please pause.   At 13:47.   And what just happened

10   here?

11   A.   The camera was then turned from facing the ceiling back

12   down and then turned to its -- that right side facing the

13   floor.

14   Q.   And now that it's facing the floor, how does that impact

15   its ability to record what's going on on the Senate floor?

16   A.   Well, it will not be able to record what's going on on

17   the Senate floor.   It'll be recording what it's looking at,

18   like a camcorder.

19   Q.   And when say it was moved, who are you referring to who

20   moved it?

21   A.   The person in the white and red hat with the sunglasses,

22   blue hoodie.

23   Q.   I'm now going to show you Government Exhibit 438.   Have

24   we watched this video in preparation for your testimony?

25   A.   Yes.

1    Q.   And are you familiar with the events depicted in this

2    video footage?

3    A.   I am.

4    Q.   Do they comport with your recollection and experience

5    on January 6?

6    A.   Yes.

7         MS. AKERS:   We move to admit Government Exhibit 438.

8         THE COURT:   438.  Mr. Shipley?

9         MR. SHIPLEY:   No objection.

10        THE COURT:   438 is admitted.

11                          (Government Exhibit No. 438

12                            received into evidence.)

13   BY MS. AKERS:

14   Q.   I'm going to start playing this for you at 4:40.

15        (Video played.)

16        And stopping at 4:52, do you see a man in the red, white,

17   and blue hat and the blue sweatshirt that I'm circling in the

18   middle right-hand of the screen?

19   A.   I do.

20   Q.   What area is he in the United States Capitol at this

21   point?

22   A.   They have now made their way -- and your individual there

23   has made their way into the chambers itself.

24   Q.   I'll continue playing.

25        (Video played.)

1      All right.  I stopped at 6:04.  What's generally going

2   on -- excuse me.  I'm going to stop at 6:03.  What's generally

3   going on in the clips that we just watched here?

4   A.   That the individuals that made their way into the Senate

5   Chamber have started going through all the effects of the

6   different senators at their desks, opening, rummaging through

7   papers, taking photographs of their personal notes or what

8   have you, yelling, still screaming, talking amongst

9   themselves, planning.

10  Q.   I'm going to circle the middle of the screen, the guy

11  in the red hat, blue sweatshirt.  Do you see him there?

12  A.   I do.

13  Q.   Are you familiar with the location of that door?

14  A.   Yes.  Yes, I am.

15  Q.   Can you describe to the Court, if you were to exit that

16  door, which it appears that person is doing, where would you

17  exit to?

18  A.   You would exit right back to that hallway that we viewed

19  a couple of exhibits ago, into the Ohio Clock Corridor.

20  Q.   And so earlier when you testified about the police line

21  that you were holding with the rioters in front of you and the

22  Ohio Clock Corridor and you made an arrow to a door, is this

23  the door that you were referring to?

24  A.   That is the door.  That's their main door.  Yes, that's

25  the door I was referring to.

1    Q.   I'm now going to pull up Government Exhibit 1009, which

2    is a, what I'll call montage of the defendant's actions on the

3    Senate floor, and so it's consisting entirely of exhibits from

4    the 300 series which have already been admitted.  So we move

5    to admit this montage.

6         MR. SHIPLEY:  No objection.

7         THE COURT:  Without objection, 1009, a montage, is

8    admitted.

9                        (Government Exhibit No. 1009

10                        received into evidence.)

11   BY MS. AKERS:

12   Q.   I'm going to start playing at 3:48.  We're not going to

13   watch this whole thing.  And before I start playing, just for

14   identification purposes, do you see the man in the red, white,

15   and blue hat and blue sweatshirt who I'm circling in sort of

16   the right upper quadrant of the screen?

17   A.   I do.

18   Q.   I'm going to play.

19        (Video played.)

20        I stopped at 4:24.  Do you see that same man in the blue?

21   A.   I do.

22   Q.   And what appears to be happening at this point?

23   A.   Leading up to this point, he's on the phone.  He's got

24   something in his hand, and then he's looking up at what

25   appears to be the camera, realizing he's on the camera.

1        MR. SHIPLEY:  Objection.  That calls for speculation.

2    Move to strike.

3        THE COURT:  Overruled.

4    BY MS. AKERS:

5    Q.   I'm going to continue playing.

6        (Video played.)

7        Since we changed angles, I'm just going to circle

8    the man in the blue sweatshirt.  Do you see him there?

9    A.   I do.  Yes, ma'am.

10   Q.   We're going to continue playing from 4:42.

11       (Video played.)

12       And what did you just see the man in the blue doing

13   in this clip?

14   A.   It looked like he was instructing someone in the

15   balconies to move the camera back down.  You can see him

16   pointing at the two individual things and then pointing down

17   as if to tell somebody to move them.

