UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,    .
                      .
        Plaintiff,     .  CR No. 21-0216 (JDB)
                      .
    v.             .
                      .  Washington, D.C.
LEO BRENT BOZELL IV,     .  Thursday, September 7, 2023
                      .  9:27 a.m.
        Defendant.    .
. . . . . . . . . . . . . . . .  Pages 168 to 360

DAY 2
TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

For the Government:          ASHLEY AKERS, ESQ.
                          BRENDAN BALLOU, ESQ.
                          U.S. Attorney's Office
                          601 D Street NW
                          Washington, DC 20530

For Defendant:              WILLIAM L. SHIPLEY, ESQ.
                          Law Offices of William L. Shipley
                          PO Box 745
                          Kailua, HI 96734

Court Reporter:            BRYAN A. WAYNE, RPR, CRR, CCP
                          U.S. Courthouse, Room 4704-A
                          333 Constitution Avenue NW
                          Washington, DC 20001

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

**C O N T E N T S**

TESTIMONY

DANIEL WRIGHT:        Direct Examination................... 171
                     Cross-Examination................... 234

LEO BOZELL IV:       Direct Examination................... 262
                     Cross-Examination................... 326

\*   \*   \*

# EXHIBITS RECEIVED

Government Exhibit No. 221 ................................ 173
Government Exhibit No. 625 ................................ 177
Government Exhibit No. 668 ................................ 179
Government Exhibit No. 603 ................................ 180
Government Exhibit No. 669 ................................ 183
Government Exhibit No. 668A ............................... 186
Government Exhibit No. 668B ............................... 188
Government Exhibit No. 628A ............................... 190
Government Exhibit No. 628B ............................... 192
Government Exhibit No. 664 ................................ 193
Government Exhibit No. 664A ............................... 194
Government Exhibit No. 607 ................................ 196
Government Exhibit No. 664D ............................... 197
Government Exhibit No. 664E ............................... 198
Government Exhibit No. 664.8 .............................. 198
Government Exhibit No. 628F ............................... 200
Government Exhibit No. 664G ............................... 201
Government Exhibit No. 458 ................................ 203
Government Exhibit No. 424 ................................ 204
Government Exhibit No. 424.4 .............................. 206
Government Exhibit No. 677 ................................ 207
Government Exhibit No. 432 ................................ 209
Government Exhibit No. 678 ................................ 212
Government Exhibit No. 430 ................................ 213
Government Exhibit No. 436 ................................ 217
Government Exhibit No. 668H ............................... 221
Government Exhibit No. 669D ............................... 222
Government Exhibit No. 664F ............................... 226
Government Exhibit No. 664I ............................... 227
Government Exhibit No. 664N ............................... 228
Government Exhibit No. 668D ............................... 229
Government Exhibit No. 664H ............................... 229
Government Exhibit No. 664L ............................... 230
Government Exhibit No. 664J ............................... 232
Government Exhibit No. 660 ................................ 234
Exhibit No. 900 .......................................... 260
Defendant Exhibit No. 7 .................................. 319
Defendant Exhibit No. 12 ................................. 322
Defendant Exhibit No. 1 .................................. 323

*   *   *

```
 1                    P R O C E E D I N G S
 2          THE DEPUTY CLERK:  Good morning, Your Honor.  We're on
 3     the record in criminal case 21-216, United States of America
 4     versus Leo Brent Bozell.  Starting with government counsel,
 5     may you please approach the podium and state your appearance
 6     for the record.
 7          MS. AKERS:  Good morning, Your Honor.  Ashley Akers
 8     for the United States.  With me is co-counsel Brendan Ballou.
 9     We also have Special Agent Daniel Wright and Paralegal
10     Specialist Aschya Boone.
11          THE COURT:  Thank you.  Good morning.
12          MR. SHIPLEY:  Morning, Your Honor.  William Shipley
13     on behalf of Defendant Leo Bozell, who's present in court at
14     counsel table.
15          THE COURT:  And good morning to you, Mr. Shipley.
16       All right.  We're ready with the next witness?  I believe
17     that's Special Agent Wright.
18          MS. AKERS:  Yes, Your Honor.  The government calls
19     Special Agent Daniel Wright.
20          DANIEL WRIGHT, WITNESS FOR THE GOVERNMENT, SWORN
21                         DIRECT EXAMINATION
22     BY MS. AKERS:
23     Q.   Can you please state and spell your name for the record.
24     A.   Daniel Wright.  D-A-N-I-E-L, W-R-I-G-H-T.
25     Q.   And you're employed?
```

1    A.    Yes.  I'm a special agent with the FBI.

2    Q.    How long have you been a special agent?

3    A.    A little over six years.

4    Q.    What did you do before being a special agent?

5    A.    I was an active duty Army officer.

6    Q.    What office of the FBI are you assigned to?

7    A.    The Philadelphia division of the FBI.

8    Q.    As part of your duties with the FBI, were you assigned

9    to investigate an individual named Leo Brent Bozell IV?

10   A.    Yes.  I was the lead case agent for that investigation.

11   Q.    I'm pulling up what's been marked as Government Exhibit

12   221.  Do you recognize this person?

13   A.    I do.

14   Q.    Who is it?

15   A.    That is the defendant, Leo Brent Bozell.

16   Q.    Thank you.

17         THE COURT:  What exhibit number is this?

18         MS. AKERS:  This is 221, Your Honor.

19         THE COURT:  So it's not on your exhibit list, or is

20   it somewhere other than after 220?

21         MS. AKERS:  You know, Your Honor, we did an updated

22   exhibit list.  I'm not sure you got it yesterday.  Can I

23   provide that to you?

24         THE COURT:  Well, it's not of much use because the

25   exhibit list I have is the one that has been marked in terms

1    of what's in evidence and what's not.  You can give it to me

2    and I can incorporate that into my exhibit list.

3         MS. AKERS:  I apologize.  Our intention was to provide

4    that to you yesterday.

5         THE COURT:  Yeah, you can't change the exhibit list

6    midstream on me because I use the exhibit list to control

7    what's in evidence and what's not.

8         MS. AKERS:  That is fair, Your Honor.

9         THE COURT:  But I'll take that copy and utilize it as

10   I can.

11        MS. AKERS:  Thank you.

12      (Document tendered to the Court.)

13        THE COURT:  Thank you.

14        MS. AKERS:  With that, Your Honor, the government moves

15   the admission of Exhibit 221.

16        THE COURT:  Any objection?

17        MR. SHIPLEY:  No objection.

18        THE COURT:  Without objection, 221 is admitted.

19                              (Government Exhibit No. 221

20                               received into evidence.)

21   BY MS. AKERS:

22   Q.   How did the FBI become aware of Mr. Bozell's conduct on

23   January 6?

24   A.   There was a tip line set up after January 6, and multiple

25   individuals called in and reported him based off social media

1    posts.

2    Q.   And did the FBI ultimately obtain an arrest warrant for

3    Mr. Bozell?

4    A.   We did.

5    Q.   Did the FBI arrest Mr. Bozell?

6    A.   We did.

7    Q.   Did you participate in that arrest?

8    A.   I did.

9    Q.   And upon the arrest did you seize any items from

10   Mr. Bozell?

11   A.   Yes.  We seized several cell phones from the residence

12   as well as the clothes that he was wearing on January 6.

13   Q.   Did the FBI obtain a search warrant for the cell phones?

14   A.   We did.

15   Q.   And as part of your investigation into the defendant,

16   did you work with a CART examiner at the FBI to review the

17   contents of the cell phone?

18   A.   Yes, I did.

19   Q.   And generally, Special Agent Wright, did you learn

20   approximately when the defendant started making plans to

21   travel to Washington, D.C., for January 6?

22   A.   It was approximately around December 22 of 2020.

23   Q.   I'm going to pull up --

24        MS. AKERS:  And, Your Honor, all of the text messages

25   we broke down in the new exhibit list so they're easier to

1    follow.  So in your old exhibit list it was one big exhibit,

2    and we've broken them down into subparts in the new exhibit

3    list.  So as we're going through messages, the second exhibit

4    list would be the one to refer to.  And again, apologies for

5    that.

6       I'm going to pull up Government Exhibit 625.  And, Your

7    Honor, one note for the record also.  I communicated with the

8    defense counsel last night and we indicated that we would be

9    redacting phone numbers from other individuals, and we did

10   accomplish that last night, but as you might be able to see

11   from the screen, it's just having trouble loading at this

12   exact moment.  So I'm going to use the messages that aren't

13   redacted.  But for the purposes of the record that we submit

14   to the Court, all the redactions of other people's cell phone

15   numbers --

16             THE COURT:  But you're going to use the ones that have

17   not been redacted?  And they'll be displayed with those phone

18   numbers to the members of the audience here?

19             MS. AKERS:  Yes, Your Honor.  And the only identifying

20   information that is available on the screen is people's names

21   and phone numbers.  There's no date of birth, Social Security

22   number, any other really sensitive information.

23             THE COURT:  All right.

24             MR. SHIPLEY:  My only concern, Your Honor, just so --

25   is that the exhibits that actually come into evidence and

1    therefore become public records not have personal identifying

2    information.

3              THE COURT:  I think that's what Ms. Akers is

4    indicating.

5              MR. SHIPLEY:  I don't have a problem with using them

6    as they are today, but as long as when they go into evidence

7    they're redacted, I'm fine.

8              THE COURT:  Ms. Akers is indicating that is what the

9    government intends to do.

10             MS. AKERS:  Absolutely.  And we have already done

11   that process.  And perhaps while we're up here it'll load.

12   BY MS. AKERS:

13   Q.   All right.  Going back to the exhibit, just to orient

14   ourselves because we're going to be going through a number

15   of these today, Special Agent, what are we looking at on the

16   screen right here with this PDF?

17             THE COURT:  This is 625, right?

18             MS. AKERS:  Correct.

19             THE WITNESS:  So this is a Cellebrite extraction which

20   is what CART examiners use to get all the information off of a

21   cell phone and put it into a readable format so we can read it

22   and review the contents of the phone.

23   BY MS. AKERS:

24   Q.   And the Cellebrite PDFs that we're reviewing today, are

25   they from the defendant's cell phone?

1    A.   They are, yes.

2    Q.   And were you involved in the review and assessment of

3    those -- that content?

4    A.   Yes, I was.

5         MS. AKERS:  Your Honor, the government moves for the

6    admission of Exhibit 625.

7         MR. SHIPLEY:  No objection.

8         THE COURT:  Without objection, 625 is admitted.

9                           (Government Exhibit No. 625

10                           received into evidence.)

11   BY MS. AKERS:

12   Q.   I'm scrolling down midway, and as we're reviewing these

13   text messages, on the right-hand side of the screen there's

14   green bubbles, on the left-hand side of the screen there's

15   blue bubbles.  Can you indicate what the difference between

16   those two is?

17   A.   Yes.  So the green bubbles on the right will be the

18   defendant's text messages, and then the ones -- the blue ones

19   on the left will be the responses to whoever he is texting.

20   Q.   And on December 22, 2020, what did the defendant say?

21   A.   "I expect to see both of you in D.C. on 1-6-21.  Bring

22   anyone you can."

23   Q.   And did an individual respond and say "I'm in.  Let's

24   meet up"?

25   A.   Yes.

1    Q.   And I'm scrolling to page 2.  And can you indicate what

2    the defendant responded to that message?

3    A.   He indicated that he liked that message.  Said loved

4    "I'm in, let's meet up."  Then it reads:  "Might drive down

5    in the night.  Might rent a bus.  I'll keep you updated."

6    Q.   And then finally, on December 22, 2020, what did he say?

7    A.   "R gives colleagues the day off as long as they go."

8    Q.   I'm now pulling up what's been marked as Exhibit 628.

9    I'm going to page 217.  And on the right-hand -- sorry, Your

10   Honor.  I hate to start the day on a technical issue.  I'm

11   just getting the circle of death here on my computer.

12        There we go.

13   BY MS. AKERS:

14   Q.   All right.  I'm going to go to now Exhibit No. 668.

15        THE COURT:  So we're skipping 628?

16        MS. AKERS:  Yes.  I'm receiving an error on that

17   message at the moment.

18        THE COURT:  668.

19        MS. AKERS:  Yes, Your Honor.  And before we read this,

20   the government would move to admit this exhibit.

21        THE COURT:  668.

22        MR. SHIPLEY:  Again, 668 is 219 pages long as delivered

23   to me, so are we only talking about marking these last two --

24        MS. AKERS:  Yes.  The government has marked a two-page

25   document titled 668.  Like I indicated, I provided you the

1    whole message just for context.

2         THE COURT:  You need to talk to the Court --

3    Mr. Shipley will hear you -- because the reporter needs to

4    hear you from the microphone, not while you're facing --

5         MS. AKERS:  Thank you, Your Honor.  The government is

6    moving to admit Exhibit 668.  As Your Honor can see on the

7    screen, it's a two-page text message.  The government

8    obviously provided the full text message to the defense for

9    context but we're moving to admit a two-page document here

10   today.

11        MR. SHIPLEY:  And that was my understanding.  I just

12   wanted to make clear that that's the process we're going to

13   use; we're not bringing in 218 pages of stuff to get to the

14   messages.

15        THE COURT:  All right.  With respect to the two pages

16   of stuff, any objection?

17        MR. SHIPLEY:  No objection.

18        THE COURT:  Okay.  Thank you.  668 is admitted as

19   described.

20                          (Government Exhibit No. 668

21                              received into evidence.)

22        MS. AKERS:  Thank you, Your Honor.

23   BY MS. AKERS:

24   Q.   Special Agent Wright, can you please read what the

25   defendant wrote on December 22, 2020.

1    A.    "You should go to D.C. on the 6th."

2    Q.    And then what?

3    A.    "Tell your enemies to kiss your ass."

4    Q.    And then what did a person respond to Mr. Bozell?

5    A.    "It isn't going to help.  They will not overturn this.

6    Ultimately Pelosi will have a say, won't she?"

7    Q.    And then on page 2, can you read what the defendant

8    responded?

9    A.    "It's totally up to Pence.  Of course it matters.

10    Of course it helps.  The war is over.  The American spirit.

11    Tell American enemies to eat your ass.  It's so fun."

12    Q.    And then what did he say at 2:51:50 a.m.?

13    A.    "6th will be a celebration."

14    Q.    And what did this person respond?

15    A.    "Ug.  I don't think so but hopefully you are correct.  So

16    many other things have fallen through and so much hope that he

17    had something up his sleeve but our system is so corrupt."

18    Q.    I'm now pulling up Government Exhibit 603.  And the

19    government moves to admit Exhibit 603.

20         MR. SHIPLEY:  Assuming it's just what's on the screen,

21    no objection.

22         THE COURT:  Without objection, 603 is admitted.

23                        (Government Exhibit No. 603

24                         received into evidence.)

25

1    BY MS. AKERS:

2    Q.   And Special Agent Wright, can you read what the defendant

3    wrote on December 26, 2020.

4    A.   "Jesse, I know you love America and I know you know this

5    election is in the process of being stolen from the people.

6    You can help.  Come to the giant rally in D.C. on 1-6-21.

7    We're expecting over a million patriots.  Here's where you

8    come in:  MAGA needs a house band.  We are 80 million deep and

9    love to patronize our teammates.  I can secure you stage time

10   and power to perform.  We need the lovers of America to come

11   out of the shadows and scream that this is the home of the

12   free because of the brave.  America loves you and needs you.

13   Message me for details."

14   Q.   And did the person respond "I'm in"?

15   A.   Yes.

16   Q.   Special Agent Wright, in the first sentence of this text

17   message from Mr. Bozell there's a reference to "the election

18   is in the process of being stolen from the people."  Based on

19   your review of the defendant's cell phone, was this content

20   found throughout the cell phone?

21   A.   It was.

22           MR. SHIPLEY:  I'll object.

23           THE COURT:  Objection is?

24           MR. SHIPLEY:  It calls for speculation and it's

25   irrelevant what his impression of the cell phone is.

1        THE COURT:  No.  She asked content.  She didn't ask

2   his impression or opinion.  She asked if content similar to

3   "this election is in the process of being stolen from the

4   people" occurs throughout the messages on the telephone.

5   That's a different question than an impression or speculation.

6        MR. SHIPLEY:  His view of that is irrelevant.  We can

7   get to the other messages.  But I don't know that the agent

8   can offer an opinion.

9        THE COURT:  He's offering a summary of the messages

10  from his review of the messages, and I will allow that.  He

11  can give his view that the messages consistently said

12  something.

13       MR. SHIPLEY:  And I understand.  And we're not in front

14  of a jury.  And it might be a different calculation in front

15  of a jury.

16       THE COURT:  Might be.

17       MR. SHIPLEY:  And you're going to see more.

18  BY MS. AKERS:

19  Q.   I'm now pulling up Government Exhibit 669.

20       THE COURT:  669?

21       MS. AKERS:  Correct, Your Honor.

22     I'm starting at page 5 of Government Exhibit 669.  The

23  government would move the admission of this exhibit.

24       THE COURT:  Mr. Shipley?

25       MR. SHIPLEY:  Yeah.  Just the list I have's not in

1   numerical order so I have to scan through and find the right

2   number.  And I have found it.  No objection.

3           THE COURT:  Thank you, Mr. Shipley.  Without objection,

4   669 is admitted.

5                           (Government Exhibit No. 669

6                             received into evidence.)

7           MS. AKERS:  Thank you, Your Honor.

8   BY MS. AKERS:

9   Q.   Special Agent Wright, on November 8, 2020, what did an

10  individual send a text message to Mr. Bozell?

11  A.   It said "This is going to get ugly."

12  Q.   And what did Mr. Bozell write in response to that on that

13  same date?

14  A.   "The glitch machines are just the beginning.  Good guys

15  will prove these machines flipped this election and flipped

16  them for a generation and flipped the Dem primaries too.

17  They're fucked.  Every voter will hate them.  This goes to the

18  top."

19  Q.   I'm scrolling down one more message to Mr. Bozell.  And

20  what did this message say?

21  A.   "What happened to the announcement from the Supreme Court

22  on Friday night about PA ballots?"

23  Q.   And scrolling down to page 6, what did Mr. Bozell write

24  back?

25  A.   "Trump is looking weak before he pounces."

1   Q.   And what did this person respond to Mr. Bozell?

2   A.   "Did everyone gloss over that obviously?"

3   Q.   And what did Mr. Bozell respond?

4   A.   "Oh no.  There will be consequences.  But they didn't

5   need the ballots separated.  They know every tactic the Dems

6   use.  Trump let them set the rules that made cheating possible

7   and simply watched them cheat.  He's either got eyes everywhere

8   or the ballots are encrypted."

9   Q.   And scrolling down to page 7, did Mr. Bozell continue

10   text messaging?

11   A.   Yes.

12   Q.   What did he say?

13   A.   "The police let us in.  Philadelphia was all optics.

14   Look weak when strong.  Hell, they sent in old small Rudy.

15   This is art of war, and Trump set them up.  Be patient.  The

16   media doesn't decide elections.  They're complicit in this.

17   Biden was always going to be called and by Fox."

18   Q.   And then on page 8 can you read what a person responded

19   to Mr. Bozell?

20   A.   "70 million people sitting on their hands waiting for

21   Trump to act, brother!"

22   Q.   And what does Mr. Bozell respond?

23   A.   "Sorry, Nate, but this is war.  You're going to have to

24   deal with some anxiety while Trump saves the world without

25   firing a bullet."

 1      Q.   And then one page down on page 9, what did Mr. Bozell

 2      follow up?

 3      A.   "Best is yet to come.  Can we come up?  Shoot hoops in

 4      your hood."

 5      Q.   That's all.  Thank you.

 6           I'm now going to pull up Government Exhibit 668.

 7                THE COURT:  668 is already in evidence.

 8                MS. AKERS:  Sorry.  I was going to do a point -- point 1.

 9                THE COURT:  Point 1.  Okay.

10      BY MS. AKERS:

11      Q.   668.1, is this a text message on November 7, 2020?

12      A.   Yes, it is.

13      Q.   And --

14                THE COURT:  We've got to get it into evidence before

15      he reads it.

16                MS. AKERS:  Sure.

17                THE COURT:  Mr. Shipley.

18                MR. SHIPLEY:  The 668.1 I've got is not that.  Can I

19      have counsel take a look at it real quick, and we confer?

20                THE COURT:  Sure.  Sure.

21         (Counsel conferring.)

22                MS. AKERS:  Your Honor, for the record we're going to

23      just call this 668A, please.

24                THE COURT:  All right.

25                MS. AKERS:  Sorry about that.

1       THE COURT:  We got a new one.  668A.

2       MS. AKERS:  Thank you.

3       THE COURT:  And you're moving its admission?

4       MS. AKERS:  Yes, please.

5       THE COURT:  And the defense position?

6       MR. SHIPLEY:  I'm sorry.  I didn't hear the question.

7       THE COURT:  With 668A that's been moved?

8       MR. SHIPLEY:  No objection.

9       THE COURT:  Thank you, Mr. Shipley.  668A is admitted.

10                      (Government Exhibit No. 668A

11                       received into evidence.)

12      THE COURT:  You're going to have some work, Ms. Akers,

13  to make sure you have a record in case there's an appeal.

14      MS. AKERS:  We have this all written down.  It's just

15  in a folder that I'm not able to pull up at the moment.  But

16  understood, Your Honor.

17      MR. SHIPLEY:  Can I ask counsel how many pages this is

18  going to be?  Because 668 itself is 256.

19      MS. AKERS:  Five pages.

20      MR. SHIPLEY:  Okay.

21  BY MS. AKERS:

22  Q.   All right.  On November 7, 2020, what did a person write

23  to Mr. Bozell?

24  A.   "Do they have anything?  Is the question enough that the

25  cheating was enough to make him lose?"

1    Q.   And then on the next page at November 7, 2020, 11:10:49

2    p.m., what did Mr. Bozell respond?

3    A.   "My brother was told in a meeting at the White House by

4    the DHS director a couple months ago that they were prepared

5    for the fraud coming.  He was very reassuring.  Pray there was

6    a plan."

7    Q.   And then what did he follow up at 11:11:28 p.m.?

8    A.   "They sat in the convention center filling out ballots

9    until Biden won."

10   Q.   I'm now going to go to 668B.

11        THE COURT:  668?

12        MS. AKERS:  B.

13        THE COURT:  B.  Oh, another new one.

14        MS. AKERS:  Yes.  We're just doing subparts in the

15   larger exhibit, Your Honor, so as to not admit too large of

16   a document.

17        THE COURT:  All right.  668B.

18        MS. AKERS:  And we'll move for the admission of that

19   text message, which is an eight-page document.

20        THE COURT:  What do you think, Mr. Shipley?

21        MR. SHIPLEY:  No objection, Your Honor.  I'm just

22   trying to find the page, if counsel could help me.

23        THE COURT:  All right.  Without objection, 668B is

24   admitted.

25

1                         (Government Exhibit No. 668B

2                         received into evidence.)

3        BY MS. AKERS:

4        Q.    And on November 8, 2020, at 3:12:11 p.m., what did

5        Mr. Bozell say?

6        A.    "They spread this disinformation through that

7        conservative meeting attended by my fam yesterday."

8        Q.    And then what did he follow up at 3:12:24 p.m.?

9        A.    "No one is conceding."

10       Q.    And on the next page at 3:12:33 p.m. on November 8, 2020,

11       what did he say?

12       A.    "Looking weak when strong.  Art of war."

13       Q.    And I'm scrolling down to the next two messages.  And can

14       you please read what Mr. Bozell said starting at 3:12:57 p.m.

15       A.    "Third glitch found in Georgia changed 80,000 votes.

16       That will flip Georgia."

17       Q.    On the next page, what did someone respond to Mr. Bozell

18       on November 8 at 3:13:23 p.m.?

19       A.    "So Kushner did not approach him but the shitbag media

20       is just saying it?"

21       Q.    And what did Mr. Bozell respond at 3:13:33 p.m.?

22       A.    "First two discovered glitches flipped House seats in

23       Michigan and California."

24       Q.    And then what did he say at 3:13:45 p.m.?

25       A.    "Those machines are used in 30 states."

1    Q.   What did someone respond to him at 3:13:46 p.m.?

2    A.   "Has this been announced yet?"

3    Q.   I'm scrolling down one full page.  And on 11/8/2020 at

4    4:15:24 p.m., what did Mr. Bozell say?

5    A.   "My theory: States thought this was the verify legality

6    of ballot.  But it was also to make them trackable and

7    traceable.  States don't know that."

8    Q.   And then I'm going to pull up another exhibit for you.

9    And this will be marked as 628B.  Or excuse me, 628A.

10            THE COURT:  We're back to 628A?  Oh, 628.

11            MS. AKERS:  628, yes.  Thank you.  And we'll move the

12   admission.  This is a one-page document.

13            MR. SHIPLEY:  May I have a moment, Your Honor?

14            THE COURT:  Yep.

15            MR. SHIPLEY:  Which page, counsel?

16       (Counsel conferring.)

17            MS. AKERS:  All of these are from his phone.

18            THE COURT:  So this is a document that in your system

19   is 669, but you're changing it to 628A?

20            MS. AKERS:  In the system, Your Honor, it's 628.

21            THE COURT:  I'm sorry.  I was looking at the 669, but

22   that's actually something else.

23            MS. AKERS:  That's from a couple of things ago.

24   Exactly.

25            THE COURT:  It's 628 and now it's going to be 628A.

1          MS. AKERS:  Exactly.  We have them in order, so A, B,

2     C.

3          THE COURT:  Right.  You know what you're doing.  I

4     don't know what you're doing.

5          MS. AKERS:  Yeah.

6          THE COURT:  Without objection, 628A is admitted.  That

7     was a quiet no objection, but I think you thought you had

8     already said it.

9          MR. SHIPLEY:  I'm just looking for the page.  And she

10    helped me so I have it now.

11                          (Government Exhibit No. 628A

12                           received into evidence.)

13    BY MS. AKERS:

14    Q.   Now, on November 27, 2020, at 4:13:27 p.m., what did

15    Mr. Bozell say?

16    A.   "Last night I came across the letter from DHS to the

17    county commissioners in Michigan from late September or

18    October of this year.  I read several pages where it outlined

19    the problems they expected with machines and that they knew

20    the CC's has allowed people to install new software into the

21    machines without it being checked.  It said in no uncertain

22    terms that there was no way it was valid and that they, the

23    CC, would be held responsible for the fraud they were

24    allowing."

25    Q.   And Special Agent Wright, based on your review of the

1 defendant's cell phone, can you just generally describe some

2 of the content that you saw that was consistent with this

3 message about the voting machines?

4 A. There was multiple text messages that indicated that

5 Mr. Bozell thought there was fraud within voting machines of

6 the election of 2020.

7 Q. I'm now pulling up what's been marked as Government

8 Exhibit 628B.

9   THE COURT:  628B or C?

10   MS. AKERS:  I believe B, Your Honor.

11   THE COURT:  I'm not questioning it, other than I didn't

12 hear clearly which it was.

