UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .
                                   .
          Plaintiff,               .  CR No. 21-0216 (JDB)
                                   .
     v.                            .
                                   .  Washington, D.C.
LEO BRENT BOZELL,                  .  Friday, September 8, 2023
                                   .  9:39 a.m.
          Defendant.               .
. . . . . . . . . . . . . . . . .  Pages 361 to 522


DAY 3
TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE



 APPEARANCES:

For the Government:            ASHLEY AKERS, ESQ.
                              BRENDAN BALLOU, ESQ.
                              U.S. Attorney's Office
                              601 D Street NW
                              Washington, DC 20530


For Defendant:                WILLIAM L. SHIPLEY, ESQ.
                              Law Offices of William L. Shipley
                              PO Box 745
                              Kailua, HI 96734


Court Reporter:               BRYAN A. WAYNE, RPR, CRR, CCP
                              U.S. Courthouse, Room 4704-A
                              333 Constitution Avenue NW
                              Washington, DC 20001




Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

# C O N T E N T S

### TESTIMONY

LEO BOZELL IV:     Cross-Examination Continued............. 363
                   Redirect Examination.................... 424

DANIEL WRIGHT:     Direct Examination...................... 444
                   Cross-Examination....................... 448

\*   \*   \*

### EXHIBITS RECEIVED

Government Exhibit No. 407.1 ........................... 382
Government Exhibit No. 600.1 ........................... 446

\*   \*   \*

Government Closing Argument ........................... 455

Defense Closing Argument .............................. 472

Government Rebuttal Argument .......................... 496

Verdict ............................................... 499

1                    P R O C E E D I N G S

2          THE DEPUTY CLERK:  Good morning, Your Honor.  We're on

3     the record in criminal case 21-216, United States of America

4     versus Leo Brent Bozell.  Starting with government counsel,

5     please approach the podium and state your appearance for the

6     record.

7          MS. AKERS:  Good morning, Your Honor.  Ashley Akers on

8     behalf of the United States.  With me is co-counsel Brendan

9     Ballou, Special Agent Daniel Wright, and our paralegal

10    specialist, Aschya Boone.

11         THE COURT:  Good morning to all of you.

12         MR. SHIPLEY:  Good morning, Your Honor.  William

13    Shipley on behalf of Defendant Leo Bozell, who is at counsel

14    table and is ready to resume the stand.

15         THE COURT:  Good morning, Mr. Shipley and Mr. Bozell.

16    And are we ready, Ms. Akers?

17         MS. AKERS:  Yes, Your Honor.

18         THE COURT:  Mr. Bozell, please.

19       (Witness resumes the stand.)

20       Good morning again, and I remind you you're still under

21    oath.  Ms. Akers.

22         MS. AKERS:  Thank you, Your Honor.

23                    CROSS-EXAMINATION CONTINUED

24    BY MS. AKERS:

25    Q.   Good morning, Mr. Bozell.  Yesterday you testified you

1    tore the tarp to allow visibility for officers.  Is that

2    correct?

3    A.   That I allowed for the ability of officers?

4    Q.   That you tore the scaffolding tarp to allow visibility

5    for officers.  Is that your testimony?

6    A.   Yes.

7    Q.   I'm going to pull up what's been admitted as Government

8    Exhibit 405.  I'm going to play from 2:15, and just please

9    take a look at this.

10        (Video played.)

11        And Mr. Bozell, I stopped at 2:25.  And you saw yourself

12   in that video, right?

13   A.   Right.

14   Q.   Yes?

15   A.   Yes.

16   Q.   And you see people are crawling under the scaffolding

17   bars to get up the stairs?

18   A.   Right.

19   Q.   And you see yourself bend down to do the same?

20   A.   Right.

21   Q.   I'm now going to play from 2:25 until 2:36.

22        (Video played.)

23        Stopping at 2:36, do you see all these officers falling

24   on the stairs and fighting with people?

25   A.   I do.

1    Q.    And they're close to you, right?

2    A.    I don't see me, but I would assume.

3    Q.    Given that we saw you in the preceding 10 seconds?

4    A.    Right.

5    Q.    And at this point you've made it past this wall in the

6    middle of the scaffolding, the wall in the middle of the

7    screen right here, correct?

8    A.    No.  I never had to go through that wall.

9    Q.    Right.  You actually went around it, correct?

10   A.    Right.

11   Q.    Most of the rioters were standing in front of it and you

12   walked around it, or climbed around it.  Correct?

13   A.    No.  That would not be correct.  It was never on my path.

14   So I -- trying to give an assessment of it, it was -- people

15   coming straight up would have hit that.

16   Q.    At this point you're at the front of the group of the

17   people storming up the stairs, aren't you?

18   A.    Which was -- yes.

19   Q.    Okay.  I'm going to continue playing.

20         (Video played.)

21         I stopped at 3:40.

22              THE COURT:  It hasn't stopped yet.

23              MS. AKERS:  I tried to, at least.

24   BY MS. AKERS:

25   Q.    I stopped at 3:47.  At this point the officers have

1    retreated all the way to the top of the stairs, correct?

2    A.   Correct.

3    Q.   And they start to move the bike racks to prevent the

4    people from continuing to progress.   Correct?

5    A.   Yes.

6    Q.   So at this point the officers are well aware of the

7    rioters' presence under the scaffolding, aren't they?

8    A.   There are not police officers at the top.

9    Q.   I'm now going to pull up what has been marked as

10   Government's Exhibit 424.

11          THE COURT:   It's in evidence.

12   BY MS. AKERS:

13   Q.   I'm going to start at 36:55.   And this video has sound;

14   turn that on.

15          (Video played.)

16          And stopping at 37:19, I'm just going forward a few

17   frames, do you see yourself in this side of the screen here?

18   A.   I do.

19   Q.   And that's you going around to the left of the wall.

20   Correct?

21   A.   The wall was never in my way.

22   Q.   And you see the officer line standing here?

23   A.   Yes.

24   Q.   And you hear how loud it is?

25   A.   Of course.

1    Q.   And obviously the officers are well aware of the presence

2    of the crowd at this point?

3    A.   These officers are.

4    Q.   I'm skipping ahead to 38:24.  Actually, 38:35 is where

5    I'm going to start.

6         (Video played.)

7         I stopped at 38:56, and you just saw rioters chucking

8    objects to the officers at the top of the stairs.  Right?

9    A.   What with officers?  Excuse me?

10   Q.   Sure.  I'm going to pull back to --

11        THE COURT:  I think he just didn't understand your

12   question.

13        MS. AKERS:  I'm sorry.

14   BY MS. AKERS:

15   Q.   I asked if you saw the rioters chucking objects at the

16   police officers at the top of the stairs.

17   A.   In the video, yes.

18   Q.   And you were in this area, right?

19   A.   I don't see myself.

20   Q.   You saw yourself about 30 seconds ago, didn't you?

21   A.   Right, but I don't see myself now.

22   Q.   Did you leave this area?

23   A.   No.

24   Q.   So you were in this area, weren't you?

25   A.   I should be hanging -- you know, the inside wall of the

1    nylon.

2    Q.   And you see at this point in the middle of the screen a

3    rioter holding a hammer about to throw it at an officer, don't

4    you?

5    A.   I see -- yeah.  I see him holding something, yeah.

6    Q.   I'm going to continue playing.

7         (Video played.)

8         And I'm now stopping at 39:26, and this is you pulling

9    the tarp, correct?

10   A.   Correct.

11   Q.   And you're pulling the tarp directly in front of the

12   officer line that just retreated up the stairs, right?

13   A.   Correct.

14   Q.   The officers who just saw and retreated from the violence

15   under the scaffolding, right?

16   A.   Correct.  But like I said, not the ones behind and not

17   the ones above.

18   Q.   Mr. Bozell, I'm trying to circle in the middle of the

19   screen.  There's a big wall here, isn't there?

20   A.   I couldn't see that.

21   Q.   So your testimony is you were tearing the tarp to help

22   other officers, not these officers, right?  These officers

23   didn't need help, did they?

24   A.   What I testified to yesterday was that in this moment I

25   wanted to get to the front of the crowd.  My understanding was

1    that the police officer with the bicycle helmet would be in

2    the same spot.  He was not, at least I couldn't see him off to

3    the edge.  I had thought that he was in command or in control

4    of the situation and that if I could get up there, maybe,

5    because we have rapport, that we could somehow help alleviate

6    the situation some way.

7         So when I get up there, you can't see half of what I

8    could see before.  Obviously, now, like I said yesterday, it's

9    mayhem inside this area.  My thought going in was that you'd

10   be able to say something to somebody, as I'd been able to say

11   something to somebody before, my first time up.  There's no

12   opportunity to be heard in any way, shape, or form.  So

13   knowing and being fearful of the fact that the police officers

14   up top -- my thinking was that -- in my head that that was

15   some sort of last -- at that point it -- I don't know.  So I

16   was fearful of the rush going up.

17   Q.   But you joined it.  Right?

18   A.   We've already established that that's not what happened.

19   Q.   And --

20        THE COURT:  Excuse me.  What did you say?

21        THE WITNESS:  We've already established that that's not

22   what happened.

23        THE COURT:  The testimony will speak for itself.

24      Go ahead.

25        THE WITNESS:  So I'm pulling the nylon.  Like I said

yesterday, I'm pulling the nylon in hopes that everyone

behind -- and you keep -- continue to refer to me trying to

provide visibility for the police.  Yes.  But I was also

trying to provide visibility for the people inside.

     And if you notice, because there's some of these things --

barriers, things to get through that you have to sort of --

I'm trying to describe this well.  Because you have the rail

and you have to dip under -- this is the first time I saw a

hammer launched.  I did not see -- I didn't see anybody

throwing a hammer.

     So I come up around the side in hopes of finding this

particular police officer who, again, I thought was in charge.

And when that was not an opportunity -- you have to keep in

mind I had been inside of the -- so the nylon does this.  I

had been here with the police officer.  Now I can't -- now

there's no getting to the spot.  Now I can't see, they can't

see.  If I can't see, I know they can't see, and if they can't

see, they can't see.  And it has to be able to improve upon

the situation if there's visibility.

     There's a tremendous amount of fear, and ultimately -- in

the whole scenario with everybody.  And ultimately, people

being able to look each other in the eyes has to help, has to

help.

BY MS. AKERS:

Q.   Mr. Bozell, you testified yesterday that everything was

1    being recorded.  Right?

2    A.   I suggested that about being inside.

3    Q.   And you testified yesterday that you actually climbed

4    these stairs twice.  Right?

5    A.   Yes.  No.  No.  No, I didn't.  No.  In the scaffolding

6    area twice.

7    Q.   Okay.  And you've actually never seen another video of

8    you climbing the stairs that first time, right?

9    A.   Again, it was -- it was the scaffolding area.

10   Q.   Have you seen a video of you climbing the stairs that

11   first time that you've testified about?

12   A.   I'm not sure.  I'm not sure.  So when I see the videos,

13   it's hard to differentiate which was the first time and which

14   was the second time.

15   Q.   Well, there was one break of the police line under the

16   scaffolding.  So is it your testimony that you climbed it

17   during that break, climbed it back down and then climbed it

18   again?

19   A.   Can you repeat that?

20   Q.   I'm just going to move on.  I'm pulling up Government

21   Exhibit 1003, which is already in evidence.  And after you

22   tore through the tarp, you waved people over.  Correct?

23   A.   No.

24   Q.   Did you say no?

25   A.   No.  Incorrect.

1    Q.   You didn't wave your arm in the air?

2    A.   I did.

3    Q.   And you weren't waving at people?

4    A.   So, again, yesterday, you showed the video.  It appears

5    as if I'm looking up to the top part where the camera's

6    facing.  And then of course, as I --

7    Q.   All right.  I'm going to play from 49 seconds, and I'm

8    going to stop at 58 seconds.

9         (Video played.)

10         And you see yourself waving.  Correct?

11    A.   Yeah.

12    Q.   You're facing the Capitol building.  Correct?

13    A.   Right.

14    Q.   I'm going to continue playing.

15         (Video played.)

16         And look at this officer in the blue, please.

17         Yesterday you testified that you were waving and so was

18    the officer; you were waving like the officer, didn't you?

19    A.   No.  What I said was moments after -- I want to clarify

20    this.  So you see me looking at the camera.  The camera would

21    have been, you know, up on -- not on the building.  I don't

22    know where exactly the camera was, but in the direction of the

23    building, and there were police officers up there.  Here --

24    Q.   I've skipped forward because I was done with my question.

25    I just asked if you were waving.

1    A.   Oh, okay.

2    Q.   I'm now going to pull up 1:40.  And you see yourself

3    now -- excuse me.  You see yourself now at 1:46, and now

4    you're facing the crowd and you appear to be waving again.

5    Correct?

6    A.   No.  I'm facing the police officer.

7    Q.   I'm going to continue --

8    A.   See us looking at each other?

9    Q.   This is not your right arm facing the crowd here?

10   A.   No, I believe that's my left arm.

11   Q.   Where's your head, then?

12   A.   Behind the flower pot.

13   Q.   So your left arm is behind the flower pot, you're looking

14   directly at the flower pot, and you're waving your left arm

15   like this?

16   A.   And he's looking at me.  The police officer --

17   Q.   Well, look at this.  I just stopped at 1:54, and the bill

18   of your hat appears to be facing forward, does it not?

19   A.   No.  That's somebody else behind me.

20   Q.   I'm going to skip ahead to 2:21.  Starting at 2:20.

21        (Video played.)

22        Now you're facing officers, correct?

23   A.   Correct.

24   Q.   And now you're pointing directly at the Capitol building,

25   aren't you?

1    A.    Again, I'm pointing in the same direction, yes.

2    Q.    You're pointing at the Capitol building, aren't you?

3    A.    Correct.

4    Q.    As you're having what you've --

5    A.    Wait.

6    Q.    -- described as --

7    A.    I'm sorry --

8          THE COURT:  Don't interrupt the question.

9          THE WITNESS:  Sorry.

10   BY MS. AKERS:

11   Q.    While you're pointing at the Capitol building, you're

12   having as -- what you've described as just small, small talk

13   with these officers.  Right?

14   A.    No.  I believe at this point there was, you know, this

15   assessment going on, and they were discussing things with

16   each other.  Obviously, you know, there's protesters behind

17   me.  It was very difficult to hear, etc., but it was calm.

18   Q.    And you pointed at the Capitol building where you then

19   proceeded almost immediately thereafter.  Right?

20   A.    Where I almost proceeded -- excuse me?

21   Q.    Immediately thereafter.  Right?

22   A.    So, I --

23   Q.    It's a yes-or-no question, sir.

24   A.    Well, there's an issue.  I can't see my hand because

25   there's a yellow thing in front of it.

1    Q.    I'm going to pull up Government Exhibit 118.

2              THE COURT:  Before we leave that, let me ask a

3    question.

4              THE WITNESS:  Please.

5              THE COURT:  These waves of the arm that are shown on

6    the video by you, is it your testimony that you were waving at

7    police officers who were located across the way, trying to get

8    them to come over?

9              THE WITNESS:  So it's more --

10             THE COURT:  Who were you waving at?

11             THE WITNESS:  So you could see the police officers --

12             THE COURT:  Who were you waving at?  Just give me the

13   answer to who.

14             THE WITNESS:  I was looking at the -- it was the police

15   officers.  If you could just get them over here --

16             THE COURT:  Why did you want more police officers over

17   there?  Were you coordinating with the police to assign their

18   forces to various places?

19             THE WITNESS:  The conversation we had, the particular

20   officer and I, inside, the first time --

21             THE COURT:  Well, I don't want you to tell me what --

22             THE WITNESS:  Yes.

23             THE COURT:  -- officers told you --

24             THE WITNESS:  Yes.

25             THE COURT:  -- because you can't testify to that.

1          THE WITNESS:  The answer to that would be, yes,
2     I thought I had some input.
3          THE COURT:  And when you were going up the stairs
4     inside the scaffolding, you thought that by pulling aside
5     the scaffolding you were helping to promote rapport with
6     the police officers and could help to calm the situation.
7     That's what you testified, I believe.
8          THE WITNESS:  Yes.  I thought if everybody could see
9     what --
10         THE COURT:  But what responsibility did you have with
11    the rioters?  Had they put you as their spokesperson?
12         THE WITNESS:  No.
13         THE COURT:  What led you to believe that they would pay
14    any attention to you, the rioters would pay any attention to
15    you in trying to speak to the police or calm things?
16         THE WITNESS:  I felt like I had to take a chance to see
17    if I could be effective.  It just seemed too dangerous not to,
18    and that if there was an opportunity if you could help, even
19    if a slim chance -- I'm a salesman --
20         THE COURT:  So the things that you were undertaking to
21    do to help were ripping aside the nylon sheeting on the
22    scaffolding to, in your view, improve the visibility of what
23    was going on, and waving police officers to come over to
24    reinforce the police line.
25         THE WITNESS:  Correct.

1          THE COURT:  Go ahead.

2     BY MS. AKERS:

3     Q.   I pulled up Government Exhibit 117, which is the version

4     of the same video we were watching without the yellow circle.

5     I asked if you were pointing at the Capitol building and you

6     said you couldn't see your finger because of the yellow

7     circle.  So I'm going to start playing at 2:18.

8          (Video played.)

9          I stopped at 2:34.  And you see yourself pointing at the

10    Capitol, don't you?

11    A.   I do.

12    Q.   I'm going to continue playing until 2:45.

13         (Video played.)

14         You're still at the front of the officer line, correct?

15    A.   Correct.

16    Q.   And I stopped here at 2:47, and I'm just going to go

17    frame by frame.  And just for all of our purposes, I just put

18    an arrow over your head.  Correct?

19    A.   I think so.  I don't have the -- I don't see the white

20    that would identify me, but okay.

21    Q.   And you don't see the white because you actually put your

22    head down to go forward, didn't you?

23    A.   I'm obviously not going forward.  Look where my head's

24    pointing.

25    Q.   I'm just going to pull back one second to 2:45, and I'm

1    going to go frame by frame.

2        (Video played.)

3        This is you, isn't it, Mr. Bozell?

4    A.   I believe so.

5    Q.   And you're right in front of the officer in the blue,

6    aren't you?

7    A.   It appear -- yes.

8    Q.   And your head is facing down like bulls do before they

9    proceed forward, isn't it?

10   A.   Like somebody who's falling.

11   Q.   Still you?  Right in front of the officer?

12   A.   Okay.  If you say so.  I looked away.  I apologize.

13   Q.   Is it you?

14   A.   I missed a frame, so I apologize.

15   Q.   So yes?

16   A.   I just said I missed a frame.  I looked away, I apologize.

17   Q.   I'll go back.

18   A.   And there's two people, so I'm not sure.

19   Q.   To 2:46 I'm going back.  I'm just going to go frame by

20   frame.  (Video played.)

21       Just so we're all on the same page, I just put an arrow

22   over your head.  Correct?

23   A.   Correct.

24   Q.   Correct?

25   A.   Correct.  Yes.

1    Q.   Now I'm going to pull up Government Exhibit 118, which

2    is that same area but a different angle slightly.  And I'm

3    starting at 44 seconds.

4         (Video played.)

5         I stopped at 46 seconds.  You see the officer in the

6    blue, right?

7    A.   I do.

8    Q.   And he is facing the crowd still, isn't he?

9    A.   The crowd on the stairs?

10   Q.   Correct.

11   A.   Or the crowd down below?  I feel like he's looking down

12   below, but --

13   Q.   He has his arm up in sort of a defensive position, right?

14   A.   Correct.

15   Q.   And the officer in front of him appears to sort of be

16   falling backwards, correct?

17   A.   I'm not sure what you're referencing.

18   Q.   All right.  I'm going to go frame by frame here.

19        And just so we're all on the same page, this is you,

20   isn't it?

21   A.   I -- I wouldn't -- I guess.

22   Q.   And now this is you, isn't it?

23   A.   You can see the hand on me, pushing me.  I mean --

24   Q.   Sir, the guy in the green behind you, he's standing

25   straight up, isn't he?

```
1    A.    There's a whole --
2    Q.    Yes or no?
3    A.    There's a wave of people.  If I'm --
4    Q.    Mr. Bozell, I'm just asking you --
5    A.    No.
6    Q.    -- is the man standing --
7    A.    No.
8    Q.    Okay.  So the man standing behind you in green appears
9    to be standing straight up.  You on the other hand appear to
10   be leaning forward.  Correct?
11   A.    The man behind me does not appear to be standing straight
12   up.  He appears to be leaning forward.  You can see how far
13   down I'm leaning and ultimately he'd have to be leaning to be
14   at that height as well.
15   Q.    And I'm going to continue playing frame by frame.
16         At this point the man behind you is not touching you,
17   is he?
18   A.    I can't tell.
19         (Video played.)
20   Q.    And here you are.  We finally see the white on your
21   sweatshirt, right?
22   A.    Correct.
23   Q.    And here we are again, and there's really no daylight
24   between you and the officer in front of you, is there?
25   A.    I see -- I can't see.  I see a bubble.
```

1            THE COURT:  I'm sorry?  You better move the microphone

2       close to you.

3            THE WITNESS:  I'm sorry.  It looks like a bubble to me.

4       I don't know if that's him or a glitch in the camera or

5       something.

6       BY MS. AKERS:

7       Q.   It appears to be a bit of a glitch in the camera, but

8       I'm just asking, there appears to be no daylight between you

9       and the officer during this whole period, right?

10      A.   I don't agree with that.

11      Q.   You see space between you two?

12      A.   Again, it's so grainy, I don't know what I see.

13      Q.   Yesterday --

14      A.   Obviously --

15      Q.   -- you testified when you got to the top of these stairs

16      you didn't see a bike rack, the bike rack wall that Officer

17      Murray testified that he helped erect.  Isn't that your

18      testimony?

19      A.   So I believe I stopped short of the top of the stairs.

20      I believe --

21      Q.   That's not the question I asked.  I asked, yesterday you

22      testified that you didn't see a bike rack barrier at the top

23      of the stairs when you got there.  Right?

24      A.   Going up the stairs -- you know, my thoughts aren't on --

25      Q.   Mr. Bozell, I'm not asking your thoughts.  I'm asking

1    when you made it to the top of the stairs, did you in fact

2    see a bike rack barrier?

3    A.   I don't remember seeing anything at the top there.

4    Q.   I'm pulling up Government Exhibit 407.  I'm going to move

5    for the admission of this video.  We previously admitted a

6    short clip of this video and we're now seeking to admit the

7    whole thing.

8         THE COURT:  So you're moving for the admission of

9    407...

10        MS. AKERS:  Point 1.

11        THE COURT:  There is a 407.1 --

12        MS. AKERS:  That must be the clipped one.

13        THE COURT:  -- on your list.  And that's what you want

14   to move?

15        MS. AKERS:  Correct.  Thank you, Your Honor.

16        THE COURT:  Mr. Shipley?

17        MR. SHIPLEY:  No objection, Your Honor.

18        THE COURT:  Without objection, 407.1 is admitted.

19                       (Government Exhibit No. 407.1

20                       received into evidence.)

21   BY MS. AKERS:

22   Q.   I'm going to play starting at 9:52.

23        (Video played.)

24        And stopping at 9:56 to orient ourself, I'm putting an

25   arrow over a man in a blue sweatshirt.  That's you, isn't it?

1    A.   If you say so.

2    Q.   I'm asking you --

3    A.   I believe so.

4    Q.   -- if that's you.

5    A.   It appears to be.

6    Q.   And you're near the front of the line of the people who

7    ascended up the stairs.  Correct?

8    A.   Well, there's -- you know, I'm counting six people in

9    front of me.

10   Q.   Yeah, I said near the front of the line.  Correct?

11   A.   Well, how would I be at the front of the line if there's

12   six people in front of me?

13   Q.   Mr. Bozell, yesterday you testified there were tens of

14   thousands of people on the west front.  There's only six

15   people ahead of you.  So you would agree that means you're

16   near the front of the line.  Right?

17   A.   No.

18   Q.   No?

19   A.   There's six people in front of me.

20   Q.   All right.  So you're six people back, and there's

21   actually a bike rack wall right in front of you, isn't there?

22   A.   Appears to be, yes.

23   Q.   All right.  I'm going to continue playing.

24        (Video played.)

25        And now you're looking directly at the bike rack wall,

1    aren't you?

2    A.    Yes.

3    Q.    There's rioters in front of you, right, one with a

4    police shield?  Correct?

5    A.    Yes.

6    Q.    There's police officers in front of you, correct?

7    A.    Yes.

8    Q.    I'm going to continue playing.

9          (Video played.)

10         At this point the rioters have overran that bike rack,

11   correct?

12   A.    Correct.

13   Q.    You were right there at the front, weren't you?  Six

14   people back, perhaps.

15   A.    I was not.  I'm not -- not in the video.

16   Q.    I know you're not in the video, but I showed you about 20

17   seconds earlier, and you were in the video.  Did you leave?

18   A.    I'd have to see where I was.

19   Q.    All right.  I'm going to pull up then Government Exhibit

20   404.

21             THE COURT:  I'm sorry.  What number?

22             MS. AKERS:  404, please.

23             THE COURT:  That's in evidence.

24             MS. AKERS:  Thank you, Your Honor.

25

1    BY MS. AKERS:

2    Q.   Starting at 39:39, and you see yourself front and center

3    in this photo, don't you?

4    A.   I do.  In the photo, yes.

5    Q.   And I'm going to play here from 39:39.

6         (Video played.)

7         And Mr. Bozell, you'd agree that the rioters just

8    overtook that bike rack line, right?

9    A.   Yes.

10   Q.   I'm going to continue playing from 40:17.

11        (Video played.)

12        And I stopped at 40:27.  And you see you right there,

13   don't you?

14   A.   Right in the middle.  Yes.

15   Q.   Picking up water that was used to decon officers.  Right?

16   A.   Yes.  That I had used to -- to help somebody as well.

17   Q.   And so you were there right at the front of the police

18   line when it broke, weren't you?

19   A.   That's not the front.

20   Q.   You were six people back, weren't you?

21   A.   At this point I'm -- I'm -- I'm way behind, number one.

22   And two, there's tons of people behind me continuing to move

23   up and push.

24   Q.   Mr. Bozell, I'm going to continue playing.

25        (Video played.)

1          I stopped at 40:29.  There's no one behind you pushing

2     you, is there?

3     A.   You see him right behind me.

4     Q.   He's pushing you?

5     A.   I'm not suggesting he's pushing me.  By the time I go

6     down to reach for the water, I didn't feel anybody --

7     Q.   You're walking voluntarily towards the Capitol building,

8     aren't you?

9     A.   Correct.

10    Q.   And at this point, you've now pulled up your hood, put

11    your sunglasses on, and put your gaiter up, didn't you?

12    A.   My hood was always on.  My sunglasses were on and off,

13    but I believe this whole sequence, my sunglasses were on.  And

14    then we're back to the issue of is there going to be gas or

15    not.

16    Q.   So at this point --

17    A.   Hence the mask on and off.

18    Q.   You pulled your gaiter up because you thought you might

19    be gassed at this point or sprayed with a chemical irritant.

20    Is that your testimony?

21    A.   So inside the scaffolding, there was -- the rise of it

22    was so bad, it just was -- you know, you kept kind of taking

23    it on and off, on to protect and then off to breathe.

24    Q.   And despite you believing that you might be sprayed with

25    chemical irritant, you kept going towards the Capitol

```
1    building, didn't you?
2    A.   Well, at that spot.
3    Q.   Yes?
4    A.   No.  Not despite the fear of being sprayed with chemical
5    irritant.  You see me stop at that spot, short of the top of
6    the stairs, and turn around and look, and that's because I
7    know that's a police line.  That's been a theme, that I know
8    that that's there, like all right, it's going to be, you know,
9    another hose-fest kind of thing.  So I put my thing up.
10   Q.   And then you kept walking towards the Capitol building,
11   right?
12   A.   And then it was not.  And then it ultimately proved to
13   not be, and, you know, I go and get a water.
14   Q.   That's not my question.  I said and then you continued
15   walking towards the Capitol building, right?
16   A.   Then, because it proved not to be, I go down and get
17   the water and then proceed.
18   Q.   To the Capitol building.
19   A.   In the direction of the Capitol building.
20   Q.   Well, you proceeded to the Capitol building.  That's
21   when you smashed the windows, right?
22   A.   There's a step in there, but yes.
23   Q.   The step is you picking up an object to use to break
24   the Capitol building windows.  Right?
25   A.   I had actually thrown my water, you know, just out of
```

1    frustration I had thrown my water down and then picked up

2    the vent cap and then gone to the doors, followed the crowd

3    to the doors.

4    Q.   Yesterday you testified that although you went into

5    Speaker Pelosi's office, you had no idea it was her office.

6    That was your testimony, right?

7    A.   When I entered?  I -- no.  I think you asked me yesterday

8    if I knew it was the majority -- or minority whip's office.

9    Q.   Well, Mr. Bozell, we're actually confusing, because you

10   tried or did go in several offices.  I'm talking about Speaker

11   Pelosi's office.

12   A.   Right.

13   Q.   I asked you yesterday if you went in the office, and

14   I believe you testified you didn't know it was her office.

15   Is that your testimony?

16   A.   No, you asked me if I saw the sign above, and I said no.

17   Q.   And so you did know it was her office, despite not seeing

18   the sign?

19   A.   I believe there was -- people were yelling from maybe

20   inside the office or something, saying something to the effect

21   of "this is Pelosi's office" or something like that.  But

22   again, there was no marker of any kind or anything like that

23   and, you know, the same scene throughout, somebody yells or

24   says go, and I move in that direction.

25   Q.   And you moved in that direction knowing, or at least

1    having a reason to believe it was Speaker Pelosi's office

2    because of what people were saying around you.  Right?

3    A.   I never knew where I was to go, not go.  This was never

4    crossing my mind.  The entirety of my time in, with the

5    exception of moments inside the Senate, did I think, where

6    am I going, what am I doing?  What's -- the entirety of it,

7    I don't know what purpose I would have in one office versus

8    a hallway or anything else.

9    Q.   Mr. Bozell, you testified that you heard people saying

10   it was Speaker Pelosi's office, and my only question is, after

11   you heard that, you then went in.  Correct?

12   A.   I don't know.  I'd have -- I don't know.  I haven't seen

13   video.  I'm not sure.

14   Q.   But you were there.

15   A.   This was two and a half years ago.

16   Q.   All right.  I'm going to play Government Exhibit 430,

17   which is in evidence, and I'm at 2:40.

18        (Video played.)

19        I stopped at 2:42.  And you can see you in this video,

20   correct?

21   A.   Yes.

22   Q.   You're at the top of a set of stairs you just ascended .

23   Correct?

24   A.   Yes.

25   Q.   And I'm going to skip ahead to 4:18, since we've already

1    seen some of this.  And this is the camera person from the top

2    of the stairs.  And right when you get to the top of the

3    stairs, this is the view, isn't it?

4    A.   Never saw it.

5    Q.   I'm going to continue playing.

6         (Video played.)

7         And you see people here at 4:20 to 25 seconds actually

8    taking pictures of the sign because it's so prominent.  Right?

9    A.   I don't see myself in here.  I don't -- I would have just

10   commented -- commented just the opposite, that it looks like

11   most everybody's not seeing the sign.  Am I wrong?

12        (Video played.)

13   Q.   See someone taking a photo of the sign?  Another person

14   taking a photo with the sign?

15   A.   You can see he's taking a photo of the person.

16   Q.   All right.  And yesterday you also testified, I believe,

17   that you helped push the Rotunda doors open because you were

18   looking for your mom.  Is that your testimony?

19   A.   There was -- there were people outside or past the doors.

20   Q.   And so actually that's a great clarification because I

21   believe your counsel was asking you questions and suggesting

22   that because of your height you couldn't actually see out the

23   windows.  Could you see out the windows?

24   A.   I couldn't see much of anything.  It was an issue all

25   day.

1   Q.   Well, you just testified, when I said were you pushing to

2   get to your mom, that there were people outside.  So you must

3   have seen people outside.

4   A.   No, no, no.  People were -- no, no, no.  People were

5   saying, let these people in, that kind of thing.  But I didn't

6   know in from what or otherwise.

7           THE COURT:  But in any event, either from seeing it or

8   from people saying it, you were under the impression there

9   were people outside those doors.

10          THE WITNESS:  Past the doors.

11          THE COURT:  Outside of the doors.

12          THE WITNESS:  Right.  Just to clarify, I didn't know

13  it was outside.  I didn't know where the doors led.

14  BY MS. AKERS:

15  Q.   You didn't know where the doors led?

16  A.   No.

17  Q.   That's your testimony?  The doors you helped to push

18  open, you didn't know that they led outside?  Yes or no?

19  A.   I don't feel like I ever had command of where anything

20  went, all day long.

21  Q.   Okay.  I'm going to start playing Government Exhibit 116,

22  which is in evidence.  Before we start I'm just going to

23  circle you so that we all know where to look.  Is that you?

24  A.   Correct.

25          (Video played.)

1    Q.   I stopped at 58 seconds.  You just progressed towards the

2    camera.  Correct?

3    A.   Yes.

4    Q.   And that's actually towards the door.  Correct?

5    A.   Yes.

6    Q.   And it actually looks like you have a very clear line

7    of vision here.  Right?

8    A.   No.

9    Q.   There's no one standing in front of you, is there?

10   A.   There's two people right there that are considerably

11   taller than me.

12   Q.   They're not standing right in front of your face, are

13   they?  No?

14   A.   At this --

15   Q.   At this point you have a clear line of vision, don't you?

16   A.   I have no idea.

17   Q.   You're looking straight ahead, aren't you?

18   A.   I have no idea what I'm seeing here.

19   Q.   I'm not asking what you're seeing, sir.  I'm asking if

20   you're looking straight ahead unobstructed based on what you

21   see here.

22   A.   So I --

23   Q.   It's a yes or no question.

24   A.   No.  I don't know.

25   Q.   No.  Okay.  So we're going to continue playing.

1           (Video played.)

2           And this is you pushing, correct?

3     A.    Yes.

4     Q.    And you see people cheering, correct?

5     A.    I saw a person put his hands up.

6     Q.    And now you see some people walking away from the door,

7     they've turned, correct?

8     A.    Right.

9     Q.    You don't see you walking away from the door, right?

10    A.    Right.

11    Q.    I'm going to pull up Government Exhibit 426.

12          I'm going to go ahead --

13              THE COURT:  I don't know that 426 is in evidence.

14              MS. AKERS:  I believe so, Your Honor.  Oh, you said

15    you don't believe it is.

16              THE COURT:  I said I don't believe it is, that is

17    correct.

18              MS. AKERS:  All right, we would move the admission --

19              THE COURT:  And I not only don't believe it is; it is

20    not.

21              MS. AKERS:  You are the keeper of the exhibits, so that

22    is fair.  Actually, one moment, Your Honor, because I think I

23    might have told you the wrong exhibit number.

24          I meant 436.

25              THE COURT:  436.

```
 1              MS. AKERS:  Apologies for that.
 2              THE COURT:  436 is in evidence.
 3      BY MS. AKERS:
 4      Q.   I'm going to start at 45 seconds.
 5           (Video played.)
 6           I stopped at 1:10, and you see you right in the middle of
 7      the screen here, correct?
 8      A.   Correct.
 9      Q.   And right in front of you is a police officer getting
10      assaulted, isn't it?
11      A.   I can't -- I don't know what's going on, but I see that's
12      a police officer.
13      Q.   You see that someone was yanking at his helmet, grabbing
14      him, pushing him.  Correct?
15      A.   Correct.
16      Q.   And this is right after you helped push open the Rotunda
17      doors, isn't it?
18      A.   Uh -- sure.
19      Q.   And you did this because you were looking for your mom?
20      Is that your testimony?
21      A.   So if you notice, everybody gets out of the way and
22      I stay where I am.  It wasn't that I was trying -- I was
23      interested in people coming through.  It was who was coming
24      through.
25      Q.   You were looking for your mom.  Is that your testimony?
```

1    A.    Right.

2    Q.    And so did you go out the doors to look for her?

3    A.    No.  This wave comes through.

4    Q.    And then you went up to the Senate Gallery, didn't you?

5    A.    I don't know.

6    Q.    Yes or no?

7    A.    I don't know.  I don't know where I went next.

8              THE COURT:  Does the video show how long before he

9    left that area?

10             MS. AKERS:  He went up the stairs?

11             THE COURT:  Yeah.  Leaving the area of the doors.

12             MS. AKERS:  This video doesn't, but I can show one if

13   Your Honor is interested.

14             THE COURT:  I'd be interested in that.

15             MS. AKERS:  Sure.

16   BY MS. AKERS:

17   Q.    I'm going to go to Government Exhibit 4... hold on one

18   moment.  435.

19             THE COURT:  It's in evidence.

20   BY MS. AKERS:

21   Q.    And I'm going to start at 2:10.

22             (Video played.)

23             I'm stopping -- this is the Rotunda door area, isn't it,

24   Mr. Bozell?

25   A.    I have no idea.  I have no idea.  It looks completely

1    different.

2              THE COURT:  Is the door on the right?

3              MS. AKERS:  Correct.  We'll just take one more step

4    here.

5    BY MS. AKERS:

6    Q.   I'm going to pull up Government Exhibit 116.

7         (Video played.)

8         And I'm going to stop -- just some indicators so we know

9    what we're looking at.  I'm going to stop at 2:38:03 p.m.

10   Okay?  And do you see you walking into the Rotunda door area?

11   I circled you in the top middle of the screen.

12   A.   Okay.

13   Q.   And do you see this man with a black helmet and black

14   attire on the left-hand side of the screen?

15   A.   Okay.

16   Q.   And do you see a man in gray bending over next to what

17   appears to be a police shield?

18   A.   Okay.

19   Q.   And at this point -- I'm going to continue playing --

20   you're walking toward the Rotunda doors.  Correct?

21   A.   Correct.

22   Q.   This is the video we watched a moment ago where you

23   actually proceed to join the crowd.  Correct?

24   A.   Yes.  We just saw this.

25   Q.   At this point you're pushing with the crowd into the

1      doors.  Correct?

2      A.   Correct.  You can clearly see I wouldn't have visibility.

3      There's flags everywhere.

4      Q.   There's flags everywhere?

5      A.   You saw all the flags in front of me.

6      Q.   All right.  Now I'm going to pull up Government Exhibit

7      435.  And we'll start to play at 51 seconds.

8           (Video played.)

9           I'm stopping.  You see doors on the right-hand side of

10      the screen at this point, correct?

11      A.   I do.  I do.

12           (Video played.)

13      Q.   I'm stopping here.  And you see that man in the gray hat

14      and the green bending over, like we did in the last video,

15      correct?

16      A.   I do.  And I also see all the flags in front of the door.

17      Q.   All right.  And that was the same time that you were just

18      walking into the Rotunda area.  Right?

19      A.   Yes.

20      Q.   Okay.  We're going to continue playing.

21           (Video played.)

22           And you just saw that police shield we saw in the other

23      video.  Correct?

24      A.   Correct.

25      Q.   So same time period as when you were walking towards the

1    door.  Right?

2    A.   Appears to be, yes.

3    Q.   You hear the sirens?

4    A.   I hear them now.

5    Q.   And I'm stopping.  He turns to do a selfie.  So now you

6    see a guy in the black helmet.  Correct?

7    A.   Correct.

8    Q.   Doors are still closed at this point, right?

9    A.   Correct.

10   Q.   So as you're approaching the crowd, doors are closed,

11   right?

12   A.   Correct.

13        (Video played.)

14   Q.   People are cheering now because you guys have proceeded

15   to push the doors open.  Right?

16   A.   You can also see the daylight pour in that you couldn't

17   see before.

18   Q.   I asked you if people were cheering because you now

19   pushed the doors open.

20   A.   It appears people are cheering, yes.

21   Q.   Now I'm going to play this on double speed since we've

22   already seen it during this trial, but to answer the Court's

23   concern about the time between when you helped push the doors

24   open and when you got to the Senate Gallery.  Okay?  We're

25   going to start playing at 1:48.

1          (Video played.)

2          Now that we're walking up the stairs at 3:11, so about a

3    minute and a half later, I'm going to play normal speed now.

4    And we just saw you, didn't we, Mr. Bozell?

5    A.    Missed it.

6    Q.    Going back to 3:20 and going frame by frame.  This is

7    you, isn't it, Mr. Bozell?

8    A.    Yes.  That's me.

9    Q.    Yes.  So we started at a little over a minute 20 seconds

10   ago from when you helped push the doors open, and now you're

11   walking up the stairs, correct?

12   A.    Right.

13          (Video played.)

14          THE COURT:  Are you just playing the video or are we

15   asking questions now?  I think you've established the time

16   frame.

17          MS. AKERS:  Sure.  I was going to ask another question.

18          THE COURT:  I don't think we should just be playing the

19   videos.  You need to be asking the witness questions.

20          MS. AKERS:  Sure, Your Honor.

21   BY MS. AKERS:

22   Q.    Mr. Bozell, you testified yesterday that you didn't see

23   any violence between officers and rioters inside the building.

24   Is that correct?

25   A.    No.

1    Q.   You did see violence?

2    A.   I didn't -- I didn't testify to that yesterday.

3    Q.   That's why I asked you the question.  Did you see

4    violence?

5    A.   You asked me specifically yesterday about the plain

6    clothed people, individuals.  I didn't know they were police

7    officers, and I suggested that I'd seen that in the outside

8    and then saw later that day.

9    Q.   My question was, did you see violence between anyone

10   who you perceived to be a police officer and the rioters?

11        THE COURT:  That actually wasn't your question.

12   The question was did you testify yesterday that you didn't

13   see any violence.

14        MS. AKERS:  And he said --

15        THE WITNESS:  No.

16        MS. AKERS:  -- no, so --

17        THE WITNESS:  No, I don't believe that was my testimony

18   yesterday.

19   BY MS. AKERS:

20   Q.   That wasn't your testimony yesterday?  So now my question

21   is did you see violence between someone you perceived to be a

22   police officer and the rioters?

23   A.   At any point inside?

24   Q.   Sure.

25   A.   I -- I'd have to -- I don't feel comfortable answering

1    that.  I'd have to really try to go through my day.  I'm not

2    sure.

3    Q.   Mr. Bozell, we're day three of your trial in this

4    courthouse, and you haven't really thought through your

5    day by this point?

6    A.   I struggle to piece together where I went --

7    Q.   Well, let's look at the video and we'll see.  So we're

8    still on Government Exhibit 435, and I'm going to start

9    playing at 5:09.  This is now the top of the stairs that you

10   just ascended near the Senate Gallery.  Right?

11   A.   Right.

12        (Video played.)

13   Q.   And you see here gentlemen in suits, older gentlemen in

14   suits.  Correct?

15   A.   Yes.

16   Q.   Fair to say these guys don't really look like the rest

17   of the crowd, do they?

18   A.   No, they don't.

19   Q.   You didn't see any other rioters storming the Capitol in

20   a suit, did you?

21   A.   No.  But they also -- they also don't look like any of

22   the law enforcement I've seen all day.

23   Q.   I'm going to continue playing.

24        (Video played.)

25        And you just saw the rioters attack those older gentlemen

1    in suits guarding the door, didn't you?

2    A.   On the video, yes.

3    Q.   And in the video, you can actually see yourself right

4    here, front and center.  Correct?

5    A.   Yes.

6    Q.   And so is it your testimony that you didn't see this

7    when you were in the United States Capitol on January 6?

8    A.   What I would have seen would be certainly nothing as

9    clear as this.

10   Q.   Was your vision obstructed here too?

11   A.   You can see everyone there is taller than me.  Every

12   single person.

13   Q.   Is your -- your testimony is you're just too short to

14   see anything in the Capitol building?

15   A.   There are -- it was obviously a hindrance.

16   Q.   We're still going to look at Exhibit 435 for one more

17   clip here.  And I'm going to 6:40 now.

18        (Video played.)

19        Now you've made it into the Senate Gallery after that

20   altercation with the gentlemen in suits.  Correct?

21   A.   Correct.

22        (Video played.)

23   Q.   And yesterday you testified that you didn't remember

24   going through a bag in the Senate Gallery.  Was that your

25   testimony?

1    A.   I didn't remember what my activity was with the bag.

2    Q.   Your recollection was that you just went into the Senate

3    Gallery because you really wanted to take a seat, you were

4    tired, you wanted to sit down.  Wasn't that your testimony?

5    A.   Right.  There was chairs.  The first thing I did in there

6    was sit down.

7    Q.   The first thing you did in there was sit down?

8    A.   I believe so.  And that was underneath and I pulled it

9    out.  That's my memory of it.

10   Q.   Going back to 5:33.  This is you in the video, right?

11   Right?

12   A.   No.  You can hear --

13   Q.   This is you in the video.  Right?

14   A.   Yes.  That's me in the video.

15   Q.   All right.

16        (Video played.)

17        5:52.  You're not sitting down, are you?

18   A.   Not yet.

19        (Video played.)

20   Q.   Not sitting down here, are you?  You're going through

21   the bag, aren't you?

22   A.   So you can --

23   Q.   Yes or no?

24   A.   No, I'm not sitting down.  If you look, you can't see the

25   things underneath there.  It's not until you sit down and put

1    your feet under that you can actually feel the thing, the box.

2    Q.   Is your testimony that you sat down and that's when

3    you found the emergency bag?

4    A.   I don't think I'd be able to find it otherwise.

5    My memory --

6    Q.   Are you guessing?

7    A.   My memory of it is that I sat down.  I could have sat

8    down on the ledge and not in a chair, but my memory was that

9    I sat down.

10   Q.   Skipping ahead to 7 minutes.

11        (Video played.)

12        Now, yesterday you testified you didn't remember

13   climbing over railings in the Senate Gallery, didn't you?

14   A.   I think I testified that I didn't remember if I went

15   over or under.

16   Q.   But you did go over, didn't you?

17   A.   Again, I don't remember if I went over or under.

18   Q.   Well, looking at this video here, you did go over,

19   didn't you?

20   A.   Okay.

21   Q.   Is that a yes?

22   A.   I -- I think I'm still behind the railing in the video.

23   Q.   Is that your foot that's now --

24   A.   So yeah, I went over.

25   Q.   -- straddling the railing?

1    A.   Yes.

2    Q.   So you did climb over multiple railings because you

3    actually ended up on the other side of the Senate Gallery.

4    Correct?

5    A.   Yes.

6    Q.   And after this, you moved a camera in the Senate Gallery,

7    didn't you?

8    A.   Yes.

9    Q.   Mr. Bozell, you testified yesterday that when you were

10   on the Senate floor, I believe you said you were looking for

11   your mom?  Is that your testimony?

12   A.   So when I'm on the Senate floor, I'm still trying to

13   locate my mom.  I believe I'm on the phone, whereas much of

14   the time in the Capitol I'm walking around trying to get

15   information, looking at it like so, but at this point I'm on

16   the phone --

17   Q.   And we do see you on the phone in the video.  Were you

18   calling someone?

19   A.   Or somebody had called me.  I believe I'm talking to

20   somebody on the phone.

21   Q.   So if you were looking for your mom, did you call your

22   mom?

23   A.   I was more trying to contact my brothers, thinking she

24   was with them.

25   Q.   Your testimony is that you were roaming all around the

1    Capitol building looking for your mom but you never called

2    her.

3    A.   I would -- my mother has a hearing issue, and I would

4    expect my brother to be -- either one of my brothers to be the

5    much better contact.  And the hope was -- remember when I left

6    my mom earlier, I'd said to my brother, while he was with her,

7    you know, I'll be right back.  So my memory was that they were

8    together.

9    Q.   Mr. Bozell, did you text your mom when you were walking

10   around the Capitol?

11   A.   I think so?  Maybe?

12   Q.   What did you say?

13   A.   I don't remember.

14   Q.   But you're not even sure if you texted her.  And you

15   didn't call her?

16          THE COURT:  You have to give an oral response, not a

17   shake of the head.

18          THE WITNESS:  I don't know.  My answer is I don't know.

19   I don't know.

20   BY MS. AKERS:

21   Q.   And your brother --

22   A.   I'll give a response.  The majority of my communication

23   attempts were to my wife.  I had asked my wife if she could

24   help.  We had conversations -- a conversation at one point

25   where she -- you know, crying, asking if I'm okay.  And I

1    tried to assure her, yes, I'm okay.  I'm not hurt.  And I'm

2    trying to get an assessment of what's going on from her from

3    what she can see.

4         She had said, you know, looks like it was really bad --

5    there was some stuff that was really bad outside.  I said,

6    well, it's safer inside here, things to that effect.  I said

7    what are you hearing?  She says, you know, I really don't

8    know what's going on, but it is safer inside certainly than

9    it was outside.

10        This -- so we have this sort of back and forth and

11   just agree, you know, to try to stay in touch with each

12   other, which obviously was very difficult if not impossible

13   at certain stretches of the -- of -- throughout the -- the

14   after -- the time I was in there and after.

15        The -- inside -- or I'm sorry.  Before we hung up or

16   got cut off -- I believe we were cut off -- there was just

17   this agreement that she would try to continue contacting

18   and I would try to continue giving her information in terms

19   of anything I was hearing myself.

20   Q.   And so just to clarify, that person you were talking

21   about that whole time, that was your wife you were referring

22   to who you were having that communication with?

23   A.   I think I just made that sound -- I'm trying to relay

24   the information.  I think I made the conversation sound longer

25   than it was.  I have -- part of the issue I'm having is the

1    time assessment with everything.  My mind, I was in there for

2    much longer than the 55 minutes.  It wasn't until I saw the

3    discovery and realized.  Everything seemed so much longer than

4    it was.

5    Q.   Mr. Bozell, I'm just asking who were you on this

6    conversation with where they said it would be safer to be

7    inside?

8    A.   I'm the one that said --

9    Q.   To who?

10   A.   To my wife.

11   Q.   To your wife.

12   A.   Yeah.

13   Q.   So you were on the phone with your wife in the Capitol

14   building?

15   A.   At some point I was on the phone with my wife in the

16   Capitol building.

17   Q.   You remember that.

18   A.   I remember being able to -- yeah.

19   Q.   And you never remember being on the phone with your mom

20   who you were looking for.  Correct?

21   A.   I don't think I ever got in touch with my mom, was able

22   to actually get in touch with my mom.

23   Q.   And you never actually tried to call or text her, did

24   you?

25   A.   I don't know if I tried to call or text her.

1    Q.   And when you say your mom was with one of your brothers,

2    was that your brother Reid?

3    A.   Or Joey.

4    Q.   Which one were you trying to contact?

5    A.   Both.

6    Q.   And after January 6, you've testified that you're very

7    close with your family, talk to them all the time.  Your

8    brother Reid went into the Capitol building, too, didn't he?

9    A.   I don't know.

10   Q.   You don't know?

11   A.   I don't know.

12   Q.   You've testified that you talk daily, hundreds of

13   messages, all the time, close, tight-knit family, talk about

14   everything.  And you don't know if your brother Reid went into

15   the Capitol building?

16   A.   I never found my brothers.

17   Q.   I'm not asking --

18   A.   I never found my --

19   Q.   -- if you found them.  I'm asking if he went inside the

20   Capitol building?

21        MR. SHIPLEY:  Objection.  Asked and answered.  He said

22   he doesn't know.

23        THE COURT:  Well, I think she can follow up by asking

24   whether he's testifying to what he knew at the time or what he

25   knows now.

1          THE WITNESS:  I don't know.

2          THE COURT:  Ask the question again.

3     BY MS. AKERS:

4     Q.   Did your brother Reid go inside the Capitol building?

5     A.   I can't confirm.  I never saw him in the Capitol

6     building.

7     Q.   I'm not asking if you saw him.  I'm asking if you know

8     from any other means, for example, you've testified under oath

9     that you communicate nearly every single day.

10    A.   Correct.

11    Q.   And so based on those communications, phone, text, in

12    person, did your brother Reid go inside the United States

13    Capitol building?

14    A.   I have --

15    Q.   Yes or no?

16    A.   He has never texted --

17         THE COURT:  She's not looking for the source of your

18    information.  She's looking for one of three answers: yes, no,

19    or I don't know.

20         THE WITNESS:  Yes.

21    BY MS. AKERS:

22    Q.   Yes, he did go inside the Capitol?

23    A.   He said he went in.

24    Q.   After January 6 --

25         THE COURT:  I want to return for a second to the

1    doors that we were talking about a few minutes ago and your

2    participation in the breach of those doors.  And then we saw

3    some videos that showed there was about a minute and 20 time

4    lapse between you with the crowd pushing on the doors, in the

5    breach of the doors, and then you on the stairs walking up to

6    the Senate Gallery.

7         So -- and it probably took a few seconds for you to get

8    up the stairs.  So there's about a minute between when you

9    were pushing to get the doors open and when you left the area.

10   Is that probably about right?

11             THE WITNESS:  That seems right, yeah.

12             THE COURT:  Okay.  And you said you were looking for

13   your mother.  Right?

14             THE WITNESS:  Right.

15             THE COURT:  So you left the area in about a minute.

16   Is that because you didn't see your mother?

17             THE WITNESS:  You could see the daylight come in.

18   So immediately you know this is a way outside.  There's no way

19   my mom would be trying to get in from right outside the doors.

20   And then you could see --

21             THE COURT:  Well, you didn't know it was a way outside

22   until the doors were breached.

23             THE WITNESS:  So you can see the flags over the area,

24   and as soon as the doors open, the daylight pours in.  You

25   can't -- I couldn't see it before.  And so I -- I didn't know

1    where any doors went.  And so the doors open up, you can see

2    that there's, you know, a scuffle going on in front of me.

3    I can't really assess who it is, but I know my mom's not

4    involved in that.  So by my assessment, there's no way my

5    mom's here, and I move on.

6              THE COURT:  Go ahead.

7              MS. AKERS:  Thank you, Your Honor.

8    BY MS. AKERS:

9    Q.   Mr. Bozell, after January 6, your brother Reid sent you a

10   text and said he got a standing O for his participation in the

11   riot.  Right?

12   A.   Yes.

13   Q.   Standing O, meaning ovation.  Correct?

14   A.   Right.

15   Q.   And you liked that message, you agreed with the principle

16   that he should get a standing O for his participation.  Right?

17   A.    I would have appreciated anything that didn't describe

18   anybody who attended Washington, D.C., that day as a murderer

19   of police officers, which is how we were being -- everyone was

20   being depicted as a whole.  So anything that went to the

21   contrary of that was heartwarming.  Anything to the contrary

22   of being described as somebody who participated in killing

23   Officer Sicknick.

24   Q.   Before January 6, you sent a text message saying you were

25   going to toss Schiff's office on J6, didn't you?

1       A.    Yes.

2       Q.    Schiff is a senator.  Correct?

3       A.    I think so.  California?

4       Q.    So you were referencing his office on January 6 when you

5       sent that message.  Right?

6       A.    That was weeks earlier.

7       Q.    It was before January 6.  You were referencing the

8       congressperson, the senator's office when you said I'm going

9       to toss Schiff's office on J6, weren't you?

10      A.    You know, that whole text --

11      Q.    Yes or no?

12      A.    That whole text thread is nothing but brothers being

13      goofy about -- there's references to people dressing up like

14      in *Braveheart* --

15      Q.    Mr. Bozell, I'm not talking about *Braveheart*, *Finding*

16      *Nemo*.  I'm talking about when you were saying you were going

17      to toss Schiff's office on January 6.  And my only question is

18      you were referring to the senator, Adam Schiff, from

19      California.  Correct?

20      A.    Yes.

21      Q.    And you also said that you hoped there was a declass on

22      the 26th through the 5th and then you would "go to D.C. and

23      throw them all out."  Didn't you?

24      A.    So --

25      Q.    Yes or no?

1    A.   You played that yesterday.  Yes.

2    Q.   And your brother Reid sent you a video prior to January 6

3    of a man taking his fist, bashing through a glass window,

4    entering a house, ransacking it, and saying "we're looking for

5    intel."  And he said, quote, "Let's do this," end quote.

6    Correct?

7    A.   Yes.

8    Q.   And you responded, "It's coming, Joey," and then you

9    referenced January 6.  Correct?

10   A.   That -- that --

11   Q.   Correct?

12   A.   -- show is a show about two doofuses that can barely get

13   out of their own way.  It was clearly humorous.

14   Q.   It was humorous but it was in fact exactly what you did

15   when you reached the Senate Wing Door on January 6, isn't it?

16   Yes or no, Mr. Bozell?

17   A.   No.  It's not.  It's not what I did.  What that guy did

18   was punch through, come through and unlock the door.  So when

19   you see me come through -- I hit the first window.  It doesn't

20   even break.  I move on to one that's already broken.

21        And in no way am I proud of this, but I go from hitting

22   to actually dropping the device that would have been better to

23   get through and just hitting it like so to get my frustration

24   out.  Because hitting it like so is a better way to get your

25   frustration out, not the better way to get through the window.

1    Q.   The doofus was actually better at breaking through the

2    window than you were, wasn't he?

3    A.   That's fair.

4    Q.   And you had conversations prior to January 6 where the

5    possibility of violence at January 6 would happen.  Correct?

6    A.   Yes.

7    Q.   So you knew to anticipate violence in Washington, D.C.,

8    on January 6, didn't you?

9    A.   It was the reason we talked about not leaving our mom.

10   Q.   So is that a yes?

11   A.   Yes.  It was -- there was --

12   Q.   And you talked --

13   A.   -- antifa issues every time you go into Washington, D.C.,

14   there was always an antifa concern.

15   Q.   And yet you still came, didn't you?  Yes or no?

16   A.   And I came -- and I came with my prayer group on December

17   12 as well.

18   Q.   That wasn't my question, sir.  You talked about watching

19   *Captain America: Civil War*, and you said you were referring to

20   the 6th.  Right?

21   A.   I watched that since lockdown.  My family and I watched

22   the entire Marvel series from beginning to end.

23   Q.   That's not my question.  I said you sent a text message

24   saying you watched *Captain America: Civil War*, and you're

25   referring to the 6th.  Right?

```
1      A.    Did I say in the text I'm referring to the 6th?

2      Q.    Yes.  That's what I'm asking you.

3      A.    Okay.  I don't see it.

4      Q.    We'll pull up 664M.  Top of the screen, it's a text

5      message from you on December 30, 2020.  Right?

6      A.    Yeah.  And I don't say --

7      Q.    And you say, "I just watched Captain America: Civil War.

8      So..."  Right?

9      A.    Right.

10     Q.    And then Reid misunderstands you, because he's not

11     thinking about the 6th like you are, and he says, "After that

12     we bum rush Area 51."  Right?

13     A.    Yes.  Do you see how goofy this is?

14     Q.    And then after that, you said, "That's in Nevada."

15     Right?

16     A.    Yes.

17     Q.    And he said, "Road trip," right?

18     A.    Yes.

19     Q.    And then you said, "I'm talking about the 6th."  Right?

20     A.    Right.

21     Q.    After -- or excuse me, before January 6 you said that the

22     rally on January 6 was, quote, "the rally to end all rallies.

23     Everyone must go.  It may be your last chance to stand up for

24     America."  Correct?

25     A.    I had written that before January 6.  Right?
```

1    Q.   That's what I'm asking you to confirm.  Is that correct?

2    A.   Correct.

3    Q.   And then after January 6, after you did all of your

4    activities on the west front, broke through both of the

5    windows, went to all of the offices, went to the Senate

6    Chamber, helped push open the doors, all of your activity,

7    people reached out to you when they learned about your

8    involvement in January 6, didn't they?

9    A.   Yes.

10   Q.   And you told numerous people in response that cancel

11   culture sucks, didn't you?

12   A.   Yes.

13   Q.   You blamed your criminal activity on cancel culture,

14   didn't you?

15   A.   No.  No.  No, no, no.  What I was referring to with

16   "cancel culture" was there was no opportunity for someone to

17   suggest that -- again, everyone there was being labeled a

18   murderer of an officer.  And there was no opportunity to --

19   people were removed from social media and such.  There's no

20   opportunity to say that's not what happened.

21   Q.   Well, let's talk about what happened.  You, after January

22   6, told people that the police let you in, didn't you?

23   A.   Like I said yesterday, before day one of this trial, I

24   thought that the "let's go" or "here we go," whatever it was

25   command, I thought that that came from law enforcement.

1    Q.   Mr. Bozell, that was on the northwest stairs.  That was

2    not the Capitol building, was it?  That was the northwest

3    stairs, right?

4    A.   Right.  So like I testified to yesterday, my thinking was

5    that at that point that it was contained and everything had

6    slowed down and that there was a stoppage and -- that there

7    was an opportunity, there was a respite -- opportunity for it

8    to end.  And then it wasn't until, in my opinion, assessing it

9    later, like boy, it was -- it was fine and everybody was

10   alive, and it wasn't until that command, which I was convinced

11   at the time came from law enforcement, that --

12   Q.   Mr. Bozell, when you were texting people that cops let

13   everyone in, you forgot to mention that in fact you let

14   everyone in when you smashed the windows, didn't you?

15   A.   I'm not going to respond to that.

16        THE COURT:  I'm sorry?

17        THE WITNESS:  Do I have to respond to that?

18        THE COURT:  Yes.  It's a question.

19   BY MS. AKERS:

20   Q.   You never mentioned that?

21   A.   I did not add that, no.

22   Q.   And after January 6, when people were talking about the

23   Capitol riot, you said that what you did was morally

24   justified, didn't you?  Yes or no.

25   A.   No.

 1    Q.   You didn't say that?

 2    A.   I believe what I said -- I believe there was a reference

 3    to what other people did -- may or may have done, and was

 4    making some sort of description of like what could be morally

 5    justified and what may not be.  I believe.

 6    Q.   Well, you used the phrase "morally justified" in many

 7    different text messages, didn't you?

 8    A.   So --

 9    Q.   Yes or no?

10    A.   I don't know.  So --

11    Q.   I'm pulling up Government Exhibit 664K.  This is written

12    on January 9, 2021, a couple of days after what you call the

13    Capitol siege.  Right?  Yes or no?

14    A.   At this point --

15    Q.   January 9 is a couple days after the Capitol siege.

16    Right?

17    A.   And it is the heart of my belief --

18    Q.   Sir, I'm just --

19    A.   -- that this was some sort of an inside deal because of

20    what I heard on the steps, and I could not wrap my mind around

21    what had happened because we had a moment where we had

22    everything -- where everything was stopped and then all of a

23    sudden it fell apart.

24         And in my opinion, I just -- oh, my -- the evaluation

25    thereafter becomes one of, if in this instance the -- these --

1    these things are being used against the people.  And that was

2    a reaction to that.

3    Q.   Mr. Bozell, my question was, January 9, 2021, is a couple

4    days after the Capitol siege.  Right?

5    A.   Yes.

6    Q.   And a couple days after, you said "Capitol siege is

7    morally justified," didn't you?

8    A.   I did.

9    Q.   And shortly after January 6, your father, who you've

10   testified is a prominent person in politics, he made a public

11   statement condemning violence on January 6, didn't he?

12   A.   I believe -- yes.  That day, in fact.

13   Q.   And you didn't agree with that condemnation, did you?

14   A.   I didn't agree that he understood -- I was upset that

15   he didn't talk to me or my brothers who were there.

16   Q.   You wanted him to change his mind, so you actually tried

17   to convince your brothers to convince him otherwise.  Right?

18   A.   Again --

19   Q.   Yes or no?

20   A.   -- at the heart of the --

21        THE COURT:  You need to answer her question.

22        THE WITNESS:  I'm sorry.

23        THE COURT:  And not give your speech.  Your counsel

24   will have a chance to ask you further questions.  But she's

25   got the right to ask you questions, and your obligation is to

1    answer the questions, not to just say whatever else you want

2    to say.

3              THE WITNESS:  I apologize.

4         And the question was?  I'm sorry.

5    BY MS. AKERS:

6    Q.   After your father made a statement condemning violence

7    on January 6, you didn't agree with him, so you texted your

8    brothers and tried to get them to convince him to change his

9    public statement.  Correct?

10   A.   Yes.  No.  No.  No.  His belief, not his public statement.

11   No.

12   Q.   And his public statement was a condemnation of violence.

13   Right?

14   A.   I was --

15   Q.   Right?

16   A.   -- not -- no.  Yes, his public statement was a condemnation

17   of violence.

18   Q.   Okay.  That's my only question.  And you, in fact, on

19   January 6, 2021, were violent, weren't you?

20   A.   I was -- I -- not toward any individual at all.

21   Q.   Towards the Capitol, the heart of our American democracy.

22   Correct?

23   A.   Toward two pieces of glass, yes.

24             MS. AKERS:  No further questions.

25             THE COURT:  I have one or two questions before

1    Mr. Shipley gets up for redirect.

2        You testified a few minutes ago, with respect to your

3    communications with your brother -- I think it was with

4    Reid -- that you used the phrase "anything that was not

5    hurting" -- I think you even said "murdering" police was

6    heartwarming.  Right?

7        THE WITNESS:  No, no, no.  I'm -- are you asking about

8    my words or -- what I was suggesting then was that the --

9    there were lots of people that did different things that day.

10   But anybody who was there was considered somebody that was

11   attacking police officers, and that's what was being played

12   in the media and social media, etc.

13       And it was -- I felt like if people could -- those that

14   could see through that and see that there was violence and

15   extreme violence, but that was not the case for the tens or

16   hundreds of thousands of people --

17       THE COURT:  But didn't you say that those things

18   that were not attacking police and were not murdering police

19   was heartwarming?

20       THE WITNESS:  No.  What I said -- in terms of

21   heartwarming, what I was suggesting was any person that

22   was not there that expressed anything other than total

23   condemnation for being there was heartwarming to hear.

24       THE COURT:  Say that again?

25       THE WITNESS:  Anybody --

1          THE COURT:  Just say what you said again.

2          THE WITNESS:  I will.  Anybody who wasn't there

3     expressing anything short of total condemnation simply for

4     being there was heartwarming, saying -- differentiating

5     between violence and just being there was heartwarming.

6          THE COURT:  So were things that were not attacking

7     police or injuring police or murdering police good, in your

8     view?

9          THE WITNESS:  What I'm saying --

10          THE COURT:  Acceptable?

11          THE WITNESS:  Attending?

12          THE COURT:  No.  What I said was, anything short of

13     attacking police was acceptable?

14          THE WITNESS:  No.  No.  No, the line was -- is not

15     there in terms of what is acceptable.

16          THE COURT:  Was breaching police lines acceptable?

17          THE WITNESS:  No.

18          THE COURT:  And did you do that?

19          THE WITNESS:  No.

20          THE COURT:  Oh, you didn't follow through a broken

21     police line immediately after it had been broken?

22          THE WITNESS:  Yes, I did -- there was -- I did

23     follow -- I did follow a line.  Yes.

24          THE COURT:  Immediately after police lines were broken,

25     for instance, at the top of the stairs with a barricade that

```
 1       was set up with bike racks?
 2                THE WITNESS:  I did follow the line.
 3                THE COURT:  And was smashing the windows of the United
 4       States Capitol acceptable?
 5                THE WITNESS:  No.  No.  I'm ashamed of that.
 6                THE COURT:  And how about the entrance into the
 7       United States Capitol?  Was that acceptable, for people
 8       to enter into the United States Capitol?
 9                THE WITNESS:  No.
10                THE COURT:  How about if they entered through windows
11       that were smashed out?
12                THE WITNESS:  No.  I don't believe so.
13                THE COURT:  Mr. Shipley.
14                MR. SHIPLEY:  Thank you, Your Honor.
15                          REDIRECT EXAMINATION
16       BY MR. SHIPLEY:
17       Q.   Mr. Bozell, you have testified you are a devout
18       Christian.  Correct?
19       A.   Correct.
20       Q.   Are you familiar with the parable of the Samaritan in the
21       book of Luke?
22       A.   I am.
23       Q.   Where the phrase "good Samaritan" comes from?
24       A.   Right.
25       Q.   What's your understanding of that?
```

1    A.   Well, the area between Judah and Israel has an area of --

2    called Samaria.  So the idea there -- I'm going to give a very

3    long-winded answer.  I'm sure you --

4         THE COURT:  I probably wouldn't let you do this with a

5    jury, Mr. Shipley.  Now, you maybe have a little more latitude

6    with me, but you better do it pretty quickly and pretty

7    meaningfully.

8         MR. SHIPLEY:  If I may lead a little bit, I'll get

9    right to the point.

10        THE COURT:  Go ahead.

11   BY MR. SHIPLEY:

12   Q.   The parable is about Samarians and Jewish people who were

13   at odds, correct?

14        MS. AKERS:  Leading.

15        THE COURT:  No, no.  I just gave him permission to lead

16   for a moment.

17        MS. AKERS:  Oh, okay.  I understand.

18   BY MR. SHIPLEY:

19   Q.   And a Samaritan traveling the road comes across a Jewish

20   man that had been beaten.  Fair?

21   A.   Right.

22   Q.   And even though a priest had passed, because it was the

23   Sabbath and the priest thought, I must go to the temple to

24   pray, and others had passed, the Samaritan stopped, even for

25   a Jewish man that he was at odds with.

```
 1    A.   Right.
 2    Q.   It was simply to lend assistance to somebody he saw in
 3    need.  Correct?
 4    A.   Correct.
 5    Q.   Okay.  As part of your religious upbringing, your
 6    religious beliefs, do you try to play that role when you see
 7    somebody in need?
 8    A.   If somebody needs something, you help them.
 9         THE COURT:  All right.  No more leading.
10         MR. SHIPLEY:  Okay.
11    BY MR. SHIPLEY:
12    Q.   So your testimony about talking to the police, did you
13    feel like you had an official position to do that?
14    A.   No.
15    Q.   What were you trying to accomplish?
16    A.   Again, when I come back up into the scaffolding, my
17    thought is simply, at that point, I don't know how I can help,
18    but I may be able to help.  I didn't have theories at that
19    point.  I will totally concede the chances may have not been
20    great that I could assist.  However, you still have a
21    responsibility if you think you may be able to.
22    Q.   So you're just trying?
23    A.   I'm a salesman.  You sell 30 percent of your opportunities,
24    you're very good at what you do.  And so -- I have a 30
25    percent chance of helping, you have a responsibility.
```

1    Q.   Sitting here today, upon reflection, knowing about

2    everything you know and seeing the videos, do you think it was

3    folly to try?  Did you have a 30 percent chance of succeeding?

4    A.   I would lower that percentage.  I -- no, I don't -- no.

5    If I'm being realistic, then I don't think I had a chance.

6    Q.   Did you think so at the time?

7            MS. AKERS:  Objection, Your Honor.  We previously filed

8    a motion in limine to preclude argument relating to allegedly

9    helpful acts to alleviate criminal liability, and Your Honor

10   reserved on that motion saying it was premature, so I'm going

11   to re-raise that.

12           THE COURT:  I'll allow this series of questions to be

13   wrapped up and we'll move along.

14   BY MR. SHIPLEY:

15   Q.   Do you deny that you violated federal law when you broke

16   the windows?

17   A.   No.

18   Q.   Do you deny that you violated federal law when you went

19   through the window to enter the Capitol?

20   A.   No.

21   Q.   Do you deny that you violated federal law by being on the

22   grounds at a time that they were restricted because a

23   protected person from the Secret Service was there?

24   A.   No.

25   Q.   Four minutes after entering the Capitol at 2:19, did you

1    attempt to act as a good Samaritan toward the officer who had

2    been sprayed in the face by offering water?

3    A.   Yes.

4    Q.   What was your motivation when you approached the man who

5    had the bat two minutes after entering the Capitol?

6         MS. AKERS:  I re-raise our objection, Your Honor.

7         THE COURT:  Overruled.  You may answer.

8         THE WITNESS:  So there's the screaming from the law

9    enforcement, "there's a bat, he's got a bat, there's a bat."

10   You've seen the video.  He reaches for his firearm on the side

11   where I am.  There's a female officer.  You can see I walk

12   over to put myself between the crowd and law enforcement in

13   hopes that we can find the bat and -- what I was saying was

14   get rid of the bat.  Law enforcement was saying put the bat

15   away, and that ended up being sufficient.

16   BY MR. SHIPLEY:

17   Q.   There were some questions yesterday about the length of

18   time that you were in the Senate.  Now, I want to combine the

19   length of time you were in the Senate Gallery and the length

20   of time you were on the Senate floor.  So to the extent that

21   you can remember, both instances, how long do you think you

22   were inside?

23   A.   I guess four, five minutes upstairs?  Downstairs, I don't

24   know.  Five, six?

25   Q.   Somewhere in the neighborhood of 10 combined?

```
 1      A.    Sure.
 2      Q.    Let me clear one thing up just so the record's not -- no
 3      question.  Between the time you got off the witness stand
 4      yesterday and the time you took the witness stand today, have
 5      you and I talked about your testimony?
 6      A.    Unfortunately, no.
 7      Q.    Did I tell you we could not?
 8      A.    Yes.
 9      Q.    Do you recall the scene just after you were helping to
10      push the doors and the doors open?
11      A.    Yes.
12      Q.    And then we saw the video of the gentleman who's
13      recording himself and then that video with that gentleman
14      recording goes up the stairs and you're on the stairs.
15      Remember that one?
16      A.    Correct.
17      Q.    That's the same gentleman you're in the Senate Gallery
18      with, isn't it?
19      A.    Right.
20      Q.    That's the gentleman that jumped down onto the floor.
21      Right?
22      A.    Okay.
23      Q.    So you were in his general proximity the entire trip up
24      the stairs and into the Senate Gallery.
25      A.    Okay.
```

```
1        Q.   And, in fact --
2             THE COURT:  "Okay," by the way, I take it as being
3        "if you say so."  He's not saying "yes" to your questions.
4             MR. SHIPLEY:  Oh, okay.
5        BY MR. SHIPLEY:
6        Q.   Did you follow that gentleman through the doors into
7        the Senate Gallery?
8        A.   I'm not sure it was that gentleman who was in front of
9        me, but I ultimately end up --
10       Q.   Were both of you in the same group that entered the
11       Senate Gallery?
12       A.   I believe so, yes.
13       Q.   Prior to that gentleman jumping down onto the floor,
14       was there anybody on the Senate Gallery floor?
15       A.   No.
16       Q.   Was the floor empty?
17       A.   It was empty.
18       Q.   So when you were playing with the camera, were you
19       attempting to record anything on the floor?
20            THE COURT:  You'll have to be careful about leading.
21            THE WITNESS:  There's nothing to be seen on the floor.
22       I testified yesterday --
23            THE COURT:  And you have to be careful about allowing
24       me to have my say.
25            THE WITNESS:  I'm sorry.
```

1          THE COURT:  So I'm saying to Mr. Shipley, don't lead.

2          MR. SHIPLEY:  I was thinking about the question in my

3     head.

4     BY MR. SHIPLEY:

5     Q.   What were you doing, maneuvering the camera?

6     A.   So Mr. Cua had said, "hey, there's a camera."  So we

7     move over to the -- again, after I had looked at the box

8     underneath, it was just, hey, what's in here?  And nothing.

9     I go over to the camera.  There's nothing to be seen or not

10    seen down below.  I never thought in terms of if you move

11    the camera, therefore there's some inability for a --

12    Q.   When you're holding the camera in the manner described on

13    the video, is there a screen image that you can see of what

14    the camera is looking at?

15    A.   No.  No.

16    Q.   After the doors -- can I have Government Exhibit 132,

17    please?

18         What I'm looking for is the Rotunda view looking towards

19    the Columbus doors, not looking back from the Columbus doors.

20         THE COURT:  You have to pick the exhibit you want.

21    You can't tell them to find you the exhibit that shows what

22    you want.

23         MR. SHIPLEY:  It might be 136.  That's why I'm...

24         THE COURT:  All right.

25         MR. SHIPLEY:  No, it's this one.  Okay.

1    BY MR. SHIPLEY:

2    Q.   So let me see if you -- I don't know if you've entered...

3    Can we just play that until we see his head?

4         (Video played.)

5         Is this you right here?

6    A.   Yes.

7    Q.   So at this point you can see the Columbus doors.  There's

8    glass panes up high.  Correct?

9    A.   I see that.

10   Q.   And then there's other glass panes down lower.  You see

11   that?

12   A.   Yes.

13   Q.   Could you see that at least that door went to the outside

14   from the glass panes up high?

15   A.   No.

16   Q.   Okay.  And is your recollection that there were people

17   taller than you in front of you?

18   A.   Virtually at all times.

19   Q.   Okay.  Let's go ahead and just play this, then.

20   A.   And flags.

21        (Video played.)

22   Q.   Why don't we stop here.  So, you see this gentleman here,

23   does that look like a police insignia on his hat?

24   A.   I can't fully see it, but okay.  Yes.

25   Q.   And then this gentleman here.  And they're both facing

1    the crowd, correct?  They have their back to the doors?

2    A.   Right.

3    Q.   Now, from where you are, here, how many people are

4    between you?

5    A.   I don't know.  On the left, one, two, three, four, five.

6    On the right, one, two, three, four -- four, five.

7    Q.   Okay.  Let's go ahead and play it again.

8         (Video played.)

9         Okay.  Please stop.

10        So now the doors are open and you can see it's outside.

11   Correct?

12   A.   Yeah.

13   Q.   What could you tell about the crowd outside?

14   A.   That they were aggressive.  There was clearly conflict.

15   At this group of people it was clear as day that there was --

16   you know, this wasn't nine people on the other side of the

17   door hoping they could get through.

18   Q.   Before those doors were opened, when you leaned in, did

19   you have any idea what was on the outside of those doors?

20   A.   I had no idea.  I had no idea.  In fact, you -- I had no

21   idea.

22   Q.   I've lost track of you in that video.  Do you still see

23   yourself?  Is this you there?  Or maybe -- can we back up like

24   10 seconds so we can find him again and try to track his

25   movement.

1          (Video played.)

2          So here you are here with the red hat.  Right?  Oh, no.

3     Your hat has a white bill.

4     A.    No.

5     Q.    No, that's right.  This is you, I believe.  Okay.  Go

6     ahead.

7          (Video played.)

8          Stop, please.  This is you here.  Right?  You moved to

9     the -- your left?

10    A.    I apologize but I couldn't see myself at all in there.

11    Q.    Okay.  Let's just let it go and see if we realize that

12    becomes you.

13    A.    Yeah.  That's me.

14    Q.    That's you, right?

15    A.    Yeah.

16         (Video played.)

17    Q.    Okay.  We can stop.  Now, you see the time stamp up here

18    says 2:39:53, right?

19    A.    Correct.

20    Q.    And do you recall about what time it was when the door

21    opened?  Was it right at 2:39?

22    A.    I wasn't looking but that seems right.

23    Q.    And now you're headed up the stairs.  Correct?  This is

24    you here?

25    A.    Yeah.  It was clear my mom's not in this group.  My mom

1     is not --

2     Q.   Did you pause there to look to kind of try to assess what

3     was out there?

4     A.   You could see, I did twice.  I come back, look again,

5     okay, she's not there.  This is not going to be where she is.

6     And I go right back to my phone seeing if, you know, there's

7     any chance.

8     Q.   I'm going to skip around here a little bit, just trying

9     to get through the few questions I have.  You make several

10    references in text messages to the phrase "declass,"

11    communicating with your brother or friends.  What were you

12    meaning when you would use the phrase "declass"?

13    A.   So there was a couple things.  The idea -- there had been

14    an ongoing sort of -- let's say part of the news cycle for a

15    couple months over certain things that were potentially going

16    to be declassified, that Donald Trump had suggested he may or

17    was going to declassify information that -- about issue --

18    things people had questions about.  I don't remember exactly

19    what that was, what those issues were, but issues the public

20    would have interest in.

21    Q.   And was that a subject of sort of ongoing conversation

22    between you and your brothers?

23    A.   I don't -- I don't think so.

24    Q.   But had you used the phrase "declass" in a similar

25    context multiple times?

1    A.   Maybe.  Probably.

2    Q.   Was it in this same time frame or some other time frame?

3    A.   I don't know.

4    Q.   You communicate with your brothers a lot by text.

5    A.   Yeah.  Yes.

6    Q.   How many times a week?  Individual text messages back and

7    forth.  How many times a week?

8    A.   From just me, just my output, or all four of us?

9    Q.   All four of you together, exchanging messages.

10   A.   I would venture to guess some days it could be 50 texts,

11   a hundred -- 50 texts, some days it could be as low as five or

12   six.

13   Q.   Was it a regular method as an alternative to a phone call

14   for you to communicate with them?

15   A.   I rarely -- a phone call might be -- could be once every

16   couple weeks.  The text is how we, you know, stay in touch and

17   goof --

18   Q.   Did you have -- feel any restrictions on the way you

19   could communicate, the language you could use with your

20   brothers or your close friends?

21   A.   No, never.  We're --

22   Q.   Did you --

23   A.   -- extreme about every topic.

24   Q.   Did you communicate with them about family issues?

25   A.   Constantly.

1    Q.   Did you communicate with them about work issues?

2    A.   Yes.  More venting about work than --

3    Q.   Did you communicate with them about religious issues?

4    A.   Constantly.

5    Q.   Communicate with them about your hobbies?

6    A.   Constantly.

7    Q.   Did you communicate with them about politics?

8    A.   Constantly.

9    Q.   Did you ever feel like you had to be guarded in the

10   language you used with them?

11   A.   I'd say just the opposite.  No one's going to be

12   interested in your text if you're guarded.

13   Q.   Did you engage in obvious exaggeration with your

14   brothers?

15   A.   Yes.  Obvious exaggeration.

16   Q.   Did they do the same in return?

17   A.   Of course.

18   Q.   What about bombast?

19        MS. AKERS:  Leading.

20        THE WITNESS:  Of course.

21        THE COURT:  That will be stricken, and that's a leading

22   question.  So let's try to elicit the information through

23   non-leading questions.

24        THE WITNESS:  There's a --

25        THE COURT:  No, no.  No more.

1          Mr. Shipley.

2     BY MR. SHIPLEY:

3     Q.   Did you ever use phrases that you considered hyperbolic?

4          MS. AKERS:   Leading.

5          THE COURT:   I have to -- how would you describe the

6     breadth in latitude of the phrases that you would use?

7          THE WITNESS:   If you weren't being ridiculous about

8     anything light, meaning outside of health, then it was not

9     really welcome on our text thread.  The idea was always, on

10    all of our -- on the combination of our brothers' text

11    messages, it was always to be ridiculous and entertaining.

12    Always.  No matter the topic of conversation.  We're

13    discussing storming Area 51.  I -- I'm not sure -- I'm sure

14    I could pull a zillion examples but that would be as good

15    as any.

16    BY MR. SHIPLEY:

17    Q.   Did you expect your brothers to interpret you literally?

18    A.   Of course not.

19    Q.   Did you interpret your brothers literally?

20    A.   Of course not.

21    Q.   Are you a fan of the HBO show *Vice Principals*?

22    A.   It was two series, and I think I finished the second one.

23    Q.   And that was the clip that was sent to you breaking

24    the --

25    A.   Yes.

```
 1    Q.   -- glass, right?  Is your brother who sent you that a
 2    fan of that show?
 3    A.   Bigger fan than I am.  He loved that show.
 4    Q.   Did you get other clips of that show from him?
 5         MS. AKERS:  Objection.  Leading.
 6         THE COURT:  I'm going to say let's move on because
 7    I think it's of marginal relevance.
 8         MR. SHIPLEY:  All right.  Okay.
 9    BY MR. SHIPLEY:
10    Q.   Do you have a practice of making screen captures, things
11    that you see on your phone and taking a picture of them?
12    A.   Yes.
13    Q.   And are those stored on your phone?
14    A.   Typically.
15    Q.   Do you get those from other people?
16    A.   Yes.
17    Q.   If you keep it, are you endorsing it?
18    A.   No.  Of course not.  I rarely take the time to delete.
19    Q.   Now, you struggled to answer the question about your
20    brother.  Correct?
21    A.   Correct.
22    Q.   And you didn't see him in the Capitol?
23         MS. AKERS:  Objection.  Leading.
24         MR. SHIPLEY:  I was just repeating what he said on
25    cross.
```

1          THE COURT:  Yeah, I think this is acceptable.

2     Overruled.

3     BY MR. SHIPLEY:

4     Q.   Did you see your brother at any time do anything you

5     thought was illegal?

6     A.   No.

7     Q.   How did you find out that he had gone in the Capitol?

8     A.   I believe he told me.

9     Q.   He just told you?

10    A.   Yeah.

11    Q.   You have no reason to think he's lying to you.  Correct?

12    A.   I have no reason to think he's lying to me.

13    Q.   So your reluctance was simply not to want to --

14         THE COURT:  Let's defend this case, not some other

15    case, Mr. Shipley.  We don't need to dwell on this.

16    BY MR. SHIPLEY:

17    Q.   Last subject.  Going up the stairs at the top, Ms. Akers

18    played that very slowly for you from the moment there was

19    forward movement.

20    A.   Yeah.  Yes.

21    Q.   How many different people did you see with their hands on

22    your back?

23    A.   I saw -- I thought it was two -- I thought it was three

24    hands, two people.

25    Q.   Did one of them have a red hat?

1    A.    I don't -- I don't remember.

2    Q.    Can we get the close-up version you had, not the one --

3    A.    I believe -- sorry.

4          MS. AKERS:  Of what exhibit?

5          MR. SHIPLEY:  118, I think.

6          MS. AKERS:  You'd like the zoom, correct?

7          MR. SHIPLEY:  Handy little tool you have.  Okay.

8    Can we just play it forward?

9      (Video played.)

10   BY MR. SHIPLEY:

11   Q.    Stop right there.

12         Okay.  This is you right here, correct?

13   A.    Correct.

14   Q.    And this is -- I believe Ms. Akers identified this person

15   as green hat.  Do you recall that?

16   A.    Okay.

17   Q.    And he has his hand on your back.  Is that one of the two

18   people you mentioned?

19         MS. AKERS:  Objection.  Leading.

20         THE COURT:  It is leading.

21         THE WITNESS:  Yes.  It's one of the two people --

22         THE COURT:  No.  You can't answer it.  That testimony

23   will be stricken.

24         THE WITNESS:  I apologize.

25         THE COURT:  Ask the question a different way.

```
1    BY MR. SHIPLEY:
2    Q.   Based on your review of the video, how many people did
3    you see with a hand on your back?
4              THE COURT:  How many, if any?
5              MS. AKERS:  That's leading.  Thank you.
6              THE COURT:  How many, if any?
7              THE WITNESS:  How many do I think?  I believe these are
8    two, and I believe on the other side --
9    BY MR. SHIPLEY:
10   Q.   All right.  Well, let me ask you:  Do you see one in this
11   image?
12   A.   Yeah.  Yes.
13   Q.   Who in this image do you see?
14   A.   Who has a hand?  The green hat.
15   Q.   You can touch the screen, please, to help us out.
16        (Witness complies.)
17        Okay.  Can we go forward a little?
18        (Video played.)
19        All right.  Stop.
20        Does anyone else have their hands on you?
21   A.   That red hat?  It's hard to --
22   Q.   Why don't you touch the screen so we know who you're
23   talking about.
24        (Witness complies.)
25        And where are you?
```

```
1     A.   Right here.
2     Q.   Now, at this point, what are the police officers doing?
3     A.   They're heading up the stairs.
4     Q.   What are you doing?
5     A.   Heading up behind them.
6     Q.   And what's behind you?
7     A.   A crowd of protesters.
8     Q.   Were you leading the crowd of protesters?
9     A.   No.
10    Q.   Were you in front of the crowd of protesters?
11    A.   Yes.
12         MR. SHIPLEY:  Thank you, Your Honor.  Nothing further.
13         THE COURT:  All right.
14       Mr. Bozell, you may step down.
15       (Witness steps down.)
16         MR. SHIPLEY:  Your Honor, we have no further evidence
17    on behalf of Mr. Bozell.
18         THE COURT:  Any rebuttal evidence?  Rebuttal case?
19         MS. AKERS:  Briefly, Your Honor, yes.  The government
20    recalls Special Agent Daniel Wright.
21       (Witness resumes the stand.)
22         THE COURT:  Special Agent Wright, you're still under
23    oath.
24         THE WITNESS:  Yes, sir.
25         THE COURT:  You understand that?
```

1              THE WITNESS:  Yes, sir.

2        DANIEL WRIGHT, WITNESS FOR THE GOVERNMENT, PREVIOUSLY SWORN

3                         DIRECT EXAMINATION

4        BY MR. BALLOU:

5        Q.   Mr. Wright, to reset, was Mr. Bozell's phone seized as

6        part of his arrest?

7        A.   It was.

8        Q.   Were you involved in the analysis of that phone?

9        A.   I was.

10       Q.   Was any content deleted from the phone?

11       A.   It was.

12       Q.   How do you know that?

13       A.   There's two ways, really.  The Cellebrite extraction

14       tells you how many items --

15            MR. SHIPLEY:  I would object.  This isn't rebuttal to

16       anything he testified to.

17            THE COURT:  He did actually say at one point that he

18       hardly ever deletes anything.

19            MR. SHIPLEY:  He said --

20            THE COURT:  He did testify at one point that he never

21       deletes anything.

22            MR. SHIPLEY:  Okay.  We were talking about captured

23       images, I think.  I thought he said I never deleted things

24       people sent me.

25            THE COURT:  I'll allow the testimony as rebuttal based

1    on what Mr. Bozell testified to.

2    BY MR. BALLOU:

3    Q.   Mr. Wright, just to reset, how do you know that content

4    was deleted from his phone?

5    A.   There's two ways.  The Cellebrite machine tells you how

6    many items have been deleted.  However, it doesn't capture

7    everything because it only captures things that have been

8    deleted recently.  So in the analysis of the phone we also

9    determined there was multiple messages that were deleted just

10   based off the context of the information.

11        So, for example, somebody would ask Mr. Bozell a question

12   via text message, there would be no response, and then a

13   continuation of the conversation later on in the text thread.

14   Q.   So to confirm, text messages were deleted from the phone?

15   A.   Correct.

16   Q.   In your analysis of phones in your work, how much would

17   you say comparatively was deleted from this phone?

18   A.   Significant amount.

19   Q.   Did you hear earlier when Mr. Bozell testified that he

20   went to the Senate floor in part to try to find his mother?

21   A.   I did.

22   Q.   Approximately when did Mr. Bozell enter the Senate floor?

23   A.   It was approximately 3:05 p.m.

24   Q.   Did you also hear Mr. Bozell testify that he was on the

25   Senate floor for approximately two to six minutes?

1    A.   Correct.

2    Q.   Pulling up what's been marked as Government's Exhibit

3    600.1.  Mr. Wright, do you recognize this document?

4    A.   I do.

5    Q.   What is it?

6    A.   We submitted a subpoena to Verizon in order to receive

7    toll records of Mr. Bozell's phone records for that time

8    period.

9    Q.   And I see on the first page it actually says Dawn Bozell.

10   Can you explain how these are the phone records for

11   Mr. Bozell?

12   A.   The phone that he used was in his wife's name, so she's

13   the subscriber.

14            MR. BALLOU:  Government moves to admit Exhibit 600.1.

15            THE COURT:  And this is 600.  Right?

16            MR. BALLOU:  Yes.  600.1.

17            THE COURT:  Oh, 600.1.  The call log?

18            MR. BALLOU:  Yes.  Exactly.

19            MR. SHIPLEY:  Just this one image to show?

20            MR. BALLOU:  Yes.  It's a 15-page document.

21            MR. SHIPLEY:  Oh, okay.  No objection.

22            THE COURT:  Without objection, 600.1 is admitted.

23                        (Government Exhibit No. 600.1

24                         received into evidence.)

25

1    BY MR. BALLOU:

2    Q.   Can you confirm, how did the FBI get this document?

3    A.   We sent a subpoena to Verizon.

4    Q.   I'm going to page 15.  Do you see that these are call

5    records for a January 6?

6    A.   Yes.

7    Q.   And if you go up, do you see it's for January 6, 2021?

8    A.   That is correct.

9    Q.   What are these records?

10   A.   Those are the toll records of Mr. Bozell's phone from

11   January 6, from the beginning of the day all the way to the

12   end of the day.

13   Q.   Now, we've attempted to redact the phone numbers from

14   this page, but did you have the opportunity to find out whose

15   phone numbers these were?

16   A.   I did.

17   Q.   How did you do that?

18   A.   It was primarily through records checks and database

19   checks that the FBI has access to.

20   Q.   Any other ways?

21   A.   No.

22   Q.   Okay.  You'll see that there are calls made on January 6

23   at 2:52, 3:06, 3:10, 3:12 and 3:24.  Do you see that?

24   A.   Correct.  I do.

25   Q.   Based on your analysis, were any of those calls to

1    Mr. Bozell's mother?

2    A.   They were not.

3    Q.   Based on your analysis, were any of these calls on

4    January 6 to or from Mr. Bozell's mother?

5    A.   The one at 7:05 p.m. is from his mother.

6    Q.   Okay.  And so I'm just highlighting this here.

7    7:05 from incoming CL.  What does "incoming" mean?

8    A.   Meaning that she called him.

9    Q.   So his mother called him; he did not call her?

10   A.   That is correct.

11   Q.   And that is the only call between them that day?

12   A.   On that day, yes.

13   Q.   Mr. Bozell also testified earlier that his mother was

14   hard of hearing.  Did you hear that?

15   A.   I did.

16   Q.   Okay.  How long is this call for?  Can you see that?

17   A.   Seventeen minutes.

18          MR. BALLOU:  No further questions, Your Honor.

19          THE COURT:  Mr. Shipley?

20                        CROSS-EXAMINATION

21   BY MR. SHIPLEY:

22   Q.   You said -- I'm not sure what I heard you say.  He was

23   inside the Senate Chambers for 3 minutes and 5 seconds or he

24   was inside the Senate at 3:05?

25   A.   He was inside the chamber at 3:05.

```
 1    Q.   At 3:05?

 2    A.   Yes.  Approximately.

 3         MR. SHIPLEY:  Can I have Government Exhibit 1009?

 4      Can we advance about three minutes forward?

 5         MS. AKERS:  Sure.

 6      (Video played.)

 7         MR. SHIPLEY:  And stop, please.

 8    BY MR. SHIPLEY:

 9    Q.   Now, this is Mr. Bozell here, right?

10    A.   That is correct.

11    Q.   And the timer on the bottom says 2:53.

12    A.   Correct.

13    Q.   And that's an accurate time.  That's the time stamp from

14    the C-SPAN cameras.  Right?

15    A.   That is correct.

16    Q.   So he's in the -- you said 3:05.  He's in 12 minutes

17    before 3:05.

18    A.   Approximately, yes.

19    Q.   And he's attempting to use his phone over and over again.

20    Right?

21    A.   Yes.

22    Q.   And you've seen this video.  This is a composite created

23    by the government.  And there's at least four or five times

24    he's attempting to make use of his phone.  Correct?

25    A.   That is correct.
```

1    Q.   He's looking at the screen over and over again.   Correct?

2    A.   Correct.

3    Q.   Let's keep playing.

4         (Video played.)

5         What did he just do?

6    A.   He just left.

7    Q.   Does he come back?

8    A.   No.

9    Q.   So at 2:53 he's out of the Senate.

10   A.   That is correct.

11   Q.   Not 3:05.

12   A.   Correct.

13   Q.   And there's actually no phone calls from the records

14   that connect at any time while he's in the Senate.   Right?

15   A.   There is.

16   Q.   I'm sorry?

17   A.   There is.   Right around 3:05 there is.

18   Q.   But he's not in the Senate at 3:05?

19   A.   That is correct.

20   Q.   In the five minutes he's in the Senate Chamber, there's

21   no records showing a call that connects?

22   A.   I believe there was.

23   Q.   Well, let's bring 600.1 --

24        THE COURT:   Just a second.

25        THE DEPUTY CLERK:   Your Honor, was that video, 1009,

1    admitted into evidence already?

2             THE COURT:  Yes.  It's in evidence.

3             MR. SHIPLEY:  So 600.1 is the call records.  If we can

4    just pull that up real quick and we can verify whether the

5    agent's testimony is accurate or I'm mistaken.

6    BY MR. SHIPLEY:

7    Q.   Okay.  You're correct.  There's one at 2:52 to a 703

8    number incoming for two minutes.

9    A.   That's correct.

10   Q.   Now, it's redacted there.  Do you have a recollection of

11   what that number was?

12   A.   I believe it was Reid's.

13   Q.   So he did get ahold of his brother while he was in the

14   chambers?

15   A.   Called Reid several times.

16   Q.   Well, at least it appears.  Now, there were problems with

17   cell connections all day.  Right?

18   A.   It's my understanding.

19   Q.   Your investigation and your overall understanding of the

20   J6 investigation that cell networks were overwhelmed?

21   A.   That is correct.

22   Q.   There was, it looks like, a two-minute call that actually

23   connected while he was in the Senate Chambers.

24   A.   That is correct.

25   Q.   And then he left.

1    A.   Yes.

2              MR. SHIPLEY:  Nothing further, Your Honor.

3              MR. BALLOU:  Nothing further, Your Honor.

4              THE COURT:  All right.  You may step down, Agent

5    Wright.  Any further rebuttal case?

6              MS. AKERS:  No, Your Honor.

7              THE COURT:  All right.  The case is, therefore,

8    submitted.  It is 11:45.  My apologies for going on that long

9    this morning but we need to take a break and then we need to

10   proceed to any motions.  Or actually, do you have any motions

11   at this time, Mr. Shipley?

12             MR. SHIPLEY:  Your Honor, we do.  My Rule 29 motion

13   just for procedural purposes.

14             THE COURT:  All right.  That is taken as renewed, and

15   I will reserve on it at this time as well, and as I have in

16   other bench trials and as the law permits, I will resolve the

17   motion in the context of resolving the case, mindful of my

18   obligations under Rule 29 with respect to the status of the

19   evidence at any given time.

20             MR. SHIPLEY:  If I can -- I had hoped when I raised

21   this issue two days ago that we wouldn't find ourselves at

22   this point, but I would ask the Court to recall I have a 12:30

23   with Judge Howell, a probation revocation hearing.

24             THE COURT:  Why don't we do this:  Why don't we take an

25   early lunch break, come back for closings.  So when will you

1    be ready, Mr. Shipley, given your other obligation, to be here

2    for closings?

3        MR. SHIPLEY:  It's a little uncertain exactly what

4    we're going to do.  We have a revocation petition filed, this

5    is the initial hearing on that.  I'm not exactly sure what

6    Judge Howell's procedure is.  We're going to deny -- likely

7    going to deny the violation.  I don't know if she'll then set

8    it for hearing or move forward right there.  I just don't know

9    because I'm not --

10        THE COURT:  Well, you need to tell her that you're in

11    trial and you need to be back here for the closing arguments.

12        MR. SHIPLEY:  And if she's able, maybe I can just go

13    back at like four o'clock if she has the flexibility.

14        THE COURT:  That's if we finish everything this

15    afternoon.  So should I say one o'clock for closings?

16        MR. SHIPLEY:  That's fine.  And I'll be in touch with

17    your clerk if that's a problem.

18        THE COURT:  Okay.  Well, you let me know if it's a

19    problem.  We'll say one o'clock.  If it has to be 10 minutes

20    further, that's not a big deal.  But if Judge Howell thinks

21    she's going to keep you there for two more hours, that is a

22    big deal.

23        MR. SHIPLEY:  And I'm sure she would not do that.  And

24    as I said, I don't eat lunch during trials so I will come back

25    here as soon as we're done there.

1        THE COURT:  Okay.  So one o'clock for closings.

2   How long does the government anticipate its closing will be?

3        MS. AKERS:  10 minutes or less.

4        THE COURT:  And Mr. Shipley?

5        MR. SHIPLEY:  I mean, with what I've got, probably at

6   least 20 to 25, but I'll work on trying to pare that down.  I

7   don't think there's any mystery about what the evidence is.

8   So I don't know that -- I'm not going to play videos for you.

9   You're going to watch them.

10        THE COURT:  You're right, you're not going to play

11   videos for me during the closings.  You might refer to a shot

12   or two, but -- okay.  So we will see you at one o'clock.

13      And then it may be that I need to take a short break

14   between the closings and then rendering a decision in the

15   case, but we'll see what we can do about getting it done

16   today.  And I think that that is in everyone's interest.

17   But perhaps particularly you, Mr. Shipley, if you're planning

18   on catching a plane back to --

19        MR. SHIPLEY:  I have a flight out tomorrow morning.

20        THE COURT:  All right.  See you all at one o'clock.

21      (Recess from 11:49 a.m. to 1:07 p.m.)

22        THE COURT:  All right.  Before I begin hearing from

23   you, I did give you what I called the legal framework, the

24   equivalent of jury instructions or the law on the various

25   counts yesterday morning, I think.  I just want to make sure

 1    there's no question or concern that anyone has with respect

 2    to that.

 3         MS. AKERS:  I don't believe we received that, Your

 4    Honor.  Did you, Mr. Shipley?

 5         THE COURT:  Oh, we didn't give it to you.  Okay.

 6    Well, you'll hear it later on.  It's pretty much what you have

 7    indicated in the trial briefs.  I don't think there was a big

 8    difference between the two sides on it.

 9         MS. AKERS:  That's correct.

10         MR. SHIPLEY:  I have no issue with not having received

11    it.  I'm confident that you're going to do exactly what the

12    law requires -- there's no new ground to be trod here.

13         THE COURT:  There really isn't new ground to be plowed.

14    I agree with you.  So we're ready for the closings.  And we'll

15    start with you, Ms. Akers, please.

16                     GOVERNMENT CLOSING ARGUMENT

17         MS. AKERS:  Thank you, Your Honor.  I'm going to pull

18    up a PowerPoint demonstrative.

19         All right.  I'll proceed, Your Honor, and of course if you

20    have questions, I'm sure you'll let me know.  Your Honor, this

21    case, United States versus Bozell is really about three

22    things:  It's about chaos, it's about destruction, and it's

23    about obstruction.

24         And my colleague Mr. Ballou told you during the opening

25    statement that the defendant here was one of the most active

1    rioters in the Capitol building, and he was one of the most
2    active in all three of those three areas.
3        In the chaos, he was one of the most active people who was
4    at the forefront of the pivotal breaks of the United States
5    Capitol riot.  The forefront includes the northwest stairs, it
6    includes the Senate Wing Door, it includes the breach of the
7    Senate Gallery, the breach of the Senate floor, the breach of
8    Nancy Pelosi's office, the breach of the Rotunda doors, the
9    breach near the Senate Carriage doors.  He was in all of those
10   places, all filled with chaos.
11       He was also at the head of destruction.  This defendant in
12   particular paved the way for hundreds of rioters to enter the
13   building.  And I would put forth that without the brazen
14   conduct of some individuals like this defendant, the breach
15   wouldn't have happened like it did.
16       There were many people who were at the Capitol that day, as
17   I'm sure you've heard in your other cases, who were followers,
18   who sort of had the mob mentality, who ended up somewhere
19   where they didn't expect.  Not so this defendant.  He was at
20   the front of the lines.  He was the one smashing the windows
21   and encouraging and facilitating that mob mentality itself.
22       And then finally, he was in the heart of obstruction.  When
23   we talk about January 6 and the certification, we think of the
24   congressional proceeding, of course, because that's why this
25   day was so significant.  It was taking place, as Your Honor

knows, in the Senate Chamber.  And this defendant was not only in the Senate Gallery and on the Senate floor, he was the first group who made it there not long after not only the vice president but the rest of the congresspeople, our lawmakers were evacuated.  And it's no coincidence he made it there.

I'm going to go through just very briefly the different major charges here.  Your Honor is obviously familiar with the charges as listed here.  There are, of course, 10 counts in this case.

The first I'm going to talk about briefly -- and I'll just note for Your Honor that I'm going to focus on what I perceive to be the more disputed areas in this case.  So the first is the obstruction count.  And this defendant in particular meets the intent requirement for obstruction in two ways.  One, he has through his words, through his words before January 6; and two, through his conduct on January 6, both of which are consistent with each other.

Now, the defendant has testified that the words that he was saying in text message should be taken in jest, it was all a joke, everything they say is a joke.  But it's important that he followed through with the words, and he said things like January 6 is a must attend.  It's our last chance to assemble and stand up.

The messages prior to January 6 show that he thought this was true.  The defendant testified, consistent with his cell

1    phone content, that he believed that the election was stolen

2    and he thought there was a way to delay the certification of

3    the Electoral College vote; he wanted a different candidate to

4    become the next president.  And it's no coincidence that he

5    talked about this date in those terms and ended up where he

6    did, doing what he did.

7        He admitted today on the stand that he had conversations

8    where there was an expectation of violence on the 6th.  You

9    see that in his messages saying, for example, "I almost hope

10   it goes south on the 6th."

11       He also talks about "throwing them all out" on the 6th and

12   references "tossing Schiff's office."  It's interesting that

13   the defendant says these things and ended up in all the places

14   where he did.  He didn't end up, at least to my knowledge, in

15   Senator Schiff's office, but he certainly --

16           THE COURT:  Representative.

17           MS. AKERS:  Representative.  Thank you, Your Honor.

18       -- ended up in Speaker Pelosi's office, he checked the door

19   of the Majority Whip on the Senate side, he went into the

20   Mansfield Room, which is the caucus area as Officer Robishaw

21   testified.  So he was in the key places, which is consistent

22   with his planning ahead of time.

23       And then he talked about -- and perhaps -- you know, he can

24   say it was in jest or not, but his language referring to the

25   6th as civil war or the great awakening or the revolution, all

1    of that again is consistent with someone who has a corrupt

2    intent for the day.

3         And then we reach the actual day.  The defendant wavered a

4    lot on the stand about what he saw and didn't see.  And I

5    think something that we've seen in the video footage is that

6    this defendant was privy to violence at the Capitol on

7    January 6.

8         Now, the government hasn't charged him with 18 U.S.C. 111

9    for all the different instances, and our contention is not

10   that he was the one hitting the officers or pushing through at

11   all times.  But he was there watching and taking advantage of

12   or riding the coattails of the other brazen rioters around

13   him.

14        For example, he witnessed this violent encounter to access

15   the Senate Gallery.  It's interesting that the defendant

16   testified that he believed these three older gentlemen in

17   suits were other rioters and they were just fistfighting.  You

18   can see in the middle picture, which is a screenshot from the

19   exhibit we saw, this man in orange grabbing the neck of the

20   officer.  You see in the right picture as the officer moves

21   away the man in orange is pointing, and the defendant is no

22   less than I'd say a foot away from all of this.  And this is

23   right outside the Senate Gallery, the first access of the

24   rioters to the gallery.  And I would submit that it's no

25   coincidence that he was there.

1    We see him in the Senate Gallery, and Your Honor's seen the

2    video twice now.  The people are chanting "traitors," they're

3    chanting "treason," they're chanting "this is our house,"

4    they're yelling.  And the defendant doesn't leave.  Rather, he

5    again, almost alone and in a brazen manner, he goes to the

6    other side of the Senate Gallery.  He's looking around, he

7    goes through the bag.

8    And then what we see in Exhibit 1009 is that person who

9    propelled onto the Senate floor.  And what's important here is

10   that was at 2:46:29 p.m.

11   Then, at 2:46:48 p.m., so 20 seconds later, or actually

12   less than 20 seconds later, the defendant watches as this man

13   covers a camera with his coat, and then the defendant right

14   after moves the camera to the ground.  Now, Mr. Bozell on the

15   stand thinks that he was just doing that for no apparent

16   reason.  I think the most reasonable inference is that he

17   knew, because he just watched someone make it on the Senate

18   floor less than 20 seconds later, that they needed to move the

19   cameras so as not to record themselves on the Senate floor.

20   Either way, this was incredibly obstructive, it was

21   consistent with the intent that he expressed prior to January

22   6, it was consistent with what he did immediately thereafter.

23   And what that is is he made it to the Senate floor.

24   The defendant testified to Your Honor that it was purely

25   coincidental that after he left the Senate Gallery he then

ended up on the Senate floor.  He told you he had no idea
where he was going, he was just walking around.  But what the
evidence showed is that at 2:48:16 p.m. he left the Senate
Gallery -- as Officer Robishaw testified, that's the third
floor -- and by 2:49:26, less than a minute later, he entered
the Senate floor with that first group of rioters.

THE COURT:  Just over a minute later.

MS. AKERS:  Just -- excuse me.  Yes.  You're correct,
Your Honor.  Just over a minute, by 10 seconds.  So we would
submit that that was no coincidence that he made it down
there; that was his intent.  And it was right after he moved
the camera, it was right after he saw the rioters break into
the Senate Gallery.  And all of this is obviously important
because this is the heart of the day of January 6.  This is
where the action was happening prior to the emergency
evacuation.

Then, Your Honor, on the Senate floor.  So we have a few
things here.  We have the very left-hand picture where we see
Mr. Bozell make eye contact with the camera.  And I asked him
about this.  He looks to me, in my characterization, to be
incredibly startled.  He actually, as you might remember,
looks at his phone and says something, I guess we don't know
for certain, and sort of seems to be quite startled that he's
being filmed here.

Almost immediately after -- Your Honor can see the time

1    stamps on this exhibit here -- he turns and he looks to the
2    gallery and he points his arms in sort of a horizontal fashion
3    and then he points downwards several times as though to say,
4    point the camera down.

5           THE COURT:  Oh, the time stamp is the running stamp,
6    it's not the actual time.

7           MS. AKERS:  That's correct, Your Honor.  That's
8    correct.  That's the montage video.  But if Your Honor were to
9    watch it, this happens immediately after the sort of startled
10   deer in the headlights look, and then he starts this directory
11   action.

12       After that, Your Honor, the defendant left the Senate
13   floor.  And we talked quite a bit today and yesterday about
14   why he was on the Senate floor.  The defendant seemed to
15   testify he was either looking for his mother or thought she
16   might be there because it was a bright light, quiet place.
17   But what we know based on the evidence is that this person is
18   on his cell phone.  He's on his cell phone quite a bit
19   throughout the Capitol building.  Never called his mom.  Never
20   texted his mom.  So his claim that he was on the Senate floor
21   coincidentally, not because it had anything to do with January
22   6 but simply that he was searching for his mother, is simply
23   inconsistent with the evidence.

24       And so these actions are the primary basis of the 1512
25   charge.  The words are indicative of his intent in conjunction

1    with the actions, really, and that's what we propose as the

2    basis -- the factual basis for Count 1.

3        I'll move next just very briefly, one slide, to Counts 2

4    and 3.  At this point, it seems that the defendant has

5    acknowledged, admitted, whatever word you want to use, to this

6    conduct.  He smashed the first window 10 times.  He smashed

7    the second window 11 times.  They're clearly broken, they were

8    clearly damaged by his conduct, and that's the basis of the 18

9    U.S.C. 231 charge.

10       Moving then to Count 4, which is the civil disorder on the

11   west front.  Your Honor heard from several officers during

12   this trial, and I think all but maybe just three of them

13   testified that they heard emergency radio calls and responded

14   based on action that was happening at the west front.  And

15   they heard this because the rioters made it past the Peace

16   Circle and stormed up the west front.  This was sort of the

17   initial breach on that lower west front.

18       The defendant, of course, was there.  He was at the

19   forefront of all of the major breaches on January 6, or most

20   of them.  He watches, we see him in several exhibits looking

21   up.  You see him looking towards rioters who are confronting

22   officers on the northwest stairs for the very first time.  He

23   aids other rioters by handing up large objects, to which he

24   testified he did so mindlessly; he didn't know why these

25   people would need large hard objects as they were brazenly

1    attacking the officers on the stairs.

2         And then he had confrontations with the police lines.  And

3    again, the government hasn't charged him under the stairs with

4    being the rioter wielding the hammer at the officers, but he

5    was in fact there, he was privy to it, he was witness to it,

6    and he didn't leave.  In fact, throughout the whole day, no

7    matter what he saw, he didn't leave.

8         He walked past the Senate Wing Door a second time; he

9    didn't leave.  He walked past the north doors; he didn't

10   leave.  He walked -- actually, he pushed open the Rotunda

11   doors; he didn't leave.  And that's really a theme that's

12   inconsistent with his testimony at trial that when he was on

13   the northwest stairs he was pushed towards the Capitol

14   building involuntarily, inconsistent with every other action

15   he took that day.

16        Once he got to the top of the stairs, he of course tears

17   the tarp on the scaffolding.  His testimony was he was trying

18   to help the officers.  The officers who had been in the heart

19   of this chaos, who had been already defending the Capitol for

20   some time.  And what's interesting here is that he claims that

21   he was trying to help not these officers but the officers

22   above, as though officers who are at a higher vantage point

23   wouldn't be able to see what was going on below.

24        And Your Honor heard from Officer Murray, who established

25   that police line at the top of the northwest stairs, and

1    Officer Murray said I was given a post and I tried to stay
2    here, but he saw what was going on down the stairs.  He
3    actually went to help.  That's why he ended up in the middle
4    landing of those northwest stairs.
5        The defendant's claim that he was helping is incredible.
6    It's inconsistent with the evidence.  You see on the
7    right-hand side here not only is he tearing the tarp on the
8    front, he's tearing the tarp on the side.  The side faces that
9    wall and the rioters on the west lawn there that were chucking
10   objects up at Officer Murray and Officer DesCamp.  It's
11   incredible to say he was tearing the scaffolding tarp to help
12   the officers.
13       He then waves the crowd, officers -- he can't say who -- up
14   the stairs.  Consistent with his actions, the government would
15   submit that he's waving other rioters.  He said that he
16   couldn't see over this railing or this handrail sort of thing.
17   You can see -- Mr. Bozell might claim that he's too short to
18   see anything on January 6, but his head is clearly over top
19   here.  You heard Officer Murray testify that he was being hit
20   with all sorts of objects at this location, and conveniently,
21   Mr. Bozell is facing the exact direction where the rioters
22   were chucking these objects from, as Officer Murray testified.
23       An important point here also is that, as the crowd is
24   barrelling through the officer line, which I'll talk about in
25   a moment, right before that you heard Officer Murray testify

1    that he was getting hit with objects.  We played two videos, I

2    believe Government Exhibit 117 and 118, where you can see

3    objects in the air coming at the officers.  And he testified

4    he couldn't defend himself to the right where the objects were

5    coming because he had to focus on the rioters in front of him,

6    rioters including the defendant here.

7        And so not only does the defendant in this instance assault

8    these officers by barrelling through them, he also aided and

9    abetted the assault from the west front, all the objects that

10   were being chucked at the officers.  Because he, as being on

11   the stairs and being aggressive in manner, in group, like

12   Officer Murray testified, took the officers' attention away,

13   impeded the officers from being able to defend themselves, and

14   obstructed the officers from doing their jobs here.

15       Then we have what's been largely the most contentious

16   factual part of this trial, and that's the barrelling through

17   the officer line.  The government would submit, Your Honor --

18   and we've watched this video in slow motion, we've watched it

19   zoomed up.  What we see is that Mr. Bozell puts his head down

20   and he charges forward.  If Mr. Bozell made it halfway up the

21   stairs, made it out of harm's way and didn't go immediately to

22   the Capitol building and do what he did, that claim might have

23   some credibility, because it was true that the crowd, all at

24   once, charged forward.

25       But what's also true, and we saw in the video where the

1    rioter right next to Mr. Bozell says, "are we ready to push,
2    are we ready to push, let's go, let's go, let's go," and a
3    split second later, the crowd barrels forward.  Mr. Bozell
4    barrels forward.  He sprints up the stairs and immediately
5    once that bike rack and officer line is broken, he charges
6    straight towards the door.  Entirely inconsistent with the
7    claim of a person who says he was pushed up the stairs, he was
8    just helping the officers, he was waving officers over to
9    reinforce their line.  It is entirely inconsistent.

10    The video evidence here shows that there is no daylight
11    between this officer in the blue and Mr. Bozell with that red
12    arrow above his head.  They are very clearly touching.

13    Mr. Bozell has testified the person behind him is touching
14    Mr. Bozell.  And if that is to be true, and there's at least
15    this much space, then certainly it's true, where there's no
16    space here, that the defendant is in fact touching this
17    officer and is certainly impeding his ability to defend the
18    Capitol steps here.

19    Next, Your Honor, just very briefly, some highlights of his
20    conduct in the building.  The defense has suggested that
21    Mr. Bozell was just quiet and just looking for his mom and was
22    not really part of the chaos at all.

23    Again, it's inconsistent with the evidence.  We see, after
24    he crawls through a window that he smashed, him yell out,
25    celebrate, however you want to characterize it, it's not a

1      stoic face, it's not the face of someone who got pushed into

2      the building.  This is not the face of someone who

3      involuntarily ended up where he was.  He got here for a

4      reason, with a reason, with a purpose, and right when he

5      enters the building, this is what you see.

6          I've already discussed briefly, but this is an important

7      factor that sets Mr. Bozell apart from many other rioters, the

8      areas that he was in.  He took it upon himself to depart from

9      the crowd at times.  For example, on the Ohio Clock Corridor,

10     you see him walk down this hallway and enter that caucus room

11     for the senators.  We don't know what he did in there, there's

12     not cameras because it's a sensitive area.  We see him check

13     the door handle.  We see him enter Speaker Pelosi's office.

14     Again, these are important components that are indicative of

15     his intent while he was in the building.

16         He is part of the, I'm going to call it infamous chase of

17     Officer Goodman up the stairs.  This is right when the rioters

18     had first breached the building.  We saw in the footage

19     Officer Goodman run by some senators and direct them one way,

20     and then meets the crowd right here.  He in many ways is a

21     hero of that day.

22         And this defendant -- by no coincidence, because he was at

23     the forefront of the mob -- was part of this chase of Officer

24     Goodman up the stairs into the Ohio Clock Corridor, right next

25     to the Senate Chamber where the senators presided.

1    We also have him bypassing the police line at the carriage
2    doors.  Another important moment that Mr. Bozell has testified
3    he was just there to offer an officer a water bottle.  And
4    it's true that the video shows him trying to offer this
5    officer, who's clearly been sprayed by Mr. Bozell's fellow
6    rioters, a water bottle.  But then what did he do immediately
7    thereafter?  He walked in an elevator, officers had to come
8    and pull him out, and then he joined this group who bypassed
9    the officers, and we saw the video of the woman officer saying
10   you can't go this way, you can't go this way, and seconds
11   later, what do they do but go that way.

12   On his way back up he passes the Senate Wing Door that he
13   helped breach, didn't leave, continued going.  And then we've
14   talked quite a bit about the Rotunda doors.  The point here is
15   sort of interesting because the defense has made quite the big
16   deal about whether he could see out the windows.

17   I would submit that it is again entirely incredible to
18   submit that someone who is 5-8 or 5-9 can't see right in front
19   of him, and if he couldn't, he could certainly see the windows
20   up top.  The point here, though, is not really what he could
21   see.  It's that he joined a group who pushed through doors and
22   created yet another access point for the mob to enter the
23   building.

24   I believe it was Mr. Shipley who asked Special Agent
25   Wright, this was the door that was breached when the line of

1    Oath Keepers made it in the building.  This was another
2    pivotal moment in the Capitol breach that again this defendant
3    was part of.

4        And then near the end of the day, or I should say near the
5    end of his time in the Capitol building, we see Mr. Bozell
6    walking around on the first floor by himself.  You'll recall
7    that Officer Robishaw testified that he directed Mr. Bozell
8    down to the first floor so that he would leave.  But he
9    didn't.  He walked around for another 10 minutes or so.  Who
10   knows what he was doing.  He's in hallways without cameras.
11   He walked by this altercation with officers near the north
12   door, turns down a hallway very quickly, didn't leave.  And
13   then we see him exiting the building only after the officers
14   were able to corral the rioters out.

15       All of these actions are really indicative of his intent,
16   his purpose that he had on January 6, and he accomplished
17   quite a lot while he was there.

18       Now, I'll wrap up by addressing just a couple of the
19   defendant's defenses.  Of course, he's not required to put on
20   a defense at all.  But he did.  And what he said was three
21   things.  He was in the Capitol building for three reasons, he
22   testified.  He said he was there to find water, he said he was
23   there looking for a bathroom, and he said he was trying to
24   find his mom.

25       There's been very little conduct in the Capitol building,

1    and we've seen a lot of his conduct in the building, that

2    supports any of those defenses.  For example, this is sort of

3    a silly one -- I guess they all are.  He claims he was looking

4    for water.  But he walks with the guy with the GoPro right

5    next to a water fountain.  Doesn't stop.

6       He claims that he was looking for his mom, but very

7    interestingly, despite being on his phone much of the time in

8    the building, never called his mom, never texted his mom.

9    Couldn't even say he thought about it.

10       And then finally, he claimed he was looking for a bathroom.

11    I don't even know what to say to that.  This defendant was in

12    well over a dozen different areas of the Capitol building.

13    The claim that he was just there looking for a bathroom, it's

14    hard to even really stomach such a statement.

15       So, in closing, Your Honor, this defendant, like we've said

16    from the beginning of this case, he was at the heart of the

17    chaos, he was really at the head of the destruction, and he

18    was part and parcel of the obstruction of the administrative

19    proceeding on January 6.  And for all of those reasons, we ask

20    that the Court find the defendant guilty on all 10 counts.

21           THE COURT:  All right.  Thank you, Ms. Akers.

22       Mr. Shipley, do we need to communicate with Judge Howell's

23    chambers?

24           MR. SHIPLEY:  I'm sorry?

25           THE COURT:  Did you hear me?  I asked whether we need

1      to communicate with Judge Howell's chambers.

2            MR. SHIPLEY:  She was still at sentencing at one

3      o'clock.  I spoke to her personally.  I said can we come at

4      1:45, she said, oh, that's great.  Take as long as you want.

5      I got an email saying come when you're done.

6            THE COURT:  Okay.  Because Ms. Akers' 10-minute

7      estimate turned out not to be totally accurate.

8            MS. AKERS:  I tried to talk slowly.

9            THE COURT:  Oh.  There's an excuse.

10         (Laughter.)

11                      DEFENSE CLOSING ARGUMENT

12           MR. SHIPLEY:  May it please the Court, counsel.  Not

13     long after I got in the legal business, a family friend who

14     was a judge on the California district court of appeals but

15     had been a trial court judge for a long time said to me,

16     you're tailor-made for this profession.  You're going to

17     really enjoy it.  But if you go into criminal practice, you'll

18     learn what drove me from the bench.

19         And that's a realization I found, after 20 years, that

20     there's really only two crimes: misdemeanor stupidity and

21     felony stupidity.  And when I was a prosecutor, there was a

22     saying exchanged among agents and prosecutors:  You know, if

23     they weren't so dumb we wouldn't catch so many of them.

24     People just do inexplicable things.

25         And something else I learned early on is it's folly to look

1    for rational thought in irrational behavior.  You can look all

2    you want; you're not going to find it, because people just do

3    stupid things.

4        Can we go up on the PowerPoint, please?

5        In doing so many of these cases -- and the Court knows what

6    I've been doing and I know what the Court's been doing, and

7    Ms. Akers, we've all been exposed to this whole sequence of

8    events many times.  I think there were three groups who came

9    to the Capitol.  There was one small group that was bad

10   actors.  Came with the plan and the intent and the desire to

11   engage in violence for whatever their purposes, some

12   political, some not political.  Some were just spoiling for a

13   brawl.  And they found it.  They didn't necessarily find it

14   maybe where they were looking for it.  I don't know that they

15   came looking for a brawl with the police, but that's where

16   they had the brawl.

17       There was a second group, larger, upset over the outcome of

18   the election, wanting to be loud, wanting to be heard, wanting

19   to try to influence the Congress to do something different

20   that day.  And some members of that second loud, boisterous

21   angry group were drawn into the violence.  They didn't come

22   there with a plan, but once it began to happen, they got

23   themselves involved.

24       Third, much larger group, came angry, with the outcome of

25   the election, came wanting to be heard.  But when the violence

started, they kind of just stood back and observed the spectacle. And I had a client named Michael Greene who testified before Judge Mehta, and when he was asked on cross-examination why he stayed -- because he was taking pictures -- why he stayed and took pictures of protesters battling with the police, his answer was, when was I ever going to see this again in my lifetime? I couldn't believe what was unfolding in front of me. I couldn't look away.

I think Mr. Bozell falls somewhere between the second and the third group. He came unhappy over the protest --

THE COURT: But not in either?

MR. SHIPLEY: He's on the borderline. Because I think his activity changed from when he arrived to when he left. He didn't -- I don't think he came with a plan for violence. There's no evidence of that. Didn't come anticipating challenging the police or anybody else. He was unhappy. But remember, his motive for even coming in the first place was for the protest and the music.

You know, that was what animated his desire to come, was to bring this musician friend of his out from Los Angeles to perform at the event, and he's inviting other fans to come and join the music with him. To the extent that he parks near where he thinks they're going to be able to play so he can unload the equipment.

Yes, he knew there was a protest. Yes, he knew what the

1    protest was about.  He had come to the Jericho protest on

2    December 12.  But his purpose in coming was to attend the

3    protest to hear the music and to be with his friends.

4         Now, that anticipation was frustrated.  The night before he

5    finds out that his friend has got a fever at the airport and

6    these were in the days when we had to go through the little

7    air -- forehead monitors to make sure we weren't feverish, and

8    if you tripped off the red light, they sent you away.  And his

9    friend wasn't allowed to fly, the whole plan came apart.  He

10   had already brought the equipment down from Pennsylvania with

11   him.  He had it in his car.

12        Now, Mr. Bozell's status among groups 2 and 3 changed when

13   he went up the stairs.  The Court hit it right on the head

14   when it said to him, Mr. Bozell, however it is that you got

15   from the point on the stairs where you were talking to the

16   police, to the top, once you got to the top, you had a choice.

17   And he did.  And he chose wrong.

18        And I don't think we have done anything during the course

19   of this trial inconsistent with what I pledged to you in the

20   trial brief, which was we are not here to deny the obvious.

21   Once he started beating on those windows and broke those

22   windows with the object in his hand, he had crossed the line

23   and nothing short of turning around and leaving was going to

24   put him back on the other side of the line.

25        And then he didn't turn around and leave.  He didn't walk

1     through the door.  He went through the window.  And there's

2     nothing about going through the window that can be defended.

3          I asked him two hours ago, did you break the law breaking

4     the window?  Yes, I did.  Did you break the law going in

5     through the window?  Yes, I did.  And his failure to follow

6     lawful police commands at various points during the day, that

7     falls under the civil disorder statute.  The police were

8     giving lawful commands during a riot and anybody who didn't

9     follow those commands was at risk.  He put himself at risk by

10    not following through with what they were telling him to do,

11    which was leave.

12         But I think that's where his problems end.  Because

13    notwithstanding Ms. Akers's characterizations of his

14    conduct -- and we'll get to a couple specific instances --

15    inside the building, he's just mostly walking around, by

16    himself.  He's not there with anybody else.  There's no joint

17    undertaken criminal activity.  There's no conspiracy.  He's

18    walking around for almost an hour.  And if there was something

19    he did inside that building more egregious than what we've

20    seen, you would have seen it.  It doesn't exist.

21         I put the first slide up, United States versus the Crowd,

22    because I was struck by so many questions and answers that

23    came through the first four witnesses about what the crowd

24    did, what the rioters did.  And, yes, Mr. Bozell in many

25    instances was adjacent to that activity, but the witnesses

conceded that he didn't engage in the activity they were
describing.  He didn't dismantle bike racks.  He didn't use
the bike racks as a barrier or weapon.  He didn't use the bike
racks to push back the police.  He didn't cut away the tarp
with any sharp instrument.  He wasn't destroying that.

He's not yelling and chanting.  If he was yelling and
chanting, there would have been -- he's carrying a phone;
presumably there would have been some recording of somebody
that the government could rely on to say that's Mr. Bozell
yelling and chanting.

He didn't throw any objects at the police officers.  The
demeanor of the crowd was described by a couple of officers as
hostile and growing more hostile as they went on.  Absolutely
accurate.  The rioters overran the bike rack barriers.  No
question Mr. Bozell was not too far back from when that
happened and he did proceed after it happened, but he was not
up there kicking apart the barriers when the police officers
were trying to maintain them at the top of the stairs.

Yes, rioters fought the plainclothes officers outside the
Senate Gallery door, but Mr. Bozell did not do that.  He was
standing back from that.  And his testimony was I didn't
realize those were police officers.  Yes, they were wearing
coats but they weren't wearing any uniforms.

Rioters pushed past officers blocking the hallway inside,
and I had Agent Wright testify that Mr. Bozell was standing a

distance away, and only after those people started going down
the hallway -- had the female officer blocking them in the
hallway, and the rioters pushed past her, Mr. Bozell wasn't
with them.  He followed along after that pathway opened.

The rioters rifled through the desks and paperwork inside
the Senate Chamber.  We followed Mr. Bozell walking around in
the Senate Chamber for close to five minutes.  He doesn't
touch a thing.

So what did Mr. Leo Bozell actually do that makes him
guilty of crimes in this case, which he certainly is.  He went
on the grounds while walking back to his car after seeing the
growing crowd.  He was with his mother and his brother.  He
went under the scaffolding to the point where the police line
blocked people from going forward.  He lingered in the area of
the scaffolding for approximately 15 minutes, including
several minutes talking calmly to two of the officers.  No
demonstration of a hostility on his part in any way.

And I think, though, maybe a bit of testimony that slipped
back -- slipped past because I didn't pay a whole lot of
attention to it was the agent testified they've interviewed
all of those officers and not one of them testified on the
stand about anything that Mr. Bozell did or said to them.

He was carried forward by the crowd surge.  There's a
fundamental disagreement between the two sides about what that
video shows.  I submit that at absolute worst the video is

1    inconclusive.  You cannot determine from the video whether

2    Mr. Bozell is a voluntary actor pushing forward aggressively

3    or it's the large crowd behind him that suddenly begins to

4    push forward all at once that carries him forward.  He's not

5    done anything up to that point that would suggest that he was

6    itching to get past the police in whatever manner he could.

7                THE COURT:  Could the same be said for most of that

8    group of rioters who pushed past the police?  Looking at the

9    video?

10               MR. SHIPLEY:  At the top of the stairs?

11               THE COURT:  Yeah.

12               MR. SHIPLEY:  Or at the midpoint in the stairs?

13               THE COURT:  The midpoint of the stairs.  Mr. Bozell is

14    there in the front of them with his head down.

15               MR. SHIPLEY:  Sure, but --

16               THE COURT:  Walking forward, bumping into, pushing

17    against the police.

18               MR. SHIPLEY:  If you're being pushed from behind

19    unexpectedly, you're going to pitch forward.

20               THE COURT:  But can't that be said about most of the

21    rioters?

22               MR. SHIPLEY:  But my point is, I don't --

23               THE COURT:  Where do you wind up?  You wind up with a

24    group of 20 or 30 who are pushing past the police, and the

25    video is inconclusive to show that any one of them is

1      voluntarily, of their own volition, doing the pushing instead

2      of being pushed?

3             MR. SHIPLEY:  Assault requires a voluntary act.

4      Assault can't be the result of an involuntary act.

5             THE COURT:  But I'm saying, is that what the video

6      shows?  The video doesn't establish conclusively -- you could

7      substitute the words "beyond a reasonable doubt" -- that any

8      particular one of those rioters is voluntarily pushing forward

9      instead of being pushed by all those around him?

10            MR. SHIPLEY:  I think that's a fair characterization of

11      the video, and I think that becomes a conundrum for a fact

12      finder in the absence of a conspiracy.  Because we don't

13      convict people based upon group activity when you're in the

14      middle of the group.  We convict you for your own activity.

15      It requires specific intent, intent to commit bodily harm, and

16      a voluntary action.

17         You know, if you're in a bad spot and you get carried

18      forward when you have no ability to resist the force behind

19      you, you have not committed a crime.  We don't convict people

20      for being caught up in a group that's committing an offense.

21      The government has to pick out the bad actors and prove that

22      they're the bad actors.  Can't just say well, we can't figure

23      out quite who was the driving force here, so a pox on all

24      their houses.

25         And that sort of goes back to my first slide, the

1      United States versus the Crowd.  This is my fifth trial.  I've

2      heard so much testimony about the crowd and the rioters, and

3      it's like I want to scream, what about my client?  What do you

4      have about my client?  And in some cases there was a lot about

5      my client.  This isn't one of them.

6           THE COURT:  No, there's a lot about Mr. Bozell.  You

7      just think that most of it is not criminal.

8           MR. SHIPLEY:  Oh, absolutely.  And that's sort of the

9      point I'm going to get to.  Should Mr. Bozell be condemned by

10     the Court for reprehensible conduct as a moral issue, absolutely.

11     That's --

12          THE COURT:  Not necessarily in his mind, since "morally

13     justified" is a term that he's applied at least to some of the

14     activities on January 6.

15          MR. SHIPLEY:  It's egregious, condemnable conduct.  Bad

16     decisionmaking in the worst.  But criminal activity is more

17     than that.  And my last point here, from the moment he

18     followed the crowd past the police barrier at the top, his

19     actions from that point forward are plainly unlawful.  It's a

20     question of which crimes did he commit.  Because he's going to

21     a place he's not entitled to be, he's doing things he's not

22     entitled to do, and he remains for 55 minutes when he's not

23     entitled to be there.

24          Did not leave the grounds.  Picked up the cast-metal drain

25     about the size of his palm, joined a group of other rioters

1    engaged in efforts to break windows and the doors of the

2    Senate Wing.  Ten strikes on the narrow glass panel.  He stops

3    when it fractures.

4        Now, those doors are actually opened from the inside by

5    people who have gotten inside and kicked them open.  So what

6    Mr. Bozell did not create an opening for anybody to come

7    though.  Actually, the opening created for the crowd to come

8    through was Mr. Pezzola on the other side who was breaking out

9    all of the glass with a big police shield.

10       And then he moved already-broken glass -- and I think when

11   you watch that video again, if you do, you'll see that another

12   individual fractures the glass first and then Mr. Bozell comes

13   to it with the object and knocks some pieces of the glass out.

14   But he never knocks all the glass out.  He does not create an

15   opening for himself.  He does not create an opening for

16   anybody else.  Somebody else came along and knocked out the

17   remainder of the glass and then, just like on the other side,

18   people start jumping through.

19       And my last point there.  And I think this is important.

20       THE COURT:  But of course on that, Mr. Bozell is asking

21   me to conclude, and so are you, that all he was doing was the

22   equivalent of pounding his fist against the wall.  He was just

23   a frustrated individual, and he was just using this metal

24   object that he went to the trouble of picking up, banging it

25   against windows of the United States Capitol, and all it was

1     was an act of frustration, equivalent to punching against a

2     wall.

3             MR. SHIPLEY:  It's a violation --

4             THE COURT:  You think that's credible?

5             MR. SHIPLEY:  I think so.

6             THE COURT:  You think that's credible?

7             MR. SHIPLEY:  It's a violation of 1361.

8             THE COURT:  No, no.  I'm not talking about whether you

9     think it's a violation of the law.  Do you think it's credible

10    that all he was doing was punching the wall?

11            MR. SHIPLEY:  I think the fact that he quit calls into

12    question what his motivation was.  He struck 10 times and then

13    he stopped.  And he dropped the --

14            THE COURT:  He struck 10 times, and then he moved to

15    another pane and struck 11 times.  He struck 21 times.

16            MR. SHIPLEY:  Absolutely.  But none of the strikes

17    broke out the windows, and he stopped.  He did not create an

18    opening for himself to go through if that was his motivation.

19    If that was his motivation, he would have just kept breaking

20    until he could get through.

21            THE COURT:  Not necessarily.  One could certainly pound

22    against the window to break it, not break it completely,

23    knowing that others were around you having one by twos or two

24    by fours and other objects that would succeed in getting the

25    rest of the glass out.  So I don't think that your logic is

1    necessarily compelling.

2         MR. SHIPLEY:  But I don't have the burden of proof.

3         THE COURT:  Nor do I, but the government does.

4         MR. SHIPLEY:  But I understand the debate.  I

5    understand that the evidence can be seen from two different

6    perspectives.  No question about that.

7         So once inside, what did he do?  He testified -- there's no

8    contrary testimony -- that he had never been inside, didn't

9    know the layout.

10        And it's a kind of confusing building.  I've only been

11   inside a couple of times, and if I went back today I couldn't

12   find my way around.  I don't know what's where.  No

13   coordinated or jointly undertaken criminal activity either

14   alleged or observed.  At 2:16, two minutes after he comes

15   through the window -- and we have lots of time stamps on the

16   CCTV video -- and I wanted to do this, but it would take up

17   too much time.  I really wanted to show these in sequential

18   order so you could cite, where's Waldo?  He's here, and he's

19   here, and he's here, and he's here, in order.

20        2:16, two minutes after he comes through, he confronts the

21   rioter with the bat.  And if you watch that video again

22   closely, you'll see that the first thing -- when he -- he

23   testifies he hears the officers yell about a bat.  He then

24   steps forward and looks and he sees the bat, and then he goes

25   backwards and around to that person, says something to him,

1  and the person puts the bat away.  Perfectly consistent with

2  exactly what his testimony was.  I saw it, I walked over to

3  him, I said put that away.

4      2:19.  So now we're four minutes, five minutes after he

5  comes through.  I think it's four minutes.

6          THE COURT:  The math does say five rather than four.

7          MR. SHIPLEY:  This was early this morning.  But it's

8  2:19 on the clock that he sees the officer come through the

9  door, obviously in distress, looking like his face had been

10  sprayed, and he offers him the water bottle.  And he doesn't

11  just offer him the water bottle casually.  He actually follows

12  him around a little bit because he's not sure if the officer

13  knows what he's trying to do.  But the officer eventually

14  waves him off and then he goes a separate way.

15     But again, this is just five minutes after coming through

16  the window, he's again playing the good Samaritan.  And I

17  understood the Court's question of him, did you have

18  authority, why were you thinking you could put yourself in

19  this position?  I think his testimony, being a devout

20  Catholic, he was familiar with the parable, when the

21  opportunity arose, if he had something to offer to assist, he

22  offered it.

23     Walked around alone.  You see him many times trying to use

24  his phone.  He's either looking at the screen, maybe looking

25  for a text message or looking for social media, whatever, he's

1    dialing, he's got it up to his ear, repeatedly, through the

2    entire time he's in the building.

3        And we do know now, right at the end, he did make contact

4    with his brother Reid at 2:52 while he's inside the Senate

5    Chamber.  And we'll get to that in just a minute.

6        He leaves at 2:53, just after he talks to his brother.

7    Remember, it's a two-minute call and he's still on the phone

8    as he's leaving the chambers.  At 3:05 -- I think that was in

9    the records -- he got a second call from his other brother

10   Joey, who was with his mother.

11       THE COURT:  What's the testimony that the mother was

12   with the brother?  Where's that come from?

13       MR. SHIPLEY:  He said his mother was with Joey because

14   Reid had gone into the building at some point, and his mother

15   never did.

16       So he gets the call with Reid at 2:52 while he's in the

17   chambers.  He leaves.  He then gets another call from Joey --

18       THE COURT:  So the mother with brother on your

19   PowerPoint is mother with other brother.

20       MR. SHIPLEY:  Yeah.  His mother was with his other

21   brother.  I actually did this this morning before we had that

22   evidence come in.  And we know there's now a second call.  I

23   believe it was at 3:05.  You have the records.  He leaves at

24   3:08.

25       As soon as he gets that call, your mom's safe, she's with

1    me, he's out the door.  Which is exactly -- I know it sounded

2    kind of weird, but his conduct actually -- think about the

3    door.  We saw the video now, and this is the second time I've

4    been through this on that door, because as you know, that door

5    is the entry point for the Oath Keepers.  It was a big point

6    of contention in that trial.

7       This is the second time I've had the government use the

8    reverse angle, looking into the building from above the door

9    rather than show the other angle, looking from inside towards

10   the door, which you can see so much more.  And you can see,

11   yes, he walked forward.  There's a group of people between him

12   and the door.  He's 5-8 or 5-9.

13          THE COURT:  5-8 and a half by his testimony, I believe.

14          MR. SHIPLEY:  I always say I'm 6-1 but I'm just a

15   little under that.

16       So there are clearly people taller than him.  When you see

17   him kind of get close to people, his head is like at shoulder

18   level.  But then once the door opens, and he's testified, once

19   the door opens, I can see it's daylight and I can see the big

20   group of people -- and his realization, okay, my mom is not in

21   there -- he walks to his left, pauses for a moment, circles

22   back behind the crowd, pauses again, kind of watching what's

23   happening as people begin to come in, then he wanders over to

24   the stairwell and he follows Josiah Colt.

25       Josiah Colt is the gentleman that's videotaping himself.

1    Follows Josiah Colt and then they're up the stairwell.  That
2    takes a minute.  So he lingers in that area to see what's
3    going to happen, for a minute, from the time the doors open
4    and the crowd starts to come in, until he exits.  His
5    testimony was maybe my mother's here, but now I realize this
6    is not where she'd be, and he's gone.

7        Again, to the point I made at the beginning, if we look for
8    rational thought in irrational conduct, we're destined to be
9    frustrated.

10       Claiming he was there to assist the police.  We're not
11   making that claim.  The only point of that testimony was to
12   show that there were anecdotal instances where he had an
13   opportunity to help, and he did.  We're not claiming that he
14   was -- you know, it was just the parable of the good
15   Samaritan.  That was it.

16       But with that information, it steps away from the idea that
17   he had hostility or any desire to have a confrontational
18   encounter with the police.  Because that's like bipolar.  You
19   know, I'm trying to help when I see them in a condition that I
20   might be able to assist, but then the government wants to say
21   I'm there to, you know, lead the rioters in attacking the
22   building.  The one inconsistent thing he did was banging on
23   the windows.

24       I underline that point at the bottom, because I think this
25   is something that is often lost in a jury trial that in my

experience is never lost in a bench trial.  This is the question of are there points where the evidence just comes up short?  It's the defense that not always is effective with a jury of failure of proof.  If there's a failure of proof, there's just a failure of proof.  The government put on what they had, and what they had just wasn't enough on a critical piece of information.  And it only has to be failure of proof on one element.

Again, I think we've covered this --

THE COURT:  Why do you say there's no evidence of any adversarial contact with the police?  It depends how one -- what one concludes, for example, with respect to the midway on the staircase and what his conduct was in pushing forward, whether it was volitional or not.  If it was volitional, and it came in contact with the police, that would seem to be adversarial.

MR. SHIPLEY:  That was a generous defense position of the record to this point.  But what I'm struck by, what really strikes me in that particular episode is the fact that the government could easily identify those five or six officers standing there.  That was clearly an event that would have stood out in their mind when that crowd overruns them in the stairwell.  Not one of them got on the stand and said that the guy standing right in front of them was part of the problem.  Not one.  Instead, they're relying on these long limb shot

1    videos where maybe he did, maybe he didn't.

2         It's really -- defense view is that the government's

3    argument is a characterization of a video that's not

4    warranted.

5         Just briefly inside the Senate video.  If you go to Exhibit

6    109, that's the composite exhibit of the interior of the

7    Senate, both while he's in the chambers and then when he's

8    down -- or in the gallery and then down in the chamber, time

9    stamped all the way along the bottom.  You can follow from the

10   time he entered.  There was some contention yesterday in your

11   questioning about how long he recalled being in, but I think

12   if you look at it, it's -- we don't know exactly when Mr. Colt

13   came in, we know exactly when he jumped down because the

14   cameras record him jumping down at 2:46.

15        But we have his video, which we've seen, where he's inside

16   talking to the video, all the commentary, and captures

17   Mr. Bozell down by the camera and looking at the stuff from

18   under the seat.  So total time inside is roughly eight to 10

19   minutes in both the top and the bottom, knowing that we're a

20   little inexact on the top because we don't have a timer

21   running on the top.

22             THE COURT:  Why is the time so crucial?  Why is it

23   important whether it's six minutes, eight minutes, or 10

24   minutes?

25             MR. SHIPLEY:  I think it just addresses the questions

1    the Court raised yesterday and wasn't too satisfied with the

2    answers Mr. Bozell gave based on his recollection.  And then

3    he kind of cleared that up today and said, you know, my

4    recollection is I was there a lot longer, and how long I was

5    in any one place or doing any one thing is just a mystery.

6    But I think to the extent that the Court really is interested

7    in knowing, the evidence is right there.

8        But I also think what's interesting is we have this eight

9    to 10-minute period, and he's on the phone nearly the entire

10   time.  And his testimony today was he got ahold of his wife,

11   let her know he was safe, and right at the end there was a

12   2:52 call with his brother.

13       So just quickly to the law.  One thing I want to say -- and

14   I think Ms. Akers make a misstatement of the law, but I'm not

15   sure, so I just want to respond briefly.  She said that by

16   being present at the front of the line at the top of the

17   stairs, before the crowd surges forward, by diverting the

18   officers' attention away from objects coming from their right,

19   that Mr. Bozell had aided and abetted the assault.

20       Well, that's not the law of aiding and abetting.  The law

21   of aiding and abetting requires that you know somebody else is

22   going to commit a crime and you take a specific act to help

23   them commit that crime.  You have to specifically know the

24   crime is being committed by a particular actor, the principal,

25   and you have to intend by your action to help the principal

1    commit the offense.

2        So I'm not sure the aiding and abetting theory of liability

3    helps anywhere with the government on the charge.

4        So the 111(a) count comes down to some basic premises of

5    definitional -- definition of elements.  There's no assault at

6    the top of the stairs because -- and we covered this just

7    briefly -- you don't have a voluntary act in our view and you

8    don't have any evidence of an intent to commit bodily harm.

9        1512.  Two issues here, I think.  Corruptly and knowingly.

10   Corruptly, we've now made it through the courthouse, is

11   otherwise unlawful activity.

12       THE COURT:  Well, the fifth floor of the courthouse is

13   about to say something.

14       MR. SHIPLEY:  They can't get their act together.

15       Otherwise unlawful activity.  Breaking the windows?  Yes.

16   But only if it's in furtherance of obstructing Congress.

17   That's where the vandalism versus nonvandalism

18   characterization becomes important, because if he's just

19   breaking the windows as some youthful delinquent, he's not

20   trying to interfere with what's going on, or you can't draw

21   that conclusion cleanly.

22       THE COURT:  Some might draw that conclusion from

23   someone taking a metal object, smashing against the window 10

24   or 11 times so that a small section of it breaks out, and it's

25   all smashed, and then someone else comes and finishes the job,

1    and then that first person immediately climbs through the

2    window, some might conclude that that was done in order to

3    climb through the window.

4         MR. SHIPLEY:  I understand.  I understand.  But you

5    don't have jointly undertaken criminal activity.  You have two

6    people doing the same things in the same place but not

7    pursuant to any kind of joint effort.  You have more than two

8    people.  You have about 10 people doing it in the same place.

9      So is it likely that that is maybe going to result at the

10   end of the day?  Sure.  But that doesn't mean that's his

11   intent.  It's a foreseeable consequence, potentially, but that

12   doesn't mean when he's banging on the window that's what he's

13   trying to do.

14     But I think the other problem here is there's an absence of

15   proof on the question of knowledge.  There is evidence he knew

16   Congress meeting on that day.  There's no evidence in the

17   record that he knew Congress was still meeting at 2:15 in a

18   proceeding that started at one o'clock.  That's a failure of

19   proof.

20        THE COURT:  I think most judges that have looked at

21   that issue have said it's not necessary that you know that

22   Congress is still meeting, or in fact that Congress was still

23   meeting because your activities may be keeping Congress from

24   resuming meeting.

25        MR. SHIPLEY:  But you would have to know -- well, okay.

1    I understand that point.  I think this is a legal principle,

2    so I would make -- my legal argument would be that if there's

3    no knowledge by him that the proceeding is still ongoing or

4    has been interrupted, and in fact --

5              THE COURT:  Well, it is one or the other.

6              MR. SHIPLEY:  Or it could be over.  It could be over.

7    It could be done.  It had already -- it already cycled through

8    the crowd that Vice President Pence had announced he was not

9    going to take any steps to halt the certification.  And so

10   that -- I mean, that -- my point is just a failure of proof

11   on the issue that this gentleman was aware that it was not

12   over yet or that it had been suspended subject to resumption.

13      These are the answers I got him to give this morning.

14   I did this before we had that testimony.  Oh, we reached the

15   end.

16      My closing thoughts.  And again, saying this to a learned

17   judge with more than three decades on the bench seems a little

18   goofy, but the bookends of the criminal justice system are the

19   presumption of innocence and burden of proof.

20      I think there is a failure of proof on crucial elements of

21   Counts 1 and 5.  Count 1 is the 1512 count.  I think the

22   failure of proof -- not the absence of proof, but the failure

23   to have proof that surmounts the hurdle of beyond a reasonable

24   doubt on Count 1 is the lack of corrupt intent in breaking the

25   windows and the lack of knowingly interfering with an ongoing

1        congressional proceeding.

2            As to Count 5, which is the 111(a) count, there's a lack of

3        evidence -- or not a lack of evidence, insufficient evidence

4        to surmount the beyond a reasonable doubt burden that his

5        conduct in either instance was voluntary and knowingly

6        targeting law enforcement officers, because he wasn't aware of

7        them.  He was aware of the ones directly in front of him on

8        the stairs but he was not aware that there were officers at

9        the front of the group when they were pushing against the

10       door.  That's the testimony.  And the video's clear; there's

11       many people between him and the officers at the door.

12           So we came into this proceeding acknowledging that the

13       Court is going to find him guilty of multiple crimes,

14       including multiple felonies.  But I think the record before

15       the Court should compel a verdict of not guilty as to Counts 1

16       and 5.

17               THE COURT:  So just to make sure that I understand,

18       you're effectively conceding that, other than Counts 1 and 5,

19       the government has met its burden.

20               MR. SHIPLEY:  I think we conceded that when we started.

21               THE COURT:  Just want the record to be clear on it.

22               MR. SHIPLEY:  We weren't here to deny the obvious.

23               THE COURT:  Right.

24               MR. SHIPLEY:  Thank you, Your Honor.

25               THE COURT:  Thank you, Mr. Shipley.

1          Mr. Ballou.

2                    GOVERNMENT REBUTTAL ARGUMENT

3          MR. BALLOU:  Your Honor, just three points.  We'll

4     make it brief.  Mr. Shipley said, and I think I'm quoting,

5     that Mr. Bozell "didn't come with a plan for violence."  The

6     evidence shows that he did.  He specifically anticipated

7     violence in his text messages when he said, for instance,

8     "note, I'm bringing lighters and fire starters," that, quote,

9     "Biden will never be sworn in, we'll have World War Four

10    before that happens."  Side bar, we don't know when World War

11    III occurred.  And quote, "I almost hope it goes south on the

12    6th.  Let's just take the Capitol and hang these pedosatanist

13    traitors."  So he anticipated violence.

14         He also committed violence, which we'll talk about more

15    momentarily.  And then after committing that violence, he

16    justified his actions and justified violence in general,

17    saying, "The Capitol siege is morally justified."  Quote,

18    "Someone needs to show these pictures to dad, and dad needs to

19    reconsider condemning all violence."  And quote, "If power is

20    stolen by child rapists and murderers, then any attempt to

21    stop them is morally justified."

22         So Mr. Bozell anticipated violence, he justified violence,

23    and he committed violence.

24         Now, Mr. Shipley is trying to say that the video on the

25    Capitol steps mezzanine is inconclusive.  And if you look at

1    the video -- we obviously won't replay that here, you've seen

2    it enough times -- he leans forward and then pushes.  And this

3    is consistent with the video of what the rioters are saying,

4    when they say "push."

5        Now, we also have the larger context of that moment, that

6    he comes out of a tarp after cutting it open, and then starts

7    arguing with the police.  We also have the video of him

8    continuing to climb up the steps.  So it wasn't just that he

9    was trying to avoid tripping.  He actually continues along

10   with the rioters, looks back briefly, and then continues along

11   his way, as if this is part of his agenda, get past the police

12   and then get up to the steps.

13       Now, Officers Murray and DesCamp couldn't remember

14   Mr. Bozell specifically, but obviously there were hundreds,

15   thousands of rioters that day.  Mr. Bozell wouldn't

16   necessarily stand out.  But Officer Murray testified that the

17   crowd that Mr. Bozell was a part of impeded and interfered

18   with the officers' work.

19       Now, Mr. Shipley said that Mr. Bozell was just looking for

20   his mom in the Capitol building.  Now, why didn't Mr. Bozell

21   call her?  He says at some point, well, she's hard of hearing.

22   But then we find out that he did have a conversation with her

23   for 17 minutes in the evening.  But he didn't call her.  She

24   called him.

25       Now, to my knowledge -- Mr. Shipley suggested this in

closing, but to my knowledge, we don't have testimony that

once Mr. Bozell found his mother through his brother that he

left the building immediately.  In fact, the call that was

placed that Mr. Shipley was talking about, 2:52 p.m., is many

minutes before he finally leaves the building at 3:07 p.m.

This is part of a much broader story of Mr. Bozell's

shifting justification for what he was doing during that day

and why.  At some point he says well, his car is just parked

on the other side of the building.  Another point he says he's

just trying to find his mom.  Another point he says he's just

trying to diffuse the situation with the police.  Another

point he says that he's trying to express his frustration.  At

no point does he concede that he's trying to interfere with

the certification of the election on January 6.

Now, Mr. Bozell at many times said things that were

literally incredible.  The one that sort of stands out to my

mind the most is when we're looking at the video of the

mezzanine and he's waving for the Capitol rioters to come on,

Mr. Bozell says, no, I'm actually faced in the other direction

and trying to wave the police to come down.

That was a moment that stuck in my mind, because it

suggests that he's saying, who are you going to believe,

Judge?  Me or your lying eyes?  And so we just simply ask that

you rely on the evidence, the videos, and not deny the obvious

here, that Mr. Bozell reasonably intended the consequences of

1    his actions.  Thank you.

2         THE COURT:  All right.  Thank you, Mr. Ballou.

3      The case is submitted.  I will now tinker with it a little

4    bit, and will intend to resume to give a decision at four

5    o'clock.  I think I can get it done if I get us together at

6    four o'clock.  All right?  So we'll see you then.

7      (Recess from 2:17 p.m. to 4:14 p.m.)

8                            VERDICT

9         THE COURT:  All right.  The case has been completed

10   and submitted, and it's now my responsibility to resolve both

11   the Rule 29 motion and, if it's denied, to determine

12   Mr. Bozell's guilt or innocence on each of the 10 counts.

13     With respect to the Rule 29 motion, Rule 29(a) of the

14   Federal Rules of Criminal Procedure provides that "after the

15   government closes its evidence or after the close of all the

16   evidence, the court on the defendant's motion must enter a

17   judgment of acquittal of any offense for which the evidence

18   is insufficient to sustain a conviction."

19     When ruling on a motion for a judgment of acquittal, the

20   Court must "consider the evidence in the light most favorable

21   to the government and determine whether, so read, it is

22   sufficient to permit a rational trier of fact to find all

23   of the substantial elements of the crime beyond a reasonable

24   doubt.  *United States v. Kayode*, 254 F.3d 204, 212-13 (D.C.

25   Cir. 2001), quoting *United States v. Harrington*, 108, F.3d

1460, 1464, (D.C. Cir. 1997).

The Court must "accord the government the benefit of all legitimate inferences" and deny the motion if "any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt." *United States v. Jabr*, No. 18-CR-0105, 2019 WL 13110682 at *3 (DDC May 16, 2019), which quotes *United States v. Weisz,* 718 F.2d 413, 437, (D.C. Cir. 1983), which in turn quotes *United States v. Arrington*, 309 F.3d 40, 48, (D.C. Cir. 2002).

"The same standard guides a district court in resolving a Rule 29 motion whether in the context of a bench or a jury trial." *Jabr* at *4. At the moment of deciding the motion for judgment of acquittal, "this Court is not the trier of fact." *United States v. Recognition Equipment, Inc.*, 725 F.Supp 587, 588 n.1 (DDC 1989).

Accordingly, the Court is not yet stepping into the jury's shoes. There is no jury here to assess the defendant's guilt or to make any findings about witness credibility but, rather, is "simply applying the legal standard to the government's evidence."

The Court will deny Mr. Bozell's motion for judgment of acquittal. The Court concludes that the government presented sufficient evidence such that a rational factfinder could find beyond a reasonable doubt that the elements of each charge against Mr. Bozell have been met.

1        The reasons for the Court's denial of the Rule 29(a) motion

2    for judgment of acquittal are the same as the reasons that the

3    Court will now give in its findings of fact and conclusions of

4    law in deciding the case, and that's consistent with what was

5    done, for example, in *United States v. Rivera*, Criminal Case

6    No. 21-060, at an order of June 17, which is found at ECF

7    No. 63.  That takes the same approach in another January 6 case.

8        So, in early January 2021, as we all know, Mr. Bozell

9    traveled to Washington, D.C., where he participated in the

10   riot at the United States Capitol on January 6.  The details

11   of his participation have been described by witnesses and

12   though the video and other evidence presented in the three-day

13   bench trial.  The government alleges that Mr. Bozell's conduct

14   on January 6 violated a number of federal statutes, as set out

15   in the 10 counts in the superseding indictment.

16       Let me just review what those 10 counts are:

17       Obstructing and Official Proceeding and Aiding and

18   Abetting, in violation of 18 U.S.C. § 1512(c)(2) and § 2.

19   That's Count 1.

20       Counts 2 and 3 are two counts of Destruction of Government

21   Property and Aiding and Abetting, in violation of 18 U.S.C.

22   Sections 1361 and 2.

23       Count 4 is Civil Disorder, in violation of Title 18 of the

24   U.S. Code § 231(a)(3).

25       Count 5.  Assaulting, Resisting, or Impeding Certain

Officers, in violation of 18 U.S.C. § 111(a).

Count 6.  Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) and (b).

Count 7.  Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2).

Count 8.  Disorderly Conduct in a Capitol Building.

And these are all violations of portions of Section 5104(e)(2) of Title 40.

Count 9.  Act of Physical Violence in the Capitol Grounds or Buildings.

Count 10.  Parading, Demonstrating, or Picketing in a Capitol building.

The government called five witnesses in this case, in addition to some transcripts of stipulated testimony.  The witnesses were Sergeant Adam DesCamp, Officer Bradley Murray, Sergeant Victor Nichols, and Officer Keith Robishaw, all with United States Capitol Police; and Daniel Wright, an FBI special agent who's the case agent in this case.

Special Agent Wright testified about text messages he recovered from Mr. Bozell's phone showing, among other things, Mr. Bozell's belief that the 2020 election was stolen, his plans to travel to Washington, D.C. to protest on January 6, and some references to violent conduct or anticipated conduct.

Testimony from the other government witnesses and video footage illustrated the breach of the Capitol and tracked

Mr. Bozell's movements and actions throughout the Capitol grounds and the Capitol building on the afternoon of January 6.

The video footage showed, among other things, Mr. Bozell passing through multiple police lines, smashing two windows near the Senate Wing Door entrance of the Capitol building, obscuring a C-SPAN camera's view so it would not capture the rioters entering the floor of the Senate Chamber, and remaining inside the Capitol building for almost an hour all told.

The defense's only witness was Mr. Bozell, and he testified about his actions on January 6 and his intent in sending the text messages introduced through Special Agent Wright's testimony.

During closing arguments, or even before, Mr. Bozell, through counsel, conceded guilt on all counts other than Counts 1 and 5.  After considering all the evidence and arguments, and for the reasons I am now going to explain, I find Mr. Bozell guilty on those two remaining counts as well as the other eight counts.

Before turning to these counts, let me say a few words on Mr. Bozell's testimony.  I find that Mr. Bozell was not a credible witness on several fronts.  Many of his explanations of his conduct before and on January 6 defy both the video evidence and common sense.

Mr. Bozell testified that his text messages in the days

leading up to January 6 conveying his views that the election
was stolen, stressing the importance of showing up in D.C. on
January 6, and referencing violence and "taking the Capitol"
were simply "silly conversations" with family and friends that
did not reflect his true goal of fun and celebration on
January 6.  But the sentiments expressed in these messages
track Mr. Bozell's actual conduct on January 6:  He did in
fact smash windows, storm the Capitol, and help to delay the
certification of the 2020 election.

Many of Mr. Bozell's explanations of his conduct on January
6 itself are also not credible.  For example, Mr. Bozell's
narrative that many of his actions on the Northwest Steps were
motivated by a desire to "help" the officers defending the
Capitol is not consistent, I find, with the evidence.

He testified that he attempted to pull aside a white tarp
not to create an access point but so that officers and rioters
could see each other better to deescalate the situation, even
though officers and rioters were clashing immediately to his
right and there was a wall several feet behind the tarp that
blocked visibility further up toward the Capitol.

He testified that he waved to summon law-enforcement
support, even though video footage shows at least one instance
of him facing down toward the crowd as he waves them up.  And
he testified that he thought when the officer line on the
Northwest Stairs broke, the officers were in fact leading the

rioters up to the Capitol, even though by that point he had seen multiple clashes between officers and rioters as *rioters* attempted to push upwards and *officers* attempted to maintain a perimeter at the Capitol.

He also testified that he did not see bike racks at the top of the Northwest Stairs, although the evidence shows him stopping just short of such a barricade, looking directly at it, and then waiting while rioters demolished it before proceeding to the Capitol.

Mr. Bozell further testified that he smashed two windows near the Senate Wing Door not in an attempt to gain access to the Capitol building but rather because he was so angry about the fact that the situation was deteriorating that he just wanted to break something.  And he smashed those windows through 21 aggressive contacts with the windows with a heavy metal object in his hand.

Mr. Bozell moved of his own volition to the Capitol building, he picked up that metal object along the way, he used the object to smash two windows near the Senate Wing Door while rioters around him were similarly attempting to break their way in, and then he climbed in through one of these windows immediately thereafter.  In light of this sequence of events, Mr. Bozell's claim of a spontaneous decision to enter the Capitol building only after the windows were smashed is simply not credible.

His assertion that his primary purpose once inside the Capitol building was to find his mother is similarly not credible.  Mr. Bozell testified that he went to the floor of the Senate Chamber because this was a recognizable location where his mother might be or might meet up with him, and that he joined a crowd pushing open a door to the Capitol Rotunda because his mother might be outside.  But Mr. Bozell stayed in both of these locations mere minutes, and he never attempted to contact his mother during his time in the Capitol.

Finally, Mr. Bozell's testimony regarding several of his actions inside the Capitol was also inconsistent with the evidence.  To give but one example, he testified that, while in the Senate Gallery, he maneuvered a C-SPAN camera not to obstruct its view, but rather just to check it out.  This claim is inconsistent with the video evidence.

Over the course of at least 20 seconds, Mr. Bozell first points the camera slightly up, then sharply down, then turned to the side so that its view of both the Senate Gallery and Senate Chamber floor were both obstructed.  While he does so, another rioter just a few feet in front of him, to whom Mr. Bozell appears to say something, puts his jacket over another camera to obstruct it.

For all these reasons and others, I find that Mr. Bozell was not a credible witness, and that reflects my assessment of the evidence in many regards.

I will now address Counts 1 and 5.  The Court makes the
following findings on these counts mindful of the government's
burden to prove each element of each charged offense beyond a
reasonable doubt.

As to Count 1.  Count 1 of the superseding indictment
charges Mr. Bozell with corruptly obstructing an official
proceeding and aiding and abetting others to commit that
offense.  To find Mr. Bozell guilty of this offense, I must
find the following elements beyond a reasonable doubt:

(1) Mr. Bozell attempted to or did obstruct or impede
an official proceeding;

(2) Mr. Bozell attempted to obstruct or impede the official
proceeding;

(3) Mr. Bozell acted knowingly, with awareness that
the natural and probable effect of his conduct would be
to obstruct or impede the official proceeding; and

(4) Mr. Bozell acted corruptly.

First, I find that Mr. Bozell obstructed or impeded an
official proceeding.  The term "official proceeding" includes
a proceeding before the Congress, such as the electoral
certification.  Mr. Bozell was part of the large crowd of
rioters who breached the Capitol on January 6 during the
election certification proceedings.

This breach caused the Vice President to be evacuated and
Congress to adjourn its session because it was no longer safe

for members of Congress to be in the Capitol.  That's from the
stipulated testimony of Captain Mendoza at 125-29.  Mr. Bozell
was part of a crowd that broke through an officer line on the
Northwest Stairs around 2:09 p.m., and he entered the Capitol
building itself around 2:13 p.m.  Government Exhibits 1000, 1011.

He thus entered the restricted area of the Capitol grounds
before the joint session was suspended.  And he then remained
in the Capitol building, which he also entered, for almost an
hour.  Government Exhibit 106.  His presence, along with that
of other rioters, further delayed the proceedings because they
were unable to resume until the crowd had been dispersed.
Indeed, Mr. Bozell even entered the floor of the Senate
Chamber where the electoral certification proceeding would
otherwise have been occurring.

This Court and other judges in this District have
previously found that actions like Mr. Bozell's constitute
obstruction of an official proceeding.  As to citations, I
will give *United States v. Brock*, 628 F.Supp 3d, 85, 91-92
(DDC 2022), a case of mine, and *United States v. Rivera*, 607
F.Supp 3d 1, 9 (DDC 2022), Judge Kollar-Kotelly.

Second, Mr. Bozell acted with the intent to obstruct or
impede the election certification.  His text messages in the
lead-up to January 6, 2021, reflect this intent.  For example:

• Mr. Bozell repeatedly expressed the view that the
2020 election was being stolen from the people through

1    widespread fraud.  You can find that in Government Exhibits

2    603, 668B, and 669.

3         • Mr. Bozell encouraged others to travel to D.C. on

4    January 6 and stated that their presence could "help."

5    Government Exhibits 603, 625, and 628H.

6         • Mr. Bozell stated, with reference to the 2020

7    election and its aftermath: "This is war."  Government Exhibit

8    669.  He also shared a Twitter post that stated: "We are on

9    the brink of war for our freedom."  Government Exhibits 628F

10   and 628.13.  He further stated that "Biden will never be sworn

11   in.  We will have WW4 before that happens."  Government

12   Exhibit 669D.

13        • Mr. Bozell stated that he would be "tossing

14   [Congressman Adam] Schiff's office on [January 6]."

15   Government Exhibit 664D.

16        • On December 24, 2020, an individual sent Mr. Bozell

17   a video of two people punching through a glass window to enter

18   a house and then breaking items inside.  The individual said:

19   "Let's do this."  Mr. Bozell responded: "It's Coming ... Soon."

20   Government Exhibit 664E.

21        • Mr. Bozell stated: "I almost hope it goes south

22   on the 6th.  Let's just take the Capitol and hang these

23   pedosatanist traitors."  Government Exhibit 664L.

24      Taken together, these messages indicate that Mr. Bozell

25   came to the Capitol on January 6 with the intent to obstruct

1    Congress's certification of the 2020 election results.  And I

2    conclude that from the messages notwithstanding the fact that

3    many of the other messages are communications with relatives

4    and aren't always to be taken seriously, but these messages

5    collectively do indicate why Mr. Bozell came to the Capitol.

6        In any event, "the law permits the factfinder to infer that

7    a person intends the natural and probable consequences of

8    their actions."  *United States v. Mejia*, 597 F.3d 1329, 1341,

9    (D.C. Cir. 2010).  Mr. Bozell testified that he thought the

10   election was stolen, was aware of the certification

11   proceeding, and that it would be happening in the Capitol on

12   January 6, 2021, and was aware that Vice President Pence,

13   Speaker Pelosi, and others were going to be in the building;

14   other members of Congress, that is.

15       I thus find that Mr. Bozell would have expected

16   that breaching the Capitol building during the election

17   certification proceedings would cause those proceedings to

18   halt — and remain halted — during the period in which there

19   were many unauthorized people, including himself, within the

20   Capitol building, even in the very Senate Chamber where the

21   certification was to occur.

22       As I have already discussed, I do not find Mr. Bozell's

23   contrary claims regarding his intent to be credible.  In

24   particular, I do not credit his claim that he came to a

25   split-second decision to enter the Capitol building only

1    after smashing the second window.

2         Mr. Bozell's prior conduct is consistent with a desire to

3    enter the Capitol building: he came to the Capitol from the

4    rally, made his way to the very front of the crowd on the

5    Northwest Stairs, ascended the Northwest Stairs forcibly with

6    a group of rioters, passed through two police lines in the

7    process, walked quickly toward the Capitol building past

8    barricades he had seen dismantled, picked up a metal object,

9    used this object to smash two windows, then climbed in through

10   one of those windows.  The assertion that he never intended to

11   enter the Capitol building until the split second before

12   climbing through the windows is simply not credible.

13        Third, Mr. Bozell acted knowingly, with awareness that

14   the natural and probable effect of his conduct would be to

15   obstruct or impede the official proceeding.  A person acts

16   "knowingly" if he realizes what he is doing and is aware of

17   the nature of his conduct, and does not act through ignorance,

18   mistake, or accident.  As discussed in the second element,

19   it is reasonable to infer that Mr. Bozell was aware that his

20   actions in entering the Capitol would have the probable effect

21   of obstructing the election certification that day.

22        Fourth, Mr. Bozell acted corruptly.  To act "corruptly,"

23   a defendant must use independent unlawful means or act with

24   an unlawful purpose, or both.  A defendant must also act

25   with "consciousness of wrongdoing."  "Consciousness of

1    wrongdoing" means with an understanding or awareness that what
2    one is doing is wrong.
3        Mr. Bozell used unlawful means and acted with an unlawful
4    purpose.  He smashed two windows near the Senate Wing Door,
5    making it easier for rioters, including himself, to break
6    through and establish an access point to the Capitol building.
7    And his purpose was unlawful.  As discussed, he was attempting
8    to disrupt the certification and reverse the result of the
9    2020 election.
10       Mr. Bozell also acted with consciousness of wrongdoing.
11   He passed through multiple police lines throughout the course
12   of the day.  And while in the Senate Gallery, he turned a
13   C-SPAN camera to point directly toward the floor instead of
14   down at the Senate Chamber, which had just been breached by
15   a rioter.
16       Later, after descending to the Senate Chamber, Mr. Bozell
17   looked up at another camera and appeared to register surprise
18   when he realized he was being recorded.  These actions evince
19   an awareness that what he and the other rioters were doing in
20   the Senate Chamber was wrong.  As discussed, I find that
21   Mr. Bozell's assertion that he had no motivation other than to
22   maneuver the first C-SPAN camera and "check it out" is not
23   credible.
24       Hence, I find Mr. Bozell guilty on Count 1 beyond a
25   reasonable doubt.

Count 5: Assaulting, Resisting, or Impeding Certain Officers. Count 5 of the superseding indictment charges Mr. Bozell with assaulting, resisting, or impeding certain officers and with making physical contact or acting with the intent to commit another felony.  To find Mr. Bozell guilty of this offense, I must find the following elements, again, beyond a reasonable doubt.

(1) Mr. Bozell assaulted, resisted, opposed, impeded, intimidated, or interfered with an officer or an employee of the United States who was then engaged in the performance of his official duties, or with any person assisting officers of the United States who were then engaged in the performance of their official duties;

(2) Mr. Bozell did such acts forcibly;

(3) Mr. Bozell did such acts voluntarily and intentionally.

And the last thing I have to find is that (4) Mr. Bozell made physical contact with a person who was an officer or an employee of the United States who was then engaged in the performance of his official duties or assisting officers of the United States who were then engaged in the performance of their official duties, or acted with the intent to commit another felony.

First, I find that Mr. Bozell assaulted, resisted, opposed, impeded, intimidated, or interfered with an officer or an employee of the United States who was then engaged in the

1    performance of his official duties.  The parties have

2    stipulated that Capitol Police and D.C. Metropolitan Police

3    officers were engaged in their official duties on January 6,

4    and I find that attempting to maintain a police line on the

5    Northwest Stairs, for example, was part of those official

6    duties.

7        Mr. Bozell was at the very front of the crowd of rioters

8    on the Northwest Stairs when they broke through this line and

9    charged up the stairs.  Video footage shows him with his head

10   lowered, his torso angled, pushing forward against an officer

11   just as the officer line breaks and the officers retreat up

12   the stairs.  This push forward opposed the officers and

13   interfered with their ability to hold their police line on

14   the Northwest Stairs.

15       I find beyond a reasonable doubt that Mr. Bozell acted

16   knowingly, with awareness that the natural and probable effect

17   of pushing forward would be to break the police line and

18   ascend further up the stairs.  And I find again beyond a

19   reasonable doubt that Mr. Bozell intended to break through the

20   officer line and gain access to the upper stairs given the

21   entire context of his movement up the stairs to the top of the

22   stairs, past a barricade that he saw dismantled, and on and

23   into the Capitol.

24       Mr. Bozell's claim that he did not act of his own volition

25   because he was pushed by the rioters behind him is not credible.

Having carefully reviewed the video evidence, I conclude that, at the moment the officer line breaks, Mr. Bozell is at the front of the crowd and is leaning toward the officers with his head down.  While another rioter appears to have a hand on Mr. Bozell's back or shoulder, this rioter is standing largely upright and is not applying the level of force that I conclude would be needed to push Mr. Bozell into a forward lean and up the stairs.

Mr. Bozell's claim that he thought the officers -- not the rioters but the officers -- were yelling "let's go" and leading the rioters up the stairs is not credible either.  Prior to this encounter, Mr. Bozell had observed lengthy violent clashes as rioters attempted to advance toward the Capitol and police attempted to repel them.  It is simply not credible that Mr. Bozell believed that the police were voluntarily leading or allowing the rioters up the stairs rather than, as I find, being overwhelmed by the rioters.

Second, I find that Mr. Bozell did so forcibly.  The term "forcibly" means to use force, attempt to use force, or threaten to use force.  Physical force or contact is sufficient, but actual physical contact is not required. Mr. Bozell does in fact make physical contact with at least one, and possibly two, officers as he pushes forward.

Third, I find that Mr. Bozell did so voluntarily and intentionally for the reasons that I have already discussed.

1      Fourth, I find that Mr. Bozell made physical contact with

2   an officer at the time of the push up the stairs.  I also find

3   that he acted with the intent to commit another felony — that

4   is, to obstruct an official proceeding — for the reasons

5   discussed with respect to Count 1.  I do not find Mr. Bozell's

6   assertion that he did not resolve to enter the Capitol

7   building until after breaking the second window near the doors

8   credible.  I don't find that credible.

9      Hence, I find Mr. Bozell guilty on Count 5 beyond a

10  reasonable doubt.  With that, the Court finds that the

11  government has proven beyond a reasonable doubt that

12  Mr. Bozell is guilty on all 10 counts of the superseding

13  indictment.

14      The next thing to do is to schedule a sentencing date,

15  and we normally have such sentencings 90 days approximately

16  out because of the volume of work that the probation office

17  has.  So we would be looking, Ms. Duncan, for a sentencing

18  date in early December.

19          THE DEPUTY CLERK:  Your Honor, you're pretty open.

20  Any preference?

21          MR. SHIPLEY:  May I ask the Court's indulgence?

22          THE COURT:  Certainly.

23          MR. SHIPLEY:  Given where I travel from, I have dates

24  already in the District in January.  I'm trying to avoid

25  December if I can.  Would it be acceptable to move it into

1       January?

2               THE COURT:  Government have any objection to that?

3               MS. AKERS:  To January?  No.

4               THE COURT:  Looking for a January day?  All right.

5       January is a little more touchy for me in terms of my

6       availability.  But, Ms. Duncan, what do you see on the January

7       calendar?

8               THE DEPUTY CLERK:  We can do the week of January 8.

9       You're pretty open.

10              THE COURT:  I have no trials scheduled then?

11              THE DEPUTY CLERK:  No.  A trial starts the following

12      week.

13              THE COURT:  Okay.  I'll be out of the jurisdiction

14      on judicial business the end of the prior week, right?

15              THE DEPUTY CLERK:  Yes.

16              THE COURT:  So why don't we look at Tuesday the 9th.

17      How's that sound to you, Mr. Shipley?

18              MR. SHIPLEY:  I will tell the Court that I am scheduled

19      to start a five-month trial on the 8th, but I'm confident that

20      that --

21              THE COURT:  You say it the way you want to say it.

22              MR. SHIPLEY:  I'm confident that my client in that case

23      is going to plead guilty.  We have an offer on the table we

24      think he's going to take.

25              THE COURT:  So you think we can schedule for the 9th --

1          MR. SHIPLEY:  Yeah, I feel comfortable.

2          THE COURT:  Government?

3          MS. AKERS:  Your Honor, just one hour ago I had a case

4     that's scheduled for sentencing that day, but it's at 10 a.m.

5     So if we could avoid that time, we'd be available.

6          THE COURT:  How about -- do you want to stay in the

7     courthouse and do it at 11:30, or do you want to do it in the

8     afternoon?

9          MS. AKERS:  Probably the afternoon, just to avoid any

10    potential overlap.

11         THE COURT:  Because all judges aren't as efficient as

12    I am?

13         MS. AKERS:  Exactly.

14         THE COURT:  Oh, okay.  So how about two o'clock?

15         MS. AKERS:  Yes, Your Honor.

16         THE COURT:  Mr. Shipley.

17         MR. SHIPLEY:  Yes, Your Honor.  Thank you.

18         THE COURT:  Two o'clock on January 9.  And that means

19    I will need sentencing memos in advance of that.  Since I'm

20    going to be out of town at the end of the prior week, probably

21    ought to kill your New Year's celebrations and ask for the

22    sentencing memos on the 2nd.  By no later than the 2nd.  All

23    right?  January 2.

24         With that, the only remaining question is, in my mind, is

25    Mr. Bozell's status pending sentencing.  Is there any request

1      from the government?

2           MS. AKERS:  The government moves to step back Mr. Bozell

3      under 18 U.S.C. 3142, which provides that Your Honor shall

4      order a person who's been found guilty of an enumerated list

5      of offenses of which a crime of violence is included.  18

6      U.S.C. 1361 is a crime of violence, and therefore we'd ask the

7      Court under the statute to step him back.

8           THE COURT:  Mr. Shipley.

9           MR. SHIPLEY:  Your Honor, obviously Mr. Bozell is not

10     under any restrictions now.  He's had no violations of his

11     conditions of release.  I'm not aware of any other judge

12     that's detained somebody purely on a 1361 offense.  I noted in

13     your verdict -- I could have been wrong, but I noted in your

14     verdict, on the 111(a), you did not use the word "assault."

15     You said Mr. Bozell's conduct interfered with the police at

16     the line.  So, frankly, I wasn't prepared to hear the

17     government say what they've just said given the circumstances

18     here, so I would oppose the government's request.

19          THE COURT:  All right.  My experience has been that not

20     only I but the other judges in this courthouse have not, by

21     and large, detained defendants convicted after bench trials in

22     January 6 cases where they have been on release beforehand.

23     The only situation that I think would convince me otherwise

24     was if the conviction was for some serious assault on a

25     federal officer, and I don't take this case to be such a case.

1      Therefore, consistent with what has been done, I think I'm

2      accurate in saying, routinely, by the judges of this court, I

3      am not going to step Mr. Bozell back and order him detained.

4      I will instead allow him to report for sentencing on the date

5      that we have just set.

6          And that means, Mr. Bozell, that you are under the same

7      conditions of release that you've been under, and you need to

8      comply with those conditions as you've been doing.  A failure

9      to do so could subject you to serious consequences.

10         You have a sentencing date now of January 9 here in this

11     courthouse at 2 p.m.  You need to be here at that time.  A

12     failure to appear could subject you to independent criminal

13     consequences.

14         Lastly, I advise you, as I advise everyone in these

15     circumstances, and probably have advised you before, that

16     if you were to commit a crime while on release under these

17     conditions, you could be subject to more serious penalties

18     for that crime than you otherwise would face.

19         So, with those admonitions, we'll see everyone for

20     sentencing on January 9, look for your sentencing memos on

21     January 2, and is there anything else from the government?

22             MS. AKERS:  No, Your Honor.

23             THE COURT:  From the defense?

24             MR. SHIPLEY:  Nothing, Your Honor.

25             THE DEFENDANT:  Thank you, Your Honor.

1          THE COURT:  Thank you all, and a good day.

2      And I thank those who have been here watching throughout

3  the proceedings for their attention and their support of

4  Mr. Bozell.  He deserves and needs that support.  Thank you.

5          (Proceedings adjourned at 4:49 p.m.)

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne