**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

- -------------------------------------------------- x
                        )

**UNITED STATES OF AMERICA**         )
                        )

     **vs.**                 )
                        )       **Case No. 21-cr-00216 JDB**

**LEO BRENT BOZELL IV,**         )
                        )

          **Defendant.**       )
                        )

- -------------------------------------------------- x

## <u>SENTENCING MEMORANDUM ON BEHALF OF LEO BRENT BOZELL IV</u>

William L. Shipley
PO Box 745
Kailua, Hawaii 96734
Phone: (808) 228-1341
Email: 808Shipleylaw.com

Eric Snyder
888 16th St NW
Washington, DC 20006
Phone: (202) 857-1700
Fax: (212) 548-7113
Email: esnyder@mcguirewoods.com

*Counsel for Leo Brent Bozell IV*

1

## I.   **FACTUAL BACKGROUND**

### A. **Mr. Bozell Did Not Attend the "Stop the Steal" Rally with the Intention of Perpetrating Any Violence or Destroying Any Property.**

On January 6, 2021, Leo Brent Bozell IV ("Zeeker Bozell" or "Mr. Bozell") traveled from Palmyra, Pennsylvania to attend the "Stop the Steal" rally in Washington D.C. with his mother and brother. After departing the rally and walking along with his family towards the Capitol – he had parked his car nearby -- he admittedly got swept up with the crowd and "crossed a line." But in stark contrast to many January 6th cases this Court has seen, the circumstances of Mr. Bozell's case demonstrate that he did not arrive that day with any intention to commit violence or to destroy property.

Mr. Bozell was dressed in a navy blue, hooded sweatshirt displaying the words, "Hershey Christian Academy," a red, white, and blue neck gator with white stars representing the American flag, and a red, white, and blue baseball cap. He did not come— as many did that day—clad in tactical gear or carrying weapons. Rather, Mr. Bozell's clothing reflected his intent to stand for what he viewed was in the best interests of his country—a country that he is proud to have been raised in. It is true that, prior to January 6th, Mr. Bozell helped to plan and coordinate "Stop the Steal" events in Washington D.C. But these were not violent protests; they involved musical performances. Mr. Bozell's original purpose for coming to Washington D.C. on January 6 was do that once again – organize a musical performance by his favorite performer who had agreed to appear and perform. But the lead singer's illness in the hours before he was set to travel – still in the days of COVID protocols for air travel – caused the plans to never materialize in their final form.

But once on the Capitol grounds Mr. Bozell got swept up in a large group of protesters and ultimately participated in disrupting police lines and unlawfully entering the U.S. Capitol Building. But Mr. Bozell did not plan that activity in advance, nor any other acts of

destruction or violence. He is not a member of any organized group involved in criminal activity, nor did he adorn any insignia affiliated with such groups. Mr. Bozell did not attend the rally armed with any weapons or tools of any type. He made a bad error in judgment that day to move with the crowd towards the Capitol building and then inside, but he did not arrive with ill intent.

Mr. Bozell is a devout man of faith who grew up in the Catholic Church. He regrets his decisions on January 6th and does not pose a threat of recidivism. And he is surrounded and supported by a close-knit family which he cherishes far more than any politician or ideological cause. As one might expect, Mr. Bozell's family had initial concerns when they first learned of the charges in this case. But they have come to show support for him at sentencing—a testament to how his commitment and devotion to his family has allowed these relationships to better define who he is as a person than his bad and unfortunate decisions on January 6th.

### B. Mr. Bozell Got Caught Up in the Fast-Developing Events of January 6th as They Unfolded in Real Time.

After the "Stop the Steal" rally, Mr. Bozell joined with his family and the crowd at the rally in moving to the U.S. Capitol. Through a combination of bad judgment and unfortunate curiosity, he entered the Capitol grounds before 2:00 p.m. and ultimately joined others in breaching the building. As the evidence shows, Mr. Bozell walked past unmanned barriers already bypassed by the crowd and approached the Northwest stairs where he witnessed acts of violence but did not participate in violence against officers. A line of officers guarded access to the Northwest Stairs, and a second line formed at the midpoint of the stairs to defend against rioters climbing the stairs and handrail. Mr. Bozell stood between the police lines, trying to avoid the commotion led by rioters who were violently pushing past the officers.

Mr. Bozell kept his distance at first and simply watched as rioters confronted the

officer lines while chanting, "Whose House? Our House!" He did not join in these chants, but he foolishly chose to join the crowd as it pressed on toward the Capitol Building. He used a bike rack as a ladder to climb partway up a wall and handed items, including a long white pole, to rioters on the Northwest stairs. Mr. Bozell climbed the ladder to evade the crowd engaged with the police under the covered scaffolding, and handed up items as others handed them to him -- this was spontaneous and not part of any thought-out plan or coordination. He was simply reacting to the events as they unfolded and making the poor decision to continue participating. A convicted rioter named Dan "Milkshake" Scott was first to surge forward and overran two officers at the bottom of the staircase under the scaffolding, creating the opportunity for the large crowd behind him to follow and ascend the stairs to the upper level. Mr. Bozell was not a part of this. As protesters chanted "Fight for Trump," Mr. Bozell climbed around using the bike rack to climb up the wall. Again, Mr. Bozell did not join in these chants. The rioters subsequently threw objects and sprayed chemical irritants at the officer line. Mr. Bozell did not take part in this either. He had no desire to hurt anyone, let alone police officers. As the outnumbered officers retreated up the stairs and fell back from the large group of people moving toward the Capitol Building, the crowd, including Mr. Bozell, reached the middle landing of the stairs under the scaffolding. They were impeded by a bike-rack wall, a line of officers, and the large white tarp that wrapped the construction scaffolding.

Mr. Bozell did not push through the bike rack barrier or the officers, but he did rip down the tarp from the scaffolding and crawl through. He thereby gained access to the landing of the Northwest Stairs, where he approached another line of officers including the officer wearing the "royal" blue bicycle helmet. Mr. Bozell should have turned back long before this point, but had clearly been swept up in the excitement of the crowd. He interacted with an officer in the royal blue helmet and said something at the line of other officers

standing with him. This interaction continued for more than a minute with no show of hostility or aggression by either Mr. Bozell or the officers towards the other. While Mr. Bozell was standing face-to-face with the officers, the crowd on the stairs behind him grew as it was fed by rioters continuing to come up the stairs from the ground level. Someone behind him then yelled for everyone to push through the officer line: "Are You Ready to Push? Let's Push! . . . Push!" At that, the crowd—with Mr. Bozell standing in the first row at the front—pushed through the officer line.

Mr. Bozell escaped from the middle of the crowd and hugged the wall to his right as dozens of rioters pushed past him and made their way to another bike rack barricade and line of officers at the top of the stairs on the Upper Terrace landing outside the Capitol Building. The video evidence clearly showed that unlike dozens of others who pushed through this manned barrier at the top of the stairs and rushed to the building, Mr. Bozell, who had stepped off to the side after reaching the landing, was passed by other, faster-moving members of the crowd, who did breach the manned barrier. It was only after others had breached the manned barrier that Mr. Bozell followed other slower moving individuals. As he admitted, along the way he picked up an object from the grass and struck it against one windowpane on one of the doors, and then another multiple times, fracturing the glass on one side. He then moved to a set of two windows directly north of the Senate Wing Doors and struck it repeatedly until the glass shattered. At approximately 2:13 p.m., Mr. Bozell climbed through the opening created when another individual cleared away the broken glass and entered the Capitol Building. At the moment Mr. Bozell entered there were no officers in the location of the Senate Wing Doors, and rioters went both to the north and south down the hallways from this entry point.

In other locations inside the Capitol Mr. Bozell witnessed efforts by officers to control the rioters. He did not engage with any officers inside the building at any point, nor did he

leave. Rather, he walked around the Capitol building. Shortly after entering he found several officers in a "stand-off" with a growing number of rioters – one of whom was carrying a baseball bat. Mr. Bozell approached the individual with the bat and told him to put it away, and the individual did so. In another location Mr. Bozell saw officers had formed a line behind the protesters and were directing the crowd to exit through the nearby Senate Carriage Door. An officer at this location was sprayed in the face with some type of chemical irritant and Mr. Bozell attempted to assist him by offering to pour water on his face and eyes. Mr. Bozell also came to the aid of another officer who had fallen down as a result of a confrontation with another rioter. Mr. Bozell remained among the crowd and wandered through the Capitol Building for approximately 50 minutes altogether, including several minutes in both the Senate Gallery and on the Senate floor. The Court has seen the video evidence which captures nearly every minute of his presence inside the Senate and has formed its own views about his conduct while he was there. But at no point did he engage in any confrontations with officers who came into the Senate, nor did he engage in any acts of destruction of vandalism inside the Senate. While on the Senate floor he spent nearly every second either looking at his phone or speaking on his phone to his family – including assuring his wife that he was safe because she had watched the violence outside on television from their home. At approximately 3:07 p.m., officers confronted Mr. Bozell and escorted him out of the building. He cooperated.

### C.  Mr. Bozell Now Accepts Full Responsibility for His Actions on January 6th.

Mr. Bozell does not deny his involvement in the events of January 6th. He does maintain, however, that his motivation for attending the rally was not to commit violence or destruction. At the time, he believed that the 2020 Presidential Election was "rigged," as President Trump was declaring, that an accurate *audit or recount* had not been accomplished, and that he should protest that wrong.

6

The Court knows from reading the various forms of messaging between Mr. Bozell and his brothers, as well as his closest friend, that this is a family that has long been "in-tune" with politics in Washington D.C. and was too personally and emotionally "invested" in the final outcome of the 2020 election. Today, however, he accepts that the President of the United States is Joe Biden. He is also convinced that safety and happiness of his wife and children are far more important to his life than electoral politics.

Mr. Bozell is further ashamed that he smashed windows at the U.S. Capitol Building and entered through them. He does not believe these actions were acceptable to commit. He is now aware of the impact that his actions have caused, especially for the Capitol Police and officials at the Capitol. He accepts full responsibility for that impact. He is also aware of the devastating ramifications that his actions have on his family, and in particular his three children.

## II.   PERSONAL BACKGROUND AND CHARACTER

### A. Mr. Bozell Was Raised in a Supportive, Loving, and Religious Home And Has No Record of Violence or Destruction.

Leo Brent Bozell, IV was born in Dallas, Texas on August 22, 1979, to Leo Brent Bozell, III and Norma Bozell. As the second oldest of five children, Mr. Bozell is still very close with his parents and four siblings, David, Joseph, Caitlin, and Reid. He is known to his family and friends by his nickname, "Zeeker," which one of his siblings bestowed on him in childhood. Mr. Bozell grew up primarily in Northern Virginia. The Bozells had a supportive and loving home, and Mr. Bozell was not subjected to any form of childhood abuse or neglect. He regards his parents as "wonderful" individuals who were "contributors to society." They raised him in the Catholic Church and instilled good family values. After attending college in Farmville, Virginia, Mr. Bozell returned initially to Northern Virginia before relocating to Pennsylvania in 2015.

Mr. Bozell's father, Leo Brent Bozell III, founded the Media Research Center (MRC) in 1987. MRC is a conservative content-analysis and media-watchdog group. Zeeker's father continues to serve in the role of President of MRC. His mother worked intermittently as a paralegal but was primarily a stay-at-home mother. Zeeker's parents, now age 68, are still married and reside in Virginia.

Mr. Bozell has no prior criminal record of violence or destruction.

**B. Mr. Bozell Is a Family Man Who Loves and Cares for His Wife and Daughters**

Mr. Bozell married his wife, Dawn Michelle Bozell, in 2007 in Virginia and characterizes their relationship as "excellent." Zeeker and Dawn have three daughters: "S. B." (age 15); "Ka. B." (age 13); and "Ke. B." (age 11). Mr. Bozell is very proud of his relationship with his three daughters and is known to speak often of their abilities and talents. He works hard to be involved in each of their lives. For instance, the girls are very involved in school activities, and the older two recently performed in the school play, "Hello Dolly," last month. The eldest daughter, S., was cast as the lead. In the run up to the performances, Mr. Bozell was distressed over the prospect of being unable to attend his daughters' performance if he were ordered into custody beforehand. He was not concerned for himself, though he would regret missing the opportunity to see his daughters perform; rather, he was concerned that his daughters might be emotionally unable to perform if he was imprisoned, causing them distress and potentially ruining the play for all involved. Mr. Bozell was distressed at the prospect that his crimes would cause his daughters and their schoolmates to suffer.

Mr. Bozell prides himself on being actively involved in his daughters' lives. He is the one who makes them breakfast each morning and transports them to and from school. Before his arrest, he coached their basketball team, including in the successful pursuit of a championship. Mr. Bozell has strived to be a good father and to "push [his] daughters to be

8

strong and go where needed."

Following his conduct on January 6th and subsequent arrest, Mr. Bozell has been suspended from coaching his daughter's basketball team. He has been banned from school property, which has forced him to enroll his daughters in a different Christian school. To date, Mr. Bozell and his wife have chosen not to reveal the details of his criminal prosecution to their daughters out of concern for the stress it would cause them, particularly during this phase of uncertainty. Mr. Bozell, alongside his wife, have always sought to create a safe and welcoming environment in their home and to help those in need in their community. For instance, whenever Mr. Bozell's daughters' friends have been in tough situations, he and his wife have opened up their home to them. Their house is known as "the house where all the kids go" because of the loving family environment that they have nurtured.

### C.  Mr. Bozell Is a Devout Catholic Who Strives to Live a Virtuous Life.

Mr. Bozell was raised with strong Christian values in the Catholic Church. His faith in God is real. Father Tim Sahd, the pastor of his parish at Seven Sorrows of the Blessed Virgin Mary Catholic Church in Middletown, Pennsylvania, recounts that he has never seen "a Faith as strong" as Mr. Bozell's.[1] In college, Mr. Bozell even considered becoming a Catholic priest.[2] He attends mass services regularly and has long been a humble, faithful member of the parish. Mr. Bozell attends prayer in the chapel of his parish every Friday and remains committed to his attendance.[3] In the midst of his criminal troubles, Mr. Bozell's faith in God has persisted through this very difficult period in his life, and he has started attending mass every day.[4] Sheila Weaver, who has written in support of Mr. Bozell, commented: "When I asked him how he can be so pleasant when he is facing possible jail time, he told me it is in

---

[1] Exhibit 1 (Letter from Father Tim Sahd)
[2] Exhibit 1 (Letter from George Vancore Jr.)
[3] Exhibit 1 (Letter from Father Tim Sahd)
[4] Exhibit 1 (Letter from Sheila Weaver)

God's hands."[5] Mr. Bozell's faith has helped him to come to repent of his past sins and to amend his life. His faith drives him to learn from his mistakes and to pursue a life of virtue as a husband and a father.

### D. Mr. Bozell Is Well-Educated, Having Achieved All His Credits to Be Awarded a Bachelor's Degree, and Remains Employed by Two Longtime Employers.

Prior to attending college in Farmville, Mr. Bozell graduated from Bishop Ireton High School in Alexandria, Virginia in 1997. He attended Hampton-Sydney College in Farmville, Virginia, from 1997 to 2002, and pursued a degree in Christian Theology. While he did not graduate, he did complete all of his credits. Mr. Bozell was one class short of earning his degree when he chose to leave college. Although he did complete his last credits at a community college, he never obtained his undergraduate degree. But he has not needed a college degree to build a good life for his wife and children.

Mr. Bozell continues to be employed by two businesses: Basement Waterproofing Solutions in York, Pennsylvania; and Easy Siders in Hummelstown, Pennsylvania. He has worked at Basement Waterproofing Solutions since 2012. He has also worked with Easy Siders, which sells decking and siding to homeowners, since 2018. With both businesses, Mr. Bozell holds the position of Inspector/Salesman, and makes his earnings based upon commissions. Both of Mr. Bozell's employers are aware of his pending incarceration and have been very supportive of him during the entire prosecution. One of his employers, Dave Horner, has verified Mr. Bozell's employment and good-standing with the business.

### E. Mr. Bozell Has Overcome a Prior History of Alcohol Abuse and Experimentation with Illicit Substances for the Past 22 Years.

As a younger man, Mr. Bozell struggled with alcohol abuse and experimented with illegal substances, but he has overcome those struggles. He has not used any illegal or

---

[5] Exhibit 1 (Letter from Sheila Weaver)

unprescribed drugs in 22 years, since 2002. Mr. Bozell has also had a history of intermittent alcohol abuse. He particularly struggled with excessive alcohol consumption as a teenager in high school and attended Alcoholics Anonymous for nine months. Although Mr. Bozell occasionally consumes small quantities of alcohol, this has not been a problem in the recent years of his life. Mr. Bozell used pain-prescribed marijuana for a time, but he has not done so since January 6th.

### F. Mr. Bozell Is Well-Regarded in His Community and Known to Touch the Lives of Those He Meets.

Mr. Bozell is a man devoted to serving those around him. He is not a man of violent inclination; rather he is someone who strives for service, forgiveness, and mercy.[6] He is a man to whom family has always been important, and he is very protective of his wife and daughters.[7] His friend, Scott Claiborne, characterizes him as a "sterling example of what every man should aspire to be as a husband and father."[8] Another friend, Charles Daglian, would agree, stating, "I have watched Zeeker progress as a man, husband and father. He is devoted to his family and extremely involved with his 3 daughters."[9] When an emotionally unstable young man threatened and tormented his family, Mr. Bozell took action to protect his family and relocated to a different state.[10]

Mr. Bozell loves his wife and daughters profoundly, having their bond described as "tied together by their Faith and by each other."[11] With the support of his wife, he is raising three adolescent daughters, nurturing them to become respectful and well-rounded young women.[12] Mr. Bozell wants the best for his daughters, and he gives them his entire attention

---

[6] Exhibit 1 (Letter from Joe McCracken)
[7] Exhibit 1 (Letter from Denise McCracken); Exhibit 1 (Letter from Mary Bozell)
[8] Exhibit 1 (Letter from Scott Claiborne)
[9] Exhibit 1 (Letter from Charles Daglian, Esq.)
[10] Exhibit 1 (Letter from David Bozell)
[11] Exhibit 1 (Letter from Father Tim Sahd)
[12] Exhibit 1 (Letter from Denise McCracken)

and dedication.[13]  He is incredibly close to his daughters, who are "the air he breathes"[14] and who look to him for guidance and support.  Mr. Bozell actively promotes his daughters' growth and search of life experiences, so that they can best "maximize their gifts."[15]

Service to others is very important to Mr. Bozell.  He eagerly embraces any opportunity to lend a hand to others in need, and not solely those whom he knows.  Indeed, Mr. Bozell routinely provides food to a homeless person who he met one day in the town where he lives.[16]  Joe McCraken, a long-time friend and neighbor of Mr. Bozell's, remarks, "If you need a helping hand, he is the first one there."[17]  As an example, Mr. Bozell once accompanied Joe to comfort his wife and transport her to the emergency room after she suffered a miscarriage at work.  Mr. Bozell then drove Joe's wife's extra vehicle back to their home— "That's just who he is."[18] And as friend Justin Shoemaker describes of Mr. Bozell, he is "the type of friend who never 'goes.'"[19]

Mr. Bozell is the type of man who sponsored a male friend for his baptism.[20]  He is the type of man who helps his friends paint their homes.[21]  He is the type of man who is there for his friends during the worst times in their lives.[22] For instance, he was there for friends Max and Jill Cedeno during their loss of a parent.[23]  He is the type of man who has provided help to one of his relative's daughters when she was in a difficult situation.[24]  He is the type of man who tried to help a cop who had fallen during January 6, 2021 and who gave water to

---

[13] Exhibit 1 (Letter from Father Tim Sahd); Exhibit 1 (Letter from Denise McCracken)
[14] Exhibit 1 (Letter from Justin Shoemaker).
[15] Exhibit 1 (Letter from Father Tim Sahd); Exhibit 1 (Letter from Denise McCracken)
[16] Exhibit 1 (Letter from Joe McCracken).
[17] Exhibit 1 (Letter from Joe McCracken).
[18] Exhibit 1 (Letter from Joe McCracken).
[19] Exhibit 1 (Letter from Justin Shoemaker).
[20] Exhibit 1 (Letter from Scott Claiborne).
[21] Exhibit 1 (Letter from George Vancore Jr.).
[22] Exhibit 1 (Letter from Scott Claiborne).
[23] Exhibit 1 (Letter from Max and Jill Cedeno).
[24] Exhibit 1 (Letter from Mary Bozell)

another officer who had been sprayed in the face with some type of irritant.[25]  Mr. Bozell is a compassionate individual, and one who is not violent or prone to destruction.

Mr. Bozell is a man of conviction who lives his life authentically, without seeking attention or praise.[26]  He is seen as a real benefit to his community, his family, and his parish,[27] and is described as demonstrating a remarkable faith in "God, man and country."[28] David Bozell, Mr. Bozell's brother, captures these sentiments in the following statement: "There's an old expression: *Put good out into the world and good will come back.*  Every day my brother tries to put 'good' out to the world, through his leadership in local business, his raising of three wonderful kids, his involvement in church, school, and community."

Denise McCraken, a long-time friend of Mr. Bozell's, has even stated that Mr. Bozell is "loved and respected by many, including myself, my husband and our young children."[29] Denise's children with husband Joe McCracken have admired Mr. Bozell as a role-model for them in his commitment to hard work, strength, faith, and patriotism.[30]  His cousin, Jennifer Bozell, wrote, "He was one of my favorite cousins as a child and remains one of my favorites as an adult."[31]  Those around Mr. Bozell are proud to call him friend—specifically a loyal friend—and believe that he is a man of "great moral character who demonstrates integrity in all aspects of his life . . . ."[32]  One of his uncles has stated, "If I had a son, I'd want one like Zeeker."[33]  He is even known to show kindness towards strangers whom he meets, exhibiting a nature that is earnest, compassionate, empathetic, and patient.[34]  Joe McCracken observed

---

[25] Exhibit 1 (Letter from David Bozell)
[26] Exhibit 1 (Letter from Father Tim Sahd)
[27] Exhibit 1 (Letter from Father Tim Sahd)
[28] Exhibit 1 (Letter from Denise McCracken)
[29] Exhibit 1 (Letter from Denise McCracken)
[30] Exhibit 1 (Letter from Joe McCracken)
[31] Exhibit 1 (Letter from Jennifer Bozell)
[32] Exhibit 1 (Letter from Denise McCracken); Exhibit 1 (Letter from Scott Claiborne)
[33] Exhibit 1 (Letter from Jennifer Bozell)
[34] Exhibit 1 (Letter from Denise McCraken); Exhibit 1 (Letter from Scott Claiborne)

that Mr. Bozell "has a giving heart.  He is a good person.  The world is a better place because of him."[35]  Jennifer Bozell finished with, "The rest of us are better for having him in our lives."[36]

### G. Two of the Family's Closest Friends Ask the Court to Consider Mr. Bozell's Good Character and Impose a Lenient Sentence Given the Negative Impact Incarceration Will Have on His Family.

Two of Mr. Bozell's closest associates, Sue Eckert and Dave Horner, further attest to Mr. Bozell's penchant for fostering community and loving environments and urge the Court to impose a lenient sentence, particularly in light of the toll that Mr. Bozell's incarceration will take on his wife and three minor daughters.

Sue Eckert has known Mr. Bozell and his family since the summer of 2020.[37]  She worked as the lead secondary teacher at the newer private school where Mr. Bozell's daughters were enrolled near their home in Pennsylvania.[38]  Ms. Eckert describes Mr. Bozell as a "man of conviction" who is "energetic and innovative."  She states, "he invests in what he values.  He embodies generosity in word and deed.  He wants to give because he wants to be part of enriching the lives of others, beginning with his family and extending into his community."[39]  Ms. Eckert further believes that Mr. Bozell is self-sacrificial and that, if he is incarcerated, it will be devastating for his family; it would be particularly difficult for his wife who would be left to provide emotionally for his daughters.[40]  Mr. Bozell's incarceration would pose undue hardship for his wife and daughters, as his absence would trigger a significant loss of parental support for his daughters.[41]  Ms. Eckert ultimately believes that Mr. Bozell is

---

[35] Exhibit 1 (Letter from Joe McCracken)
[36] Exhibit 1 (Letter from Jennifer Bozell)
[37] Exhibit 1 (Letter from Sue Eckert)
[38] Exhibit 1 (Letter from Sue Eckert)
[39] Exhibit 1 (Letter from Sue Eckert)
[40] Exhibit 1 (Letter from Sue Eckert)
[41] Exhibit 1 (Letter from Sue Eckert)

a good man, and she states, "I desire a good outcome for Zeeker because he is a good man. He has proved that over and over again to me ever since I met him.  I don't want his family to experience the upheaval of a prison sentence."[42]

Dave Horner, who is Mr. Bozell's friend and current employer, characterizes Mr. Bozell as "good" and "believable," given that he is not one to embellish when he is selling a product and is not going to sell a product to someone if they do not need it.  According to the Presentence Investigation Report, Mr. Horner believes that Mr. Bozell is honest in his dealings with clients and exhibits great integrity: "he will flat out tell them they have a smaller issue opposed to a bigger one." Mr. Horner does not believe, on the other hand, that Mr. Bozell's actions on January 6th align with his professional ethic and disposition. He insists that those actions were "not consistent" with his character"[43] And refers to Mr. Bozell as an "idiot" for his decisions that day on January 6, 2021.  Mr. Horner would ultimately like the Court to consider the following when sentencing Mr. Bozell: "I think that he is a very good employee, dedicated, I know his family life is good, he's a terrific father, very involved with his children.  I would hate to see him not be able to continue that.  In my opinion he got caught up in something." He therefore asks the Court to accord leniency to Mr. Bozell for what was a "short lapse in judgement."[44]

III.    **OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT**

Mr. Bozell has had the opportunity to review and object to the Presentence Investigation Report (PSR) and incorporates his objections here as well:

Mr. Bozell objects to Paragraph 7 of the PSR.  He did not contest his guilt as to Counts

---

[42] Exhibit 1 (Letter from Sue Eckert)
[43] Exhibit 1 (Letter from Dave Horner)
[44] Exhibit 1 (Letter from Dave Horner)

2, 3, 4, and Counts 6-10. It was conceded in both the Opening Statement and Closing Argument that Mr. Bozell was not asserting his innocence on 8 of the 10 Counts in the Superseding Indictment. The record is clear that Mr. Bozell only maintained his factual innocence as to Counts 1 and 5—"Obstruction of an Official Proceeding" and "Assaulting, Resisting, Impeding, etc., Certain Officers," respectively.

Mr. Bozell objects to Paragraph 17 of the PSR. Specifically, he objects to the factual inaccuracy surrounding his alleged coordination of events in Washington D.C. He denies having "helped to plan and coordinate events in Washington DC" with regard to January 6, 2021. There was no evidence of any such conduct at trial. Any such planning for any other date(s) would not be relevant for purposes of sentencing.

Mr. Bozell objects to Paragraph 19 of the PSR. Specifically, he objects to the following factual inaccuracy: he did not solely walk with the crowd towards the U.S. Capitol. He walked with members of his family from the rally at the Ellipse to the U.S. Capitol Grounds.

Mr. Bozell objects to the misrepresentation of facts delineated in Paragraph 23 of the PSR. Two officers at the ground level on the West Front Plaza were knocked down by Daniel "Milkshake" Scott, a member of the Proud Boys from Florida. Mr. Bozell had no involvement with Mr. Scott and was not involved in the crowd over-running the line of officers at the bottom of the staircase on the ground level of the West Plaza.

Mr. Bozell objects to Paragraph 24 of the PSR. Specifically, he objects to his implied association with the activities of fellow rioters at this specified juncture in time on January 6th. Mr. Bozell was not involved in throwing objects or spraying chemical irritants at the officers on the Northwest Stairs. He is not alleged to have been involved in any jointly undertaken criminal activity. This reference should be deleted.

Mr. Bozell objects to the following factual inaccuracy in Paragraph 26 of the PSR: he denies that he "yelled" at any officers on the landing between the two sets of stairs, except as

necessary to be heard above the noise of the crowd. The video evidence shows that Mr. Bozell remained at this location and engaged in an extended conversation with the officer wearing the royal blue jacket and bicycle helmet. The video shows no agitation or anger was displayed by Mr. Bozell towards this officer or any of the officers towards him.

Mr. Bozell objects to the misrepresentation of facts delineated in Paragraph 27 of the PSR. Mr. Bozell was "face-to-face" with the "officer line" because the stairwell behind him had filled with other protesters who had come from the ground level, leaving him no path to back away. While Mr. Bozell was at the front of the crowd, the video indicates that at this pivotal moment, after a few steps and passing the police line, Mr. Bozell moved to the right side of the stairwell—prior to reaching the Upper Terrace—while the aggressive members of the crowd moved past him up the stairs. While he was among the first five individuals when the crowd began the push up the stairs, the video showed that dozens of other protesters reached the top of the stairs and the Upper Terrace level before Mr. Bozell.

Mr. Bozell objects to the factual inaccuracy in Paragraph 28 of the PSR. The video evidence shows that Mr. Bozell was not involved in pushing through the bike rack barriers at the top of the stairs. He saw the barriers when he reached them but the officers who had manned the barriers were already returning to the Capitol building and the barriers had been displaced by rioters who arrived before him. This reference should be deleted.

Mr. Bozell objects to the following factual inaccuracy in Paragraph 30 of the PSR: the object that he picked up was not a "rock." In fact, he testified that he picked up what he thought was some kind of a metal grate that prevented objects from falling into a drainpipe in the grass areas.

Mr. Bozell objects to Paragraph 34 of the PSR. Specifically, he objects to the description that he "celebrated" after entering the Capitol Building. There is no evidence to suggest that he was celebrating.

Mr. Bozell objects to Paragraph 37 of the PSR. Specifically, he objects to the claim that he "chased" Officer Goodman up a staircase. He merely followed, if not walked along with numerous others behind Officer Goodman.

Mr. Bozell objects to Paragraph 42 of the PSR. Specifically, he objects to the claim that he witnessed another bout of violence before walking deeper into the Capitol Building. The corresponding photo is inaccurate, as it does not display this bout of violence, nor is there any other evidence to support that Mr. Bozell in fact witnessed this violence. Additionally, what another protester shouted while in the general proximity of Mr. Bozell should not be attributed to or used against Mr. Bozell. The Offense Conduct should properly focus on Mr. Bozell's action or comments, and not comments of strangers around him. Similarly, what other protesters did in the building—as reflected in the last sentence—should be removed if Mr. Bozell was not a participant in the conduct.

Mr. Bozell objects to Paragraph 43 of the PSR. Specifically, he objects to the use of the word "swarm" as a conclusory descriptor for the crowd of protesters, given its inherently negative connotation. The crowd of protesters is more accurately described as a "large group" as opposed to a "swarm."

Mr. Bozell objects to Paragraph 47 of the PSR. Specifically, he objects to the use of the word "amassed" as a conclusory descriptor for the way the protesters convened, given its inherent invocation of militancy, war, and overall violence. It is less pejorative and more neutral to say that the crowd was gathering or collecting—the preceding activities are not clear from the corresponding photo.

Mr. Bozell objects to Paragraph 49 of the PSR. Specifically, he objects to a factually inaccurate statement. At this time of the day on January 6th, there was no ongoing effort by law enforcement outside the U.S. Capitol on the East side of the building. This information was not part of the evidence offered during the trial.

Mr. Bozell objects to Paragraph 50 of the PSR. Specifically, he objects to this inclusion of facts. What other protesters were doing as Mr. Bozell passed them in the same general location is not offense conduct nor relevant conduct attributable to Mr. Bozell, and the reference should be removed.

Mr. Bozell objects to the misrepresentation of facts in Paragraph 51 of the PSR. There was no evidence offered at trial that Mr. Bozell yelled "Treason," and the reference should be removed.

Mr. Bozell objects to Paragraph 53 of the PSR. Specifically, he objects to the claim that he directed protesters in the Gallery to push the C-SPAN cameras down to ensure that the protesters were not being filmed on the Senate floor. It is unclear exactly what Mr. Bozell is signaling or directing other protesters to do at that point. While the government has argued forcefully that Mr. Bozell was clearly directing others to push the cameras down, so as to not film the protesters on the Senate floor this video does not seem to depict this with any certainty.

Mr. Bozell objects to the misleading delineation of facts in Paragraph 54 of the PSR. The evidence at trial showed that during the entirety of the six minutes Mr. Bozell was in the Senate floor he was using his phone—speaking with his relatives. This was the first time since Mr. Bozell entered the U.S. Capitol that a call had successfully been completed—all prior efforts to that point were not successful due to the cellular network being overloaded by the number of individuals in the general vicinity of the Capitol using their phones.

Mr. Bozell objects to Paragraph 56 of the PSR. Specifically, he objects to the misleading inference this paragraph might allow one to make, potentially mischaracterizing his actions in this moment, and he therefore seeks to offer clarification. When Mr. Bozell turned around and walked away from the encounter where rioters were breaking the police line, he was attempting to avoid violence altogether, as he did not wish to be embroiled in the

commotion. Had Mr. Bozell been intent upon confronting the police officers or otherwise engaging himself in a clash, he would have walked towards that encounter rather than walk away from it.

Mr. Bozell objects to Paragraph 58 of the PSR. Specifically, he objects to the misleading inference this paragraph might allow one to make, potentially mischaracterizing his actions in this moment, and he therefore seeks to offer clarification. Mr. Bozell was escorted out of the building by other officers, without putting up any struggle or resistance. After this, Mr. Bozell remained outside peacefully, which further supports that he did not travel to the Capitol that day with plans for violence or destruction.

Mr. Bozell objects to Paragraph 59 of the PSR. Specifically, he objects to the omission of text messages that support his intent—in anticipation for preparations for January 6th— to acquire a musician and to procure an amplifier and drummer to accompany Boots Electric, also known as Jesse Hughes, who is a country folk performer and performs under the ironic band name, "Eagles of Death Metal." It is a sad reality that this band was the target of an Islamic extremist attack at the Bataclan Theater in Paris, France on November 13, 2015.

Mr. Bozell objects to Paragraph 60 of the PSR. Specifically, he objects to the omission of text messages that support his intent to acquire a musician and to procure an amplifier and drummer to accompany Boots Electric in anticipation of preparations for January 6th. Furthermore, the communications referenced here should specify the dates and recipients. These are text messages to specific individuals, not a general public commentary. Most are directed to his two brothers and a very close friend. They are part of running exchanges between the four over a period of weeks discussing their collective views of the November 2020 election process and its aftermath.

Mr. Bozell objects to Paragraph 62 of the PSR. Specifically, he objects to the inclusion of text messages that suggest he intended to bring lighters and fire starters, as this was not

meant seriously and mere bluster and stupid talk—not a serious declaration. The Court recognized in the text of the verdict it read into the record that the text message and email exchanges between Mr. Bozell and these three individuals included clearly sarcastic and unserious suggestions – as well as messages about which the Court ascribed more meaningful intent. This particular message about lighters and fire starters was one intended as hyperbolic rhetoric and not reflecting meaningful planning or intent.

Mr. Bozell objects to Paragraph 66 of the PSR. Specifically, he objects to the government's discrediting of his testimony regarding his attempts to assist officers. The video clearly showed Mr. Bozell, after spotting the baseball bat in the hands of another protester, walking through the crowd in the hallway and telling that individual to put the bat away. The video also showed Mr. Bozell did indeed offer water to a Capitol Police officer whose eyes had been sprayed with a chemical irritant, and, additionally, Mr. Bozell had assisted another Capitol Police officer off the ground who had fallen. All of these acts demonstrate a lack of any intent to assault or harm officers that day.

Mr. Bozell objects to Paragraph 120 of the PSR. Specifically, he objects to the reasoning behind his distress over potentially not having been able to attend the April 11th, 12th, and 13th his daughters' performance in their school play, "Hello Dolly." In the event that he might have been ordered into custody, Mr. Bozell's daughters did not have understudies, and he was concerned that if he was incarcerated, it would have negatively affected his daughters' performance and would have undone months of preparation put into the play by their other classmates. (Obviously, this objection was made before the performances of April 11th, 12th, and 13th, and this is no longer a concern of his because the performances have passed.)

Mr. Bozell objects to Paragraph 127 of the PSR. At no point in time did Mr. Bozell state that he did not have social media. He stated that he does not <u>post</u> anything on social

media.

Mr. Bozell objects to Paragraph 133 of the PSR.  He has not used pain-prescribed marijuana since shortly after the events of January 6th.  He still does drink alcohol, although not frequently or to excess.

In addition to the aforementioned objections, Mr. Bozell contends that his actions do not warrant a combined sentence of 60-months recommended by US Probation. Nor does Mr. Bozell's conduct warrant the Government's request that this Court sentence him to a period of incarceration of 210 (or more) months. However, this is a case where the guidelines themselves should be discarded since they fail to take into account Mr. Bozell's unique personal attributes as well as the circumstances of his case. Furthermore, this sentence would be excessive as compared to other January 6th rioters who also breached the safety of the Capitol Building – including January 6th rioters who actually assaulted and injured United States Capitol Police Officers and Metropolitan Police Officers.  We the defense argue that pursuant to all of the 18 U.S.C. 3553(a) factors, a sentence of 30 months' incarceration would be most appropriate in this case.  Mr. Bozell's objections to certain counts he has been charged with alongside his request for a downward variance to his sentencing are addressed below.

## IV.   CONTINUING OBJECTIONS TO THE PSR: OBJECTIONS TO THE APPLICATION OF SENTENCING ENHANCEMENTS

### A.  The PSR Incorrectly Recommends Several Enhancements.

#### i.   *The Court should not apply the terrorism enhancement in U.S.S.G. § 3A1.4(a), but even if it does, Mr. Bozell's conduct is plainly outside the heartland and the Court should depart downwards.*

Mr. Bozell was found guilty of Destruction of Government Property and Aiding and Abetting same, in violation of 18 U.S.C. §§ 1361, 2.  In addition to the objections he previously raised, Mr. Bozell objects to the recommendation in the revised draft PSR for the Court to

apply the terrorism enhancement under U.S.S.G. § 3A1.2(a).[45] Even if the Court were to conclude that the enhancement were technically applicable, a corresponding downward departure would be warranted because Mr. Bozell's conduct falls well outside the heartland of terrorism cases that justify the enhancement. Mr. Bozell's conduct on January 6th was not motivated by nor calculated to promote any federal crime of terrorism.

**Mr. Bozell's Conduct Does Not Meet the Definition of Terrorism**. The terrorism enhancement applied by U.S. Probation should be removed (or offset by a downward departure) because Mr. Bozell's case is atypical from terroristic conduct that has typically warranted the enhancement and comprised the heartland. Section 2332b(g)(5) of Title 18 defines "terrorism." A federal crime of terrorism is one that (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and is one of the enumerated offenses set forth in section (B) of the aforementioned section and statute.[46] A broad range of crimes *would* warrant this sentencing enhancement, including offenses like taking victims hostage, destruction of an aircraft, use of fire or explosives to demolish a building, and hacking computer security systems. Those offenses placing the safety of the public at large in danger and typically jeopardize national security. Some of the enumerated offenses include very extreme crimes involving biological and chemical weapons, explosives, arson, nuclear and weapons of mass destruction threats, and the bombing of properties. Whether as a matter of federal law or as a matter of common sense, Mr. Bozell's conduct on January 6th, while criminal, does not constitute "terrorism."

Mr. Bozell's actions were not "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."[47]

---

[45] *See* PSR, ¶ 95.
[46] *See* 18 U.S.C. § 2332b(g)(5).
[47] *Id.*

Calculation is "concerned with the object that the actor seeks to achieve through planning or contrivance."[48] Calculation concerns being "devised with forethought" and again implicates specific intent. Mr. Bozell traveled to the District of Columbia with his mother and brother to participate at a rally in support of President Trump. He had tried to arrange for a folk singer to perform, but that did not work out. He walked to the U.S. Capitol Building alongside thousands of other protesters, broke two panes of glass in a chaotic and emotional moment that he deeply regrets, and did not cause further destruction to property on the Capitol grounds. Mr. Bozell did not personally inflict any harm upon officers or others and did not hurl objects into the crowd like other rioters did. He assisted officers who were harmed, or who had fallen and/or been knocked down. And he eventually and peacefully cooperated with officers who escorted him out of the U.S. Capitol Building. Further, Mr. Bozell's actions on January 6th were not premeditated and were therefore not calculated as defined by 18 U.S.C. § 2332b(g)(5).[49]

**In Any Event, His Conduct Is Outside the Heartland**. Even if the Court were to conclude that the enhancement applies on its face, an offsetting downward departure would be warranted because Mr. Bozell's conduct is plainly outside the "heartland" of the terrorism enhancement.[50]

The Second Circuit's decision in *United States v. Stewart*,[51] which involved defendants convicted of providing material support to a known terrorist, is instructive. The district court did not apply the terrorism enhancement in U.S.S.G. § 3A1.4 to one defendant, a translator,

---

[48] *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010).

[49] *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009).

[50] *See, e.g., Rita v. United States*, 551 U.S. 338, 344 (2007) (citing U.S.S.G. § 5K2.0(a)(2) and explaining that a defendant may seek "a departure from the applicable Guidelines range on the ground that his circumstances present an 'atypical case' that falls outside the 'heartland' to which the United States Sentencing Commission intends each individual Guideline to apply").

[51] 590 F.3d 93 (2d Cir. 2009).

"because he did not act with the requisite state of mind."[52] The court also "concluded that a substantial downward variance was appropriate" and sentenced him to 20 months' imprisonment, which the Court of Appeals affirmed.[53] It was indisputable that the translator's crimes supported terrorism and helped to facilitate it. But the Court of Appeals held that the district court correctly declined to apply the enhancement because the Government had not established that that the translator had the "specific intent" to commit terrorism.[54]

Mr. Bozell similarly lacked the specific intent to influence or affect government conduct by intimidation or coercion, as defined in 18 U.S.C. § 2332b(g)(5). He is plainly less worthy of the terrorism enhancement than the personal translator for a known terrorist. Mr. Bozell's conduct at the Capitol Building, while foolish and criminal, was not intended to force the government to change its conduct—*i.e.*, to commit an act of terrorism. Mr. Bozell went to the U.S. Capitol with his mother and brother to support President Donald Trump and to express his views about the 2020 Presidential Election. But Mr. Bozell did not intend to commit any acts of violence to overturn the election, or to coerce or intimidate government officials into overturning the results of the election.

Even if the Court were to conclude that the formal definition of "terrorism" did apply, the case of the co-defendant in *Stewart* would still be instructive. For her, the district court held that the terrorism enhancement did apply but acknowledged that hers was an "'atypical case' for the terrorism enhancement in as much as 'the thrust of the violation was the provision of a co-conspirator to a terrorist conspiracy.'"[55] Concluding that application of the enhancement would be "dramatically unreasonable" would not fit the defendant's past

---

[52] *Id.* at 136.
[53] *Id.* at 137.
[54] *Id.* at 139.
[55] *Id.* at 147.

conduct or likelihood of recidivism,[56] the district court departed downward and imposed a sentence of 28 months.[57] While the Second Circuit agreed with the downward departure, the court determined that a downward departure from 360 months to 28 months was too great of a departure given the facts in that case.

Here too, a downward departure is warranted to offset the effects of the terrorism enhancement even if the Court should conclude that it technically applies. If connecting terrorists with co-conspirators is an "atypical" terrorism case that justifies a downward departure, then surely Mr. Bozell's conduct at the Capitol Building would warrant the same. Like with Stewart, the purported link between Mr. Bozell and terrorism is overstated. Mr. Bozell is not remotely like a terrorist who perpetrates mass killings of innocent civilians or seeks to violently overthrow governments.  Mr. Bozell did neither of these things. He broke two windowpanes, handed up a pole from one person to another, and allowed himself to get swept up in the fervor of fellow January 6th rioters. However, Mr. Bozell's actions, while serious, were contained, non-violent, and more akin to vandalism, and rioting than terrorism. Furthermore, Mr. Bozell has not demonstrated any propensity—through past or recent conduct—to commit these same actions again.  His case is therefore too atypical of terroristic conduct to justify even a 60-month sentence – much less the 210+ month sentence the Government initially recommended – if the terrorism enhancement is applied here.

The Ninth Circuit's decision in *United States v. Alhaggagi* points the same way.[58] The Ninth Circuit joined the Second, Fourth, Sixth, and Eighth Circuits in holding that the terrorism enhancement requires a showing of specific intent.[59] The Court of Appeals reversed the district court's determination that the enhancement should apply to a defendant who

---

[56] *Id.*
[57] *Id.* at 148.
[58] 978 F.3d 693 (9th Cir. 2020).
[59] *Id.* at 700.

attempted to provide material support to a terrorist organization by opening social media accounts that targeted and encouraged ISIS sympathizers.[60] The defendant had participated in a chatroom "replete with posts praising ISIS, denouncing the United States, and planning 'to kindle strife and chaos' in the United States through Twitter," but there was no evidence to suggest that he was serious in his comments in those chatrooms.[61] Nor did he have significant engagement with these chatroom posts.

Like Alhaggagi, Mr. Bozell's text messages to his brother about bringing lighters and fire starters to the U.S. Capitol on January 6th were not supported by any evidence showing that Mr. Bozell in fact meant this seriously. Mr. Bozell did not bring any lighters or fire starters (or any materials, weapons or any other items) with him that day. These text messages were just bluster and not serious in any way. Like Alhaggagi, his text messages were wholly lacking in any action showing them to be seriously intended. And Mr. Bozell's actions that day were not accompanied by the required mental state to justify the application of the terrorism enhancement to his sentence.

***The Court Should Sentence Without the Terrorism Enhancement***. Mr. Bozell's conduct on January 6th is outside the heartland of terrorism offenses and was not intentionally calculated to promote terroristic acts. The Court therefore should not elevate Mr. Bozell's criminal history category to a VI, resulting in an initial guideline range of 210 months to 262 months, reduced to 60 months in the April 25th Sentencing Recommendation. The guideline range offers irrelevant guidance because it is (1) the product of a guideline that is not based on comparable instances of conduct; (2) would result in unwarranted disparity as compared with sentences for similarly situated Defendants; and (3) is far greater than necessary to promote the goals of sentencing in this case. The guideline range, however, is

---

[60] *Id.* at 700–04.
[61] *Id.* at 703.

only one of the factors the Court must consider under 18 U.S.C. § 3553(a).

While the instant offenses are serious in nature, they are nowhere near and should not be grouped in the same category or considered to be equally to the heinous acts committed by individuals such as Timothy James McVeigh (who perpetrated the 1995 Oklahoma City bombing that killed 168 people, 19 of whom were children, injured 680, and destroyed one-third of the Alfred P. Murrah Federal Building) or Osama bin Laden (who perpetrated the largest terrorist attack on the United States, killing thousands of innocent victims). This federal sentencing guideline enhancement should be applied to sentences for those with ties to foreign terrorist organizations or to violent domestic extremists. Here, the government property "destroyed" by Mr. Bozell were two panes of glass. The conduct committed by Mr. Bozell personally, does not rise to the level of "terrorism" to support an enhancement that results in a decades long prison sentence, as common sense would suggest that this does not result in a "sufficient, but not greater than necessary" sentence required by 18 U.S.C. § 3553(a). Under § 3A1.4(b), if applied, the terrorism enhancement that the Government believes applies suggests that the defendant be punished the same as violent career offenders, serial offenders and/or offenders with very serious criminal histories, with many lengthy prior sentences of imprisonment and/or repeated violations of probation, parole and/or supervised release.

The Court should agree that the terrorism guideline enhancement is not appropriate here and is therefore advisory rather than mandatory. The Government has unreasonably chosen to seek this enhancement for certain defendants involved in the events of January 6th but has failed to raise this same enhancement in other cases with significantly more violent offenders than Mr. Bozell who stands before this Court.

### ii. The Court should not fault Mr. Bozell for going to trial and should not apply an eleven-level enhancement in light of Brock

Mr. Bozell did not go to trial because he was unwilling to accept any responsibility for his conduct on January 6th. Rather, he went to trial because had to in order to preserve his rights. He was prepared to accept guilt for Counts 2, 3, 4, and Counts 6-10.[62] But the Government charged two other Counts that made it problematic for him to accept a plea offer: (i) Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2), 2; and (ii) an assault charge under 18 USC § 111.

Under the only plea offer ever extended to Mr. Bozell, he was required to stipulate that a combined 11-levels of enhancements from U.S.S.G. § 2J1.2—namely, an 8-level enhancement under § 2J1.2(b)(1)(B) and a 3-level enhancement under § 2J1.2(b)(2)—would apply to the guideline calculation on the obstruction count. But as the D.C. Circuit eventually held in *United States v. Brock*,[63] the 3-level enhancement under § 2J1.2(b)(2) does not apply here because the electoral college voting process did not constitute the "administration of justice" for purposes of that enhancement.

*Brock* is a watershed development in sentencing of January 6th cases where the Sentencing Guideline calculation is based on a violation of § 1512(c)(2). (See Mr. Bozell's objections to Paragraphs 92 and 93 below). Before *Brock*, a typical guideline calculation based on a violation of Sec. 1512(c)(2) involved a Base Offense Level of 14, and an Adjusted Offense Level of 25 after the 11-level enhancement was applied. A defendant who pled guilty received the 3-level reduction for "acceptance," and the Total Offense Level was 22. With a Criminal History Category of 1, the recommended Guideline Range was 41-51 months.

---

[62] Counts 2-3: Destruction of Government Property and Aiding and Abetting - 18 U.S.C. §§ 1361 and 2; Count 4: Civil Disorder - 18 U.S.C. § 231(a)(3); Count 6: Entering and Remaining in a Restricted Building and Grounds - 18 U.S.C. § 1752(a)(1); Count 7: Disorderly and Disruptive a Restricted Building and Grounds - 18 U.S.C. § 1752(a)(2); Count 8: Disorderly Conduct in a Capitol Building - 40 U.S.C. § 5104(e)(2)(D); Count 9: Act of Physical Violence in the Capitol Grounds or Buildings - 40 U.S.C. § 5104(e)(2)(F); Count 10: Parading, Demonstrating, or Picketing in a Capitol Building - 40 U.S.C. § 5104(e)(2)(G).
[63] 94 F.4th 39 (D.C. Cir. 2024).

Although only the 3-level enhancement under § 2J1.2(b)(2) was at issue in *Brock*, the same rationale applies equally the 8-level enhancement under § 2J1.2(b)(1)(B). Both enhancements depend on some form of interference with the "administration of justice."

After *Brock*, without the 11-level enhancement, the recommended Guideline Range is now 15-21 months. Under the proposed plea agreement offered by the Government—if the 11 levels subject to *Brock* were removed, and a 2-level reduction for acceptance applied—the recommended Guideline Range would have been 10-16 months. But that offer was never available to Mr. Bozell. The Government demanded that he agree to the 11-level enhancement, quadrupling his guideline range, based on the Government's legally erroneous interpretation of the relevant provisions.

Mr. Bozell could not reasonably be expected to accept a plea based on that sentencing recommendation with which he would have been stuck. His only option was to go to trial.

### iii. The Court should not apply the 8-level enhancement on his conviction under 18 USC § 1511 in light of Brock

Mr. Bozell was originally charged with the Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2), 2. For the reasons set forth above, Mr. Bozell should not receive an 8-level enhancement for what his PSR states was an offense that "involved causing or threatening physical injury to a person and property damage in order to obstruct the administration of justice "to wit: the defendant smashed two panes of glass. Additionally, the defendant bumped/made contact with a police officer on the Northwest Stairs while making his way to the upper terrace." That recommendation is directly contrary to *Brock* and only applies if the conduct interfered with the "due administration of justice."

### iv. The Court should not apply a 6-level enhancement for risk of harm to law enforcement; Mr. Bozell assisted rather than assaulted officers on January 6th.

Mr. Bozell was originally charged with Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2. Mr. Bozell should not receive a 6-level enhancement for what his PSR states was an offense whereby Mr. Bozell "created a substantial risk of serious bodily injury, knowing or having reasonable cause to believe law enforcement officers were engaged in the course of their official duties when he crossed the police line on the Northwest staircase." Such an enhancement is not warranted by the facts. At the point where Mr. Bozell crossed the police line on the Northwest staircase, he made only slight or grazing contact with the police officer but did not cause any actual injury or substantial risk of serious bodily injury or injure law enforcement at any time. In fact, throughout his hour or so on the Capitol Grounds that day, Mr. Bozell did the opposite on several encounters in which he assisted police officers.

Furthermore, this Court, in *United States v. Hazelton*, rejected the application of this adjustment for another January 6th defendant who illegally entered the Capitol Grounds and participated in multiple confrontations with police authorities. Defendant Hazelton had made several statements inciting the crowd of rioters to action. This Court ultimately held that the defendant's conduct did not fall under the category of a jointly undertaken activity, which would be required for the enhancement to apply, because Defendant Hazelton did not make an explicit agreement with fellow protesters.[64] In this case, Mr. Bozell's conduct similarly does not fall within a jointly undertaken activity because he never made any explicit agreements with fellow protesters to incite chaos and violence.

**V.      A SENTENCE OF 30 MONTHS' INCARCERATION WOULD BETTER SATISFY THE GOALS OF § 3553(a) THAN THE GOVERNMENT'S RECOMMENDATION**

---

[64] *See United States v. Hazelton*, No. 21-00030 22 (D.C. Cir. 2023).  This court rejected application of the victim-related adjustment because defendant Hazelton did not make an explicit agreement with fellow protesters that would suggest that her conduct constituted jointly undertaken activity.

18 U.S.C. § 3553(a)(2) states that the Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)," which are "the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."[65] In "determining the particular sentence to be imposed," the Court must consider these purposes, the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid unwarranted disparities, and the need to provide restitution to any victims of the offense.[66]

No workable guideline could ever "account for the myriad factors that are properly considered in fashioning just sentences."[67] A substantial downward variance is needed in this case because of the following mitigating factors, all of which are highly relevant to the purposes of sentencing and none of which are taken into account by the guideline range.

### A. The Sentencing Guidelines Applied to Mr. Bozell Fail to Promote Any Purpose of Sentencing Because They Are Not Based on Comparable Instances of Terroristic Conduct.

There is no indication that the terrorism enhancements applied to sentences in January 6th cases are based in real world policy, rather than in reactionary politics. The purpose of these enhancements is to take on an overly deterrent posture. In 1984, Congress first began directing the United States Sentencing Commission to mandate sentences to

---

[65] 18 U.S.C. § 3553(a)(2).
[66] *See* 18 U.S.C. § 3553(a)(1)-(7).
[67] *See United States v. Ovid, slip op.*, 2010 WL 3940724, *1 (E.D.N.Y. 2010).

include an upward adjustment if a defendant's crimes were related to terrorism.[68] However, two dimensions of the application of the terrorism enhancement have rendered it controversial. For instance, the enhancement has been viewed as applying to too wide a range of criminal offenses, as it can be imposed on defendants convicted of a broad scope of violations spanning from those who have promoted terrorism through nonviolent activities such as donating funds to terroristic organizations as well as those who have in fact committed violent crimes like homicide or taking civilians hostage.[69] The terrorism enhancement is also viewed as controversial because of the steep increase applied to a defendant's sentence under the enhancement.[70] The enhancement is therefore critiqued for being both too severe a sanction and applied too liberally.[71]

Mr. Bozell's case is a textbook example. He was convicted of a low-level property destruction offense, which is barely a felony and involved breaking two windows. The dollar value of the damage does not even warrant an enhancement under the applicable guidelines, since damage valued at less than $6500 results in no enhancement under Sec. 2B1.1(b)(1). The Base Offense level is 6.

It is arguable whether the offense conduct here involved a "reckless disregard for the risk of . . . serious bodily injury" caused by creating access for the crowd to the interior of the U.S. Capitol. That would in increase the Offense Level to 14 and the recommended Guideline Range would be 15-21 months absent any other enhancements.

---

[68] Violent Crime Control and Law Enforcement Act, Pub. L. No. 103-322, 108 Stat. 1796, 2022 (1994), amended by the Antiterrorism and Effective Death Penalty Act of 1996 28 U.S.C. § 2254 (1996).
[69] Wadie E. Said, Sentencing Terrorism Crimes, 75 OHIO ST. L.J. 477, 500-01 (2014); U.S.S.G.§ 3A1.4 cmt. 2, 4.
[70] See generally James P. McLoughlin, Jr, Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations, 28 LAW & INEQ. 51 (2010).
[71] See Joanna Baltes, et al., Symposium, Trials And Terrorism: The Implications of Trying National Security Cases in Article III Courts: Convicted Terrorists: Sentencing Considerations and Their Policy Implications, 8 J. NAT'L SECURITY L. & POL'Y 347, 356–58 (2016)

So, the application of the terrorism enhancement in these factual circumstances results in a nearly 14-fold increase in bottom of the recommended Guideline Range – from 15 to 210 months—or offense conduct involving the breaking of two windows.

These same critiques are applicable to January 6th defendants who have been aggressively pursued by federal prosecutors seeking to impose terrorism enhancements to their sentences. For instance, the guideline surrounding offenses involving Obstruction of Official Proceedings is not based on empirical data of past practice or on comparable instances of terroristic conduct. The Sentencing Commission has failed to rely on empirical data or comparable instances of terroristic conduct in promoting and revising § 2D1.1 and has therefore declined to fulfill its institutional obligation toward upholding both ethical and equitable legal exercises in criminal sanctioning. As such, we ask this Court to apply a downward variance to the applicable Guidelines calculation and sentence Mr. Bozell to 30 months imprisonment, per the Commission's recommendation.[72]

While the events of January 6th raise considerable concern over the state of American politics and instinctively invoke the desire to solidify retributivist principles, it is worth questioning whether the pursuit of these enhancements by the Government are not strongly rooted in social political pressure rather than strict legal fairness. This pressure to achieve and thereby maintain the appearance of harsh punishment for fear of undermining the integrity of the American political system renders the calls for the terrorism enhancement to January 6th conduct as falling well beyond the scope of what is ordinarily considered "terroristic." This seemingly reactionary demand for a terrorism enhancement for Mr. Bozell would have this Court move away from a straightforward application of a guidelines sentence and careful consideration of the applicable 18 U.S.C. § 3553(a) factors. and these same

---

[72] *See Spears v. United States*, 129 S. Ct. 840, 843 (2009); *Kimbrough*, 552 U.S. at 101-02, 109-10; *Rita*, 551 U.S. at 351, 357.

implications are no less true for the application of the terrorism enhancement to Mr. Bozell's January 6th conduct.

### B. 18 U.S.C. § 3553(a) Demands Just Punishment Commensurate with the Seriousness of the Offense, But Not Greater Than Necessary.

Needs and demands for retribution are measured against a defendant's degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (*mens rea*), motives, role in the offense, and mental illness or other diminished capacity."[73] The guidelines include none of the factors bearing on Mr. Bozell's degree of culpability.

### C. Mr. Bozell's Case Does Not Call for Gratuitous Deterrence.

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[74] "Three National Academy of Science panels ... reached that conclusion, as has every major survey of evidence."[75]

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University.[76] The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries.[77] It examined the effects of changes to both the certainty and severity of punishment.[78] While significant

---

[73] Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (February 2005).

[74] *See* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).

[75] *Id.*; *see also* Zvi D. Gabbay, Exp*loring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447048 (2007) ("certainty of punishment is empirically known to be a far better deterrent than its severity").

[76] *See* Andrew von Hirsch, *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999).

[77] *Id.*, at 1.

[78] *Id.*

correlations between sentence severity and crime rates ... were not sufficient to achieve statistical significance."[79] The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects."[80]

According to "the best available evidence, ... prisons do not reduce recidivism more than noncustodial sanctions."[81] Again, it is impossible not to recognize that Mr. Bozell committed serious offenses. Nevertheless, it should also be recognized that, other than January 6, 2021, Mr. Bozell was and is a devoted family man, a productive member of our society and someone who respects the law. Mr. Bozell's actions on January 6th were an aberration and, going forward, Mr. Bozell can be someone the Court can rely on to faithfully comply with the law.

### D.  Mr. Bozell Will Not Recidivate

Mr. Bozell will not make this mistake again.  He deeply regrets his conduct from that terrible day and has learned his lesson. The events of January 6th were a rare happening that is unlikely to recur. But even in the unlikely event that something similar happens in the wake of the 2024 Election, the Court can be confident that Mr. Bozell will not be there. Of course, if he is incarcerated, he would be incapacitated and unable to participate even if he wanted to. But more importantly, Mr. Bozell has realized that the happiness and well-being of his wife and daughters are far more important than electoral politics. And he knows all too well what can come from getting swept up in political fervor. He has no interest in repeating his past mistakes.

In *United States v. Munchel*, the Court of Appeals for the D.C. Circuit made clear that

---

[79] *Id.* at 2.
[80] *Id.* at 1.
[81] *See* Francis T.  Cullen, *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J.  48S, 50S-51S (2011).

"the specific circumstances that made it possible, on January 6th, for [the defendants] to threaten peaceful transfer of power" no longer exist and should not be viewed as a high recidivism risk.[82] The Court explained that the defendants "had a unique opportunity to obstruct democracy on January 6th because of the electoral college vote tally taking place that day, and the concurrently scheduled rallies and protests. Thus, [the defendants] were able to attempt to obstruct the electoral college vote by entering the Capitol together with a large group of people who had gathered at the Capitol in protest that day."[83] The D.C. Circuit criticized the district court for finding that the defendants were "a danger to 'act against Congress' in the future," without providing any "explanation of how the appellants would be capable of doing so now that the specific circumstances of January 6th have passed."[84] The same goes for Mr. Bozell, even before the Court considers his changed perspectives.

### E.  The Sentence Recommended by the Government Is Excessive as Compared to Other January 6th Defendants, and the Court Must Avoid Unwarranted Disparities.

This Court must consider the need to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct.[85] This Court should avoid unwarranted similarities in sentencing among defendants who are different in ways not accounted for in the guideline range,[86] and unwarranted differences among defendants whose conduct and characteristics are similar.[87]

Exhibit 2 contains a sample of January 6th cases in which defendants received

---

[82] Case No. 21-3010 (D.C. Circuit March 26, 2021).

[83] *Id.*

[84] *Id.*

[85] 18 U.S.C. § 3553(a)(6).

[86] *See Gall*, 552 U.S. at 55 ("need to avoid unwarranted similarities among other co-conspirators who were not similarly situated"); *United States v. Ovid*, 2010 WL 3940724 (E.D.N.Y. 2010) (sentencing two Defendants with similar guideline ranges to 60 months and 126 months respectively based on distinctions in circumstances of the offenses and characteristics of the Defendants)

[87] *See United States v. Parris*, 573 F. Supp. 2d 744, 753, 756-62 (E.D.N.Y. 2008).

sentences substantially below the guideline ranges applicable in those cases and sentences, and substantially below the guideline range of 210 months to 262 months that U.S. Probation initially calculated here. Even the Probation Office has recognized that the recommendation was too high and lowered its recommendation to 60 months. But that is still at the high of sentences for January 6th defendants with far worse offense conduct. This Court should take into account the sentencing trend exemplified by this list and sentence Mr. Bozell to 30 months imprisonment.[88]

In *Parris*, Judge Block in the Eastern District of New York took a similar collection of cases into account in fashioning an appropriate sentence for two securities fraud offenders. At the Court's request, each party submitted a sample group of cases to illustrate the sentences imposed in other securities fraud cases.[89] Based on these samples, the Court concluded that "[t]hose [Defendants] who were not cooperators and were responsible for enormous losses were sentenced to double-digit terms of imprisonment (in years); [while] those whose losses were less than $100 million were generally sentenced to single-digit terms."[90] The court relied on this national pattern in arriving at a sentence of 60 months for the two Defendants who faced an advisory guideline range of 360 months to life, which was 16.7% of the bottom of the applicable guideline range.[91]

The Justice Department has historically applied stricter sentencing to January 6th defendants than any other group of defendants arrested in connection with violent, disruptive political protests. Here, U.S. Probation initially recommended a sentence between 210 and 262 months, though the Probation Office later reduced its recommendation to 60 months on April 25, 2024. However, even when compared to sentences imposed in January 6th cases, it

---

[88] Exhibit 2.
[89] *Id.* at 752.
[90] *Id.* at 753.
[91] *Id.* at 745.

is apparent that an even lower sentence is more appropriate for Mr. Bozell. Mr. Bozell's conduct on January 6th and his unique circumstances, as compared to the sentences other January 6th defendants have received, warrant a sentence in the lower range of sentences imposed.[92] The Court should impose a sentence of no more than 30 months' incarceration. Not only does Mr. Bozell have a low risk of recidivism to begin with, but under the imposition of a 30-month sentence, Mr. Bozell would still be subject to meaningful consequences: he would not have the opportunity to attend his daughters' high school graduation ceremonies, birthday gatherings, or engage in everyday father-daughter moments that are so important to Mr. Bozell who is very devoted father and husband.  Nor would Mr. Bozell have the chance to participate in any upcoming opportunities for political involvement.  A 30-month sentence would accomplish the same objectives imposed by a 210-262-month, or even 60-month, sentence without the risk of over-punishment or upholding a sentence that variates so greatly with similar January 6th defendants who have been sentenced to lower terms of incarceration.

For example, in *United States v. Sargent*, a case in which the defendant was convicted in this Courthouse of physically striking a police officer on January 6th, Judge Hogan ordered the defendant to serve a sentence of 14 months.  In addition to hitting an officer with his hand, that defendant recorded the scene on social media while boasting, "we got a clash of police going . . .. Shit's getting fucking rowdy out here now. We got flash bangs."[93] After striking one officer, Sargent tried to strike another officer, but instead made contact with another protestor.  At one point, that defendant bragged that he "duffed an officer in the face." He also told officers, "Fuck you guys, you guys are either with them or with us."[94] In the instant case, by contrast, Mr. Bozell did not strike or injure any police officer.  Mr. Bozell

---

[92] *See* Exhibit 2.
[93] *United States v. Troy Sargent*, 1:21CR258(TFH).
[94] *Id.*

did not shout, nor direct any threatening, abusive, or profane language towards police officers. In fact, he came to the aid of two different police officers struggling at two different times on January 6th. These factors support a significantly more lenient sentence than the 60-months revised recommendation by U.S. Probation.

Again, Mr. Bozell traveled to Washington D.C. to listen to former President Trump's speech and walked to the Capitol Building with his mother and brother, alongside hundreds of other protestors. Mr. Bozell was not intending, nor did he come prepared to incite violence. Nor did Mr. Bozell start out that day with any intent to damage the Capitol Building. He did not bring any weapons with him. He did not wear any protective riot type-gear. Instead, video footage captured Mr. Bozell wearing everyday clothing and assisting two police officers amidst the ensuing chaos of that day. By contrast, Defendant Matthew Ryan Miller, for example, repeatedly assaulted law enforcement with beer cans, batteries, and spray, and was sentenced to 33 months' incarceration.[95]

In another comparable January 6th case, *United States v. Leffingwell*, involving an assault on police officers, Judge Berman Jackson imposed a 6-month sentence on Defendant Leffingwell who chanted at officers standing before him to "join us."[96] When two officers tried to repel defendant Leffingwell and the crowd around him, Leffingwell struck both officers in the head. Despite his physical assault of those officers, Judge Berman Jackson imposed a sentence of only six months' incarceration. Again, unlike defendant Leffingwell, Mr. Bozell at no point in time chanted along with protesters, nor violently struck a police officer. Rather, Mr. Bozell offered assistance to two officers that day.

In *United States v. Blair*, which also involved assault, Judge Paul Friedman imposed a sentence of five months' incarceration on the defendant who, while carrying a large

---

[95] *See United States v. Miller*, No. 1:21-CR-00075-RDM.
[96] *United States v. Leffingwell,* 1:21CR5 (ABJ), ECF. No. 4.

Confederate flag and a backpack with a knife and duct tape inside, pushed a metal lacrosse stick against a police officer's chest while yelling that he would not submit to commands.[97] Again, Mr. Bozell's actions significantly deviate from this case in which Defendant Blair came to the Capitol armed with a knife and assaulted police officers with a metal lacrosse stick. Mr. Bozell is therefore deserving of a more lenient sentence than what was imposed in the above cases.

Mr. Bozell's conduct is in no way comparable to the conduct of many other defendants in these cases who, for example, brought firearms and other weapons to the U.S. Capitol[98]; who engaged in extensive planning prior to their trips[99]; or, who engaged in assaultive conduct which caused serious injuries on officers.[100] Furthermore, Mr. Bozell was not a member of the Proud Boys, Oath Keepers, or any other anti-government organization.[101]

---

[97] *United States v. David Blair*, 1:21CR186 (PLD), ECF. No. 55.

[98] *See, e.g., Byerly*, No. 1:21-CR-00527-RDM (defendant used a stun gun on officers, received 34 months' incarceration); *United States v. Coffman*, No. 1:21-CR-00004-CKK (defendant traveled to D.C. with multiple firearms in his truck, received 46 months' incarceration); *United States v. Mazza*, No. 1:21-CR-00736-JEB (defendant traveled to D.C. with two loaded handguns, received 60 months' incarceration); *United States v. Sandlin*, No. 1:21-CR-00088-DLF (defendant traveled to D.C. with car full of weapons including guns, bear spray and knives, received 63 months' incarceration); *United States v. Khater*, No. 1:21-CR-00222-TFH (defendant arrived to D.C. with bear and pepper spray, received 80 months' incarceration); *United States v. Head*, No. 1:21-CR-00291-ABJ (defendant brought knife on to Capitol grounds, received 90 months' incarceration); *United States v. Webster*, No. 1:21-CR-00208-APM (defendant traveled to D.C. with bulletproof vest and revolver, received 120 months' incarceration).

[99] *See, e.g., United States v. Mault*, No. 1:21-CR-00657-BAH (defendant planned for violence through pre-riot text messages, received 44 months' incarceration); *United States v. Herrera*, No. 1:21-CR-619-BAH (defendant came prepared to Capitol, received 48 months' incarceration); *United States v. Denney*, No. 1:22-CR-00070-RDM (defendant used Facebook to recruit for his militia group called the Patriot Boys, received 52 months' incarceration); *United States v. Sandlin*, No. 1:21-CR-00088-DLF (defendant traveled to D.C. with others with a car full of weapons and equipment, received 63 months' incarceration).

[100] *See, e.g., United States v. Head*, No. 1:21-CR-00291-ABJ (defendant repeatedly struck police officers with a stolen riot shield and dragged an officer into the mob where he was assaulted, received 90 months' incarceration); *United States v. Webster*, No. 1:21-CR-00208-APM (defendant dragged an officer by his helmet, pinned him to the ground, and tried to rip his gas mask off received, 120 months' incarceration); *United States v. Young*, No. 1:21-CR-00291-ABJ (defendant joined an attack on officers by restraining an officers wrist and attacking other officers, received 86 months' incarceration); *United States v. Rodriguez*, No. 1:21-CR-00246-ABJ (defendant drove a stun gun into an officers neck received 151 months' incarceration).

[101] *See, e.g., United States v. Ochs*, No. 1:21-CR-00073-BAH (defendant who was a member of Proud

Based on the sentences highlighted above, Mr. Bozell should receive a similar sentence to those who committed similar conduct; therefore, a sentencing range of 210 to 262 months, or even 60 months, would not be a just sentence in Mr. Bozell's case. A sentence of no more than 30 months' incarceration would be consistent with other defendants who were found guilty of similar actions or similarly serious offenses that terrible day.

### F. Mr. Bozell's Case Warrants Consideration for Alternative Sentences Available.

This Court must consider all of "the kinds of sentences available" by statute, § 3553(a)(3), even if the "kinds of sentence . . . established [by] the guidelines" zones recommend only a lengthy prison term.[102] According to the Supreme Court's decisions in *Gall* and *Kimbrough*, federal judges are free to consider relevant circumstances related to an offense and the history and characteristics of a defendant, and are not tied to the rigid, arithmetic framework of the Guidelines. Indeed, *Kimbrough* and *Gall* have returned sentencing courts to the "federal judicial tradition" of considering "every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify the crime and the punishment to ensue."[103]

Ultimately, the Court must "impose a sentence sufficient, but not greater than

---

Boys and threw smoke bombs at police received 48 months' incarceration); *United States v. Decarlo*, No. 1:21-CR-00073-BAH (defendant who was a Proud Boy Member received 48 months' incarceration); *United States v. Pruitt*, No. 1:21-CR-00023-TJK (defendant who was a Proud Boy member, tossed a chair at officers as well as coming face to face with then-Senate Minority Leader Chuck Schumer received 55 months' incarceration ); *see also United States v. Denney*, No. 1:22-CR-00070-RDM (defendant who was the founder of a militia group called the Patriot Boys of North Texas who assaulted law enforcement officers received 52 months' incarceration); *United States v. Wright*, No. 1:21-CR-00341-CKK (defendant who organized two full charter buses transporting over 100 people sentenced to 49 months' incarceration); *United States v. Rhodes*, No. 1:22-CR-00015-CKK (defendant who was the leader of the Oath Keepers group received 216 months' incarceration).
[102] *See Gall*, 552 U.S. at 59 & n.11.
[103] *Gall*, 552 U.S. at 52; *see also United States v. Tornko*, 562 F.3d 558, 560 (3d Cir. 2009) ("The sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case.").

necessary" to comport with the goals of sentencing.[104] Congress directed the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," and the "general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury."[105]

Congress issued this directive in the belief that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and non-serious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service."[106] Mr. Bozell is not a "violent and serious offender" who "pose[s] the most dangerous threat to society" as demonstrated by his criminal history: his prior convictions involve traffic infractions and driving under the influence, which are not inconsistent with the complete lack of any violent predisposition. Mr. Bozell had no intention of injuring any officer through his actions, and no officers were injured by Mr. Bozell's actions on January 6, 2021.

## VI. CONCLUSION: MR. BOZELL NEVER PLANNED OR INTENDED TO CAUSE HARM TO ANYONE OR TO DESTROY ANY PROPERTY.

At the time of Mr. Bozell's sentencing, this Court will be charged with imposing a sentence that is fair, but not "greater than necessary."[107] This bedrock principle of sentencing law cannot be fulfilled in Mr. Bozell's case if he is sentenced at or near the range proposed by

---

[104] *See United States v. Olzovsky*, 562 F.3d 530, 552 (3d Cir. 2009).
[105] 28 U.S.C. § 9940).
[106] *See* Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note).
[107] 18 U.S.C. § 18553(a); Kimbrough, 552 U.S. at 101.

the Guidelines. Rather, as reflected by the data and analogous case law above, a sentence of 30 months' incarceration is more appropriate in this case.

Over the past three years, Mr. Bozell has taken the time to reflect, and has accepted responsibility for the crimes he committed on January 6, 2021. He has leaned into his faith to help him process his actions and their impact, returning a sense of humility to his outlook on this terrible event. Mr. Bozell is embarrassed and saddened by his actions that day. Following January 6th, Mr. Bozell has grown stronger in his faith, and he is intent on continuing on the path forward to leading a good life and setting a strong example for his daughters, his wife, and the many people who love and respect him.

For this, we ask that this Court give Mr. Bozell an opportunity to right his wrongs and get back to his life of service as soon as possible—something he cannot do while serving a sentence of 210-262 or even 60 months. Instead, we kindly ask this Court for its leniency and to grant Mr. Bozell a sentence that does not disproportionately punish what was a complete collapse of judgment resulting in the crimes he committed while caught up in the chaos of the crowd of protesters.

Good people do bad things. Mr. Bozell is a good man, who committed serious crimes on January 6, 2021. There is no question about this, and he has tremendous remorse and regret for his actions.[108] However, violence was not part of what Mr. Bozell had envisioned for that day on January 6, 2021 Instead, this committed father, husband, brother, and son, was caught up in the chaos of the day, committing crimes that he will have to live with forever. This event was out of character for Mr. Bozell[109] who, as one friend describes, was "swept in the frenzy of the day" and had "no ill-will."[110] Punishment for these crimes is

---

[108] Exhibit 1 (Letter from David Bozell).
[109] Exhibit 1 (Letter from Rebekah Manney).
[110] Exhibit 1 (Letter from Justin Shoemaker).

certainly in order, and Mr. Bozell stands ready to accept that punishment. But a sentence of greater than 3 years' incarceration will be especially devastating to Mr. Bozell's wife and three daughters who love and rely on him tremendously in their lives. This is what we ask this Court to remember, above all else, and we thank your Honor for your careful and thoughtful consideration of the sentence you will impose here.

Dated: May 3, 2024                                     Respectfully Submitted,

                                                       /s/ William L. Shipley
                                                       William L. Shipley, Jr., Esq.
                                                       PO Box 745
                                                       Kailua, Hawaii 96734
                                                       Tel: (808) 228-1341
                                                       Email: 808Shipleylaw@gmail.com

                                                       /s/ Eric Snyder
                                                       Eric Snyder
                                                       888 16th St. NW
                                                       Washington, DC 20006
                                                       Phone: (202) 857-1700
                                                       Fax: (212) 548-7113
                                                       E: esnyder@mcguirewoods.com

                                                       *Counsel for Leo Brent Bozell IV*

# EXHIBIT 1

**LETTERS TO THE COURT IN SUPPORT OF LEO BRENT BOZELL IV**

# Table of Contents

Letter from George V. Vancore, Jr ........................................................................ 48

Letter from David Bozell .................................................................................... 49

Letter from Sheila F. Weaver .............................................................................. 52

Letter from Jennifer Bozell ................................................................................. 53

Letter from Mary Bozell ..................................................................................... 54

Letter from Scott Alan Claiborne ........................................................................ 55

Letter from Father Tim Sahd ............................................................................... 57

Letter from Denise McCracken ........................................................................... 58

Letter from Joe McCracken ................................................................................. 59

Letter from Susan Eckert .................................................................................... 60

Letter from Charles P. Daglian, Esq .................................................................... 62

Letter from Rebekah Manney .............................................................................. 64

Letter from David Horner .................................................................................... 65

Letter from Leo Brent Bozell III ......................................................................... 67

Letter from Max and Jill Cedeno ........................................................................ 69

Letter from Justin M. Shoemaker ........................................................................ 70

Letter from Dawn Bozell ..................................................................................... 73

Letter from Justin Weiner .................................................................................... 78

Letter from Norma Bozell .................................................................................... 79

Letter from Joseph Bozell .................................................................................... 83

Letter from Wallace Parcell Greene ..................................................................... 87

Letter from Caitlin Manaois ................................................................................ 88

Letter from Leo Brent "Zeeker" Bozell IV .......................................................... 90

Letter from Norma Bozell .................................................................................... 93

### Letter from George V. Vancore, Jr.

April 10, 2024

To:      Whom it May Concern

Re:      Personal Character Letter for Leo Brent "Zeeker" Bozell IV, Palmyra, Pennsylvania,

It has been my pleasure and privilege to have known Leo Brent Bozell IV, more commonly referred to as "Zeeker", his entire life.  Over the years, I have witnessed his personal growth from a young, highly energetic child, into a fine outstanding young individual and dedicated family man who loves his family, friends, co-workers, country, and, most importantly, his Lord.

Over the years, there have been several of his life experiences that I personally witnessed or knew about where Zeeker demonstrated his individual character and what makes him the special person that he has become:

- While Zeeker was in College, he thought seriously about becoming a Catholic Priest where he could serve others less fortunate than himself.  His love for his Lord is only surpassed by his love for his family.
- He sponsored a close personal friend into becoming a practicing Catholic.
- Once he got married to the love of his life and became a father to three beautiful girls, he consistently volunteered his time to coach them in a variety of youth sport teams and also volunteered his time to help out at their schools.
- When I personally needed some help painting my home, Zeeker was the first to come to my aid since I was unable to complete the painting myself.  I offered him a financial incentive which he subsequently turned down!
- Zeeker's love for his family and the closeness he feels to his Lord is always on display each and every Sunday and on any holy day when he packs up his family and heads off to church.

There are countless other examples that I could document here but these few highlight the high degree of personal character that Zeeker has always been able to demonstrate.  Zeeker is a very giving individual, fine young man and father and has always extended a helping hand to others when and where needed.  He is a selfless individual that always sees the good in others and does all he can to be a better person, friend, neighbor, brother, son, husband, and dad.

I hope this is helpful and please do not hesitate to let me know if I can provide you with any additional comments or feedback on Zeeker's character and the fine young man that he has become.  I am blessed to know and have Zeeker in my life.

Sincerely,

# George V. Vancore, Jr.

1920 Perregrine Circle South
Saint Johns, Florida 32259
904-742-1470

**Letter from David Bozell**

Your honor,

I trust the Court is wanting to hear from those that know my brother best. That would be me. Zeeker and I are closest in age. I know my brother perhaps beter than anyone else on the planet. I know every speck of dust in his closet, so to speak, and he could say the same about me.

We didn't just grow up together. We went to the same schools, including college. We lived together as bachelors. We share nearly the same extracurricular passions, be it music or television or sports. We were each other's best man at our weddings. We even have the same-sized family, both of us fathers of three young girls, at nearly identical ages.

Sidebar: his nickname, "Zeeker," is essentially my doing. When Zeek was born, we were only 18 months apart, and I either could not or refused – I don't recall which -- to call my brother by his birthname. I gnarled the name, Brent, into "the beaker," then "the zeeker," and in the tradition of "the beaver" from *Leave it to Beaver* fame, the name Zeeker stuck.

I appreciate what you said during my brother's trial regarding our text messages. You said, and I'm paraphrasing, "let's be careful not to infer too much meaning in texts between brothers."

I understand the prosecution has a job to do to paint a certain picture, but a lot of what was highlighted by the prosecution was nothing more than exaggerated hyperbole between brothers. I think you were recognizing that reality in your comments. Furthermore, a lot of those texts presented by prosecution were out of context, out of chronological order, and skipped the 99.9% of the other communications that had nothing to do with any of this.

I know what his intentions were because he and I spoke and texted often about the logistics: my brother thought he was meeting one of his music heroes to put on an impromptu concert.

The amplifier in his car also proves it. Carrying this equipment in his car wasn't normal or convenient. My brother is not a musician who takes his gear with him wherever he goes. He's not a musician at all. Look in his car now and it's bound to have car seats and kids sports equipment inside. It would've been the same back then.

Prosecutors are arguing my brother barreled into the police line. Over the years, I've been on the receiving end of many a barrel by my brother. He played football, offensive and defensive line, in fact. He knows how to form tackle. I think the video proves my brother was talking to the officer and was then shoved from behind by surprise. I know he regrets the physical contact and he absolutely should've found a way to get out of the way, but had

he wanted to physically move the officer, my brother's physical moons would've been completely different.  I know that with certainty.

What kind of a man is my brother? He adores his children, and brags about them to the rest of the family regularly.  He dotes on every one of nieces and nephews and spoils my daughter – his Goddaughter – way too much.

Yes, most folks have people have support systems, people they can turn to for help.  But if ever a situation arose when I needed someone to drop everything they're doing and tend to my aid, and I knew without a shadow of a doubt that he would do it, I would call Zeeker.  I'm also confident Zeeker would be "that guy" for a lot of his friends.

He has the respect of his peers, and I could snap my fingers and have over a dozen of his friends, from every political persuasion, testify to his loyalty, friendship and generosity.  Many have offered.  Zeeker would never solicit them or accept them, but I know who they are, and they are many.

He works his tail off to put food on the table.  By all accounts the survival of the business, and the employees who work for it, rely on and depend on Zeeker's work ethic and success.

Roughly 14 years ago, my brother, his wife, and their two-year old and infant daughters lived in Fairfax at the end of a two-house cul-de-sac.  A single-mother, with two young children of her own, lived next door.

My sister-in-law, Dawn, was on maternity leave from being a Special Needs/Special Ed counselor for Arlington County. These programs are now commonly referred to as "exceptional" programs.

While my brother was at work, an emotionally disturbed and unstable young man came to their home looking for my sister-in-law.

He was a student of Dawn's from years prior and had a misplaced infatuation with her.  For months afterwards, he tormented my brother and his family, repeatedly showing up at their home, pacing the cul-de-sac driveway, circling the house, threatening the family, and provoking confrontations with my brother. He wrote disturbing letters, simultaneously professing his love for my brother's wife and threatening her and her loved ones.

My brother went through all the proper legal channels to remove this threat against his family, but reprieves were limited in both scope and me.

He was at a critical inflection point: stay at home, protect his family, and prepare for the inevitable additional confrontation with this young man, or give up everything and basically disappear.

Rather than risk confrontation, my brother made the difficult decision to leave his home state he'd lived in for his entire life. He le his small home improvement business he had created, and moved his wife and their young family hours away where they knew not a soul, with careers uncertain.

The decision to protect all involved, including the young man, is testimony to his priories.

As it pertains to his charges, I know my brother was no saint that day. I know he has tremendous remorse and regret about how his actions affected everyone that lives near and works in the Capitol.

I knew plenty of friends who worked in the building that day. The windows were devasting to learn about. We're humiliated by it, and I know he is as well.

I also know he tried to help a cop who had fallen victim to tear gas – he told me that from the very beginning.

I know he tried – perhaps erroneously – to speak with police to help all involved. He relishes being in the solution-providing business. Doing so that day wasn't smart -- and I know my brother didn't understand the gravity of the moment while he was in it -- but it wasn't out of malice or intent to harm anyone.

There's an old expression: *Put good out into the world and good will come back.* Every day my brother tries to put "good" out to the world, through his leadership in local business, his raising of three wonderful kids, his involvement in church, school and community.

And *good* comes back to him. Zeeker will be the first to tell you how blessed he is whether it's the love from his family, the appreciation of good work from his customers, the appreciation for the good pay he provides for his colleagues, or how a community of total strangers has embraced him and how much they value his contributions and volunteerism.

But specifically, he is also blessed to have been forgiven by some of those who were working in the Capitol that day.

I pray that your honor can forgive his transgressions and we ask for leniency for my brother so that the cycle of *good* can continue.

■ David Bozell

**Letter from Sheila F. Weaver**

April 11, 2024
6 Conway Drive
Middletown, PA  17057

United State District Court for the District of Columbia

To Whom It May Concern:

I worked for a home-improvement company.  The group as a whole, even those who professed to be devout Christians, made working there difficult.  The foul language, the temper tantrums, the mistreatment of people made it a very unpleasant experience.  The only bright spot – Leo Brent Bozell, IV.

Of all the people who worked there, you would think Brent would have been the unpleasant one since he is facing criminal charges and possible jail time.  However, he was always smiling, always pleasant, and never had an unkind word for anyone and never confrontational when he should have been.  Things at the company that would upset me greatly would not bother him in the least and he would talk to me in a calming manner to ease my irritation.  Since I left that company, I have chosen to keep in touch with only one person - Brent.

He has a strong work ethic – working as a salesperson for two different companies.

He is strong in his faith, attending mass at Seven Sorrows of the Blessed Virgin Mary Church every day without fail.  When I asked him how he can be so pleasant when he is facing possible jail time, he told me it is in God's hands.

Also to consider is the fact that he is father to two young daughters.  Jail time would affect them terribly and adversely.

Thank you for your consideration.

Sincerely,


Sheila F.  Weaver

**<u>Letter from Jennifer Bozell</u>**

As Zeeker's older cousin, I've known him for his entire life.  We have a very large family, and yet Zeeker was one of my favorite cousins as a child, and remains one of my favorites as an adult.  The reason? He is, and has always been, a kind, loyal, cheerful person, a man of integrity, intelligence and honesty.

Once, when my siblings and I were playing with Zeeker and his siblings when we were all children, our parents were observing our playtime.  I overheard my father (the father of 4 daughters) say, a bit wistfully, "If I had a son, I'd want a son like Zeeker." This has always stood out in my memory.  My father had never made a statement like that about anyone before, or since.  But my father saw what I see…what everyone who comes to know Zeeker sees.  He's a good man, and the rest of us are better for having him in our lives.

Jennifer Bozell
jbozell@yahoo.com
310-614-7320

**<u>Letter from Mary Bozell</u>**

To whom it may concern.

Leo Brent Bozell , aka Zeeker, is one of the finest young men in our huge family and of his generation.

He's a man of integrity.  He's a wonderful husband, father, friend , and nephew.

I've witnessed his spiritual and intellectual growth since his youth  He's very protective of his wife , daughters and ,yes, he came to the aid of our daughter who was in a difficult situation.

Please consider his wonderful qualities so that he can continue to do good works in the world

Thank you,

Mary  Bozell

713 962 4133

### Letter from Scott Alan Claiborne

To Whom It May Concern,

My name is Scott Claiborne.  I am Director of Development at a small commercial real estate development firm in Florida.  I'm a dedicated husband to my wife of eleven years, devoted father to my three, beautiful children and a proud, faithful Christian.

I write to you today to provide my loving support and reverence for my dear and beloved friend, Leo Brent "Zeeker" Bozell.  I have known Zeek for twenty-six years from Bishop Ireton high school and to Hampden-Sydney College where our friendship blossomed into what it is today—brotherly love rooted in a mutual respect and appreciation for one another and our lord and Savior, Jesus Christ.  In fact, Zeeker, through the tenets of the Catholic Church, is my godfather.  He stood beside me at my baptism and has always been there for me in the best and worst times of my life.  I know him to be a loyal friend and sterling example of what every man should aspire to be as a man, husband and father.  His very nature is one of earnestness, compassion, patience, and empathy for those he meets.

Our bond is that of brothers and, spiritually-speaking, given the rules of the Catholic church, I am a member of the Bozell family.  As you know, brothers can banter from time to-time with conversations rooted in logic evolving into ridiculousness and on to the absurd—"locker room" talk.  As a four-year varsity athlete in college, I've heard and said things that could only be described as boorish, foolish, insensitive, and outright stupid.  I've engaged in similar conversations with my brother, Zeeker, and I can assure you that amongst the various one-liners, "Simpsons" references and counterculture statement of the day, in no way was anything ever intended to be more than simple locker room talk.  It's not nor was it ever intended to be serious.

The accusations against my friend on January 6th are unfounded.  To use nonsensical chatter to accuse him of being a domestic terrorist is baseless and lacks real merit.  I ask you, sir, who among us is without regrettable statements/actions in our own lives?  Who among us is without sin?

Romans 2:1 says: "You, therefore, have no excuse, you who pass judgment on another.  For on whatever grounds you judge the other, you are condemning yourself, because you who pass judgment do the same things."

Zeeker deserves the same compassion, patience, and empathy.  Respectfully, I ask you to give leniency to a decent man, a committed friend, a loving husband and father, and, above all, a child of Almighty God.

Sincerely,

(Mod)

Scott Alan Claiborne

**<u>Letter from Father Tim Sahd</u>**



# SEVEN SORROWS B.V.M. PARISH

280 N. Race Street, Middletown, PA 17057-2298
Phone (717) 944-3133   Fax (717) 944-1170

April 15, 2024

To Whom It May Concern:

I am writing to you today on behalf of Brent Bozell IV. I am pastor of Brent's parish, Seven Sorrows of the Blessed Virgin Mary Catholic Church in Middletown, PA, and have known Brent and his family for all of the three years that I've been assigned as pastor here.

I have not really seen a Faith as strong as the one possessed by Brent. For a year or so, I had no idea that Brent had been charged for the events of Jan. 6, 2021. Brent came to Mass every week with his family, and was a faithful member of our parish. He never sought any distinction, and humbly lived his Christian Faith. As I got to know Brent and his family, I saw how close they were and how strongly they were tied together by their Faith and by each other.

At the center of this strong unit is Brent. He seeks to live his Faith and his life as authentically as possible. In our conversations, he has been extremely reflective on his experiences over the last three years, and how God has helped him navigate every step of the way. I believe this has given him a greater humility and the ability to reflect on those events and to see where he made mistakes.

But his growth in Faith has taken a real hold. He has signed up for an hour of prayer every Friday in our chapel, and is faithful to that, despite many other commitments in his life that could pull him away. His Faith is real and strong.

His relationship with his family is also extremely strong. He adores his girls and, along with his wife, Dawn, form an awesome team for them. He is so supportive of them, whether in sports, academics, learning about their Faith, or in the arts. Just last weekend, I had the privilege of seeing two of his oldest daughters perform in a school musical. Brent was so proud of them and actively encourages them to grow and experience life, so that they may use every gift they've been given.

I did not know Brent before January 6, 2021, but I know him now. I can tell you that he is a definite benefit to our parish, our community, and to his family. If it is in your power to show mercy in sentencing, I believe it would be a real benefit to our community if you showed it to Brent.

Thank you for your time, and if you have any questions, please do not hesitate to ask.

Fr. Tim Sahd
Pastor

(Modified graphics)

**Letter from Denise McCracken**

To Whom it may concern,

I am writing to you on behalf of Brent Bozell, whom I have known for more than 10 years. I am proud to call Brent, whom I affectionately call "Zeek," one of my closest friends. Brent is a person of great moral character who demonstrates integrity in all aspects of his life, including interactions with his friends, family members, customers at work, neighbors and even the strangers he meets on the street. He is loved and respected by many, including myself, my husband and our young children.

Brent was raised with strong Christian values and family has always been important to him. He is married to a wonderful and supportive woman, and together they are raising three very respectful and well-rounded school-aged daughters. His daughters look to him for guidance and support, and he never fails in giving them his entire attention and dedication.

Brent demonstrates a remarkable faith in God, man and country. I have seen a positive change in Brent following the January 6 events. He has grown even stronger in his spirituality, and his sights on the future have become even more focused. I am confident that he wants to move forward and lead a good life by example.

While this letter is focused on Brent's character, allow me also to mention the impact that the forthcoming decision will have on his family. I cannot comprehend the damage and heartache that a long-term absence from their father's presence will have on his young daughters at such a vital time in their lives, and the stress and heartbreak his wife will ultimately endure as she takes on the family responsibilities as a single parent.

I pray that this all will be considered as a final decision is made.

Sincerely,
Denise McCracken

--

Joe McCracken/MarJo Media

marjomedia.com

**Letter from Joe McCracken**

To Whom it may concern,
I am writing this letter on behalf of Brent Bozell.  I am proud and honored to call
him my closest friend and confidant.  We started out as neighbors nearly 10 years
ago when both of our daughters were in the same grade at the same school, and
our families quickly formed a lasting friendship.

My faith and trust in Brent are strong.  I am blessed to know that my children
admire him as another example of a strong, hardworking, patriotic and Godly
male figure in their lives.  He is a man of great integrity and moral value.  If you
need a helping hand, he is the first one there.  A few years ago, when my wife
experienced a miscarriage while at work, he insisted on accompanying me to help
comfort her, get her to the emergency room and drive the extra vehicle to our
home.  That's just who he is.

Brent recently helped my wife and I navigate through a difficult family
circumstance where wrongdoings were done, and his advice focused on
forgiveness and extending mercy to those who've harmed us, and not about
finding excuses for the offending person's behavior or pretending it didn't
happen, but rather forgiving them.

This is a man whose morning routine consists of dropping his three daughters off
at school and then attending daily Mass and picking up food to take to a homeless
person he randomly befriended one day. He has a giving heart. He is a good
person.  The world is a better place because of him.

On January 6, it is evident that those same qualities accompanied him.  Not only did
he help people stand up who had been pushed down in the crowd, he also aided a
Capitol Police Officer who had come into contact with pepper spray by getting him
water and helping to flush his eyes.

He is a husband and father whose family needs him close.  This sentencing not only
impacts Brent, but his young family, too.

I respectfully ask that you consider the details in this letter as you make your final
determination.

Sincerely,

Joe McCracken

--

Joe McCracken/MarJo Media marjomedia.com

**Letter from Susan Eckert**

Susan Eckert
59 Palmyra Road
Palmyra, PA 17078
sae4b3g@proton.me


April 16, 2024

The Honorable Judge Bates
Re: Sentencing of Leo Brent "Zeeker" Bozell

Dear Judge Bates,

It is my privilege to write to you as a character witness on behalf of Leo Brent "Zeeker" Bozell.  I, Susan Eckert, met him and his family in the summer of 2020.  He and his wife, Dawn, scheduled an appointment with the principal and faculty of a newer private school near their home in Pennsylvania, and I was the lead secondary teacher at the time.  Zeeker and Dawn impressed me by their profound love for their three daughters and by their determination to find the best possible environment for them – academically, socially, emotionally, and spiritually.  Hershey Christian Academy was fortunate indeed when the Bozells joined the community.

Zeeker and I got to know each other better when we drove students down for a field trip to the Museum of the Bible in Washington, D.C.  Like Zeeker, I was raised in the D.C. suburbs.  We knew the schools we each attended, although he is much younger than me.  Back at Hershey Christian Academy, Zeeker and his wife were among our most active parents, attending parent meetings, preparing and serving teacher appreciation treats, offering to help with after-school clubs, including a Bible club, and attending teacher-parent conferences *together*.  Zeeker offered to form, fund, and coach an intramural secondary school basketball team at a time when the school had absolutely no sports program whatsoever.  He also planned, funded, and led an evening glow-in-the-dark gym night for students, just to make them happy and to build momentum for a sports program.  As the lead secondary teacher, I was grateful for the input Zeek and Dawn gave when we discussed the developing secondary program and how it could best meet the needs of our students.  *Would that every school have a Zeeker Bozell!*

I also know Zeek and Dawn as fellow parents.  My youngest daughter and their eldest daughter shared classes together and developed a friendship.  I had no hesitation in letting my daughter participate in sleepovers at the Bozell home, knowing that she was safe and well cared-for.  Zeek would go downstairs to the basement where his daughter and her guests were and pray with them and for them before he went to sleep.  I also felt cared for when Zeeker offered to help me move residences twice.  He lifted and

moved heavy boxes and furniture, modeling service with a happy heart, with no complaints, as a friend. *Would that every neighborhood have a Zeeker Bozell!*

I no longer work at the school, and the Bozell girls attend another school, but I continue to be in awe of how Zeek continues to love his family self-sacrificially. While he works in sales so that he can provide for his family, he does not allow his job to conflict with his family's priorities. He works appointments around their activities so that he can be available to help out. Every sports practice. Every game. Every play practice. Every performance. Every church service. Every family gathering that they can either make or host (while living at a considerable distance from relatives). As a team, Zeek and Dawn are examples of self-sacrificial love to their children. *Would that every family have a Zeeker Bozell!*

In summary, I want to emphasize that Zeeker is a man of conviction. He invests in what he values. He embodies generosity in word and deed. He wants to give because he wants to be part of enriching the lives of others, beginning with his family and extending into his community. *Our society needs him and others like him.* He is energetic and innovative. He's creative. He doesn't wait for others to do something that he can do.

I desire a good outcome for Zeeker because he is a good man. He has proved that over and over again to me ever since I met him. I don't want his family to experience the upheaval of a prison sentence. It would devastate them. Practically speaking, the family would forfeit his income, his presence, his practical help and service, and his irreplaceable emotional support and encouragement. His wife would suffer tremendously to be able to provide practically and emotionally for their three daughters. I do not see that such sentencing would serve any corrective or otherwise valuable purpose. Therefore, I request the lowest possible option on the sentencing spectrum for Leo Brent "Zeeker" Bozell.

Thank you for your service and for the privilege of your time.

Yours respectfully,

Susan Eckert

**<u>Letter from Charles P. Daglian, Esq.</u>**


**LAW OFFICE**
**CHARLES P. DAGLIAN**
**115 E Saddle River Road**
**Saddle River, NJ 07458**

CHARLES P. DAGLIAN

(973) 979-1617


April 17, 2024

The Honorable John D. Bates
United States District Court Judge
U.S. District Court for the District of Columbia
333 Constitution Avenue, Northwest
Washington, DC 20001

Re:  Leo Brent Bozell IV

Dear Honorable Judge Bates:

I am writing to the Court to provide a character reference for Leo Brent Bozell IV who I know as Zeeker. I am aware of his appearance for sentencing and I would like to express my support for leniency in that sentence.

I have know Zeeker for over 20 years since he met and married my niece, Dawn. We are a small and close family and spend a great deal of time together at family functions and vacations.  I have watched Zeeker progress as a man, husband and father.  He is devoted to his family and extremely involved with his 3 daughters.  I have been present to watch that interaction and it is warm and loving. I am sure the girls would be devastated by any absence of their Father especially at this time of their young lives.

I can speak to Zeeker's integrity and strong moral character.  As an attorney and former Prosecutor I always admired his personal conduct in his business sales dealing with families. Often he was more concerned with their situation than " making the sale". I have often seen deceptive practices in businessmen that I have prosecuted.  I saw none of that in Zeeker.

While I can not speak to this pending charges against Zeeker, I can say without hesitation that this is an aberration and conduct not likely to occur again. Zeeker has been remorseful to me in every conversation we have had about his situation.

I know the Court must weigh the aggravating and mitigating factors in any sentence, and in this matter, I would respectfully submit to the Court, that there is substantial mitigation, that warrants leniency in sentencing Zeeker.

Respectfully submitted,

Charles P. Daglian, Esq.

**Letter from Rebekah Manney**

April 22, 2024

To Whom It May Concern:

My name is Rebekah Manney. I am a mother of three young children. I first got to know Mr. Bozell when my children attended the same school as his children. In all my interactions with Mr. Bozell as a parent, I felt he was very genuine, always showing love and concern for his family. His actions on January 6, 2021 seemed very out of character for him. He was always an enthusiast man, but never violent or ill-tempered. In the aftermath of the event, he showed appropriate remorse for his actions. His family was once again his clear priority.

I believe that everyone makes mistakes, but I also believe that the goal of punishment should be to change someone's heart. In Mr. Bozell's case, the punishment has been lingering over his head for years. The stress of that alone has been a punishment for his actions. I do believe that Mr. Bozell has learned from this event. I hope you will see that he is a devoted husband and father. I pray that the court's decision will help both he and his family heal and move forward.

Sincerely,

Rebekah Manney

**Letter from David Horner**



To: Honorable Judge Bates


My name is David Horner. I am the owner of Basement Waterproofing Solutions, Inc. I started my business in 2000. I am an Air Force veteran. We are a service business that solves homeowners water intrusion issues as well as mold remediation and structural issues that impact their everyday health and emotional wellbeing.

Brent Bozell contacted me in April 2014 with an interest in joining my company. I had not advertised or was actively seeking a sales rep at that time. I have always been protective of the image my team and I have built. Being in the home improvement industry for many years I have seen my share of sales reps that use very questionable tactics that take advantage of homeowners to benefit themselves first. Brent told me that the reason he wanted to work for me was because my reviews showed I was honest with homeowners and completed quality projects.

Brent was persistent, asking for a chance to prove himself to show me that he was not like the other sales reps. After numerous conversations I was convinced of his character and commitment to help others. He is family oriented and offers his available time to youth sports and activities in his community.

The feedback I get from our clients about Brent is consistent. He is not a high pressure "one call close" individual. He genuinely Looks for ways to solve their problems. The things I hear are about his honesty, integrity, and professionalism. Brent is an in-home inspector. Because he is initially a stranger meeting people for the very first time, he must be able to be non-threating and be able to have a respectful persona. Brent does this. He is a good fit for my business. Brent is looking for ways to solve the problem even if it does not include work for our company. This is unique for a commissioned salesperson that only gets paid for work that is completed by us and is using his time and is paying for his own travel expenses.


I am 71 years old and have come to rely on Brent to take a lot of the workload from me. This year will be 10 years working with Brent. He is a valuable asset that quite frankly I could not afford to lose. Hiring a replacement will be impossible as finding an experienced and honest individual without all the bad habits that are found in the home improvement industry. As my only inspector Brents loss of income would also affect the livelihoods of our crews and their families as we all rely on Brents flow of business. Lastly, many homeowners will be at a loss . His willingness to help people that call us

for help for issues that we do not service many times saves them hundreds and in some cases thousands of dollars.

As his sentencing approaches I ask that leniency consideration for , in my opinion was a short lapse in judgement during the January 6 TH. rally and not consistent with Brents character. I know he feels the same.

Respectfully,

David S. Horner

(Mod)

Basement Waterproofing Solutions, Inc.

(Mod)

Toll Free 800-390-9271  •  Local 717-846-1117  •  Cell 717-495-3190  •  Fax 717-755-6415
Email dhorner@bwsdry.com  •  Web www.bwsdry.com

## Letter from Leo Brent Bozell III

Dear Judge Bates,

I am Zeeker Bozell's father, and speak for my son as only a father can speak of his son. No father can vouchsafe for the perfection of his son, and I don't. Nor should a father ever excuse the inexcusable behavior of his son, not to anyone, to include the judge who will determine his fate, and I won't do that either.

But I will state categorically here what I would say if I was on the stand, under oath: My son is a good man. In fact, as you've read, or will read in the character letters sent on his behalf, his goodness is extolled by everyone, family, friends at every stage of his life, neighbors, professional associates, clients - everyone. Every testimonial tells the same story. Zeeker is not just a good man, he is a noble soul with a generous heart and a lifetime of good deeds directed toward his fellow man. A good man sends a contribution to an organization that brings a meal to a destitute woman living under a bridge. A noble soul does so himself, day after day - and for months his parents don't know he is doing this because noble men do this quietly, seeking no acclamation. A good man provides a home for his family. A noble man told by the police that they cannot guarantee his wife's safety from a stalker, and advised to move to another state immediately, does so without a single word of complaint, or a single regret, perfectly content to start all over, with all of the attendant hardships that would bring because that's what noble men do. A good man offers condolences to a family whose son has just been murdered. A noble man rushes to their home to offer consolation and doesn't leave their side for days.

But even very good men make mistakes, and Zeeker did on January 6.

I believe all in the Bozell household voted for Trump, but we were not unanimous in our analysis of the election results. Some joined with the sentiments of almost 50% of America that believed the elections had been stolen, others disagreed. We are a political family, and have been for generations. As such there was great discussion over the subject, be it by phone, by email, text or dinner conversation. Passionate? Of course, if you felt your greatest gift as an American - the right to vote - had been stolen. But never, *ever* was there a discussion of violent behavior - planned, proposed, considered, raised or even mentioned.   It is easy for me to make that statement of fact. Not one of my children has *ever* behaved in that manner.

Opportunities for angry political activision, on both sides of the political divide, have presented themselves for years. Social media, the public square where man visits his fellow man, has been poisonous, with dark vitriol being spewed on all ends. Between the elections and January 6, social media was ablaze with anger over the outcome, with tens of millions of Americans believing their vote, and the presidential election, had been stolen.  It is a mark of Zeeker's character that he never participated in *any* of these discussions. The *only* organized effort he joined after the elections, as a result of the elections, was a prayer group in his hometown. Day after day gathered with that group - and they prayed. That is not the mark of a man of violence. That is the mark of a man of peace.

But men of peace can make mistakes and Zeeker did on January 6.  He owned up to this from the very start. He made no excuses, not to his family and not to the court. He knew what he did was wrong, all circumstances notwithstanding. He pled guilty because he was guilty, and was prepared to take his punishment. It was distressing to his brother and to his father in the courtroom that the remorse he's expressed to his family, with humility, did not evince itself in his testimony. But it's been there from the beginning.

I have remained silent for the past 3 1/2 years because I didn't want to tip the apple cart of justice. But given what I saw in the trial, and more importantly learning about this terrorism enhancement, I no longer can. I believe there is more at play here.

 The Justice Department clearly investigated everything about my son leading up to the trial. They had access to all of his phone records, his texts, his emails, his friends, his neighbors, his co-workers - everything. Certainly they learned everything about him because his life is an open book, and the goodness everyone has documented has been there for them to see. Why then the desire to paint him as a monster? Why slam him with an assault charge when to know him is to know that he'd take a bullet for a defenseless policeman, or run into a burning building to save a fireman in distress? Literally, not figuratively, and without a moment's hesitation. It is why on that day he brought water to a policeman suffering from tear gas when no one else would. It is why he crossed a room and forcefully (and successfully) demanded a protester sheath a baseball bat in his backpack after that man had ignored similar demands from a policeman.  It is why, when a policeman was knocked to the ground, it was my son who offered him a helping hand to his feet. We would have expected nothing less from him.  The prosecution knew all of this, and yet it meant nothing to them.

I am not pleading my son's innocence, only that his punishment match the crime. I am asking the Court to consider my son's character that is sterling and is being defended by absolutely everyone around him. I ask that you consider their words as words of honest men and women speaking honest truth. Every single one would recoil in horror in your presence were they told he should now be considered a terrorist.

We are grateful that your reputation for fairness precedes you. We are grateful that you've allowed our pleas to be heard.

Sincerely,
L. Brent Bozell III

**Letter from Max and Jill Cedeno**

Max and Jill Cedeno
1384 Bradley Avenue
Hummelstown, PA  17036

April 21, 2024

To the Honorable Judge Bates:

We are writing on behalf of Zeeker Bozell, who we have known for the past 4 years.  We had the privilege to meet him and his family when our kids were in school together.  During this time we have spent many outings and events with his family and have witnessed his dedication as a husband and father.  Over this time we have developed a friendship with him and he has been there for our family during the loss of a parent.

His involvement with his girls is an example to many. As Jill was PTO president and very involved in the school, we could also count on Zeeker to be there and help out.  He volunteered with the basketball program at the school, chaperoned field trips and helped with many school fundraisers.

It is our sincere hope that the court takes this letter into consideration at the time of sentencing. We believe Zeeker to be a valuable member of the community and a good human being.

Sincerely,

Max and Jill Cedeno

**<u>Letter from Justin M. Shoemaker</u>**

April 23, 2024

To:     The Honorable John D. Bates

        United States District Court Judge

        U.S. District Court for the District of Columbia

The purpose of this letter is to provide a character reference for Leo Brent Bozell IV, also known as 'Zeeker'. I met Zeeker at the start of our 7th grade year (32 years ago) at Saint Louis Catholic School in Alexandria, VA. Within the first few weeks of school, we became great friends. As it often occurs in life, many friends come and go; however, Zeeker is the type of friend who never "goes." I have witnessed hundreds, if not thousands, of interactions with Zeeker over the past 30 years, and it is crystal clear why people naturally gravitate towards him. He never, ever condemns, or passes judgment on anyone. It does not matter where a person comes from, or what they do, or where they live. He genuinely cares and wants to know about you. He never forgets what he is told and follows up weeks later with even his newest friends to check in (upcoming surgeries, aging parents, stressful pregnancies, etc.). In this regard, Zeeker makes people feel seen, heard, and loved. And this is only newer friendships I am describing. As one of his oldest friends, I am forever grateful to have Zeeker in my life. I have always candidly described him to others as "a genuine, good guy." Zeeker would, and likely has, give a stranger the shirt off his back (and then invite him into his home for a warm meal and a kind ear). He will pray with you, or if you are not comfortable praying along with him, you may just get a prayer card in the mail with a note to let you know he is praying for you. He has a heart of gold and cares about everyone he meets. The world would be a better place if everyone had his heart. The first 10 years of our friendship are packed with some of the most fond memories. We played sports together through junior high and high school. Often playing basketball in each other's driveway during the summer, or on the high school basketball court in the winter season. We had much in common growing up, including the same groups of friends. The both of us also had very supportive, loving, and caring families. As a young man, spending time in Zeeker's house with his parents and siblings was always a special occasion. While it could get chaotic at times, with his parents, three brothers, and his sister moving about, being shuttled to and from activities and practices, I was always impressed by the kindness and happiness that collectively and consistently radiated from the Bozell household.

After our college years, and for the past two decades, I have had the absolute privilege to watch Zeeker get married to his wife Dawn and then become a father to three beautiful girls of his own (S.B.,Ka.B., and Kelsie).  Just like the home he grew up in, Zeeker's immediate family is bonded tightly together with generous amounts of love and kindness. As busy fathers, it is always a little more difficult to get together, but whenever we do get a chance to meet, the entire day is spent talking about our families. There are very few friends I will talk with who want to spend all their time discussing their children. Zeeker is different… his three girls are the air he breathes. He has always been so proud to be such a huge part of their lives. Celebrating milestones like crawling, teething, and walking, to elementary school parties, field days, birthday parties, coaching, play dates, and athletic achievements… there is not a single thing Zeeker misses, and he always lights-up, enthusiastically when telling me about all of these experiences with his daughters.  As I became a husband and a father of four children of my own, I often strive to emulate the energy and enthusiasm that Zeeker brings to being an amazing father and husband.  This includes my most recent conversation with Zeeker. Knowing his court case was approaching, my wife and I were very concerned with how Zeeker and his wife were coping, imagining the stress they must have felt. I called to check in only a few weeks ago, not knowing what to expect with our conversation. The entire conversation was spent asking about my wife and kids, and as always, not just letting me talk, but asking questions because he genuinely cared. He then went on to tell me he recently went to his daughter's play. He was so proud and did not leave out a single detail. This is the most typical conversation with Zeeker; however, my heart was heavy as I was listening this time, knowing there is a chance he could miss even a single minute of his precious girls' lives. They are his universe, and he is theirs.

When I think about the day of January 6, I would never imagine Zeeker to be a threat to anyone. I know from the bottom of my heart and with utmost conviction that Zeeker got swept-up in the frenzy of the day.  This one moment in time is in no way a reflection of Zeeker or his character.  I can say with the sincerity and confidence, Zeeker did not intend to cause any sort of commotion while he was in attendance. In fact, in typical 'Zeek' fashion, he was looking at that day as a way to bring people together in a peaceful fashion. He had no ill-will. As long as I have known Zeeker, he has never scared, hurt, or caused emotional harm to another person. It is the exact opposite. Zeeker can be passionate about things he believes in, which is a quality I admire.  He may have made mistakes, and errors in judgment; however, I can confidently say Zeeker would never hurt another human being. I can only imagine the pain he feels when he is accused of being a threat during January 6, and I am certain it is a day that will haunt him forever.

I continue to hold the highest regard for Zeeker.  He is the same person of great faith, integrity, character, and morals that I met over thirty-two years ago. For Zeeker, I know the stress that has been hanging over his head these past three years has been a horrible punishment on its own. He has spent more time, resources, and heartbreak, taking away the precious time he could have been dedicating to his family. That alone breaks my heart for him and his family, because Zeeker is the personification of an amazing father and husband.  Continuing to create a stable, loving, and happy environment for his wife and three daughter is his greatest passion.

I kindly and respectfully request that you take my statements within this document into consideration as you deliberate.  I can say with certainty that Zeeker has suffered a tremendous deal over the past three years.  The events of that horrible day and the resulting aftermath have been etched into his persona and will undoubtably lead to exercising the soundest judgment in all experiences throughout the rest of his life.

Please do not hesitate to contact me if you should require further information.  I'm happy share more information and instances of Zeeker's integrity, honesty, and sound moral character over the past three decades.

Respectfully,

Justin M. Shoemaker

**Letter from Dawn Bozell**

Your Honor,

     I know you will read many letters testifying to the high moral character of my husband, Brent, or Zeeker, as most family and friends refer to him, and while those letters are significant and so very appreciated, I hope you agree that my letter is the *most* important, as I write for my children.

     As Zeeker and I have suffered the pain and humiliation of his once good name and reputation being eviscerated online and in the media over the past few years, we have made it our absolute highest priority to protect our children from this entire situation as much as is humanly possible. Please know that even while you read this letter, my three beautiful, innocent daughters have no idea the fate that potentially awaits them. We have managed to protect them from this entire nightmare, they have no idea that their family may be torn apart in the next few weeks.

     While I have dreaded this moment for months, the moment I plead with the person who controls my family's future, I have thought about what I should say to you; what you need to know about Zeeker, myself, our daughters, and the life we have built together over the past 20 years. I hope you read each word.

     Zeeker and I met and married and started our family in Northern Virginia, where I had worked for years as a special education teacher. Due to a terrifying stalking case with a mentally ill former student, we decided out of necessity and fear for my safety to leave the area. We moved away from the comfort of having Zeeker's family close by, where he had lived his entire life. He put myself and our children's safety above all else.  We are now raising our daughters in a small, tight-knit community, and I trust my neighbors with my children's lives.

     We have three exceptional daughters, S.B. (16), Ka.B. (14), and Ke.B. (11). I honestly wish you could meet each of them, so you would think of them while determining what their future holds. Maybe the first thing I should tell you about them is how much their father loves them and is as involved in their lives as much as any father could be. He has been coach to each of them, ensuring that he was a driving force in teaching them good sportsmanship and instilling in them a love of all sports, but basketball in particular. He led S.B.'s 6th grade Catholic school basketball team to their first championship season. That moment is captured in photos all over her room and is probably one of her most cherished childhood memories with her father.

     Although he is far from a soccer player, when 10 year-old Ka.B.'s soccer team lost their coach, my husband was the dad that stepped up to the plate to take over, if for nothing else than to spend that precious time with his daughter. It was not a winning season, but neither of them would have had it any other way. Despite the losing season, when a more qualified coach was hired, the team dissolved, with parents citing that they only wanted their daughters to play for Coach Bozell. That's the level of trust our community put in my husband.

     Ke.B. is our youngest, the baby of the family. Knowing the joy he found in coaching S.B. and Ka.B., Zeeker has coached Ke.B. since she was old enough to step onto a field. Sadly, since the news first broke of Zeeker's arrest, he was asked to step down as a coach. Of all the things we have lost over the past few years, this was one of the hardest for Zeeker. In an effort to protect our girls from the true

reason he is no longer allowed to coach in our community, we made excuses that work was too busy, etc., but our hearts have broken a little more every time a new season starts and they wonder why their dad suddenly can't find the time to coach them anymore.

Zeeker is also the kind of dad that goes on the school field trips, volunteers for the school holiday parties, and everything in between, just to spend more time with his girls. Since the arrest, those opportunities are also gone. Once the news of his arrest broke, the people in our small town turned on him. People we'd never met were so very vicious online, slandering him and humiliating me. I've never felt so alone. This was devastating.

As our daughters have gotten older and conversations shifted from Barbies to boys and school cliques, Zeeker has prided himself on cultivating open, trusting relationships with our girls. They don't just come to mom for advice, they go to dad. Our daughters could take the bus to school, a 25 minute drive, but Zeeker insists on driving them to school every morning, just for the quality time that affords him. He is the dad that wants to hear all the gossip, listens to their problems with deep intent, never down-playing their feelings. After school, he pauses his work day every single day at 3:30 to pick them up from the bus stop and drive them one block home to our house. He attends every single sporting and school event without fail. He puts everything, including his job, second to his family.

Zeeker is the funny dad, the one who can joke around with all of our daughter's friends, that blasts the music while driving them to and from school or around town. On any given weekend our home is filled with teenagers. Our daughters *want* to hang at our house rather than going to someone else's home. The parents of our daughter's friends trust Zeeker and I implicitly with their children. While most parents today are inherently distrustful of others, they do trust us. Our home is THAT home – the one where parents continue to leave their children in our care, despite knowing about his arrest.  I don't even know what weekends at our home will look like if Zeeker is taken from us. I don't know what life will look like or how we as a family even go on with the void that his absence will create in every aspect of our lives.

Together, Zeeker and I have created a warm, safe environment for our daughters and their friends. On one occasion S.B. had confided in us that a friend was struggling, even hurting herself. It was Zeeker that carefully and thoughtfully explained to S.B. that we would need to reach out to that girl's parents, that it was the right thing to do so she could get the help and care she needed. He taught her that this was being a true friend. This only brought S.B. closer to us.  On a more recent occasion another one of S.B.'s friends had a terrible fight with her father. Her mother called Zeeker and I and asked if she could bring her daughter to our house until things had calmed down in theirs – she trusted us to watch over her daughter while she was vulnerable and upset.

Your honor, since you are in control of how long my children may lose their father for, I want you to know at least a little about them and the devastating effects this will absolutely have on them.

S.B. has the voice of an angel and never stops singing. She just starred in her high school musical, Hello Dolly as Dolly. She is a straight A student, was just accepted into the National Honor Society, leads the chapel praise team in school, is on the track team and was recently Ka.B.'s confirmation sponsor. She has so many friends and is a well-adjusted, beautiful, mature, outgoing young lady.

Ka.B. is a basketball and soccer star, a theater star, an exceptional artist (who was chosen to paint a mural on a local art studio building this summer) and has the kindest heart of anyone I know. She won the Bible passion award at school, was MVP of her basketball team, is also a straight A student, and wants nothing more than to make everyone around her feel good. As special as she is, she is humble. Her dad and I are so very proud.

Ke.B. is a spit-fire. She is sassy, but kind. Academics don't come as easy to her as they do to her older sisters, but she is determined and works very hard. She is also an amazing basketball player and is a budding Ninja competitor. A sport new to all of us, but one that her Dad is learning everything he can about, just because she loves it.

I share all of this with you because I need you to know how completely and utterly terrified I am of their perfect, safe, innocent world being shattered if their Dad and I have to sit them down and tell them they are losing one of the most important people in their entire lives. I just don't have any comprehension of what that will do to them. I don't actually have the words or language strong enough to truly express my fear of the trauma this will cause them. Will they go into a depression, will they isolate themselves, will the social implications of having a father incarcerated be just too much for them to handle? These are the questions that I can't escape each and every night.

These girls are my only priority. They are the most important thing. They do not deserve to have their lives shattered, to lose their father. Zeeker and I have taken every precaution to protect them from all of this. Removed the internet on their cell phones, change the channel whenever a news program comes on. We ensure every conversation on this topic is in hushed tones behind closed doors. I am so scared that breaking their hearts and shattering their world is inevitable. And for that, I beg you for your mercy.

Zeeker and I have both tried to be positive role models for our girls in all aspects of our lives. They watch us and absorb so much more than we ever give children credit for, so with that in mind, we both strive to be productive members of our community. When we have a friend or relative in need, Zeeker is the first one to offer help, to offer prayers (always having our girls join him in prayer for whoever may be struggling or in need). Zeeker works in home improvement sales. He is always sharing stories of how he saved a customer money by being honest, rather than taking advantage of customers when he or others could. If you were to ask any of my children what their father does for a living, they would not say "salesman," instead, they would say that he helps people.

Zeeker is an upstanding member of our church. The girls see him dedicate his time and energy there. We go to church as a family every Sunday, and on those weekends that we just can't get to Mass because of all the kids' activities, Zeeker will lead the girls in a Bible study lesson instead.  Please believe me, Your Honor, when I tell you that I know this sounds too good to be true, but please know that every word I have written is an honest account of our lives. My husband leads my children in saying the rosary and a bible study when we miss church. One would also think that kids would hate that, but honestly mine love it. In fact, I'm the one typically looking for other tasks to do, while my kids are guilting me into joining them.

I hope that I have captured what our family and our life looks like. I also hope you can appreciate that I feel like this will all crumble without him.

Your Honor, my husband went to Washington DC on January 6 to meet up with his favorite rock star, a man named Jesse from a band called the Eagles of Death Metal. For weeks, maybe a month, leading up to the march, I heard about little else other than Jesse. Zeeker absolutely loves this man and his music. I've never personally seen him play, but my husband has, on more than one occasion and even met him in person following one of Jesse's shows. They connected online prior to January 6 and Jesse actually agreed to fly to Washington DC to play if Zeeker could figure out how to make that happen. Every single day Zeeker was hard at work, on the phone, trying to figure out how and where and when to help Jesse play music that day. There was talk of building a small stage/platform on wheels with some type of amp/electricity set up so they could pull Jesse to different areas to serenade the citizens throughout the day. There were parking inquiries, could they build and leave said platform somewhere in a parking lot or at a meter so it would be ready to go on January 6 when Jesse arrived. There were conversations about finding another musician, a drummer, to accompany Jesse. There were conversations with friends and I believe even congressional staffers in an attempt to make all of this happen. Your Honor, **these** were the conversations in my home leading up to January 6. I had no reason to be concerned for my husband's safety, I had no reason to worry about him attending this march at all. This concert endeavor was his sole reason for going to the march and was all-consuming of his time in the weeks and days leading up to it. That is why it turned out to be so devastating that, at the very last minute (after my husband arrived in Virginia) Jesse was not able to come. I honestly cannot remember if he got sick or missed his flight – or both, but in the end, he was no longer coming.

My husband ultimately decided to still go to the march. I wish to God he had not, but I had no reason to persuade him not to. He was going with his mom and siblings. He assumed he'd be home in time for dinner. I still remember that afternoon when he told me that they were heading to their cars to drive home. I had no reason to worry or expect anything out of the ordinary. There was no way of knowing that my entire life would change in the days that followed.

The FBI raided my home. While my children slept. I woke up to a nightmare – armed FBI agents with automatic rifles aimed at my house as the sun came up. Banging on my front door and yelling to open up. It was exactly like it is in the movies. My children woke up to this. They saw the guns. In their home. They heard them yelling. They saw them take their Dad. I will NEVER be able to forget that morning. My daughters faces with tears streaming down, confused and terrified, will forever be ingrained in my mind.

I still don't quite grasp how we were ultimately able to convince our daughters that everything was ok after that morning. I know they went to bed scared for so long, with visions of waking up to police with guns drawn in their home every morning.

Your Honor, I understand you have guidelines for sentencing. I understand you have a job to do, but I am praying that you also have compassion that will factor into your decisions.  That you will weigh what my husband was found guilty of that day and the price my children and I have already paid and what it will cost us if he is taken from our home.

I don't know how to do life without him. Everything from raising three children on my own to the things he does that I don't ever have to think about – taking care of things around the house, or maintenance on our cars, he takes care of our taxes, he winterizes the home, he takes care of the lawn, etc. I know these things seem trivial in the grand scheme of all of this, but they just represent more ways that I will be paying the price. Then there are the bigger things. It takes both of our incomes to pay the

mortgage and the bills. How will I keep my children in their home? Will they lose their dad and their home too? What happens if I get sick – who will take care of my kids? Who will make sure they get to their activities and school? I will be a single mother with no extended family in the area to even help.  I am so scared.

Zeeker and I have been together for 20 years. 20 years we've never spent more than a week apart. I cannot even fathom months or years. I cannot imagine picking up the phone and not being allowed to talk to him. I cannot imagine seeing him actually incarcerated. I get a pit in my stomach to think of him like that. I will never bring my children to a prison. I cannot do that to them. Will that bring more trauma? I honestly do not know how to do this. I never imagined, in my wildest nightmares, that I would be in this position.

Please know that I am not writing this letter to tell you what a great person my husband is. I am writing this letter begging for you to consider all of five of us when you sentence him. Please think of S.B., Ka.B., and Ke.B. and what their Dad's sentence means to them and the trauma they will inevitably suffer because of it. To think that he could miss high school graduations, birthdays, teaching our girls to drive, boyfriends, heartbreaks, proms, college tours….their lives. I don't know how to do this without him.


Thank you Your Honor.


Dawn Bozell

### Letter from Justin Weiner

The honorable Judge Bates,


My name is Justin Weiner. I hope this letter finds you well. I am writing to you today not as a legal expert or an authority on matters of the court, but simply as a friend advocating for someone dear to me. I understand the gravity of the situation before you, and I appreciate your time and attention in considering my words. I am writing to express my unwavering belief in the character and integrity of Zeeker who stands before you today. In the time that I have known Zeeker, I have witnessed firsthand the depth of his compassion, his unwavering sense of responsibility, and his commitment to making the world a better place.

Zeeker and I have known each other for over 30 years. We attended high school and college together and have stayed well in touch with each other since. We both got married to women well out of our league. I was a groomsman at his wedding and Zeeker was a groomsman at mine. When my wife passed away suddenly in 2014, a few weeks after giving birth to my daughter, Zeeker was the first person I called to relay the devastating news. He was there for me during my grief with unwavering support. In fact, Zeeker stood next to me while I gave my wife's eulogy. I would ask him to stand next to me again without hesitation even today.

Zeeker is the kind of person who goes out of their way to help others, often without seeking recognition or praise. Whether it's lending an ear to a friend in need, or simply offering a kind word to brighten someone's day, Zeeker consistently demonstrates an exceptional level of empathy and generosity. Beyond his heart, Zeeker is also a person of remarkable integrity. He possesses a strong moral compass and holds himself to the highest ethical standards in all aspects of his life. I have always admired Zeeker's unwavering commitment to doing what is right, even when faced with difficult decisions or challenging circumstances.

Your Honor, I humbly ask for your leniency and understanding as you consider Zeeker's case. I believe wholeheartedly in his capacity for redemption and his potential to contribute positively to society. I kindly urge you to consider the entirety of Zeeker's character and the positive impact he has had on those around him.

Thank you for your time and consideration. I trust that you will weigh all factors carefully and make a fair and just decision.


Sincerely,

Justin Weiner

## Letter from Norma Bozell

To the court of Judge Bates regarding the case of L. Brent Bozell IV, (Zeeker) who resides in Palmyra, PA. Here are the highlights which speak to the man we call Zeeker:

Before meeting Zeeker, my daughter-in-law Dawn taught 9th grade at Wakefield High School in Arlington, VA which specializes in special needs and learning disabled students. She had a student in one of her classes named Jamal_____.

Fast forward 6 years, Dawn and Zeeker are now married and live in Alexandria, VA with their two young daughters, ages 3 and 1. My son had just left for work when a 20ish year old big man appeared walking up and down their driveway. He rang the doorbell as Zeeker returned home at the request of his wife. Zeeker asked him if he needed anything and Jamal responded that he was looking for Ms. D. Dawn did not recognize him. Zeeker said he owned the home and there was no Ms. D. there. After Jamal raised his fists as if to fight him, Dawn called the FCPD. He slowly left the property and they subsequently picked him up a couple blocks from the house. He told the cops that he wanted to see Ms. D. and he wanted to "F*^*^K" her. The police did not arrest him but told my son he had mental problems and they would increase patrols through their neighborhood. Dawn established that he was in fact one of her previous students from years ago. His last known address was in P.G. County, Md. He had a drug distribution record and was on probation in MD. Under advice from FCPD, Dawn and the babies came to stay in our home in the Mt. Vernon area of Alexandria.

He returned the second time to an empty house but the neighbors saw him walking the perimeter of the home, trying the doors and windows. Zeeker contacted police and was told he was being questioned a short distance from the home as a merchant had called to inform them that he was looking into car windows at the shop's parking lot. Zeeker sent his wife and children down to Florida to be with her parents. She was too frightened to be in her home alone.

Zeeker, as advised, purchased a shotgun. This stalker had threatened his wife and family and Jamal was certainly in need of medical attention. Z was also told he had every right to defend himself but he chose to resolve this in a peaceable manner. He knew he would return and sure enough, on the first sunny day he came back on the property.

Jamal knocked and then pushed open the front door of the foyer and Zeeker held him at gunpoint. He had already called FCPD and walked him back out of the house telling him the police were already on their way. He kept him at bay until police arrived and he simply stated, "you can go now, they are here for YOU." He was taken in but on the way to the station, he kicked out the back window of the cruiser. They sent Jamal to a psychiatric facility in Harrisonburg, VA for months and while there he smeared his own feces on the walls of his room. It was determined that he was "restorable" as long as he continued on his medication. In the court proceedings, he received 30 days in jail with a restraining order in effect. Zeeker spoke with Jamal's mother and stated that they had to keep him on his meds otherwise he was guaranteed to hurt someone or himself. He said he could not guarantee her son's safety if he chose to return and threaten his family. They exchanged phone numbers and through the years have had more than a few conversations. He has always been respectful of her.

The best solution for Zeeker and Dawn was to move away and so they did. They picked up their lives and their girls, left their careers and his childhood home town, friends and family and moved to Pennsylvania. I remember asking Zeeker about those scarry days, when his wife was terrified and he was faced with keeping this sick individual from harming his family, if he was thought Jamal would find them in PA. He was confident he would not. "God put Jamal in my life to save his life, not to end it." This is my son, in so many ways, not the person the prosecution painted at his trial.

My son has always been a lover of life.  When I told him his father and I were expecting our fifth child at the age of 41, (my oldest is already in college, Zeeker a senior in high school) he picked me up with joy and threw me in the air and made me feel like a million dollars.  Today his littlest brother is Zeeker's best friend.

He took a bunch of 10 year old boys that he had never met except for his little brother Joey, at the age of 15, and coached them to the basketball championship 3 years in a row.  Two of them they won.  Most had never played on a team before.  Years later, my sister-in-law with the same last name met a shop owner who asked if she knew a Zeeker Bozell.  "Yes, he is my nephew." she explained.  The owner told her " He changed my son's life, he was very quiet and had never played on a basketball team."  One game day, the friend of a Army Major whose son played on Zeeker's team was there to watch.  He was the Head of Admissions at West Point and was so impressed with his leadership skills that he introduced himself to Zeeker and told him to come up for a visit.  He wanted him to apply for a commision.  We were reminiscing recently about the team so I could write to you about it and Zeeker told me he returned to his gym after college and found that 7 of his former players were coaching their own teams.

Zeeker had incredible leadership skills.  He started a ping pong club at school.  He won an award for his Optimist Club presentation on drugs and suicide.  He taught elementary students Catholic Catechism classes.  He played sports and swam as a young boy.  He played basketball and football in high school.  He wrote on the sports page at Hampden Sydney College.  He is fiercely loyal and won't let you criticize people; has even scolded me if I complain about lawyers or the parole office he deals with in PA.  He said, "don't Mom, they are all good people and have been fair with me."  He walked with a prayer group in the days leading up to and after the election, reciting the 15 decade rosary.  He told me, "Mom, I want to be like these people."  He was his brothers' best man at their weddings.  He sponsored his baby brother's confirmation.  He was godfather to his high school and college friend who was never baptized as a child.  They are fiercely close to this day.  His friend's one and only brother was stabbed to death with a machete when he was so unfortunate to stop by the house of a new friend whose brother was involved with drug dealing.  The murderers burst through the door and violently killed everyone there.  He was just playing a video game.   His parents came to us after the funeral and told us how kind and devoted Zeeker was to their entire family.  Another high school and college buddy lost his wife two weeks after their third child was born, leaving behind 3 young ones and a husband at the age of 32. Zeeker was with Justin through it all.  Zeeker gets into people's lives,  he doesn't run from pain or sorrow.  He gives, he engages, he brings love to people when they need it most.

He has, for YEARS, brought an elderly homeless woman her breakfast/lunch while she resides under an overpass near Harrisburg.  Zeeker has tried to convince her to go to a shelter or a motel but she refuses. I think of that.  He is not a rich man, they work hard, they have 3 girls to put through college and I wonder how much money he has spent on her.  He doesn't care about money.  It's not important to him.  He told us once when he was still in college that he wanted to be a priest.  He majored in theology.  It was not in the cards for him.  He met his lovely wife and together they have 3 gorgeous daughters that have been raised as lovers of Christ.  They are smart and talented, modest and full of life.  They don't cause trouble, thrive in their school and have oodles of wholesome young friends.  They still have no knowledge of Zeeker's situation.  That is amazing in itself and I point this out as I think that his community protect them along with their parents.  Dawn and Zeeker are known in their small town community as contributors, givers, not takers.  They have oodles of friends; their friends are their children's godparents and confirmation sponsors and educators and coaches and visa versa. When our granddaughters receive their First Communion or something similar, we are there to celebrate with a houseful of friends, relatives and children.

There are many "what ifs" I think about in regard to going to the rally.  I looked online, which I don't like doing, and there's a story that Z tried to ORGANIZE a demonstration the night before.  It was a street concert as he had seen during the Jericho March in 2020.  As you might recall, the plans fell through when the band leader, Jesse, was stopped at the airport for a failed Covid test/fever.  The media made it sound like he was organizing a protest.

That day, I parked beyond the Capitol, near PA Avenue N.E. on a side street as that was the only place I could find.  Z parked somewhere below the house buildings to the East nearer the 695 highway .  Oh, how I wish we had found parking on the State Dept side!  We made our way to the Ellipse.  People were praying, singing songs, everyone was friendly, happy to be there.  People were speaking at the podium but we could only see them on a large screen.  At one point, they said they were going to go over the contested states one by one.  I was freezing, we all needed a bathroom, there WERE none available to all those people that day.  I said, "let's go, we know this stuff."  That has run through my mind a zillion times.  If we had parked on the opposite side of the Ellipse, we would have gone to the car, left for Virginia, found a bathroom and got some food before saying our goodbye.  But, we walked in the opposite direction, down PA Avenue toward our cars. As we walked our cell phones lit up and began to work, in came the news that Mike Pence would not contest or send back electors to the contested states.  You could see the crestfallen faces of all those around us reading the news on their phones for the first time.  Phones did not work on the Ellipse.  I remember Zeeker saying, " Well, let's just go home then, I can make it back by dinnertime." (I wonder why that statement wasn't used at trial.)  As we walked there were no barriers or officials or signage or a loud speaker telling us to not be there.  It was already becoming a MASSIVE crowd.  I remember seeing the Shaman, everyone took pics of him because of his outfit, for the fact that he had no shirt on in the freezing cold and he was funny.  Zeeker pointed to a massive Christ Is King banner from his local Jericho Walk friends from PA and said he promised to stop and say hello.  That is the last I saw of him until later by my car.

I want to point out that I indeed do have a hearing disability.  I wear a hearing aid.  This came out in the trial that Zeeker was not being truthful about his efforts to contact me through his brother to find out where we were.  Again, the cell coverage became almost nonexistent.   I didn't know where Zeeker was.  As we learned, he was on the inside, by himself, texting and calling without reaching until late in the game.

I couldn't bear the cold anymore, had watched the bizarre events of that day and was saddened and walked to the warmth of my car.  I saw as we passed the opposite side of the Capital that people were being let in. We returned to the car and heard that someone had been shot and I burst into tears.  That night, I called Z who was driving back home to Palmyra and we spoke.  The prosecution tried to use that as evidence that he was lying about my hearing problem, that his testimony was not believable as if it was impossible for me to have a phone conversation.  Zeeker expressed his regret that he allowed me to go, had he known he wouldn't have brought me anywhere near D.C.

As I have described my son in the prior paragraphs, as he got himself into the thick of that mass of humanity, he always wants to try to make a difference.  He spoke to that police officer (in the video) and tried to get him to get more officers at that juncture.  I asked him who he was waving to (as you see in the video) as I couldn't HEAR all the testimony that day in the courtroom and he said, "Mom! I was trying to get those officers to come down and make a barrier right there.  I said someone is going to get killed, form a barrier here and it stops here!"  This is my son, he can go overboard thinking he can be a positive influence but he HAS made an influence in the past when it comes to difficult situations.  People trust him, they go to him when they wouldn't anyone else.  I remember a friend of his in high school sought him out for solace and advice when she thought she was pregnant by her boyfriend.

Zeeker was found guilty of impeding that officer.  He never intentionally put a finger on him but was pushed from behind.  Which brings me to the window.  I have asked, "why did you do that?"  Here, you find yourself in the middle of a melee.  He was dismayed by what it had devolved into and confused by

the reaction of the police.  His actions up till now have been to try to diminish the danger, to open up a line of sight so people below would know and see weapons pointed toward them.  He NEVER was a part of some bigger/planned action.  He was alone as he always had been during every video that he was in.  He did not know anyone on the inside.  He NEVER had any plan, nor a group plot, never had a weapon.  We never once before discussed entering the Capitol.  He said, "After being pushed by that crowd, I just lost it and I wanted to break something. I wish I could take it all back."  He let himself down, went against his better judgement but he never tried to hurt anyone. His efforts that he made inside the capital to help law enforcement, that's him.  Others will speak to that so I will trust them, including Zeeker to address the 3 times he tried to be of help inside.

 The entire previous year, he participated in group prayer.  He was never violent.  Throughout the year, we, as a nation, saw the manner of justice dealt to other protests.  Most of those groups were allowed much leniency if not widespread acquittal.  On the day of the rally, there were no cars set on fire, there were no bricks, no frozen bottles of urine, no taunting and spitting.  There were not enough police to handle a crowd that size and the crowd was frightened, confused and bewildered by the concussion grenades and explosion of tear and other gases.  It devolved into chaos.  I saw a photo of another demonstration by Antifa in Washington, and they had hundreds of National Guard blocking the steps of the Capital in staggered row upon row and I thought if only the Guard had been allowed to show that presence that day.  I would wager that none of this would have happened.

Lastly, my son and his wife Dawn have 3 daughters, ages 16, 14 and 11.  They will be absolutely devastated should he be cut from their lives.  Zeeker told me one of the companies he works for will go under if he is not there.  I look at some of the sentences of the people charged and I am absolutely destroyed at the high price people have paid for their wrongdoing that day.  So many of them, including Zeeker never thought the justice given would be so capacious and wholesale.  I remember thinking that he would perhaps have to pay a fine, be on probation.   If that makes me sound naive, then so be it.  I am a mother.  He is a good son.  He made a big mistake on being a part of breaking the window, he has turned toward his confessor, his faith and his family and repented and made reparation for his action.  He lives his life as a servant of our Lord and he is determined to give nothing but love to his fellow human beings.

 When one holds the scales of justice in their hands I pray that they see that on one side, I think, there is mercy to be imparted.  I don't envy your seat, but I ask you as a parent to see that Zeeker has never been a threat to society, we are better for having him in our lives and that a heavy sentence weighs into the devastation of his girls and his wife, Dawn and their future.  I know they asked for none of this, but Zeeker has shown remorse, regret and sorrow and has tried to make it as right as possible since that day. Please, Judge, if I may, I beg you to treat Zeeker with benevolence.  Thank you for your time.  Norma Bozell

**Letter from Joseph Bozell**

20 April 2024

United States District Court for the District of Columbia

Dear Honorable Judge Bates,

Thank you for the opportunity to write to the court. My name is Joseph Bozell, the younger brother by 5 years to Brent "Zeeker" Bozell. I reside in Winchester, Virginia with my wife and seven children. I fully understand and respect that Zeeker has been found guilty of charges brought against him. I was with Zeeker at the rally in Washington D.C. on January 6th. I am writing to offer insight into who Zeeker is as a person, from my vantage point and experience as his brother of nearly forty years. Since we were kids, Zeeker and I have talked regularly, 3-4 times a week, without fail, for twenty plus years. I know Zeeker well. As a former United States military officer of 9 years, I offer the forthcoming as honestly as I know how, without exaggeration or embellishment.

I have three brothers. My closest relationship is with my brother, Zeeker. I recall my very first memory of my life: I was three years old sitting on the front porch of our family's house, with Zeeker right next to me. This memory is a snapshot of most of my life: my big brother, Zeeker, right by my side. From the start, Zeeker took an avid interest in my life and showered me with unconditional love and attention. Growing up, Zeeker was ever-present to me, supportive, generous, positive, and always fun. Zeeker and I shared a bedroom growing up, our twin beds adjacent to each other. Five years younger, I was in bed well before Zeeker. Knowing how much I enjoyed his company, Zeeker would go to bed early, just to stay up and talk with me. Each night, we would talk for hours, about anything and everything. Zeeker was my head basketball coach on three teams, he attended my baseball games, and he taught me how to be an altar boy, serving alongside with me for six years, helping and complimenting me after every Sunday mass. (I remember the day before my first mass, he stayed up with me practicing until mid-night because I was so terrified). Reflecting back, I seemingly learned everything from my brother Zeeker: how to run a pick-and-roll in basketball, how to dress sharply without looking dorky, how to tie-a-tie, how to comb my hair with just the right amount of hair spray, and how to avoid getting in trouble with my parents without lying. Zeeker was truly an incredible big brother to me. He was always by my side.

I am nearly forty, married with seven children of my own, and Zeeker is still next to me as ever before. Six years ago, my family and I were exposed to long-term carbon monoxide poisoning, and my health collapsed. I was practically bed-ridden and unable to provide for my wife and young family. It was a very scary time. Zeeker was with me

every step of the way. He helped me on a daily basis, working through the endless medical treatments, appointments, making living arrangements, family stress, thinking through difficult decisions to be made, and above all else, he helped me deal with the ever-present fear that I was never going to get better. After two years of that trial, my family and I successfully made it through the other end. Yet, soon thereafter, another trial emerged: a very serious marital crisis between my wife and me that threatened the future of our family. I was deeply discouraged, angry, and exhausted. I nearly gave into despair many times. As ever, Zeeker was right next to me, every step of the way. We talked every day. Zeeker was there, listening, encouraging, and praying for me. When Zeeker is next to you, you always sense everything is going to be okay. He was a rock for me, as he has always been. Without his support, I may have lost my family. Today, my marriage and seven children are stronger than ever. It's because my brother was there for me, as he always is.

Zeeker is this kind of brother and friend not just to me or his immediate family, but literally to dozens and dozens of others in his life. He has been there and helped people through some of their toughest, darkest times in their lives, generously offering his encouragement, advice, and boundless energy. If one were to call Zeeker on the phone, anytime of time of day in need of any kind of assistance, he will immediately pick up and give you his undivided attention. If you are in serious need, he will drive to you as quickly as time permits and help you. This isn't just part of Zeeker's DNA, it is his DNA. It is who Zeeker is. In 2013, the wife of a close friend of Zeeker's died suddenly from complications from surgery. His friend had just tragically lost his wife, and had three small children to care for on his own. Zeeker dropped everything in his life, and went to his friend. Zeeker remained with his friend for weeks, living with him as he absorbed the blow of losing his wife. He stays in close contact to this day with his friend. Zeeker is always there for him, just as he has always been there for me.

I know Zeeker's wife and daughters very well. We are involved in each other's families. We get together for birthdays, holidays, First Communions, school events. Zeeker loves and is devoted to his wife, Dawn, and their three daughters. He is very involved and plays an integral role in their day to day lives. He coaches their sports teams, cooks their healthy meals, helps with homework, assists with school events, teaches them how to pray, how to be a friend to others, counsels them, challenges them, and provides a constant listening ear and feedback. His daughters are thriving young teenagers, largely because of their Father. They love and adore him.

I was with Zeeker and our Mother at the rally on January 6th. Due to the reported voting irregularities, we felt strongly that Congress should decline to certify the electoral count. To this end, we chose to attend the rally to support the President, and pray for the Congress to pursue this course of action. For the previous month or so, Zeeker had been attending prayer rallies at the state capital of his home state of Pennsylvania. Many times he mentioned to me the positive effect he sensed these prayer rallies were having. He wanted to attend the national rally for the same purpose. Which was, ultimately, to pray for the country and its leaders. As is typical for Zeeker, he works to add fun to any gathering. A week before the rally, Zeeker was arranging to have a prominent musical act (a band whose lead singer Zeeker personally knows) come and

perform live outdoors in Washington D.C. during the rally. I recall Zeeker doing all the logistical work to make this happen: acquiring the equipment, and arranging travel plans for the performers. I can attest: Zeeker had no preconceived plans for any type of violence, instigation, or anything illegal whatsoever for the rally. None at all. His biggest, and only focus really, was making arrangements for the live music. I spoke with Zeeker several times leading up to January 6th. If I, or our Mother, had any sense that he was attending this rally with the aim of somehow causing trouble, any trouble at all, not only would we have not attended with him, we would have strongly reprimanded him for thinking in such terms. But none of that was necessary. We were simply attending to support the President and exercise our first amendment rights.

After listening to the President speak, Zeeker, my mother, and I began walking towards the Capital. While walking, we were notified of the statement just released by Vice President Pence that he intended to certify the electoral count that day. I remember that moment very well. We were disappointed, but ever calm. I suggested to Zeeker and my Mother that we head back to our car, and return home. We all agreed. Including Zeeker. I remember Zeeker's exact response, "Yeah, I could be back home by dinner if we leave now." We stopped, referenced our iphone maps to find the shortest route back to our vehicle, which was located just past the Capital building. To reach our vehicle, we had to walk past the Capital. So we kept walking, continuing with the crowd, thinking that our day, as far as the rally was concerned, had concluded. As we approached the Capital building, the pure noise and pandamonium seemed to draw us ever closer As we approached, we never encountered a barrier, fence, sign, law enforcement, or anything that prevented us from approaching the Capital. Like the seemingly hundreds of thousands of others that day, we simply thought we were permitted to be there. Arriving at the Capital, I was stunned by the pure chaos I saw. This was no rally. For about a minute, Zeeker, my Mother, and I watched in stunned silence the chaos breaking out between some in the crowd and law enforcement. Zeeker pointed out that he could see the flag of the prayer group he had joined back at the state rallies in Pennsylvania. This group was located closer towards the front steps of the Capital, towards the heart of the commotion. He said he was going to join them and "be right back."

This was the last I saw of Zeeker until about two hours later when he returned to the car, my Mother and I waiting for him. When he returned, Zeeker was disoriented and talking erratically, almost nonsensically. As the days, weeks, and months quickly unfolded we all learned of Zeeker's behavior that day. My family and I were shocked. All I can say is that I simply do not recognize the person who engaged in that behavior. It's simply not the person I've always known. Zeeker does not do these kinds of things. I cannot really say this enough: Zeeker helps people, he does not tear down. I was alongside Zeeker from the beginning of the day until he parted from me. He had no intention of doing anything illegal that day. Somehow after he parted, he allowed himself to be pulled into the whirlwind of confrontation and raw emotion of the moment and act contrary to everything that he truly is as a person. Zeeker's actions that day were wrong. Dead wrong. I know he knows this and is deeply regretful of the pain it has caused his wife and his entire family. Zeeker has spent the past three years doing penance to his wife and family to earn back their trust. He is a better husband, father,

and man because of it. I ask the court not to treat Zeeker as a terrorist. He loves his country. He loves his community and serves it everyday as a father and salesman. He is someone who had no intention of doing harm that day, but made a very foolish mistake. I ask the court for leniency for Zeeker. For the sake of his wife and three young daughters, who deeply rely on their Father and are in the formative years of their young lives. They need their Father. Please, be lenient to Zeeker, not for his own sake, but for the sake of the immense amount of good he will continue to do for those around him. Please allow him to continue to serve his family, his business, his community and all those God puts in his path.

Thank you again for the opportunity to write and tell you about Zeeker.


Respectfully,

Joseph Bozell
2620 Stonegate Drive
Winchester, VA 22601

**Letter from Wallace Parcell Greene**

Your Honor,

I am writing this letter to you in support of my dear friend, Leo Brent Bozell, who is before you for sentencing. I have known Zeeker since I had the privilege of being his roommate in college. I can attest to his character, as he has always been a smart, kind, and thoughtful friend. We are still as close as brothers twenty three years later. He taught me many valuable lessons in college about faith, friendship and intellectual pursuit. One of my favorite lessons learned from him was to eliminate thinking in terms of the problems that were weighing me down and instead focus on my fortunate blessings and moving forward to solve my problems with courage.

Zeeker is a wonderful father to his children, always putting their needs before his own. He has been actively involved in their lives, attending school events, coaching their sports teams, and providing a loving and nurturing environment for them to grow up in. As a friend, Zeeker has been there for me through thick and thin, offering a listening ear and a helping hand whenever I needed it. We had a mutual friend Andres Yelice that was senselessly murdered and Zeeker called me immediately, it was 3 AM, he had already rallied all of his friends to come surround the family and take on tasks to help ease their nightmare situation. For weeks after the murder, Zeeker helped the Yelice family by organizing social events and outings to make life as normal as it could be in such a horrendous situation. The love he showed and extended to their family and friends of Andres will never be forgotten.

Your Honor, I ask that you consider the many positive qualities that Zeeker possesses when determining his sentence. He is not only a wonderful father and friend, but also a valuable member of our community who has made a significant impact on the lives of those around him. I humbly request that you show leniency and compassion in your sentencing, taking into account the many positive contributions that he has made to society.

Thank you for your time and consideration.

Sincerely,

Wallace Parcell Greene

2/14/2024

### Letter from Caitlin Manaois

Dear Judge Bates,

My name is Caitlin Manaois and I am the younger sister of Leo Brent Bozell IV. I am a wife, a mother of four children, as well as a full-time communications professional working for military veterans' causes.

I am writing today about my older brother, Zeeker, as he is called by many of his close friends and family.

I first want to express that I did not and do not condone my brother Zeeker's actions on January 6th, for which he was convicted. Given the out-of-character nature of those actions, I can only assume they were driven by an exceptional level of emotion and reactivity. In my 40 years of personally knowing him, it's important for me to share that my brother Zeeker has consistently shown himself to be a loving, kind, protective and caring man of faith.

As one of my four brothers, Zeeker always went above and beyond in showing up for me, figuratively and literally. As the only girl among the siblings, I was and am grateful to have him as a key part of my life. He was the brother that took the time to introduce me to all genres of music, bringing me along to concerts when I was a kid just so I could share the experience with him. He taught me about working hard and having an entrepreneurial spirit, giving me my first job as his sidekick when he painted houses as a teenager. I'd follow him on foot as he went door-to-door distributing his handmade flyers. He'd strike up friendly conversations and get some leads, while I struggled to keep up with his pace. I was a terrible painter, but he'd just laugh and fix my mistakes, hustling until the job was done and we could enjoy the money we earned. He never criticized me. As I left for my first date in high school, he was the brother who quietly offered to follow us in his car to make sure we arrived safely. Years later, when I was about to drive alone five hours away to college, he made the same offer to escort me. Zeeker fiercely loves and looks out for others. That's always been his way.

Without a doubt, he possesses the wittiest sense of humor in our family, yet his life-long quest remains to keep God at the center, constantly seeking the goodness in everyone and everything around him. During the weeks leading up to January 6th, he spoke often of prayer and the importance of praying for our country.

From afar, I've watched my brother Zeeker be nothing short of a rock for the people in his life – close friends and strangers alike. When his good friend's wife passed away tragically after childbirth, Zeeker didn't leave his side for weeks. So many of us are inclined to keep our distance, and leave the casserole dish at the front door, but Zeeker's instinct is the exact opposite. If you are in need, he will show up. Even since January 6th, he's been a model for me on how to show up for people. For instance, a few years ago a 2nd grade classmate of my daughter's died in a tragic accident. After a few months went by, I was embarrassed that I

hadn't done much to reach out to the mother, opting like most people do to keep my distance and give space. After running into her at the park and seeing her sadness still so raw, I was feeling guilt-ridden and wasn't sure what to do. My first phone call was to Zeeker. I asked him, "What would *you do* to help her?" Before telling me, he stopped first to tell me that he would be praying for her – this woman he didn't even know. Then, he challenged me to "call her up on a whim and say, 'Hey friend, I'm headed to the grocery store, let me pick you up and let's go run some errands together.'" Zeeker explained that this grieving mother probably wants to get out of the house and do everyday things, but those are sometimes the hardest things to accomplish when you're in pain. His advice was perfect.

I can confidently say that his wife, children, extended family, friends, community, and countless others are all better as a result of Zeeker's presence. Perhaps the most important point here involves Zeeker's children. My nieces, who have been mostly shielded from the details of his case, are thriving. Speaking as objectively as possible, and not just as a doting aunt, each of them is faith-filled, loving, and hardworking, with amazing futures ahead of them. I share this to highlight that their exceptionalism does not come *despite* their father, but rather, in large part, due to his constant presence and guidance.

Zeeker is acutely aware and involved in every aspect of his children's lives – from leading prayers every night with his family, to taking them to and from school and activities, even ensuring he's cooked them a protein-rich breakfast each morning before school. The last time I visited their home over a weekend, I witnessed my oldest niece – who might otherwise be a typical teenager avoiding sharing details of her life with her parents – stay up past midnight with her parents just so together they could relive every detail of her closing night school theater performance. Zeeker and his wife listened intently with peak interest and pride. I saw my niece and sister-in-law head to bed, exhausted after four shows in a row, only for my niece to return downstairs because there was more she wanted to reminisce about with her Dad over the kitchen island. The irreplaceable bond his children share with him is undeniable.

As the only man and sole protector of their household, my nieces and sister-in-law will have their sense of peace and safety gutted if Zeeker is sentenced for a prolonged period of time. He is a constant, positive presence in their lives. He rightfully deserves consequences for his actions, but I ask the court to grant mercy. At a minimum, I respectfully request that no consideration be given to a terrorism level sentencing enhancement. Since his arrest, he has exhibited humility and taken responsibility for his actions. He was, and remains, a good man.


Respectfully,

Caitlin Manaois

89

**Letter from Leo Brent "Zeeker" Bozell IV**

To the Honorable Judge Bates,

Your Honor, I wanted to take this opportunity to not only address you at my sentencing hearing but also in letter form. I'm glad and sincerely appreciate you taking the time to read it.
I wish I understood my actions that day. I am not destructive. I am never violent. I don't train for it, consider it, or understand it as an option. I do not recognize the person I see in the discovery videos. How can someone, described as by those that know me as a leader who is trusted around so many people's children, become the world's biggest follower? Someone said "hand me that" and I did. Someone said, "Hey, there's cameras" and I run toward it. A crowd goes somewhere and I follow. People bang on doors and windows and I wanted to join. To this day, I don't understand what happened to me.

Though I continue to struggle with an explanation for my behavior, I have not waited three years to repent. Regardless of what anyone else did, my behavior was terrible. My actions were not remotely acceptable by any standard. On January 8th, I attended 8am mass and stayed in the dark church well after. I prayed and wondered how I could succumb to such behavior. I was a decent man…trusted by others but capable of behavior I don't condone. That day, I learned of Officer Sicknick's passing. I was devastated. So I went back to mass the next morning. One mass lead to another and to another and almost immediately, it became my daily routine. I may have been a decent man, but I lacked the discipline to be decent always. Masses lead to daily rosaries and time in scripture. I went to confession and recommitted to being the best husband, dad, son, brother, neighbor, and citizen I could. I strengthened my back so I would not require medications. I changed my diet and cut out virtually all television. The investigator in my trial testified that there was lots of dialogue between my brothers, friends, and me regarding matters of faith prior to the 6th. But for me, the dialogue was not a lifestyle. In those days, I promised my wife I would never attend a rally again and I meant it. I support causes with prayer. I believe I have forfeited my right to assemble.

I take no pride in my actions on that day, just the opposite. I am humiliated and have humiliated those that love me most. I have a beautiful family that is a beacon of light to everyone they meet. Their works of service and love are too many to number. But the actions of their husband/dad have left a stain on all of us.

My wife, Dawn, has served the communities in which we've dwelled as either as special education teacher or behavioral specialist/consultant for twenty six years. In a profession with an average length span of seven years, she has maintained her passion for helping the most challenging emotionally disturbed kids in the county. Recently, she has birthed a program here in Lebanon County that will afford many disabled young adults to work at a retirement community. There they will acquire work skills to take into the world and become employable. This retirement community has approached Dawn regarding a desire to expand the program into their other retirement homes in Pennsylvania and other states. She would be the obvious choice to lead the program's expansion. At home, she is committed mother, daughter, sister, and friend. The moment she hears of someone in our community in need, she prepares meals that I often deliver. She bakes edible art for church and school fundraisers. She raises our children to be

kind, giving, hardworking, and service minded. She is a wonderful person and aid to everyone she knows and many she only knows of.

Ke.B. (11) has an incredible faith in God well beyond her years. She prays with authority, expects her prayers will be answered, and constantly asks questions regarding Bible stories or debates within Christian theological interpretations. She leads her basketball team, trains for and competes in American Ninja competitions, plays soccer and field hockey, and signs up for any after school club she can find. She has a fervor for cultivating team success that pours into her social life. She is often discontented with interpersonal conflicts within friend groups. She sees their resolution as her responsibility but as a youngster, is learning to use time to allow healing instead of always intervening. She boasts a straight A average at school and is more poised to challenge her middle school Bible teachers next year than her sisters were.

Ka.B. (14), in her first year at the school, won her middle school Bible passion award last year. In fact, teachers told Dawn that they didn't know who would come in second but whoever it was, he or she was a distant second. She did not grow up in the school's program, she grew up in mine. In my home, we teach God's need for you. This is his world, His creation. We reject the notion that God is perfect and therefore does not need. Rather, He is better than perfect and created a world where he needs you. Scripture then becomes not just the word of God but what He needs you to know. She regularly brings her school lessons home to me in order to further her command of the subject. We both love it. She also plays basketball and soccer though she doesn't want to but knows she is needed. She volunteers for a local art program for young kids, stars in school theatre performing in major roles in every production her school has produced, and also boasts a straight A average. She glows.

I teach my children to aggressively pursue where they are needed. Years back, upon picking them up from school I would insist on the daily account of where or when they were needed and where and when they failed. "Do not spend your time considering what you want" I would tell them. "God knows the desires of your heart. Let him take care of that." No one embodies this more than S.B. (16). She learned the guitar and now leads her High School Christian praise team that performs in front of the school during chapel productions. She has just been admitted in her school's National Honor Society which demands not only academic but a record of community service for application. Upon receiving the lead in her school's musical production, her first act was to buy and create personalized gold stars to secure to every member of the casts' book bags to promote a family atmosphere. She assumed a leadership role though only a sophomore. She has made herself invaluable to her friends. Mental illness issues including depression and self-mutilation are unfortunately commonplace upon young ladies in her friend groups. She is invaluable to them. She listens, learns, and supports. When someone is in the hospital we go. She has been trusted by friends' parents to take their child into our home when troubles arose in theirs. She is a blessing to many.

Dawn and I foster a healthy, safe environment that welcomes and if needed houses all. Our home is the home the kids' convene, have the sleepovers, share the meals, etc.

These things may all fall apart and it's my fault.

My parents and siblings are wonderful wonderful people.  They are all major contributors to charity, have devoted their professional lives to the causes they believe in, assisting Veterans, and service to America within the United States Marine Corps.  Now, they are consistently harassed online and constantly asked about my actions.  They are forced to engage in a dialogue they never wanted.  I have left a stain on the family name that my parents, siblings, grandparents, and extended family have spent generations developing with honor. I hope to spend the rest of my life making it up to all of them.  I am forever in their debt.

In addition to my family, I have sought and will continue to seek forgiveness from my friends, many acquaintances from my youth and adult life, and the residents of the greater Washington/Maryland/Virginia area.  I spent years serving this area with honest quality workmanship to everyone that invited my expertise and hired the companies I represented.  I have designed and managed projects all around the capitol area including dozens of homes, churches, and embassies. I managed a project at a women's shelter not too far from the capitol that involved out of necessity, me watching the door for security purposes as my laborers went in and out.  After the project was completed, I spent the afternoon with the children of the home playing on the playground outside.  On January 6th, I ruined all of the equity I had earned from the city that helped raise me and trusted me.  I wish I could go door to door apologizing.

I can't thank the DC pre-trial officers enough for the mercy and kindness they have showed me.  John Copes and Ms. Andrews have reminded me of the city I left years ago.  I was pleased to have the opportunity during my trial to run into the FBI investigator in the bathroom.  I recognized his eyes from the day of my arrest.  I thanked him for handling that day, me, and my family with respect.  He actually shook my hand.  My time with the Probation office was much the same.  The mercy these individuals have shown me has cultivated mine.

Your Honor, and to anyone that reads this, I am so sorry.  I don't know who that person was that day.  But I am no longer person.  I am incapable of those actions.  Since then and going forward, no one will know me as anything but a peace maker.  I will spend the rest of my life atoning for that day.

I thank you for your time and consideration,
Leo Brent "Zeeker" Bozell IV

**Letter from Norma Bozell**

To the court of Judge Bates regarding the case of L. Brent Bozell IV, (Zeeker) who resides in Palmyra, PA.  Here are the highlights which speak to the man we call Zeeker:


Before meeting Zeeker, my daughter-in-law Dawn taught 9th grade at Wakefield High School in Arlington, VA which specializes in special needs and learning disabled students.  She had a student in one of her classes named Jamal_____.

Fast forward 6 years, Dawn and Zeeker are now married and live in Alexandria, VA with their two young daughters, ages 3 and 1.  My son had just left for work when a 20ish year old big man appeared walking up and down their driveway.  He rang the doorbell as Zeeker returned home at the request of his wife.  Zeeker asked him if he needed anything and Jamal responded that he was looking for Ms. D.  Dawn did not recognize him.  Zeeker said he owned the home and there was no Ms. D. there.  After Jamal raised his fists as if to fight him, Dawn called the FCPD.   He slowly left the property and they subsequently picked him up a couple blocks from the house.  He told the cops that he wanted to see Ms. D. and he wanted to "F*^*^K" her.  The police did not arrest him but told my son he had mental problems and they would increase patrols through their neighborhood.  Dawn established that he was in fact one of her previous students from years ago.  His last known address was in P.G. County, Md. He had a drug distribution record and was on probation in MD.   Under advice from FCPD, Dawn and the babies came to stay in our home in the Mt. Vernon area of Alexandria.

He returned the second time to an empty house but the neighbors saw him walking the perimeter of the home, trying the doors and windows.  Zeeker contacted police and was told he was being questioned a short distance from the home as a merchant had called to inform them that he was looking into car windows at the shop's parking lot.   Zeeker sent his wife and children down to Florida to be with her parents.  She was too frightened to be in her home alone.

Zeeker, as advised, purchased a shotgun.  This stalker had threatened his wife and family and Jamal was certainly in need of medical attention.  Z was also told he had every right to defend himself but he chose to resolve this in a peaceable manner.  He knew he would return and sure enough, on the first sunny day he came back on the property.

Jamal knocked and then pushed open the front door of the foyer and Zeeker held him at gunpoint.  He had already called FCPD and walked him back out of the house telling him the police were already on their way.  He kept him at bay until police arrived and he simply stated, "you can go now, they are here for YOU."  He was taken in but on the way to the station, he kicked out the back window of the cruiser.  They sent Jamal to a psychiatric facility in Harrisonburg, VA for months and while there he smeared his own feces on the walls of his room.  It was determined that he was "restorable" as long as he continued on his medication.  In the

court proceedings, he received 30 days in jail with a restraining order in effect.  Zeeker spoke with Jamal's mother and stated that they had to keep him on his meds otherwise he was guaranteed to hurt someone or himself.  He said he could not guarantee her son's safety if he chose to return and threaten his family.  They exchanged phone numbers and through the years have had more than a few conversations.  He has always been respectful of her.

 The best solution for Zeeker and Dawn was to move away and so they did.  They picked up their lives and their girls, left their careers and his childhood home town, friends and family and moved to Pennsylvania.  I remember asking Zeeker about those scarry days, when his wife was terrified and he was faced with keeping this sick individual from harming his family, if he was thought Jamal would find them in PA. He was confident he would not.  "God put Jamal in my life to save his life, not to end it."  This is my son, in so many ways, not the person the prosecution painted at his trial.


My son has always been a lover of life.  When I told him his father and I were expecting our fifth child at the age of 41, (my oldest is already in college, Zeeker a senior in high school) he picked me up with joy and threw me in the air and made me feel like a million dollars.  Today his littlest brother is Zeeker's best friend.

He took a bunch of 10 year old boys that he had never met except for his little brother Joey, at the age of 15, and coached them to the basketball championship 3 years in a row.  Two of them they won.  Most had never played on a team before.  Years later, my sister-in-law with the same last name met a shop owner who asked if she knew a Zeeker Bozell.  "Yes, he is my nephew." she explained.  The owner told her " He changed my son's life, he was very quiet and had never played on a basketball team."  One game day, the friend of a Army Major whose son played on Zeeker's team was there to watch.  He was the Head of Admissions at West Point and was so impressed with his leadership skills that he introduced himself to Zeeker and told him to come up for a visit.  He wanted him to apply for a commision.  We were reminiscing recently about the team so I could write to you about it and Zeeker told me he returned to his gym after college and found that 7 of his former players were coaching their own teams.

Zeeker had incredible leadership skills.  He started a ping pong club at school.  He won an award for his Optimist Club presentation on drugs and suicide.  He taught elementary students Catholic Catechism classes.  He played sports and swam as a young boy.  He played basketball and football in high school.  He wrote on the sports page at Hampden Sydney College.  He is fiercely loyal and won't let you criticize people; has even scolded me if I complain about lawyers or the parole office he deals with in PA.  He said, "don't Mom, they are all good people and have been fair with me."   He walked with a prayer group in the days leading up to and after the election, reciting the 15 decade rosary.  He told me, "Mom, I want to be like these people."  He was his brothers' best man at their weddings.  He sponsored his baby brother's confirmation.  He was godfather to his high school and college friend who was never baptized as a child.  They are fiercely close to this day.  His friend's one and only brother was stabbed to death with a

machete when he was so unfortunate to stop by the house of a new friend whose brother was involved with drug dealing.  The murderers burst through the door and violently killed everyone there.  He was just playing a video game.  His parents came to us after the funeral and told us how kind and devoted Zeeker was to their entire family.  Another high school and college buddy lost his wife two weeks after their third child was born, leaving behind 3 young ones and a husband at the age of 32.  Zeeker was with Justin through it all.  Zeeker gets into people's lives,  he doesn't run from pain or sorrow.  He gives, he engages, he brings love to people when they need it most.

He has, for YEARS, brought an elderly homeless woman her breakfast/lunch while she resides under an overpass near Harrisburg.  Zeeker has tried to convince her to go to a shelter or a motel but she refuses. I think of that.  He is not a rich man, they work hard, they have 3 girls to put through college and I wonder how much money he has spent on her.  He doesn't care about money.  It's not important to him.  He told us once when he was still in college that he wanted to be a priest.  He majored in theology.  It was not in the cards for him.  He met his lovely wife and together they have 3 gorgeous daughters that have been raised as lovers of Christ.  They are smart and talented, modest and full of life.  They don't cause trouble, thrive in their school and have oodles of wholesome young friends.  They still have no knowledge of Zeeker's situation.  That is amazing in itself and I point this out as I think that his community protect them along with their parents.    Dawn and Zeeker are known in their small town community as contributors, givers, not takers.  They have oodles of friends; their friends are their children's godparents and confirmation sponsors and educators and coaches and visa versa. When our granddaughters receive their First Communion or something similar, we are there to celebrate with a houseful of friends, relatives and children.


There are many "what ifs" I think about in regard to going to the rally.  I looked online, which I don't like doing, and there's a story that Z tried to ORGANIZE a demonstration the night before. It was a street concert as he had seen during the Jericho March in 2020.   As you might recall, the plans fell through when the band leader, Jesse, was stopped at the airport for a failed Covid test/fever.  The media made it sound like he was organizing a protest.

That day, I parked beyond the Capitol, near PA Avenue N.E. on a side street as that was the only place I could find.  Z parked somewhere below the house buildings to the East nearer the 695 highway .  Oh, how I wish we had found parking on the State Dept side!  We made our way to the Ellipse.  People were praying, singing songs, everyone was friendly, happy to be there. People were speaking at the podium but we could only see them on a large screen.  At one point, they said they were going to go over the contested states one by one.  I was freezing, we all needed a bathroom, there WERE none available to all those people that day.  I said, "let's go, we know this stuff."  That has run through my mind a zillion times.  If we had parked on the opposite side of the Ellipse, we would have gone to the car, left for Virginia, found a bathroom and got some food before saying our goodbye.  But, we walked in the opposite direction, down

PA  Avenue toward our cars.  As we walked our cell phones lit up and began to work, in came the news that Mike Pence would not contest or send back electors to the contested states.  You could see the crestfallen faces of all those around us reading the news on their phones for the first time.  Phones did not work on the Ellipse.  I remember Zeeker saying, " Well, let's just go home then, I can make it back by dinnertime."  (I wonder why that statement wasn't used at trial).  As we walked there were no barriers or officials or signage or a loud speaker telling us to not be there.  It was already becoming a MASSIVE crowd.  I remember seeing the Shaman, everyone took pics of him because of his outfit, for the fact that he had no shirt on in the freezing cold and he was funny.  Zeeker pointed to a massive Christ Is King banner from his local Jericho Walk friends from PA and said he promised to stop and say hello.  That is the last I saw of him until later by my car.

I want to point out that I indeed do have a hearing disability.  I wear a hearing aid.  This came out in the trial that Zeeker was not being truthful about his efforts to contact me through his brother to find out where we were.  Again, the cell coverage became almost nonexistent.  I didn't know where Zeeker was.  As we learned, he was on the inside, by himself, texting and calling without reaching until late in the game.

I couldn't bear the cold anymore, had watched the bizarre events of that day and was saddened and walked to the warmth of my car.  I saw as we passed the opposite side of the Capital that people were being let in. We returned to the car and heard that someone had been shot and I burst into tears.  That night, I called Z who was driving back home to Palmyra and we spoke. The prosecution tried to use that as evidence that he was lying about my hearing problem, that his testimony was not believable as if it was impossible for me to have a phone conversation. Zeeker expressed his regret that he allowed me to go, had he known he wouldn't have brought me anywhere near D.C.

As I have described my son in the prior paragraphs, as he got himself into the thick of that mass of humanity, he always wants to try to make a difference.  He spoke to that police officer (in the video) and tried to get him to get more officers at that juncture.  I asked him who he was waving to (as you see in the video) as I couldn't HEAR all the testimony that day in the courtroom and he said, "Mom! I was trying to get those officers to come down and make a barrier right there.  I said someone is going to get killed, form a barrier here and it stops here!"   This is my son, he can go overboard thinking he can be a positive influence but he HAS made an influence in the past when it comes to difficult situations.  People trust him, they go to him when they wouldn't anyone else.  I remember a friend of his in high school sought him out for solace and advice when she thought she was pregnant by her boyfriend.

Zeeker was found guilty of impeding that officer.  He never intentionally put a finger on him but was pushed from behind.  Which brings me to the window.  I have asked, "why did you do that?" Here, you find yourself in the middle of a melee.  He was dismayed by what it had devolved into and confused by the reaction of the police.  His actions up till now have been to try to diminish the danger, to open up a line of sight so people below would know and see weapons pointed

toward them.  He NEVER was a part of some bigger/planned action.  He was alone as he always had been during every video that he was in.  He did not know anyone on the inside.  He NEVER had any plan, nor a group plot, never had a weapon.  We never once before discussed entering the Capitol.  He said, "After being pushed by that crowd, I just lost it and I wanted to break something. I wish I could take it all back."  He let himself down, went against his better judgement but he never tried to hurt anyone. His efforts that he made inside the capital to help law enforcement, that's him.  Others will speak to that so I will trust them, including Zeeker to address the 3 times he tried to be of help inside.

 The entire previous year, he participated in group prayer.  He was never violent.  Throughout the year, we, as a nation, saw the manner of justice dealt to other protests.   Most of those groups were allowed much leniency if not widespread acquittal.  On the day of the rally, there were no cars set on fire, there were no bricks, no frozen bottles of urine, no taunting and spitting.  There were not enough police to handle a crowd that size and the crowd was frightened, confused and bewildered by the concussion grenades and explosion of tear and other gases.  It devolved into chaos.  I saw a photo of another demonstration by Antifa in Washington, and they had hundreds of National Guard blocking the steps of the Capital in staggered row upon row and I thought if only the Guard had been allowed to show that presence that day.  I would wager that none of this would have happened.

Lastly, my son and his wife Dawn have 3 daughters, ages 16, 14 and 11.  They will be absolutely devastated should he be cut from their lives.   Zeeker told me one of the companies he works for will go under if he is not there.  I look at some of the sentences of the people charged and I am absolutely destroyed at the high price people have paid for their wrongdoing that day.  So many of them, including Zeeker never thought the justice given would be so capacious and wholesale.  I remember thinking that he would perhaps have to pay a fine, be on probation.  If that makes me sound naive, then so be it.  I am a mother.  He is a good son.  He made a big mistake on being a part of breaking the window, he has turned toward his confessor, his faith and his family and repented and made reparation for his action.  He lives his life as a servant of our Lord and he is determined to give nothing but love to his fellow human beings.

 When one holds the scales of justice in their hands I pray that they see that on one side, I think, there is mercy to be imparted.   I don't envy your seat, but I ask you as a parent to see that Zeeker has never been a threat to society, we are better for having him in our lives and that a heavy sentence weighs into the devastation of his girls and his wife, Dawn and their future.  I know they asked for none of this, but Zeeker has shown remorse, regret and sorrow and has tried to make it as right as possible since that day.  Please, Judge, if I may, I beg you to treat Zeeker with benevolence.  Thank you for your time.  Norma Bozell

# EXHIBIT 2

**COMPARABLE CASES OF JANUARY 6TH DEFENDANTS WHO HAVE RECEIVED LOWER SENTENCES**

| # | Case Name | Case Number | Sentence Issued | Case Facts |
|---|---|---|---|---|
| 1. | *United States v. Haynes* | No. 1:21-CR-00594-TSC | **32 Months of Incarceration** | In this case, the defendant pleaded guilty. They had entered the Capitol Building and had attacked CNN reporters and destroyed video and television equipment. |
| 2. | *United States v. Judd* | No. 1:21-CR-00040-TNM | **32 Months of Incarceration** | In this case, the defendant was convicted after a stipulated trial. They lit an object on fire and threw it at the police line in the Lower West Terrace tunnel. They also passed riot shields to other rioters in order to breach police lines. |
| 3. | *United States v. Strand* | No. 1:21-CR-00085-RDM | **32 Months of Incarceration** | In this case, the defendant pleaded guilty. They illegally entered Capitol Building and made their way to House Chambers. |
| 4. | *United States v. Miller* | No. 1:21-CR-00075-RDM | **33 Months of Incarceration** | In this case, the defendant, while on restricted ground of the Capitol, draped in a Confederate flag, threw a full beer can at law enforcement. They used a bike rack to scale the Capitol wall. They threw batteries at officers. They sprayed officers located in the Lower West Terrace tunnel with the contents of a fire extinguisher as other rioters assaulted officers with bats, flagpoles and riot shields. The contents of the fire extinguisher sprayed at least a dozen police officers. |
| 5. | *United States v. Byerly* | No. 1:21-CR-00527-RDM | **34 Months of Incarceration** | In this case, the defendant purchased a stun gun and traveled with it to D.C. The defendant engaged in three separate assaults: two against police and one against a news reporter. They also used their stun gun against Capitol police and MPD officers. After having had the stun gun removed from their hands, they continued to charge toward and physically strike officers, grabbing and wrestling one officer for his baton. |

| 6. | *United States v. Thompson* | No. 1:21-CR-00161-RBW | **36 Months of Incarceration** | In this case, the defendant came prepared wearing a bulletproof vest. They walked into and looted a Senate Parliamentarian's office, stealing two bottles of liquor. They additionally stole a coat rack, and announcer pager used by U.S. Capitol Police to send emergency alerts throughout the building. They then picked up an individual's cellphone off the desk of a staffer. |
|---|---|---|---|---|
| 7. | *United States v. Watson* | No. 1:21-CR-00513-RBW | **36 Months of Incarceration** | In this case, the defendant pleaded guilty. They traveled to D.C. armed with a pocketknife, which he used on the Capitol Building. They additionally broke a windowpane and jumped through the window to enter the Capitol Building. |
| 8. | *United States v. Williams* | No. 1:21-CR-00618-ABJ | **36 Months of Incarceration** | In this case, the defendant illegally entered the Capitol Building. They resisted U.S.C.P officers, led a group of protestors into the Capitol Building, and up to former Speaker of the House Pelosi's office. |
| 9. | *United States v. Tenney* | No. 1:21-CR-00640-TFH | **36 Months of Incarceration** | In this case, the defendant entered the Capitol through the West Terrace.  They then walked through the Rotunda, and personally forced open the Rotunda Doors on the east side which ultimately allowed protestors to enter the building. They grabbed the Sergeant at Arms from behind and pushed him into a doorframe. They also locked arms with U.S. Capitol Police Officer B.A. and shoved another U.S. Capitol Police officer. |
| 10. | *United States v. Barnhart* | No. 1:21-CR-00035-EGS | **36 Months of Incarceration** | In this case, the defendant pleaded guilty. They climbed over banisters and entered the Capitol Building armed with a ballistic vest. They also assaulted officers by grabbing them and dragging officers into the crowds. |

| 11. | *United States v. Brockhoff* | No. 1:21-CR-00524-CKK | **36 Months of Incarceration** | In this case, the defendant pleaded guilty. They threw objects at police officers. They discharged two fire extinguishers on officers attempting to hold a line at the Lower West Terrace entrance. They also illegally entered the Capitol Building through a broken window while wearing a stolen MPD helmet. |
| 12. | *United States v. Dennis* | No. 1:21-CR-00679-JEB | **36 Months of Incarceration** | In this case, the defendant was convicted following a bench trial. They engaged in numerous physical altercations with U.S.C.P officers. They further used U.S.C.P batons to push back against U.S.C.P officers. |
| 13. | *United States v. Vallejo* | No. 1:22-CR-00015-CKK | **36 Months of Incarceration** | In this case, the defendant was convicted by jury. They were a member of the Oath Keeper group, and they joined other Oath Keepers in illegally entering Capitol Building. |
| 14. | *United States v. Strand* | No. 1:22-CR-00015-APM | **36 Months of Incarceration** | In this case, the defendant was a member of the Oath Keepers, and they joined other members in storming the Capitol Building. They were dressed in paramilitary gear. |
| 15. | *United States v. DeGrave* | No. 1:21-CR-00088-DLF | **37 Months of Incarceration** | In this case, the defendant pleaded guilty. They traveled to D.C. with a plan to stop the "stolen election" and arrived with protective gear and bear spray. They further conspired with three co-defendants. |
| 16. | *United States v. Reid* | No. 1:21-CR-00316-DLF | **37 Months of Incarceration** | In this case, the defendant was among the first to rush up the steps when protestors broke through a police line under the scaffolding. The defendant then, for over an hour, walked through the Capitol, surged through police lines, led protestors through the building, and encouraged other protestors to enter. They finally made their way over to the Speaker's Lobby and damaged a |

| | | | television and water cooler in the nearby bathroom. |
|---|---|---|---|
| 17. | *United States v. Elliot* | No. 1:21-CR-00735-RCL | **37 Months of Incarceration** | In this case, the defendant was a member of the Proud Boys. They used a Flagpole to attack police officers and to breach police lines. |
| 18. | *United States v. Owens* | No. 1:21-CR-00286-BAH | **37 Months of Incarceration** | In this case, the defendant pleaded guilty. They assaulted Officers with a skateboard. |
| 19. | *United States v. Miller* | No. 1:21-CR-000119-CJN | **38 Months of Incarceration** | In this case, the defendant made threatening posts before and during riots. They threatened Representative Ocasio-Cortez. They further encouraged crowds to overrun police lines. |
| 20. | *United States v. Hughes* | No. 1:21-CR-00106-CKK | **38 Months of Incarceration** | In this case, the defendant climbed the scaffolding. They were at the front of the mob that forced bike rack barriers down and breached the police line, and they were among the first protestors to reach the Upper West Terrace.  They were also the ninth protestor to enter the Senate Wing Door building through the smashed window. Finally, the defendant chased a Capitol Police officer and yelled violent and angry threats. |
| 21. | *United States v. Beddingfield* | No. 1:22-CR-00066-CJN | **38 Months of Incarceration** | In this case, the defendant pleaded guilty. They used a flagpole to strike officers. They also illegally entered the Capitol Building and engaged in vandalization of the premises. |
| 22. | *United States v. Therres* | No. 1:22-CR-00381-JEB | **40 Months of Incarceration** | In this case, the defendant pleaded guilty. They threw a large heavy plank of wood at officers on the line, striking one in the head. They also used an unknown chemical spray on officers. |
| 23. | *United States v. Bilyard* | No. 1:22-CR-00024-RBW | **40 Months of Incarceration** | In this case, the defendant pleaded guilty. They traveled to D.C., armed with a baseball bat, and used it to break out a window at the Capitol Building. |

102

| | | | | The defendant further used chemical irritant toward police officers. |
|---|---|---|---|---|
| 24. | *United States v. Smith* | No. 1:21-CR-00567-RCL | **41 Months of Incarceration** | In this case, the defendant assisted a group of protestors in hoisting and thrusting a large metal sign frame into a line of officers.  The sign could have "split someone's head open." They encouraged protestors to keep forcing a door closed so that officers could not exit and defend the Capitol. |
| 25. | *United States v. Rubenacker* | No. 1:21-CR-00193-BAH | **41 Months of Incarceration** | In this case, the defendant was one of the first 50 protestors to enter the Capitol. They were at the front of the mob, along with other protestors, and chased a Capitol police officer up a flight of stairs, directly past where lawmakers had just retreated from conducting the joint session, yelling "Where are they counting the votes?" and "He's one person, we're thousands!" The defendant then exited the east side of the Capitol and reentered later through the East Rotunda doors as part of a mob of protestors, during which protestors surrounded and assaulted law enforcement officers attempting to prohibit entry to the East Rotunda doors. They additionally smoked marijuana in the Rotunda, swung a water bottle at an officer's head, and threw liquid at other officers. |
| 26. | *United States v. Fairlamb* | No. 1:21-CR-00120-RCL | **41 Months of Incarceration** | In this case, the defendant shoved and punched an MPD officer. They climbed the scaffolding and entered the Capitol carrying a stolen police baton. |
| 27. | *United States v. Shalvey* | No. 1:21-CR-000334-TJK | **41 Months of Incarceration** | In this case, the defendant pleaded guilty. They entered the Capitol Building with their wife, and they also destroyed letter written by Senator Romney. They further destroyed other property while in the Capitol Building. |

| 28. | *United States v. Chansley* | No. 1:21-CR-0003-RCL | **41 Months of Incarceration** | In this case, the defendant was a "Q-Anon Shaman" and the face of the events of January 6th. They climbed the scaffolding, entered the Capitol and roamed the second and third floors of the building. The defendant then entered the Senate gallery and screamed obscenities. They scaled the Senate dais "taking the seat that Vice President Mike Pence had occupied less than an hour before" and took pictures of themselves on the dais. They also called other protestors up to the dais and lead them in an incantation including to be thankful for the "opportunity to allow us to send a message to all the tyrants, the communists, and the globalists, that this is our nation, not theirs, that we will not allow American, the American way of the United States of America to go down." They additionally gave a 60 Minutes interview falsely claiming that he was let into the Capitol by law enforcement and was merely intending to bring divinity, to bring God back into the Senate. |
|---|---|---|---|---|
| 29. | *United States v. Secor* | No. 1:21-CR-00157-TNM | **42 Months of Incarceration** | In this case, the defendant scaled scaffolding. They walked through the office suite of Nancy Pelosi. They assisted a group of protestors to push open the East Rotunda doors and helped other protestors enter the building. The defendant further sat in the seat that Vice President Mike Pence occupied 30 minutes earlier. |
| 30. | *United States v. Nix* | No. 1:21-CR-00678-BAH | **42 Months of Incarceration** | In this case, the defendant used a flagpole on the Capitol Building. The defendant assaulted U.S.C.P officers with flagpole. Additionally, they illegally entered the Capitol Building. |
| 31. | *United States v. Egtvedt* | No. 1:21-CR-00177-CRC | **42 Months of Incarceration** | In this case the defendant forcibly entered the Capitol Building by pushing through numerous U.S.C.P officers. |

| | | | | |
|---|---|---|---|---|
| | | | | In this case, the defendant needed to be physically removed from the Capitol grounds after having fallen on officers, injuring them. |
| 32. | *United States v. Mault* | No. 1:21-CR-00657-BAH | **44 Months of Incarceration** | In this case, the defendant anticipated and planned for violence in pre-riot text message conversations with co-defendant Mattice. They then pushed against the line of police, broke the line, and forced the police barriers apart, overwhelming and surrounding the police. The defendant also body-surfed over members of the crowd and hung from the wooden frame beneath the arch. Additionally, they assaulted police officers. |
| 33. | *United States v. Mattice* | No. 1:21-CR-00657-BAH | **44 Months of Incarceration** | In this case, the defendant anticipated and planned for violence in text message conversations with co-defendant Mault. They further recorded a video conveying his intent and foreshadowing his violent conduct.  They explained, "We're all getting ready to go march on Capitol Hill.  We're gonna fuck some shit up.  It's about to be nuts." They then pushed against the line of police, broke the line, and forced the police barriers apart, overwhelming and surrounding the police. The defendant also texted family to brag about breaking police line. They also body-surfed over members of the crowd and hung from the wooden frame beneath the arch. They then used chemical spray against police officers. They finally lied to FBI agents claiming that they did not fight with police but, instead simply absorbed their blows without fighting back. |
| 34. | *United States v. Languerand* | No. 1:21-CR-00353-JDB | **44 Months of Incarceration** | In this case, the defendant threw a piece of wood at police. The, just a few minutes later, he threw a heavy black audio speaker at the police. One minute later, the defendant proceeded to throw |

| | | | | |
|---|---|---|---|---|
| | | | | two sticks in rapid succession at officers. Three minutes later, he then threw another stick at officers. A few seconds later, he threw a large orange traffic bollard which ricocheted off the riot shield of an officer before colliding with multiple officers inside the archway. Then a minute later, he threw a pepper spray container followed by a bottle of liquid. Approximately 30 seconds later, the defendant threw a piece of wood. He then finally threw another stick at the police. |
| 35. | *United States v. Thompson* | No. 1:21-CR-00461-RCL | **46 Months of Incarceration** | In this case, the defendant joined protestors as they actively assaulted police. He armed himself with a police baton and incited violence outside of the Capitol. He Also stayed in the heart of the violent zone, watching hours of attacks against law enforcement. Indeed, for nearly two hours he stood "in the vicinity of some of the most violent conduct on January 6, observing, commenting and occasionally chanting while windows were smashed, and the police line was repeatedly attacked." He further provided rioters/protestors with riot shields to use against the police which had previously been stolen from the police. He also assisted in throwing a large audio speaker at police. He finally assaulted a police officer with a baton when the officer was trying to assist a protestor needing medical attention. |
| 36. | *United States v. Richardson* | No. 1:21-CR-00721-CKK | **46 Months of Incarceration** | In this case, the defendant struck a police officer three times with a metal flagpole, stopping only when the pole broke in his hands. He retreated after he was pepper sprayed. Two minutes later, he and other protestors grabbed and shoved a large metal billboard toward the police, using it as a battering ram. |

Case 1:21-cr-00216-JDB   Document 89   Filed 05/03/24   Page 107 of 120

| 37. | *United States v. Hughes* | No. 1:21-CR-000106-TJK | **46 Months of Incarceration** | In this case, the defendant climbed the scaffolding. He was among the first of rioters/protestors to reach the Upper West Terrace. He was the eighth protestor to enter the Senate Wing Door building through smashed window. He then kicked the Senate Wing Door open from inside with another protestor. |
|-----|---------------------------|------------------------|-------------------------------|------------------------------------------------------------------------------|
| 38. | *United States v. Coffman* | No. 1:21-CR-00004-CKK | **46 Months of Incarceration** | In this case, the defendant drove to Washington on January 6th from Alabama in a pickup truck containing loaded firearms, including a 9mm handgun, a rifle, and a shotgun. Also, inside the pickup truck and in its covered bed were hundreds of rounds of ammunition, large-capacity ammunition feeding devices, a crossbow with bolts, machetes, camouflage smoke devices, a stun gun, cloth rags, lighters, a cooler containing eleven mason jars with holes punched in the lids, and other items. The eleven mason jars each contained a mixture of gasoline and Styrofoam. The mason jars and their contents, along with the lighters and cloth rags, made up the component parts of bottle-based improvised incendiary weapons (i.e. Molotov cocktails). The Styrofoam in the Molotov cocktails was designed to have a napalm effect of adhering to the skin of its victims. A month before January 6th, the defendant had traveled to Washington and attempted to drive to the residence of a United States Senator. |
| 39. | *United States v. Neefe* | No. 1:21-CR-00567-RCL | **46 Months of Incarceration** | In this case, the defendant pleaded guilty. He traveled to D.C. armed with a wooden club, nicknamed the "Commie Knocker". He further conspired with others to go to the Capitol Building. |
| 40. | *United States v. Ochs* | No. 1:21-CR-00073-BAH | **48 Months of Incarceration** | In this case, the defendant was a Proud Boys member. They threw a smoke bomb at police, and they smoked cigarettes in Rotunda. They pointed |

| | | | | |
|---|---|---|---|---|
| | | | | protestors toward the Speaker's Office. They also posed in front of "Murder the Media" graffiti his co-defendant had scrawled on one of the Capitol's doors. |
| 41. | *United States v. Perkins* | No. 1:21-CR-00447-CIN | **48 Months of Incarceration** | In this case, the defendant was convicted after trial. The defendant attacked three U.S.C.P officer with a flagpole. |
| 42. | *United States v. Herrera* | No. 1:21-CR-619-BAH | **48 Months of Incarceration** | In this case, the defendant convicted after a trial. They came prepared wearing a gas mask, goggles, and a bulletproof vest. The defendant then climbed scaffolding and entered the Capitol through a fire door, located near the Senate Parliamentarian's Office on the Senate wing side of the building. They posted an Instagram photo of himself picking up a stack of papers and throwing them in the air. Later, in an exchange with someone else on Instagram, he said he had picked up the papers and had someone photograph him because he wanted a "fuck you" picture. They also stole a bottle of liquor, which he drank and raised triumphantly as he exited the Capitol the first time. They reentered the Capitol through the nearby Senate Wing Doors. As they entered, they walked past shattered windows on each side of the door and spent a few minutes setting up his camera and taking photographs. Then they proceeded to a nearby "hideaway" office of a U.S. Senator, where he smoked a marijuana cigarette that was passed around by other protestors. After, they proceeded to the Crypt, and remained inside for 15 minutes while he took more photographs, before exiting the building. |
| 43. | *United States v. Gieswein* | No. 1:21-CR-00024-TNM | **48 Months of Incarceration** | In this case, the defendant pleaded guilty. They were also one of the first to illegally enter Capitol Building. They also engaged in numerous acts of vandalization. |

| 44. | *United States v. Hale-Cusanelli* | No. 1:21-CR-37-TNM | **48 Months of Incarceration** | The defendant was convicted after a trial sporting a "Hitler mustache." They were a former Army reservist and security contractor who held a "Secret" level security clearance when he and others sieged the Capitol. They were at the front of a mob that attacked police and smashed windows and doors to breach the Capitol. They unsuccessfully intervened in an arrest of a protestor by trying to pull the protestor away from the officer. |
|---|---|---|---|---|
| 45. | *United States v. Decarlo* | No. 1:21-CR-00073-BAH | **48 Months of Incarceration** | In this case, the defendant Significant ties to Proud Boys. They threw a smoke bomb at police. They rummaged through a Capitol police duffle bag and stole a pair of flex cuffs. They crawled under "Murder the Media" on one of the Capitol's doors. |
| 46. | *United States v. Harrelson* | No. 1:22-CR-00015-CKK | **48 Months of Incarceration** | In this case, the defendant was convicted by jury. They were a member of the Oath Keeper group. They also transported firearms and ammunition into D.C. They further recruited numerous other members. They supplied Oath Keeper Members with tactical gear. |
| 47. | *United States v. Bledsoe* | No. 1:21-CR-00204-BAH | **48 Months of Incarceration** | In this case, the defendant was convicted after a trial.  Moreover, their PSR recommended a sentencing enhancement based on their false testimony at trial. The defendant scaled a wall to access the upper northwest terrace. They climbed a statue of President Gerald Ford and planted a Trump flag on his arm. They remained inside the Capitol for 22 minutes and wandered through the Statuary Hall before joining another crowd of protestors circling the House Chamber while members of Congress were trapped inside and unable to evacuate. |

| 48. | *United States v. Speed* | No. 1:22-CR-000244-TNM | **48 Months of Incarceration** | In this case, the defendant was convicted after a bench trial. They possessed illegally obtained silencers for firearms. They marched to the Capitol Building with members of the Proud Boys. |
|---|---|---|---|---|
| 49. | *United States v. Wright* | No. 1:21-CR-00341-CKK | **49 Months of Incarceration** | In this case, the defendant pleaded guilty. They organized two charter buses to transport himself and 100 other people to Washington, D.C. on January 6. They illegally entered the Capitol Building. |
| 50. | *United States v. Manley* | No. 1:21-CR-00691-TSC | **50 Months of Incarceration** | In this case, the defendant pleaded guilty. The defendant traveled to Capitol Building grounds with pepper spray and protective gear. They sprayed officers with multiple cans of pepper spray. They also illegally entered the Capitol Building. |
| 51. | *United States v. Sibick* | No. 1:21-CR-00291-ABJ | **50 Months of Incarceration** | In this case, the defendant pleaded guilty. They stole a riot shield and assaulted multiple MPD and U.S.C.P officers. They also stole police equipment such as a radio. |
| 52. | *United States v. Lyons* | No. 1:21-CR-00079-BAH | **51 Months of Incarceration** | In this case, the defendant convicted following a bench trial. Illegally entered the Capitol Building armed with tactical gear. |
| 53. | *United States v. Wilson* | No. 1:21-CR-00345-RCL | **51 Months of Incarceration** | In this case, the defendant physically engaged with officers by punching, shoving and kicking them, as well as attempting to steal their riot shields. They picked up a several feet long white cylindrical object, believed to be a thin polyvinyl chloride (PVC) pipe, and indiscriminately struck officers with it. Specifically, the defendant "[E]ngaged multiple officers with whatever means he had available." |
| 54. | *United States v. Jersey* | No. 1:21-CR-00035-EGS | **51 Months of Incarceration** | In this case, the defendant pleaded guilty. They assaulted numerous officers |

| | | | | with batons and large sticks causing numerous injuries. |
|---|---|---|---|---|
| 55. | *United States v. Mink* | No. 1:21-CR-00025-RDM | **51 Months of Incarceration** | In this case, the defendant, pleaded guilty. Used a metal bat to break Capitol Building windows. The defendant illegally entered Capitol Building and removed chairs and other items from the building. They threw numerous objects at police officers such as a traffic cone and a stick. |
| 56. | *United States v. Stager* | No. 1:21-CR-00035-CRC | **52 Months of Incarceration** | In this case, the defendant pleaded guilty. The defendant used a flagpole to beat an officer while the officer had been removed from his police line position, and they illegally entered Capitol Building. |
| 57. | *United States v. Denney* | No. 1:22-CR-00070-RDM | **52 Months of Incarceration** | In this case, the defendant was a former military police officer. They used Facebook to recruit for his militia group called the Patriot Boys of North Texas and fundraised for weapons, gear, lodging, and travel. They arrived eager for violence in full battle attire wearing a helmet, knuckled gloves, and a ballistic vest with body armor. They deployed pepper spray at the line of Capitol police officers, and they grabbed and shoved a police officer. They threw a pepper spray cannister in the direction of the line of officers, assaulted officers with a pole and attempted to disarm them. They, along with another protestor, had launched a large tube at the line of police officers guarding the west side of the Capitol building. They then swung his arm and fist at an officer in an attempt at pulling him down the stairs. He further lied to FBI agents about his knowledge of the assault. |
| 58. | *United States v. Sanford* | No. 1:21-CR-00086-PLF | **52 Months of Incarceration** | In this case, the defendant pleaded guilty. He struck U.S.C.P officers in the head with a fire extinguisher. He hurdled |

| | | | | numerous items at other officers while they attempted to hold the line. |
|---|---|---|---|---|
| 59. | *United States v. Sills* | No. 1:21-CR-00040-TNM | **52 Months of Incarceration** | In this case, the defendant was convicted after a stipulated trial. He stole a police baton from an MPD officer. He struck multiple officers with the stolen baton and flashed a strobe light at the police line in order to disorient police officers. |
| 60. | *United States v. Brown* | No. 1:21-CR-00178-APM | **54 Months of Incarceration** | In this case, the defendant was convicted following a trial. He stole police pepper spray and used it against officers in an attempt to storm the building. |
| 61. | *United States v. Minuta* | No. 1:22-CR-00015-CKK | **54 Months of Incarceration** | In this case, the defendant was convicted by jury. He was a member of the Oath Keeper group. He transported firearms and ammunition into D.C. and recruited numerous other members. He further supplied Oath Keeper Members with tactical gear. |
| 62. | *United States v. Gardner* | No. 1:21-CR-00622-APM | **55 Months of Incarceration** | In this case, the defendant pleaded guilty. He used a pepper spray device against officers in the West Terrace Tunnel. He used a pepper spray device on Capitol Building windows. He further encouraged others to storm the Capitol Building. |
| 63. | *United States v. Pruitt* | No. 1:21-CR-00023-TJK | **55 Months of Incarceration** | In this case, the defendant was a Proud Boys member. He wore a tactical glove with knuckle pads and a cut-off t-shirt with the logo of the "Punisher"–an anti-hero known for dispensing violent vigilante justice. He wore an electronic ankle monitor for being arrested recently. The defendant then climbed a bike rack as a ladder to be at the front of the mob that breached the building, and he tossed a chair in the direction of officers in the Visitor Center. Finally, he came face to face with then-Senate Minority Leader Chuck Schumer, who was trying to evacuate. |

| 64. | *United States v. Courson* | No. 1:21-CR-00035-RD | **57 Months of Incarceration** | In this case, the defendant pleaded guilty. He stole a police baton and pummeled an MPD officer that was being dragged down a flight of stairs. |
|---|---|---|---|---|
| 65. | *United States v. Williams* | No. 1:21-CR-00377-BAH | **60 Months of Incarceration** | In this case, the defendant was convicted after a trial. He helped protestors climb bicycle racks so that they could overrun the police on the Northwest stairs. He also stole water bottles that Capitol Police officers had stored to be used for decontamination if they were hit with chemical irritants. He further entered the Capitol through the Senate door with the first large wave of protestors to breach the Capitol. Finally, the defendant celebrated and smoked marijuana with other protestors in the Rotunda. |
| 66. | *United States v. Mazza* | No. 1:21-CR-00736-JEB | **60 Months of Incarceration** | In this case, the defendant traveled to D.C. with two loaded handguns: a Smith and Wesson, .40 caliber semi-automatic handgun, and a .45 caliber/.410 caliber revolver ("Taurus Judge"). They then dropped or lost the Taurus Judge revolver on the steps leading up to the West Front Terrace. After entering the Capitol, they joined a mob of other rioters/protestors who were trying to break through the police line to gain entry into the lower level of the Capitol. They armed themselves with a stolen police baton and used it to assault police officers. They then filed false police report about how he had lost the Taurus Judge and provided false information to Capitol Police. |
| 67. | *United States v. Scott* | No. 1:21-CR-00292-DLF | **60 Months of Incarceration** | In this case, the defendant was a member of the Proud Boys. They assaulted numerous officers with his body. They further led numerous individuals in storming a police line which led to a police perimeter to collapse entirely. |

| 68. | *United States v. Jensen* | No. 1:21-CR-00006-TJK | **60 Months of Incarceration** | In this case, the defendant was convicted after trial. He was a ringleader during the attack on the U.S. Capitol, working to rile up the crowd and encourage others to follow him into and through the building. He scaled a twenty-plus-foot wall to be one of the first rioters/protestors to break into the building and disrupt the proceedings in Congress. He was also the tenth rioter/protestor to enter the Capitol. The defendant further led a group of armed protestors in pursuit of an officer up a staircase, steps away from the Senate Chamber, where members of Congress were sheltering at the very moment. |
| --- | --- | --- | --- | --- |
| 69. | *United States v. Ramey* | No. 1:21-CR-00184-DLF | **60 Months of Incarceration** | In this case, the defendant was convicted following a bench trial. They sprayed numerous officers with a chemical irritant. |
| 70. | *United States v. Stevens* | No. 1:21-CR-00040-TNM | **60 Months of Incarceration** | In this case, the defendant was convicted following a bench trial. They stole riot gear from police and used it against officers in attempts to breach the Capitol Building. |
| 71. | *United States v. Sandlin* | No. 1:21-CR-00088-DLF | **63 Months of Incarceration** | In this case, the defendant traveled to D.C. along with two co-conspirators in a car full of weapons, including several knives, bear spray, Glock 43 pistol, two magazines of ammunition, gas masks, stun gun, slingshot, military-style vests/body armor, two helmets, a baton, walkie-talkies and Sandlin's M&P pocket pistol. The defendant made their way through the East Rotunda doors with their co-conspirators and shoved officers to force the door behind them open, allowing the mob outside to begin streaming in. They further attempted to rip the helmet off an officer, and along with their co-conspirators, they engaged in a shoving match with officers in an attempt to keep the doors to the Senate |

| | | | | |
|---|---|---|---|---|
| | | | | Gallery open, striking an officer's head in the process. The defendant then wandered through the Capitol in pursuit of members of Congress, asking an unknown individual, "is that where the Senators are at?" Finally, they smoked a marijuana joint in the Rotunda of the Capitol while stating, "we made history" and "this is our house." |
| 72. | *United States v. Ponder* | No. 1:21-CR-00259-TSC | **63 Months of Incarceration** | In this case, the defendant was convicted after trial. They recruited co-defendants and swung a pole at an officer and after their pole broke against the officer's shield, they re-armed themselves with a sturdier pole and assaulted another officer. 15 minutes after the first two assaults, he assaulted another officer with the same sturdier pole. |
| 73. | *United States v. Palmer* | No. 1:21-CR-0328-TSC | **63 Months of Incarceration** | In this case, the defendant was on the steps leading to the LWT tunnel, and having acquired a wooden plank, he threw the plank like a spear at police officers. He picked up a fire extinguisher, and sprayed police with its contents.  Then, once it was empty, he threw it at police officers. The defendant then "cast around for additional items with which he could assault the police." He took hold of a long piece of scaffolding wrapped in canvas and pushed it at the legs of the police. He additionally picked up the fire extinguisher he previously used to assault police and again threw it at police. Also, at some point, he picked up an orange traffic barrier and threw it towards the police. |
| 74. | *United States v. Caldwell* | No. 1:21-CR-181-CKK | **68 Months of Incarceration** | In this case, the defendant was a marine veteran. He had armed himself with bear spray, outfitted himself with glasses that could protect himself from some of the effects of pepper spray, and brought a hand-held two-way radio. He sprayed a |

| | | | | line of officers protecting the Lower West Terrace Place with a canister of gaseous chemical irritant. The defendant then confronted and taunted police officers by asking them to spray, and asking if they were "scared." He was present on the front lines of the main assault for almost the entire duration of the confrontation. |
|---|---|---|---|---|
| 75. | *United States v. Gillespie* | No. 1:22-CR-00060-BAH | **68 Months of Incarceration** | In this case, the defendant was convicted by jury. He used a stolen riot shield to "ram" police officers. He grabbed an MPD Officer by the arm and yanked him toward the crowd. |
| 76. | *United States v. Kenyon* | No. 1:21-CR-00726-CJN | **72 Months of Incarceration** | In this case, the defendant pleaded guilty. He attempted to break a window with his fists and a flagpole. He also used a variety of objects to assault officers in the Lower West Terrace tunnel, throwing large plastic pylons towards officers. The defendant then used a table leg to strike an officer. |
| 77. | *United States v. Maly* | No. 1:21-CR-00178-BAH | **72 Months of Incarceration** | In this case, the defendant was convicted after a jury trial. He stole police pepper spray and used it against officers in an attempt to storm the building. |
| 78. | *United States v. Southard-Rumsey* | No. 1:21-CR-00387-APM | **72 Months of Incarceration** | In this case, the defendant broke through police barricades to illegally enter the Capitol Building. He grabbed an officer's riot shield and used it to push against officers. He then used a flagpole to strike officers in the head. |
| 79. | *United States v. McGrew* | No. 1:21-CR-00398-BAH | **78 Months of Incarceration** | In this case, the defendant was a former U.S. Marine. He flew with bear mace to D.C. He then entered the Capitol through the unguarded Upper West Terrace doorway. Prior to entering, the defendant encouraged other protesters, repeatedly yelling, "Let's Go!" He struck an MPD officer within seconds of entering the Capitol. |

| | | | | He screamed at officers and refused to follow instructions to leave the building. The defendant struck several more officers, attempted to and successfully grabbed officers' batons, and locked arms with other protestors, in defiance of officer's commands that protestors leave the building. |
|---|---|---|---|---|
| 80. | *United States v. Khater* | No. 1:21-CR-00222-TFH | **80 Months of Incarceration** | In this case, the defendant arrived in D.C.  with two containers of bear spray and two containers of hand-held pepper spray. They pepper sprayed any police officer he could find for nearly half a minute.  He sprayed at least three officers at close range on the Lower West Terrace. |
| 81. | *United States v. Grider* | No. 1:21-CR-00022-KKK | **83 Months of Incarceration** | In this case, the defendant assisted others in dismantling police barricades and turning bike racks into ladders. They illegally entered the Capitol Building. They led others into the Chamber and used police officer equipment to break windows. |
| 82. | *United States v. Alberts* | No. 1:21-CR-00026-CRC | **84 Months of Incarceration** | In this case, the defendant pleaded guilty. They entered the Capitol Building while armed with a loaded firearm. |
| 83. | *United States v. Young* | No. 1:21-CR-00291-ABJ | **86 Months of Incarceration** | In this case, the defendant brought their 16-year-old son with them. They stormed the police line in the tunnel on the Lower West Terrace and handed a fellow protestor a taser. They then worked with another protestor to throw a large audio speaker toward the police line, which missed the officers and struck a fellow protestor on the head, drawing blood. They used a long pole or stick to jab towards the police line. They then joined an attack on an officer by restraining his wrist while a co-defendant removed his police badge and police radio.  The officer's wrist was broken by a riot shield moving through |

| | | | | the crowd above the protestors' heads. Finally, the defendant assaulted an officer who was temporarily disoriented and blinded by bear spray by grabbing at his helmet and body, pushing him, and hitting him. |
|---|---|---|---|---|
| 84. | *United States v. Robertson* | No. 1:21-CR-00034-CRC | **87 Months of Incarceration** | In this case, the defendant brought a gas mask and large wooden stick. He then raised up his wooden stick in "port arms," a tactical position used by the military and law enforcement to push others away and blocked the path of officers attempting to hold back the mob. The defendant additionally destroyed evidence from him and a co-defendant prior to arrest. |
| 85. | *United States v. Guy Reffitt* | No. 1:21-CR-00032-DLF | **87 Months of Incarceration** | In this case, the defendant was a recruiter for an antigovernment movement. He stormed the Capitol Building with a firearm. |
| 86. | *United States v. Sandoval* | No. 1:21-CR-00195-CKK | **88 Months of Incarceration** | In this case, the defendant pleaded guilty. He illegally entered the Capitol Building. He stole riot shields from two officers and shoved two others. |
| 87. | *United States v. Head* | No. 1:21-CR-00291-ABJ | **90 Months of Incarceration** | In this case, the defendant carried a knife on his hip. He repeatedly struck towards police line with a riot shield. He then pushed the shield against an officer for nearly three minutes.  After a continued struggle with the officer, he wrapped his arm around the officer's neck and yelled, "I've got one!" He then dragged the officer into the mob, isolating him as the crowd violently assaulted the officer. |
| 88. | *United States v. McCaughey* | No. 1:21-CR-00040-TNM | **90 Months of Incarceration** | In this case, the defendant was convicted after trial. He assisted in overwhelming a police line, taunted and assaulted police officers. He then used a stolen riot shield to push against Law enforcement officers, trapping them against a door frame. |
| 89. | *United States v. Watkins* | No. 1:22-CR-00015-CKK | **102 Months of Incarceration** | In this case, the defendant was convicted by jury. He was a member of the Oath Keeper group. He further led a group from Ohio to Washington, D.C.  armed |

| | | | | |
|---|---|---|---|---|
| | | | | with tactical gear in order to breach the Capitol Building. |
| 90. | *United States v. Webster* | No. 1:21-CR-00208-APM | **120 Months of Incarceration** | In this case, the defendant was convicted after trial. He was a former Marine and a 22-year veteran of the New York City Police Department. He traveled to D.C. with an NYPD bulletproof vest and a Smith and Wesson Model 640 revolver, small enough to conceal inside a jacket pocket. The defendant then carried a large metal flagpole. He forcefully pushed against a bike rack. The officer reached across to shove him away but in doing so, struck Webster on his face. Webster then swung the flagpole against the bike rack with enough force to break the metal pole in half.  The defendant charged at the officer and tackled the officer to the ground after the officer wrestled the flagpole out of his grip.  He then dragged the officer by his helmet, pinned him to the ground, and tried to rip his gas mask off.  This caused tear gas to become trapped inside the officer's mask, and his throat and nose began to burn.  While he restrained the officer on the ground, other protestors began kicking the officer.  He left the officer on the ground and continued toward the Capitol. |