**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-216 (JDB)** |
| **LEO BRENT BOZELL IV,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. After applying the Chapter Two specific offense characteristics and Chapter Three adjustments, including the application of Section 3A1.4 to the defendant's federal crime of terrorism, the advisory guidelines range is properly calculated as 262-327 months of imprisonment. For the reasons set forth herein, the government requests that this Court sentence the defendant to 140 months of incarceration, which reflects a downward variance from the advisory guidelines range and is consistent with sentences imposed in other January 6 cases and the government's sentencing recommendations for those actors whose conduct had an outsized impact on the course of the riot on January 6. As explained in more detail herein, Bozell is not similarly situated to any other defendant given his relentless and sustained attacks on law enforcement in multiple locations inside and outside the Capitol on January 6. Bozell's conduct was dangerous, and it enabled and encouraged others to overwhelm the Capitol's defenses. A sentence of 140 months is fully justified by his actions.

1

## I.  INTRODUCTION

Leo Brent Bozell IV led the charge in a violent attack on the United States Capitol, which forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

There are few rioters on January 6 who were involved in as many pivotal breaches as Bozell. He positioned himself at the forefront of the mob during pivotal moments of the attack as he actively and aggressively propelled the momentum of the mob from the Senate Wing Doors—where he personally created entry points for hundreds of rioters—all the way to the Senate Chamber, which he occupied rendering it impossible for Congress to meet. Bozell participated in—and often led—a series of critical breaches on January 6: the police line under the scaffolding (2:00 p.m.); the police line on the landing of the Northwest Stairs (2:09 p.m.); the final police line at the top of the Northwest Stairs (2:11 p.m.); the initial breach of the Capitol building at the Senate Wing Doors (2:12 p.m.); the police line near the Carriage Door (2:21 p.m.); the East Rotunda Doors (2:38 p.m.); the Senate Gallery (2:42 p.m.), and the Senate Floor (2:49 p.m.).

Bozell started on the west front where he bypassed barriers and overran several police lines at different points on the Northwest Stairs. He then led the charge toward the Capitol building when he

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

marched directly to the Senate Wing Door and, using a solid metal object, shattered the windowpane of the Senate Wing Door after violently striking it at least ten times. He moved a few feet and struck a large windowpane at least eleven times until the glass shattered and crumbled onto the floor inside the building.

After brazenly facilitating the mob's access to the building, Bozell was in the first group of the rioters to enter the Capitol. He joined others in a menacing pursuit of United States Capitol Police (USCP) Officer Eugene Goodman up a staircase. The pursuit ended only a few steps away from the Senate chamber where members of Congress were sheltering at that very moment. When an officer line stopped the progression of the mob, Bozell broke away. He entered a private meeting room and then rejoined a different group of rioters near the Carriage Door. When police officers attempted to force rioters out of the building through that door, Bozell joined other rioters in overrunning the police line. Bozell next entered former Speaker of the House Nancy Pelosi's office and left carrying an unidentified object in his hand.

After passing through the Rotunda, Bozell joined other rioters as they forcefully pushed open the East Rotunda Doors from the inside, creating yet another entry point for the hundreds of rioters on the east front. Bozell quickly moved towards the Senate Chamber. Several officers stood guard outside the Senate Gallery, but the mob pushed through them and entered the Gallery. Bozell was one of the first rioters to enter the Senate Chamber. He maneuvered one of the video cameras towards the floor to obstruct its recording and then watched as another rioter jumped from the Senate Gallery to the Floor to open the doors for the mob.

At that point, Bozell marched directly to the Senate Floor. He was one of the first rioters on the Floor. Bozell directed rioters still in the Gallery to point other cameras down to prevent them from recording the mayhem inside the Chamber. After Bozell and fellow rioters occupied the Senate

Floor—where Senators should have been meeting to advance the certification vote—Capitol Police officers corralled Bozell and others towards the exit of the building. Bozell again broke away and continued his procession through the Capitol. Eventually, after Bozell spent nearly an hour inside the Capitol building, entering more than a dozen locations, and joining rioters in overrunning numerous police lines, police officers corralled him and moved him out of the building.

After January 6, Bozell expressed disappointment that the election results were eventually certified despite the mob's efforts, calling Mike Pence a "traitor" for his part in certifying the election results. Bozell also sought to minimize and justify his conduct. For example, he made fantastical claims about how he accessed the building, and he told his friends and family that the "Capitol siege was morally justified." And during his trial testimony, Bozell came up with outrageous justifications for his conduct on January 6 that were both inconsistent with the video evidence and implausible.

For his unrelenting, wide-ranging, and unlawful actions on January 6, the government recommends that the Court sentence Bozell to 140 months of incarceration, which is below the advisory Guidelines range of 262-327 months. That sentence reflects the gravity and significance of Bozell's conduct on January 6, which was crucial to the mob's success, while also taking into account the need to avoid unwarranted sentence disparities among defendants.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the Statement of Offense filed in this case, ECF No. 1-1, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

**B.    Bozell's Role in the January 6, 2021 Attack on the Capitol[2]**

*Planning And Preparation For January 6*

Leo Brent Bozell IV was disappointed in the results of the 2020 presidential election and wanted to stop President-elect Biden from taking office; he believed that the election had been stolen. Trial Tr. at 330 (9/7/23). He said, for example, that he believed people "sat in the convention center filling out ballots until Biden won," Ex.[3] 668.3.4, and he knew that people "illegally filled out legal ballots," Ex. 628.44.1. Bozell sent tweets about electoral votes and election fraud, Ex. 628.52.3, and prepared for patriots to be "ready" to respond, Ex. 628.23.2; *see also* Ex. 628.101.2 (Bozell sending tweet showing polling place video saying fraud is "blatant"); Ex. 628.138.1 (Bozell sharing tweet about the election not being legitimate); Ex. 675.91.2 (Bozell: "The world is about to get the shock of a lifetime. Great Awakening. Trump won.").

In response to claims of election fraud, Bozell heard that Trump supporters were planning a big event in Washington, D.C. on January 6. Bozell immediately began making arrangements to attend, coordinating with the rally leaders to provide entertainment for the day, and encouraging his family and friends to attend. Trial Tr. at 270 (9/7/23). Bozell warned his friends that "The 6th is a must attend. Might be our last chance to assemble and stand for our country, our freedom, and our children." Ex. 664.179.1; *see also, e.g.*, Ex. 676.12.1-.3 (Bozell: "Can I expect to see you in DC on 1-6-21? . . . The rally to end all rallies. Everyone must go. It may be your last chance to stand up for America."); Ex. 625.1.1 (Bozell: "I expect to see both of you in DC on 1-6-21. Bring anyone you can."); Ex. 668.227.1-2 (Bozell: "You should go to DC on the 6th. Tell your enemies to kiss your ass."); Ex. 603.1.1 (Bozell: "Jesse, I know you love America and I know you know this election is in

---

[2]  Much of the facts from Section B are discussed in the Court's oral verdict, Trial Tr. at 330 (9/7/23).
[3]  Citations to "Ex." throughout refer to the Government's trial exhibits.

the process of being stolen from the people. You can help. . . .").

Bozell understood the Constitutional significance of January 6. He knew the certification was scheduled to occur that day, that Congress would be in the Capitol building, and that Vice President Pence would be present and presiding. Trial Tr. at 329 (9/7/23). Bozell shared his knowledge about the day; prior to January 6, he informed others about both the significance and process of the certification. *See, e.g.*, Ex. 664.329.3-.320.3 (question to Bozell: "Okay so how's the Jan 6 session supposed to work? . . ." Bozell's response: "Pence can accept either set of electors or none at all."); Ex. 664.354.3-.4 to 664.355.1 (Bozell: "Constitutionally, Pence can't ignore them. It's all on Pence. He can do whatever he wants. VP has crazy authority."); Ex. 664.322.1-.4 (Bozell explaining that a "contingent election" should take place "[t]hat day").

Even before he arrived in Washington, D.C., Bozell planned to go to the Capitol on January 6. Trial Tr. at 327 (9/7/23). And during his planning, he expressed both violent and criminal intentions. *See also* Trial Tr. at 502 (9/8/23) (Trial Verdict) ("Special Agent Wright testified about . . . some references to violent conduct or anticipated conduct."). For example, prior to January 6, Bozell's brother sent him a video clip showing a man breaking into a house by punching his hand through glass, ransacking the house, and claiming that he was stealing intel from the house. Bozell's brother wrote, "Let's do this ^." Bozell responded, "It's coming, Joey. Soon. Lots of declass before 1-6." Ex. 664.219.1-.3. Bozell stated that he was going to D.C. for the 6th to "throw[] them all out," Ex. 664.191.1, and he expected that things would get violent at the Capitol so he planned accordingly—stating that he would bring "lighters and fire starters," Ex. 664.305.3; *see also* Ex. 607.6.4 (Bozell: "I talk[ed] to my wife, she wants me to come home on wednesday because of concerns that things are going to get violent at the capital [sic]."). When discussing the 6th, Bozell said that he would be "tossing Schiff's office." Ex. 664.217.4. And in those same types of

conversations, Bozell also sent a photo showing a bulldozer going through the police line with a caption referencing "break[ing] through a police line." Bozell responded, "looks like fun." Ex. 636.50.1.

### The January 6 Capitol Riot And Bozell's Actions

Bozell traveled to Washington, D.C. from Palmyra, Pennsylvania on January 5. On January 6, Bozell attended the former president's "Stop the Steal" rally. As planned, after the rally, Bozell marched with the crowd towards the U.S. Capitol. He entered Capitol grounds before 2:00 p.m., made his way past the barriers, and approached the Northwest Stairs where he watched as rioters confronted officers on the landing of the staircase. Bozell watched as another rioter, Guy Reffitt, rushed at the officers while nearby rioters cut through the tarp on the construction scaffolding.



*Ex. 455 showing Bozell (yellow square) watching as rioters confronted the police officers (red rectangle) on the Northwest Stairs*

Bozell saw plumes of tear gas in the air and heard rioters accosting police officers and chanting things like, "WHOSE HOUSE? OUR HOUSE!" Ex. 455 at :29. As rioters continued to assault officers, Bozell, for his part, used a bike rack barrier as a ladder to climb part way up the balustrade and supply the violent rioters on the stairs with objects, including a long white pole.



*Ex. 408 showing Bozell (yellow circle) passing a large and long white pole to rioters (left) and an object (right) as he climbed up a bike rack repurposed by rioters as a ladder*

Around 1:48 p.m., at the base of the Northwest Stairs near the entrance of the scaffolding, rioters, Bozell included, surged forward and overran a police line. Ex. 423. About halfway up the stairs, the rioters were slowed down by a construction wall and another line of officers underneath the scaffolding. As rioters chanted "FIGHT FOR TRUMP!," Bozell climbed around the wall and joined the rioters as they overran the line of officers. The officers retreated up the stairs to the landing as the mob moved forward.



*Ex. 424.2 (left) showing wall obstructing rioters, and Ex. 424.7 (right) showing Bozell (yellow circle) climbing around the wall and approaching another line of officers (red rectangle) that the mob quickly overran*



*Ex. 424 showing Bozell (yellow circle) ascending stairs after the mob overpowered the police line and showing a rioter attacking a police officer nearby (red square)*

Once the mob reached the landing of the staircase, they were again stopped, this time by a bike rack wall, a line of officers, and the large white tarp that wrapped the construction scaffolding. Bozell and other rioters attempted to bypass the police line. At trial, USCP Officer Adam DesCamp described the scene: as the officers held their line, rioters "joust[ed]" the officers with a bike rack, used the bike racks to push the officers away, and tried to disarm the officers of the bike racks. Trial Tr. at 35, 39-40 (9/6/23). Other rioters threw objects at officers and sprayed chemical irritant at the officer line.

As officers struggled to maintain control of the bike racks, Bozell ripped through the tarp. *Id.* at 37.



*Ex. 423 showing Bozell (yellow circle) tearing the tarp under the scaffolding*

As the mob continually attempted to break through the police line, Bozell moved to the corner

of the scaffolding tarp and, at about 2:07 p.m., successfully tore through the tarp. Bozell crawled

through the entry point that he ripped, making it one step closer to the Capitol building.



*Ex. 443 showing Bozell (yellow circle) under the construction scaffolding tearing through the tarp
as another rioter sprays chemical irritant at the officer line*



*Ex. 117 showing Bozell (yellow arrow) climbing through tarp onto the landing
platform on the Northwest Stairs and confronting another officer line (red rectangle)*

As Bozell emerged on the landing, one officer immediately moved to push Bozell back, and

Bozell aggressively yelled at him. Ex. 117. Bozell leaned his body over the balustrade and waved

for other rioters to ascend the stairs. He faced an officer and yelled in the officer's face.



*Ex. 117 showing Bozell (left, yellow circle) waving rioters up the stairs and (right, yellow arrow) facing off with USCP Officers*

The officers did everything they could to prevent the rioters from gaining access to the Capitol. Trial Tr. at 38, 64 (9/6/23). But, as USCP Officer Bradley Murray testified, with Bozell at the forefront, the rioters on the landing of the staircase became increasingly aggressive as rioters on the lawn below threw objects, such as a traffic cone, metal objects, and a pole, at the officers. *Id.* at 64 ("[W]e were taking debris from individuals . . . I remember being struck at least two times by different pieces of debris, one being a large bolt. And then I recall other officers saying that they were struck with items such as batteries."). At that point, Officer Murray and his fellow officers were in a precarious position with a staircase immediately behind them, objects being thrown at them from the side, and an angry mob at front. *Id.* at 66 ("We had objects coming in from the right and then the crowd to our front. And also, one of my fears was the staircase behind us. . . . If we were pushed back, that would have been a tripping hazard and we could have been overrun.").

As the officers' attention was partially diverted while they dodged objects thrown from below the landing, *id.* at 66, Bozell and his fellow rioters on the staircase took advantage. At about 2:09 p.m., with Bozell still face-to-face with the officer line, one rioter—standing directly next to Bozell—coordinated the crowd by yelling, "ARE YOU READY TO PUSH?! LET'S PUSH! . . . PUSH!" With

that, the rioters—Bozell still at the front—forcefully barreled through the police line, making physical contact with the officers. Trial Tr. at 70 (9/6/23). Some officers quickly moved to the side and others, including Officer Murray, retreated up the stairs to avoid being trampled on the staircase. *Id.* at 68-71.



*Exs. 117, 1001 showing Bozell (red arrow) barreling through the police line to gain access to stairway*

At the top of the stairs, Officer Murray and other officers formed another line behind bike racks. However, with Bozell at the front of the mob, the rioters forcefully pushed the bike racks aside, sprayed the officers with chemical irritants, and used their momentum to quickly overrun this police line. *See id.* at 76.



*Ex. 407 showing Bozell ascending the NW Stairs towards a line of bike racks and a line of officers*



*Ex. 404 showing rioters tearing down bike racks and overrunning a police line*

At about 2:12 p.m., the mob pushed over the barricades and surged forward toward the Capitol building. After having joined rioters in overrunning *four lines of police officers*, Bozell stepped past the toppled bike racks and darted towards the Senate Wing Door. Along the way, Bozell picked up a "heavy metal object" from the ground.



*Ex. 410 showing Bozell picking up a heavy metal object from the ground en route*
*to the Senate Wing Door*

Bozell rushed to the Senate Wing Door, making him one of the first rioters to reach the Capitol building. He used the heavy metal object and immediately started bashing the windowpane, striking it at least ten times and shattering the glass.



*Exs. 412 and 1007 showing Bozell (yellow circle, left) bashing the windowpane of the Senate Wing Door and shattering the glass (red arrow, right)*

Bozell moved a couple of feet over to the large window directly north of the Senate Wing Door. He bashed that window at least eleven times until the glass shattered and littered the floor.



*Exs. 100, 1008 showing Bozell (yellow circle, left) walking to the window and bashing it until glass shattered into the building (yellow circle, right)*

Other rioters succeeded in pushing through the last of the glass out of the window, which created a pivotal access point into the Capitol building. At 2:13 p.m., Bozell climbed through the window, and, as a high-pitched alarm sounded overhead, he immediately began yelling—celebrating his accomplishment of taking the Capitol.

14



*Ex. 100 (top) showing Bozell (yellow circle) climbing through the window after smashing through it, and Ex. 220 (bottom) showing Bozell immediately celebrating*

Bozell marched north towards the Senate Wing as nearby Senate staffers hurried away from the mob. *See* Ex. 426.

At that time, USCP Officer Eugene Goodman responded to desperate radio calls and sprinted to meet the mob face-to-face. The mob, Bozell included, chased Officer Goodman up a staircase. *See* Trial Tr. at 111 (9/6/23) (describing the mob as "shouting, chanting, moving up, intimidating the officer, [and] pushing him back up the stairs"). Heroically, Officer Goodman led the mob away from the nearby Republican Doors—the most commonly used entrance to the Senate Chamber where lawmakers remained—and to the Ohio Clock Corridor and backup USCP officers. *Id.*



*Exs. 427, 428 showing Bozell (yellow rectangle, top) ascending the stairs with the mob
chasing Officer Eugene Goodman, and then confronting a line of officers
in the Ohio Clock Corridor (yellow circle, bottom)*

The rioters faced off with USCP Officers, including Officer Keith Robishaw. At trial, Officer

Robishaw testified that it was important that the rioters did not bypass the officer line because they

were "right outside of the [senate] chamber" and the police officers had no idea if the lawmakers were

still in the Chambers. Trial Tr. at 111-112 (9/6/23). Officer Robishaw described these rioters as very

hostile, irate, and angry. *Id.* at 112, 116.

Bozell separated from the group and made his way down a hallway. He entered a meeting

room for Senators. Two USCP Officers checking rooms for staffers in hiding eventually discovered

Bozell in the room and corralled him out; Bozell rejoined the rioters in the Ohio Clock Corridor.



*Ex. 112 showing Bozell walking down a hallway and entering doors to his right,*
*where officers eventually found him and escorted him out (right, yellow circle)*

Bozell left the Ohio Clock Corridor and resumed checking door handles. He unsuccessfully

attempted to enter the Senate Majority Leader's office.



*Ex. 126 showing Bozell (yellow rectangle) attempting to open the door of*
*the Senate Majority Leader's Office*

Bozell descended to the first floor and approached the Senate Carriage Door. There, officers

attempted to corral the aggressive rioters out through the nearby door.



*Ex. 103 showing Bozell (yellow circle) turning away from officers*
*trying to corral rioters out of the door*

17

Rather than leaving the building when he saw another bout of violence, and after unsuccessfully trying to use the elevator, Bozell walked back towards the center of the Capitol building. By then, officers had formed a line behind the rioters. Rioters, Bozell included, refused to leave. A rioter standing next to Bozell exclaimed, "this is our country, this is our house, that's it!" The rioters charged forward and overran the police line.



*Ex. 404 showing Bozell (yellow circle) with other rioters facing an officer line and resisting the officers' attempts to corral the rioters out of the nearby Senate Carriage Door*

Bozell walked back through the Senate Wing foyer and marched through the building into the Memorial Hall alongside a swarm of rioters yelling for Nancy Pelosi and screaming things like, "WHOSE HOUSE? OUR HOUSE!" As Bozell approached a staircase, he again separated from the group and attempted to enter the Law Library.



*Ex. 430 showing Bozell (yellow circle) attempting to open the doors of the Law Library*

18

After another unsuccessful attempt to breach another room, Bozell ascended to the second floor and entered the Rotunda.



*Ex. 121 showing Bozell (yellow arrow) in the Rotunda with other rioters*

After about five minutes, Bozell left the Rotunda and entered another private space: Speaker Pelosi's office. As Bozell exited the Speaker's office, he carried out an unidentifiable object.



*Ex. 120 showing Bozell (yellow circle) entering Speaker Nancy Pelosi's Office (left) and later exiting with an object in hand (right, red arrow)*

Bozell next entered the foyer near the East Rotunda Door where a group of rioters had amassed. Bozell joined as the rioters collectively pushed into the door, crushing officers between the mob and the door. Just a few people back from the front, Bozell used the force of his body weight to help push the doors open, creating yet another access point for the mob.

19



*Exs. 116, 407, 132, respectively, showing Bozell (yellow circle) pushing with rioters to force open the Rotunda Doors as police officers (red squares) guarded the doors*

Bozell ascended to the third floor. He reached the foyer outside the Senate Gallery as police officers attempted to secure the doors of the Senate Chamber where the Vice President and the Senate had recently evacuated. As Bozell approached, he watched as rioters assaulted the officers to gain access to the Senate Chamber—a "sacred" area in the Capitol building. Trial Tr. at 128 (9/6/23).



*Exs. 114 (left) and 435.6 (right) showing Bozell (yellow circle) approaching the doorway to the Senate Chamber as rioters overran and overthrew officers attempting to lock the doors*

Bozell was one of the first rioters in the Senate Chamber. As he entered the Gallery, the rioters chanted "TREASON! TREASON!" Bozell unpacked an emergency bag that he found under one of the Gallery seats.



*Ex. 435 showing Bozell as one of the first rioters to enter the Senate Chamber (left) and Bozell rustling through an emergency supply bag and removing a rope (right)*

Bozell climbed over several handrails to the opposite side of the Gallery and moved a camera that was live recording the Chambers, obstructing that camera from recording the riot.

21



*Ex. 218 showing Bozell moving a camera to face the ground*

Bozell watched as another rioter jumped from the Senate Gallery onto the Senate Floor to open the doors for the mob. Once the mob gained access to the Senate Floor, Bozell exited the Senate Gallery and walked directly to the Senate Floor.

Bozell entered the Senate Floor at 2:49 p.m. As he entered, personal effects, papers, laptops, and other items remained on Senators' desks—evidence that the rioters had caused the Senators to abruptly abandon the certification proceeding and flee. While on the Senate Floor, rioters "started going through the effects of the different Senators at their desks, opening, rummaging through papers, taking photographs of their personal notes . . . , yelling, still screaming, talking amongst themselves, [and] planning." Trial Tr. at 135 (9/6/23). At one point, Bozell peered towards the Gallery and saw a camera directly facing him. *Id.* at 137. He directed rioters in the Gallery to push the cameras down.

 

*Ex. 305 showing Bozell looking directly at the Senate camera and directing (yellow arrow) rioters to move the Senate cameras down*

22

About six minutes later, Officer Robishaw and other officers directed this pack of rioters towards an exit, Trial Tr. at 139 (9/6/23), but Bozell did not leave. He broke away and continued to roam the building. Around that time, a new wave of rioters breached the nearby Parliamentarian's Door and approached an officer line in an adjacent hallway. Bozell watched as rioters attempted to break through the police line.



*Ex. 106 showing Bozell (yellow circle) watching as rioters fight to get past police officers*

Officers eventually resecured the area and were finally able to force Bozell out of the North Door at 3:07 p.m.



*Exs. 307 and 217 showing Bozell (yellow circle) exiting the Capitol building through the North Door*

Once outside, Bozell remained on Capitol grounds near the North Doors as officers continued to expel rioters from the building. Bozell later reapproached the Senate Wing Doors where he remained until after 3:45 p.m., when police officers regained control of the area and corralled rioters out of the area.

### Post January 6 Statements

Despite his critical role in leading several breaches of the Capitol's defenses, after January 6, Bozell sent numerous text messages that minimized his participation in, and actively misled his friends and family about, the riot. For example, Bozell sent a text message that said, "We got played today. Antifa lead. Cops let everyone in. . . ." Ex. 664.446.2-.4; *see also* Ex. 668.246.1-.2 (Bozell: "What you're hearing/reading is not true. Cops let the protestors in. They put up no fight/let protestors do what they wanted inside."); Ex. 664.495.1-.4 (Bozell: "Cops opened the doors. Antifa coordinated with Congress, DC mayor and police to gain unfettered access."). Bozell sent a text message to his brother, encouraging his brother to convince their father, who had publicly condemned violence on January 6, to reconsider. Ex. 664.490.1. Bozell also expressed his disdain for former Vice President Pence. He repeatedly said, for example, that Pence was a "traitor." Ex. 668.249.1-.4.

### Bozell's Trial Testimony

At trial, Bozell testified on his own behalf. His testimony was riddled with falsehoods. His rendition of the events of January 6 stood in direct contrast to the dozens of videos introduced at trial showing his conduct on January 6. And when Bozell testified to his intentions, the testimony was not only unbelievable but also stood in conflict with his multitude of text messages prior to January 6 and his actions on that day.

The Court's verdict established the mendacity of Bozell's testimony: "I find that Mr. Bozell

24

was not a credible witness on several fronts. Many of his explanations of his conduct before and on January 6 defy both the video evidence and common sense." Trial Tr. at 503 (9/8/23) (Trial Verdict). The Court explicitly discredited Bozell's story that his text messages conveying his views that the election was stolen, stressing the importance of showing up in D.C. on January 6, and referencing violence and "taking the Capitol," were simply "silly conversations" with family and friends that did not reflect his true goal of fun and celebration on January 6. The Court explained that "the sentiments expressed in these messages track Mr. Bozell's actual conduct on January 6: He did in fact smash windows, storm the Capitol, and help to delay the certification of the 2020 election." *Id.* at 504.

The Court also found Bozell's explanations about his conduct incredible. For example, the Court explained that Bozell's narrative that he was trying to "help" the police officers was inconsistent with the evidence. *Id.* The Court discredited Bozell's testimony that: he was waving at officers, not rioters, *id.*; he did not see bike rack barriers, even though video footage shows Bozell looking directly at them, *id.* at 505; Bozell smashed two windows because he was angry that the situation outside was deteriorating so quickly—not because he was attempting to gain access to the Capitol, *id.*; and Bozell roamed through the Capitol for nearly an hour because he was trying to find his mother, *id.* at 506. The Court also found that Bozell's testimony about his conduct inside the Capitol was not credible.

## III.   THE CHARGES AND TRIAL

On April 26, 2023, a federal grand jury returned a superseding indictment charging Bozell with ten counts:

1. Count 1: Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2;
2. Count 2: Destruction of Government Property and Aiding and Abetting, in violation of 18 U.S.C. §§ 1361 and 2;
3. Count 3: Destruction of Government Property and Aiding and Abetting, in violation of 18 U.S.C. §§ 1361 and 2;
4. Count 4: Civil Disorder, in violation of 18 U.S.C. § 231(a)(3);

5. Count 5: Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1);

6. Count 6: Entering and Remaining in a Restricted Building and Grounds, in violation of 18 U.S.C. § 1752(a)(1);

7. Count 7: Disorderly and Disruptive a Restricted Building and Grounds, in violation of 18 U.S.C. § 1752(a)(2);

8. Count 8: Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D);

9. Count 9: Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F); and

10. Count 10: Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

On September 8, 2023, Bozell was convicted of all ten offenses following a bench trial.

## IV.   STATUTORY PENALTIES

Bozell now faces sentencing on all ten counts of the superseding indictment. The Presentence Report issued by the U.S. Probation Office accurately identifies the statutory maximum sentences for each of count of conviction. Pre-Sentence Report, ECF No. 86 ("PSR") ¶¶ 158-163.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government calculates the defendant's guidelines' total offense level prior to be 34, and Criminal History category to be VI. Therefore, the guidelines range is 262-327 months.

### A.   Guidelines Analysis

The Sentencing Guidelines direct the sentencing court to repeat the applicable Guidelines for each count. Therefore, the government presents herein a count-by-count calculation for each crime of conviction. The Guidelines set out the specific "order" of the analysis: first, determine the offense guideline; second, determine the base offense level and apply appropriate specific offense characteristics, cross references, and special instructions; third, apply any adjustments in Parts A, B,

and C of Chapter 3. U.S.S.G. § 1B1.1(a)(1)-(3). Then, repeat each step for each count. U.S.S.G. § 1B1.1(a)(4). Finally, perform the grouping analysis in Part D of Chapter 3. *Id.*

The government submits the following count by count Guidelines analysis applies to Bozell's conduct and convictions:

1. **Count One, 18 U.S.C. §§ 1512(c)(2), 2 (Obstruction of an Official Proceeding, Aiding and Abetting)**

The Statutory Index lists U.S.S.G. § 2J1.2 (Obstruction of Justice) as the guideline for a Section 1512(c) offense.

| Base Offense Level | 14 | U.S.S.G. § 2J1.2(a) Obstruction |
|---|---|---|
| Chapter 3 Adjustment | +2 | U.S.S.G. § 3C1.1: "If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels." |
| | | Bozell obstructed the administration of justice by repeatedly testifying untruthfully on material matters at trial. As the Court described in the oral verdict, Bozell testified untruthfully on more than a dozen topics on material matters, including his intent for sending text messages planning for January 6, his intent when he waved on the Northwest Staircase, his purpose in tearing through the scaffolding tarp, his intent and purpose in plowing through the police line, his intent and purpose in breaking two windows, his reason for going inside the Capitol, his objective while inside the Capitol, and numerous other facts related to his time and reason for being in the building. These untruths were material because they related specifically to Bozell's intent and purpose for traveling to D.C., breaking through the windows, entering the Senate Chambers, assisting rioters in breaking open another door, and generally being in the Capitol building, all of which are directly relevant to Count One. |
| **Total** | **16** | |

***Two Level Upward Departure For Obstruction of Justice Under Section 3C1.1***

Section 3C1.1 of the Guidelines provides for a two-level increase if the court finds, by a preponderance of the evidence, that the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instance offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." The guidelines provide a non-exhaustive list of obstruct conduct that warrants an enhancement under this provision, including "committing perjury." U.S.S.G. § 3C1.1 n.4(B); *see United States v. Dunningan*, 507 U.S. 87, 92-95 (1993) (confirming that perjury merits the obstruction enhancement under Section 3C1.1).

In the January 6 context, courts have routinely concluded that a defendant's dishonest trial testimony supports this enhancement. *See United States v. Alford*, 89 F.4th 943, 954, 954 n.6, (D.C. Cir. 2024) (explaining there was no indication that the application of Section 3C1.1 "punished [the defendant] for exercising his right to a jury trial" and explaining that it was "not unreasonable for the district court to conclude that [the defendant] warranted a sentence greater than other January 6th misdemeanants because he . . . brought upon himself the penalty of a two-level enhancement through his testimony"); *United States v. Bledsoe*, 21-cr-204 (BAH), Sent. Tr. at 18 (10/21/2022) ("[D]efendant's testimony, to put it bluntly, [was] evasive. . . . He was trying to minimize his knowledge that he knew his actions were obstructing an official proceeding," and his testimony was "incredible given the evidence presented," *id.* at 19, on four separate topics, including (1) his knowledge and understanding of what was taking place in Congress, (2) the lawfulness of his entry into the Capitol, (3) the identities of individuals he entered the Capitol looking for, and (4) the meaning of text messages and content he sent condoning violence and storming the Capitol, *id.* at

71); *United States v. Alberts*, 21-cr-26 (CRC) (applying Section 3C1.1 following false testimony under oath at trial); *United States v. Padilla*, 21-cr-214 (JDB) (same); *United States v. Griffith*, 21-cr-244 (CKK) (same).

Here, the evidence is more than sufficient to find that Bozell committed perjury. Bozell committed perjury if he gave, "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Dunnigan*, 507 U.S. at 94. A "material" statement is one that concerns "information that, if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1 n.6.

At trial, Bozell committed perjury when he made numerous self-serving statements that minimized and distorted his conduct, denied culpability, and attempted to avoid responsibility. As the Court acknowledged during the verdict, Bozell testified untruthfully on more than a dozen topics on material matters, including his intent for sending text messages planning for January 6, his intent when he waved on the Northwest Staircase, his purpose in tearing through the scaffolding tarp, his intent and purpose in plowing through the police line, his intent and purpose in breaking two windows, his reason for going inside the Capitol, his objective while inside the Capitol, and numerous other facts related to his time and reason for being in the building. He doubled down and attempted to distort the clear meaning of his pre- and post-January 6 text messages, even though they were not complicated, not difficult to understand, and certainly not ambiguous. The repeated untruths were material because they related specifically to Bozell's intent and purpose for his conduct. Not surprisingly, this Court found Bozell's testimony was "incredible given the evidence presented." In light of Bozell's incredible testimony, the two-point enhancement pursuant to Section 3C1.1 is applicable.

### 2. Count Two, 18 U.S.C. §§ 1361, 2 (Destruction of Government Property, Aiding and Abetting) (breaking the window to the north of the Senate Wing Door)

| Base offense level | 6 | U.S.S.G. § 2B1.1(a)(2): Property Destruction |
|---|---|---|
| Cross reference | | U.S.S.G. § 2B1.1(c)(4): "If the offense involved a cultural heritage resource . . . apply § 2B1.5, if the resulting offense level is greater than" under § 2B1.1. |
| | | The United States Capitol is a "historic property" and accordingly a "cultural heritage resource," pursuant to Application Note 1(A)(i) for U.S.S.G. § 2B1.5. The Application note refers to 54 U.S.C. § 300308, which defines a "historic property" as "any prehistoric or historic district, site, building, structure, or object *included on, or eligible for inclusion on, the National Register [of Historic Places]* . . . ." 54 U.S.C. § 300308 (emphasis added). While the United States Capitol is not included on the National Register, as it is exempt from inclusion on the National Register and other attendant regulations in 54 U.S.C. § 300101 et. seq. pursuant to 54 U.S.C. § 307104, it would otherwise be *eligible for inclusion* on the National Register. |
| | | The United States Capitol was designated as a National Historic Landmark in December 1960 and the National Park Service continues to recognize that designation to this day, and National Historic Landmarks are otherwise automatically included on the National Register pursuant to 54 U.S.C. § 302102(a). Accordingly, the United States Capitol is a historic property and cultural heritage resource, and Section 2B1.5 should be applied. |
| Base offense level | 8 | U.S.S.G. § 2B1.5(a) |
| Specific Offense Characteristics | +2 | U.S.S.G. § 2B1.5(b)(2)(B): Offense involved a National Historic Landmark |
| | | Application Note 3(C) for U.S.S.G. § 2B1.5, defines a National Historic Landmark as "a property designated as such pursuant to 54 U.S.C. § 302102." Section 302102(a) states that "[a] property that meets the criteria for National Historic Landmarks established *pursuant to section 302103* of this title shall be designated as a National Historic Landmark and included on the National Register, subject to the requirements of section 302107 of this title." 54 U.S.C. § 302102(a) (emphasis added). |

| | | |
|---|---|---|
| | | While, as noted above, the Capitol is exempt from inclusion on the National Register and other regulations in 54 U.S.C. § 300101 et. seq., Section 302103(2)(B) gives the Secretary of the Interior the authority to designate and remove the designation of National Historic Landmarks. 54 U.S.C. § 302103(2)(B); 36 C.F.R. § 65.9 (discussing withdrawal of National Historic Landmark designation by the Secretary of the Interior). The Capitol was designated as a National Historic Landmark in December 1960, and the National Park Service (on the Secretary of the Interior's behalf) continues to recognize that designation to this day. *See* List of NHLs by State – National Historic Landmarks (U.S. National Park Service) (nps.gov), https://www.nps.gov/subjects/nationalhistoriclandmarks/list-of-nhls-by-state.htm (last visited April 4, 2024) (listing the United States Capitol as a National Historic Landmark and noting its December 1960 designation date); *see also* 36 C.F.R. § 65.1(c) ("The National Park Service (NPS) administers the National Historic Landmarks Program on behalf of the Secretary"). |
| Specific Offense Characteristics | | U.S.S.G. § 2B1.5(b)(6): "If a dangerous weapon was brandished or its use was threatened, increase by 2 levels. If the resulting offense level is less than level 14, increase to level 14." |
| | | Bozell picked up a "heavy metal object" off the ground on the West Terrace as he approached the Senate Wing Doors and he "used the object to smash two windows near the Senate Wing Door" for a total of at least 21 times. Trial Tr. at 505, 9/8/23 (Trial Verdict). The moment when Bozell began to smash the two windows by the Senate Wing Doors was a pivotal moment on January 6. Bozell was the first rioter to begin breaking glass on the Senate Wing Door windowpane, creating a physical breach into the Capitol Building and inspiring other rioters to do the same. At the time that Bozell started smashing the windowpane, a large number of lawmakers and staffers had not been warned of the danger presented by the rioters and had not been evacuated or sheltered-in-place. As Bozell's actions and pivotal role in the initial breach of the Capitol building helped to place all of their lives in danger. |
| Offense Level | 14 | |

| Chapter 3 Adjustment | +2 | U.S.S.G. § 3C1.1: Bozell obstructed the administration of justice by repeatedly providing untruthful testimony under oath at trial.  As the Court described in the oral verdict, Bozell testified untruthfully that "he smashed two windows near the Senate Wing door not in an attempt to gain access to the building but rather because he was so angry about the fact that the situation was deteriorating that he just wanted to break something." Trial Tr. at 505, 9/8/23 (Trial Verdict). In reality, Bozell picked up an object on his way to the Capitol entrance and "smashed those windows through 21 aggressive contacts with the windows with a heavy metal object in his hand." *Id.* As the Court found, "[i]n light of this sequence of events, Mr. Bozell's claim of a spontaneous decision to enter the Capitol building only after the windows were smashed is simply not credible." *Id.* |
| **Total** | **16** | |

### 3. Count Three, 18 U.S.C. §§ 1361, 2 (Destruction of Government Property, Aiding and Abetting) (breaking the window on the Senate Wing Door)

| Base Offense Level | 6 | U.S.S.G. § 2B1.1(a)(2): If the defendant was convicted of an offense referenced to this guideline and the offense of conviction has a statutory maximum term of imprisonment of 20 years or more, (a)(1) applies. Otherwise, (a)(2) applies.<br><br>The offense of conviction has a statutory maximum term of imprisonment of 10 years, so (a)(2) applies. |
| Cross reference | | U.S.S.G. § 2B1.1(c)(4): "If the offense involved a cultural heritage resource . . . apply § 2B1.5, if the resulting offense level is greater than" under § 2B1.1.<br><br>The United States Capitol is a "historic property" and accordingly a "cultural heritage resource," pursuant to Application Note 1(A)(i) for U.S.S.G. § 2B1.5.  The Application note refers to 54 U.S.C. § 300308, which defines a "historic property" as "any prehistoric or historic district, site, building, structure, or object *included on, or eligible for inclusion on, the National Register [of Historic Places]* . . . ." 54 U.S.C. § 300308 (emphasis added).  While the United States Capitol is not included on the National Register, as it is exempt from inclusion on the National Register and other attendant regulations in 54 U.S.C. § 300101 et. seq. pursuant to 54 U.S.C. § 307104, it would otherwise be *eligible for inclusion* on the National Register. |

| | | |
|---|---|---|
| | | The United States Capitol was designated as a National Historic Landmark in December 1960 and the National Park Service continues to recognize that designation to this day, and National Historic Landmarks are otherwise automatically included on the National Register pursuant to 54 U.S.C. § 302102(a). Accordingly, the United States Capitol is a historic property and cultural heritage resource, and Section 2B1.5 should be applied. |
| Base offense level | 8 | U.S.S.G. § 2B1.5(a) |
| Specific Offense Characteristics | +2 | U.S.S.G. § 2B1.5(b)(2)(B): Offense involved a National Historic Landmark |
| | | Application Note 3(C) for U.S.S.G. § 2B1.5, defines a National Historic Landmark as "a property designated as such pursuant to 54 U.S.C. § 302102." Section 302102(a) states that "[a] property that meets the criteria for National Historic Landmarks established *pursuant to section 302103* of this title shall be designated as a National Historic Landmark and included on the National Register, subject to the requirements of section 302107 of this title." 54 U.S.C. § 302102(a) (emphasis added). |
| | | While, as noted above, the Capitol is exempt from inclusion on the National Register and other regulations in 54 U.S.C. § 300101 et. seq., Section 302103(2)(B) gives the Secretary of the Interior the authority to designate and remove the designation of National Historic Landmarks. 54 U.S.C. § 302103(2)(B); 36 C.F.R. § 65.9 (discussing withdrawal of National Historic Landmark designation by the Secretary of the Interior). The Capitol was designated as a National Historic Landmark in December 1960, and the National Park Service (on the Secretary of the Interior's behalf) continues to recognize that designation to this day. *See* List of NHLs by State – National Historic Landmarks (U.S. National Park Service) (nps.gov), https://www.nps.gov/subjects/nationalhistoriclandmarks/list-of-nhls-by-state.htm (last visited April 4, 2024) (listing the United States Capitol as a National Historic Landmark and noting its December 1960 designation date); *see also* 36 C.F.R. § 65.1(c) ("The National Park Service (NPS) administers the National Historic Landmarks Program on behalf of the Secretary"). |
| Specific Offense Characteristics | | U.S.S.G. § 2B1.5(b)(6): "If a dangerous weapon was brandished or its use was threatened, increase by 2 levels. If the resulting offense level is less than level 14, increase to |

| | | |
|---|---|---|
| | | level 14." |
| | | Bozell picked up a "heavy metal object" from the ground on the West Terrace as he approached the Senate Wing Doors and he "used the object to smash two windows near the Senate Wing Door" for a total of at least 21 times. Trial Tr. at 505, 9/8/23 (Trial Verdict). The moment that Bozell began smashing the two windows by the Senate Wing Doors was a pivotal one on January 6. Bozell was the first rioter to break glass on the Senate Wing Door windowpane, which not only led to the physical breach of the Capitol Building but inspired other rioters' brazen actions. At the time that Bozell started smashing the windowpane, many lawmakers and staffers had not been evacuated or sheltered-in-place. Bozell's actions and pivotal role in the initial breach of the Capitol building helped to place all of their lives in danger. |
| Offense Level | 14 | |
| Chapter 3 Adjustment | +2 | U.S.S.G. § 3C1.1: Bozell obstructed the administration of justice by repeatedly providing untruthful testimony under oath at trial. As the Court described in the oral verdict, Bozell testified untruthfully that "he smashed two windows near the Senate Wing door not in an attempt to gain access to the building but rather because he was so angry about the fact that the situation was deteriorating that he just wanted to break something." Trial Tr. at 505 (9/8/23) (Trial Verdict). In reality, Bozell picked up an object on his way to the entrance and "smashed those windows through 21 aggressive contacts with the windows with a heavy metal object in his hand." *Id.* As the Court found, "[i]n light of this sequence of events, Mr. Bozell's claim of a spontaneous decision to enter the Capitol building only after the windows were smashed is simply not credible." *Id.* |
| **Total** | **16** | |
| Adjustment (Terrorism) | 32 | U.S.S.G. § 3A1.4(a): "If the offense is a felony[4] that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than 32, increase to level 32." |
| | | A "federal crime of terrorism" is defined in 18 U.S.C. § 2332b(g)(5) and means an offense that "is calculated to |

---

[4] The evidence presented at trial demonstrated that the damage to this window exceeds the sum of $1,000, Trial Tr. 9/6/23 at 7, and thus Count Three constitutes a felony. The damage to the window in Count Two is less than $1,000 and thus constitutes a misdemeanor, to which Section 3A1.4 is not applicable.

influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and is a violation of a statute enumerated in 18 U.S.C. § 2332b(g)(5)(B), including 18 U.S.C. § 1361.

As discussed in more detail immediately below, Bozell committed his crimes on January 6 in an effort to stop or delay Congress from certifying the Electoral College vote, as charged in Count One and as reflected in his communications leading up to January 6. Bozell's attack first on the window of the door and second on the large window at the Senate Wing entrance of the building were specifically part of an effort to get inside the Capitol Building in order to stop or delay Congress from certifying the Electoral College vote. Bozell's actions of smashing these windows ultimately led to the rioters' initial breach, leading to emergency evacuations of the lawmakers and a recess of the Congressional proceeding. As demonstrated at trial, Bozell's intent was to intimidate members of Congress and the Vice President and thereby prevent or delay a fundamental activity of our Constitutional democracy, the peaceful transition of Presidential power following an election. Bozell also intended to retaliate against members of Congress who planned to certify the Electoral College vote, as reflected in text messages he sent prior to January 6, *e.g.*, reference to "tossing Schiff's office."

Judge Kelly held that the U.S.S.G. § 3A1.4 enhancement applied to the Offense Level calculation for violations of § 1361 in sentencing several individuals associated with the Proud Boys, including in the case of defendant Dominic Pezzola, who broke the same type of window that Bozell did with respect to his charged conduct in Count Two, but on the other side of the Senate Wing Door. *See United States v. Nordean*, 21-cr-175 (TJK); *see also United States v. Meggs*, 21-cr-00028 (APM), Dkt. 1171 at 46:14-19 (applying U.S.S.G. § 3A1.4, Note 4 upward departure, finding "certainly the conduct by the assaultive behavior toward officers, the threatening behavior toward officers, the presence with a mob of others, is conduct that is intimidating and coercive…"); *see also United States v. Southard-Rumsey*, 21-cr-00387 (APM) (finding requisite "calculation" and applying U.S.S.G. § 3A1.4, Note 4 upward departure for defendant convicted of violations of 18 U.S.C. §§ 111(a)(1), 231(a)(3), and 1512(c)(2)).

35

| Chapter 3 Adjustment | +2 | U.S.S.G. § 3C1.1: *see analysis for Count Two* |
|---|---|---|
| **Total** | **34** | |

### *Application of Section 3A1.4*

Section 3A1.4 of the Guidelines provides for an increased offense level and criminal history category when the offense was "a felony that involved, or was intended to promote, a federal crime of terrorism" as that term is defined by 18 U.S.C. § 2332b(g)(5). That statutory definition, in turn, involves two requirements: (1) that the offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct"; and (2) that the offense is one of the enumerated crimes listed in 18 U.S.C. § 2332b(g)(5)(B). Both of those criteria are met here; consequently, the Section 3A1.4 adjustment must apply to Bozell's conviction on Count Three.

Taking these elements in the reverse, the Section 3A1.4 adjustment applies if the offense "involved, or was intended to promote," one of the enumerated offenses listed at 18 U.S.C. § 2332b(g)(5)(B). "[A] defendant's offense 'involves' a federal crime of terrorism when his offense includes such a crime, *i.e.*, the defendant committed, attempted, or conspired to commit a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5), or his relevant conduct includes such a crime." *United States v. Awan*, 607 F.3d 306, 313–14 (2d Cir. 2010); *see also United States v. Arnaout*, 431 F.3d 994, 1001 (7th Cir. 2005) ("the word 'involved,' as used in § 3A1.4, signifies that where a defendant's offense or relevant conduct includes a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5)(B), then § 3A1.4 is triggered"); *United States v. Fidse*, 862 F.3d 516, 522 (5th Cir. 2017) (same); *United States v. Arcila Ramirez*, 16 F.4th 844, 850 (11th Cir. 2021) (same).

36

Count Three charged felony Destruction of Government Property in violation of 18 U.S.C. § 1361. This offense is listed in 18 U.S.C. § 2332b(g)(5)(B)(i). Accordingly, the defendant's conviction on Count Three qualifies as a "federal crime of terrorism."

Next, a defendant's offense is "calculated" to influence government or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct, as required by Section 3A1.4, if the offense was specifically intended to have the effect of influencing, affecting, or retaliating against government by force or the threat of force. *See, e.g.*, *United States v. Mohammed*, 693 F.3d 192, 201 (D.C. Cir. 2012) (defendant's narcoterrorism offense had requisite "calculation" where evidence showed defendant "specifically intend[ed] to use the commission from the drug sales to purchase a car to facilitate attacks against U.S. and foreign forces in Afghanistan"). While they are related, "calculation" for the Section 3A1.4 enhancement is distinct from a defendant's particular "motive" and a defendant need not be "personally motivated by a desire to influence or affect the conduct of government," so long as the predicate crime was "calculated to have such an effect." *United States v. Khatallah*, 314 F. Supp. 3d 179, 199 (D.D.C. 2018). Although "calculation may often serve motive," the enhancement's "calculation" requirement is satisfied if a defendant's offense was "planned—for whatever reason or motive—to achieve the stated object." *Awan*, 607 F.3d at 317 (Section 3A1.4 applied to defendant motivated by "prestige and potential influence obtained by associating with" another terrorist, even if defendant did not share the specific political motivation of that terrorist). Moreover, a defendant's intent to influence government conduct or retaliate against the government need not have been his "sole" or "primary" purpose and the "calculation" requirement may be satisfied even if a defendant's relevant conduct sought to "accomplish other goals simultaneously." *United States v. Van Haften*, 881 F.3d 543, 545 (7th Cir. 2018); *see also United States v. Haipe*, 769 F.3d 1189, 1193 (D.C. Cir. 2014) (defendant's "money-raising goals obviously

do not preclude a finding of intent to influence government policy," even if raising money was defendant's "primary purpose").

Indeed, Section 3A1.4 is applicable regardless of the defendant's claim that he believed that he was stopping a fraudulent election. *See United States v. Christianson*, 586 F.3d 532, 539 (7th Cir. 2009) (affirming application of the adjustment for defendants convicted under Section 1361 who professed they intended to "sav[e] our earth," because "the purpose behind defendants' actions was to further [their] political agenda: the end to industrial society"). As the Seventh Circuit explained, "it doesn't matter why the defendants oppose capitalism and the United States government—if they use violence and intimidation to further their views, they are terrorists." *Id.* So too with this defendant.

Here, Bozell's "relevant conduct" was specifically intended to have the effect of influencing, affecting, or retaliating against government by force or the threat of force. Bozell believed that the presidential election had been "stolen" and thus planned to respond through violence. Ahead of January 6, Bozell planned for this conduct, stating that he would be "bringing lighters and fire starters," Ex. 664.305.3; he expected that "[t]he world [wa]s about to get the shock of a lifetime," (Ex. 675.91.2); he was prepared to "go to DC and throw[] them all out," referring to lawmakers, Ex. 664.191; and he was planning on "tossing Schiff's office," Ex. 664.217.4. Bozell indicated that patriots were "ready" to respond, Ex. 628.23.2, and he referred to the day as "[t]he rally to end all rallies," Ex. 676.12.1-.3. Bozell acknowledged that things might "get violent at the capital," Ex. 607.6.4, but he traveled to Washington, D.C. anyway.

And on January 6, as demonstrated by his convictions for obstruction of an official proceeding, interference with law enforcement officers during a civil disorder, and assaulting, resisting, or impeding federal officers, Bozell attempted to and temporarily did prevent Congress from certifying the 2020 Electoral College vote and physically prevented Members of Congress from

38

performing their constitutional duties inside the Capitol building, all through the planned, threatened, and actual use of force. Bozell not only joined the mob in overrunning numerous police lines to gain access to the Capitol building, but he used physical force in breaking through two windows to make his entry. And once inside, Bozell joined another mob in overrunning officers to gain access to the Senate Gallery, and ultimately the Senate Floor. These were not random acts—they were intentional acts done for the overarching purpose of influencing government action.

After breaching the Capitol and halting the Certification, the defendant's statements continued to indicate that his intent had been to coerce and intimidate the government. He explained that the "Capitol siege was morally justified" and called the former Vice President a "traitor" for his part in certifying the election results. Ex. 668.249.1-.4.

Moreover, the defendant's choice of target, itself—the Capitol building, where Congress was in session—further evidences his intent to intimidate and affect the government. A defendant's specific intent to influence and retaliate against government conduct for purposes of Section 3A1.4 can often "be inferred from the defendant's choice of target." *Abu Khatallah*, 314 F. Supp. 3d at 198. Attacking a government facility that is "a physical manifestation of the U.S. government . . . suggests a desire to retaliate against or influence that government." *Id.* at 199. That is why, "[u]nsurprisingly . . . , several courts have applied and upheld the terrorism enhancement for defendants who targeted government facilities." *Id.* (citing cases). Clearly, attacking the seat of our government while the entire complement of legislators and the Vice President of the United States are inside performing their constitutional and statutory duties is a strong indication of intent to influence or affect the government.

In short, the defendant's offenses displayed a clear intent to stop Congress from certifying the results of the election through the use of both physical force and property destruction. That conduct

is a quintessential example of an intent to influence and retaliate against government conduct through intimidation or coercion and warrants the application of the terrorism enhancement pursuant to Section 3A1.4.

### 4. Count Four, 18 U.S.C. §§ 231(a)(3), 2 (Civil Disorder, Aiding and Abetting) (interfering with and obstructing officers on the Northwest Staircase)

Since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, use "the most analogous guideline." U.S.S.G. § 2X5.1. Here, that is U.S.S.G. § 2A2.4, "Obstructing or Impeding Officers."

| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a): Obstructing or Impeding Officers |
|---|---|---|
| Specific Offense Characteristics | +3 | U.S.S.G. § 2A2.4(b)(1):  "If (A) the offense involved physical contact . . .  increase by 3 levels."<br><br>As the Court found during the oral verdict, Bozell made physical contact with police officers on the Northwest Stairs. Trial Tr. at 513 (9/8/23) (Trial Verdict). Bozell was at the front of the police line, standing face-to-face with the officers, as a rioter standing directly next to Bozell coordinated the crowd by yelling, "ARE YOU READY TO PUSH? LET'S PUSH! . . . PUSH!" With Bozell at the front of that mob as it squared off against the officers who were protecting the Capitol building and its lawful occupants, Bozell and his fellow rioters barreled through the police line, making physical contact with the officers. *Id.* at 515-516. The Court also found that Bozell made physical contact "forcibly." *Id.* |
| Cross Reference | | U.S.S.G.  §  2A2.4(c)(1):  "If  the  conduct  constituted aggravated assault, apply § 2A2.2 (Aggravated Assault)."<br><br>Section 2A2.2 defines "aggravated assault" as a "felonious assault that involved … (D) an intent to commit another felony." U.S.S.G. § 2A2.2 cmt. n.1.<br><br>The cross-reference in § 2A2.4(c) applies here because Bozell's  assault  of  officers  on  the  Northwest  Stairs constituted aggravated assault under U.S.S.G. § 2A2.2 cmt. |

| | | n.1(D) because Bozell engaged in a civil disorder with the intent to commit "another felony," that is, obstruction of a Congressional proceeding in violation of 18 U.S.C. § 1512(c)(2); destruction of government property in violation of 18 U.S.C. § 1361; and assault on federal officer in violation of 18 U.S.C § 111(a)(1). |
|---|---|---|
| Base offense level | 14 | U.S.S.G. § 2A2.2 (a) |
| Official Victim | +6 | U.S.S.G. § 3A1.2(b): "If the victim was a government officer or employee, the defendant's criminal action was motivated by that status, and the applicable base offense level Guidelines is from Chapter Two, Part A (Offenses Against the Person), a 6-level enhancement applies. |
| | | Bozell assaulted police officers on the Northwest Stairs as part of his civil disorder. Bozell's assault was motivated by the fact that the officers were doing their job protecting members of Congress and keeping rioters from accessing the upper terrace and ultimately from entering the building. Bozell assaulted the officers because he wanted to enter the Capitol to stop the certification of the 2020 Election, and the line of officers prevented him from achieving his goal. |
| Chapter 3 Adjustment | +2 | U.S.S.G. § 3C1.1: Bozell obstructed the administration of justice by repeatedly providing untruthful testimony under oath at trial.  As the Court described in the oral verdict, Bozell testified untruthfully that "many of his actions on the Northwest Steps were motivated by a desire to 'help' the officers defending the Capitol," which is "not consistent . . . with the evidence." Trial Tr. at 504 (9/8/23) (Trial Verdict). Bozell testified that he attempted to pull aside a white tarp to help officers and rioters see each other better to de-escalate the situation—but that was contradicted by the evidence, which showed that "officers and rioters were clashing immediately to [Bozell's] right and there was a wall several feet behind the tarp that blocked visibility further up toward the Capitol." *Id.* Bozell also untruthfully testified that he waved to summon law enforcement support, even though video footage show that he was facing the *crowd* when waving. *Id.* Finally, Bozell untruthfully testified that he thought the police officers were "leading the rioters up to the Capitol" when the line broke, but the evidence demonstrated that, by that time, Bozell "had seen multiple clashes between officers and rioters as *rioters* attempted to |

41

| | | |
|---|---|---|
| | | pushed upwards and *officers* attempted to maintain a perimeter at the Capitol." *Id.* at 504-505. |
| **Total** | **22** | |

**5.  Count Five, 18 U.S.C. § 111(a)(1) (Assaulting, Resisting, or Impeding Certain Officers) (assault on police officers on the Northwest Stairs)**

The Statutory Index lists two guidelines for a Section 111 offense: U.S.S.G. § 2A2.2 (Aggravated Assault) and U.S.S.G § 2A2.4 (Obstructing or Impeding Officers).   The guidelines direct that, if Appendix A lists more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction.  *See* § 1B1.2 n.1.   Here, the most applicable guideline is § 2A2.4 (Obstructing or Impeding Officers).

| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Specific Offense Characteristics | +3 | U.S.S.G. § 2A2.4(b)(1): As the Court found during the oral verdict, Bozell made physical contact with police officers on the Northwest Stairs. Trial Tr. at 513 (9/8/23) (Trial Verdict). Bozell was at the front of the police line, standing face-to-face with the officers, as one rioter standing directly next to Bozell coordinated the crowd by yelling, "ARE YOU READY TO PUSH? LET'S PUSH! . . . PUSH!" With Bozell at front, rioters barreled through the police line, making physical contact with the officers. The Court also found that Bozell made physical contact "forcibly." *Id.* at 515-516. |
| Cross Reference | | U.S.S.G. § 2A2.4(c)(1): *see analysis for Count Four* |
| Base offense level | 14 | U.S.S.G. § 2A2.2 (a) |
| Official Victim | +6 | U.S.S.G. § 3A1.2(c)(1): *see analysis for Count Four* |
| Chapter 3 Adjustment | +2 | U.S.S.G. § 3C1.1: *see analysis for Count Four* |
| **Total** | **22** | |

**6.  Count Six, 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds)**

The Statutory Appendix lists two guidelines for a Section 1752 offense: U.S.S.G. § 2A2.4

(Obstructing or Impeding Officers) and § 2B2.3 (Trespass). The Guidelines direct that, if Appendix A specifies more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. *See* § 1B1.2 n.1. Here, the most applicable guideline is § 2B2.3.

| Base Offense Level | 4 | U.S.S.G. § 2B2.3(a) |
|---|---|---|
| Specific Offense Characteristics | +2 | U.S.S.G. § 2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds." <br><br> On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Cross Reference | | U.S.S.G. § 2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply § 2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." <br><br> Bozell trespassed with the intent to obstruct an official proceeding in violation of 18 U.S.C. § 1512.[5] |
| Base offense level (adjusted) | 16 (from Count One: base 14 under 2J1.2(a) + 2 under 3C1.1) | U.S.S.G. § 2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." <br><br> As described above, Bozell entered the restricted area of the Capitol to obstruct the official proceeding—that is, stopping Congress from fulfilling its constitutional and statutory duties. The substantive offense is thus Count One, and the base offense level and the Specific Offense Characteristics for that offense should be applied. |
| **Total** | **16**[6] | |

### 7. Count Seven, 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds)

The Statutory Appendix lists two guidelines for a Section 1752 offense: U.S.S.G. § 2A2.4

---

[5] The Court could also cross-reference to Bozell's conviction under 18 U.S.C. § 231(a)(3), Civil Disorder. The resulting total offense level would be 22.

[6] The statutory maximum term of imprisonment for a violation of 18 U.S.C. § 1752(a) is one year.

(Obstructing or Impeding Officers) and § 2B2.3 (Trespass). The Guidelines direct that if Appendix A specifies more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. *See* § 1B1.2 n.1. Here, since 18 U.S.C. § 1752(a)(2) includes behavior beyond mere trespass, the most applicable guideline is U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers).

| | | |
|---|---|---|
| Base Offense Level | 10 | Pursuant to U.S.S.G. § 2A2.4(a), the base offense level is 10. |
| Specific Offense Characteristics | +3 | U.S.S.G. § 2A2.4(b)(1)(A): *see analysis above Count Four* |
| Cross Reference | | U.S.S.G. § 2A2.4(c)(1): *see analysis for Count Four* |
| Base offense level | 14 | U.S.S.G. § 2A2.2 |
| Chapter 3 Adjustment | +2 | U.S.S.G. § 3C1.1: *see analysis for Count Four* |
| **Total** | **16** | |

### 8. Counts Eight, Nine, and Ten, 40 U.S.C. §§ 5104(e)(2)(D), (F), (G)

| | | |
|---|---|---|
| Base Offense Level | N/A | Because these offenses are Class B misdemeanors, the Guidelines do not apply to them.  *See* 18 U.S.C. § 3559; U.S.S.G. § 1B1.9. |

### B.      Grouping

The offenses charged in Counts One, Six, and Seven constitute a single group because the victim is the U.S. Congress, and they are also connected with the same common criminal objective: to stop the certification of the Electoral College vote. *See* U.S.S.G. § 3D1.2(a) and (b).

The offenses charged in Counts Four and Five group because Count Four "embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to" the Count Five offense of violating 18 U.S.C. § 111(a)(1).

The offenses charged in Counts Two and Three (destruction of government property) involve the same victim, the Architect of the Capitol, and therefore constitute a single group. *See* U.S.S.G.

§ 3D1.2(a).

The conduct underlying Count One (obstruction of an official proceeding) is treated as a specific offense characteristic in, or other adjustment to, Count Three. Therefore, Counts Two and Three group with Counts One, Six, and Seven.

Therefore, counts are grouped in the following manner:

| Group One | Victim | Offense Level |
|---|---|---|
| Count 1 – 18 U.S.C. § 1512(c)(2) | (Congress) | (OL: 16) |
| Count 2 – 18 U.S.C. § 1361 | (Architect of Capitol) | (OL: 16) |
| Count 3 – 18 U.S.C. § 1361 | (Architect of Capitol) | (OL: 34) |
| Count 6 – 18 U.S.C. § 1752(a)(1) | (Congress) | (OL: 16) |
| Count 7 – 18 U.S.C. § 1752(a)(2) | (Congress) | (OL: 16) |

| Group Two | | |
|---|---|---|
| Count 4 – 18 U.S.C. § 231(a)(3) | (Officers on NW Stairs) | (OL: 22) |
| Count 5 – 18 U.S.C. § 111(a)(1) | (Officers on NW Stairs) | (OL: 22) |

**C.      Multiple Count Adjustment**

Units are assigned pursuant to U.S.S.G. § 3D1.4(a), (b) and (c). One unit is assigned to the group with the highest offense level. One additional unit is assigned for each group that is equally as serious or from 1 to 4 levels less serious.

| **Count** | **Adjusted Offense Level** | **Units** |
|---|---|---|
| Group 1 | 34 | 1 |
| Group 2 | 22 | 0 |
| | | |
| **Total Number of Units:** | | 1 |
| | | |
| Greater of the Adjusted Offense Levels Above: | | 34 |
| | | |
| Increase in Offense Level: the offense level is increased pursuant to the number of units assigned by the amount indicated in the table at U.S.S.G. § 3D1.4: | | +0 levels |
| | | |
| **Combined Adjusted Offense Level:** | | **<u>34</u>** |

**D.     U.S.S.G. § 4C1.1**

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply in this case for two independently sufficient reasons. First, Section 4C1.1 does not apply because Bozell used violence or the credible threats of violence against police officers during his assault against officers on the Northwest Stairs, as well as when the defendant joined rioters in pushing through police officers and forcing open the East Rotunda Doors. *See* U.S.S.G. § 4C1.1(3). Second, Section 4C1.1 does not apply because, as explained above, the terrorism enhancement applies under Section 3A1.4. *See* U.S.S.G. § 4C1.1(2).

**E.     Criminal History Category**

Under U.S.S.G. § 3A1.4(b), the defendant's Criminal History Score "shall" increase to VI. PSR ¶ 115.

**F.     Total**

Accordingly, based on the government's calculation of Bozell's total adjusted offense level at 34, Bozell's Guidelines imprisonment range is 262-327 months of imprisonment.[7]

---

[7] Note that in a case involving multiple counts with different statutory maximum punishments such as this one, there is still a single Guidelines range. *See* U.S.S.G. §§ 3D1.4, 5G1.2; *United States v. Haynes*, 640 F. App'x 540, 541 n.1 (7th Cir. 2016). "The federal sentencing guidelines direct the judge, when there are multiple counts of conviction, to impose maximum and consecutive sentences to the extent necessary to make the total punishment equal in severity to what the guidelines would require were it not for the statutory maxima." *United States v. Veysey*, 334 F.3d 600, 602 (7th Cir. 2003); *United States v. Brown*, 843 F.3d 74, 82 (2d Cir. 2016) (explaining the application of U.S.S.G. § 5G1.2 for multiple counts of conviction); *see also United States v. Lewis*, 594 F.3d 1270, 1275 (10th Cir. 2010) (where the guidelines recommendation was life in prison but none of the crimes of conviction allowed for a life sentence, the district court correctly imposed consecutive maximum sentences on all counts).

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration. Here the properly calculated advisory guidelines range is 262-327 months of imprisonment, which is considered presumptively reasonable and is reasonable in light of defendant's conduct. As explained in more detail herein, the government's recommendation of 140 months incorporates a downward variance that ultimately results in a sentence of incarceration that is consistent with the sentences reserved for those most culpable for the events of January 6th, while also reflecting the defendant's unrelenting, wide-ranging, unlawful actions during the riot.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Bozell's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Bozell's actions were integral to the success of the mob. Not only did Bozell join mobs of rioters at various points in the building to outnumber and overpower police officers who were trying to gain back control of the building, but he facilitated the mob's access to the building when he rushed to the Senate Wing Door and smashed two windows to gain access to the building. Once inside, Bozell was not only one of the relatively few rioters who occupied the Senate Chamber shortly after Congress evacuated, but that was only a sliver of his obstructive and assaultive conduct on January 6. Bozell bears the distinction of being in more than a dozen areas of the Capitol building, many at the most pivotal moments of the day. Without individuals like Bozell, who brazenly plowed through any obstacle in his way—including numerous lines of officers on the west front, the Senate Wing Door and the adjacent window, and officers inside the building in

47

numerous locations—the riot would not have succeeded in delaying the certification vote by several hours. Bozell's relentless actions not only facilitated the breach, but no doubt encouraged others. The nature and circumstances of Bozell's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 140 months of incarceration.

**B.      The History and Characteristics of the Defendant**

Bozell is a 44-year old Inspector/Salesman from Palmyra, Pennsylvania. He graduated high school. PSR ¶ 143. Bozell has been regularly employed as an Inspector/Salesman at two companies. PSR ¶ 146. Bozell was admittedly raised in a loving and supportive family. *See* PSR ¶ 121..

Bozell has had several criminal convictions as an adult, including Reckless Driving (PSR ¶ 111), Driving Under Revocation/Suspension (PSR ¶ 112), Driving Under Revocation/Suspension (PSR ¶ 113), and Drunk in Public (PSR ¶ 114), and he has a long list of 18 traffic arrests/convictions (PSR ¶ 116). Most of these convictions are dated. Bozell also has had some history of alcohol and drug abuse. *See* PSR ¶¶ 140-142.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a lengthy sentence of incarceration. Bozell's criminal conduct on January 6 not only flouted the rule of law but eviscerated it. A lesser sentence for a leader of the riot would suggest to the public, in general, and other rioters, specifically, that the court does not take seriously the actions of someone who does everything in his power to subvert the constitutional process.

### D.     The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[8] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to Bozell also weighs heavily in favor of a lengthy term of incarceration. Bozell has not exhibited remorse for his participation or leadership in one of the darkest days our democracy since the end of the Civil War. After January 6, Bozell minimized his actions and role in the attack on the Capitol to his family and friends, claiming that he was a victim rather than a perpetrator. For example, he encouraged his brother to convince their father to retract their father's public condemnation of violence on January 6 and he repeatedly blamed police officers and antifa for any negative outcomes of the day. And despite his own involvement in smashing two windows to create entry points for the mob and joining rioters to force open another entry point, Bozell remarkably claimed to all who would listen that the Capitol Police let the mob in.

Even at trial, despite his counsel's representations that Bozell accepted responsibility for the majority of the crimes charged, Bozell testified at direct odds with acceptance of responsibility, and with reality. He made up outlandish stories and excuses about his actions and intent on that day. He claimed, for example, that he roamed through the Capitol building for nearly an hour because he was

---

[8] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

looking for his mother, despite no evidence that he ever called or texted her (despite being on his mobile telephone throughout the day) and despite that his actions were inconsistent with that story. Trial Tr. at 356 (9/7/23). He testified that, in several instances, he was attempting to *help* police officers, despite consistently pairing himself with violent, aggressive rioters who physically confronted and assaulted police officers. Trial Tr. at 290, 376 (9/7-8/23). And he minimized his conduct, such as when he testified that he was pushed up the stairs even though the video evidence shows that he followed his fellow rioter's direction to "PUSH!" and then he ran up the stairs and continued towards the Capitol once off the stairs. He claimed he did not know he was helping to push open doors to allow people from outside the Capitol to come inside, because he was too short, even though video footage shows Bozell with a clear view of the large windows ahead of him and despite that rioters around him yelled, "let's push to get them in!" He claimed he didn't see barriers, despite tearing through scaffolding, standing directly behind bike racks that were overrun, and violently breaking two windows. Bozell has repeatedly attempted to mislead the Court to paint himself in a light that is plainly inconsistent with the facts.

Bozell's failure to accept responsibility, his minimization of his conduct, and his extreme actions in furtherance of political gain demonstrate that his sentence must be sufficient to provide specific deterrence from committing future crimes of violence, particularly in light of an approaching Presidential-election cycle that, regrettably, has the potential for more violent conflict.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past

practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. Here, the application of Section 3A1.4 plays a significant role in the calculation of the advisory guidelines range. The application of Section 3A1.4 is required and appropriate here due to Bozell's conduct, which includes a federal crime of terrorism. At the same time, the government's recommendation in this case must align with the sentences imposed on the most culpable actors on January 6, and this consideration is reflected in the government's ultimate sentencing recommendation of 140 months of incarceration.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). The goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6)

is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). Many salient differences explain the differing recommendations and sentences in cases involving the Capitol breach on January 6.[9] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following case provides a comparison to the relevant sentencing considerations in this case.

In *United States v. Pezzola*, 21-cr-175 (TJK), Pezzola's advisory sentencing guidelines range, after the imposition of Section 3A1.4 for a federal crime of terrorism (*i.e.*, 18 U.S.C. § 1361), was calculated by the Court to be 210-262 months of imprisonment. The government recommended 240 months of incarceration, and the court sentenced Pezzola to 120 months of incarceration following his convictions to eight felony offenses.

On January 2, 2021, Pezzola joined the Proud Boys' "Ministry of Self Defense," a small group within the Proud Boys selected by their leadership who intended to respond to the former president's announcement of an election-related rally on January 6. Once on Capitol grounds on January 6, Pezzola and other Proud Boys helped lead the charge up the initial breach of the Capitol grounds at First Street. Pezzola and dozens of other rioters who were led to the Capitol by the Proud Boys were among the first rioters to enter the restricted area surrounding the Capitol building. While in the West Plaza of the Capitol, Pezzola and other rioters forcefully grabbed one officer's shield and pulled the officer to the ground. Pezzola, like Bozell, joined the group of rioters that stormed past officers on

---

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

the Northwest Stairs and charged forward towards the Capitol. Once he reached the building, Pezzola used the stolen police shield to bash through the windows[10] immediately south of the Senate Wing Door, allowing the first rioters to enter the Capitol.[11] Pezzola entered the Capitol building in the initial group of rioters, like Bozell. Afterwards, Pezzola filmed a video of himself having a "victory smoke in the Capitol." Pezzola's admitted goal in smashing the window was for someone inside the building to hear him, and he believed this was a way to get the government to listen to him.

Both Pezzola and Bozell planned ahead for January 6. For Pezzola's part, for the few days prior to January 6, he joined a group chat that prepared and planned for January 6, including organizing what participants would wear, bring, and do. Bozell, on the other hand, acted alone, but with no less preparation or anticipation of violence. He encouraged his family and friends to attend January 6, claiming that it would be their "last chance" to stand up for their country. He communicated with the organizers of the "Stop the Steal" rally so that he could provide entertainment for the events. He communicated with family members about his intentions for the day, referencing "tossing" a lawmaker's office, running through police lines, and using force to break in and steal "intel." Bozell planned, as early as December 2020, to go to the Capitol on January 6, and he followed through with those intentions.

---

[10] Pezzola helped to break two separate windowpanes and was convicted of violating Section 1361. Similarly, Bozell smashed both the windowpane of the Senate Wing Door and a windowpane to the north of the Senate Wing Door. Both of those broken windows became primary conduits for the first wave of rioters to enter the building.

[11] For reference, this was the same window but on the opposite side of the Senate Wing Door that relates to Count Two in Bozell's case.

Although both defendants based a window to gain access to the Capitol and then entered the building, Bozell's actions once inside the building were more extensive than Pezzola's actions in certain regards. For example, unlike Pezzola, Bozell:

- entered the Senate Chamber—both in the Gallery and on the Floor;
- entered numerous sensitive spaces, including Speaker Pelosi's office and a private meeting room outside the Senate Chamber;
- aided the mob in forcing open another major breach point at the East Rotunda Doors; and
- *repeatedly* plowed through police lines. For example, Bozell not only joined the mob in overrunning police lines on the Northwest Stairs (like Pezzola), but he also joined rioters in overrunning officer lines near the Senate Carriage Door and near the Senate Chamber, and he helped to force open the East Rotunda Doors, which were guarded by police officers who were visibly crushed between the rioters and the doors.

Moreover, Pezzola remained in the Capitol building for only 23 minutes. Bozell remained for nearly an hour. Pezzola's and Bozell's charged conduct is similar, [12] and Bozell's individual contributions to the riot on January 6 warrant a significant sentence. Moreover, Bozell's fantastical testimony and lack of remorse underscores the need for a significant sentence.

Next, in *United States v. Reffitt*, 21-cr-32 (DLF), following convictions on five counts, defendant Reffitt was sentenced to 87 months of incarceration. Prior to January 6, Reffitt indicated his intent to obstruct the Congressional proceeding and commit acts of violence. He said, for example, that he intended to remove legislators from the building and "take over" Congress. Then, on January 6, while armed with a handgun in a holster on his waist, wearing a tactical helmet and bulletproof armor, and carrying police-style flexicuffs, Reffitt confronted three U.S. Capitol Police officers on

---

[12] Pezzola was convicted of two counts of violating 18 U.S.C. § 1361 (as well as violations of 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 231; and 18 U.S.C. § 111(a)(1)). In Pezzola's case, Judge Kelly held that the Section 3A1.4 enhancement applied to the offense level calculation for violations of § 1361. Thus, like the government's and the Probation Office's calculations in this case, Pezzola's offense level increased to 32 and his criminal history category increased to VI. Here, however, the government's guidelines calculations, with the application of Section 3C1.1, bring Bozell to an offense level of 34.

the Northwest Stairs (the same group of officers that Bozell and the mob later overran). Reffitt rushed at the officers as the officers unsuccessfully tried to repel him with two different types of less-than-lethal projectiles before successfully halting his advances with pepper spray. Before and after being hit with pepper spray, Reffitt encouraged other rioters to charge forward at the officers, which they did both by moving up the stairs and by climbing up through the scaffolding. Reffitt repeatedly told other rioters than he was going to take over the Capitol by, in part, physically removing the legislators who were working inside. After January 6, Reffitt continued to champion the riot and expressed that he would do it again.

Bozell's conduct on January 6 was far more extensive than Reffitt's conduct, and thus warrants a significantly longer sentence. Although Reffitt confronted a line of officers and, through his brazen actions, encouraged other rioters to confront police officers, Reffitt's actions were limited to the Northwest Stairs outside the building. Bozell overran this same line of officers on the Northwest Stairs as a warmup act—Bozell then joined mobs in overrunning and overpowering several additional police lines outside and inside the Capitol building, and Bozell created a key point of entry for the first rioters to enter the building by smashing out a window at the Senate Wing Door. Reffitt's actions were inherently dangerous because he carried a weapon on January 6, which is a significantly aggravating factor, but for his part, Bozell armed himself with a hard metal object and then *used* that object to create an access point for the mob to enter the building. Thus, not only did Bozell make it inside the building – whereas Reffitt did not – but he was also instrumental in facilitating access for the mob. Moreover, during his almost hour inside the Capitol building, unlike Reffitt, Bozell occupied both the Senate Gallery and Senate Floor, Speaker Pelosi's office, and more than a dozen locations through the building. Despite several attempts to remove Bozell from the building, officers were unable because Bozell continually and strategically positioned himself with the mass of rioters that

outnumbered officers. Like Reffitt, Bozell expressed little remorse for his conduct following January 6, and Bozell took the stand and offered fantastical testimony. Therefore, a significantly longer sentence is warranted for Bozell.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).

First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). In this case, Bozell was convicted of numerous violations of offenses under Title 18, so the VWPA applies, and the Court can order restitution accordingly.

Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, including "an offense against property under" Title 18. 18 U.S.C. § 3663A(c)(1)(A)(ii). The MVRA applies to certain offenses where there is "an identifiable victim or victims [that have] suffered … pecuniary loss." *Id.* at § 3663A(c)(1)(B). Here, Bozell's violations of 18 U.S.C. § 1361 were " "offenses against property."  that involve an identifiable victim—the Architect of the Capitol, the federal agency charged with operating and maintaining the physical and esthetic integrity of the Capitol Building and Grounds, and from whose budget the repairs to the Capitol for damage caused by the January 6 riot were paid. *See* 18 U.S.C.

§ 3663A(a)(2) ("'[V]ictim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered."). Therefore, the Court must order restitution under the MVRA.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[13]

---

[13] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A) (requiring that, for restitution imposed under § § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C. § 3664(h). That latter approach is appropriate here.

Applying these principles, the Court *must* require Bozell to pay restitution under the MVRA of $1,905 for damaging, and aiding and abetting the damaging, of the Senate Wing Door (Count Three) and $824 in restitution for damaging the window near the Senate Wing Door (Count Two). The Court should require Bozell to pay restitution under the VWPA in an additional amount of $2,000 for Bozell's felonious conduct at the Capitol on January 6 in the remaining Counts. The first two amounts – totaling $2,729 – reflect the cost of repairing the Senate Wing Door and nearby window, costs to which Bozell stipulated at trial. The remaining $2,000 amount fairly reflects Bozell's role in the overall January 6 attack and the damages resulting from the remainder of Bozell's conduct on January 6, for which he was convicted in the remaining Counts.

Significantly, in other January 6 cases in which defendants have pleaded guilty to felony offenses pursuant to plea agreements and the defendants were not charged with damaging specific items of property, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court. Accordingly, a $2,000 restitution amount for Bozell's overall participation in the January 6 attack, in addition to the $2,729 restitution amount for the property that Bozell was personally and specifically responsible for destroying, avoids sentencing

58

disparities. *See United States v. Faulker*, 21-cr-126 (BAH) (awarding $10,560 restitution for damaging windowpanes); *United States v. Kenyon*, 21-cr-726 (CJN) (awarding $41,315.25 restitution for damaging a window and $2,000 for participation in the Capitol riot); *United States v. Grider*, 21-cr-22 (CKK) (awarding $3,044 restitution for damaging the House Speaker's lobby doors and $2,000 for participation in the Capitol riot); *United States v. Gardner*, 21-cr-622 (APM) (awarding $1,500 restitution for damaging for a window and $2,000 for participation in the Capitol riot); *United States v. Bilyard*, 22-cr-34 (RBW) (awarding $1,500 restitution for damaging a window and $2,000 for participation in the Capitol riot); *United States v. Ehmke*, 21-cr-126 (TSC) (awarding $2,821 restitution for damaging for windowpanes).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 140 months of incarceration, 3 years of supervised release, $4,729 in restitution, and a $580 mandatory special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By:      */s/ Ashley Akers*
ASHLEY AKERS
MO Bar #69601
Trial Attorney
United States Attorney's Office
601 D Street, N.W.
Washington, DC 20530
Phone: (202) 353-0521
Email: Ashley.Akers@usdoj.gov

Brendan Ballou
DC Bar No. 241592
Special Counsel, Detailee
950 Constitution Avenue
NW Washington, DC 20530
(202) 431-8493
brendan.ballou-kelley@usdoj.gov