18       MR. SHIPLEY:  Again.  Move to strike.  "As if to tell

19   someone"?  It's pure speculation.

20       THE COURT:  It is what he says it is and what he thinks

21   it is, and I can take into account whether he knew or whether

22   he was just surmising.  Overruled.

23   BY MS. AKERS:

24   Q.   I'm going to start playing now at 5:27.  And if you look

25   in the bottom left-hand corner of the screen, do you see that

1    same individual we've been identifying in videos?

2    A.   You said bottom left?

3    Q.   Yes.  The red, white, and blue hat and sunglasses?

4    A.   Yes.

5    Q.   Okay.

6         (Video played.)

7         All right.  I stopped the video at 6:19.  I'm now going

8    to pull up Government Exhibit 111.  What area is this?  Is

9    this, first off, CCTV footage?

10   A.   Yes.

11   Q.   What area is this?

12   A.   We're back in the Ohio Clock Corridor.

13   Q.   What's the time here?

14   A.   Oh, I see it.  It's 2:55:30.

15   Q.   I'm going to play from zero seconds to 31 seconds.

16        (Video played.)

17        I stopped at 32 seconds.  Do you recognize anyone in

18   this video?

19   A.   Myself is right in the center of the frame.  Would you

20   like me to circle myself?

21   Q.   Sure.

22   A.   There you go.

23   Q.   And next to you do you also recognize the man in the blue

24   sweatshirt?

25   A.   I do.

```
1    Q.   What were you doing at this time?

2    A.   In the video you see him exit and we start pointing this

3    way and we're moving the rest of the people that had funneled

4    out of the chambers down and back the way they came up.

5    Q.   When you say you see him exit, out of what door are you

6    referring to?

7    A.   The chamber door that I referred to earlier that's right

8    here.

9    Q.   And so you see the man in the blue sweatshirt exit there,

10   and then you said you're funneling him down where?

11   A.   Back the direction they had originally come up.

12   Q.   Where were you trying to funnel him towards?

13   A.   We had discussed that we would push him back out the

14   window they had come in.

15   Q.   And would that be on the first floor of --

16   A.   Correct.

17   Q.   What floor would you be on if you were in the Ohio Clock

18   Corridor?

19   A.   That's the second floor.

20   Q.   Now I'm going to pull up Government Exhibit 129.

21        Do you recognize this area of the Capitol building?

22   A.   Correct.

23   Q.   We've seen it before?

24   A.   Yes, ma'am.

25   Q.   And where is this in relation to the Ohio Clock Corridor
```

1    that we were just looking at?

2    A.   It's -- from the video footage it was where we were

3    walking from, so the Ohio Clock Corridor from this camera is

4    behind us.

5    Q.   Going to play.

6         (Video played.)

7         You see the man in the blue walking out?

8    A.   I see him walking.  Yeah.

9    Q.   Are you walking behind him?

10   A.   I am.

11   Q.   What were you doing with your hand there?

12   A.   Pointing the people to go down.

13   Q.   All right.  I stopped at 25 seconds.  You end up going up

14   the stairs it looks like.  Correct?

15   A.   Correct.

16   Q.   And the person in the blue went downstairs.  Correct?

17   A.   Yes.

18   Q.   All right.  I'm now going to pull up Government Exhibit

19   105.  Do you recognize this area of the Capitol building?

20   A.   Yes, ma'am, I do.

21   Q.   What area is it?

22   A.   That's the north door, is what we refer to it, is the

23   north door.

24   Q.   Where is the north door in relation to the video footage

25   that we're looking at on the screen?

1   A.   Where's the -- oh, so the door is right behind the

2   camera.  So it's just outside of the camera.  You see the desk

3   right there?  It's directly down of the frame.  And it's a

4   series of two doors.

5   Q.   So the door's essentially under the camera.  If you were

6   to walk towards the camera you would be walking towards the

7   door?

8   A.   Yes.  You would see it's exit, it's got glass panels,

9   you can see straight through both doors.

10  Q.   So if you were looking towards the door, would you be

11  able to see the outside based on the glass panels --

12  A.   Correct.  If you were standing right here, looking this

13  way -- if you're looking that way, yeah, you'd see the glass

14  panels and you can look right outside.

15  Q.   It looks like you drew a stick figure.

16  A.   Correct.

17  Q.   I'll finish it for you.

18  A.   There it is.  Thank you.

19  Q.   I'm going to play 11 seconds here.

20       (Video played.)

21       And at 11 seconds do you see the person in the blue

22  sweatshirt?

23  A.   Yes.

24  Q.   What direction does he appear to be looking?

25  A.   He's looking towards the north door.

```
 1    Q.   What time is it?
 2    A.   It's 2:57:31.
 3    Q.   Okay.  I'm going to continue playing.
 4         (Video played.)
 5         Okay.  Officer, you testified in the last video preceding
 6    this video in time that you directed this gentleman down the
 7    stairs so he could exit out the door.  Does it appear that he
 8    exited when he made it to the first floor?
 9    A.   No, he did not.
10    Q.   What actually did he do based on this video footage?
11    A.   He's walking up toward the top of the frame.
12    Q.   Okay.  We're going to continue playing.
13         (Video played.)
14         And what's happening at the north door now?
15    A.   It appears that the sergeant opened the door and they
16    want everyone to be funneled from where they're coming from,
17    down, out the door.  And now they're fighting with the crowd,
18    pulling them out of the door.
19    Q.   I'm going to stop here at 1:22.  And do you see in the
20    upper top corner of the screen -- excuse me -- in the upper
21    middle portion of the screen that person in the blue
22    sweatshirt with the white emblem on the front?
23    A.   Yes.
24    Q.   I'm going to continue playing.
25         (Video played.)
```

1     I stopped at 1:40.  And what did you just see the
2   gentleman do at this time?
3   A.   Could you roll back, please?
4   Q.   Sure.
5   A.   So you can see the individual walking down from the top
6   of the screen.  He makes a left, which then he turns around
7   abruptly and starts going down the adjacent hallway to what
8   would have been his right.
9   Q.   I'm going to pull up Government Exhibit 106.  And is this
10   the same location that we were just looking at?
11   A.   Correct.
12   Q.   Is it now 3:07 p.m.?
13   A.   3:07:10.  Yes.
14   Q.   About 10 minutes later from the time you testified from
15   the last exhibit?
16   A.   Correct.
17   Q.   And I'm going to play here until 8 seconds.
18        (Video played.)
19        At 8 seconds, I'm stopping.  Do you see that man in the
20   blue sweatshirt that I circled in the left middle of the
21   screen?
22   A.   I do.
23   Q.   And at this point, what's happening?
24   A.   That they are now getting the crowd to walk outside the
25   door.

1              MS. AKERS:  No further questions for this witness,

2      Your Honor.

3              THE COURT:  Mr. Shipley.

4                          CROSS-EXAMINATION

5      BY MR. SHIPLEY:

6      Q.   Setting aside just for a moment the testimony you gave

7      that you gave them directions to go down the stairs and find

8      an exit presumably, and that when he got to a point where he

9      could see an exit, he went another direction.  Setting that

10     aside for a moment.

11     A.   Setting that aside.

12     Q.   Yeah.

13     A.   Okay.  I got what you're saying.  I'm sorry.

14     Q.   Other than that, any place on that video where Mr. Bozell

15     didn't follow the directions he was given?

16     A.   I mean, he did go downstairs.

17     Q.   And at no other point did he come into any encounters

18     with either yourself or other law enforcement officers that

19     you saw where he didn't do what they told him to do.  Right?

20     A.   That would be fair.

21     Q.   Like he went down -- we saw the video where he went down

22     the hallway, you said there was like a room down at the end

23     with a table and chairs where the senators eat sometimes.

24     A.   Yeah, where he went into the -- okay.

25     Q.   And an officer with a long gun sort of -- obviously see

1    he's got the long gun, maybe the only one we saw in the video,

2    he sees him, signals for him to come out, and within a few

3    seconds he comes out, and the officer tells him to go that way

4    and he follows the directions, right?

5    A.    True.  But it was the other officer who goes in to get

6    him before the other officer saw it.  Because those two doors

7    go to the same room.

8    Q.    Sure.  And the officer went down behind him maybe?

9    A.    Yeah.

10   Q.    And they both come out together.

11   A.    Correct.

12   Q.    Didn't seem to be objecting.  Right?

13   A.    No.

14   Q.    Going into the Senate Gallery, I don't know if we saw

15   that video where he actually goes in through the door of the

16   Senate Gallery, there wasn't any video of him going past a

17   police line or overcoming police officers there, right, going

18   into the gallery?

19   A.    No, not in the video.

20   Q.    In fact, the first encounter that you testified to is

21   where he goes through the window, he turns to the left, which

22   is towards the Senate Wing?

23   A.    Correct.

24   Q.    And then you kind of come up from the other direction

25   along with, I think it's a command officer because he's got

1    the hat on and a little more brass -- and there's a group of

2    like six or eight of you that kind of form a line there, and

3    then maybe 20 protesters, rioters, whatever you want to call

4    them, come the same direction that Mr. Bozell came from.

5    Right?

6    A.   Yep.

7    Q.   We'll call it a standoff for lack of a better

8    description.  But both sides just stand there and there's

9    dialogue back and forth.  You described them as angry.

10   Fair enough.  One individual there had a bat, didn't he?

11   A.   A bat?

12   Q.   Yeah.  A baseball bat.

13   A.   I don't remember a bat.  I'm sure they did.  I saw poles,

14   shields.

15   Q.   Right.  But the individual with the baseball bat is the

16   individual with Mr. Bozell, when he -- remember, he first --

17   he walks in and he goes all the way to the far left side,

18   right, so he's on your extreme right.  You recall that?

19   A.   Yes.

20   Q.   And then he crosses over to the middle.  Correct?

21   A.   Okay.

22   Q.   But he's not like right in front of you, he's about four

23   or five people deep, and he stands right next to a gentleman,

24   and that gentleman had the bat.

25   A.   Okay.

1          THE COURT:  He's saying "okay."  But he says he doesn't

2    recall a bat.

3          MR. SHIPLEY:  Well, I have that video number.

4    Can we --

5          THE COURT:  If you need to show the video, show the

6    video.  But you can't get him to testify to something he

7    doesn't recall.

8          MR. SHIPLEY:  Can we have 109.

9    BY MR. SHIPLEY:

10   Q.   Okay.  This is Mr. Bozell here in the hat.  Right?

11   A.   Okay.

12   Q.   And we'll see in just a moment he walks this way.

13   Go ahead and play.

14     (Video played.)

15     Right there.  See that gentleman in the green?  Want me

16   to back it up a little bit?

17   A.   I see the gentleman in the green.  Sure, if you want

18   to back it up.

19   Q.   Why don't we back it up just five seconds.  What's that

20   in his hand, right there?  Baseball bat, right?

21   A.   It would appear to be some sort of metal --

22   Q.   Now, Mr. Bozell is -- he's not even in the frame at this

23   moment.  Oh, no.  He's right here.  He's right here.

24   A.   Yeah, he's right there.

25          THE COURT:  And we can clarify that the officer is just

1    walking up from a distance away at this point.  He's not up

2    there to see the bat yet.

3         MR. SHIPLEY:  Fair enough.  This video is in, so I'm

4    asking him what he sees on the video.

5    BY MR. SHIPLEY:

6    Q.   Okay, keep going.

7         See Mr. Bozell, he walks over to the gentleman with the

8    bat, right?  And then the gentleman puts the bat away?

9    A.   I don't see Mr. Bozell on the screen.

10   Q.   Let's back up a little bit.

11        (Video played.)

12        See?  There he is right there.

13   A.   Okay.

14   Q.   And then that gentleman puts the bat down.

15        Okay.  Can we go to 1013.

16        This is the composition that has the Secret Service audio

17   over the top of the video.

18   A.   Okay.

19   Q.   And you've seen all these before.  Right?

20   A.   Yes.

21        MS. AKERS:  Would you like me to play?

22        MR. SHIPLEY:  Just go ahead and play it.  I'm not

23   exactly sure where we're going to get to.  It's only 1:18

24   long.  Can we have the sound?

25        (Video played.)

1           Okay.  Why don't you stop right there.

2      BY MR. SHIPLEY:

3      Q.   So this is sort of the beginning of this whole sequence.

4      Right?

5      A.   Yes.

6      Q.   You've got this one officer here?

7      A.   Mm-hmm.

8      Q.   And then there's several of you that come up behind to

9      help him.  Right?

10     A.   Correct.

11     Q.   And as the rioters come out -- and these are the people

12     that have just come through the window -- as they're coming

13     down this hallway --

14          THE COURT:  Wait a minute.  These are people who've

15     just come what?

16          MR. SHIPLEY:  Come through the window.  This is the

17     group that had just come in through the window.  The broken

18     windows.

19          THE COURT:  Is it immediately after they came in the

20     window?

21          MR. SHIPLEY:  It's within like 30 seconds.

22          THE COURT:  Go ahead and ask the witness.

23     BY MR. SHIPLEY:

24     Q.   This is the group when they come in through the windows

25     that they turn left and they end up right there.  Correct?

1     A.   When they come up the stairs --

2          -- (Simultaneous speaking) --

3     A.   -- the window, then the hall, then the stairs, the Grand

4     Staircase, then they come around to the Majority Whip's

5     office.  Now you're in the Ohio Clock --

6     Q.   And that's what we saw just before that with the crowd

7     video with somebody following everybody going up the stairs?

8     A.   Correct.

9     Q.   And then they end up right here?

10    A.   The crowd video?  Or the --

11    Q.   Well, there was a crowd shot video.

12    A.   Okay.  You're talking about the one with -- the Secret

13    Service one?

14    Q.   Yes, just before -- let's go back.

15    A.   Because the Secret Service one was the one before this,

16    correct?

17    Q.   I understand.  Go ahead.

18         (Video played.)

19         So at this point Mr. Bozell, with the red, white, and

20    blue hat and the blue sweatshirt, he hasn't even come in yet,

21    right?  You haven't seen him enter.

22    A.   Correct.

23    Q.   All right.  Let's go ahead and play.

24         (Video played.)

25         Okay, stop.  This isn't immediately -- this is some time

1    later, right?  Now the whole crowd has moved forward and

2    Mr. Bozell is not even there.

3    A.    Yeah.  I don't see him in the video.

4    Q.    So there's a gap in the video there where something

5    happened but we don't have it recorded.

6    A.    Sure.  In this video, yes.

7    Q.    Now, let's pay attention real quick and see if we can see

8    where the white smoke comes from.

9         (Video played.)

10        Stop.  Look at that right there?

11   A.    Red tube?

12   Q.    Yeah.

13   A.    Looks like a fire extinguisher.

14   Q.    Fire extinguisher.  And what's a fire extinguisher look

15   like when it goes off?

16   A.    Smoke.  White.

17   Q.    You've seen this video.  Right?

18   A.    Yeah.

19   Q.    You testified on direct you didn't know where the smoke

20   came from.

21   A.    I didn't then.

22   Q.    So your testimony is you just had never noticed that,

23   that the guy is holding a fire extinguisher?

24   A.    I haven't gone through any of the videos with a

25   fine-toothed comb looking at everybody's hands and what they

1    all are holding.

2    Q.   Fair enough.  I'm just asking you, you testified on

3    direct that you didn't know where it came from, but if you

4    look at this video, it's pretty obvious it comes right from

5    that fire extinguisher.

6    A.   That would.

7    Q.   Okay.  I think you testified that given the events at

8    this point in time -- and you'd already been involved in a few

9    other things before this happened.  Right?

10   A.   Correct.

11   Q.   Seen the crowd, you knew what was happening, you knew

12   that the building had been breached?

13   A.   I knew the building had been breached but I'd only seen

14   the crowd before this from an obscured view of a window from

15   the Cannon building.

16   Q.   But what I want to ask you about, just to confirm, that

17   you said it, is you at this point were assuming everybody was

18   a threat.

19   A.   Correct.

20   Q.   And that would be true for those who actually were no

21   threat but you were operating under a worst-case scenario.

22   A.   Correct.

23   Q.   Now, in preparing either for this trial or other

24   instances where you've testified -- and I don't know how many

25   trials you've testified in, but you've testified before the

1    grand juries, right?

2    A.   Of course, yes.

3    Q.   And multiple different defendants have been involved.

4    Right?

5    A.   Yes.

6    Q.   You learn the names of any of those defendants along

7    the way?

8    A.   I've been told their names but I don't recall.

9    Q.   The big gentleman in the orange shirt kind of is

10   prominent through --

11   A.   Oh, the crowd video?  Yeah, I don't know his name.

12   I don't think I've been told his --

13   Q.   Ronald Sandlin?  You don't recognize Ronald Sandlin?

14   A.   No.

15   Q.   And the gentleman who actually jumped down from the

16   railing, you ever heard the name Josiah Colt?

17   A.   No.

18   Q.   Okay.  But it wasn't -- this gentleman never jumped

19   down from -- right?

20   A.   In the video footage, no.

21   Q.   Yeah, he walked out and then came in on the bottom.

22   A.   Yes.

23   Q.   Or --

24   A.   You did say that we never saw in the video him coming

25   through, but he does appear in the footage in the chambers.

1    Q.   But -- fair enough.  There's no video that shows him

2    jumping down and you didn't see him jump down, so that's all

3    you can offer today?

4    A.   Correct.  That he was in the chamber.

5    Q.   Now, you made a comment about, you know, his movement of

6    the camera, the C-SPAN camera, being suggestive of a desire to

7    not have things filmed on the floor of the Senate?

8    A.   Yes.

9    Q.   There's more than one camera, right?

10   A.   There's multiple cameras.

11   Q.   Is there -- have you seen any video of him going around

12   moving the other cameras so they wouldn't film things on the

13   floor of the Senate?

14   A.   I haven't seen all the footage, but the footage I've

15   seen, you did see him in that one particular footage move

16   the camera, obscure its vision, and put it at the floor.

17   Q.   But pretty much all of that video is actually shot from

18   the other cameras, isn't it?

19   A.   True.  But that doesn't mean he saw all those other

20   cameras.

21   Q.   Well, if he had the presence of mind to maneuver one in

22   such a way so that it wouldn't record the floor, it kind of

23   makes sense that he would think about whether there were

24   others, because there's clearly not just one C-SPAN camera.

25   A.   Well, that's why I made that one inference when you see

1       him in the other video point at the other two cameras and it

2       looks to me that he is appearing to instruct others to move

3       those cameras --

4       Q.   What if he's pointing at the same camera that he had

5       moved?

6       A.   Well, he wasn't in the right spot for that camera to be

7       moved again because that camera would have been at the top

8       left.  He was pointing at the top right of the screen.

9       Q.   We'll come back to that.  But it's fair to say -- we did

10      have that composition video, shot from above --

11      A.   Correct.

12      Q.   -- where he's in different places doing different things.

13      Right?

14      A.   Yes.  He has moved around the chambers.

15      Q.   And almost the entire time he's either on his phone or

16      he's looking at his phone, right?

17      A.   Correct.  He was on his phone at one point.

18      Q.   And you testified that there's lots of video of other

19      people looking at documents, opening up the desk drawers,

20      sitting in the speaker's or the president's chair -- not the

21      speaker because that's on the other side.

22      A.   Yep.

23      Q.   None of those videos show Mr. Bozell doing any of that.

24      A.   That's correct.

25      Q.   And when he walked out of the Senate Chamber -- we saw

1    that CCTV video from the camera, the stationary camera outside

2    the Senate Chamber -- he walks out alone.  Right?

3    A.   Yes.

4    Q.   Well, actually, you're not too far behind him.

5    A.   I'm outside of the chamber in the hallway.  Yeah.

6    Q.   Oh, you're already outside the chamber --

7    A.   Yeah.  He comes out of the -- well, from what I remember

8    of the video footage we just watched --

9    Q.   And then you follow --

10   A.   -- he comes out, I kind of like spin around, and then I

11   think -- he comes out by himself at first and then there's

12   another, and then we kind of move those individuals out.

13   Q.   Now, at some point, you went back into the chambers with

14   several other officers once you had the manpower to kind of

15   force those still inside to leave.

16   A.   Oversimplification, but I did go back into the chambers

17   and at one point I was by myself for a while before more

18   officers came in.

19   Q.   That's when you followed Mr. Chansley in by yourself, and

20   you were alone with 25 or 30 or 40 people.  Right?

21   A.   Correct.

22   Q.   But at some point you had backup come to your assistance?

23   A.   Yes.

24   Q.   And once you had enough people in there, you were able to

25   persuade the people on the --

1    A.   I wouldn't say so much me as the, you know, riot control

2    MPD officers, accompanied by the few U.S. Capitol Police.

3    They moved everybody out.

4    Q.   Okay.  Other law enforcement, whichever agency.

5    A.   Yes.  I was relieved when they came in.

6    Q.   But Mr. Bozell is already gone, right?

7    A.   I don't know.  I didn't see that footage.

8    Q.   Okay.

9    A.   I mean, I have seen the footage.  I just haven't seen --

10   specifically looking for this individual in those footages or

11   videos before.  So I'm unsure of the time table.

12   Q.   But would it be fair to say that from the video that we

13   did watch of him exiting the doors and going down that hallway

14   the direction he'd come --

15   A.   Oh, I see what you're saying, yeah.

16   Q.   -- he wasn't escorted by police, he just came out by --

17   A.   Yeah.  He came out by -- I see what you're saying.  I'm

18   sorry.  Yes, you're correct.  He did come out and we pointed

19   him down towards the stairs.  I see what you're saying.

20   Q.   Of his own volition.  He wasn't being escorted out.

21   A.   Yeah.

22   Q.   And even at the very end, when he was with a group and

23   the group comes down to the -- which door was that?

24   A.   North door.  That's what we call it.  I don't know its

25   technical name.  We call it the north door.

1    Q.   The door they actually exited?

2    A.   In the last video?

3    Q.   Yeah.  At the very end when he's actually heading out the

4    door to the outside.

5    A.   Yeah.

6    Q.   He looked out one time and kept walking?

7    A.   Yeah.

8    Q.   He's with a group and the whole group has a few officers

9    sort of around them and behind them, making sure they go where

10   they're going.  Right?

11   A.   Yes.

12   Q.   No resistance.

13   A.   No.

14        MR. SHIPLEY:  Can I have just a moment, Your Honor?

15        THE COURT:  Certainly.

16     (Defense conferring.)

17        MR. SHIPLEY:  Thank you, Officer Robishaw.  Nothing

18   further.

19        THE WITNESS:  Thank you.

20        THE COURT:  Redirect, Ms. Akers?

21        MS. AKERS:  Briefly, Your Honor.

22                    REDIRECT EXAMINATION

23   BY MS. AKERS:

24   Q.   Officer Robishaw, on cross-examination you were asked

25   about the interaction between the rioters and the officers who

1   you identified in plain clothes outside the Senate Gallery.

2   Correct?

3   A.   Correct.  Yes.

4   Q.   And counsel said it wasn't my client, Mr. Bozell, going

5   through the police line.  Correct?

6   A.   Correct.

7   Q.   I'm going to play for you Exhibit 435, which has been

8   admitted.  And we're going to start at 5:05.

9        (Video played.)

10       What did you just see happening there?

11   A.   That the crowd in this video were assaulting the two

12   plain clothes individuals to try to get into the Senate

13   Gallery.

14   Q.   And do you see the person in blue who I circled right in

15   the middle of the screen?

16   A.   I do.

17   Q.   Fair to say in the video you don't see him actually

18   throwing the punches.  Right?

19   A.   That is fair, yes.

20   Q.   Also fair to say he was part of the group who was

21   confronting the officers.

22   A.   Yes.  He is in that group that is assaulting the

23   officers.

24   Q.   And based on your experience on January 6, even the

25   people who weren't at the very front line at all times, how

1   did the other people in the group impact officers like

2   yourself when you were doing your duty of trying to protect

3   the building and the people in it?  How did those other people

4   impact you?

5   A.   Like personally?  Like how I was affected that day, or --

6   I'm sorry.

7   Q.   Sure.  In your experience, where there times where you

8   were outnumbered by the crowd?

9   A.   Oh, yes.  Pretty much all --

10  Q.   And so even, for example, in the Ohio Clock Corridor

11  where that one rioter was face-to-face with you, it wasn't

12  just him who was at the front of the line, there were other

13  people there.  Right?

14  A.   Correct.  I viewed them as a group.  It wasn't just the

15  one individual that I was dealing with; it was the group as a

16  whole.

17  Q.   And how did there being a group as a whole, not just the

18  person at the front line, but how did their being a group as a

19  whole impact your ability to do your job?

20  A.   I mean, we weren't able to gain any sense of compliancy.

21  We wanted everyone to leave.  They were obviously chanting and

22  yelling.  We weren't able to, you know, escort them out or

23  push them out of the building, whatever words you want to use.

24  So in that line of the sense we couldn't establish a -- you

25  know, protect the building because they had made their way in.

1    Q.   Is it more obstructive to you as an officer when there's

2    a mob or a group of people as opposed to when there's one or

3    two people?

4    A.   That is correct, yes.

5    Q.   You were also asked on direct examination about the fire

6    extinguisher.  Correct?

7    A.   Yes.

8    Q.   And Mr. Shipley pointed out the fire extinguisher in that

9    rioter's hand.  Correct?

10   A.   Yes.

11   Q.   When you were testifying on direct examination and you

12   testified you didn't know what was in the air and you and your

13   fellow officers were frightened, was that based on your

14   recollection on January 6?

15   A.   Yes.  I was going with what I knew from the time, not so

16   much the video.  I heard a loud noise.  It startled everybody.

17   I had just dealt with the pipe bombs in the RNC and DNC,

18   evacuating the building.  So it's kind of where my mind went

19   to first, and then when, you know, you're mixed with a

20   chemical, you're not looking for a fire extinguisher, there's

21   smoke in the air and you're thinking worst-case scenario that

22   now I'm breathing in some sort of toxin.

23   Q.   So that was your present perception on January 6 in the

24   Ohio Clock Corridor when you were confronted by the mob of

25   rioters who just came through the building?

1    A.   Yes.

2    Q.   You were also asked about your, I believe the word

3    perception or assumption that people were threats.  Right?

4    And I believe Mr. Shipley said you assumed that everyone was

5    a threat even though there were people who were not a threat

6    or something to that effect.  Do you remember that?

7    A.   Yes.

8    Q.   Did you perceive, by the time these people got through

9    the windows or doors up to the Ohio Clock Corridor, did you

10   perceive all of them to be a threat?

11   A.   Yes.

12   Q.   And why is that?

13   A.   Well, the assumption that everyone that was gaining

14   entrance into the building was a threat because we heard on

15   the radio, before even getting into the Capitol, that they

16   were using violence to push back the front line officers, what

17   we call Civil Disturbance Unit or CDU.  Those guys, you could

18   hear them on the radio asking for additional officers, so

19   obviously there was some sort of violence, force, being pushed

20   upon the officers that were there, being pushed back.

21        Then also the radio traffic that the window had been

22   busted out and that people, you know, were entering the

23   building now.  I mean, a window doesn't break unless you put

24   force upon it to break the window.  So I assumed then too that

25   the -- I'm sorry.  I lost my train of thought.

1        But, yeah, so that they broke out the window, so violence

2   was used then to gain entry into the building, to make their

3   way up to us.  And between that time and the time that I, you

4   know, find myself in the Ohio Clock Corridor, I don't know

5   what had transpired.  You know, I didn't know they were

6   chasing Officer Goodman or if they had assaulted other

7   officers.  I had no knowledge of what other additional violent

8   means may have been used up to that point.  So that's why I

9   kind of made my assumption.

10        MS. AKERS:  Thank you, Officer.

11        THE WITNESS:  Yes, ma'am.

12        MS. AKERS:  No further questions, Your Honor.

13        THE COURT:  All right.  Thank you very much, Officer.

14   You may step down.  We appreciate you coming.

15        THE WITNESS:  Thank you, sir.

16     (Witness steps down.)

17        MS. AKERS:  Your Honor, I would request, given the

18   stipulations that we received this morning signed, and so we

19   were able to cut a huge chunk of our witnesses, our last

20   remaining witness is our agent, who won't be able to finish

21   in 20 minutes for sure.

22        THE COURT:  Why don't we do 15 minutes of the

23   introductory stuff with your agent.  If you really need to

24   wait until tomorrow morning, I'll give you that latitude,

25   but --

1          MS. AKERS:  I would ask that, Your Honor.  We had a

2     dozen other witnesses lined up to go and we received the

3     stipulations this morning.  We don't have all that much

4     background information anyway because the defense has in fact

5     stipulated to identification and the cell phone and things

6     like that.  So we're really just going to dive right into the

7     cell phone tomorrow.

8          THE COURT:  How long do you think his testimony will

9     take?

10          MS. AKERS:  I am terrible at this estimation game.

11     I would say --

12          THE COURT:  You're a lawyer.

13          MS. AKERS:  Yes.  No more than two hours?

14          THE COURT:  All right.

15          MS. AKERS:  Is my best guess.

16          THE COURT:  All right.

17          MS. AKERS:  But please don't hold that against me if

18     I'm terribly wrong.

19          THE COURT:  All right.  Tomorrow morning I have

20     something at eleven o'clock.  Is that the time -- someone has

21     to look at the calendar for me.  Eleven o'clock.  A sentencing

22     in a January 6 case.  Which will take a good hour and a half

23     or so.  So we probably won't have --

24          THE DEPUTY CLERK:  You have two matters.

25          THE COURT:  The second matter is pretty short, though.

1    So we probably won't have a normal schedule tomorrow.

2    We'll probably have what I'll call an early lunch break and

3    then we'll resume again 12:30-ish or so.  So we need to keep

4    that in mind.

5        I'd like to get the testimony of your agent done tomorrow,

6    but also we have a potential defense case.  And I'd like to

7    get that going well underway tomorrow, perhaps completed

8    tomorrow.  So be mindful of that.  If you need the time now,

9    I'll go ahead and give you that latitude, but we're going to

10   crack the whip tomorrow and --

11       MS. AKERS:  Understood.  I think it's reasonable that

12   we'll finish tomorrow.  And I think it'll be more efficient if

13   we take those 15 minutes and dedicate them to being efficient

14   tomorrow.

15       THE COURT:  Any big objection to this, Mr. Shipley?

16       MR. SHIPLEY:  No, Your Honor.  I just want to put one

17   thing on your radar just so -- I don't think it's a problem,

18   but if unforeseen circumstances make it a problem I just want

19   you to know.  12:30 on Friday I have a probation revocation

20   hearing with Judge Howell.  It was originally set for 11:00.

21   I told her I expected to be in here in trial at 11:00.  She

22   specially set it for me during the lunch hour.

23       THE COURT:  We'll accommodate that over the lunch hour,

24   and you just won't get lunch.

25       THE SHIPLEY:  I don't eat lunch during trials.  My wife

1    loves that because it's the one chance I have to actually lose

2    weight.

3        THE COURT:  All right.  So we'll be ready to go at

4    9:30 tomorrow morning.  Actually, how about if we're ready to

5    go at 9:15 since I have to stop at 11:00?  Does that cause a

6    problem?  I know schedules sometimes are --

7        MR. SHIPLEY:  I think the only problem it causes,

8    Your Honor, there's five juries going right now.  So the

9    entrances are crowded in the mornings.  I don't know that

10   we'd do any worse at 9:15 or 9:30.

11       THE COURT:  Yeah, I don't think there's going to be

12   any difference.  It just means you have to get here 15 minutes

13   earlier in order to get in than you otherwise would.  I know

14   we have a lot going on in the courthouse.  Thank you.  All

15   right.  See you ready to go at 9:15 instead of 9:30, and I

16   appreciate the flexibility everyone's showing.  See you then.

17       Oh, and by the way, I think out of courtesy to you, I

18   think I will give you both tomorrow morning what I'll call

19   the legal framework, which is, in other words, what I see as

20   the elements of the various counts.  Equivalent to jury

21   instructions.  And you've both given some input on that and

22   I've taken that into account.  But I think if I give it to

23   you, that's fairer, so you can be mindful of it when you do

24   your closings.  All right?  Thank you.

25       (Proceedings adjourned at 4:02 p.m.)

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

_/s/ Bryan A. Wayne_
Bryan A. Wayne