13   MS. AKERS:  Oh, okay.  I thought you were suggesting I

14 already did B, but it's written B in my outline, so I'm going

15 to go with B like boy.

16   THE COURT:  So it's B.

17   MS. AKERS:  Correct.

18   THE COURT:  Any objection?

19   MR. SHIPLEY:  I'm just looking for the page of the

20 report.

21  (Counsel conferring.)

22  Now I know where to look.

23  Okay.  No objection.

24   THE COURT:  Thank you, Mr. Shipley.  628B is admitted.

25

1           (Government Exhibit No. 628B

2                 received into evidence.)

3   BY MS. AKERS:

4   Q.   On November 27, 2020, did the defendant send a tweet?

5   A.   Yes, he did.

6   Q.   And as part of your investigation were you able to see

7   that tweet attached to the message?

8   A.   Yes, we were.

9           THE COURT:  But now we're not.

10  BY MS. AKERS:

11  Q.   And was this the tweet that was attached to Mr. Bozell's

12  message?

13  A.   Yes.

14  Q.   And can you just describe -- you don't have to read all

15  the hashtags, but just describe what the tweet indicates.

16  A.   It's basically saying that the Pennsylvania state senate

17  and house are taking back the power from the Democrats, that

18  Trump won the vote in Pennsylvania, and that the Electoral

19  College votes will go to Trump.

20  Q.   And based on your review of Mr. Bozell's cell phone, was

21  there other content about the Electoral College vote?

22  A.   Yes, there was.

23  Q.   And can you just generally explain what you found there?

24  A.   That he sent messages or received messages indicating

25  that other states would support Trump and turn over the

1    election in those states to send the Electoral College's votes

2    to Trump.

3    Q.   Now I'm going to pull up what's been marked as

4    Government's Exhibit 664.  And this is a two-page document.

5    The government would move for its admission.

6         MR. SHIPLEY:  Can you scroll down?

7     Can you please scroll up?

8         MS. AKERS:  Sure.

9         MR. SHIPLEY:  No objection.

10         THE COURT:  664 is admitted.

11                     (Government Exhibit No. 664

12                       received into evidence.)

13    BY MS. AKERS:

14    Q.   Special Agent Wright, at 2:24:46 p.m. on December 30,

15    2020, what did a person say to Mr. Bozell?

16    A.   "Okay so how's the Jan 6 session supposed to work?  A

17    congressman and senator object to results, debate happens...

18    majority of House and Senate still have to agree, which will

19    never happen."

20    Q.   And then on the next page, at 2:24:54 p.m. on December

21    30, 2020, what did that person follow up?

22    A.   "What am I missing?"

23    Q.   And then?

24    A.   "Don't think they have to agree."

25    Q.   And then what did Mr. Bozell respond?

 1    A.    "Pence can accept either set of electors or none at all."

 2    Q.    I'm now pulling up Government Exhibit 664.

 3          THE COURT:  That's what that just was, or are we

 4    point-something?

 5          MS. AKERS:  We'll just have to wait till it loads.

 6    664A this is.

 7          THE COURT:  You're going to make it 664A.  Okay.

 8          MS. AKERS:  Correct.  And the government moves the

 9    admission of this five-page document.

10          MR. SHIPLEY:  Just looking for those pages...

11          MS. AKERS:  Sure.

12          MR. SHIPLEY:  Thank you.  No objection.

13          THE COURT:  664A is admitted.

14                              (Government Exhibit No. 664A

15                               received into evidence.)

16    BY MS. AKERS:

17    Q.    I'm scrolling down to the second page on the bottom on

18    December 31, 2020, at 6:40:52 p.m.  What did Mr. Bozell say?

19    A.    "Walking down a place for Boots to play outside."

20    Q.    And based on your review of the text messages, do you

21    understand what he's referring to here?

22    A.    Yes.

23    Q.    Can you explain?

24    A.    He was trying to get other people to come to the January

25    6 rally, and he was trying to get individuals to come and play

1    and perform on the stage as well.

2    Q.   Based on your review of Mr. Bozell's cell phone, was he

3    involved in some planning of events that were occurring on

4    January 5 and January 6?

5    A.   Yes.

6    Q.   On the next page, at the third message down, there's a

7    text message on December 31, 2020, at 7:16:45 p.m. from

8    Mr. Bozell.  What did he say?

9    A.   "Georgia Senate judiciary committee just voted

10   unanimously to decertify Biden votes."

11   Q.   And then what did he follow up?

12   A.   "1-6 just got easier."

13   Q.   Based on your review of Mr. Bozell's cell phone, Special

14   Agent Wright, did you review text messages that indicated

15   there might be some indicia of violence happening on January

16   6?

17   A.   There was indications that there was going to be a lot of

18   people there and that there was going to be a lot of angry

19   people there that wanted to change the election.

20   Q.   I'm pulling up now what's been marked as Government

21   Exhibit 607.  And the government moves for the admission of

22   607.

23        MR. SHIPLEY:  Can I make a suggestion?  I don't think I

24   have any objection to these.  If we can maybe move past

25   seeking the admission as we go here, counsel and I can confer

1    at the break and she can give me these numbers and I can look

2    at them.  Because they're just coming at me out of order.

3            THE COURT:  That's fine.  Without a jury, I don't think

4    that's any problem.  And if there is something that you

5    ultimately find objectionable, you can raise that with me.  So

6    that'll be fine.

7            MR. SHIPLEY:  So we'll confer and then we'll get back

8    to the Court about if there's any objection.

9            THE COURT:  That's fine.

10   BY MS. AKERS:

11   Q.   All right.  I pulled up Government Exhibit 607.  And on

12   January 3, 2021, at 6:07:44 p.m., what did Mr. Bozell write?

13           THE COURT:  What I'm going to do is conditionally admit

14   these, and only if you raise something with me, they will be

15   further examined.

16           MR. SHIPLEY:  Thank you, Your Honor.

17           THE COURT:  607 is conditionally admitted.

18                              (Government Exhibit No. 607

19                               received into evidence.)

20   BY MS. AKERS:

21   Q.   All right.  We're back to the text message, Special Agent

22   Wright.  On January 3, 2021, at 6:07:45 p.m. what did

23   Mr. Bozell write?

24   A.   "My brother has a guitar and amp for him, but he said he

25   was bringing one.  I'll find out when he's in town."

1   Q.   And based on your review of the messages, does that

2   relate to the music that Mr. Bozell was trying to organize for

3   the event?

4   A.   Correct.

5   Q.   And then what did this person respond to Mr. Bozell on

6   January 3 at 10:47:22 p.m.?

7   A.   "I talked to my wife.  She wants me to come home on

8   Wednesday because of the concerns that things are going to get

9   violent at the Capitol."

10  Q.   I'm now going to pull up Government Exhibit 664D, like

11  dog.

12          THE COURT:  664D will be conditionally admitted.

13                      (Government Exhibit No. 664D

14                      received into evidence.)

15          MS. AKERS:  Thank you.

16  BY MS. AKERS:

17  Q.   And I'm scrolling down to the second and third text

18  message on this one-page document.  And what did an individual

19  say to Mr. Bozell on December 24, 2020, at 6:29:33 p.m.?

20  A.   "Everyone's with their families (mostly) and safe."

21  Q.   What did Mr. Bozell respond at 6:29:49 p.m.?

22  A.   "I'll be tossing Schiff's office on 1-6."

23  Q.   I'm now going to pull up Government Exhibit 664E.

24          MS. AKERS:  Your Honor, would you like me to move for

25  the admission of all of these since we've conditionally agreed

1     that all the text messages will be admitted, or --

2            THE COURT:  You don't have to move the admission.  I'm

3     just going to take care of it.

4            MS. AKERS:  Okay.

5            THE COURT:  But I need to make a record.

6            MS. AKERS:  Sure.  I just wanted to make sure --

7            THE COURT:  And this is 664...

8            MS. AKERS:  E.

9            THE COURT:  664E is admitted.

10                            (Government Exhibit No. 664E

11                             received into evidence.)

12    BY MS. AKERS:

13    Q.   On December 24, 2020, did an individual send Mr. Bozell

14    a YouTube video?

15    A.   Yes.

16    Q.   And as part of your review of the cell phone were you

17    able to see the YouTube video?

18    A.   Yes, I was.

19    Q.   I'm pulling up 664.8, which is a subcomponent of 664E.

20            THE COURT:  So now we're on 664.8.

21            MS. AKERS:  Correct.

22            THE COURT:  And it is admitted.

23                            (Government Exhibit No. 664.8

24                             received into evidence.)

25

1    BY MS. AKERS:

2    Q.   And is 664.8 the YouTube video that the person sent to

3    Mr. Bozell?

4    A.   It is.

5    Q.   I'm going to plug in the sound for audio for this one.

6         (Video played.)

7         Special Agent Wright, we're not going to play this whole

8    clip, but can you --

9             THE COURT:  Thank you.

10            MS. AKERS:  You're welcome.

11   BY MS. AKERS:

12   Q.   -- just to get a taste.  Can you describe what happens

13   over the course of these four minutes and 30 seconds?

14            MR. SHIPLEY:  Objection.  Lacks foundation.

15   BY MS. AKERS:

16   Q.   Have you watched this YouTube clip that was on

17   Mr. Bozell's cell phone?

18   A.   I did, yes.

19   Q.   And can you describe what you saw when you watched this

20   YouTube clip on his cell phone?

21            MR. SHIPLEY:  Objection.  The video speaks for itself.

22            MS. AKERS:  Well then, Your Honor, we'll watch the

23   whole video.

24            THE COURT:  The video does speak for itself, but so do

25   the text messages that the witness has been reading.  I'll

1    overrule the objection.  I'm not a jury, I'm a judge, and I

2    can deal with it accordingly.  Go ahead.

3         THE WITNESS:  Generally, it was two individuals who

4    decided to break a window to break into a house.  They

5    indicated they were looking for intel.  When they couldn't

6    find the intel, they decided to destroy part of the house.

7    BY MS. AKERS:

8    Q.   And after this individual sent this YouTube video to

9    Mr. Bozell on December 24, 2020, at 6:33:24 p.m., what did

10   he say?

11   A.   "Let's do this" with an arrow pointing up toward the

12   YouTube video link.

13   Q.   And then what did Mr. Bozell say in response?

14   A.   "It's coming Joey, soon.  Lots of declass before 1-6."

15   Q.   I'm now going to go to 628F.

16        THE COURT:  628F is admitted.

17        MS. AKERS:  Thank you.

18                          (Government Exhibit No. 628F

19                           received into evidence.)

20   BY MS. AKERS:

21   Q.   Special Agent Wright, on December 1, 2020, did Mr. Bozell

22   send a Twitter post?

23   A.   Yes, he did.

24   Q.   Were you able to review that Twitter post in your review

25   of the cell phone?

1    A.   Yes.

2    Q.   And pulling up now 628.13, which is an attachment to 628,

3    was this the Twitter post that Mr. Bozell sent?

4    A.   Yes.

5    Q.   And what did the post that he sent say?

6    A.   "We have all sensed it over the past several months.

7    We have tried to avoid the ugly truth.  Now we must face the

8    truth, embrace it and live it.  We are on the brink of war

9    for our freedom."  And then there's a picture with a prayer.

10   Q.   And were there other text messages based on your review

11   of the cell phone about being on the brink of war or language

12   akin to that?

13   A.   Yes, there was.

14   Q.   I'm pulling up now 664G.

15        THE COURT:   664G is admitted.

16                            (Government Exhibit No. 664G

17                             received into evidence.)

18   BY MS. AKERS:

19   Q.   And on December 22, 2020, what did an individual say to

20   Mr. Bozell at 2:11 p.m.?

21   A.   "There are six patriots in the Senate.  Six out of 100.

22   We are screwed."

23   Q.   And what did Mr. Bozell respond at 2:58:36 p.m.?

24   A.   "If we don't win this thing, we need to get out of the

25   U.S.  America will be the redheaded stepchild of the CCP.

1    We will spend our days working to feed our families while

2    our government at every level steals from us, gets rich, and

3    destroys us."

4    Q.   And then I'm scrolling a full page down on December 22,

5    2020, at 3:46:52 p.m.  What did Mr. Bozell respond?

6    A.   "The 6th is a must attend.  Might be our last chance to

7    assemble and stand for our country, our freedom, and our

8    children."

9    Q.   All right.  Special Agent Wright, as part of your

10   investigation, did you review video footage of the defendant

11   on Capitol grounds and in the Capitol building?

12   A.   Yes.

13   Q.   I'm pulling up what's been marked as Government Exhibit

14   458 and moving for its admission.

15            THE COURT:  463?

16            MS. AKERS:  458.

17            THE COURT:  458.  I'll consult my two exhibit lists,

18   and it goes on the new one, I guess.

19            MS. AKERS:  And this is not a text message,

20   Mr. Shipley.  This is a video.

21            MR. SHIPLEY:  458?

22            MS. AKERS:  Correct.

23            THE DEPUTY CLERK:  Was that admitted, Your Honor?

24            THE COURT:  It hasn't been yet.  It hasn't been moved

25   yet.  It's not subject to the agreement because it's a

1    different kind of document.

2            MS. AKERS:  Correct.  We're moving for the admission

3    of 458.  I thought we were waiting for Mr. Shipley.

4            MR. SHIPLEY:  No objection.

5            THE COURT:  All right.  Streamlining things.  458 is

6    admitted.

7                              (Government Exhibit No. 458

8                               received into evidence.)

9            MS. AKERS:  Thank you.

10   BY MS. AKERS:

11   Q.   And I'm starting the video at 8:21.  Before I press play,

12   do you recognize Mr. Bozell in this video?

13   A.   Yes, I do.

14   Q.   And was this on what area of the Capitol?

15   A.   This was right around the -- where the inauguration stage

16   was being built.

17   Q.   I'm going to skip ahead to 8:35 and play.

18       (Video played.)

19       And I'm stopping at 8:47, and did you just see Mr. Bozell

20   in this video footage?

21   A.   I did, yes.

22   Q.   And what did he appear to be doing at 8:39 p.m.?

23   A.   The rioters were using --

24   Q.   Excuse me.  It's not 8:39 p.m.  It's 8:39 into the video.

25   A.   The rioters are using a bike barricade as a ladder, and

1    he's handing up a large white pole to other rioters that are

2    up on the upper part of that terrace.

3    Q.   And then a few seconds later, at 8:44 into the video,

4    what was he doing then?

5    A.   It's kind of hard to determine what he's handing up to

6    them, but he's handing over a large item to several other

7    rioters up that same makeshift ladder.

8    Q.   I'm now going to pull up Government Exhibit 424, which is

9    a video exhibit.  And we would move for the admission of this

10   exhibit.

11             THE COURT:  424.

12             MS. AKERS:  Correct.

13             MR. SHIPLEY:  No objection.

14             THE COURT:  Without objection, 424 is admitted.

15                            (Government Exhibit No. 424

16                              received into evidence.)

17   BY MS. AKERS:

18   Q.   Yesterday, Special Agent Wright, did you see some video

19   footage of Mr. Bozell under the scaffolding as he sort of

20   reached the top of the stairs?

21   A.   Yes, I did.

22   Q.   And did you also review video footage where he was sort

23   of making his way up the stairs?

24   A.   I did.

25   Q.   We're going to play for 19 seconds starting at 37

1     minutes.

2          (Video played.)

3          And Special Agent Wright, at 37:20 on this video, are you

4     able to identify Mr. Bozell?

5     A.   Yes.  He's over here to the far left.  I'm circling him

6     here.

7     Q.   You circled a person in the far left of the screen in

8     that blue sweatshirt?

9     A.   Yes.

10    Q.   Now I'm going to go to 38:39 into the video and play from

11    here.

12         (Video played.)

13         All right.  I'm stopping at 39:28.  And I'm going to pull

14    up 424.1, which is a screenshot of this video.  Or excuse me,

15    424.4.  And are you able --

16         THE COURT:  Wait a minute.  So you said 424.1 but we're

17    doing 424.4.

18         MS. AKERS:  .4.  Sorry about that, Your Honor.

19    BY MS. AKERS:

20    Q.   And are you able to identify Mr. Bozell in the screenshot

21    of this video?

22    A.   Yes, I am.

23    Q.   And where is he?

24    A.   He's to the far left, pulling back the tarp under the

25    scaffolding on the Capitol grounds.

1    Q.   And in your review of --

2         THE COURT:  424.4 hasn't been moved, but I take it

3    you're moving it.  Any objection, Mr. Shipley?

4         MR. SHIPLEY:  I'm losing track of where counsel's at,

5    Your Honor.

6         THE COURT:  I'm sorry.  I couldn't hear that with your

7    hand over your mouth.

8         MS. AKERS:  You have the exhibit.

9         MR. SHIPLEY:  I don't see 424.8.  I see all the way up

10   to 7.

11        MS. AKERS:  It's 424.4 is what I believe I said.

12        MR. SHIPLEY:  I don't have an objection to 24.4.

13        THE COURT:  424.4 is admitted.

14                         (Government Exhibit No. 424.4

15                          received into evidence.)

16   BY MS. AKERS:

17   Q.   Special Agent Wright, I'm showing you now what has been

18   marked as Exhibit 677.  Is this a photo from the defendant's

19   cell phone?

20   A.   Yes, it is.

21   Q.   And what date was it taken on as indicated on his cell

22   phone?

23   A.   On January 6 of 2021.

24        MS. AKERS:  The government moves to admit -- this is

25   contents of the cell phone so I believe it would fall under

1     our previous agreement, but this is labeled 677.

2                 THE COURT:  677, this photo.

3                 MS. AKERS:  Correct.  He said no objection.

4                 MR. SHIPLEY:  No objection.

5                 THE COURT:  Thank you.

6     BY MS. AKERS:

7     Q.   Special Agent Wright -- I'm sorry to interrupt you, Your

8     Honor.

9                 THE COURT:  Go ahead.

10    BY MS. AKERS:

11    Q.   This photo was taken on January 6, 2021 on the

12    defendant's cell phone?

13                THE COURT:  Just a second.  677 is admitted.

14                              (Government Exhibit No. 677

15                               received into evidence.)

16                THE WITNESS:  Yes.  This was a photo that was taken and

17    extracted off the defendant's cell phone.

18    BY MS. AKERS:

19    Q.   And what location of the Capitol is this?

20    A.   This is under the scaffolding on the west side of the

21    Capitol that kind of coincides with the video we just watched.

22    Q.   Now I'm going to pull up Government's Exhibit 103, which

23    has already been admitted in the 100 series.

24                THE COURT:  The entire 100 series is admitted, yes.

25

1    BY MS. AKERS:

2    Q.   And Special Agent Wright, we watched a lot of video of

3    the defendant in the Capitol building yesterday.  Were there

4    also other areas of the Capitol building the defendant was in

5    based on your investigation that we haven't looked at up to

6    this point?

7    A.   Yes.

8    Q.   And can you identify approximately -- well, I guess, is

9    this CCTV footage depicting what we refer to as the Senate

10   carriage doors?

11   A.   Yes.

12   Q.   Okay.  I'm going to play four seconds.

13        (Video played.)

14        And can you identify Mr. Bozell in this footage?

15   A.   He's on the bottom left corner.  You can see the blue

16   hooded sweatshirt as well as the blue-billed red and white

17   Trump hat.

18   Q.   In front of him, can you just briefly describe what's

19   going on here?

20   A.   The police are fighting with rioters and attempting to

21   push them outside the door.

22   Q.   I'm going to pull up Government Exhibit 432.  And I'm

23   going to skip ahead to 2:20 and move for the admission of this

24   video.

25             THE COURT:  Any objection to 432?

1          MR. SHIPLEY:  No objection, Your Honor.

2          THE COURT:  432 is admitted.

3                              (Government Exhibit No. 432

4                              received into evidence.)

5      BY MS. AKERS:

6      Q.   I'm going to play starting at 2:20, and before I do, is

7      this around the same location as the CCTV footage that we just

8      watched?

9      A.   Yes, it is.

10          (Video played.)

11     Q.   I stopped at 3:23.  Can you identify Mr. Bozell?

12     A.   Yes, I can.  He's in the middle of the screen there.  You

13     can see the blue-billed hat as well as the orange reflective

14     sunglasses on the top of his head.

15     Q.   You can continue playing.

16          (Video played.)

17          I'm stopping at 3:49.  And what just happened here,

18     Special Agent Wright?

19     A.   In the beginning of the video the police had set up a

20     police line attempting to keep the rioters out of a certain

21     hallway.  After about a minute or so, they pushed through and

22     the rioters made their way down that hallway that the police

23     were attempting to keep them out of.

24     Q.   And based on your review of the lengthier footage, did

25     Mr. Bozell continue walking with this group --

1   A.   Yes, he did.

2   Q.   -- in the Capitol building?

3        I'm pulling up what's been marked as Government Exhibit

4   101.  It's already been admitted into evidence.

5        And I'm pulling ahead to 1 minute.  Can you indicate the

6   time of day?

7   A.   It is 2:23 p.m. on January 6, 2021.

8   Q.   And are you able to identify the location of this video

9   footage?

10  A.   This is the Senate Wing Door.

11  Q.   I'm pressing play, and I'm stopping at 1:04.  Are you

12  able to identify Mr. Bozell?

13  A.   Yes.  I'm circling him here.  He's on the bottom left of

14  the video.  You can see the blue hooded sweatshirt as well as

15  the blue-billed and red and white hat that he's wearing.

16  Q.   And at this point are the doors and the windows to the

17  right and the left of the door open and accessible to leave?

18  A.   Yes, they are.

19  Q.   Based on your review of the video evidence, does

20  Mr. Bozell exit at this time?

21  A.   No, he does not.

22  Q.   After walking through the Senate Wing Door, did the

23  defendant make it into the Crypt area?

24  A.   Yes, he did.

25  Q.   And once he made it into the Crypt, were you able to

1     identify a video on his cell phone of the rioters confronting

2     a police line in the Crypt?

3     A.   Yes, I was.

4     Q.   I'm going to now play Government Exhibit 678.

5          THE COURT:  678.

6          MS. AKERS:  Which is cell phone content.  And I'm going

7     to press play, so this nine-second video.

8          THE COURT:  This is a video?

9          MS. AKERS:  It's a video from his cell phone.

10         THE COURT:  On your list, 678 is listed as a photo.

11    But it's in fact a video?

12         MS. AKERS:  It is a video.  We included a photo as just

13    a still image of the video for printing purposes.

14         THE COURT:  But it's a video?

15         MS. AKERS:  Yep.

16         THE COURT:  The exhibit you're trying to admit is a

17    video.

18         MS. AKERS:  Correct, Your Honor.

19         THE COURT:  All right.  678.  Mr. Shipley?

20         MR. SHIPLEY:  Your Honor, I have 678 as a photo too, so

21    I don't know where 678 video is.

22       (Counsel conferring.)

23       Your Honor, I mean, it came off of his phone, so I don't

24    have an objection to that.  I just don't see it.

25         THE COURT:  I understand.  We're having a little bit of

```
 1        trouble keeping track of things and creating a record.  But
 2        this is what you are marking as Exhibit 678, and it is a
 3        video.
 4                MS. AKERS:  Yes, Your Honor.
 5                THE COURT:  All right.  And without objection?
 6                MR. SHIPLEY:  No objection.
 7                THE COURT:  It is admitted.
 8                            (Government Exhibit No. 678
 9                             received into evidence.)
10        BY MS. AKERS:
11        Q.   All right.  I'm going to play this video.  And can you
12        identify the location in the Capitol?
13        A.   Yes.  This is in the Crypt of the U.S. Capitol.
14             (Video played.)
15                THE COURT:  That was very useful for me.
16        BY MS. AKERS:
17        Q.   In the video, were you able to hear what the crowd was
18        chanting as they were facing a police line?
19        A.   Yes.  They were chanting "Stop the Steal."
20        Q.   I'm pulling up what's been marked as Government Exhibit
21        430.
22                THE COURT:  I'm sorry.  What was it?
23                MS. AKERS:  430.
24                THE COURT:  430.  Thank you.
25                MS. AKERS:  And the government moves to admit
```

1      Government Exhibit 430.

2                   MR. SHIPLEY:  No objection.

3                   THE COURT:  Without objection, 430 is admitted.

4                                       (Government Exhibit No. 430

5                                        received into evidence.)

6      BY MS. AKERS:

7      Q.   I'm going to play starting at 1:40.

8           (Video played.)

9           And are you able to identify Mr. Bozell at 1:49?

10     A.   Yes.  He's in the top middle of the screen, right there.

11     Q.   I'm going to continue playing.

12          (Video played.)

13          I'm stopping at 2:42.  Are you able to identify the

14     defendant in this video?

15     A.   Yes.  He's to the right of the person being interviewed.

16     Q.   Did he just ascend a staircase?

17     A.   Yes.

18     Q.   At the top of that staircase are there any offices of the

19     United States Capitol?

20     A.   Yes, there are.

21     Q.   Did that include Nancy Pelosi's office at the time?

22     A.   Yes.

23     Q.   I'm going to pull up Government's Exhibit 120.

24                  THE COURT:  120 is in evidence.

25

1    BY MS. AKERS:

2    Q.   Special Agent Wright, is this CCTV footage?

3    A.   Yes, it is.

4    Q.   And can you identify where in the Capitol building this

5    is?

6    A.   This is a CCTV video footage right outside the Speaker

7    of the House's office, which was Nancy Pelosi at the time.

8    Q.   I'm going to skip ahead to 20 seconds, and I'm going

9    to play until 27 seconds.

10        (Video played.)

11        Were you able to identify the defendant in this video

12   footage?

13   A.   Can you play it one more time?

14   Q.   Sure.

15        (Video played.)

16        I'm stopping at 29 seconds.  Are you able to identify the

17   defendant in this video footage?

18   A.   Yes.  He was coming from the top right of the screen

19   to -- toward the office of Nancy Pelosi.

20   Q.   Can you circle it for me?

21        (Witness complies.)

22        And what direction does he appear to be walking towards?

23   A.   Towards the Speaker of the House's office.

24   Q.   I'm going to continue playing.

25        (Video played.)

1    I stopped at 33 seconds, which is 2:34:33 p.m.  And what
2    did Mr. Bozell do?
3    A.   He entered the Speaker of the House's office.
4    Q.   I'm going to skip ahead to 1:42, which is 2:35:41 p.m.
5    And now can you identify the defendant?
6    A.   Yes.  He's now exiting Nancy Pelosi's office.
7    Q.   And does there appear to be -- I'm going to pull back one
8    second and just go frame by frame.  And at 2:35:42 p.m. are
9    you able to see something that appears around the area of the
10   defendant's hand?
11   A.   Yes.  In his left hand there seems to be some sort of
12   object that he's carrying.
13   Q.   Can you circle that, please?
14        (Witness complies.)
15        And then I'm going to clear the screen, and I'm going to
16   just go frame by frame as his hand comes back.
17        Are you able to see some sort of object as his hand sort
18   of comes back?
19   A.   Yes.  It's a little obscured because of the person
20   standing in front of him, but you can see when his hand goes
21   back that there's also some sort of object in his left hand.
22   I'll circle it here.
23   Q.   I'm now going to play Government Exhibit 116, which is
24   already in evidence.  Based on your investigation of the
25   defendant, Special Agent Wright, was he also in the Rotunda

1     door area on January 6, 2021?

2     A.   Yes, he was.

3     Q.   And is that the area that we are looking at at this time?

4     A.   It is.

5     Q.   And here, what is the crowd facing in this video footage?

6     A.   They're facing a door that exits the Capitol.

7     Q.   I'm going to skip ahead to 29 seconds and play.

8          (Video played.)

9          And in the top middle of the screen I'm making a blue

10    circle around a man in a blue sweatshirt.  Can you identify

11    that person?

12    A.   That's Mr. Bozell.

13    Q.   I'm going to continue playing.

14         (Video played.)

15         I'm stopping at 1:02, which is 2:38:32 p.m., and can you

16    describe the route of Mr. Bozell at this time?

17    A.   He's pushing himself, along with the rest of the crowd,

18    towards that door.

19    Q.   I'm going to pull up Government Exhibit 436.  Is this a

20    video footage from the outside of the door from the same time

21    period?

22    A.   Yes.

23         MS. AKERS:  The government moves to admit Government's

24    Exhibit 436.

25         MR. SHIPLEY:  Objection.  There's no foundation that

1    the defendant knows anything about what's going on outside.

2    He's inside the whole time.  This is irrelevant.  He's inside.

3    He can't see what's going on outside.

4            THE COURT:  What's the relevance?

5            MS. AKERS:  Sure, Your Honor.  The defendant, as

6    Special Agent Wright just identified, walked up to a crowd and

7    started pushing.  He'll end up pushing --

8            THE COURT:  From the inside.

9            MS. AKERS:  From the inside.  He'll end up pushing the

10   door open and we'll see him from the outside right after the

11   door comes open.  So the defendant assisted in forcing to open

12   the door.

13           THE COURT:  So this video is going to show Mr. Bozell

14   ultimately?

15           MS. AKERS:  Yes, Your Honor.

16           THE COURT:  Overruled.  You may show the video.  It is

17   admitted.  436, right?

18           MS. AKERS:  Correct, Your Honor.

19                           (Government Exhibit No. 436

20                            received into evidence.)

21   BY MS. AKERS:

22   Q.   I'm going to play starting at 1 second.

23        (Video played.)

24        I'm stopping at 1:10 and going just a couple frames

25   forward.  And are you able to identify the defendant in this

1    video?

2    A.   Yes.   He's in the top middle.   You can see the blue

3    hooded sweatshirt as well as the hat and the orange reflective

4    sunglasses on his head.

5    Q.   Which way was he facing as the doors came open?

6    A.   He's facing towards the door.

7    Q.   I'm going to pull up Government Exhibit 132, which has

8    already been --

9         MR. SHIPLEY:   I'm sorry.   Can I have the number of

10    that?

11         MS. AKERS:   436.

12    BY MS. AKERS:

13    Q.   And now I'm pulling up Government Exhibit 132.   Is this

14    the same time frame and same location as the last two videos

15    we watched, just looking at a different vantage point?

16    A.   That is correct.

17    Q.   And is this at 2:38:01 p.m.?

18    A.   It is.

19    Q.   What do you notice about the Rotunda doors at this time?

20    A.   There are several officers guarding the door in an

21    attempt to keep the people on the outside from coming in.

22    Q.   And based on your review of the last video footage that

23    we looked at, were there also officers guarding from the

24    outside?

25    A.   There were.

1    Q.   I'm going to play until 20 seconds.

2         (Video played.)

3         I stopped at 20 seconds.  And in the middle of the screen

4    are you able to see Mr. Bozell in the blue hooded sweatshirt?

5    A.   Yes, I am.

6    Q.   At this point, as he approaches the crowd, what is the

7    status of the doors?

8    A.   They're still closed and being guarded by the police.

9    Q.   I'm going to continue playing.

10        (Video played.)

11        And just to orient, are you able to still see the

12   defendant at this time?

13   A.   Yes.  He's toward the back of the crowd that's starting

14   to push up against the officers and the door.

15   Q.   I'm going to continue playing from 27 seconds.

16        (Video played.)

17        I'm going to stop here at 42 seconds.  And what was the

18   crowd just able to do here?

19   A.   They were able to push themselves up against the door and

20   the officers in order to open it, to allow the other rioters

21   to come in.

22   Q.   And Special Agent Wright, do you know approximately how

23   long the defendant was inside the Capitol building on January

24   6, 2021?

25   A.   It was approximately 54 minutes.

1          MS. AKERS:  Your Honor, all we have left is some

2     additional text messages.  And I would propose if we could

3     just break 10 minutes early or so, and I can get them, so

4     we'll be very efficient when we come back and bust them out.

5     Since we've been having the technical difficulties, perhaps

6     I can access my folder that I've been unable to access, go

7     through those, and then we'll be finished with our

8     case-in-chief.

9          THE COURT:  Well, it may be more efficient, but we are

10    losing time by doing this, because the next 15 minutes now is

11    wasted.  Because I can't accomplish anything in that 15

12    minutes.  This trial is not happening and the sentencing

13    that's scheduled for eleven o'clock is scheduled for eleven

14    o'clock, not 10:45.

15         MS. AKERS:  Sure.  I can keep going.  I just don't want

16    to waste Your Honor's time as I try to scroll through the text

17    messages and --

18         THE COURT:  Well, start and let's see how it goes.

19    If it's not going smoothly, we'll do as you suggest and break.

20         MS. AKERS:  Sure.

21    BY MS. AKERS:

22    Q.  I'm going to pull up what's been marked as Government

23    Exhibit 668H.

24         THE COURT:  And this is subject to the same agreement

25    as earlier, that you'll consult if there are any objections?

1      Mr. Shipley?

2               MR. SHIPLEY:  No, Your Honor.

3               THE COURT:  Is it subject to the same agreement that

4      you made earlier that you'll consult as to whether there are

5      any objections but I'll admit them conditionally?

6               MR. SHIPLEY:  Yes.  That's fine.

7               THE COURT:  668H is admitted.

8                              (Government Exhibit No. 668H

9                               received into evidence.)

10     BY MS. AKERS:

11     Q.   All right.  Special Agent Wright, on November -- excuse

12     me -- December 22, 2020, at 3:05:50 p.m., what did Mr. Bozell

13     say?

14     A.   "Everyone needs to go on the 6th.  Stand up for your

15     country and children.  No excuses."

16     Q.   And I'm scrolling -- that's all for that one.

17          I'm now going to go to 669.

18               THE COURT:  669 is actually in evidence.

19               MS. AKERS:  I just need to see which subpart it is.

20     I'm just getting the wheel of death here for a minute,

21     Your Honor.  I'm sorry.

22               THE COURT:  That's all right.

23               MS. AKERS:  All right.  669D.

24               THE COURT:  I'm sorry, six-sixty...

25               MS. AKERS:  9D.

1          THE COURT:  C?

2          MS. AKERS:  D, like dog?

3          THE COURT:  D like dog.  All right.

4     BY MS. AKERS:

5     Q.   And on December 24, 2020, at 2:53:28 p.m., can you read

6     what Mr. Bozell wrote?

7     A.   "Biden will never be sworn in.  We'll have WW4 before

8     that happens.  Trump will never hand America over to evil."

9          THE COURT:  And 669D is in evidence.

10                         (Government Exhibit No. 669D

11                          received into evidence.)

12          MS. AKERS:  Thank you, Your Honor.

13          THE COURT:  And, Ms. Akers, you were right.  Let's take

14     our break.

15          MS. AKERS:  I apologize, Your Honor.

16          THE COURT:  That's all right.

17          MS. AKERS:  I'm just having a major technical issue.

18     I'll try to switch out my computers at the break.

19          THE COURT:  Let's hope so.  So we're going to break in

20     this trial.  You're going to have to clear off counsel table

21     because we have a sentencing that's going to commence in 10

22     minutes.  And as I said, it's going to take a little while.

23          I think what I'm going to do is say that we're going to

24     resume -- I'll give you a hard time that we'll actually resume

25     and I'll thereby also be giving staff a chance to have some

1    lunch.  So we'll resume at one o'clock.  1 p.m.

2              MR. SHIPLEY:  Yes, sir.

3              THE COURT:  Okay.  See you then.

4         (Recess from 10:49 a.m. to 1:50 p.m.)

5              THE COURT:  All right.  Good afternoon, everyone.

6    A short afternoon, but let's make the most of it.  I hope

7    you're prepared to do so, Ms. Akers.

8              MS. AKERS:  Thank you, Your Honor.  I believe so.

9              THE COURT:  And, Special Agent Wright, I remind you

10   you're still under oath.

11             THE WITNESS:  Yes, Your Honor.

12             THE COURT:  Please.

13   BY MS. AKERS:

14   Q.   Special Agent Wright, we're going to look at a few more

15   text messages and then wrap up here.  We were looking at

16   before the break --

17             THE COURT:  And I will say for Mr. Wayne's benefit,

18   just because I'm in a hurry doesn't mean you should speak

19   faster.

20             MS. AKERS:  Thank you.  He probably thanks you for

21   saying that, because I was on a roll there.

22   BY MS. AKERS:

23   Q.   Before the break we were talking about some text messages

24   relating to Mr. Bozell's understanding of the certification of

25   the Electoral College vote.  Is that right?

1      A.   That's correct.

2      Q.   All right.  I'm pulling up Government Exhibit 621, which

3      is a two-page document.  And on the first page do you see a

4      message from someone to Mr. Bozell?

5      A.   I do.

6      Q.   And it's a lengthy message here that goes on to the

7      second page.  And I'm going to just go to the bottom of that

8      text message, which was written on November 10, 2020.

9           THE COURT:  And consistent with how we've been doing

10     this, 621 is admitted.

11          MR. SHIPLEY:  Yes, Your Honor.

12     BY MS. AKERS:

13     Q.   And I don't want you to read the whole thing, but I want

14     to direct your attention to the area that says "FWD" colon.

15     Do you see that?

16     A.   I do.

17     Q.   And do you see that it says, "Okay, in a nutshell.  This

18     is going to go to the Supreme Court."  Do you see that?

19     A.   I do.

20     Q.   And then can you continue reading on from there and I'll

21     interrupt you when you can stop.

22     A.   "Where they will rule that the election is invalid due to

23     fraud or mistakes on a countrywide scale.  It will go one of

24     two ways.  Either they will rule that all the unconstitutional

25     mail-in ballots will be removed and the states ordered to

1   recount without them, or they will simply rule the election is

2   invalid due to mass voter fraud, and at the point it will be

3   sent to the Congress and Senate for a vote.  This is where it

4   gets good.  The House Congress votes on who the president will

5   be.  It has nothing to do with what party that has power.

6   Every state gets one vote and 30 states are held by

7   Republicans and 19 by Democrats.  They have to vote down party

8   lines.  They have no choice due to the 12th Amendment of the

9   Constitution, and the Senate votes for the vice president

10   where a similar even will take place."

11       I think that's a typo.  I think it was meant to say

12   "event."

13       "This is the law.  This is why the Democrats are so mad

14   at Nancy Pelosi.  This will all happen in January."

15   Q.   Okay.  You can stop there.  That gets I think the gist of

16   the message.  And then did Mr. Bozell respond to this message

17   about a minute and 45 seconds later?

18   A.   Yes.

19   Q.   And can you read his response?

20   A.   "Oh, you thought he sat back, had no plan and did

21   nothing?  This is DJT we're talking about.  He's always got a

22   plan."

23   Q.   I'm now going to pull up Government Exhibit 664F, like

24   Frank.  And this is a one-page document that's a text message

25   written on December 7, 2022, at 2:58 a.m.  And can you read

1    the message from the defendant?

2             THE COURT:  Before you do so, I'll say that 664F is in

3    evidence.

4             MS. AKERS:  Thank you.

5                              (Government Exhibit No. 664F

6                               received into evidence.)

7             THE WITNESS:  "I still have this sneaky feeling that

8    this event that's happening will play out with failure at

9    state legislature level (pussy plus dot corruption), failure

10   at SCOTUS (corruption), Trump saying everyone to Washington,

11   time to dissolve your government while you still can.

12   Internet off.  Trump communicates through EBS.  Millions go to

13   Washington because we have to learn to stand up again as human

14   beings.  Dissolve government under maritime law and

15   reconstitute with common law with the immediate new

16   elections."

17   BY MS. AKERS:

18   Q.   And then did someone respond to him and say, "Tough to

19   do without the country tearing itself apart, i.e., antifa

20   terrorizing cities and neighborhoods (families) while the

21   patriots go to war in D.C. (which is what that would be)"?

22   A.   Yes.

23   Q.   I'm now going to pull up Government Exhibit 664I.  This

24   is a text message string that's one page in length starting at

25   December 29, 2020, at 7:21:46 p.m.  And did someone write to

1    Mr. Bozell and say, "So does this all come down to Pence?"

2    A.   Yes.

3    Q.   And then what did Mr. Bozell respond?

4    A.   "States may flip before 6th but yes, the judicial fight

5    probably will come down to Pence."

6    Q.   And then what did he say after that?

7    A.   "I think he punts both sets of electors.  I believe he's

8    a patriot."

9    Q.   And then the last two messages, what do they say from

10   Mr. Bozell?

11   A.   "I have a hard time believing Trump would invite a

12   million people to receive bad news that could turn the city

13   into a giant terrorist event.  I also don't believe Trump

14   doesn't know exactly what Pence will do."

15   Q.   I'm going now to --

16            THE COURT:  Before you do that, 664I is admitted.

17            MS. AKERS:  Thank You, Your Honor.

18                              (Government Exhibit No. 664I

19                               received into evidence.)

20   BY MS. AKERS:

21   Q.   I'm going to pull up 664G and move for the admission of

22   that.

23            THE COURT:  664G is already in evidence.

24            MS. AKERS:  We'll relabel this as 664N, which is our

25   last one.

1          THE COURT:  Okay.  664N.

2          MS. AKERS:  Yep.  Thank you.

3          THE COURT:  And that will be admitted.

4                    (Government Exhibit No. 664N

5                    received into evidence.)

6    BY MS. AKERS:

7    Q.   On this two-page text stream, there's a message from

8    Mr. Bozell on December 14, 2020, at 1:05:49 a.m.  And what is

9    the text message?

10   A.   It is a link to a Twitter tweet.

11   Q.   I'm going to pull up 664.3.  Is this the link to the

12   tweet that was associated with Mr. Bozell's text on his cell

13   phone?

14   A.   Yes.

15   Q.   And can you please read this for us?

16   A.   It's from Donald Trump's Twitter account.  Says, "Swing

17   states that have found massive voter fraud which is in all of

18   them cannot legally certify these votes as complete and

19   correct without committing a severely punishable crime.

20   Everybody knows that dead people, below age people, illegal

21   immigrants, fake signatures, prisoners..."

22   Q.   And then I'm going back to 664.  And right below

23   Mr. Bozell's tweet, what did he write in a text message?

24   A.   "'Certify and I'll kill you.'  I like it."

25   Q.   I'm now going to pull up 668D.  And this is a text

1    message string --
2              THE COURT:  This is 668 what?
3              MS. AKERS:  D.
4              THE COURT:  D?
5              MS. AKERS:  D like dog.  Thank you, Your Honor.
6              THE COURT:  668D is in evidence.  It's admitted.
7                        (Government Exhibit No. 668D
8                         received into evidence.)
9    BY MS. AKERS:
10   Q.   And is this from January 7, 2021, at 3:02:22 a.m.?
11   A.   Yes, it is.
12   Q.   And did someone say to Mr. Bozell, "Why did Pence not
13   pull through?"
14   A.   Yes.
15   Q.   And what did Mr. Bozell respond?
16   A.   "Traitor."
17   Q.   I'm going to go now to 664H.  This is a two-page
18   document, and we're just going to read from the second text
19   stream on the left, which is at December 23, 2020, 2:26:48
20   a.m.
21              THE COURT:  And 664H is admitted.
22                        (Government Exhibit No. 664H
23                         received into evidence.)
24   BY MS. AKERS:
25   Q.   And did someone write to Mr. Bozell: "Declass

1      everything"?

2      A.   Yes.

3      Q.   And then did someone else write: "Patriots are capable of

4      celebrating Christ plus declass"?

5      A.   Yes.

6      Q.   And then did Mr. Bozell respond on December 23, 2020, at

7      2:30:13 a.m.?

8      A.   He responded: "I'm hoping declass 26-5th.  Then we go to

9      D.C. and throw them all out.  I hope."

10     Q.   I'm now going to pull up 664L.  And is this a text

11     thread, one page in length, beginning on December 30, 2020,

12     3:02:52 a.m.?

13     A.   Yes.

14     Q.   And does a person say to Mr. Bozell, "Making list"?

15     A.   Yes.

16     Q.   And then what did Mr. Bozell respond?

17     A.   "I almost hope it goes south on the 6th.  Let's just take

18     the Capitol and hang these pedosatanist traitors."

19     Q.   I'm going to pull up now 664 --

20          THE COURT:  664L is admitted, by the way.

21          MS. AKERS:  Thank you, Your Honor.

22                              (Government Exhibit No. 664L

23                               received into evidence.)

24     BY MS. AKERS:

25     Q.   What did you say?

```
1    A.   I'm sorry.  I just mispronounced.  It says "pedosatanist

2         traitors."

3    Q.   No problem.  I'm going to pull up 664M.

4              THE COURT:  N?

5              MS. AKERS:  M.

6              THE COURT:  M.

7              MS. AKERS:  Thank you.

8    BY MS. AKERS:

9    Q.   And is this a text thread from December 30, 2020, that

10        starts at 2:40:43 a.m.?

11   A.   Yes.

12   Q.   And what did Mr. Bozell say?

13   A.   "I just watched Captain America: Civil War so..."

14   Q.   And did someone respond after that, "We bum rush Area 51"?

15   A.   Yes.

16   Q.   And then what did Mr. Bozell respond?

17   A.   "That's in Nevada."

18   Q.   And then did someone respond "Road trip"?

19   A.   Yes.

20   Q.   And then what did Mr. Bozell respond?

21   A.   "I'm talking about the 6th."

22   Q.   And then did someone respond "Brilliant, Zeek and K bum

23        rush Langley or Pentagon"?

24   A.   Yes.

25              THE COURT:  Those are two different responses from two
```

1     different people.

2                 MS. AKERS:  Thank you for that clarification.

3     BY MS. AKERS:

4     Q.   I'm going to scroll down past a couple messages to

5     Mr. Bozell's response on that same date at 2:42:49 a.m.  And

6     what did he say?

7     A.   "Both outside D.C., Reid.  And heavily guarded.  Let me

8     lead, Reid."

9     Q.   I'm going to pull up 664J.  And is this a two-page text

10    message string beginning on January 7, 2021?

11    A.   Yes.

12    Q.   And on January 7, 2021, at 3:20 a.m., did Mr. Bozell say

13    "We got played today"?

14    A.   Yes.

15    Q.   And then did he say, "Antifa led.  Cops let everyone in.

16    Cop took action and shot one girl."

17    A.   Yes.

18    Q.   And then did he say, "Did nothing close to that level

19    anywhere else," and in the next text message, "Shot her down

20    the hallway?"

21    A.   Yes.

22                 THE COURT:  664J is admitted.

23                 MS. AKERS:  Thank you.

24                         (Government Exhibit No. 664J

25                           received into evidence.)

1    BY MS. AKERS:

2    Q.   And did someone else respond a few minutes later and say,

3    "We showed up and it was immediately a showdown at the

4    Capitol"?

5    A.   Yes.

6    Q.   I'm going to go to 664K.  And is this a one-page text

7    message stream with a text from Mr. Bozell on January 9, 2021,

8    at 8:09:30 p.m.?

9    A.   Yes.

10   Q.   And did he say "Capitol siege is morally justified"?

11   A.   Yes.

12   Q.   I'm going to pull up 660.  And starting midway down the

13   first page, is this a text message stream from January 23,

14   2021, at 3:43:17 a.m.?

15   A.   Yes.

16   Q.   And did someone say to Mr. Bozell, "I just got a standing

17   O for my actions on the 6th"?

18   A.   Yes.

19   Q.   And what did he respond?

20   A.   He loved that comment.  Loved "I just got a standing O

21   for my actions on the 6th."

22   Q.   And then did someone write back, "Within five minutes of

23   walking into South Carolina bar"?

24   A.   Yes.

25   Q.   And on January 23, 2021, what did Mr. Bozell respond?

1    A.    "Don't tell people, bro.  Rats everywhere."

2              MS. AKERS:  No further questions for this witness,

3    Your Honor.  Thank you for your patience.

4              THE COURT:  All right.  Thank you, Ms. Akers.

5         Mr. Shipley.

6         By the way, 660, I don't think I ever said, is admitted.

7                              (Government Exhibit No. 660

8                                received into evidence.)

9                         CROSS-EXAMINATION

10   BY MR. SHIPLEY:

11   Q.    Good afternoon, Agent Wright.

12   A.    Good afternoon.

13   Q.    How many brothers does Leo Bozell have?

14   A.    I'm not sure.

15   Q.    Who is Reid?

16   A.    A relative of Mr. Bozell.

17   Q.    Younger brother, right?

18   A.    I'm not sure.

19   Q.    Who's Joey Bozell?

20   A.    I do not know.

21   Q.    Younger brother of Leo Bozell, right?

22   A.    You have to tell me, sir.

23   Q.    This case started more than two years ago and you're

24   sitting here and you don't even know who these individuals

25   are that's reflected in the report?

1    A.    That's correct.

2    Q.    How many people that he communicated with over text

3    message have you interviewed before coming here today?

4    A.    Me personally?

5    Q.    Or -- you're the case agent.  Right?

6    A.    Correct.

7    Q.    So the case file's got your name on it.  Right?

8    A.    Correct.

9    Q.    Case number is assigned to you.  Correct?

10   A.    Correct.

11   Q.    Every investigative step in the case is serialized, 1

12   through whatever, from the opening EC until this week.  Right?

13   A.    Correct.

14   Q.    Have you been the case agent since the start?

15   A.    I have.

16   Q.    You know everything that's in that file.  Right?

17   A.    I do.

18   Q.    Doesn't get serialized without you?

19   A.    It can get serialized without me, yes.

20   Q.    But you get notice when something gets serialized?

21   A.    Correct.

22   Q.    Okay.  How many interviews have been done in that case

23   file of people who he's communicating with by text?

24   A.    None.

25   Q.    None.

1    A.   Correct.

2    Q.   Have you ever interviewed Mr. Bozell?

3    A.   He declined to be interviewed when we arrested him.

4    Q.   So you sit here today testifying about the content of

5    these text messages and you really have no idea what the

6    context might have been between the individuals communicating.

7    A.   I understand the context based off what happened on that

8    day and based on the communications.

9    Q.   You know the words on the page.

10   A.   Correct.

11   Q.   You don't know if there's any meaning behind the words on

12   the page that's not obvious.  Right?

13   A.   It's pretty self-explanatory.

14   Q.   Who's Jesse Hughes?

15   A.   He's a musician of some sort.

16   Q.   Who is Boots Electric?

17   A.   Some sort of speaker and/or musician of some sort.

18   Q.   Is Boots Electric the nickname of Jesse Hughes?

19   A.   I do not know.

20   Q.   Is Jesse Hughes the front man of a band called Eagles of

21   Death Metal?

22   A.   I do not know.

23   Q.   Was the band Eagles of Death Metal the target of a

24   radical Islamist attack in France about four years ago?

25        MS. AKERS:  Objection.  Relevance.

1          THE COURT:  Well, I have to say that a large number

2     of the text messages that I've been reading are not all that

3     relevant, and this examination isn't all that relevant.  I'm

4     going to overrule the objection and give you a little bit of

5     leeway, Mr. Shipley --

6          MR. SHIPLEY:  I'm not going much further.

7          THE COURT:  -- only a little.

8          MR. SHIPLEY:  Mr. Bozell will provide the context for a

9     lot of this stuff.  I'm just establishing that the bureau did

10    not track it down.

11    BY MR. SHIPLEY:

12    Q.   I want to go through just a few of the text messages.

13    And I'm not going to try to pull them up, but I think you're

14    going to remember them because they had some meaningful

15    phrases.

16    A.   Okay.

17    Q.   And if you recall them, great.  If not, we can try to

18    find the number and maybe government's counsel can call them

19    up for me.  But there's a reference in -- when you first

20    started this morning, there's a reference to a text message on

21    November 8, 2022, sent by Mr. Bozell, talking about a glitch

22    in the machines.  Remember that?

23    A.   I do.

24    Q.   And now, part of your job as the case agent, obviously

25    the Cellebrite report, thousands of pages long, comes to you.

1    Right?

2    A.   Correct.

3         THE COURT:   You said 2022.   November 8, 2022.   Is that

4    what you're talking about?

5         MR. SHIPLEY:   2020.   I'm sorry.   2020.   So five days

6    after the election.   You're listening pretty closely there.

7    BY MR. SHIPLEY:

8    Q.   And so a Cellebrite report -- and this one is thousands

9    of pages long.   Right?

10   A.   Correct.

11   Q.   But part of the job is to read it.   Correct?

12   A.   Correct.

13   Q.   All right.   And you pull out, working with other agents

14   or working with the prosecutor, you pull out what seems

15   meaningful to you.

16   A.   Correct.

17   Q.   And this one about glitch in the machines on November 8,

18   2020, seemed meaningful.   Right?

19   A.   It did.

20   Q.   And then you testified earlier that you are aware of

21   several messages that sort of explore this same subject.

22   A.   Correct.

23   Q.   Now, the issue five days after the elections of whether

24   there were problems with the automated vote recording and

25   tallying, that was widely reported across the country.   Right?

1      A.   It was discussed, yes.

2      Q.   I mean, it was a point of contention with regard to the

3      outcome of the election.

4      A.   It was.

5      Q.   And as of November 8, five days after the election, it

6      hadn't been settled yet, had it?

7      A.   No.

8      Q.   Been no concession by Donald Trump that he had lost?

9      A.   Correct.

10     Q.   There had been no vote of the Electoral College.

11     Correct?

12     A.   Correct.

13     Q.   The State of Georgia hadn't gone through its recount, and

14     that was one of the places where there was a concern about

15     electronic vote counting.  Right?

16     A.   I don't know what the exact date of when Georgia went

17     through their recount.

18     Q.   Are you familiar with a federal judge in Atlanta who in

19     October of 2020 declared that the -- Georgia's new system was

20     subject to penetration but it was too late to order an

21     only-paper election?

22     A.   I'm not, no.

23     Q.   The YouTube video, the *Vice Principals* video, now, that

24     was sent to Mr. Bozell by Joey.  Right?

25     A.   I believe it was by Reid.

1    Q.   Okay.  But it was by Reid or Joey.  And I'm going to

2    represent to you just for the purposes of our exchanges that

3    Reid and Joey are two of his younger brothers, and he's got an

4    older brother named David, who's in the courtroom.  Okay?

5    A.   Mm-hmm.

6    Q.   So if I said -- so that was sent, your recollection is it

7    was by Reid or Joey.

8    A.   Yes.

9    Q.   But you've never interviewed either one.

10   A.   Reid declined to be interviewed by the FBI.

11   Q.   All right.  Couldn't decline a grand jury subpoena,

12   though, could he?

13   A.   No.

14   Q.   Now, there's a reference in Exhibit 664, which is the

15   same exhibit that has that YouTube video.  I'm just going to

16   tell you, 664 is 505 pages long.  And you went in there for

17   that video and you also made reference to a -- actually, it

18   was right at the end there.  There was a reference to satanist

19   pedo traitors.  Remember that?

20   A.   Pedosatanists.

21   Q.   The phrase jumped off the page at you, right?

22   A.   I mispronounced it, yes, sir.

23   Q.   Yeah, okay.  Can I get 664 real quick?

24        If you could go down to 226.

25           MS. AKERS:  I'm going to object to this, Your Honor,

 1    because he's trying to introduce statements of the defendant

 2    that this agent wasn't asked about.

 3         THE COURT:  So?

 4         MS. AKERS:  So the defendant's trying to introduce his

 5    own statements into evidence.  That's hearsay.

 6         MR. SHIPLEY:  Not for the truth of the matter asserted.

 7         THE COURT:  I don't see them yet so I can't make a

 8    judgment on that.

 9    BY MR. SHIPLEY:

10    Q.   Well, let me just ask this question:  Had you seen that

11    phrase elsewhere in other contexts?

12    A.   Pedosatanist?

13    Q.   Yeah.

14    A.   Not that I can recall.

15    Q.   Well, can we see that now, please, and ask him if he

16    recognizes that.  He's reviewed the whole Cellebrite report.

17         THE COURT:  You can ask him if he recognizes it.

18         MS. AKERS:  Okay.  I would just reassert our objection

19    that the defendant can't introduce his own written statements

20    into evidence.  That's hearsay.

21         THE COURT:  The objection is noted.  I'm going to rule

22    on it as soon as it comes up on the screen.

23      (Exhibit displayed.)

24      The question posed is what?

25         MR. SHIPLEY:  If having reviewed the Cellebrite report,

1    if he'd seen that phrase before in other contexts.

2           THE COURT:  And the answer is?

3           THE WITNESS:  Not that I can recall.

4           MR. SHIPLEY:  Then to refresh his recollection, I'd

5    like to show him the Cellebrite report and see if it changes

6    his testimony.

7           THE COURT:  The objection to doing that is overruled.

8    He can be impeached by showing him something that may be

9    inconsistent with what he's just testified to.

10          MS. AKERS:  Well, I would object to that, Your Honor.

11   It's not inconsistent.  He said "I don't remember."

12          THE COURT:  I'll nonetheless allow it.

13          THE WITNESS:  It's a different saying, sir.  It was

14   "pedosatanist."  This is "satanist pedo."

15   BY MR. SHIPLEY:

16   Q.   Correct.  He uses the same phrase, just in a different

17   context.  He says, "I wish my priests weren't satanist pedo

18   sympathizers."  Right?

19   A.   That's what it said.

20          THE COURT:  This may be a new depth in these January 6

21   cases, that I'm going to be sitting here while there's a

22   debate going on about the use of this term.

23          MR. SHIPLEY:  I understand.

24          THE COURT:  I mean, really.

25          MR. SHIPLEY:  I understand.

1    BY MR. SHIPLEY:

2    Q.   Now, there's a lot of text messages in not just that

3    thread but many others by Mr. Bozell talking about his

4    religious beliefs as a practicing Catholic.  Right?

5    A.   There are references to his religion, yes.

6    Q.   It is a Catholic family, and they talk about going to

7    mass, they talk about praying, they talk about confession,

8    all of those things, right?

9    A.   Yes.

10   Q.   And Mr. Bozell expresses dissatisfaction with the

11   investigation into pedophilia among the priesthood that was

12   done in Philadelphia, doesn't he?

13   A.   In that text message he does, yes.

14        MR. SHIPLEY:  That's the context, Your Honor.

15   BY MR. SHIPLEY:

16   Q.   Let's go back to 221 to 225.

17        MS. AKERS:  I would object again to the defendant's

18   introduction of his own written statements as hearsay.

19        THE COURT:  And we'll deal with it on a case-by-case

20   basis.  I understand the objection.  And Mr. Shipley should

21   understand that as well.  I'm not going to allow him to

22   introduce --

23        MR. SHIPLEY:  Different subject.  221, 225, I'm going

24   to ask him just to scan them and then I'll ask him a question.

25        MS. AKERS:  And I would object as improper.  He didn't

1    say he can't remember something, there's no --

2          THE COURT:  Whoa, whoa, whoa.  We're getting ahead of

3    ourselves.  So 221 to 225, you've asked for those to be called

4    up.  You haven't asked the witness anything yet.

5          MR. SHIPLEY:  Correct.

6    BY MR. SHIPLEY:

7    Q.   Well, let me ask you before you look at them:  In this

8    same Cellebrite report do you recall an exchange between him

9    and his brother regarding the movie *Finding Nemo*?

10         THE COURT:  Just a second.  221 to 225 pages?

11         MR. SHIPLEY:  My apologies.

12         THE COURT:  Or exhibit?

13         MR. SHIPLEY:  Pages 221 to 225 of 664.

14         THE COURT:  Okay.  Now I understand what is --

15         MR. SHIPLEY:  I set it up by saying it's a 505-page

16   document.  So my reference --

17         THE COURT:  That's true of a lot of these documents.

18   Okay.  So go ahead and ask the question you want to ask.

19   BY MR. SHIPLEY:

20   Q.   664, Exhibit 664, is a very long -- more than 500 pages

21   worth of messages between the two brothers.  Right?

22   A.   Correct.  And the entire Cellebrite extraction is

23   thousands of pages.

24   Q.   Exactly.  It's a modern-day curse of the investigator.

25   Do you recall a five-page exchange with dozens of messages

1    about the movie *Finding Nemo* and their kids watching it?

2    A.   No, I do not.

3    Q.   But generally you testified that you recall lots of

4    messages about the election, lots of messages about

5    protesting.  There's a ton of messages between brothers about

6    their families, right?

7    A.   Yes.

8    Q.   They were constantly in communication with each other,

9    and not just Reid, but Joey and Dave.  Right?

10   A.   That is correct.

11   Q.   Now, Exhibit 432, which is a video, just to kind of set

12   the scene for you to see if you recall it, it's inside and a

13   series of protesters are talking to a female officer and a

14   couple of others who are blocking their way.  And then like

15   three minutes into the video you catch a glimpse of Mr. Bozell

16   just kind of standing back two or three people deep.  Right?

17   A.   I recall that, yes.

18   Q.   And then the video switches back because the group that

19   was talking to the female officer, they just proceeded to go

20   down the hallway.  Right?

21   A.   That is correct.

22   Q.   And Mr. Bozell falls in and follows the group down the

23   hallway?

24   A.   Correct.

25   Q.   Okay.  So if you testified earlier that Mr. Bozell pushed

1    through the police line, that wouldn't be accurate, would it?

2    A.   I said the people there pushed through the police line.

3    Q.   So the crowd pushed through and then Mr. Bozell came in

4    behind them.

5    A.   That's what I said.

6    Q.   Okay.  You remember seeing -- there's actually three

7    videos that show the Columbus doors being opened.  Right?

8    A.   The Columbus doors?

9    Q.   The Columbus doors are the great big doors where the

10   crowd inside pushes against them and pushes it out.

11   A.   Okay.

12   Q.   Three videos of that.  Correct?

13   A.   Correct.

14   Q.   Okay.  There's one video that's a closed-circuit TV

15   camera from above the door facing interior, where you can kind

16   of have a limited view but you see Mr. Bozell, and I think

17   that's 116.  Then you have 132, which is the reverse angle.

18   It's from the inside shooting back towards the door.  Right?

19   A.   Yes.

20   Q.   And then the last one is Exhibit 436 which is the video

21   taken by the crowd outside showing the door being pushed open.

22   A.   Correct.

23   Q.   You make any trip to the Capitol to try to estimate the

24   distance between where Mr. Bozell was and where that door was

25   and how many people were between him?

1    A.    I did take a trip to the Capitol, yes.

2    Q.    What was the distance between Mr. Bozell where he was

3    standing and the door?

4    A.    I did not measure that.  It's hard to tell from a video.

5    And to get any sort of measurement, I'd have to estimate.

6    Q.    Now, there are three officers on the interior next to

7    that door.  Right?

8    A.    Three to five.

9    Q.    Well, there's an officer that's got -- a tall African

10   American officer that's got a hat on.  Right?

11   A.    There's one with a helmet.

12   Q.    Correct.  And to that officer, that officer is at the

13   left side of the door as you're facing it.

14   A.    Facing it from the outside or the inside?

15   Q.    No, facing from the inside, facing the door.  That

16   officer is on the inside.

17   A.    Okay.

18   Q.    Tall African American officer on the left side as you're

19   facing it.  And then there's an officer with a helmet and a

20   face shield on the right side.  Is that correct?

21   A.    I remember that one.

22   Q.    And then there's a second officer right next to him with

23   a soft cap.

24   A.    Correct.

25   Q.    Correct?  How tall is Mr. Bozell?

1    A.    I'd have to estimate.  5-9?

2    Q.    How many people were between him and those officers when

3    he walked in there?

4    A.    Again, I'd have to estimate.  I'd say 15-ish.

5    Q.    The crowd was deep.  He comes into the back of the crowd

6    and there's 12 or 15 people between where he's standing and

7    where the officers are.  Right?

8    A.    Approximately.  Yes.

9    Q.    But he does move up to the back of the crowd as the crowd

10   begins to push on the door.  The crowd can see the door

11   opening a little bit.  Correct?

12   A.    The crowd can see that, yes.

13   Q.    And then he leans into the back of the crowd.  He's

14   almost the last person pushing.  Correct?

15   A.    Correct.

16   Q.    And the doors open, and that's it.  Now the crowd from

17   outside can get in through those doors?

18   A.    They had to push through the officers and through the

19   door and the officers on the outside.

20   Q.    Okay.  Now, you've physically seen that location?

21   A.    I have.

22   Q.    You cannot see what's on the outside from the interior

23   position where Mr. Bozell was, can you?

24   A.    You can see through the windows that there's people out

25   there.

1    Q.   But the windows were broken, weren't they?

2    A.   You can still see through the broken window.

3    Q.   You can -- fractured glass windows, square windows, you

4    think he could see the police officers outside from his

5    position 12 people deep?

6    A.   I'm not sure.  I can't testify to say what he could see.

7    Q.   And that's my point.  You don't know if he could actually

8    see that there were officers on the outside of that door?

9    A.   I don't know if he could see the officers on the outside.

10   That is correct.

11   Q.   And that happens at 2:38 p.m.  Correct?

12   A.   Approximately.

13   Q.   Because that's the famous door that the Oath Keepers all

14   came through right after it opened?

15   A.   Correct.

16   Q.   Marching up in a line wearing their outfits.

17   A.   Correct.

18   Q.   Now, the initial break into the building was at 2:14, the

19   windows that Mr. Bozell fractured with whatever was in his

20   hand.  Right?

21   A.   Correct.

22   Q.   So we're talking about 24 minutes later, the Columbus

23   doors are being pushed open.  Isn't it true that by that point

24   in time there were more than 20 entry points that had been

25   established for the building?

1    A.    I couldn't testify to tell you how many entry points

2    there were.

3    Q.    And when I say entry points I mean the crowd had broken

4    in at 20 different places.

5    A.    They had broken in.  Again, I couldn't tell you how many

6    places they had broken in.

7    Q.    All right.  Now, we had Officer -- not Nichols, the

8    second officer that testified yesterday before Officer

9    Nichols -- who was up at the top of the stairs.

10   A.    Okay.

11   Q.    Can you refresh his name for me?

12   A.    Officer Murray, I believe.

13   Q.    Murray.  Correct.  You had interviewed him obviously as

14   part of your investigation, right?

15   A.    Correct.

16   Q.    Or he had been interviewed by somebody working with you?

17   A.    Correct.

18   Q.    Did he ever identify Mr. Bozell as somebody who pushed

19   him out of the way?

20   A.    No, he did not.

21   Q.    Now, we know from the video that Mr. Bozell was right

22   there face-to-face with those first three or four officers at

23   the top of the stairs when the crowd had filled in the stairs

24   behind him.  Right?

25   A.    That's correct.

1    Q.   And in fact right at the beginning of that video, right

2    at the beginning of that video you can see Mr. Bozell come out

3    from underneath the tarp.  Correct?

4    A.   Correct.

5    Q.   And that is in the same time frame roughly when he was

6    inside under the scaffolding and he was pulling back on the

7    tarp.

8    A.   It was a few minutes after he started pulling back on

9    the tarp.

10   Q.   But in effect, you know, the tarp could be pulled back

11   and there was no longer any barrier, was there?

12   A.   I believe the tarp that he pulled back was the barrier.

13   Q.   Yeah.  The tarp was the barrier.  Without pulling the

14   tarp back, was it possible to go through?

15   A.   No.

16   Q.   It wasn't possible to go under?

17   A.   I didn't see anyone go under so I couldn't testify if

18   it was possible, but I didn't see anyone in the video going

19   under.

20   Q.   And we've seen video that there were bike racks there.

21   There were officers standing behind the bike racks.  Right?

22   Then Mr. Bozell was off to the side where the tarp was?

23   A.   Yes.

24   Q.   The bike racks ended right at that point, didn't they?

25   A.   Right where he was, yes.

1    Q.   So there was no -- the bike rack wasn't a barrier to him

2    going through.  Correct?

3    A.   It was a barrier for him to go through.

4    Q.   Well, but there was no bike rack in front of him.

5    It had ended just slightly to his right, because he's facing

6    the tarp.  The bike rack ends at his right.  Correct?

7    A.   Correct.  It's right there to his right.

8    Q.   So the tarp was the barrier.

9    A.   It's one of the barriers.

10   Q.   That prevented him from walking through?

11   A.   It's one of the barriers, yes, sir.

12   Q.   And on the back side of that were the police.  The police

13   were behind the barrier, the police then went out to where we

14   could see them in that video on the landing.  That was all one

15   location, right?

16   A.   Correct.

17   Q.   And right at the beginning of the video -- this is

18   Government's Exhibit 1003.  Now, let's orient ourselves.

19   We're talking about this area right in here.  Correct?

20   A.   Yes, sir.

21   Q.   And this is the tarp that Mr. Bozell's pulling on, or

22   in that general vicinity.

23   A.   In that general vicinity, yes, sir.

24   Q.   And that's him right there emerging out from under the

25   tarp.  Correct?

1    A.    Yes.

2    Q.    And he steps forward to the police standing right there,

3    doesn't he?

4    A.    Yes.

5    Q.    And initially an officer steps forward and pushes him.

6    Correct?

7    A.    Yes.

8    Q.    Mr. Bozell takes a step back, but then another officer

9    comes up.  This officer right here comes up and tells him no,

10   no, no.  Leave him alone.  See that?

11   A.    It's hard to depict what exactly happened from a video.

12   Q.    Has any officer told you that Mr. Bozell had been there

13   for about 10 minutes talking to those officers?

14   A.    No.

15   Q.    So Mr. Bozell comes through, that officer steps forward

16   and pushes him.  Right?

17   A.    Yes.

18   Q.    Right hand out extended.  Then the officer comes

19   backwards.  And I want you to watch this officer here.

20        (Video played.)

21        And then the first officer steps back.  And Mr. Bozell

22   steps forward.  Right?

23   A.    I can't even tell if that's another officer or a

24   protester or rioter.

25   Q.    Well, that's Mr. Bozell there.

1   A.   Correct.  And that's an officer that pushes him.  I can

2   see the riot shield that he's holding.  But the person that's

3   talking to him, I can't determine if that's an officer or a

4   rioter.

5   Q.   But now he's standing there, without being bothered by

6   the police, and he begins to talk to the officer standing

7   there.  Right?

8   A.   Correct.

9   Q.   And that goes on for two minutes, doesn't it?

10   A.   Approximately.

11   Q.   Well, this is -- I don't have the counter here, but I

12   think this is just after 2:07 and we know the rush up the

13   stairs starts at 2:09:30.  Right?

14   A.   Approximately, yes, sir.

15   Q.   In reviewing the video, have you determined whether or

16   not Mr. Bozell got to this location more than one time in like

17   this 15-minute time period?

18   A.   I'm sorry.  Can you rephrase that, sir?

19   Q.   Have you seen any evidence or in your investigations come

20   across any evidence, video or otherwise, that in fact he had

21   gone up there, spent some time, gone back down, spent some

22   time down below, and then gone back up a second time, that

23   this is actually his second time up there?

24   A.   No.

25   Q.   Did Speaker Pelosi's office report anything stolen that

```
 1    you could attribute to whatever Mr. Bozell was carrying?

 2    A.   No.

 3    Q.   Who is Jim Goldsmith?

 4    A.   I do not know.

 5    Q.   Well, let me orient you.  Exhibit 621, which is the first

 6    one we started with when we came back from lunch, is the long

 7    comment from Jim Goldsmith about the sequence of events that

 8    might happen and the Congress and the states' votes and blah,

 9    blah, blah.

10    A.   Yes, I recall.

11    Q.   Do you remember that one?  Right?

12    A.   I do.

13    Q.   Do you understand the 12th Amendment?

14    A.   No.

15    Q.   So you don't -- I'm not faulting you for it.  I had to

16    learn it to figure out what the heck it meant.  But you

17    understand the 12th Amendment of the United States

18    Constitution provides a process by which Congress can come to

19    play a role in selection of the president depending on events

20    that happened in the election.  Right?

21    A.   Like I said, I don't know.

22    Q.   Are you familiar at all with the Electoral Vote Act and

23    the mechanics of how Congress might go about doing that?

24    A.   No.

25    Q.   But in any case, Exhibit 621, that long text message,
```

1     wasn't written by Mr. Bozell, was it?

2     A.   No, it was not.

3     Q.   And his response, very short response, like two

4     sentences, didn't include any language that was like adopting

5     that idea.  Correct?

6     A.   I'd have to look at it again, sir.

7     Q.   You know who Scotty Claiborne is?

8     A.   I do not.

9     Q.   Now, Scotty Claiborne is another person who appears

10    throughout these text messages.  Right?

11    A.   Correct.

12    Q.   And, in fact, I think you testified there was a series of

13    messages just ahead of January 6 where Mr. Bozell was inviting

14    people to come to D.C.  Right?

15    A.   Correct.

16    Q.   Scotty Claiborne was one of those people he invited.

17    A.   Yes.

18    Q.   There were a lot of communications with him about Scotty

19    Claiborne traveling from Florida to attend it.  Right?

20    A.   I don't remember from which state, but I do remember --

21    Q.   You might be right.  Might be California.  Couple of

22    people I get mixed up.

23         But he ultimately did not come.  Correct?

24    A.   I don't know.

25    Q.   You don't recall the text messages about him contracting

1   Covid and not being able to fly?

2   A.   I do not, no.

3   Q.   There were a lot of references -- you recall seeing the

4   word "declass" several times in communications between

5   Mr. Bozell and his brothers?

6   A.   I do.

7   Q.   You have an understanding of the context of what he's

8   referring to with "declass"?

9   A.   I understand what the term "declass" means, yes.

10  Q.   Declassification?  Right?

11  A.   Yes.

12  Q.   Wasn't it true or isn't it true that in the immediate

13  aftermath of the election there was a lot of discussion about

14  whether Trump would declassify certain material that might

15  have to do with the Russian connection from the 2016 campaign

16  or the Mueller investigation or all of these other

17  controversies?  They were talking about that he was going to

18  declassify all of that information and make it public, right?

19  A.   I don't know what they're referring to, honestly, sir.

20       MR. SHIPLEY:  May I have just a moment, Your Honor?

21       THE COURT:  Certainly.

22     (Defense conferring.)

23  BY MR. SHIPLEY:

24  Q.   Do you recall in reading anywhere -- and again, I'm not

25  holding you to a photographic memory of what's in that

```
 1      thing -- you recall ever seeing a message from Mr. Bozell to

 2      Scotty Claiborne about leave your guns at home, it's going to

 3      be a celebration?

 4      A.   I remember him texting somebody to leave guns at home.

 5      I couldn't tell you who he was texting, though.

 6      Q.   Okay.

 7           MR. SHIPLEY:  Nothing further, Your Honor.

 8           MS. AKERS:  No redirect, Your Honor.

 9           THE COURT:  All right.  You may step down, Special

10      Agent Wright.

11         (Witness steps down.)

12         Further evidence from the government?

13           MS. AKERS:  Just would like to confirm, Your Honor,

14      that we have moved into evidence the stipulations including

15      the stipulated testimony of --

16           THE COURT:  Yeah, you have -- I'm sorry.  I interrupted

17      you.  Including what did you say?

18           MS. AKERS:  The stipulations including the stipulated

19      testimony from day one, yesterday.  I just wanted to ensure

20      that that was --

21           THE COURT:  There's a single 13-page stipulation of the

22      parties.

23           MS. AKERS:  Correct.  And then there are four different

24      exhibits for each of the stipulated testimony.  They're

25      referred to --
```

```
 1                 THE COURT:  And transcripts, and you've provided copies

 2       of those transcripts to me.

 3                 MS. AKERS:  Correct.  As well as accompanying exhibits.

 4       I just wanted to make sure all of that was in evidence; we've

 5       moved all of it.  And I believe we've covered that.  I just

 6       wanted to clarify --

 7                 THE COURT:  It is in evidence, and I believe there's an

 8       exhibit number attached to it, but we didn't actually formally

 9       admit it.  Is 900 the joint stipulations, the exhibit number

10       that we should attach to the stipulation of the parties?

11                 MR. SHIPLEY:  I think for the record that makes sense

12       so we know what we're referring to by number.

13                 THE COURT:  Let's do that.

14                 MS. AKERS:  Yes.

15                 THE COURT:  Let's make that Exhibit 900.  And the only

16       copy I have is an unsigned copy, but I assume that by now

17       there's a signed copy?

18                 MS. AKERS:  Yes.  We have a signed copy, and we will

19       submit that -- would Your Honor like that on the docket or

20       just in the evidence folder?

21                 THE COURT:  I think it should be in the evidence folder

22       because it's an exhibit.

23                 MS. AKERS:  Of course.  Some judges --

24                 THE COURT:  So that's Exhibit 900, and it's admitted.

25
```

1                              (Exhibit No. 900

2                                  received into evidence.)

3          MS. AKERS:  Thank you.  And then we've listed Exhibit

4    901, 902, 903, 904 as the stipulated testimony.

5          THE COURT:  They're all parts of 900, but 900 covers

6    all of it.

7          MS. AKERS:  Perfect.  Just wanted to clarify that.

8       And with that, Your Honor, the government rests.

9          THE COURT:  All right.

10     Mr. Shipley.

11         MR. SHIPLEY:  Given it's a bench trial, Your Honor, I'm

12    not sure it's more than I need to do than simply to make a

13    motion pursuant to Rule 29 for judgment of acquittal on all

14    counts based on a failure of proof.  And I know typically the

15    practice is to just take it under advisement.

16         THE COURT:  Bench trial is a little different but I can

17    take it under advisement in a bench trial.

18         MR. SHIPLEY:  If you'd like me to argue, I can, but --

19         THE COURT:  I think you should save that for the end

20    of -- I'll reserve on it, and then we will have to address it

21    further.

22         MR. SHIPLEY:  My concern is just not to procedurally

23    default by not raising it now at the close of the government's

24    evidence.

25         THE COURT:  It's all preserved, and I will reserve on

 1      it without hearing any further argument from either side.

 2           MR. SHIPLEY:  Okay.  So as I represented previously,

 3      I do still expect that Mr. Bozell will testify, but what I

 4      would like to do, if the Court can indulge me, is give me 10

 5      minutes, now that we've heard all the government's evidence,

 6      to discuss the pros and cons with him about whether or not he

 7      should come forward and make that final determination, which I

 8      think he's not obligated to make until now.  And I'd just like

 9      a little quiet time with him alone to go through the things

10      that we've already talked about.

11           THE COURT:  I'll give you some quiet time in the

12      corner, Mr. Shipley.

13        Oh, that sounds like I'm talking to my children.

14        (Laughter.)

15        You can take -- is 10 minutes enough?

16           MR. SHIPLEY:  Yeah.  I think that's fine.

17           THE COURT:  It may wind up being our afternoon break.

18      Go ahead and take that time, and we will resume in about 10

19      minutes.

20           MR. SHIPLEY:  Okay.  Thank you, Your Honor.

21           THE COURT:  Maybe 12 minutes.  I'll give you 12.

22        (Recess from 2:40 p.m. to 2:57 p.m.)

23           THE COURT:  Pouring some water.  I think that gives me

24      an indication of what your answer is going to be.

25           MR. SHIPLEY:  Yes, Your Honor.  Mr. Bozell would like

1      to testify.  So at this time, the defense would call Leo
2      Bozell.
3                  THE COURT:  All right.  Mr. Bozell?
4          LEO BRENT BOZELL IV, WITNESS FOR THE DEFENSE, SWORN
5                          DIRECT EXAMINATION
6      BY MR. SHIPLEY:
7      Q.   Mr. Bozell, how old are you?
8      A.   Forty-four.
9      Q.   What's your educational background?
10     A.   Through college.
11     Q.   And are you married?
12     A.   I am.
13     Q.   How long have you been married?
14     A.   Sixteen years.
15     Q.   Those are the answers that get you in trouble if you
16     don't remember them.
17                 THE COURT:  Yeah.  You're here in trouble, but that's
18     *big* trouble.
19        (Laughter.)
20     BY MR. SHIPLEY:
21     Q.   And do you have any kids?
22     A.   Three.
23     Q.   And boys or girls?
24     A.   All girls.
25     Q.   All still school age?

1    A.    11, 13, 15.

2    Q.    How tall are you?

3    A.    About 5-8 1/2.

4    Q.    Sometimes find yourself in trouble in a crowd.

5    A.    I'm sorry?

6    Q.    Do you sometimes find yourself in trouble in a crowd?

7    A.    I try to stay out of crowds for that reason, yeah.  I'm

8    certainly not tall.

9    Q.    Now, you came to the Capitol on January 6.  Correct?

10   A.    Yes.

11   Q.    Well, you came to Washington, D.C., and ended up at the

12   Capitol?

13   A.    Correct.

14   Q.    Had you been to any other post-election rally or protest

15   prior to January 6?

16   A.    The Jericho event -- Jericho March that took place in

17   D.C., but even before that we were doing local Jericho marches

18   around Harrisburg.

19   Q.    And the reference to Jericho, is that meaningful to you?

20   A.    It's from scripture.  The Jericho marches, they walk

21   around the city for six days and then blow the trumpets on the

22   seventh and the walls fall.  It's a story from scripture, from

23   the Bible.

24         THE COURT:  Let's do this.  See if you can bend that

25   microphone closer to you or move your chair in a little bit.

1    BY MR. SHIPLEY:

2    Q.   I'm not going to get too deep into this, but it does form

3    a little context for some of the things that have been

4    testified about.  Are you a practicing Catholic?

5    A.   I am.

6    Q.   Do you attend mass regularly?

7    A.   I do.

8    Q.   Is your faith a big part of your life?

9    A.   A big part.

10    Q.   Is it a big part of your communications with family

11    members?

12    A.   At least daily.

13    Q.   And the family of your upbringing, how many siblings do

14    you have?

15    A.   I'm one of four boys.  Three brothers and one sister.

16    Q.   And the three brothers are who?

17    A.   Older brother Dave, younger brothers Joey and Reid.

18    Q.   And are you close with them still to this day?

19    A.   Incredibly.  Incredibly close with all of them.

20    Q.   You in communication with them regularly?

21    A.   I would think daily at least, throughout the day

22    oftentimes.

23    Q.   Now, the Bozell name is a name that has some prominence.

24    You grew up with that.  Right?

25    A.   Correct.

1    Q.    Won't you explain that just briefly.

2    A.    My father's had a public policy operation for 31 years

3    now, something to that effect.  He's been involved with

4    influencing politics around the D.C. area since the Reagan

5    administration.

6    Q.    And that's Brent Bozell, who's in the courtroom and has

7    been here both days.  Right?

8    A.    Correct.  Correct.

9    Q.    And would it be fair to say you grew up in a conservative

10    political household?

11    A.    Correct.

12    Q.    Have those same political beliefs been part of your life

13    into adulthood?

14    A.    Yes.  Not entirely, but yes.  I think it's a fair

15    perception.

16    Q.    Have you ever voted for a Democrat?

17    A.    Yes.  I voted for Tom Wolf, the second term, in

18    Pennsylvania.

19    Q.    Presidential politics, though, have you typically

20    supported the GOP candidate?

21    A.    No.  I wrote in my high school buddy twice.

22    Q.    Okay.  I'm sure he appreciated it.

23    A.    He does.

24    Q.    But Donald Trump in 2020.  Were you a Donald Trump

25    supporter?

1    A.    I was.

2    Q.    Living in Pennsylvania, did that influence your outlook

3    on the 2020 election?

4    A.    Certainly.  I moved to Pennsylvania about 11 years ago,

5    and within Pennsylvania politics, election issues are talked

6    about.  I didn't know anything of this type of stuff till I

7    got to Pennsylvania.  2016 was a hot topic in terms of

8    potential fraud and the election.  And frankly, it was -- I

9    would suggest it was even doubted by Republicans to some

10   extent.  When you have elections that close like it was in

11   2016 there's a lack of confidence.

12   Q.    Who won the Pennsylvania presidential election in 2016?

13   A.    Trump.

14   Q.    Donald Trump?

15   A.    Right.

16   Q.    But it was controversial.

17   A.    Correct.

18   Q.    And what about 2020?

19   A.    Same.

20   Q.    Controversial?

21   A.    Correct.

22   Q.    But who won 2020?

23   A.    Trump.  I'm sorry.  Biden.

24   Q.    Now, in 2020 did you follow the events in the aftermath

25   of the election in the media?

1    A.    I did.

2    Q.    Was it a subject of conversation between you and family

3    members?

4    A.    It was -- yes.  Certainly.  More -- yes.  Certainly.

5    Q.    Was it a topic of conversation among acquaintances or

6    friends in Pennsylvania?

7    A.    Yes.

8    Q.    Was it a daily topic of conversation between you and

9    like-minded believers in Pennsylvania?

10   A.    I would say from November 3rd on, yes.

11   Q.    Now, in November of 2020, are you traveling about freely?

12   A.    Yeah.  Trying to consider where Covid was at the time but

13   I believe so.

14   Q.    But did Covid have you spending more time in front of the

15   computer?

16   A.    Sure.  Certainly, you couldn't do half the things you

17   used to be able to do.  No question.

18   Q.    Let's move ahead to December 2020.  Now we're several

19   weeks removed from the actual event of the election.

20   A.    Sure.

21   Q.    In December of 2020 as a general proposition, were you

22   satisfied with the explanations that were coming out of

23   Pennsylvania officials with regard to the vote count and

24   tally?

25   A.    Definitely not.  There was a -- I think it was December

18 there was a report due on the election, and there was a lot
of excitement in Pennsylvania when that executive order was
signed that -- and it wasn't just from right wingers.  But we
finally get an investigation into our state and have
confidence in what was going on.  It was a both side kind of
thing.  But that December 18 came and went and ultimately that
report was delayed, and certainly in Pennsylvania that added
to frustration.

Q.   And do you recall whether or not -- or the circumstances
of the state of Texas suing the state of Pennsylvania?

A.   Of course.  Yeah.  Of course.

Q.   What do you remember of that?

A.   The sentiment in Pennsylvania, and certainly with me --
well, with, you know, people I speak to in Pennsylvania and
certainly with me was a little bit of dissatisfaction over the
tenets of the case because we really wanted an investigation
into the state.  But, you know.  We'll take what we can get, I
suppose.

Q.   But that was in the Supreme Court.  Right?

A.   Right.

Q.   Let me ask you this.  Let's just get this out of the way.
Are you a member of the Proud Boys?

A.   No.

Q.   Are you a member of the Oath Keepers?

A.   No.

1    Q.   Are you a Three Percenter?

2    A.   No.

3    Q.   Are you a member of any kind of militia organization that

4    came to the Capitol on January 6?

5    A.   No.  I'm not sure I'd fit in.  I own one firearm that's

6    specifically designed for home protection.

7    Q.   Had you been to other political rallies connected to the

8    2020 election besides December 12?

9    A.   I'm sorry.  At the -- have I been to rallies at the

10   Capitol?

11   Q.   No.  I'm just talking about your involvement in politics

12   as a general proposition.  You said you came on December 12

13   for the Jericho rally.

14   A.   Mm-hmm.

15   Q.   Do you recall attending any other rallies or events prior

16   to December 12?

17   A.   The Jericho marches around the Capitol and Harrisburg

18   would have been the only ones.  So at noon every day there was

19   a group of us that would show up.  There was a Catholic group

20   and a Christian group and we would sort of split because we

21   might pray differently.  And so we'd pray walking around the

22   Capitol.  I'd bring my dog and we'd get our exercise and we'd

23   get our steps in.  That was effectively everybody's lunch

24   hour.

25        And then we'd have a banner.  You know, we really loved

1    it.  And we had a banner that was about 30 inch by five feet

2    wide, read "Christ is king" across the front of it, so we'd

3    all just sort of walk around and say our prayers and be on our

4    way.  Take about an hour.

5    Q.   Now, you heard the testimony earlier that the government

6    has found text communications with you suggesting that you

7    were planning to come to the Capitol as early as December 22.

8    A.   Correct.

9    Q.   What was your plan?  Why were you actually coming to

10   Washington, D.C.?

11   A.   So at that point, on December 22, it was nothing more

12   than, hey, we need to be there.  There's some, you know, it's

13   not a time to sit around and not be counted.  I want to be

14   counted.  That changed by the 26th.  I was in communiqué with

15   Jesse, and we started to have a thing to do, a plan to put

16   forth in terms of hey, we could do something.  We could

17   actually add entertainment to this.

18   Q.   Okay.  Let's stop there.

19   A.   Sure.

20   Q.   Because there's text communications about you and Jesse

21   and music.

22   A.   Correct.

23   Q.   What was that all about?

24   A.   So Jesse and I had met a couple times --

25   Q.   Who is Jesse?

1   A.   Jesse Hughes is the front man for -- plays guitar and

2   sings for Eagles of Death Metal.

3   Q.   Eagles of Death Metal.

4   A.   Eagles of Death Metal.  He was -- I don't know if anybody

5   remembers, but four or five, six years ago, there was a

6   terrorist attack at a concert in Paris, and it was his band

7   playing, and I want to say 32 people were killed there, and he

8   was shook by it.

9        So he and I, after multiple shows, had spent hours

10   talking kind of about that and other things, but had just sort

11   of connected.  And so when I came down -- you know, 22nd,

12   decided I really wanted to go to the Capitol, Christmas, and

13   then come out of Christmas, and like I said, I'm the father of

14   three, three days before Christmas, that's all you're doing.

15   And then we come to the 26th and I reach out to Jesse.

16   Q.   Let me ask you the obvious question:  Are you a fan of

17   the band, Eagles Death Metal?

18   A.   Yeah.  I'm a total fanboy of the Eagles of Death Metal.

19   Yeah.

20   Q.   Would you call that your favorite --

21   A.   Not my favorite, but top three.  And he is one of the

22   kindest, warmest people I've ever been around.  So it's a

23   pleasure to be around Jesse.

24   Q.   And does he have a nickname?

25   A.   Boots Electric.

1   Q.   Boots Electric.  So the references in your text message

2   to Boots are not about boots on the ground --

3   A.   Boots is Jesse.  Jesse is Boots.

4   Q.   What did you arrange for Jesse?  What actual arrangements

5   were made?

6   A.   So, it was tricky.  Having been to the Jericho march,

7   there's music, and you don't quite know how.  And so we were

8   trying to have a street show of some kind.  And I apologize,

9   I don't know the names of different areas in the town like

10  some people in the room may, but there's a sort of stage area

11  that's down the street from the Capitol and the -- I knew

12  it -- from the Supreme Court, down the street from the Supreme

13  Court, where I've seen people perform before.  Along that

14  street, you know, people have a generator, a guitar and a

15  speaker and play.

16      So my thought was it's perfect because he's a simple

17  band.  Eagles of Death Metal is a two-piece band.  The

18  drumming is very simple, and really it's sort of -- it's more

19  about Jesse having fun with the crowd.  It's perfect for the

20  situation.  Perfect.  And so I thought, he's going to come if

21  we can -- we'll be able to find a drummer, which was my little

22  brother Reid.  If I could find a bassist, great.  If not, he

23  doesn't need one, and we'll be able to plug-and-play, and we

24  started working on equipment we could get there.

25      And I've never done something like this before.  But sort

1    of small -- I don't know how to explain this but sort of my

2    mind was sort of small on this.  I wasn't coming with six-foot

3    speakers.  I didn't think that far.  My thought was he'd be on

4    a street corner somewhere, playing like he was brand-new to

5    the music scene or something.

6    Q.   Through family connections, did you have the ability to

7    contact the organizers of the rally to suggest this?

8    A.   Actually, I was able to contact organizers myself just by

9    direct messaging people and saying, hey, we got a rocker

10   coming in.  If anyone wants entertainment, I have a rocker

11   coming in.  Who is coming in?  Boots Electric.

12   Q.   In addition to inviting Jesse -- which is in your text

13   messages that we saw this morning, right?

14   A.   Right.

15   Q.   The reference to "Jesse" is Jesse Hughes.  -- did you

16   invite other people?

17   A.   You mean to be outside -- within the whole sort of music

18   idea?

19   Q.   Not musicians.  Did you invite other people to come see

20   Jesse?

21   A.   Oh, absolutely.  Yes.  Yeah, I'd invite everybody to go

22   see Jesse.

23   Q.   Were you inviting people to come see Donald Trump?

24   A.   I would say before the Jesse introduction into the plan.

25   Q.   Which was the motivating factor for you sending

1    invitations?

2    A.    I would rather go see Jesse Hughes than Donald Trump 10

3    out of 10 days, no two ways about it.  I don't necessarily

4    expect everyone I invited to feel the same way, but.

5    Q.    And did some people come in?

6    A.    Just my -- just two brothers.

7    Q.    Now, you traveled down from Hershey to Washington, D.C.,

8    on what day?

9    A.    On the 5th.

10   Q.    Did you bring something with you?

11   A.    I brought the amp and the microphone for Jesse.

12   Q.    So when you traveled down on the 5th, you were bringing

13   equipment for Jesse.

14   A.    Correct.

15   Q.    What happened?

16   A.    I get into my folks' house or area -- we may have met at

17   the restaurant -- a restaurant by their home.  And by then I'd

18   received a call from him that he blew a fever at the airport

19   and they wouldn't let him board.

20   Q.    He couldn't fly.

21   A.    Couldn't fly.  So at this point, I think it was said

22   earlier testimony, Scotty was not coming because of Covid, and

23   now --

24   Q.    Scotty is who?

25   A.    Scotty Claiborne was not coming because he had Covid and

1   couldn't get on a plane.  Jesse is now not coming because of

2   the fever he blew at the airport.

3   Q.   And explain -- Scotty Claiborne turns up in a lot of your

4   text messages as well.  Right?

5   A.   Right.  Scotty's my godson.  He and I have been friends

6   since high school.  He converted to Catholicism in college.

7   So he's my godson.  He's, you know, one of my best friends.

8   He's a family man.  Good guy.

9   Q.   Did you still go?  Even though now you knew on the night

10  of the 5th that Jesse Hughes was not coming, did you still

11  plan to go to the rally the next day?

12  A.   I was already there.

13  Q.   When you say you were already there, what do you mean?

14  A.   I was already in town.

15  Q.   In Northern Virginia?

16  A.   Correct.  So I was already in town.  It's -- yes.  The

17  easy answer is yes.

18  Q.   And you ended up going, obviously.  Did you go alone?

19  A.   No.  I went with my mom.  My mom and two brothers.

20  Q.   And did you all travel together?

21  A.   We took separate cars.

22  Q.   Why was that?

23  A.   Because I was going to Pennsylvania.  After the rally I

24  was going home.

25  Q.   You had come in the day before, right?  Had you come into

```
 1    the District of Columbia on the evening of the 5th?

 2    A.   Yes.

 3    Q.   For what purpose?

 4    A.   And I apologize; I made a mistake.  I actually came in to

 5    D.C. on my way to my parents' house.  So I went to D.C., met

 6    my little brother, we went and sort of scoped out the area

 7    where he could play.  In D.C. it was raining and cold.  And

 8    then we took off and went and met my folks at the restaurant.

 9    So six o'clock or so.

10    Q.   So did you park at a particular place on the evening of

11    the 5th?

12    A.   Yeah.  Again, I'm going to struggle to describe it, but

13    it was -- didn't cost anything.  It was on a side street that

14    was, I don't know, 200, I would say 200 yards from the Capitol

15    and Supreme Court.  So I parked there.  I had parked there

16    because I'd parked there the exact -- I'm sorry.

17         Let me back up.  For the Jericho march I parked in this

18    spot about 250 yards away.  On the evening of the 5th I come

19    into town and I parked closer to where -- we wanted to see the

20    parking over in this area in case we had to unload equipment.

21    On the 6th we ended up parking back over by the Jericho march

22    spot which was, like I said, about 250 yards from the Supreme

23    Court.

24    Q.   Why not park closer to where the rally was going to be at

25    the Ellipse?
```

1    A.   I knew I could park there.  I felt confident -- I felt

2    confident we could go there and nothing would happen with the

3    car.  It had been safe there once before.  I don't mind the

4    walk.  I think it was probably, to the Ellipse was probably a

5    mile to a mile and a half, something like that.  I'm a walker

6    anyway.

7    Q.   All right.  Now, so then the next morning the group of

8    family members come, park in the same place, and walk to the

9    Ellipse.  Were you early or late in the morning?

10   A.   We were early morning, 7?

11   Q.   Before the crowd.

12   A.   There were people.  There were people.  There was --

13   Q.   Did you stay for the entire event?

14   A.   No.  It's cold.  And frankly it was boring.

15   Q.   Did you stay to hear former President Trump speak?

16   A.   Yes.  Until about -- I couldn't tell you how much longer

17   he spoke after we left, but again, it was cold, and it was

18   boring.

19   Q.   So you -- it was cold and boring.  That's a bad

20   combination.  So you left in the middle of the speech?

21   A.   I would guess toward the end.  My best guess is 12 to 15

22   minutes before it ended.

23   Q.   When you left, where were you going?

24   A.   We were going to go walk back in the direction toward our

25   cars, which were past the Capitol.

1    Q.   Were you going to the Capitol for a protest based on

2    anything you heard at the rally?

3    A.   We were certainly looking forward to some sort of update

4    that was going on, but as far as I was concerned, I didn't

5    know of protests until Trump had mentioned it at his speech.

6    Q.   All right.

7    A.   So the Stop the Steal protests and such, my understanding

8    was the night before.  And so -- and I understand there was

9    some organizing beforehand until I guess Trump had sort of

10   taken it over.  That was my understanding at the time.

11   Q.   Okay.  But when you left the Ellipse walking east, in the

12   direction of the Capitol and your car, where was your

13   destination?  Were you going to the Capitol or were you going

14   to your car?

15   A.   The first stop was Capitol.  My car was past.

16   Q.   Did you plan on stopping at the Capitol?

17   A.   On the way there I actually said to everybody, let's go

18   see what's going on at the Capitol on our way to the cars.

19   Q.   And when you arrived at the Capitol grounds, say right

20   outside this building, what did you see?

21   A.   Not much.  So we come to the grounds and we just keep

22   walking, so you're just, you know, following the people in

23   front of you.  Sort of like a music festival kind of thing in

24   the sense you're just following the people in front of you.

25   So we walk up until we can't walk anymore, effectively, or

1    comfortably anyway and, you know, it's -- you're on the grass

2    of the Capitol and you're looking at a lot of concrete.

3        So we came and we just sort of stopped and at that point

4    my -- my brother has some odd sort of health things.  He

5    stopped and I think he had a book bag and he started pulling

6    out food, tuna, something like that.

7    Q.   Okay.  So --

8    A.   So we kind of stopped.  We sort of planted ourselves at

9    this spot.

10   Q.   All right.  Now, in the aftermath of the event -- so

11   starting on the 7th and thereafter -- did you see videos of

12   violent clashes on the Capitol grounds?

13   A.   Yeah.

14   Q.   When you went to the Capitol grounds, you went through

15   the west side.  Right?

16   A.   Correct.

17   Q.   Did you see -- did you witness any of that?  Were you

18   aware that had either happened or was happening?

19   A.   So when we -- you mean when we approach?  We could hear.

20   We could hear noise.  We could hear the bangs, the flash bangs.

21   That was our first sort of what's going on here.  So again,

22   we're in this -- at this spot and looking around, and tough to

23   see much of anything.  And then I could see up, perked up on a

24   concrete ledge of sorts, my banner.  So I can see my banner

25   being hung up, the "Christ is king" banner that I march

1    behind, the Jericho rally banner.  I knew that my prayer team

2    was going to be there, and I see the banner.  And I go, oh,

3    it's there.

4        So I said to my mom -- I said, I have to go; I promised

5    them I'd say hello.  Now, this group is probably half

6    55-year-old women and older and, you know, some 20-something

7    kids and 30-something --

8    Q.   Now, is this prayer group associated with your parish?

9    A.   No.  No, it's just sort of a -- no, it's just the people

10   that had been -- it's a prayer walking group that goes around

11   Harrisburg.

12       So I see my banner, and I told my mom, I said I have to

13   go say hello; I promised them I would say hello.  So that was

14   the point where I separated from my family.

15       So you sort of have to take a bit of a path to get there

16   to the banner.  And so when I get there, the banner is I'm

17   going to guess 30 feet away from the steps which we'll be

18   highlighting soon, but the steps next to the scaffolding.  At

19   this point you could see stuff.

20       What I could see now that -- what I come to find, first

21   of all, it's not my prayer group.  It's the leader of our

22   prayer group's son who's 19 years old or so, and with somebody

23   else, a friend of his, who's holding up the banner.  So what I

24   see is, looking up, I see people with it looked like paintball

25   guns, shooting down toward the crowd.  And so I go up to the

1    banner and stand next to my friend's son, and said you gotta

2    get out of here.

3    Q.   Now, at some point -- we've seen the video -- that you

4    end up in the area of the northwest side of the -- or the west

5    side of the building.  Right?

6    A.   Yeah.

7    Q.   I'm talking about where the stairs are that at some point

8    you ascend those stairs and end up on the top.

9    A.   Okay.  So --

10   Q.   I just want to orient you --

11   A.   Yes.

12   Q.   -- that that's what I want to talk about now.

13   A.   Yes.  Yes.

14   Q.   Okay.  How did you get to that point?  How long were you

15   there?  And what did you do?

16   A.   Okay.  So there was actually two times that I go into the

17   scaffolding area.  So with the mayhem going on and what looked

18   to me -- well -- with the mayhem going on, there's people on

19   the ground looking rough but ducking rubber bullets or

20   actually being hit by pepper balls, whatever it was, and the

21   bangs and the bangs and the bangs.

22       I thought the bangs were coming from inside the

23   scaffolding, and having no clue what they are, and just the

24   noise I thought was echoing out of the scaffolding.  So out

25   of a desire to see what's going on for myself, I go and climb

1    into the -- might be a couple -- might be a step and then into

2    the scaffolding area.  So I go into the scaffolding area.  And

3    there's a picture that was taken from my phone and looks up

4    the stairs and there's 10 cops, 10 police officers there, and

5    everything's relaxed.  Clearly the bangs were not happening

6    in this area.  There's some screaming and yelling coming from

7    down below, but there's not -- the police officers were

8    fairly, you know, leaning up against things and relaxed and

9    watching --

10   Q.   Now, this is your first trip --

11   A.   My first trip.  Yeah.  So I had -- still puzzled as to

12   why the munitions are being deployed.  I couldn't understand

13   that.  Now, granted, you can't see a whole ton from inside the

14   scaffolding.  In fact, I didn't know until after the 6th that

15   there was anything that had happened on the other side of that

16   area, where apparently it was a mess.

17        So I had -- there's I don't want to say barriers but sort

18   of the nylon, the rails that hold the nylon up certain steps,

19   and police officers at different areas.  And in an attempt to

20   see who's in charge and to see who I could talk to, I ended up

21   having brief conversations with police officers on --

22   throughout -- kind of earned some trust to the next level, you

23   know, it might be two steps and then to the next level.

24        And then ultimately, as I'm up there I'm having this

25   conversation -- now, granted, it's a yelling conversation

1    because you can't hear anything -- with the gentleman who was

2    in the video with me on the steps who's got the biker helmet

3    who appeared to me to be in charge.

4    Q.    In the blue bicycle helmet?

5    A.    The blue -- I'm sorry.  Bicycle helmet, not biker helmet.

6    The blue bicycle helmet.  He just had the presence.  He just

7    seemed sort of stoic and seemed to have command.  And so, you

8    know, asked, why are you doing this?  Why are you doing this?

9    These people support you.  Why are you shooting at them?  He

10   was very stoic, didn't give me really an answer.

11       But I stand a step down from him, he's behind what

12   ultimately became the bike rack barricade.  So just to give

13   you a point of reference where that was.  The bike rack

14   barricade, he's standing behind it, I'm one step in front of

15   him but still able to have a loud -- well, you have to project

16   your voice to hear anything, to be able to have a conversation

17   with him.  So -- and I wasn't the only one, you know, another

18   protester or so came up, and down, that kind of thing.

19       So, ultimately, I suppose I'd earned his trust and said

20   can I just come up with you so you can hear me.  And he says

21   yeah, yeah.  So I go under -- like I said the rail is sort of

22   there, kind of wiggle under the rail.

23   Q.    Now, this is not the video where we see you come out from

24   the tent.  This is before then?

25   A.    This is well before.  Right.  So I go and I'm now behind

1    the barricade with him, standing next to him, and in fact

2    somebody yells "get back" to me, and I just turned and he puts

3    his hand up and does like -- you know, he's with me, he's fine

4    kind of thing.  I had encouraged him, I said to him, you've

5    got to clear out the Capitol.  You have to clear out the

6    Capitol.  You have to evacuate the Capitol.  There are so many

7    people out there.  I assumed he hadn't seen it.  I had been

8    outside the scaffolding.  You can see the masses on their way.

9    So you have to evacuate the Capitol.

10   Q.   Was the scaffolding that had the white tarp on it, was

11   that a visual barrier --

12   A.   Yes.

13   Q.   -- from where the police were to seeing the crowd, at

14   least in that proximity --

15   A.   Yes.

16   Q.   -- block or location?

17   A.   Yeah, we were in a box.  You could see sort of out the

18   bottom, and I believe there was a rectangular opening at the

19   front, you know, looking down.  But yes, it was very much a

20   barrier.  You couldn't see much.  I thought it was useful to

21   report to him.

22   Q.   Was there an incident in that time frame while you were

23   there where another protester became incapacitated?

24   A.   Yeah.  So now, again, at this point I'm behind this

25   railing with him, and there was another -- a protester who had

1    been in the area a couple steps down and had been fine and

2    acting manageable, and then goes into a coughing fit and ends

3    up on his knees.  And so he -- the officer here runs up the

4    stairs, I follow to -- him to like the bottom of the stairs,

5    and he grab -- somebody -- he says water, somebody throws him

6    a water, and he comes down, turns around, he hands it to me

7    and I run down to the gentleman who's having a, I don't know,

8    asthmatic attack or had taken in -- there's lots of tear gas

9    and I'll say chemical something -- I don't know what it was --

10   but coming up through the air.

11        And so I go over and, you know, take it and run over to

12   him and bend down and, you know, pour water on his face and in

13   his mouth.

14   Q.   All right.  Now, at some point this first trip comes to

15   an end.  What'd you do when your first time up there ended?

16   A.   So I'm down pouring water on his face and -- and in his

17   mouth.  And he gives me this look of satisfaction like, you

18   know, thank you.  And just then I get hit with what I imagine

19   was a pepper ball or a rubber bullet in my arm.

20   Q.   It hurt?

21   A.   Yeah.  It hurt.  That said, I can't imagine, had I not

22   been there, I mean, if he was -- now, don't get me wrong.

23   Obviously, why would he be shooting a rubber bullet at this

24   guy who's having an event here on the ground, but in my mind

25   I thought, geez, good thing it hit my shoulder and not the

1     gentleman who was, you know, his head was very low.

2         So that happens.  Now, back up to the gentleman in the

3     biker -- the guy in the bike -- if I remember correctly, the

4     guy with the bicycle helmet.  I said, why did he get shot at?

5     You know, he gives me this I don't know.  And so, okay.  So at

6     this point, I leave.  This is my first time in there.  I leave

7     and I go back down, kind of lick my wound.  And there's video

8     of me when I'm sort of gazing at the crowd.  And now with my

9     glasses on, gazing at the crowd and, you know, at this point

10    there's just a sea of humanity that has come into the area.

11    Q.   Now, you had left your family behind when you went to go

12    look for the prayer group, right?

13    A.   Correct.

14    Q.   Were you making any efforts to try to figure out where

15    they might be?

16    A.   They were not where I left them and I could not see them

17    anywhere.

18    Q.   Okay.  So now, there was a video that was played earlier

19    of you, a bike rack had been turned upside down or been turned

20    on end and was being used as a makeshift ladder to climb up.

21    You remember seeing yourself do that?

22    A.   Yes.

23    Q.   And there was a white pole.  You remember that white

24    pole?

25    A.   Yes.

1    Q.   What was the white pole?

2    A.   I have no idea.  I have no idea what that was.  I

3    remember better the second one where I hand something to

4    somebody.  The guy says, hey, hand this to him, and I did.

5    Q.   The first time you were up at the top, did you see any

6    fighting?  You see any instruments or weapons being used

7    against any of the police there?

8    A.   Not inside the scaffolding, there was nothing like that.

9    Q.   So did you -- did it even cross your mind that this might

10   be handed up to be some kind of weapon to be used against the

11   police?

12   A.   I don't know what it could be used for.  No.  It was more

13   like, hand me that, you know, and I handed it to the guy.  It

14   was --

15   Q.   Now, you had --

16   A.   I was surprised to even see it in the discovery

17   suggesting -- I didn't recall it.

18   Q.   Now, you had no weapon on you, right?

19   A.   No.  I had nothing.  No.

20   Q.   Didn't bring any kind of gear that would be either

21   self-defense or combat equipment.

22   A.   In fact, I'm wearing my mom's gloves she'd given me.

23   No, I'm wearing a sweatshirt, a hoodie.  I was hoping --

24   Q.   So now let's talk about your second trip back up.

25   That's some of the video we saw.  Right?

```
1    A.   Correct.  Yeah.  So the second --

2    Q.   And let's talk --

3    A.   So second trip --

4    Q.   At any point up until that second trip, when you begin to

5    go up through the scaffolding a second time to get back to the

6    place you had been, had you moved any barrier in order to gain

7    access to someplace you weren't supposed to go?

8    A.   The second trip?  No.

9    Q.   Anytime before the second trip?

10   A.   No.  Nothing got moved.  It was -- it was easy.  The

11   rails that hold the nylon are very open.  You don't have to be

12   very nimble to --

13   Q.   Well, let me be more clear.  When you walked on the

14   grounds --

15   A.   No.

16   Q.   -- up to the building, did you encounter any barriers --

17   A.   No.

18   Q.   -- that you had to overcome?

19   A.   No.

20   Q.   The first time up to the scaffolding did you have to

21   overcome any barriers to get up to where the police were?

22   A.   No.

23   Q.   So now we're talking about the second time up there,

24   which is what we see on the video.  Describe your recollection

25   of that second trip up and how it ended.
```

A.   So I'm back down and it's sort of this what are you going

to do?  Now -- the thing you promised to do, you've not done

now, which is stay with your family, stay with your mom

specifically.  And what do you do?  And so there's this moment

on this concrete area where I'm really contemplating, what am

I going to do?

I'm incredibly afraid.  I had seen the police officers up

at the top of the stairs.  I think I'm the only one that's

seen them, and I can just imagine they're armed and my fear

was if people were going to go up there that way, that there

could be -- I don't know how these things are handled.  I

don't know anything about law enforcement.  My fear was the

worst, that lives would be lost.

Q.   So now you said that on your first trip up there,

standing where the police were, the tarp was a barrier for

anybody to see the -- for the police to see the number of

protesters down below.

A.   Yes.

MS. AKERS:  Objection.  Leading.

THE COURT:  Overruled.  He's repeating the testimony --

BY MR. SHIPLEY:

Q.   So now when you're back a second time, and we see the

video of you starting to pull the tarp away, what's your

motivation?  Why are you pulling that tarp?

A.   So I go back up to the top expecting to see bicycle

1    helmet officer again, and he's not there.  And now the -- it's
2    a depleted force, and you see the one young officer who's
3    trying to hold the bike rack as best he can.
4    Q.   Let me just ask you a simple question.  Had it become
5    more combative your second time?
6    A.   Most definitely, without question.  Now it had filled.
7    Now there's people climbing the scaffolding.  There's a
8    purpose to what's happening now.  And the police force was
9    depleted.  This was not the same, numbers-wise, group of
10   people that had been there.
11        So I go scurry right up into this area in hopes of
12   finding the officer.  In my mind I might be the only one here
13   that has a rapport with a police officer, and that may come in
14   handy.  So my hope was to tell people there's cops up there
15   that you -- that are waiting for you in the event, something
16   to that effect.  You can't hear a thing.  Earlier you could
17   hear better.  You might have to yell, but you could hear
18   better.  Now it's a roar.
19        So just trying to think quickly on my feet, next best
20   thing was to give them some visibility so they could see, so
21   that the police officers which were on the other side could
22   see all the protesters, and so the protesters inside the
23   scaffolding could see that it's a lot more than one police
24   officer behind -- at this one spot with the bike rack.
25        So I start pulling with all my might, trying to remove --

1    if you watch the video, you'll even notice that I pull it with

2    plenty of room for someone or me or anybody to get in and

3    advance if that was the goal.  I was continuously pulling it

4    and pulling it in hopes that I could actually provide

5    visibility for people.

6    Q.   Now, had you wanted at that moment to get behind the

7    police line, was there a bike rack barrier preventing you?

8    A.   Well, there was the nylon rail thing and then next to

9    it was the bike rack.

10   Q.   But between the two there was room for you to get

11   through?

12   A.   Oh, yeah.  You can get skinny and get through it, yeah,

13   no question.

14   Q.   So at any point while you were doing that, if what you

15   were trying to do was to step through, you could've just

16   stepped through.

17   A.   Right.  If you watched, the bike rack repeatedly gets

18   moved, and then he -- it kind of gets reset lots of times, or

19   a few times.  So there's plenty of opportunity if I wanted

20   to -- if the goal was to scooch through there, there's plenty

21   of opportunity to do so.

22   Q.   Now, eventually you did, right?

23   A.   At this -- when I did -- at this point things had kind of

24   gone toward the stairs in terms of the other protesters.  And

25   so I had looked outside the nylon, see my -- the police

```
 1    officer that I had built a rapport with, and then come through

 2    that end of it, and I start walking through.

 3    Q.   Okay.  And that's where we see in the video we just saw a

 4    half hour, 45 minutes ago, you emerging from under the tarp?

 5    A.   Correct.

 6    Q.   I'm going to -- that's Government's Exhibit 1003.  I'm

 7    just going to play the first 30 seconds or so and then have

 8    him continue.

 9         (Video played.)

10    A.   I'm sorry.  Do I give a description here?  Can we go to

11    the very beginning?

12    Q.   This is the very beginning.

13    A.   Thank you.  Okay.

14         (Video played.)

15         So you can see me come through in the yellow.

16    Q.   Let me stop you.

17    A.   Sure.

18    Q.   That's not the exact same location where you were pulling

19    on the tarp?

20    A.   Um...

21    Q.   Well, if you have a recollection.  If you don't, you

22    don't.

23    A.   I've gone back and forth on that.  So I don't --

24    Q.   You're not certain.

25    A.   I'm not certain.
```

1    Q.   But that's you coming out from underneath the tarp,

2    right?

3    A.   Correct.

4    Q.   Now, what happened there?

5    A.   I'm sorry.  I missed it.

6         (Video played.)

7         So I come out -- go ahead.  I come out and immediately a

8    law enforcement officer tries to push me back, right here.

9    Q.   Do you remember that?

10   A.   Oh, yeah.

11   Q.   What happened next?

12   A.   My guy with the bicycle helmet immediately comes and

13   tends to me and, you know, does the hey, he's okay, sort of

14   vouches for me.

15   Q.   So that's the bicycle helmet officer you're talking about

16   that's wearing like the royal blue?

17   A.   Correct.  Who I thought was in charge.  I have no idea.

18   He tends to me and then helps me down.

19   Q.   Now, from this point forward what happens?

20   A.   If you continue to watch, there's law enforcement up here

21   in this area with me.

22   Q.   With your finger, you can draw on the screen.

23   A.   Okay.  There's law enforcement up here in addition to the

24   officer with the bicycle helmet.  So I come out and we're

25   talking.  You can hear much better here than you could inside

1       the scaffolding.  So we're able to have somewhat of a

2       conversation.  You can keep playing.

3           Hello, how are we doing here?  What's the -- you know, at

4       this point I've been vouched for and so there are people

5       willing to have conversations with me.  And in a moment

6       bicycle helmet and I will sort of reconnect if I remember

7       correctly.

8           So just sort of lock eyes and then we move.  But at this

9       point you can -- behind the flower pot you can see the two of

10      us.  You can't see me.  You can see him half looking at me and

11      I'm sort of looking at him and we engage in a conversation

12      here.  You'll see us sort of go back and forth I believe once.

13      I'm looking, looking, so stop if you don't mind.

14          So I had come over to this area, and he had said, you

15      know, we've got this held pretty good.  I said great.  So, you

16      know, we were looking around and said you can see that this

17      was a better spot, obviously, than the scaffolding, which is a

18      wider opening, much -- far less predictable, etc.

19          So here, if you can see where I'm looking, it's very

20      difficult to tell but it's almost like I'm looking at the

21      camera.  So if somebody could maybe correct me if I'm wrong,

22      but that camera would have been perched up on the wall looking

23      at me.  So here, there's law enforcement here, but again, as I

24      stated earlier --

25      Q.   Okay, wait.  Use your finger so we can see, when you're

1    saying "here," we know what you're talking about.

2    A.    There's law enforcement in this general area.  The

3    officer who testified yesterday, he was, if I remember

4    correctly, a little bit further up the stairs, and then of

5    course there were more at the top of the stairs.

6         So I suggested to him, you know, why isn't this just the

7    spot.  There's also police up in this area on the wall, okay?

8    So I've watched this, you know, 15 times at this point.  If we

9    can go back to the wave.

10   Q.    I'm going to let it run for about 30 seconds, and to the

11   extent you remember the exchange and what you were doing, you

12   can testify about it.

13   A.    Right.

14         (Video played.)

15         All right.  You can see people looking down, looking

16   down, looking down.  Can I pause it?  Pause it.  Can we pause

17   it?  Mr. Shipley, can we pause it, the video?

18   Q.    Oh, I'm sorry.

19   A.    I'm sorry.  Just to give some context as to what you see

20   here, what could be seen here, there's an area that's sort of

21   concrete and such that sort of bumps out that I don't know

22   what it's called but I think the terrace up here, there are

23   police officers up in this area, but basically just

24   spectating, four or five of them up here spectating.

25         I can't see down below.  I'm not tall.  It's an issue.

1    So you even see -- and I don't like heights.  So at some point

2    I lean over, but it's just simply not with any sort of

3    commitment.  In fact, it had been mentioned to me that -- I'd

4    asked, what was the roar.  There had been a mention of

5    somebody falling off of this area.  So here -- so let's play.

6    I hope I didn't miss it.

7         So here we are talking.  Here we are talking.  Talking,

8    talking, talking.  He's pointing at something.

9    Q.   So now you're behind the flower pot so we can't see you.

10   A.   Correct.

11   Q.   But this officer is talking to you while you're behind

12   the pot.

13   A.   Right.  This is our second encounter, or third if you

14   count, you know, me helping the guy and then coming back up

15   to him, helping the guy with the water who was coughing.

16        Well, we'd have to go back, I suppose, to show it, but

17   the wave, if you look, I'm looking in the camera area.  I'm

18   not looking down.  And it's not a wave, it's a wave.  So I'm

19   looking -- like I said, there's police officers perched up at

20   the top if I remember correctly.  I remember correctly.  And

21   I'm waving like this.

22        If numbers -- if numbers were stronger here -- again,

23   please keep in mind, I have no idea what's going on on the

24   other side of this building.  No clue.  I have no idea what's

25   going on in the front other than what he has told me, that

1      they'd started to fill into the front.  And so my thought is,
2      gee, you could -- this could stop here.
3           So we could continue.
4      Q.   Okay.  Let's just let this run through until we get to
5      the point where the crowd comes forward.
6      A.   Okay.
7           (Video played.)
8      Q.   Now, let me ask you, do you remember, was the stairs in
9      this area, was it full of people or was there open gaps?
10     A.   I don't recall.  My eyes are on the officer, the
11     majority -- other than when he's -- I can see what I can see
12     looking down and he's pointing at things.  It's generally on
13     him.
14     Q.   All right.  Let's keep it rolling until the crowd comes
15     forward.
16          Now, there's a gentleman waving there, but that's not
17     you, right?
18     A.   That's not me.
19          I go back up to talk to the law enforcement guys.  None
20     of this -- can we pause?  This is cool and calm, an absolute
21     departure from what was going on inside the scaffolding.  It
22     is the opposite of what was going on in the scaffolding --
23     inside the scaffolding area.  And I couldn't tell you
24     specifically when, but at some point I had asked them about
25     the people inside, or maybe he just volunteered it, and he had

1    made some mention of, yeah, they've already moved people, and

2    I forget what he said, moved people out of chambers or

3    something like that.  I know he didn't use the word I used,

4    which was "evacuate," which is the only word I would know to

5    use.  But he said something to the effect of confirming what

6    I had -- what I was suggesting earlier.

7         Okay.  So -- okay.  Can we back up about five seconds?

8    So now I turn and this other law enforcement fellow who's

9    leaning up against the wall is -- engaged me.  If you watch

10   and see the direction of my bill of my hat, or at least the

11   front of my hat -- can we play?  Yeah, that's helpful.

12        So I'm talking to him and talking to him.  And I remember

13   he says -- see me look down?  He says you're from Hershey.  My

14   sweatshirt says Hershey Christian Academy.  It's where my kids

15   had gone to school at the time.  He said, you're from Hershey.

16   I'm sure he has kids.  I get this all the time.  Everybody

17   takes their kids to Hershey Park at some point or another.

18        So keep going.

19   Q.   Okay.  Now, I think this is about the moment where the

20   crowd comes forward.  So let's --

21   A.   Let me -- can I back up for one second?  I believe that's

22   what happened, that he was referencing my sweatshirt.  If I

23   remember correctly.  It's two and a half years ago.  That's

24   what I believe he was saying, something to that effect.

25        All right.  So I just feel -- I feel in here -- I feel

1    the pressure and then you can see I almost go into the two

2    of them, the first one, the one I was talking to face-to-face,

3    which you'll see I'm facing -- I'm not facing up the stairs or

4    down the stairs until I get the push behind me.

5    Q.   Let me stop you here.  So this is you.  You can see the

6    white brim of your cap there.  Right?

7    A.   Right.

8    Q.   That you with the white brim of your cap?

9    A.   Correct.

10   Q.   Okay.  Now let's go forward, and ask you if you recognize

11   something in just a moment.  Now here, the crowd begins to

12   move.  Everybody's moving, right?  People behind you are

13   moving.

14   A.   My arms extended behind me.

15   Q.   What is that right there?  Is that the hand of the person

16   behind you on your back?

17            MS. AKERS:  Objection.  Leading.

18            THE COURT:  Sustained.

19            THE WITNESS:  Okay.

20            THE COURT:  Sustained.  Ask a new question.

21   BY MR. SHIPLEY:

22   Q.   Did you charge forward under your own power?

23   A.   No.

24   Q.   What happened?

25   A.   Absolutely not.  Like I said, I'm having a conversation

1    and then the push comes from behind.  And if we -- you know,

2    we watched the video that the government put on --

3    Q.   Okay.  Let me stop you.  You saw a video yesterday shot

4    from behind you, right?

5    A.   Right.  Right.

6    Q.   And you remember the one I'm talking about is where

7    you're silhouetted in blue.

8    A.   Right.  Right.

9    Q.   Had you changed positions on the stairwell by the time

10   you were silhouetted in blue?

11   A.   How do you mean, change positions?  I ran up to where

12   it was clear and then stopped.

13   Q.   Exactly.  What did you do?

14   A.   I ran up to where, you know, I didn't feel like anybody

15   was going to fall on me or knock me over and I stopped and

16   turned around.

17   Q.   But on the initial movement of the crowd, you're in the

18   front, right?

19   A.   No.  I -- no.  Because the police officers moved too.

20   If you include -- if you include the police officers in the

21   crowd --

22   Q.   Let's set the police officers aside.  I'm talking about

23   the crowd members going up the stairs.  You're right at the

24   front, correct?

25   A.   Okay.  So I'm just telling you from my visibility there's

1      men in front of me --

2      Q.    Okay.

3      A.    -- and even if they're law enforcement, everybody's

4      moving.

5      Q.    Did you get to the top first?

6      A.    No.  No.

7      Q.    So people went past you to get to the top?

8      A.    Oh, absolutely.  Like I said, I sort of veered --

9      Q.    Now, I want to change subjects for just a second about

10     this.  We watched a video yesterday shot from behind you with

11     audio.  Right?

12     A.    Correct.

13     Q.    And what did you hear on that audio?

14     A.    "Let's go.  Okay, everybody.  Let's go."  Something like

15     that.

16     Q.    That's what I want to talk about.

17     A.    Yeah.

18     Q.    Sitting here before, listening to that video, did you

19     have a memory of hearing "let's go"?

20     A.    Yes.

21     Q.    Based upon your experience that day, before you saw that

22     video, what was your memory of the circumstances surrounding

23     somebody yelling "let's go"?

24     A.    I thought it was law enforcement yelling "let's go."

25     My visibility, because I turned, that's law enforcement going.

1    And you can see them all, you know, sort of boogie move.

2    Q.   Did that cause you any kind of conspiratorial thoughts?

3    A.   Yeah.

4    Q.   Why?

5            THE COURT:   That's a very leading question, too.

6    So let's avoid the leading questions.

7    BY MR. SHIPLEY:

8    Q.   In what nature, what did you take away from your memory?

9    A.   That we got duped.  You know, the cops were leading us

10   there.

11   Q.   That's what you thought at the time?

12   A.   What I saw -- what I thought I heard and saw from my

13   vantage point was the police officers saying "let's go" and

14   then leading the crowd.  That's what I thought.  I thought

15   that every day until yesterday.

16   Q.   Seeing the video and listening to the audio, did it

17   change your mind?

18   A.   Yes.

19   Q.   What do you now think, based on having seen the video and

20   hearing the audio?

21   A.   It's just the opposite, obviously.  But even more so, it

22   was still -- I thought it was law enforcement because it was a

23   command.  It was a sort of, you know, announcement to a group

24   of people.  And so that's why it struck me as being law

25   enforcement, and particularly what was a relatively tame --

1    frankly might have been the most tame moment of the day, you

2    know, for two minutes everything sort of slowed and became

3    reasonable.

4    Q.   Having now seen that video and heard that audio -- well,

5    we're going to move on.

6    A.   Yes.   I now know --

7         THE COURT:   No, no, no.   You wait for a question.

8    You don't volunteer information.

9         THE WITNESS:   I apologize.

10        THE COURT:   Mr. Shipley will ask you a question.

11   BY MR. SHIPLEY:

12   Q.   So you get to the top of the stairs, you're not in front.

13   There's other people now in front of you that you can see.

14   Right?

15   A.   I don't even think I got to the top of the stairs.   Close

16   to it.

17   Q.   Was there another barrier at the top?

18   A.   I don't know if it was still there.   I know I'd seen it

19   earlier with -- when the police officer had given me the

20   water.   I know I'd seen the barrier there earlier.   I don't

21   know if it was still there.

22   Q.   Now, we saw the video, the sequence where you stopped on

23   a grassy area and reached down.   Right?

24   A.   Right.

25   Q.   Were there a lot of people already ahead of you by that

1    point?

2    A.   Yes.  Yes.

3    Q.   Do you remember stopping on the grass and picking

4    something up?

5    A.   I do.

6    Q.   What did you pick up?

7    A.   It's a sewer vent cap.  Either PVC or like a cheap cast

8    iron.

9    Q.   What was it made of?

10   A.   This one was cast iron.

11   Q.   Cast iron.  All right.  I was listening for metal.

12   I didn't hear metal.

13        And shortly after picking it up, you're at the Senate

14   Wing Door which has sets of windows on each side.  Right?

15   A.   Right.

16            MS. AKERS:  Objection.  Leading.

17            THE COURT:  Overruled.  That's not a harmful leading

18   question.

19            MS. AKERS:  Just repetitive, every question.

20   BY MR. SHIPLEY:

21   Q.   What did you do?

22   A.   So, like I said, for a moment in time I thought we had

23   an opportunity to cool everything off.  I thought things were

24   cooling off, frankly.  And then we have this rush of events

25   up the stairs.  I thought I'm going to get -- I could get

1    trampled.  I get to clearing, I turn around to make sure no

2    one else gets trampled.  At this point I've gone from -- I'm

3    just -- I'm furious over the way that whole thing transpired.

4    We were so close to, at least in my mind, at the time, I

5    thought like we could actually avoid something terrible here.

6    And so I just was -- was so angered by the situation.  So

7    there was a -- there was a -- you know, 18 or 24 pack of

8    waters, and I pick up a water and throw it and was just

9    dissatisfied, didn't get anything out of that.  And I find

10   the --

11   Q.   What did you throw it at?

12   A.    -- the metal, I find the sewer vent and bend over and

13   pick it up, and at this point, you can see people banging on

14   the -- you know, the only thing to bang on.  Everything there

15   is concrete.  Everything there is concrete.  And so ran over

16   to the first thing I could find to sort of let out my

17   frustration on, and banged the glass on the -- on the Senate

18   Wing Door, I guess the left-hand side one.  Banged it till it

19   cracked and then moved over to the second window, and did the

20   same.

21   Q.   Did you break it out so that you -- sufficient to get

22   inside?

23   A.   I did not.

24   Q.   Were windows broken out sufficient that people could get

25   inside?

```
1    A.    Yes.

2    Q.    Did you see that happen?

3    A.    Yes.

4    Q.    Did you see people go inside?

5    A.    Yes.

6    Q.    What did you do?

7    A.    I followed.

8    Q.    Why?

9    A.    I think you will see throughout the day I do a lot of

10   following.  There was a group, the group started to flow

11   inside.  I was fearful again at this spot that there would be

12   a potential death.  There was not.  And so, okay, let's go

13   inside.  I guess that's what we're doing next, and I just

14   flowed inside.

15        THE COURT:  Did you testify that in terms of thinking

16   that one of the law enforcement officers said "let's go," that

17   you thought that the police had led you up the stairs and that

18   you'd been duped into being led up the stairs?  If you thought

19   you had been duped into being led up the stairs, why did you

20   just continue on being duped into breaking into the Capitol

21   and going into the Capitol?

22        THE WITNESS:  That's a great question.  That's actually

23   something I didn't think until late -- after, when I was

24   assessing it.

25        THE COURT:  What didn't you think until after?
```

1          THE WITNESS:  That I'd been duped.  I'd never thought

2     about --

3          THE COURT:  Oh, you didn't think it at the moment.

4     That's something that you're saying you thought later?

5          THE WITNESS:  Correct.  So as I reviewed it in my head,

6     like, come on, something weird's going on here.  The police

7     officers brought the crowd up.  How did that happen?

8        This is after reviewing it in my head.  In the moment all I

9     thought was, don't get trampled, and then turned, looked back

10    down the stairs, make sure no one else got trampled.  So I

11    looked down the stairs, everything is, you know, clean, but

12    here we are back at mayhem again.

13    BY MR. SHIPLEY:

14    Q.   Let me ask you this:  Before jumping through the window,

15    to go inside the Capitol, had you ever been inside the Capitol

16    before?

17    A.   No. No.

18    Q.   When you went inside the Capitol, people were going to

19    the right, and people were going to the left.  Right?

20    Correct?

21    A.   Correct.  I'm not sure.

22    Q.   You've seen the video?

23    A.   I saw people going to the left.

24    Q.   You saw the video, you went left?

25    A.   Right.

1      Q.   Why did you go left?

2      A.   That's where everybody was going.

3      Q.   Did you know where you were going?

4      A.   I had no idea where I was going.

5      Q.   We then saw the video of the crowd going through a

6      hallway and up the stairwell, and you're in the crowd going

7      up the stairwell.

8      A.   Correct.

9      Q.   Why were you going up the stairwell?

10     A.   Everybody was going up the stairwell.

11     Q.   Now, we've seen the video of the initial meeting of a few

12     officers, and then the crowd coming off of the stairs on the

13     second floor, then there being a standoff, for lack of a

14     better word, in the hallway, right?  The bat incident.

15     Remember that?

16     A.   Mm-hmm.

17     Q.   Describe what you remember about the bat incident.

18     A.   The bat incident.  So we walk into the hallway -- excuse

19     me.  Everyone flows into the hallway.  There's -- I'm a little

20     bit later coming in.  Couldn't tell you how much later.  I

21     would guess seconds, you know, 30, 45 seconds, something like

22     that.  And I come in, and as I walk in around the back of the

23     crowd, you could hear police officers, or at least a police

24     officer -- I shouldn't commit to multiple, I feel like it

25     was -- yelling, "Bat, he's got a bat, he's got a bat."

1        So I come around the room -- the group, and bark at the

2   guy, what do you have a bat for?  I think I said something to

3   the effect of give up the bat.  But they were satisfied with

4   put the bat away.  The police officers were satisfied with put

5   the bat away.  So then I moved through the crowd and get right

6   next to him, to the gentleman, where he says -- or he looks at

7   me and says "got it, I got it."  And then, you know, he had

8   secured the bat and everybody seemed content with that.

9   Q.   We know there's no audio because that's closed-circuit TV

10  video.

11  A.   Okay.

12  Q.   But that's your best recollection of the exchange, of the

13  conversation?

14  A.   My words would be -- the only question to me is was it

15  one police officer or multiple police officers yelling.  But

16  you can also -- you can see this moment where everybody sort

17  of takes a step back and goes hey, what's that?  Yelling, with

18  one yelling, hey, that's a bat.  And you can see the bat

19  there.  And if you see, he's holding it.  Briefly, he's kind

20  of behind somebody, in the video you can't see, but when I

21  came around to the front you could see him holding it like

22  he's, you know, Negan from *Walking Dead* or something.

23  Q.   This is Defense Exhibit 6.  So it is a government

24  exhibit, we've already seen it.  I'm just going to play it

25  briefly, ask Mr. --

 1              THE COURT:  It's a government exhibit so it's already

 2      in evidence?

 3              MR. SHIPLEY:  It's already in but I've got it marked

 4      with a 6 and it's with mine.  So I won't mark mine because

 5      it's already in.  But I'm going to play it.

 6              THE COURT:  Okay.  Do we know what government exhibit

 7      it is so they can be sure that --

 8              MS. AKERS:  It's the Ohio Clock Corridor?  I can't see

 9      it.

10              MR. BALLOU:  Yeah.

11              MR. SHIPLEY:  We can mark it as Defense Exhibit 6 and

12      you'll just have two copies.

13              MS. AKERS:  I believe it's 109.  Is it 2:15 p.m.?

14              MR. SHIPLEY:  Yes.  2:15 p.m.

15              MS. AKERS:  Yeah.  Government Exhibit 109.  Thank you.

16      BY MR. SHIPLEY:

17      Q.   We have it on the screen.  There we go.

18           (Video played.)

19           Okay.  You see yourself?  Where are you?

20      A.   No, I don't.

21      Q.   You can touch the screen.

22      A.   I don't see myself.  Oh, there I am.

23      Q.   Okay.

24      A.   See?  You see the police officer pointing?  And he goes

25      to his device and says something about the bat.  You have

1   people start looking around, where's the bat?  But then -- go

2   ahead.

3       I come over.  What are you doing with the bat?  Put the

4   bat away.  Walk over and make sure --

5   Q.   So this gentleman right here is who you're talking about?

6   A.   Yeah.  Yeah.  Correct.

7   Q.   Okay.  What did you say to him right there?

8   A.   I had said it toward the front of the crowd when I was at

9   the front of the crowd, "What are you doing with a bat?  Get

10  rid of the bat."  Either "get rid of the bat" or "put the bat

11  away," one or the other.  But I believe it was "get rid of the

12  bat" while the police officers were saying "put the bat away,

13  put the bat away."  And, you know, followed to make sure that

14  was fulfilled and then, you know, he's -- starts to sort of

15  put it away and says "I got it, I got it."

16  Q.   Now, this is at 2:15.  And we know you came in at 2:14.

17  So was this pretty much the first encounter you had with the

18  police?

19  A.   Correct.

20  Q.   Now, after that you turned around and exited the same way

21  you came in.  Right?

22  A.   I believe so, yes.

23  Q.   And where did you go next?

24  A.   I don't know.  I don't remember.

25  Q.   You remember being in the gallery, the Senate Gallery up

1    above?

2    A.    Yes.

3    Q.    How'd you get there?

4    A.    Followed the crowd.

5    Q.    Was that another floor up?

6    A.    I don't -- I don't recall.  I feel like we walked

7    upstairs to get to this spot that we were just at.

8    Q.    I guess that's a better question.  Did you know where

9    the stairs went when you were going up and down the stairs?

10   A.    I didn't know where anything was.  Didn't know where

11   anything went, was going.  I didn't know where anything was.

12   Q.    When you went through the doors that went into the Senate

13   Gallery, did you know where those doors would take you?

14   A.    Had no idea.

15   Q.    Remember seeing a video yesterday the government played

16   that there was a scuffle or a fight right outside those

17   gallery doors involving the gentleman with the big orange --

18   A.    I do.

19   Q.    Were you involved in that fight?

20   A.    No.

21   Q.    After that fight ended, did you go through the doors

22   there?

23   A.    Yes.

24   Q.    Were you the only one?

25   A.    No.

1   Q.   Were you the first one to go through the doors?

2   A.   No.

3   Q.   Some testimony yesterday about you moving the camera,

4   standing next to a C-SPAN camera and you moved it.  Why did

5   you move it?

6   A.   So I come into the Senate -- it's the gallery, right up

7   top, Senate Gallery, and the first thing you see is chairs,

8   somewhere to sit down, which I desperately needed, just to sit

9   down.  So I sit down, and somebody says hey, there's something

10  under the chairs.  So I lift them, under the chair, there's

11  some sort of bag for emergencies or something like that

12  underneath there.  Look at it, put it down.  Put it back.

13       And as -- at least in my mind as quickly, I get a yell

14  from another protester, hey, there's cameras.  Come check it

15  out.  So, okay.  So I go down to the camera and to go check it

16  out.  So with the camera you just see me sort of maneuver it

17  and check it out.  I didn't really have any motivation other

18  than I'm in here and there's a camera and somebody suggested

19  it's something neat to look at.  I didn't have any -- I didn't

20  have any purpose behind it.

21  Q.   Was there anything about it to suggest it was on?

22  A.   No.  No.  In fact, I think at one point I think I'm

23  looking for a, you know, is there a power button on this thing

24  or anything like that.  Not for the purpose of doing anything

25  with it, but just how does this thing work?

1    Q.   Try to skip a little bit here.  You've seen all of the

2    videos, many of which have been played so far, of you just

3    going various places inside the Capitol building.  Right?

4    A.   Mm-hmm.

5    Q.   At any point inside the Capitol building, were you with

6    anybody you knew?

7    A.   No.

8    Q.   Was everybody you encountered a stranger?

9    A.   Everybody.

10   Q.   Where was your mother and your brother?

11   A.   What did I know then?

12   Q.   Yes.

13   A.   I had no idea.

14   Q.   Did anybody ask you to leave the gallery?

15   A.   No.

16   Q.   What happened?

17   A.   I believe the crowd started -- a couple -- a fellow or

18   two jumped down, which was a terrifying idea to me, and I

19   believe we slowly left, if I remember correctly.

20   Q.   Now, you were directly in close proximity to the

21   gentleman who jumped over the rail and down onto the floor.

22   Right?

23   A.   I believe so, yes.  Sort of in the direction of the

24   cameras --

25   Q.   Did you encourage that activity by him?

1    A.   I've got bad ankles.  I would not encourage anybody to do

2    that.  In fact, one of the things -- I hate to backtrack but

3    on the outside of the stairwell with the bicycle helmet guy

4    had -- where I'd pointed out, you know, there are people

5    climbing up the tall wall, I was terrified for them, that they

6    were going to hurt themselves.  And frankly, this was a lot of

7    a shorter fall and I still thought he was going to hurt

8    himself.

9    Q.   Now, at some point you left the gallery, back out in the

10   hallway --

11   A.   Right.

12   Q.   -- walking again?

13   A.   Right.

14   Q.   When you left the gallery, back out in the hallway and

15   started walking, did you have a destination in mind?

16   A.   No.

17   Q.   We saw a video yesterday.  You at some point shortly

18   thereafter end up on the Senate floor.

19   A.   Right.

20   Q.   In the chamber of the Senate.  What led you there?  Did

21   you know the door, as you went through, that's where you were

22   going?

23   A.   No.  I'm not sure there's a door I ever went through that

24   I had -- knew what was on the other side, no.

25   Q.   Once you got inside -- you saw the video.

1     A.    Right.

2     Q.    What's your recollection of what you were doing inside?

3     A.    So at this point I had -- since I'd already been up at

4     the top, and one of the videos played yesterday had shown

5     me -- just identifying where I was, had shown me looking out

6     of a window, and I'm sort of intently looking out of a window

7     and trying to see what's to see outside, and I notice that

8     there appears to be very few people compared to what I had

9     seen when I was outside.

10          And what I concluded was everyone's inside.  There's

11    probably tens of thousands of people in here, including my

12    mom, or at least could also include my mom.  And so being at

13    the Senate had some appeal because I knew what it was, and I

14    figured other people would know what it was, so it could be

15    sort of a known spot.  You know, if everybody'll be here at

16    some point, you'll eventually see -- something -- something to

17    that effect.

18    Q.    Did you consider it a possible rendezvous location that

19    other people would know how to find it?

20          MS. AKERS:  Objection.  Leading.

21          THE WITNESS:  I thought that's what --

22          THE COURT:  Wait, wait, wait.

23       Sustained.  Ask another question.

24    BY MR. SHIPLEY:

25    Q.    Was there something about that location that you thought

1     was meaningful?

2     A.   I thought that's what I was describing, that it obviously

3     stuck out in terms of color.  I didn't know what any other

4     room was called.  That I -- my thinking was other people would

5     look at this the same way, say okay, this could be a spot that

6     you would -- that people are going to find.

7     Q.   What was the sound like in there compared to other places

8     you had been?

9     A.   Quiet.  Relatively quiet.  You could talk in there as

10    opposed to, you know, loud and yelling down the hallways in

11    certain areas.

12    Q.   Many times you seem to be on your phone.  Do you recall

13    what you were doing?

14    A.   Looking for my family most notably.  Trying to figure out

15    what's going on.

16    Q.   What were you doing with the phone?

17    A.   Anything from calling to trying to text, to even get on

18    news to see what is going on, what's the story here.

19    Q.   And were you able to make phone calls?

20    A.   I don't remember at all times but certainly toward the

21    end of my time in there I was able to make a -- at least one,

22    I feel like it was potentially to --

23    Q.   Who did you talk to?

24    A.   I don't remember.  I think it was one of my two brothers.

25    It was either Joey or Reid.

1    Q.   At any point before you left the Senate Chamber did you

2    have a confrontation with law enforcement?

3    A.   No.

4    Q.   Was it law enforcement that caused you to leave the

5    Senate Chamber?

6    A.   No.  No.  I don't think so.  No.  I told anyone that

7    would listen that I never had a negative encounter with law

8    enforcement.  On the days that followed that, the entire

9    notion was that if you were there you were attacking law

10   enforcement.  And I told anybody that would listen that I

11   never engaged with law enforcement and never had my hands --

12   you know, outside we may have bumped elbows, the one with the

13   bicycle helmet, that was -- never had a negative encounter.

14   Q.   Okay.  Now, we heard earlier from the FBI agent that, by

15   examining the video, you were inside 55 minutes, from the time

16   you entered till the time you left.

17   A.   Okay.

18   Q.   What were you doing for 55 minutes?

19   A.   So -- I thought it was much longer, like much longer.

20   Walking around.  So the priorities were, see if I could find

21   my family, number one.  Number two, desperately wanted a

22   bathroom.  Three, desperately wanted some water.  But I

23   don't -- you know, having watched these videos, confirms what

24   I thought after that day, like I don't know what I was doing,

25   I don't know what my purpose was outside of those things.

1       Q.   Okay.  I have Defense Exhibit 7 up on the screen.  I'll

2       ask you to watch a couple seconds and see if you recognize

3       yourself.  This may also be duplicative of a government

4       exhibit.  I think it's probably quicker just to mark it.

5            THE COURT:  Well, okay.  We can admit it as Defense 7

6       if that's what you want to do.  It's a government exhibit, I

7       believe, as well.

8                          (Defendant Exhibit No. 7

9                              received into evidence.)

10      (Video played.)

11      BY MR. SHIPLEY:

12      Q.   Do you see yourself now?  The white hat?

13      A.   I do.

14      Q.   Yes or no?

15      A.   Yeah.  Yeah, I do.  Sorry.

16           MR. SHIPLEY:  And if I didn't say so earlier, I'd move

17      to admit 7 at this point.

18      BY MR. SHIPLEY:

19      Q.   Are you following the instructions of any police officer

20      at this point?

21      A.   I believe he's -- yeah.  He's leading us out the door.

22      Yes.  I suppose.  I mean I was heading in that direction

23      before, but yes.

24      Q.   Did you have an encounter with a police officer who was

25      knocked down?

1   A.   That was knocked down, yeah.  So there was a set of --

2   there was a set of doors -- it was a hallway and a set of

3   doors at the end of it, and I want -- there's times on this

4   video where you can see I'm sort of by myself in a hallway,

5   thought I might actually find a bathroom, when I found myself

6   in a hallway.  And he is there, and I want to say I come

7   around at the very end and he's having a struggle with a door,

8   and it gets pushed open, the doors get pushed open, and he

9   gets knocked over onto the ground.

10      And I'm probably 15 feet away from him, and he's, I don't

11  know, 50 years old, 45 to 55, somewhere in that window,

12  African American.  And I ran over and picked him up -- helped

13  get him up.  He's a bigger fellow.  Helped get him up off the

14  ground and, you know, dusted him off and apologized, said hey,

15  I'm sorry this happened to you.  Are you all right?  Yeah,

16  yeah, yeah.  He was frustrated, as you can imagine.  But

17  grateful to get helped up.

18  Q.   You've seen the video of the Rotunda doors where you came

19  up in the back of a group of people attempting to push the

20  Rotunda door -- Columbus doors.  Columbus doors go to the

21  outside.  Do you remember that episode?

22  A.   Not --

23  Q.   You don't remember specifically it happening?

24  A.   No.

25  Q.   Do you remember seeing the video?

1   A.   Yeah.  Yeah, yeah.

2   Q.   When you came up to the back there, did you see any

3   police officers?

4   A.   No, not at all.  This is a bit of a struggle for me all

5   day.  It's part of the reason why I multiple times find myself

6   in empty hallways.  At least I can see.  At least I can assess

7   what's happening in front of me better.  And I have a bit of a

8   pattern of going with a crowd, by myself, with a crowd, by

9   myself, because each one seems to be fruitless.

10       But in this instance, no, I'm not.  I can't see anything

11   past the crowd of people at the doors.  But they are talking

12   about opening up, hey, let's push open the doors; there's

13   people there, which was -- I didn't -- I to this day don't

14   know where those doors went or go.

15   Q.   Did you know that they went to the outside?

16   A.   No.  No.  But I certainly wanted to see what people would

17   come through there.  I'm concerned that I have family,

18   potentially my mother could be in there -- would be in that

19   group.

20   Q.   But as you leaned into the back, six or seven people deep

21   or whatever the number is, you did not know there were police

22   officers at the front?

23   A.   I had no idea.

24   Q.   This is Defense Exhibit -- getting to the end, Your

25   Honor -- Defense Exhibit 12.  And I'm going to play the first

1    couple seconds and ask if you see yourself come into the

2    frame?

3              THE COURT:  Any objection to Defense Exhibit 12?

4              MS. AKERS:  No objection.

5              THE COURT:  Without objection, Defense Exhibit 12 is

6    admitted.

7                                (Defendant Exhibit No. 12

8                                  received into evidence.)

9       (Video played.)

10   BY MR. SHIPLEY:

11   Q.   Can you see yourself?  Down at the bottom?

12   A.   Yeah.  Sorry.

13   Q.   Is this you right there?

14   A.   Mm-hmm.

15   Q.   Is that you?

16   A.   Yeah.  That's me.

17   Q.   All right.  I'm just going to -- do you remember walking

18   through the -- I guess this is the Rotunda.

19   A.   Yes.

20   Q.   I'm skipping ahead because I think we see him actually

21   coming back, if I can find that.

22        And you exited the other side.  Correct?  Did you know

23   where you were going?

24   A.   I had no idea.

25   Q.   Just wandering around?

```
1    A.    I didn't know that was the Rotunda.  Had no idea.  I'm
2    almost embarrassed to have it characterized as wandering
3    around.  I -- again, just looking and peeking and looking and
4    peeking in hopes that, you know, looking for -- do I have
5    family here, is my mom here specifically.
6    Q.    There are -- you've seen videos of you in at least one
7    instance grabbing a door handle.  You remember that?
8    A.    Yeah.
9    Q.    Did you know what door that was?
10   A.    No.
11   Q.    Did you see the sign up above?
12   A.    No.
13   Q.    I want to show you one last video, and we've seen part of
14   it.  I'm going to ask you if this is -- this is Defense
15   Exhibit 1.  You've seen this, Mr. Bozell?
16        (Video played.)
17   A.    Yes.
18        THE COURT:  Any objection to Defense Exhibit 1?
19        MS. AKERS:  No.
20        THE COURT:  Without objection, Defense 1 is admitted.
21                         (Defendant Exhibit No. 1
22                          received into evidence.)
23   BY MR. SHIPLEY:
24   Q.    I'm just going to let it run, and then we'll talk about
25   it after you see the whole thing.
```

1              (Video played.)

2              Is this you right here?

3       A.    Yes.

4              (Video played.)

5       Q.    Okay.  This is 2:19.  See that in the upper left-hand

6       corner?  That's five minutes after you're inside.  Right?

7       A.    Okay.

8       Q.    What happened?  What do you recall happening right there?

9       A.    So this -- again, no idea where I am, but this police

10      officer comes in and clearly can't see.  And so he's walking

11      toward me and I say to him, you know, dude, your eyes are on

12      fire, are you okay?  And I had water.  In the earlier

13      testimony somebody had played something where I had gone into

14      a room and a gentleman, a law enforcement with a rifle had

15      asked me to leave.  There was water in that room.  There was

16      water bottles on the tables there.  And I walk out with a

17      water.  That's that water.

18             So he comes walking up, you know, sort of clearly in pain

19      and disarray, and I try to get close to him and say do you

20      need water?  I have water.  And, you know, in my mind that was

21      a precious commodity at the time.  And so offered him the

22      water.  So I'm not sure if it's the first time or the second

23      time, but the first time, don't really get a response out of

24      him, and then it dawned on me, he probably can't see me

25      because he'd been sprayed or something, you know, he was doing

1    this.  He probably can't see me.

2        So I kind of went back at him again to make sure, like

3    hey, I've got water, do you want water.  And if I remember,

4    one of those two times he did his best to look at me and just

5    couldn't do it.  And I don't know if -- I don't know what

6    solution he found.

7    Q.   When you went to the Capitol building and you went to

8    those windows, broke, fractured them with the item in your

9    hand, were you at all contemplating what was happening inside

10   before the crowd went in?

11   A.   I wasn't contemplating much of anything other than just

12   my general frustration over how things had fallen apart.  I

13   had gone from 24 hours earlier, I was thinking I was going to

14   go be a part of a street show with one of my favorite rockers

15   and get to hang out with one of my favorite people in the

16   world, to -- to this.  To now this.

17       And I just -- I just -- it's been a long time since I

18   ever punched a wall or anything like that.  But that's just

19   how I felt.  I just wanted to see -- I just wanted to break

20   something.

21   Q.   Did the --

22   A.   No.  I did not have any thought as to what was inside or

23   who was inside.  In fact, it had been suggested to me that,

24   you know, they had moved some of the things outside, something

25   like that -- or I'm sorry -- that some sort of contingency had

1      been enacted by the police officers outside.

2      Q.   Your entrance into the building, was it in any way

3      motivated by the congressional proceeding taking place inside?

4      A.   No.

5      Q.   Did it even cross your mind?

6      A.   No.

7           MR. SHIPLEY:  Can I have one minute just to ask my

8      client if there's anything more he wants to say?

9           THE COURT:  No.  You may not consult with the witness

10     to determine whether there's something more to ask the

11     witness.

12          MR. SHIPLEY:  I've had judges say yes.

13          THE COURT:  That was an interesting question to ask me.

14          MR. SHIPLEY:  I've had that question answered yes

15     before, but I understand.

16          THE WITNESS:  I would have said, if he asked me, I need

17     to use the bathroom.

18          MR. SHIPLEY:  I did tell him no, he couldn't do that

19     while he was on the stand.

20        Okay.  Mr. Bozell, no further questions.  Thank you.

21          THE COURT:  Ms. Akers.

22                         CROSS-EXAMINATION

23     BY MS. AKERS:

24     Q.   All right.  Mr. Bozell, you just testified at the end of

25     your testimony here that you went to the Capitol building and

1    it had nothing to do with what was going on inside.  Is that

2    your testimony?

3    A.   Meaning when I actually approached the Capitol building?

4    Q.   Sure.

5    A.   I didn't say that.  I said my motivation was to break

6    something.

7    Q.   And your motivation was to break something because you

8    wanted to get into the Capitol building, didn't you?

9    A.   It's more like you just want to punch the wall to see --

10   to get the -- to get the frustration out.

11   Q.   You wanted to go into the Capitol building, didn't you?

12   Hadn't you been planning since December, referencing the

13   Capitol in hundreds of text messages to your family, your

14   friends, your godson?

15   A.   No.  There are text messages throughout the -- we're

16   going through the context of them, there's a lot of goofiness

17   and silliness.

18   Q.   I'm not asking about the goofiness or silliness.

19   A.   Right, right.

20   Q.   I'm asking that since December 2020 you had been

21   referencing going to the Capitol on January 6, 2021.  Right?

22   A.   Right.

23   Q.   So you intended, before that day, that you were going to

24   go to the Capitol building.  Right?

25   A.   Right.

1    Q.   And you intended to go inside the Capitol building,

2    didn't you?

3    A.   No, I did not.

4    Q.   That was a spur-of-the-moment decision?

5    A.   That was a spur-of-the-moment decision.

6    Q.   And what time did you make that decision?  At what point

7    when you were on Capitol grounds?

8    A.   Time of the day?  I couldn't answer that.

9    Q.   At what point?  Was it when you were on the west front

10   watching the violence?  Was it when you were under the scaffolding

11   watching the violence?  The first time?  The second time?  Was

12   it when you tore through the tarp?  Was it when you overran

13   the police line?  At what point did you decide that your

14   motivation was to go inside the Capitol building?

15   A.   So I hit the second window, and hit it multiple times.

16   Q.   Ten times, right?

17   A.   I guess.  I won't dispute that.  And then ultimately it

18   gets broken out by somebody else.

19   Q.   They finished your job.

20   A.   So then I think two or three people hop up and go in.

21   And so at that -- that was the point where I made the

22   decision --

23   Q.   At that moment.  So when you were smashing the first

24   window pane, you had no intention of going into the building.

25   A.   So you can see with the first one, you know, it breaks

```
 1    and then I sort of give up on it.  And then with the second
 2    window, I actually pass by the window pane that's totally
 3    intact and go and hit the one that's already broken.
 4    Q.   So you were just smashing the window to smash the window,
 5    not to actually get inside.  That's your testimony.  Violence
 6    for violence.
 7    A.   It was the only thing up there that was breakable.  Had
 8    there been a flower pot, this may be a different --
 9    Q.   You would agree that you in fact broke both windows.
10    Correct?  You smashed both of them.
11    A.   Sure.  Took part in the second one, yes.
12    Q.   So before we get to that a little more, I just want to
13    know, you had been texting since December 2020 about January
14    6.  You knew the certification of the Electoral College was
15    happening on that day, right?
16    A.   Yes.
17    Q.   You knew Congress was going to be in the building.
18    Right?
19    A.   Yes.
20    Q.   You knew Vice President Pence was going to be in the
21    building.  Right?
22    A.   Yes.
23    Q.   You knew Nancy Pelosi was going to be there.  Right?
24    A.   Yes.
25    Q.   And you knew who all those people were?
```

1      A.   Yes.

2      Q.   You understood the process.

3      A.   At least as -- yeah.  Well enough.

4      Q.   And you thought the election was stolen.  Correct?

5      A.   Yes.

6      Q.   So you thought the election was stolen, you knew January

7      6 was the important day, and that was the day that the new

8      president was going to be inaugurated -- or not inaugurated,

9      elected.  Right?

10     A.   Yes.

11     Q.   And you were upset at that.  Right?

12     A.   Just backing up for a second.  There was some question as

13     to the day, you know, from our state, Pennsylvania, we were --

14     there had been, you know, requests asking for additional time

15     to assess, you know, some of the issues we had in

16     Pennsylvania.  And so it wasn't necessarily a date certain of

17     January 6 to me.  It was -- it had multiple outcomes, possible

18     outcomes.

19     Q.   You thought that maybe the crowd, the people, could have

20     changed that date, right?  You thought you could have pushed

21     it, didn't you?

22     A.    I thought the idea was that a mass of people -- the top

23     of the Capitol, right, has the dome -- right?  The idea is, at

24     least in terms of its symbolism, is that you can hear the

25     people.  Right?  It almost acts as like sort of a pretend

1      amplifier of sorts.  And so -- and it was designed that way.

2           And so the idea being that, yeah, we could go and make

3      our voices heard, and that would potentially have influence on

4      something -- on a simple outcome of let's take a moment and

5      double-check on this, which was all that was being requested

6      from Pennsylvania and I believe Arizona and Georgia.

7      Q.   So the purpose of you going to the Capitol building and

8      going inside the Capitol building was to let your voice be

9      heard so that the certification of the Electoral College vote

10     didn't happen that day.  Correct?

11     A.   No.  I -- I think attributing -- it would be a mistake to

12     attribute any real thought behind that flow of -- I don't know

13     even know what it was, you know, 60, 75 seconds.  We had --

14     I'll leave it at that.  I --

15     Q.   Would you agree, though, that one of your purposes of

16     going into the Capitol building was to stop the certification

17     of the Electoral College vote that day?

18     A.   So my understanding was that that had taken place, right?

19     So we're walking up, you get the thing from -- the notice from

20     Pence, from Mike Pence, Vice President Pence, which suggests

21     then that what was potentially several outcomes was now -- my

22     understanding was a quick, you know, up and down outcome.

23          And so, no, I didn't -- my understanding is there wasn't

24     anything of consequence at that point by the time I get to the

25     window.  In fact, it had been suggested to me that they're not

1    even there.

2    Q.   And you testified to that on direct.  I believe your

3    testimony was that an officer, while you were having the

4    casual conversation in the midst of chaos, just casually told

5    you -- well, first said, you know, I like your sweatshirt or

6    Hershey, Pennsylvania or something, and then just told you

7    they evacuated, something to that effect.  That's your

8    testimony?

9    A.   No, there was actually -- it was multiple law

10   enforcement, but the one with the biker helmet, we had talked

11   about this my first time into the scaffolding area, and I had

12   said to him, you're going to have to evacuate them out of

13   there.

14   Q.   Because you were helping the officers, right?

15   A.   Yeah.  I said you have to see the crowd out here.  You're

16   going to have to evacuate them out there.

17   Q.   At that point, if you were telling officers you need to

18   evacuate them, you knew that you and the fellow rioters were

19   going to get in the building, right?  What would be the point

20   of evacuating if you didn't know that?

21   A.   I mean, I don't know how I could know that.

22   Q.   But that was your intention, right?  To get into the

23   building.  Right?

24   A.   No.  You could see just a mass of people, and you could

25   see the conflict going on, at least multiple layers of

1    conflict you could see going on.  Of course, I couldn't see

2    everything.  But no, I -- I thought that was a basic thought

3    at the moment.

4    Q.   And it seems that your testimony --

5    A.   A remedial thought at the moment.

6    Q.   -- on direct is that basically throughout the day on

7    January 6 you were just being a helper to the officers.

8    Right?

9    A.   Well, I didn't --

10   Q.   Yes or no?

11   A.   I didn't -- I said in my testimony that at no point did I

12   have -- did I believe I had a negative encounter --

13   Q.   That's not what I'm asking.  I'm asking, do you believe

14   you were just helping the officers on January 6?

15   A.   I can't imagine that the fact that we were all there was

16   helping the police officers that day.

17   Q.   Right.  You being part of the crowd, even if you weren't

18   always at the front of the line, impeded the officers.  Right?

19   A.   I -- so we --

20   Q.   Right?  Yes or no.  I'm not asking for an explanation.

21   A.   No.

22   Q.   No.  You being part of a massive group of people, a mob

23   if you will, overwhelming and outnumbering the officers, it

24   didn't help them, did it?

25   A.   I was never part of a mob.

1    Q.   And at no point when you were on the west front watching

2    the violence, under the stairs watching the violence, on the

3    stairs watching the violence on the west front, at no point

4    did you think I'm going to leave this group of violent people

5    who are trying to storm the Capitol building, did you?

6    A.   So when I came down from the scaffolding the first time,

7    and I looked out at the crowd and I asked myself, what are you

8    going to do?  What's -- what's the -- what's the do?  What's

9    the do?  And again, as I stated, I'm the only one, at least in

10   my mind at that time, that had any rapport with law

11   enforcement.

12   Q.   You were helping them?

13   A.   I thought I could -- I thought I could help in some way.

14   I had already, and I was hoping I could do the same.

15   Q.   And you helped --

16   A.   Or do something --

17   Q.   -- them by joining the group and going under the stairs

18   up towards the building.  Is that your testimony?

19   A.   No.

20   Q.   So then why did you go under the stairs and rush towards

21   the police line?

22   A.   We didn't.

23   Q.   You didn't?  You didn't see the video where you were

24   running up the stairs under the scaffolding?

25   A.   Running up the stairs.  No.

1    Q.   And when you got to the top of the stairs you started

2    tearing at the front of the tarp.  And your testimony is

3    that's because you were trying to open up for visibility

4    purposes.  Right?

5    A.   Right.  Right.

6    Q.   And then you walked over to the other side of the tarp

7    and you started tearing that one.  And that was also for

8    visibility purposes.  Right?

9    A.   I couldn't get -- I couldn't get that side off.  Yeah.

10   Q.   And then you eventually tore through the tarp and climbed

11   out.  Right?

12   A.   I don't think I was ever able to tear through a tarp.

13   Q.   But you were trying to, weren't you?

14   A.   There's -- there's little tiny like zip ties on the tarp.

15   So I was trying, you know, to get --

16   Q.   You were trying to tear through the tarp, weren't you?

17   A.   No.  Tearing through the tarp, no, I was not.

18   Q.   You were trying to open up the tarp?

19   A.   Trying to -- yes.

20   Q.   To get through.

21   A.   No.

22   Q.   What were you trying to do --

23   A.   Again, like I said, like I said twice now, so that

24   everybody could see.  No one could see on either side of it.

25   The protesters couldn't see that you had police on one side

1    and the police couldn't see that -- this was a different

2    situation.  They would have then left the area -- excuse me,

3    police officers would have left the area at this point.  They

4    wouldn't -- they wouldn't know that there was now a wave

5    inside here.

6    Q.   You were trying to be helpful to the officers?  You just

7    wanted them to see the mob in front of them.  Is that your

8    testimony?

9    A.   I thought if people could see each other and look at each

10   other, that it may actually help something.

11   Q.   So then when you were able to make it through and you

12   could see the officers and they could see you, did it help

13   anything?

14   A.   Yeah.  I thought so.

15   Q.   It did.  And so you stood there and then you went over to

16   the flower pot and your testimony is that when you were waving,

17   you were waving at other officers.  You were helping them.  Is

18   that your testimony?

19   A.   To the best of my memory, that's what I'm hoping I was

20   waving at.  If you see, I can't see below because it's a big

21   concrete area.  So as the police officer was pointing to

22   something down there, I can't really see, but at least I have

23   this memory of police officers being up, perched sort of where

24   the camera's pointing.  And I believe -- I had two thoughts.

25   I'm going to offer them.  I believe that there's police

1       officers and I'm like, you know, why can't -- get them -- they

2       could come here, that kind of thing, number one.

3           Two, seconds after I, you know, waved or moved my arm,

4       the police officer -- maybe not -- could be five, eight

5       seconds, the police officer does something similar.  And so

6       I'm not totally convinced that that's what I'm looking at, but

7       it looks like that's the direction I'm looking at.

8       Q.   You don't know who you were waving at, is your testimony?

9       A.   Well, I'm saying --

10      Q.   You don't remember who you were waving at.  Is that

11      correct, yes or no?

12      A.   It's a question of --

13      Q.   Do you remember who you were waving at, waving to?

14      A.   I believe -- first of all, I'm not sure I was waving.

15      Because --

16      Q.   What do you consider this object when your arm is coming

17      toward you?

18      A.   Again, when you look at the police officer a few seconds

19      later, he does the same thing --

20      Q.   Mr. Bozell, I'm asking you, do you have a memory of

21      waving police officers over to you?

22      A.   I have a memory of seeing police officers that are useful

23      and up on the ledge and that -- and a discussion having taken

24      place down below --

25      Q.   You don't know who you were waving to --

1    A.    -- if you had more people.  And if you look on the

2    camera, if you look at the shot, I'm looking right up toward

3    the camera area.  And so, you know, the split-second moment

4    of, you know, this, of moving my arm -- and again, it wasn't

5    come on, you know, like this, down below.  That's what I

6    believe happened.

7    Q.    Okay.  So before we get up to where you broke the

8    windows, you also agree that you handed up a big white pipe up

9    a bike rack that was being used as a ladder.  Correct?

10   A.    I don't know what it was, but --

11   Q.    It appeared to be a big white pipe.  Right?

12   A.    Sure.  Yes.

13   Q.    And then you handed up another item that I can't really

14   identify, but it looked to be about this tall compared to your

15   body.  Right?

16   A.    I have no idea what it was.

17   Q.    But you handed it up.  Right?

18   A.    Somebody said hand this to that guy.

19   Q.    And you just did it without thinking?

20   A.    That's right.

21   Q.    Okay.  And then, you have already agreed that there was

22   chaos all around you.  Right?

23   A.    Right.

24   Q.    I think you called it mayhem?

25   A.    Right.

1    Q.   And then you get up through the northwest stairs, you go

2    through the scaffolding, come through the tarp, and then at

3    some point you barrel through the police line, up the stairs.

4    Right?

5    A.   You can see that's not the case.

6    Q.   Well, the video shows you running -- sprinting up the

7    stairs, doesn't it?

8    A.   The video from behind shows me running to clear.  Right.

9    Q.   And your testimony is that although you voluntarily stood

10   at the front of the police line for two minutes, waved God

11   knows who over, pointed to the Capitol building, your

12   testimony is then that you just got pushed up the stairs.

13   Right?

14   A.   It's clear on that video.  That I'm facing the police

15   officer.  I was nice and reserved and then a push comes from

16   behind me from several people.

17   Q.   Not intentional on your part at all.

18   A.   And a command comes from somebody else that's not me.

19   Q.   And did you listen to the command?

20   A.   Again, the crowd behind me clearly responded to this

21   command, and here comes a wave.

22   Q.   But you didn't respond to the command.  You didn't

23   respond to the commands that yelled "push, let's go."

24   A.   It's clear on that video I got pushed.

25   Q.   That you didn't respond to the command.

1    A.   It's clear on that video that I got pushed and then --

2    repeatedly.

3    Q.   But you were able to catch your balance.  You were able

4    to run with the crowd.  Right?

5    A.   Right.

6    Q.   And you touched an officer, even if you were pushed, when

7    you went forward, didn't you?  The officer in the blue, in the

8    jacket, you were clearly into him.  Right?

9    A.   I don't know that I pushed into him.

10   Q.   You don't remember?

11   A.   No.  I'm being pushed over.

12   Q.   And so your testimony is that you didn't intentionally

13   decide to ascend the stairs even though you'd already

14   intentionally ascended half of the stairs at that point.

15   Right?

16   A.   Correct.  Correct.

17   Q.   And then once you got to a point where you could stop

18   running, there were more bike racks, weren't there?

19   A.   I had seen the bike racks earlier with my first time up

20   into the scaffolding.

21   Q.   And then you bypassed those, right?

22   A.   I don't believe they were there, or that somebody else

23   had knocked them over or something before I got there.

24   Q.   You knew that there were barriers there and you bypassed

25   them.  Right?

1    A.    By the time I got to the top, there weren't barriers.

2    Q.    Well, that's not consistent with the video footage that

3    we watched where you made it to the top of the stairs and

4    there's a scuffle right in front of you, is it?

5              THE COURT:  Let's make sure we're doing questions and

6    answers rather --

7              MS. AKERS:  Sure.

8              THE COURT:  -- than argument between the two of you.

9              THE WITNESS:  I don't recall.  I certainly didn't hurl

10   a bike rack.

11   BY MS. AKERS:

12   Q.    And so then you picked up an object out of the grass,

13   correct?  And so at that point, you knew that you were going

14   to destroy something, didn't you?

15   A.    Yes.

16   Q.    And then you walked all the way through the northwest, we

17   call it the courtyard there, to the window, and that's where

18   you bashed the window.  Right?

19   A.    Right.

20   Q.    And then you bashed the window to the side, and then you

21   climbed in.  And you said it was because you were just being a

22   follower.  Right?

23   A.    Right.

24   Q.    So, again, not really your own volition like the stairs.

25   You were just following the crowd, weren't you?

1      A.   The stairs -- you can watch the police officers, the law

2      enforcement officers, no one had an option to stand.

3      Q.   No one had an option because the group of people you were

4      with charged forward, right?

5      A.   You can see clearly in that video I'm not with those

6      people.  There's next to no, if any, interaction with them.

7      Q.   Except for you -- you ran forward the second that the guy

8      next to you yelled "push, let's go"?

9      A.   So did the police officers.

10     Q.   That was just convenient, wasn't it?

11     A.   So did the police officers.

12          THE COURT:  Just a second.  No one had an option, you

13     say.  But as soon as you got to the top of the stairs, you had

14     an option, and you chose to go forward to the Capitol.

15          THE WITNESS:  Correct.

16          THE COURT:  You moved purposefully forward to the

17     Capitol.  You didn't divert and go away.  You didn't try to

18     go back down the stairs or try anything other than walk to

19     the Capitol.  And then you picked up an object on the way.

20          THE WITNESS:  Right.  But we were discussing the area

21     below.

22          THE COURT:  I know.  But you answer my question.

23          THE WITNESS:  Oh, sure.

24          THE COURT:  When you got up the stairs, whether you

25     were pushed up involuntarily or went with the flow

1    voluntarily, you then had an option.  And you took the option

2    of going to the Capitol building.

3           THE WITNESS:  Yes, sir.

4    BY MS. AKERS:

5    Q.   And you testified on direct, I believe, that you touched

6    elbows with the officer with the bike helmet.  Right?

7    A.   We were standing right next to each other.

8    Q.   So when I asked if you pushed, you disagree with my

9    characterization, but you agree that there was physical

10   contact, correct?

11   A.   There was two different instances.  So the first time at

12   the scaffolding area when we're standing next to each other,

13   looking down, that's when I was referencing touching elbows,

14   not at the time of the -- on the stairs.

15   Q.   All right.  And so then you voluntarily entered the

16   Capitol building at 2:13 p.m.  Correct?

17   A.   If that time is correct.

18   Q.   And you turned left and went straight toward the Senate

19   Wing of the building, didn't you?

20   A.   I went with the flow.

21   Q.   Your testimony is that it's just convenient that it

22   happened to be toward the Senate Wing, right?

23   A.   I don't know where anything in there is.  Anything.

24   Q.   You don't know anything, but you did end up in all of the

25   most secure places on the Senate Wing side of the building,

1    didn't you?

2    A.   I don't know what the most secure places on the Senate

3    Wing --

4    Q.   Well, you heard Officer Robishaw testify, for example,

5    that the Senate Chamber is a sacred place in the Capitol.

6    You ended up there, didn't you?

7    A.   Yeah, I did.

8    Q.   And you ended up in Nancy Pelosi's office, didn't you?

9    A.   I didn't know that was --

10   Q.   You didn't see the big sign on top of the door that said

11   "Speaker Pelosi"?

12   A.   It seems -- walking around.

13   Q.   Seems convenient, doesn't it?

14        MR. SHIPLEY:  Objection.  Argumentative.

15   BY MS. AKERS:

16   Q.   And you also ended up in the Mansfield Room, right off

17   of the Ohio Clock Corridor when you departed from the group,

18   didn't you?

19   A.   I don't know what the Mansfield Room is.

20   Q.   You agree that you went into a room off the Ohio Clock

21   Corridor, right next to the Senate Chamber, don't you?

22   A.   No, I do not.  I don't --

23   Q.   You didn't see the video of you walking into the room and

24   an officer escorting you out?

25   A.   Is that the officer that had the rifle?

```
 1        Q.   Yes.

 2        A.   Yes.

 3        Q.   So you did go in that room.  Right?

 4        A.   Yes, that was the room that had the --

 5        Q.   You went in the Mansfield Room --

 6             COURT REPORTER:  Okay.  Y'all need to stop.  You're

 7        talking all over each other and the record's a mess.

 8             MS. AKERS:  Sorry.

 9             COURT REPORTER:  Repeat all that, please.

10             MS. AKERS:  Sure.

11   BY MS. AKERS:

12        Q.   You the went in the Mansfield Room.  You went into

13        Speaker Pelosi's office.  You went in the Senate Gallery.

14        Then you went on the Senate floor.  You tried to open the

15        door of the majority whip.  Correct?

16        A.   I have no idea.

17        Q.   Remember when you checked the door handle and it was

18        locked?

19        A.    I checked a few door handles.

20             THE COURT:  You're asking questions that you're getting

21        no answers to.  So you're not getting --

22             MS. AKERS:  Understood, Your Honor.

23             THE COURT:  -- much other than your testimony.

24             MS. AKERS:  Fair.

25
```

1    BY MS. AKERS:

2    Q.   Correct?

3    A.   I forget the question.  Sorry.

4    Q.   Did you check the door handle of the majority whip's

5    office door?

6    A.   I have no idea where the majority whip's office door is.

7    I'm sure I checked a door handle.

8    Q.   And at trial did you see that above the door handle --

9    apparently you don't look above the doors -- it said "Majority

10   Whip"?

11   A.   I did not.

12   Q.   You don't remember that?

13   A.   No.

14   Q.   So your testimony is that although you had been talking

15   about coming to the Capitol since December, it was just

16   convenient that you ended up in all of those places on the day

17   of the certification of the Electoral College vote.  It was

18   just a coincidence.

19   A.   My -- my dad's been involved in politics for four

20   decades.  For the last 30 years or so he's put on political

21   fundraisers of sorts, has said, you know, at home, gosh, can

22   you believe this, isn't this terrible, isn't this criminal,

23   that kind of comment, regarding political things.  But his

24   output ultimately is -- you know, he puts on fundraisers with

25   rock shows.  And he's known for it.

1    That's what I was planning on doing.  I understand you're

2    trying to make a correlation between -- again, reading more of

3    the context of it, it's silly conversations between my closest

4    friends and my brother, brothers, and my -- and my presence at

5    the Capitol.  But ultimately my goal for that day was fun and

6    celebration as I stated repeatedly in text messages with

7    people.  Fun.  I wore identifiable clothes for a reason.  I

8    was hoping it would get filmed and I had a completely

9    different expectation for that day.

10   Q.   But that's not how it ended up, right?

11   A.   Well, just to finish the thought.

12   Q.   Well, Mr. Bozell, I haven't asked you a question for you

13   to -- Mr. Shipley can ask you all the questions he wants and

14   you can talk your ears off.  But I'm just saying -- I'm asking

15   you --

16        THE COURT:  Just ask the question.

17        MS. AKERS:  Sure.  Thank you.

18   BY MS. AKERS:

19   Q.   Is it your testimony that it was just by happenstance

20   that you ended up in all of those secure locations on January

21   6?

22   A.   Of course it is.

23   Q.   Okay.  Not only did you end up in all of those sensitive

24   locations, you also were involved in several instances where

25   police lines were overran in the building, weren't you?

1    A.    I heard the testimony the past two days, and I'm trying

2    to recall.  The suggestion in one hallway was that there was a

3    group of people that pushed through a crowd and then I believe

4    the -- I can't remember the name, but the agent even

5    suggested, you know, I just followed behind the police line --

6    I'm sorry, the crowd, and had nothing to do with pushing that

7    line.  And I don't believe there's another one.  So no.  No.

8    Q.    Okay.  So when you got to the Crypt, the video on your

9    phone, you don't remember a police line there that --

10   A.    No.

11   Q.    -- you got through?

12   A.    No.

13   Q.    No?  And when you went up to the Senate Gallery and there

14   were plain clothes officers guarding the door, you don't

15   remember bypassing them?

16   A.    So --

17   Q.    Yes or no?

18   A.    No.

19   Q.    And when you were at the Senate Carriage Door, which is

20   the incident you were just talking about, you don't remember

21   officers standing there and saying you can't go farther, like

22   that lady was in the video, and then --

23   A.    The Senate Carriage Door?

24   Q.    It's the instance you were just referring to where the

25   agent testified you were in that group that pushed through the

1      officers.  You don't remember that either?

2      A.   He testified that there was a group and that I was behind

3      the group.

4      Q.   So that was another instance.  Right?

5      A.   Okay.  So we are -- already suggested that's not an

6      instance.  You mentioned the Senate entrance.  I thought those

7      were -- that everybody in that group was protesters.

8      Q.   And they were just fistfighting?

9      A.   There were fistfights in the scaffolding.  There were

10     people, protesters, in the scaffolding.  And that wouldn't

11     have been the first time that day.

12     Q.   So your testimony --

13     A.   That wouldn't have been the last time that day that I saw

14     protesters strike each other.

15     Q.   Your testimony is that when you were about to enter the

16     Senate Gallery, where our lawmakers had just evacuated, and

17     you saw people fighting, fistfighting outside the door, your

18     expectation was that those were just rioters fighting?

19     A.   Suggesting that I'm doing a diagnosis of every moment and

20     drawing conclusions and my brain is spitting out conclusive

21     data is -- would not be accurate.

22     Q.   You weren't really thinking, were you?

23     A.   I see people -- again, there's people walking toward

24     these doors, and from what I see, the doors open, they go in

25     the doors.  In fact, frankly, I think at that one somebody

1    stands at the door and is patting people in, one of the

2    protesters is patting people in.

3    Q.   And that was after the fistfight that you saw, right?

4    A.   I don't remember seeing the fistfight.

5    Q.   And then you get into the Senate Gallery, and you start

6    going through one of the emergency kits, don't you?

7    A.   It's -- it's -- it's like easy to open.

8    Q.   So is that a yes?

9    A.   You open it up --

10   Q.   Yes?

11   A.   I wouldn't characterize it as going through.

12   Q.   You don't remember the video where you were holding up

13   that big orange item?

14   A.   No.

15   Q.   And then after you picked up, or however you want to

16   characterize it, the emergency kit, then you started climbing

17   over the handrails to get to the other side of the Senate

18   Gallery, didn't you?

19   A.    I didn't see that on the video, but if -- I won't argue

20   it.

21   Q.   Did you do it?

22   A.   Again, I didn't see it, but I wouldn't argue that -- I'd

23   have to see it.

24   Q.   Did you go to the other side of the Senate Gallery?

25   A.   In the Senate Gallery I went doors to corner to doors

1      if I remember correctly.

2      Q.   And once you got to the other side, another rioter put

3      his jacket over the C-SPAN camera.  Right?

4      A.   I didn't see that.

5      Q.   You didn't see that?

6      A.   No.

7      Q.   Did you see it in the video?

8      A.   I did.

9      Q.   You didn't see that in person?

10     A.   I don't remember seeing it in person, no.

11     Q.   And one second after he covered the camera, you pointed

12     the camera directly at the ground.  And is it your testimony

13     that that was just coincidental, that you also obstructed the

14     camera that time?

15     A.   I'm not -- from the beginning I've not quite understood

16     what the line here was in regard to what effect at all the

17     direction of the camera would have on anything.  And so, no --

18     Q.   Well, Mr. Bozell, you realized when you were in the

19     Senate Chamber, you and others were being recorded.  Correct?

20     A.   Do I realize that now?

21     Q.   Yeah.

22     A.   Yeah.  And I realized that then.  There was cameras

23     everywhere.

24     Q.   And so you moving a camera would prevent it from

25     recording what was going on, wouldn't it?

1    A.    There's cameras everywhere.

2    Q.    But would you moving that camera prevent it from

3    recording what was going on?

4    A.    Well, there was nothing going on.

5    Q.    Other than a mob that just breached the Capitol building.

6    Correct?

7    A.    The Senate floor was empty.  There was nothing going on.

8    Q.    And so is it your testimony that you just moved that

9    camera and pointed it towards the ground for no reason?

10   A.    You see me.  I'm kind of, you know, look at shiny thing.

11   Q.    And it just coincidentally ended up facing towards the

12   ground.  Is that your testimony?

13   A.    Yeah.  Yes.

14   Q.    And then you testified on direct that after that you left

15   and ended up in the Senate Chamber and you didn't even realize

16   it was the Senate floor, did you?

17   A.    I testified I didn't realize it was the Senate floor?

18   Q.    You didn't realize where you were going, I believe you

19   testified.

20   A.    I didn't know where I was going.  No.

21   Q.    So it's also a coincidence that after you bypassed the

22   plain clothed officers who were fistfighting, made it onto

23   the Senate Gallery, coincidentally just put the camera on the

24   floor, then made it downstairs and entered the Senate Chamber

25   a couple minutes later, that was just all a coincidence, that

1    chain of events?

2    A.   I'm -- if you're suggesting I knew where I was going, I

3    had no idea where I was going.

4    Q.   Okay.  So you entered the Senate floor, right?  And did

5    you see people looking through all the senators' desks,

6    pulling out papers, yelling things?

7    A.   I saw people near -- no.  I didn't see that as much as

8    I saw people on the step up, you know, where you would see a

9    -- if you're watching on TV.

10   Q.   You knew that you shouldn't have been in that room,

11   right?

12   A.   Um, there was a value to the one spot that I thought

13   people could identify, and so, like knowing where it was was,

14   again, of value.  And so I -- I could leave it at that, but

15   it's also -- it's different in that it's brightly lit and you

16   come in and it's sort of a respite from the dizziness of the

17   hallways.  And so -- that's part of the reason why, you know,

18   when I was on the floor I thought, if you're going to find

19   somebody, this is your best shot.

20   Q.   And who were you looking for?

21   A.   I was worried my mom was in the building.

22   Q.   Why were you worried that she would be in the building?

23   A.   So when you look at the shot of me looking out the

24   window, you can actually see outside the window, and there's

25   very few people outside.  And since there's no indication in

1    regard to, you know, everybody had gone home, my impression in

2    my head was everybody had come in or something to that effect.

3    And I was --

4    Q.   Why would that be worrisome, that your mom was in the

5    building?

6    A.   Because I wasn't leaving without my mom.

7    Q.   Was it a dangerous situation in the building?

8    A.   I had promised -- I had promised my mom that morning I

9    wasn't leaving -- I wouldn't separate from her.

10   Q.   Well, you already had separated from her, didn't you?

11   A.   I know.  I know.

12   Q.   And so you were on the Senate floor looking for your mom,

13   and then at some point you look up at a camera, directly at

14   the camera, and you look terrified.  Why was that?

15   A.   I have no idea.

16   Q.   You don't remember?

17   A.   I have no idea.

18   Q.   Did you realize that you were actually on camera,

19   although you moved the other camera?

20   A.   I think anybody that was there that day that thought they

21   weren't on camera for any moment was being -- didn't -- was

22   being ridiculous.  I think -- no.  There was no moment you

23   would have gone oh, no, now we're on camera.  There's cameras

24   everywhere.

25   Q.   Then why did you look so terrified when you looked

1     directly up at the one camera that you hadn't moved towards

2     the ground?

3     A.   I don't know that it -- I'm looking at the camera, and

4     I don't know if there's somebody up there doing something.

5     I don't know...

6     Q.   You don't remember?

7     A.   I don't remember.  I don't know where it was.

8     Q.   Well, that seems convenient.

9     A.   And I'm not -- and I just -- for the record, I don't

10    agree that I was terrified in that moment.  I don't know that

11    I was or was not.

12    Q.   And then at one point you also made it to the Rotunda

13    doors --

14         THE COURT:  I think we're going to stop here and not go

15    to the Rotunda.  We're going to break for the day.  It's after

16    five o'clock.  Except I have a couple questions.

17         THE WITNESS:  Please.

18         THE COURT:  How long did you stay in the Senate

19    Chamber, on the Senate floor?

20         THE WITNESS:  Senate floor?  I don't recall.

21         THE COURT:  Were you there 10 minutes?

22         THE WITNESS:  I would say less than that.

23         THE COURT:  Less than five minutes?

24         THE WITNESS:  I would guess less than five.

25         THE COURT:  Less than two minutes maybe?

1          THE WITNESS:  I feel like I did a circle in front of

2     the podium, but you could see the speed I'm kind of moving

3     most of the time, it's a little circle and...

4          THE COURT:  And you've testified that that was a place

5     that you thought was a good spot to be because maybe you and

6     your mother would be able to reconnect there.

7          THE WITNESS:  Or at least know --

8          THE COURT:  Just answer my question.

9          THE WITNESS:  Yes, sir.  Or at least know where it was.

10         THE COURT:  Right.  And yet you only stayed there for

11    two minutes.

12         THE WITNESS:  No, no, no.

13         THE COURT:  No, no, no?  You just said you did.

14         THE WITNESS:  I apologize.  I remember the calling

15    coming from up top -- there was -- that's what it was.  Jake

16    Chansley started calling, started yelling from up top, and I

17    stopped, and that's what I'm looking at up there.  And I'm

18    looking at -- I believe -- you had suggested I was terrified,

19    but I believe I smiled, if that's what it says in the video,

20    because, you know, he's doing like animal --

21         THE COURT:  I don't think that's answering my question.

22    It's interesting that you want to add more information, but I

23    want you to answer my question.

24         THE WITNESS:  What I'm suggesting --

25         THE COURT:  So my question was, you had said that you

1      thought it was a good idea to be in the Senate Chamber because

2      that was a place that you and your mother might be able to

3      both gravitate to and reconnect.

4           THE WITNESS:  Right.

5           THE COURT:  Then why did you only stay there for a

6      matter of mere minutes and then leave?

7           THE WITNESS:  It was probably more like five or six

8      minutes.

9           THE COURT:  No.  That's not what you said a minute ago.

10          THE WITNESS:  Right.

11          THE COURT:  But why did you leave that quickly if you

12     were going to reconnect with your mother because that was a

13     good place to do that?

14          THE WITNESS:  She wasn't there, number one.  Number

15     two, I thought it was the best place.  I didn't think it was a

16     great place, but to me I thought it was the best place.

17          THE COURT:  Best but not great?  I don't understand

18     that.

19          THE WITNESS:  All I seen was lots of rooms, lots of

20     hallways.  I don't know that she's going to make it here.  And

21     if there's oh so many people in the building, how come they're

22     not all here?  How come they're not here?  How come you're not

23     seeing them here?  So in my mind, she's not here, maybe this

24     isn't --

25          THE COURT:  Now, wait a minute.  Now you seem to be

1    telling me that you purposefully went into the Senate Chamber

2    because you thought it would be a great place, but yet you

3    told me, everybody, that you didn't know where you were going.

4         THE WITNESS:  Right.  So when I go into the chamber

5    down below, I walk in, oh, okay, I'm in the Senate Chamber.

6    And then like I said, because it's brightly lit, because you

7    can actually hear inside there, I thought this might be a

8    place where people will ultimately have a chance -- will be

9    able to get to and people will know what this place is.

10        THE COURT:  But yet you didn't stay there.  You left

11   virtually immediately.

12        THE WITNESS:  Well, about five, six minutes later.

13   And I know --

14        THE COURT:  I don't think five or six minutes was

15   what you first testified to, but okay.  That's what you're

16   testifying to now.

17        THE WITNESS:  Again, the suggestion being -- it just

18   dawned on me what I had seen, while we were discussing the

19   camera, was because that Jacob Chansley had come in and was

20   doing these animal calls, and so, you know, stopped and

21   listened and it was a few more minutes than just a couple is

22   what I'm suggesting.  And so stayed and just sort of wanted to

23   note where that was.  Okay, so this is where this is.  I don't

24   know what any other room is, so if I have to say hey, meet me

25   at this place, I can meet at that place.

1          That was my -- in my mind what would be useful information.

2     The first potentially useful information I could have

3     gathered.

4               THE COURT:  All right.  Let's resume at 9:30 tomorrow

5     morning.  How much longer do you think your cross-examination

6     will take?

7               MS. AKERS:  Not much longer.  30 minutes or less.

8               THE COURT:  All right.  And we'll see everybody then.

9     Thank you.

10          (Proceedings adjourned at 5:09 p.m.)

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne